# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Michael H. Holland, Michael W. Buckner, B.V. Hyler and Steven F. Schaab as Trustees of the United Mine Workers of America 1974 Pension Trust, <br><br> Plaintiffs, <br><br> v. <br><br> Freeman United Coal Mining Company, et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 07-cv-00490 (PLF/AK) |
| Freeman United Coal Mining Company, <br><br> Plaintiff, <br><br> v. <br><br> United Mine Workers of America, et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 07-cv-01050 (PLF/AK) |

**MONTEREY COAL COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT FILED BY THE TRUSTEES OF THE UNITED MINE WORKERS OF AMERICA 1974 PENSION TRUST AND IN SUPPORT OF MONTEREY'S ALTERNATIVE MOTION THAT THE COURT DENY THE TRUSTEES' MOTION IN ORDER TO PERMIT DISCOVERY**

Monterey Coal Company ("Monterey") submits this memorandum of points and authorities in opposition to the Motion for Summary Judgment filed by Michael H. Holland, Michael W. Buckner, B.V. Hyler, and Steven F. Schaab, in their capacity as Trustees of the United Mine Workers of America 1974 Pension Trust ("Trustees") in Case No. 07-cv-00490. Additionally, Monterey requests that the Court deny the Trustees' motion in order to allow necessary discovery. The basis for denial of the Trustees' motion pending completion of

discovery is described in the Affidavit filed pursuant to Rule 56(f) of the Federal Rules of Civil Procedure attached hereto as Attachment 1.[1]

## **INTRODUCTION**

The Trustees have sued Monterey and Freeman United Coal Company ("Freeman") asserting a breach of contract for failure to contribute to the United Mine Workers of America 1974 Pension Plan and Trust ("1974 Pension Trust") at the rates established in a contract referred to by the Trustees as the National Bituminous Coal Wage Agreement of 2007. Monterey and co-Defendant Freeman have asserted, and the Trustees have not denied, that in executing that agreement, which was negotiated by executives of Consolidation Coal Company ("Consol"), the Bituminous Coal Operators' Association ("BCOA") acted merely as an instrumentality or agent of a single employer – Consol. Thus, the most recent agreement executed by BCOA is legally dissimilar to other agreements negotiated by it as a multiemployer bargaining group. Accordingly, notwithstanding the Trustees' denomination of this agreement as a "National Bituminous Coal Wage Agreement of 2007", to avoid confusion between prior multiemployer group contracts negotiated by BCOA and the individual employer agreement negotiated by Consol and signed by BCOA in 2007, Monterey will refer to the latter agreement as the "Consol Agreement."

The Trustees' arguments in support of their claim against Monterey are identical to the arguments asserted against Freeman. In the interest of judicial economy, Monterey hereby

---

[1] This Court joined the Trustees' action against Monterey and Freeman United Coal Mining Company in Case No. 07-cv-00490 with Case No. 07-cv-01050, an action commenced by Freeman against the Trustees, the Bituminous Coal Operators' Association ("BCOA"), and the United Mine Workers of America ("UMWA") in Illinois that was subsequently transferred to this Court. To the extent the Court may consider arguments made by BCOA and/or the UMWA in considering the Trustees' entitlement to summary judgment against Monterey in Case No. 07-cv-00490, Monterey relies upon the arguments presented by Freeman in Case No. 07-cv-01050 and this Memorandum.

adopts, and incorporates by reference into this Memorandum, the Memorandum of Points and Authorities in Support of Freeman United Coal Mining Company's Opposition to the Motions for Summary Judgment Filed by the 1974 Pension Trust, United Mine Workers of America, and Bituminous Coal Operators' Association.  Monterey also adopts and incorporates by reference, the reasons set forth in Freeman's separate motion requesting the Court to refrain from ruling on Plaintiffs' motions for summary judgment pending the completion of discovery in this case as well as the reasons set forth in Attachment 1 hereto.

Having joined in Freeman's memorandum, Monterey submits this memorandum to set forth arguments related specifically to Monterey demonstrating that the Consol Agreement cannot be found as a matter of law to be a "successor" to the National Bituminous Coal Wage Agreement of 2002 ("2002 NBCWA") within the meaning of the "evergreen clause" in the 2002 NBCWA.  Monterey also advances an additional legal argument for denial of the Trustees' motion for summary judgment.

**ARGUMENT**

**I**

**THE CONSOL AGREEMENT CANNOT BE CONSTRUED AS A MATTER OF LAW TO BE A "SUCCESSOR AGREEMENT" TO THE NATIONAL BITUMINOUS COAL WAGE AGREEMENT OF 2002 WITHIN THE MEANING OF THE 1974 PENSION TRUST.**

As set forth in detail in Freeman's memorandum, there is, minimally, a factual dispute whether the Consol Agreement was the result of multiemployer bargaining or was negotiated by and for one employer, Consol.  Indeed, the Trustees do not assert in their Statement of Undisputed Material Facts that BCOA was a multiemployer group in negotiating and executing the Consol Agreement.  Instead, the Trustees contend that the Court must find, as a matter of

3

law, that an agreement negotiated by and for Consol is a "successor agreement" to the multiemployer group 2002 NBCWA. To prevail, the Trustees must establish that such a finding is the "only reasonable interpretation" of the term "successor agreement" in Article X of the 1974 Pension Trust and Article VIII.B.(16) of the 1974 Pension Plan. *United Mine Workers of America 1974 Pension Trust v. Pittston Co.*, 984 F.2d 469, 473 (D.C. Cir. 1993) (citing *Connors v. Link Coal Co.*, 970 F.2d 902, 904 (D.C. Cir. 1992)), *cert. denied*, 509 U.S. 924 (1993). The Trustees do not carry that burden.

The *sui generis* nature of multiemployer bargaining group lay at the heart of the *Pittston* decision. *Id.* Having relied upon the uniqueness of multiemployer bargaining in *Pittston*, the Trustees now contend that the individual-employer Consol Agreement is the "successor" to a multiemployer contract. That contention is not correct. Most certainly, it is not the only reasonable interpretation of the 1974 Pension Trust as demonstrated by the facts applicable to Monterey and the Trustees' own Exhibits.

1. Monterey's labor agreement expired on December 31, 2006, and, since that date Monterey has not had a contract with the Union.

Monterey terminated its previous labor contract with the UMWA effective December 31, 2006, and its employees have continued to work without a contract since that time. Thus, Monterey is not currently a signatory to a labor contract with the UMWA. As a result, Monterey was not a signatory to any contract with the UMWA at the time during which other companies independently negotiated with the UMWA and reached agreements similar to, but not identical with, the Consol Agreement.[2]

---

[2] In Paragraph 8 of their Statement of Uncontested Material Facts, the Trustees state that many other coal operators signed agreements mirroring the Consol Agreement but "some with minor modifications . . . ." (R. 46 at 4) (Record cites are to 07-cv-00490 (PLF/AK) unless otherwise noted). As set forth below, Monterey is entitled to discovery regarding such modifications as

2.    Declarations submitted by the UMWA Funds' undercut its argument.

Declarations filed by the Trustees demonstrate that the Consol Agreement is not a successor to the 2002 NBCWA. Addressing the evergreen provision in Article VIII.B.(16) of the 1974 Pension Plan, Roger Haynes, formerly a member of the BCOA standing committee on employee benefits and chairman of that committee from December 1971/January 1972 until mid-1979 declares:

> 18.    This provision, sometimes referred to as the "evergreen" clause, was designed to require each employer that signed the NBCWA of 1978 to continue making contributions to the UMWA Funds, and at the rate set forth in the NBCWA, as long as the NBCWA of 1978 and "successor agreements thereto" required such contributions. The term "successor agreements thereto" was intended to be successor national agreements, and not agreements between the UMWA and an individual company." This concept of successor national agreements was discussed with the UMWA on numerous occasions, and the UMWA agreed to it without objection. (Emphasis added.)

Declaration of Roger M. Haynes (R. 46, Attachment 13, at 12) (hereinafter, "Haynes Declaration").

According to the Haynes Declaration, the then-multiemployer BCOA and UMWA specifically agreed that the agreement between the UMWA and an individual company would not be a successor agreement to an NBCWA. That statement by the Chair of the BCOA Benefits Committee at the time when the BCOA and UMWA agreed upon the contract and Pension Plan language in question, standing alone, defeats the notion that the term "successor agreement" may "only" be reasonably interpreted to mean the individual-company Consol Agreement. The Haynes Declaration, however, does not stand alone.

---

part of its inquiry into the Trustees' contention that the Consol Agreement should be considered a national agreement.

David W. Kempken served on the BCOA-UMWA Benefits Subcommittee of the BCOA

Benefits Committee when the BCOA and UMWA reached the language in question. Mr.

Kempken's Declaration is as clear and unambiguous as Mr. Haynes. Mr. Kempken declares:

> 13. The term "successor agreement" in the evergreen clause was
> intended to refer to successor NBCWAs negotiated by BCOA and the UMWA,
> and not to other agreements negotiated by individual coal companies and the
> UMWA.

Declaration of David W. Kempken (R. 46, Attachment 11, at 8) (hereinafter "Kempken
Declaration").

The Trustees do not assert in their Statement of Uncontested Material Facts that the

Consol Agreement is an agreement between a multiemployer group and the UMWA. Monterey

avers that Consol, and Consol alone, negotiated the terms of the Consol Agreement. Clearly,

therefore, the Consol Agreement falls outside the sort of agreement referred to by Mr. Kempken.

Thus, the status of BCOA as a multiemployer group is disputed, and the Court must presume for

purposes of the Trustees' motion that the Consol Agreement is an individual employer

agreement – that is, exactly the sort of agreement that Haynes and Kempken declare is not a

successor agreement to an NBCWA.

Apparently aware of this fatal flaw, the Trustees seek to turn the individual-company

Consol Agreement into a "successor" agreement by claiming it is a "national" agreement as

mentioned in the Haynes Declaration. The Trustees contend that the Consol Agreement should

be considered a "national" agreement because, over the period of a few months after the

agreement was executed, many unionized bituminous coal operators in the eastern United States

signed separate contracts mirroring, with modifications, the Consol Agreement. Thus, the

Trustees rely upon the number of independent coal operators that subsequently signed an

agreement similar to the Consol Agreement. Under Trustees' proffered interpretation, therefore,

6

the Consol Agreement was not a "national" agreement when signed and its status as a national agreement was dependent upon conditions subsequent to its execution – namely, the extent to which other coal operators separately and independently decided to enter the identical agreement.[3]

The Trustees make no effort to explicate the requirements for such "after-acquired" national contract status, such as how many companies must sign a mirror agreement for the individual company agreement to become a "national" contract, whether "national" status depended upon the number of companies, tonnage, or represented employees subject to a mirror agreement, the date upon which the unstated threshold for such status was reached, or any other factors bearing upon the satisfaction of a condition subsequent. For example, would an agreement with Consol be a "national" agreement if agreements signed by other companies included a commitment to contribute to the 1974 Pension Trust, but differed materially in other respects? What if they mirrored the Consol Agreement in every respect except they did not include a provision requiring participation in the 1974 Pension Trust?

If there were conceivable merit to the contrivance of morphing an individual-company agreement into a national agreement and, in turn, a "successor" agreement by the independent, post hoc actions of separate entities, acceptance or rejection of such proffered interpretation would be reserved for the trier of fact. As set forth immediately below, however, it is illogical to

---

[3] If Trustees' argument were to prevail, it would send a powerful message to the unionized coal industry that the extent to which operators may negotiate separate pension obligations would depend upon the number of companies that execute an agreement mirroring the next Consol Agreement.

believe that the Consol Agreement could be considered a "successor" or a "national" agreement based upon the subsequent actions of independent companies.[4]

3. The UMWA's submission in the *Freeman United* case demonstrates that the Consol Agreement is not a "national" agreement and, thus, not a successor agreement.

Neither the UMWA nor BCOA has asserted in the Freeman Case No. 07-cv-01050 that they reached an agreement, tacit or express, that the UMWA would only sign identical agreements with other coal operators. The most that the Trustees can assert, therefore, is that the UMWA "intended" to seek an identical agreement in separate bargaining with each other bituminous coal operator in the Eastern coalfields. Indeed, that is what the Union asserts in its Memorandum of Points and Authorities in Case No. 07-cv-01050 where it admits that it only offered other coal operators the "opportunity" to sign an agreement mirroring the individual-employer Consol Agreement.

[C]onsistent with previous NBCWAs, the Union announced that it would provide coal companies that were not members of the BCOA with the opportunity to sign the 2007 agreement.[5]

UMWA's Memorandum of Points and Authorities in Support of their Motion for Summary Judgment filed in 07-cv-1050 (PLF) (R. 17, Attachment 1, at 9).

Moreover, attachments to a declaration by UMWA President Cecil Roberts submitted with the UMWA's Memorandum of Points and Authorities demonstrate the incontestable fact that no other coal operator was obliged to accept the Consol Agreement. In announcing that the

---

[4] The Trustees attempt to change subtly the contract issue whether an individual company agreement is a "successor" agreement into a debate whether it is a "national" agreement. Even were the key issue the definition of a "national" contract rather than the term "successor" agreement, the Trustees cannot prevail. The question before the trier of fact will be whether the Consol Agreement is a "successor" agreement not whether it is a "national" agreement.

[5] Of course, only one coal company – Consol – was a member of "BCOA."

8

Union membership had voted to approve the Consol Agreement, the Union stated in its press release that:

> The agreement will, at the outset, be between the UMWA and Consol Energy, which is the only company currently in the BCOA. The union will present the agreement to the other coal companies between now and mid-January.

> \* \* \*

> "We're going to give the other coal companies an opportunity to sign this agreement through the middle of January," Roberts said. "Hopefully, they will do that. But if they don't, the union will make a determination at that time as to what action we will take."

UMWA Press Release attached to Declaration of Cecil E. Roberts filed in 07-cv-1050 (PLF) (R. 17, Attachment 2, Exhibit A attached to Exhibit 1).

Thereafter, as other companies signed their own agreements, UMWA press releases identified each separate employer and stated it had signed an agreement that "mirrored" the BCOA signed Agreement. *Id.* Even according to the Union, therefore, the most that may be said about the Consol Agreement is that, on the date it was executed, the Union *intended* to ask other companies to sign an identical agreement.[6]  Further, the Union was not successful in that undertaking as it admits that some of the subsequent operators obtained modifications of the BCOA-signed Agreement, asserting without support that such modifications were "minor."

Further, nowhere in the Haynes Declaration does Mr. Haynes state or imply that by "national" agreement, he meant a pattern labor agreement independently executed, with

---

[6]  The Union did seek to stake out a position on the 1974 Pension Trust in the press release by asserting that other companies would be bound by the changes to the 1974 Pension Trust even if they did not agree to sign an agreement identical to the Consol Agreement. Of course, that self-serving insertion does not bear upon the outcome determinative issue in this case whether the Consol Agreement was a "successor" agreement. As to that issue, the paramount significance of the press release is the Union's explicit recognition that the Consol Agreement, when signed, was only an individual company agreement that other unionized coal operators could accept or reject and over which each operator had an independent right to bargain.

modifications, by a host of coal industry employers after separate employer bargaining.  As Freeman has demonstrated in its Memorandum in Opposition, there are critical legal differences between a pattern agreement and a successor agreement.  In the context of the Haynes Declaration, he clearly meant a new agreement between the Union and a multiemployer, industry-wide group to succeed a prior NBCWA.  The Trustees' contention that this Court may determine whether an agreement is "national" by reviewing it once it has been signed to determine if some undefined number of companies in the industry have executed it later simply does not square with its own declarations.

The Trustees' recognition that mere execution of the Consol Agreement did not consummate a national agreement means that the Trustees also recognize that each employer had the right to bargain for a separate and distinct agreement and, thus, was within its legal rights to reject the Union's request that they sign an agreement identical to the Consol Agreement.  In law and logic, therefore, when the Consol Agreement was signed no successor agreement existed and each company had a right to bargain over the terms of ongoing obligations to pensioners.  Under the Trustees' theory, that right was then lost by these separate, independent employers at some undefined later moment when an unspecified but sufficient number of companies executed "mirroring" agreements to the Consol Agreement.  The notion of such a "hiatus" in a successor agreement dependent upon the number of companies signing clearly is not even "a" reasonable interpretation of the meaning of "successor agreement" let alone the "only" reasonable interpretation.  As we understand the Trustees' position, at the time Monterey's UMWA labor agreement expired it may not have been subject to a continuing obligation to contribute at the rates contained in the Consol Agreement, but at some later point, when the Consol Agreement

was signed by a sufficient number of other unionized employers to bear the nomenclature of a "national" agreement, the evergreen clause was activated.

The more logical, more reasonable, lawful interpretation is that when the multiemployer group disintegrated, each company was free to bargain over its obligations to its own pensioners. Indeed, it stands the logic of the *Pittston* case on its head to suggest that group interests were to be protected by the decisions of *one* employer – Consol. Very likely, a trier of fact will be unable and unwilling to square the group concept of the evergreen clause with the notion that one company was free to establish to its own advantage terms of the 1974 Pension Trust that would continue to bind other, independent employers without regard to their specific circumstances and bargaining imperatives, and without their specific agreement to be bound thereto.

    4.    <u>Monterey contests facts asserted by Plaintiff and such contested facts must be determined by the trier of fact after trial.</u>

Declarations by the Union in Case No. 07-cv-01050 belie the assertion by the Trustees at Paragraph 5 of their Statement of Uncontested Material Facts that BCOA and the Union signed a "national" agreement. Monterey disputes that assertion contending, for the reasons set forth in this Memorandum, that the agreement between BCOA and the Union referred to in Paragraph 5 of Plaintiff's Statement of Uncontested Material Facts is an individual-company agreement that does not constitute either a "successor" agreement or "national" agreement. The dispute concerning Paragraph 5 of Trustees' Statement of Uncontested Material Facts is fatal to Plaintiff's motion.

Further, in Paragraph 8 of Plaintiff's Statement of Uncontested Material Facts, the Trustees' admit that agreements signed by other coal industry employers are not the same as the individual company agreement. The Trustees confess that the agreements executed by at least "some" other companies were modified from the Consol Agreement. The Trustees characterize

such modifications as "minor" but do not identify the nature or extent of such modifications. The Trustees merely cite to a brief, conclusory allegation in the Declaration of Cecil Roberts that accompanied the Union's memorandum of points and authorities in the Freeman United Case, No. 07-cv-1050. In the absence of any verified and authenticated evidence regarding the nature of such modifications, Defendants are entitled to discovery regarding the agreements of other operators allegedly mirroring the Consol Agreement.[7]

## II.
### DISCONINTUANCE OF CONTRIBUTIONS TO THE 1974 PENSION TRUST UNDER THE 2002 NBCWA PRECLUDES LATER APPLICATION OF A CONTINUING CONTRIBUTION OBLIGATION UPON SIGNATORIES TO PRIOR NBCWAS.

The Trustees base their claim against Monterey exclusively on a provision in the 1974 Pension Trust referred to as the "evergreen clause." As noted above, Monterey is not currently signatory to an agreement with the UMWA that incorporates the Pension Plan by reference, or that otherwise requires it to contribute to or participate in the 1974 Pension Trust. The Trustees nevertheless aver that the evergreen clause provides a basis for the 1974 Pension Trust to enforce against Monterey payment of the substantial contributions established in the Consol Agreement.

The evergreen clause in question states:

---

[7] The Trustees also assert in Paragraph 8 of their Statement of Uncontested Material Facts that modifications were not made to the 1974 Pension Trust in the separate labor agreements signed by other companies. Regardless of the accuracy of that allegation, the issue before this Court is not whether the 1974 Pension Trust portions of the Consol Agreement and agreements signed by unrelated entities are the same but instead whether the Consol Agreement is a "successor" agreement. Moreover, the Trustees' assertions assume that other employers voluntarily entered into separate labor agreements which obligated them to contribute at rates established in the Consol Agreement, without allowing for the possibility that some or all of those employers did so only because they believed the Trustees would initiate action against them to compel payment of such contributions if they did not.

12

> Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978 as amended from time to time and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2002.

United Mine Workers of America 1974 Pension Plan ("UMWA Pension Plan"), Article VIII Miscellaneous, B. General (hereinafter "Article VIII B.") at ¶16. Relevant portions of the version of the UMWA Pension Plan in effect during the term of the 2002 NBCWA is appended as Attachment 2.

The extensive – indeed, exclusive – reliance the Trustees place on the interpretation of this clause in *United Mine Workers of America 1974 Pension Trust v. Pittston Co.*, 984 F. 2d 469 (D.C. Cir. 1993) as providing the legal basis for their action against Monterey is misplaced. A separate "discontinuance of contributions" provision in the UMWA Pension Plan – which was not before the court in *Pittston* – supersedes and negates the Trustees' reliance on the evergreen clause as a basis for its claim in this case.

1.    *Pittston* did not consider the discontinuance of contributions clause.

The Trustees' motion for summary judgment must be denied because it fails to address Article VIII B. at ¶4 of the 1974 Pension Plan. This Plan provision states:

> Upon the termination of this Plan **or the complete discontinuance of contributions to the 1974 Pension Trust**, this Plan shall remain in force and effect for the period necessary to complete the payment of benefits in accordance with the terms of this Plan to the extent assets in the 1974 Pension Trust are available to pay such benefits. (Emphasis supplied)

Article VIII B. ¶4. This clause has been a part of every version of the 1974 Pension Plan since 1974.

13

The "discontinuance of contributions clause" appears in the same Article of the UMWA 1974 Pension Plan as the "evergreen clause" which the Trustees rely on as the basis for their claim in this case. (The evergreen clause appears at Article VIII B. at ¶16. The two Plan provisions are therefore of equal importance for purposes of contract interpretation. For purposes of assessing its relevance to the Trustees' claim in the instant case, it is important to note that the discontinuance of contributions clause does not require formal Plan termination in order to have legal effect. Nor does it say that for the discontinuance of contributions clause to be applicable it must be coupled with a clear statement of intent in the underlying labor agreement that such discontinuance is permanent.

The 2002 NBCWA provided that companies that had been signatory to prior agreements could discontinue contributions to the 1974 Pension Plan during its term. Article XX(d)(1) of the 2002 NBCWA specified that:

*Section (d)* **Contributions by Employers**

(1)  During the life of this Agreement, for the periods of time indicated below, each signatory Employer (including those engaged in the production of coal and those not engaged in the production of coal) shall contribute to the Trusts referred to in this Article the amounts specified below based on cents per hours worked by each of the Employer's Employees who perform classified work under this Agreement.

\* \* \*

(ii)  Into the 1974 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated. 0.0¢ per hour on each such hour worked for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1974 Pension Trust meeting the required standard of such Trust . . ..

14

National Bituminous Coal Wage Agreement of 2002, Article XX, Section (d)(1). [8]

The fact that the 2002 NBCWA is the first to discontinue contributions to the 1974 Pension Trust since the evergreen clause was added to Article VIII of the Pension Plan in 1978 completely negates the Trustees' assertion that the 1993 *Pittston* decision is *stare decisis* in this case. The factual situation here was not before the Court in *Pittston* because contributions to the UMWA Plans were not discontinued until the 2002 NBCWA. The Court therefore had no occasion to consider the relevance of the discontinuance of contributions clause to the evergreen clause.

      2.    <u>Discontinuance of contributions under the 2002 NBCWA obviated any necessity to resume contributions as a result of the agreement between Consol and the UMWA.</u>

The evergreen and discontinuance of contributions clauses must be read *in pari materia*. Both were placed in the 1974 Pension Plan before federal pension plan withdrawal liability was established under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). *See* 29 U.S.C. §§ 1381 et seq. The same parties that created the evergreen clause in 1978 and

---

[8]    The relevant language from Article XX of the 2002 NBCWA is appended hereto as Attachment 3. This section required an employer that began participation in the Plan for the first time after the effective date to contribute 75 cents per hour worked during the term of the Agreement, in recognition that employees of companies that had not previously participated in the Plan would be accruing benefits during the term of the 2002 NBCWA, and it was therefore appropriate to require such employers to make a contribution for the new liability they were responsible for adding to the Plan during the contract term. Moreover, if the Trustees claim that this residual and limited contribution requirement applicable to employers (if any) who first become bound to participate in the Plan after January 1, 2002 bars application of the discontinuance clause, their claim would create a disputed issue as to whether the unequal contribution rates of the 2002 NBCWA nullifies the evergreen clause. In *Pittston*, 782 F. Supp. at 667, the Court held that "[h]aving reviewed the voluminous evidence of the negotiating history of the evergreen clause, the Court is convinced that the clause was intended to ensure that all participating employers would contribute equally to the Trusts. . . ." If the restricted and targeted contribution requirement for new participating employers undercuts application of the discontinuance of contributions clause, then the Court's recognized basis for the evergreen clause as establishing a uniform contribution rate was destroyed when the 2002 NBCWA set unequal contribution rates for the 1974 Pension Trust.

inserted it in the 1978 version of the 1974 UMWA Pension Plan did so with knowledge of and against the backdrop of the discontinuance of contributions clause, which first appeared in the 1974 version of the Pension Plan document.

In the absence of statutory withdrawal liability, these two pre-MPPAA clauses demonstrate an intent in 1978 by the Union and by employers (acting through BCOA as the industry-wide bargaining group) to construct an arrangement whereby companies participating in the 1950 and 1974 Pension Plans would be required to contribute to the Plans at rates set forth in true successor agreements, until a subsequent agreement discontinued that obligation. However, once the Union and the BCOA determined that the funding condition of each Plan was sufficient to warrant the discontinuance of contributions, the underlying purpose of the evergreen clause (to avoid a last man's club) would be satisfied as evidenced by the fact the Union and the industry bargaining group agreed that further contributions were not needed.

Contrary to the Trustees' position in the instant case, Article VIII B. at ¶4 demonstrates that the evergreen clause is conditional, not perpetual, and the condition described in Article VIII B. at ¶4 was met in the 2002 NBCWA when contributions to the 1974 Pension Trust were discontinued. As Article VIII B. at ¶4 makes clear, at that point the parties' commitment was that the 1974 Pension Plan would "remain in force and effect for the period necessary to complete the payment of benefits in accordance with the terms of this Plan." This is the situation that existed when Monterey's UMWA contract expired December 31, 2006. The Trustees can point to no action taken by Monterey since its contract expired that changes or overrides the operation of Article VIII B. at ¶4 as it pertains to Monterey.

The fact that the discontinuance of contributions clause means the companion evergreen clause has no applicability to Monterey with respect to periods after December 31, 2006, does

not preclude UMWA from entering into a new agreement (whether with an industry bargaining group or with a unionized employer such as Consol) that amends the Plan to add new benefits, and require contributions to the 1974 Pension Trust.   However, in that situation a former participating employer such as Monterey is under no obligation to contribute at the rates set forth therein unless it signs the new agreement. [9]

Reading the evergreen and discontinuance of contributions clauses together demonstrates that when the parties inserted the evergreen clause into the 1978 Plan document they foreshadowed the solution Congress ultimately adopted in MPPAA in 1980.   The principal difference is that the evergreen clause, in conjunction with the discontinuance of contributions clause, required signatory employers to contribute to the 1974 Pension Plan until the UMWA and the industry bargaining group determined contributions were no longer necessary.   In contrast, MPPAA permits an employer to cease making contributions to a plan at any time, but imposes on that employer an obligation to pay its pro rata share of any unfunded plan liability as of the time it withdraws.   *See e.g. Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp*, 522 U.S. 192, 196-7 (1997) (Under MPPAA payments of withdrawal liability "are set at a level that approximates the periodic contributions the employer had made before withdrawing from the plan.")

Based on the foregoing, the Trustees cannot prevail on their summary judgment motion even if the Court were to conclude that the Consol Agreement is a "successor" to the 2002 NBCWA for purposes of the evergreen clause.   This is because the relevance of the discontinuance of contributions clause (Article VIII B. at ¶4) to the evergreen clause (Article

---

[9]   Of course, under MPPAA, where a company does not renew its participation in a multiemployer pension plan the trustees will assess that employer withdrawal liability to make the plan whole (and protect other participating employers) in the event the plan is underfunded.

VIII B. at ¶12) does not depend on whether there is a "successor" to the 2002 NBCWA. Since contributions were discontinued for the term of the 2002 NBCWA, application of the discontinuance of contributions clause means that, even if a true successor to the 2002 NBCWA required contributions to the 1974 Pension Trust, a former signatory would not be bound to renew its participation unless it specifically agreed to do so.

The Trustees reliance on the *stare decisis* effect of the Court's 1993 *Pittston* decision is simply unavailing, because, at a minimum, the different facts here create ambiguity that makes summary judgment for the Plan premature. Defendants therefore must be afforded an opportunity to have discovery that might illuminate the intent, meaning and purpose of the discontinuance of contributions clause.

## CONCLUSION

For the reasons set forth herein, Monterey respectfully requests that this Court deny the Trustees' motion for summary judgment, or in the alternative, defer ruling on the motion until Defendants have had the opportunity to complete discovery in this case.

Respectfully submitted,

_____/s/_____
John R. Woodrum, D.C. Bar No. 933457
Ogletree, Deakins, Nash, Smoak
   & Stewart, P.C.
Fifth Floor
2400 N Street, N.W.
Washington, DC   20037
john.woodrum@odnss.com
Phone: (202) 887-0855

*Counsel for Monterey Coal Company*

Dated: October 22, 2007

18

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Michael H. Holland, Michael W. Buckner, B.V. Hyler and Steven F. Schaab as Trustees of the United Mine Workers of America 1974 Pension Trust, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 07-cv-00490 (PLF/AK) |
| Freeman United Coal Mining Company, et al., | ) ) | |
| Defendants. | ) ) | |
| Freeman United Coal Mining Company, | ) ) | |
| Plaintiff, | ) ) | Case No. 07-cv-01050 (PLF/AK) |
| v. | ) ) | |
| United Mine Workers of America, et al., | ) ) | |
| Defendants. | ) ) | |

**STATEMENT BY MONTEREY COAL COMPANY OF**
**MATERIAL FACTS AS TO WHICH THERE ARE GENUINE ISSUES**

Pursuant to Local Rule 56.1, and in support of its Opposition to the Motion for Summary

Judgment filed by Michael H. Holland, Michael W. Buckner, B.V. Hyler, and Steven F. Schaab,

in their capacity as Trustees of the United Mine Workers of America 1974 Pension Trust

("Trustees") in Case No. 07-cv-00490, Monterey Coal Company ("Monterey") hereby sets forth

the following material facts as to which there are genuine issues:

1.      Monterey disputes the assertion in Paragraph 5 of the Statement Of Material Facts

As To Which There Is No Genuine Issue by the United Mine Workers of America 1974 Pension

Trust ("Trustees' Statement of Uncontested Material Facts") that the United Mine Workers of

America ("UMWA") and Bituminous Coal Operators' of America ("BCOA") reached an agreement, tentative or otherwise, upon a new national agreement in December 2006. The agreement purportedly reached between the UMWA and BCOA was, in fact and law, only an agreement between the UMWA and a single employer – Consolidation Coal Company ("Consol") as demonstrated by the fact that the only entities wholly owned and controlled by Consol were members of BCOA and the Chief Operating Office of Consol negotiated with the UMWA on behalf of BCOA/Consol. Declaration of Cecil E. Roberts in Case No. 07-cv-01050, ¶¶ 12 and 13 and Exhibit A thereto. Additionally, as set forth in the Affidavit of John R. Woodrum, Esq., discovery is required in order to gather further facts demonstrating the individual company nature of the agreement reached between the UMWA and Consol through its agent and instrumentality BCOA in December 2006.

2.      A genuine issue exists concerning whether the agreement reached between the UMWA and Consol through its agent and instrumentality BCOA in December 2006 constitutes a "successor agreement" within the meaning the so-called "evergreen clause" in the United Mine Workers of America 1974 Pension Plan and Trust. An agreement between the UMWA and an individual company, such as the agreement reached between the UMWA and Consol through its agent and instrumentality BCOA in December 2006, does not constitute such a successor agreement. Declaration of Roger M. Haynes, Exhibit, attached to Declaration of Julia Penny Clark attached to Memorandum of Points and Authorities in support of the Motion for Summary Judgment on the issue of liability by the United Mine Workers of America 1974 Pension Trust and its Trustees and Declaration of David W. Kempken, Exhibit C, ¶13, attached to Declaration of Julia Penny Clark attached to Memorandum of Points and Authorities in support of the Motion for Summary Judgment on the issue of liability by the United Mine Workers of America

1974 Pension Trust and its Trustees. Additionally, as set forth in the Affidavit of John R. Woodrum, Esq., discovery is needed to discern the meaning of the term "successor agreement" in the so-called evergreen clause.

3.    Monterey disputes the assertion in Paragraph 8 of Trustees' Statement of Uncontested Material Facts that modifications made to the Consol Agreement before other entities entered separate but similar agreements were "minor." As set forth in the Affidavit of John R. Woodrum, Esq., discovery is needed with respect to the substance of separate agreements entered between the UMWA and separate, unrelated employers.

4.    Monterey submits that the meaning of the discontinuance of contributions clause at Article VIII, B. at ¶ 4 of the UMWA 1974 Pension Plan constitutes a material issue of disputed fact for the reasons set forth in its Points and Authorities in Opposition to Plaintiff Trustees' Motion for Summary Judgment.

Respectfully submitted,

_____/s/_____
John R. Woodrum, D.C. Bar No. 933457
Ogletree, Deakins, Nash, Smoak
  & Stewart, P.C.
Fifth Floor
2400 N Street, N.W.
Washington, DC  20037
john.woodrum@odnss.com
Phone:  (202) 887-0855

*Counsel for Monterey Coal Company*

Dated: October 22, 2007

**ATTACHMENT 1**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Michael H. Holland, Michael W. Buckner, B.V. Hyler and Steven F. Schaab as Trustees of the United Mine Workers of America 1974 Pension Trust, <br><br> Plaintiffs, <br><br> v. <br><br> Freeman United Coal Mining Company, et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) Case No. 07-cv-00490 (PLF/AK) ) ) ) ) |
| Freeman United Coal Mining Company, <br><br> Plaintiff, <br><br> v. <br><br> United Mine Workers of America, et al., <br><br> Defendants. | ) ) ) ) Case No. 07-cv-01050 (PLF/AK) ) ) ) ) ) ) ) |

## AFFIDAVIT OF JOHN R. WOODRUM, ESQ. IN SUPPORT OF MONTEREY COAL COMPANY'S MOTION FOR DENIAL OF TRUSTEES' MOTION FOR SUMMARY JUDGMENT IN ORDER TO PERMIT NECESESARY DISCOVERY

Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, the undersigned John R. Woodrum, Esq., having been duly sworn, states as follows:

1.     My name is John R. Woodrum.  I am an attorney licensed in the District of Columbia and a member of the Bar of the United States District Court for the District of Columbia.

2.    I represent Defendant Monterey Coal Company in the above-captioned Case No. 07-cv-00490.

3.    Michael H. Holland, Michael W. Buckner, B.V. Hyler, and Steven F. Schaab, in their capacity as Trustees of the United Mine Workers of America 1974 Pension Trust ("Trustees") assert that Monterey has failed to make payments required by a labor agreement entered between the United Mine Workers of America ("UMWA") and, purportedly, the Bituminous Coal Operators' of America ("BCOA").

4.    Material facts related to the Trustees' claim center upon whether (1) the BCOA constituted a multiemployer bargaining group in executing the purported agreement; (2) the purported agreement is a "successor agreement" to the National Bituminous Coal Wage Agreement of 2002 ("2002 NBCWA") as that term is used in certain provisions in the 2002 NBCWA; and (3) the purported agreement is a "national" agreement or is an agreement between the UMWA and an individual employer, Consolidation Coal Company ("Consol").

5.    Discoverable materials related to the determination of the facts set forth in Paragraph 4 above largely are in the possession and/or control of the Trustees, the UMWA, the BCOA, and nonparty Consol.  Monterey has not been able to undertake necessary discovery of such material.

6.    In the interest of efficiency and expediency, Monterey has cooperated with co-Defendant Freeman United Coal Company in pursuing discovery in this case.  In conjunction with Freeman, Monterey intends to pursue discovery related to the following material facts:

- Whether the drafters of the National Bituminous Coal Wage Agreement of 1978 ("1978 NBCWA") considered that a later agreement between an individual employer and the UMWA could constitute a "successor agreement" to the 1978 NBCWA;

- Whether only entities wholly owned and controlled by Consol were members of BCOA during bargaining ostensibly between BCOA and the UMWA in 2006;

- Whether Consol employees, or BCOA employees acting under instructions from Consol, conducted all negotiations during bargaining ostensibly between BCOA and the UMWA in 2006;

- Whether wholly owned and controlled entities of Consol that were members of BCOA during bargaining ostensibly between BCOA and the UMWA in 2006 constituted a "single employer" for purposes of federal labor law with respect to such bargaining;

- Whether Consol employees, or BCOA employees acting under instructions from Consol, during bargaining ostensibly between BCOA and the UMWA in 2006 acted only in the interests of Consol in such bargaining;

- Whether the Agreement ostensibly reached between BCOA and the UMWA in December 2006 applied only to Consol;

- Whether coal operators that in January through March 2007 executed labor agreements similar to the Consol Agreement were entitled to, and in fact did, engage in separate negotiations with the Union that in many instances resulted in material differences between such agreements and the agreement ostensibly reached between BCOA and the UMWA in December 2006;

- How the separate discontinuance of contributions clause of Article VIII B.(4) of the UMWA 1974 Pension Plan relates to the evergreen clause at Article VIII B.(16), and the background, purpose and effect of that clause.

7.     The captioned action has been commenced recently thereby precluding Monterey and co-Defendant Freeman from undertaking such discovery previously. Monterey has acted in a good faith and timely manner with regard to all aspects of the captioned action. Monterey intends to undertake and/or coordinate with co-Defendant Freeman discovery regarding the matters set forth in Paragraph 6 above in a timely manner.

8.     For the foregoing reasons, Trustees' motion for summary judgment should be denied or continued to allow Monterey and Freeman adequate time for discovery of material facts related to the action against the Defendants in this case.

Respectfully submitted,

John R. Woodrum, D.C. Bar No. 933457
Ogletree, Deakins, Nash, Smoak
   & Stewart, P.C.
Fifth Floor
2400 N Street, N.W.
Washington, DC   20037
john.woodrum@odnss.com
Phone:  (202) 887-0855

District of Columbia:  SS

      The foregoing document was subscribed and sworn to before me, in my presence, by John R. Woodrum, personally know to me, this 22nd day of October, 2007.

Notary Public

My Commission Expires: July 14, 2012

5

**ATTACHMENT 2**

UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN
EFFECTIVE DECEMBER 6, 1974

ARTICLE I - INTRODUCTION

Pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974, the United Mine Workers of America 1974 Pension Plan (hereinafter sometimes referred to as the "1974 Pension Plan" or the "Plan") provides pension benefits as hereinafter set forth. The Plan is effective as of December 6, 1974 (the "effective date") and, as amended March 27, 1978, April 29, 1980, June 7, 1981, October 1, 1984, February 1, 1988, February 1, 1991, January 16, 1992, December 16, 1993, August 16, 1996, January 1, 1998, and January 1, 2002, the provisions of the Plan are set forth below. Except in the case of total disability resulting from mine accidents occurring after the effective date, this Plan does not provide benefits to persons retiring on or before December 31, 1975, but such persons may be entitled to pension benefits under the United Mine Workers of America 1950 Pension Plan (hereinafter referred to as the "1950 Pension Plan").

The 1974 Pension Plan and Trust is a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950.

Except to the extent otherwise required by the Employee Retirement Income Security Act of 1974 ("ERISA") or other applicable law, governmental rule or regulation, and except to the extent that the 1974 Pension Plan or 1974 Pension Trust specifically provides otherwise, or as required by the context, all amendments to the 1974 Pension Plan effective as of January 1, 2002, pursuant to the authority contained in Article VIII herein, shall be given only prospective application commencing on January 1, 2002, and shall have no retroactive application whatsoever. The amendments effective as of January 1, 2002, shall not be deemed to be an approval or disapproval by the parties to any action or failure to act by any Trustee or Trustees for any period prior to January 1, 2002. The terms and provisions of the 1974 Pension Plan in effect as of December 31, 2001, shall continue in effect and shall be applicable only to circumstances or events which occurred prior to January 1, 2002, and which are not governed by the amendments adopted as of January 1, 2002.

Section A  Definitions

(1)     "Wage Agreement" means the National Bituminous Coal Wage Agreement of 1974, as amended from time to time and any successor thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2002. Any reference in this Plan to the Wage Agreement or to the bituminous coal wage agreement then in effect shall also refer (a) to the Sub-bituminous and Lignite Agreement and the National Coal Mine Construction Agreement with respect to any period for which such agreements provide that pension benefits shall be made available pursuant to this Plan or a predecessor plan established under the bituminous coal wage agreement, and (b) with respect to any period prior to the 1950 Bituminous Coal Wage Agreement, to any collective bargaining contract between the United Mine Workers of America and any employer in the bituminous coal industry, and (c) solely for the purposes of determining who is required to make contributions to, and receive benefits under, the 1974 Pension Trust, any other collective bargaining contract entered into between the United Mine Workers of America and any Employer in the bituminous coal industry, which contract provides that contributions shall be made to or benefit payments made from this Plan.

(2)    "Employer" means an employer who is signatory to the Wage Agreement, or, with respect to prior periods, was signatory to the bituminous coal wage agreement then in effect.

(3)    "Construction Employer" means an Employer that is signatory to the National Coal Mine Construction Agreement of 1984, as amended from time to time and any successor thereto; or is signatory to any other collective bargaining contract with the United Mine Workers of America which provides that contributions shall be made to the 1974 Pension Trust or the United Mine Workers of America 1985 Construction Workers Pension Trust for construction work related to the development, expansion or alteration of coal mines, provided that substantially all the employees, with respect to whom the employer has an obligation to contribute, perform construction work related to the development, expansion or alteration of coal mines, including the erection of tipples and preparation plants and other facilities placed in, on or around the coal mines, sinking of shafts, slopes, drifts or tunnels and all other such coal-related work that is performed under a Wage Agreement. In the case of a Construction Employer which is a single trade or business and which is also signatory to a Wage Agreement other than a Wage Agreement described in the preceding sentence, the Construction Employer shall be treated as an Employer other than a Construction Employer with respect to its employees or operations for which it has an obligation to contribute to the Plan pursuant to such Wage Agreement.

(4)    "Bituminous Coal Segment" and "Coal Mine Construction Segment" mean the two accounts within the 1974 Pension Plan maintained after June 30, 1981, for the sole purpose of calculating employer withdrawal liability under Article X.

(5)    "Participant" means any person who is employed in a classified job for an Employer after the effective date and any person entitled to receive pension benefits under the Plan; provided, however, that any person who is not employed in a classified job for an Employer on the effective date shall not become a participant until such person completes at least 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2002 NBCWA) of Credited Service within a 12-month period after the effective date, or unless such person is subject to the provisions of Article II(f)(3).

(6)    "Pensioner" means any person who is receiving a pension pursuant to Article II of this Plan.

(7)    "1974 Pension Trust" means the trust established pursuant to the National Bituminous Coal Wage Agreement of 1974 to fund this Plan.

(8)    "Trustees" means the Trustees of the 1974 Pension Trust, who shall be named fiduciaries pursuant to Section 402 of ERISA and the Plan Administrator, as that term is defined in that Act; provided, however, that the 1974 Pension Trust may be amended to designate other or additional named fiduciaries under said Trust and the Plan.

(9)    "Credited Service" means signatory and nonsignatory service determined pursuant to Article IV.

(10)    "Hour of Service" shall mean each hour for which the participant is directly or indirectly paid or entitled to be paid by the Employer (a) for the performance of duties or (b) on account of a period of time during which no duties are performed due to vacation, holiday, illness, sickness and accident, incapacity, layoff, bereavement, jury duty, military duty or leave of absence; or (c) time spent performing contractual obligations such as safety inspections and mine committee work, even though such time off is not paid for by the Employer, provided that:

(1)    except for hours of service credited on account of a period during which a Participant is eligible to receive benefits under Article IV(B)(3), no more than 501 hours of service shall be credited to a Participant on account of a single continuous period during which the Participant performed no duties;

(2)    no credit shall be given for payments made or due under a plan maintained solely for the purpose of complying with the applicable worker's compensation or unemployment compensation or disability insurance laws or payments which solely reimburse a Participant for medically related expenses incurred by the Participant; and

(3)    hours of service shall be credited for back pay for the period for which such back pay was awarded, irrespective of mitigation of damages, either awarded or agreed to by the Employer to the extent such back pay represents payment for hours which are required to be taken into account. However, no hours of service shall be credited for back pay if such hours were previously credited. The determination of hours of service for reasons other than the performance of duties shall be made in accordance with the applicable rules of the regulations prescribed by the Secretary of Labor under 29 C.F.R. Part 2530.200b-2(b).

(11)    "UMWA" or "Union" shall mean the United Mine Workers of America.

(12)    "Hours Worked" shall mean (a) each hour for which an employee is paid, or entitled to payment, for the performance of duties for the Employer during the calendar year, and (b) hours for which back pay, irrespective of mitigation of damages, is awarded or agreed to by an Employer, to the extent that such award or agreement is intended to compensate an Employee for periods which the Employee would have been engaged in a performance of duties for the Employer. Time spent performing contractual obligations such as safety inspections and mine committee work and periods of time when the Participant is eligible to receive sickness and accident benefits shall be included as hours worked.

(13)    "Construction Industry Service" means, with respect to a participant,

(a)    all periods of service after June 20, 1985 with a Construction Employer that involves work related to the development, expansion or alteration of coal mines; and

(b)    all periods of signatory and nonsignatory service before July 1, 1985, if the participant's last such service before July 1,1985 was for a Construction Employer.

3

(2)    It is established to the satisfaction of the Trustees that the consent required under subparagraph (1) may not be obtained because there is no spouse, because the spouse cannot be located, or because of such other circumstances as the Trustees may by law consider.

E.    A qualified surviving spouse shall be any spouse who has been married to the Participant for at least nine months prior to death, unless such nine-month requirement would be waived for purposes of determining entitlement to widow or widower's insurance benefits under the Social Security Act.

F.    Except as provided in Paragraph B above, payment to a qualified surviving spouse under this Article will commence as of the first of the month following the month in which the Participant's death occurs, and the final payment shall be made for the month in which the spouse's death occurs.

## ARTICLE VIII – <u>MISCELLANEOUS</u>

A.    <u>Determination of Eligibility</u>

The Trustees or such other named fiduciaries as may be properly designated shall have full and final determination as to all issues concerning eligibility for benefits.

B.    <u>General</u>

(1)    The Trustees are authorized to promulgate rules and regulations to implement this Plan, and those rules and regulations shall be binding upon all persons dealing with and Participants claiming benefits under this Plan.

(2)    No benefit payable under this Plan shall be subject in any way to alienation, sale, transfer, assignment, pledge, attachments, garnishments, execution or encumbrance of any kind, and any attempt to accomplish the same shall be void.  Notwithstanding the foregoing, the Plan shall comply with any qualified domestic relations order, as that term is defined in ERISA, and with any written authorization by a Participant or beneficiary made pursuant to paragraph (19) of this section.

(3)    The Employers and the Union, by joint action, reserve the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of this instrument or to terminate this Plan, without reopening or otherwise affecting the integrity of any other provision of the Wage Agreement, by a written agreement between the Employers and the Union, provided, however, that:

(a)    this Plan shall not be amended in such manner as would cause or permit any part of the assets in the 1974 Pension Trust to be diverted to purposes other than the exclusive benefit of the Participants and their beneficiaries;

(b)    this Plan shall not be amended to deny to a Participant retroactively any benefits to which such Participant was entitled under this Plan, unless such amendment is necessary to conform this Plan to, or to satisfy the conditions of, any law, governmental regulations or ruling;

29

(c)    the Employers and the Union have delegated to the Trustees the authority and responsibility to make certain changes and amendments as set forth in Article XX(g)(4) of the National Bituminous Coal Wage Agreement of 2002, as amended from time to time, and any successor agreements to that specific Agreement; and

(d)    any written agreement executed by the Union shall be signed by the International President.

(4)    Upon the termination of this Plan or the complete discontinuance of contributions to the 1974 Pension Trust, this Plan shall remain in force and effect for the period necessary to complete the payment of benefits in accordance with the terms of this Plan to the extent assets in the 1974 Pension Trust are available to pay such benefits.

(5)    Forfeitures arising from the operation of the Plan shall not be used to increase the benefits which otherwise would be received under this Plan.

(6)    Any Participant or beneficiary whose claim for benefits under this Plan has been denied shall be (a) provided with adequate notice in writing setting forth the specific reasons for such denial, such notice shall be written in a manner calculated to be understood by the Participant, and (b) afforded a reasonable opportunity for a full and fair review of the decision denying the claim by an appropriate named fiduciary or a person properly designated to carry out such responsibility.

(7)    The Trustees are hereby authorized to allocate fiduciary responsibilities in any manner permitted pursuant to section 405(c) of ERISA and to appoint an investment manager or managers as permitted by section 402(c) of ERISA.

(8)    Contributions to the 1974 Pension Trust to fund the benefits under this Plan shall be paid solely by the Employers in accordance with Article XX of the National Bituminous Coal Wage Agreement of 2002, as amended from time to time, and any successor agreements to that specific Agreement.

(9)    In the event that this Plan merges or consolidates with, or transfers some or all of its assets or liabilities to, any other plan, no Participant or beneficiary herein shall, solely on account of merger, consolidation or transfer, be entitled to an accrued benefit immediately following such event which is less than the benefit to which such Participant or beneficiary would have been entitled immediately preceding such event.

(10)    In the event that an Employer fails to make the contributions to the Plan required by Article XX of the National Bituminous Coal Wage Agreement of 2002, interest (calculated at a rate established by the Trustees at the beginning of each calendar year) shall accrue from the date due until the date on which payment is made. If the Trustees file suit to collect unpaid contributions, plus accrued

30

interest, and a judgment is entered by the courts in favor of the Trustees, the judgment entered shall provide for an additional amount equal to the accrued interest in liquidated damages.

(11)    Upon the termination or partial termination of the Plan, the rights of all affected Participants to benefits accrued to the date of such termination or partial termination, are nonforfeitable to the extent required by law or to the extent provided for under the National Bituminous Coal Wage Agreement of 2002.

(12)    Except as otherwise provided herein, it shall be unlawful for any part of the assets held pursuant to this Plan, other than such part as is required to pay taxes and administrative expenses, to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the Participants of the Plan except that in the case of a contribution which is made by an Employer by a mistake of fact, or law (other than a mistake relating to Plan qualification), such mistaken contribution may be returned to the Employer within six months after the Trustees determine that the contribution was mistakenly made.

(13)    To the extent not inconsistent with the provisions hereof, the Trustees shall comply with the further requirements imposed upon them by and shall have the further powers contained in Article XX, Sections (e), (f), and (g) of the National Bituminous Coal Wage Agreement of 2002, as amended from time to time, and any successor agreements to that specific Agreement.

(14)    This instrument, and the 1974 Pension Trust shall be construed, regulated and administered in accordance with Federal law, and, to the extent not preempted or inconsistent with such Federal law, the laws of the District of Columbia.

(15)    Any action of the Employers which may, or must, be taken hereunder may be taken by BCOA. Any action which must be taken in writing shall be signed by the President of BCOA.

(16)    Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978 as amended from time to time and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2002.

(17)    The Employers, the Union and the Trustees shall fully cooperate to obtain all necessary rulings and do all other acts appropriate to ensure that the 1974 Pension Plan and Trust are qualified under Section 401 of the Internal Revenue Code, and that contributions are deductible under Section 404 of the Internal Revenue Code.

(18)    Notwithstanding any other provision of this Plan to the contrary, a distribution of benefits shall commence to a participant not later than the April 1 of the calendar year following the calendar year in which the Participant attains age 70-1/2 and shall be distributed over the life of such

31

Participant or over the lives of such Participant and his surviving spouse, in accordance with Section 401(a)(9) of the Internal Revenue Code of 1986 and any regulations promulgated thereunder. In the event that the Participant dies before distributions have commenced hereunder, the surviving spouse shall begin to receive a distribution of the benefit, if any, to which such spouse is entitled no later than the date on which the participant would have attained age 70-1/2 and shall be distributed over the life of such surviving spouse.

(19)     Any Participant or beneficiary whose benefit is in pay status (including a disabled miner who is entitled to a one-time single sum payment of $2,250) may voluntarily authorize the Trustees to check-off an amount from his or her monthly benefit for remittance to the UMWA of Union membership dues, including assessments, initiation fees, credit union, voluntary COMPAC contributions and other voluntary deductions, or from his or her one-time single sum payment of $2,250 for remittance to the UMWA 1993 Benefit Trust of the required annual payment, provided that an y such arrangement must be terminable by the Trustees upon reasonable notice, must be revocable by the Participant at any time upon reasonable notice to the Trustees, and either:

(a)     such arrangement must not permit any Participant or beneficiary to check-off an amount exceeding 10% of his or her monthly benefit; or

(b)     the designated recipient must file a written acknowledgement that it has no enforceable right in or to any Plan benefit or portion thereof (except to the extent of payments actually received pursuant to the terms of the arrangement); and

an agreement for such check-off is in effect between the Plan and the Union, or between the Plan and the UMWA 1993 Benefit Trust. Any check-off authorization must be in writing, must be voluntary and must comply in all respects with the requirements of the Internal Revenue Code of 1986, as amended, ERISA, the Labor Management Relations Act of 1947, as amended, and any other applicable law.

(20)     (a)     Notwithstanding any provision of the plan to the contrary that would otherwise limit a distributee's election under this part, a distributee may elect, at the time and in the manner prescribed by the Trustees, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(b)     An "eligible rollover distribution" is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; the portion of any distribution that is not includible in gross income (determined without regard to the exclusion of net unrealized appreciation with respect to employer securities); and any amount that is treated by the Plan as distributed on account of hardship.

(c)    An "eligible retirement plan" is an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in section 403(a) of the Code, or a qualified trust described in Section 401(a) of the Code, that accepts that distributee's eligible rollover distribution. However, in the case of an eligible rollover distribution to the surviving spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity.

(d)    A "distributee" includes a Pensioner and a surviving spouse. In addition, a Pensioner's surviving spouse and the Pensioner's spouse or former spouse who is an alternate payee under a qualified domestic relations order, as defined in Section 414(q) of the code, are distributees with regard to the interest of the spouse or former spouse.

(e)    A "direct rollover" is a payment by the Plan to the eligible retirement plan specified by the distributee.

## ARTICLE IX - PARTICIPANTS COVERED BY A SUCCESSOR PLAN

The following individuals shall cease to be Participants in the Plan and shall not be entitled to benefits hereunder (with respect to Credited Service prior to December 6, 1977):

(1)    A Participant in this Plan who retired prior to December 6, 1977, if the Participant is entitled to a pension under a plan qualified under Section 401(a) of the Internal Revenue Code and established by an employer pursuant to an agreement with the UMWA which is a successor agreement to the Western Surface Coal Wage Agreement of 1975, provided that the pension is at least as great as the pension due under the terms of this Plan in effect on December 5, 1977;

(2)    A Participant in this Plan prior to December 6, 1977, who on or after December 6, 1977, is an employee of a employer which is signatory with the UMWA to a successor agreement to the Western Surface Coal Wage Agreement of 1975, if the Participant becomes a participant in a pension plan qualified under Section 401(a) of the Internal Revenue Code established by such employer pursuant to such agreement, provided that the plan gives credit for participation, vesting and Credited Service prior to December 6, 1977, determined under the terms of this Plan in effect on December 5, 1977.

## ARTICLE X

A.    As soon as practicable after an Employer's complete or partial withdrawal, the Trustees shall calculate and demand payment of withdrawal liability in accordance with Section 4219 of ERISA. In the case of a Construction Employer that withdraws on or after July 1, 1981, the amount of unfunded vested benefits allocable to it will be determined with reference to the unfunded vested benefits of the Coal Mine Construction Segment of the 1974 Pension Plan. In the case of an Employer other than a Construction Employer that withdraws on or after July 1, 1981, the amount of unfunded vested benefits allocable to it will be determined with reference to the unfunded vested benefits of the Bituminous Coal Segment of the 1974 Pension Plan.

33

IN WITNESS WHEREOF, the Employers and the Union, pursuant to proper authority, have caused this instrument, effective December 6, 1974, and amended as of January 1, 2002, to be signed by their proper officers or representatives in Washington, D.C. on this ___18___ day of _February_ 2002.

UNITED MINE WORKERS OF AMERICA

_Cecil E. Roberts_
International President

BITUMINOUS COAL OPERATORS'<br>ASSOCIATION, INC.

President

44

**ATTACHMENT 3**

# National Bituminous Coal
# Wage Agreement of 2002

# TABLE OF CONTENTS

Page

**Article I - ENABLING CLAUSE** . . . . . . . . . . . . .    1

**Article IA - SCOPE AND COVERAGE** . . . . . . . .    3
Section (a)        Work Jurisdiction . . . . . . . . . . . .    3
Section (b)        Exemptions Clause . . . . . . . . . . .    4
Section (c)        Supervisors Shall Not Perform
                   Classified Work . . . . . . . . . . . . .    5
Section (d)        Management of the Mines . . . . . .    5
Section (e)        Union's Rights . . . . . . . . . . . . . .    5
Section (f)        Application of This Contract to
                   the Employer's Coal Lands . . . . .    6
Section (g)        Contracting and Subcontracting . .    6
Section (h)        Leasing, Subleasing and
                   Licensing Out of Coal Lands . . .    8
Section (i)        Construction Work . . . . . . . . . . . .    8

**Article II - JOB OPPORTUNITY AND BENEFIT
SECURITY (JOBS)** . . . . . . . . . . . . . . . . . . . . . .    9
A        Non-Signatory Operations of the
         Signatory Employer . . . . . . . . . . . . . . . . . .    10
B        Lessee-Licensee . . . . . . . . . . . . . . . . . . . . .    13
C        Coordination of Employment Obligations
         Under the JOBS Program . . . . . . . . . . . . . .    17
D-1      Employer-Wide Panel Rights to
         Signatory Operations . . . . . . . . . . . . . . . . .    18
D-2      Exhaustion of Employer Panel . . . . . . . . . . .    18
D-3      Monitoring of Job Selections . . . . . . . . . . . .    18
E        UMWA-BCOA Training and Education
         Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21
F        Skills Training . . . . . . . . . . . . . . . . . . . . . .    24
G        UMWA-BCOA Labor Management
         Positive Change Process ("LMPCP") . . . . .    26
H        UMWA-BCOA Labor Management
         Policy Committee . . . . . . . . . . . . . . . . . . . .    36
I        UMWA-BCOA Resolution of Disputes Trust .    38

i

*Contents*

Page

Section (i)    Job Bidding ................... 126
Section (j)    Training for Vacancy Not Filled
               by Bidding ................. 130
Section (k)    Transfer to Other Mines of
               Employer ................... 131
Section (l)    Leave of Absence ........... 133
Section (m)    Permanent and Temporary
               Supervisors ................ 133
Section (n)    Shift Preference ............. 134

**Article XVIII - TONNAGE RATES AND HAND
LOADING** ........................ 134
Section (a)    Tonnage Rates .............. 134
Section (b)    Checkweighman ............. 134
Section (c)    Preparation and Cleaning of Coal . 136
Section (d)    Delivery of Cars ............. 137
Section (e)    Explosives ................. 137
Section (f)    Bottom Coal ............... 137
Section (g)    Cutting Coal ............... 138
Section (h)    Blacksmithing .............. 138
Section (i)    Rockdusting ............... 138
Section (j)    Day Men Transferred ......... 138

**Article XIX - CLASSIFICATION** ........... 138
Section (a)    Working in Classification ........ 138
Section (b)    Classification Requirement ...... 138
Section (c)    Temporary Assignments ........ 139
Section (d)    Protection Against Discrimination  139
Section (e)    Compensation for Temporary
               Assignments ............... 139

**Article XX - HEALTH AND RETIREMENT
BENEFITS** ........................ 140
Section (a)    General Purpose ............. 140
Section (b)    1950 Pension Plan and Trust ..... 142

*Contents*
Page

Section (c)      1974 Pension Plan and Trust,
                 1993 Benefit Plan and Trust,
                 and Employer Benefit Plans  . . . .  143
Section (d)      Contributions by Employers  . . . . .  148
Section (e)      Responsibilities and Duties
                 of Trustees  . . . . . . . . . . . . . . . .  157
Section (f)      Audits, Reports and Notices  . . . . .  159
Section (g)      Administration of Trusts  . . . . . . . .  161
Section (h)      Guarantee of 1950 and 1974 Plans
                 and Trusts  . . . . . . . . . . . . . . . . .  163

## GENERAL DESCRIPTION OF THE HEALTH AND RETIREMENT BENEFITS . . . . . . . . . . . . . . . . . 164

(1)     Pensions for Miners Retired Under the
        1950 Pension Plan . . . . . . . . . . . . . . . . . . . . . . . .  168
(1A)    1950 Widows' Pension . . . . . . . . . . . . . . . . . . . .  171
(2)     Pensions for Miners Who Retired Under the
        1974 Pension Plan Prior to the
        Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . .  172
(3)     Pensions for Miners Who Retire on or
        after the Effective Date . . . . . . . . . . . . . . . . . . .  175
(4)     Signatory Service . . . . . . . . . . . . . . . . . . . . . . . .  178
(5)     Pensions for Disabled Miners . . . . . . . . . . . . . .  180
(6)     Pensions for Surviving Spouses . . . . . . . . . . . .  181
(6A)    Pre-retirement Survivor's Pension . . . . . . . . . . .  184
(7)     Deferred Vested or Special Pensions . . . . . . . . .  185
(7A)    Pension Bonuses . . . . . . . . . . . . . . . . . . . . . . . . .  191
(8)     Life and Accidental Death and
        Dismemberment Benefits . . . . . . . . . . . . . . . . . .  192
(9)     Pensioner's Death Benefits . . . . . . . . . . . . . . . . .  193
(10)    Health Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  195
(11)    Vision Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  208
(12)    Health Care Cost Containment . . . . . . . . . . . . . .  208
(13)    National Health Care . . . . . . . . . . . . . . . . . . . . . .  210

vii

Art. XX

shall not be construed to apply to Employees whose regular job duties include the relief of other Employees for short periods of time which do not exceed thirty (30) minutes for each occurrence during the basic workday. For such relief periods, however, the Employee providing relief shall be paid the higher rate.

## Article XX—HEALTH AND RETIREMENT BENEFITS

### Section (a) General Purpose

This Article makes provision for pension, health and other benefits for Employees covered by this Agreement, and for former Employees who were covered under the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such Employees. The benefits to be provided are as set forth under separate plans and trusts referred to in Sections (b) and (c) of this Article.

A general description of the benefits to be provided appears immediately following this Article. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

Pursuant to the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), the health benefits (and in some cases the death benefits) provided to retirees who were age and service eligible as of February 1, 1993,

Art. XX

and who actually retired by September 30, 1994, are guaranteed by an Act of Congress. The Coal Act, which was enacted with the active support of the United Mine Workers of America and the BCOA, requires responsible employers to provide and pay for these benefits for life. Although, under certain circumstances, employers are permitted to adopt cost containment and managed care programs, the levels of benefits provided to retirees and dependents covered by the Coal Act are fixed by law, and may not be changed by any employer.

Benefits under the Coal Act are provided either by the employer who was providing those benefits on February 1, 1993, or by two newly-created Funds: the United Mine Workers of America Combined Benefit Fund and the United Mine Workers of America 1992 Benefit Plan. Those benefits are not governed by this Agreement.

For purposes of this Article, the 1950 Pension Plan and Trust and the 1974 Pension Plan and Trust shall be a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund).

Each participant and beneficiary shall be entitled only to the pension benefits provided in and paid from either the 1950 Pension Plan and Trust or the 1974 Pension Plan and Trust and each participant, beneficiary and dependent shall be entitled only to the benefits provided in and paid from the 1993 Benefit Trust, or the individual benefit plans referred to in Section

141

Art. XX

(c). An individual that is entitled to health benefits from a plan maintained pursuant to the Coal Act will receive benefits from such plan, and not from a plan maintained pursuant to this Article. In addition, an individual that is entitled to death benefit coverage from the United Mine Workers of America Combined Benefit Fund shall not be entitled to death benefit coverage from any plan maintained pursuant to this Article.

The general purpose of the plans referred to in this Article shall be to provide health care for working and retired miners and their dependents; pensions for miners upon their retirement; health care and financial support for eligible disabled miners; and financial support for surviving spouses and surviving dependents provided by each of the Trusts and Plans referred to in this Article.

Except as otherwise specifically set forth in this Article, it is agreed that the Trusts referred to in this Article are irrevocable Trusts created pursuant to, and within the scope of, Section 302(c) of the Labor-Management Relations Act, 1947, and shall endure as long as the purposes for their creation shall exist.

## *Section (b)* **1950 Pension Plan and Trust**

(1) The United Mine Workers of America 1950 Pension Trust ("1950 Pension Trust") is incorporated by reference and made a part of this Agreement. The United Mine Workers of America 1950 Pension Plan (the "1950 Pension Plan") is incorporated by refer-

ence and made a part of this Agreement. The pensions to be paid from the 1950 Pension Trust are as set forth in the 1950 Pension Plan.

(2) Pursuant to the requirements of the Coal Act, the United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Benefit Trust") and the United Mine Workers of America 1974 Benefit Plan and Trust (the "1974 Benefit Trust") were merged into the United Mine Workers of America Combined Benefit Fund (the "Combined Fund"). The Combined Fund is governed by the terms of the Coal Act, and is not maintained pursuant to this Article. Health benefits for individuals who would be eligible for benefits under the 1950 Benefit Plan but for the passage of the Coal Act and who are not entitled to benefits under the Coal Act will be provided by the 1993 Benefit Fund during the term of this Agreement.

(3) Upon the discharge of all its obligations, any remaining assets in the 1950 Pension Trust shall, upon termination of such Trust, be transferred to the 1974 Pension Trust.

### Section (c)  1974 Pension Plan and Trust, 1993 Benefit Plan and Trust, and Employer Benefit Plans

(1) The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1974 Pension Trust are

Art. XX

as set forth in the United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan"), which is incorporated by reference and made a part of this Agreement. This Plan is a continuation of the pension program of the 1950 Fund and was effective December 6, 1974.

(2) The United Mine Workers of America 1993 Benefit Trust ("1993 Benefit Trust") is incorporated by reference and made a part of this Agreement. The 1993 Benefit Trust provides certain health benefits, not including pension benefits, and the terms and conditions under which those benefits will be provided are as set forth in the plan under the 1993 Benefit Trust and under the terms of this Article.

(3)(i) Each signatory Employer shall establish and maintain an Employee benefit plan to provide, implemented through an insurance carrier(s), health and other non-pension benefits for its Employees covered by this Agreement as well as pensioners under the 1974 Pension Plan and Trust whose last signatory classified employment was with such Employer and who are not eligible to receive benefits from a plan maintained pursuant to the Coal Act. The benefits provided by the Employer to its eligible Participants pursuant to such plan shall be guaranteed during the term of this Agreement by that Employer at levels set forth in such plan. The plans established pursuant to this subsection are incorporated by reference and made a part of this Agreement, and the terms and

conditions under which the health and other non-pension benefits will be provided under such plans are as to be set forth in such plans.

(ii) The 1993 Benefit Plan and Trust provides health and other non-pension benefits during the term of this Agreement, to any retired miner (or the eligible dependent of such retired or deceased miner) who meets the conditions of one of the following:

(a) The retired miner is described in Section (b)(2).

(b) The retired miner separated from classified employment prior to December 16, 1993, would be eligible to receive benefits from the 1974 Benefit Plan but for the passage of the Coal Act, is not entitled to benefits under the Coal Act, and whose last signatory employer was no longer deriving revenue from the production of coal on December 16, 1993.

(c) The miner is retired under the 1974 Pension Plan or any successor plan(s) thereto, last worked in signatory classified employment for an Employer who was obligated to contribute and contributed to the 1993 Benefit Trust at the rates specified in Section (d) and would otherwise cease to receive the health and other non-pension benefits provided herein because such last signatory Employer (including successors and assigns) is no longer in business. An Employer's obligation to contribute at the rates specified in Section (d) must be in effect on the date the Employer is first considered to be "no longer in business." For purposes of determining eligibility

145

Art. XX

under the 1993 Benefit Plan and Trust, the Employer is considered to be "no longer in business" only if the Employer meets the conditions of (I) and (II) below. The parties expressly intend that each of the requirements of (I) and (II) be met.

(I) The Employer has ceased all mining operations and has ceased employing persons under this Wage Agreement, with no reasonable expectation that such operations will start up again; and

(II) The Employer is financially unable (through either the business entity that has ceased operations as described in subparagraph (a) above, including such company's successors or assigns, if any, or any other related division, subsidiary, or parent corporation, regardless of whether covered by this Wage Agreement or not) to provide health and other non-pension benefits to its retired miners and surviving spouses.

In the case of an otherwise qualifying last signatory Employer that first became obligated to contribute to the 1993 Trust after December 31, 2001, within the meaning of Section (d)(1)(iii) of this Article, and that did not contribute to the 1993 Benefit Trust substantially all amounts owed and at the rates specified in Section (d), eligible retired miners and dependents shall receive only limited coverage under a separate program of benefits designed by the Plan's Trustees. The Trustees shall design the program taking into account the need for the Plan to remain sol-

146

vent throughout the term of this Agreement, while providing more complete benefits for individuals whose last signatory Employer met the "substantially all" contribution requirement of this Article.

Each Employer is required to maintain, and make available to the Trustees, those business and financial records that may be necessary to determine whether the eligibility requirements of the 1993 Benefit Trust have been satisfied. If a miner's last signatory Employer ceases to provide health benefits as required under Section (c)(3)(i) of this Article, and the Trustees are investigating whether the Employer is "no longer in business" within the meaning of Section (c)(3)(ii)(c) of this Article, the Employer shall make available to the Trustees those business and financial records that may be necessary to the "no longer in business" determination, including but not limited to financial statements, tax returns, bank statements, coal production and sales data, and information on equipment and other property and assets of the signatory Employer. The Trustees shall make their initial determination of whether an Employer is "no longer in business" no later than 90 days following receipt of such business and financial records, as practicable.

(d) The retired miner worked under the terms of the 1974 NBCWA (but not under the terms of the 1978 NBCWA), has been or would have been denied a benefit by the UMWA 1974 Benefit Plan solely because the miner did not work under the terms of a

Art. XX

1978 or subsequent NBCWA; and is not eligible to receive benefits under the Coal Act.

The Union and Trustees shall assist and fully cooperate with the Employers in obtaining all necessary opinion letters, exemptions, or rulings from the Department of Labor, the Internal Revenue Service or other applicable federal agencies, in order to implement the provisions of this subsection so as to ensure compliance with all applicable federal laws and regulations and ensure the deductibility for income tax purposes of any and all contributions made by signatory Employers to the 1993 Benefit Trust and the individual health plans referred to in this Section.

*Section (d)* **Contributions by Employers**

(1) During the life of this Agreement, for the periods of time indicated below, each signatory Employer (including those engaged in the production of coal and those not engaged in the production of coal) shall contribute to the Trusts referred to in this Article the amounts specified below based on cents per hours worked by each of the Employer's Employees who perform classified work under this Agreement.

(i) Into the 1950 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per hour on each such hour worked;

(ii) Into the 1974 Pension Trust: for the period beginning on the Effective Date and ending when this

148

Agreement is terminated, 0.0¢ per hour on each such hour worked for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1974 Pension Trust meeting the required standard of such Trust; and $0.75 per hour on each such hour worked for any Employer that became obligated to contribute for the first time on or after January 1, 2002.

(iii) Into the 1993 Benefit Trust: for the period beginning on the Effective Date and ending the day prior to the first anniversary of the Effective Date, 13¢ per hour on each such hour worked for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1993 Benefit Trust meeting the required standard of such Trust; and 75¢ per hour on each such hour worked for any Employer that became obligated to contribute for the first time on or after January 1, 2002; and for the period beginning on the first anniversary of the Effective Date and ending when this Agreement is terminated, 50¢ per hour on each such hour worked for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to

Art. XX

make contributions to the 1993 Benefit Trust meeting the required standard of such Trust; and 75¢ per hour on each such hour worked for any Employer that became obligated to contribute for the first time on or after January 1, 2002; provided that the obligation of each signatory Employer to make contributions into the 1993 Benefit Trust shall be suspended at any time that the net assets available for future benefits equal or exceed $20 million, and shall not resume following any such suspension until such time as the net assets available for future benefits are less than $15 million. For purposes of this subdivision, "net assets available for future benefits" is the amount shown as such on the 1993 Benefit Plan monthly financial statement, under "Statements of Net Assets Available for Plan Benefits."

(iv) In addition to the contributions indicated above, during the life of the Agreement, each signatory Employer shall, for the periods of time indicated below, contribute to the Trusts established in this Article in the amounts shown below based on cents per ton on each ton of two thousand (2,000) pounds of bituminous coal after production by another operator, procured or acquired by such Employer for use or for sale on which contributions to the appropriate Trusts as provided for in this Article have not been made (amounts shown below include cents per hours worked contributions converted to tonnage equivalents).

Art. XX

(a) Into the 1950 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per ton on each such ton;

(b) Into the 1974 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per ton on each such ton for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1974 Pension Trust meeting the required standard of such Trust; and 14.5¢ per ton on each such ton for any Employer that became obligated to contribute for the first time on or after January 1, 2002; and

(c) Into the 1993 Benefit Trust: for the period beginning on the Effective Date and ending the day prior to the first anniversary of the Effective Date, 2.5¢ per ton on each such ton for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1993 Benefit Trust meeting the required standard of such Trust; and 14.5¢ per ton on each such ton for any Employer that became obligated to contribute for the first time on or after January 1, 2002; and for the period beginning on the first anniversary of the Effec-

151

Art. XX

tive Date and ending when this Agreement is terminated, 10¢ per ton on each ton for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1993 Benefit Trust meeting the required standard of such Trust; and 14.5¢ per ton on each such ton for any Employer that became obligated to contribute for the first time on or after January 1, 2002; subject to the provision regarding suspension of the contribution obligation in (iii) above.

The parties hereto mutually agree that, if at any time during the term of this Agreement a court or tribunal of competent jurisdiction determines by a final decision that is not appealable that the provision appearing in paragraph (iv) just preceding is invalid or in violation of the National Labor Relations Act, 1947, as amended, or other Federal or state law, the parties shall, at the option of and upon demand by the Union, without affecting the integrity of any other provision of this Section or any other provision of the National Bituminous Coal Wage Agreement, meet and engage in good faith negotiations to agree upon a clause to be inserted into this Agreement in replacement of the provision found invalid or unlawful.

(v) In the event the BCOA ceases to exist, or in the event that more than 50% of the tonnage membership of BCOA on the Effective Date has withdrawn prior

152

Art. XX

to the time when the BCOA is required or permitted to take action under this Article, then such action may be taken by a majority vote, based on tonnage, of Employers who were BCOA members on the Effective Date.

(vi) At any time during the term of this Wage Agreement, the Bituminous Coal Operators' Association may reallocate the contributions to be paid under the respective subdivisions (i) and (ii) in this Section, which reallocation will increase the cents per hour to be contributed into the 1950 Pension Trust and correspondingly will decrease the cents per hour to be contributed by the Employers into the 1974 Pension Trust, or which will decrease the cents per hour to be contributed into the 1950 Pension Trust and correspondingly will increase the cents per hour to be contributed by the Employers into the 1974 Pension Trust, provided that notice shall be given to the Union, and to the Trustees (who shall in turn notify all contributing Employers) of the cents per hour to be allocated to each such Trust at least 30 days prior to the date the contributions become due and owing to the respective Trusts. No reallocation of the contributions to be paid to the two Trusts shall be made which will increase the total combined contributions required by this Article to be made by the Employers to those two Trusts.

(vii) Hours of work for purposes of Employer contributions to the plans and trusts described in this Article shall include all hours worked, or fractions

153

Art. XX

thereof, by Employees in a classified job covered by this Agreement. Hours actually worked for which a premium pay of any type is provided shall be treated for purposes of Employer contributions to the Trusts as though worked on a straight-time basis. Reporting pay for hours not actually worked shall not be included for the purpose of making Employer contributions to the Trust.

(2) The sole obligation under this Section of any Employer signatory hereto shall be to contribute the amounts specified in this Section.

(3) The obligation to make payments to the Trusts specified in this Article shall become effective on the dates specified in the respective Subdivisions (i) through (iv) of this Section, and the first payments are to be made on the 10th day of each month after such specified dates, and thereafter continuously on the 10th day of each succeeding calendar month.

(4) It shall be the duty of each of the Employers signatory hereto to keep current said payments due to the Trusts, and to furnish to the International Union, United Mine Workers of America and to the Trustees of those Trusts a monthly statement showing on a mine-by-mine basis the full amounts due hereunder and the tons of coal produced, procured or acquired for use or for sale and the hours worked with respect to which the amounts are payable. Payments to those Trusts shall be made by check payable, as appropriate, to:

Art. XX

"Trustees of the United Mine Workers of America 1950 Pension Trust"

"Trustees of the United Mine Workers of America 1974 Pension Trust"

"Trustees of the United Mine Workers of America 1993 Benefit Trust"

The Trustees are hereby authorized to require each signatory Employer to make payment of all contributions to the 1993 Benefit Trust, the 1950 Pension Trust and the 1974 Pension Trust by a single check made payable in such manner as may be specified by the Trustees.

(5) Payments shall be delivered or mailed to such location as designated by the Trustees of those Trusts.

(6) Failure of any Employer signatory hereto to make full and prompt payments to the Trusts specified in this Article in the manner and on the dates herein provided shall be deemed a violation of this Agreement. This obligation of each Employer signatory hereto, which is several and not joint, to so pay such sums shall be a direct and continuing obligation of said Employer during the life of this Agreement and it shall be deemed a violation of this Agreement, if any mine, preparation plant or other facility to which this Agreement is applicable shall be sold, leased, subleased, assigned, or otherwise disposed of for the purpose of avoiding any of the obligations hereunder.

155

Art. XX

(7) Each Employer agrees to give proper notice to the president of the appropriate local union by the 18th day of each month that the Employer has made the required payment to the Trusts for the previous month, as required by this Article, or is delinquent in such payment, such notice to set forth the amount paid to the Trusts, or the amount of the delinquency, the tonnage procured or acquired for use or for sale and the hours worked with respect to the mine or mines under the jurisdiction of such local union. Each Employer agrees to give notice to the appropriate president of the local union by the 18th day of each month that the Employer has made the appropriate payment to the insurance carrier for the Employer benefit plan established under (c)(3) above, or is delinquent in such payment.

(8) Title to all the monies paid into and/or due and owing to the Trusts specified in this Article shall be vested in and remain exclusively in the Trustees of those Trusts. It is the intention of the parties hereto that those Trusts shall constitute irrevocable trusts and that no benefits or money payable from those Trusts shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and that any attempt so to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be void.

(9) It is understood that the individual Employees of Employers agree, through their representative, the

156

Art. XX

United Mine Workers of America, to surrender any personal or individual right to or interest in monies paid or required to be paid to the Trusts pursuant to this Agreement.

(10) Any judgment obtained by the Trustees of the Trusts established pursuant to this Agreement for a default giving rise to damages accruing to more than one of the Trusts established hereunder shall be allocated by the Trustees among such Trusts in proportion to the amounts owing to each which gave rise to such judgment.

*Section (e)* **Responsibilities and Duties of Trustees**

(1) The 1950 Pension Trust, the 1974 Pension Trust, and the 1993 Benefit Trust shall each be administered by a Board of four Trustees, two of whom shall be appointed by the Employers and two of whom shall be appointed by the Union. Either party may, but shall not be required to, appoint an individual to serve as a Trustee on more than one Trust. One of the Trustees appointed by the Union shall be the Chairman. Each Board of Trustees shall perform its duties in accordance with the requirements, terms and conditions of each such Trust.

(2) It is the intent and purpose of the contracting parties that full cooperation shall be given by each of them to one another, to the Trustees provided for under this Article, and to all affected mine workers, to the eventual coordination and development of poli-

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Michael H. Holland, Michael W. Buckner, B.V. Hyler and Steven F. Schaab as Trustees of the United Mine Workers of America 1974 Pension Trust,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>Freeman United Coal Mining Company, et al.,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 07-cv-00490 (PLF/AK) |
| Freeman United Coal Mining Company,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>United Mine Workers of America, et al.,<br><br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 07-cv-01050 (PLF/AK) |

## PROPOSED ORDER DENYING TRUSTEES'
## MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on a Motion for Summary Judgment filed by Michael H. Holland, Michael W. Buckner, B.V. Hyler, and Steven F. Schaab, in their capacity as Trustees of the United Mine Workers of America 1974 Pension Trust and the Opposition of Defendant, Monterey Coal Company thereto in Case No. 07-cv-00490.

The Court having reviewed the pleadings and arguments of the parties, it is hereby ORDERED this ___ day of _____, 2007 that said Motion for Summary Judgment should be, and is hereby, denied.

　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　United States District Court Judge