## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
Michael H. Holland, Micheal W. Buckner,    )
B.V. Hyler and Steven F. Schaab as Trustees )
of the United Mine Workers of America 1974 )
Pension Trust,    )
              Plaintiffs,    )
)
      v.    )
)    Case No. 07-cv-00490 (PLF/AK)
Freeman United Coal Mining Company, et al.,    )
)
          Defendants.    )
_____)
)
Freeman United Coal Mining Company,    )
)
         Plaintiff,    )    Case No. 07-cv-01050 (PLF/AK)
)
      v.    )
)
United Mine Workers of America, et al.,    )
)
         Defendants.    )
_____)

### FREEMAN UNITED COAL MINING COMPANY'S OPPOSITION TO THE MOTIONS FOR SUMMARY JUDGMENT FILED BY THE 1974 PENSION TRUST, UNITED MINE WORKERS OF AMERICA, AND BITUMINOUS COAL OPERATORS' ASSOCIATION

Freeman United Coal Mining Company ("Freeman") hereby submits its combined opposition to the motions for summary judgment filed by Michael H. Holland, Micheal W. Buckner, B.V. Hyler, and Steven F. Schaab, in their capacity as Trustees of the United Mine Workers of America 1974 Pension Trust ("Trustees"), the United Mine Workers of America ("UMWA"), and the Bituminous Coal Operators' Association ("BCOA").  In the alternative, by separate motion pursuant to Federal Rule of Civil Procedure 56(f), Freeman moves the Court to deny, or at the very least stay its ruling on the motions for summary judgment until Freeman has

had the opportunity to complete fact discovery and to supplement its opposition.  The  following materials are submitted in support of Freeman's opposition and Rule 56(f) motion:   (1) memorandum and points of authority in support of opposition (including Exhibits A through T); (2) statement of issues setting forth all material facts as to which there is a genuine issue necessary to be litigated and responding to the opposing parties' statements of fact; (3) motion pursuant to Rule 56(f); (4) memorandum and points of authority in support of Rule 56(f) motion; (4) affidavit of Susan C. Levy in support of Rule 56(f) motion.

Respectfully submitted,


   /s/ Susan C. Levy

Paul M. Smith
DC Bar No. 358870
Jessica Ring Amunson
DC Bar No. 497223
JENNER & BLOCK LLP
601 13th Street, NW
Washington, DC 20005
Tel:    (202) 639-6000
Fax:    (202) 661-4993
psmith@jenner.com
jamunson@jenner.com

Susan C. Levy (*pro hac vice*)
Aaron M. Forester (*pro hac vice*)
JENNER & BLOCK LLP
333 North Wabash Avenue
Chicago, IL 60611
Tel:    (312) 923-2772
Fax:    (312) 840-7772
slevy@jenner.com
aforester@jenner.com

Michael W. Robinson
DC Bar No. 437979
Gregory J. Ossi
DC Bar No. 460243

VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, VA 22182
Tel:     (703) 760-1600
Fax:     (703) 812-8949
mwrobinson@jenner.com
gjossi@jenner.com

***Counsel for Freeman United
Coal Mining Company***

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
Michael H. Holland, Micheal W. Buckner,                 )
B.V. Hyler and Steven F. Schaab as Trustees             )
of the United Mine Workers of America 1974              )
Pension Trust,                                          )
                        Plaintiffs,                     )
                                                        )
            v.                                          )
                                                        )    Case No. 07-cv-00490 (PLF/AK)
Freeman United Coal Mining Company, et al.,             )
                                                        )
            Defendants.                                 )
_____)
                                                        )
Freeman United Coal Mining Company,                     )
                                                        )
            Plaintiff,                                  )    Case No. 07-cv-01050 (PLF/AK)
                                                        )
            v.                                          )
                                                        )
United Mine Workers of America, et al.,                 )
                                                        )
            Defendants.                                 )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FREEMAN UNITED COAL MINING COMPANY'S OPPOSITION TO THE MOTIONS FOR SUMMARY JUDGMENT FILED BY THE 1974 PENSION TRUST, UNITED MINE WORKERS OF AMERICA, AND BITUMINOUS COAL OPERATORS' ASSOCIATION

Freeman United Coal Mining Company ("Freeman") hereby submits this memorandum

of points and authorities in opposition to the motions for summary judgment filed by Michael H.

Holland, Micheal W. Buckner, B.V. Hyler, and Steven F. Schaab, in their capacity as Trustees of

the United Mine Workers of America 1974 Pension Trust ("Trustees"), the United Mine Workers

of America ("UMWA"), and the Bituminous Coal Operators' Association ("BCOA").  In the

alternative, by separate motion, Freeman moves the Court to abstain from ruling on the motions

for summary judgment until Freeman is able to complete the discovery necessary to allow it to submit by affidavit the facts essential to its opposition, pursuant to Rule 56(f).

## INTRODUCTION

In these combined cases, Freeman seeks a declaratory judgment that it is not obligated to contribute to the 1974 Pension Plan and Trust ("Trust") at the exorbitant rates set by the so-called 2007 National Bituminous Coal Wage Agreements ("2007 Agreement"), and the Trustees have sued Freeman for breach of contract for failure to contribute at the rates set by the 2007 Agreement. Freeman contends that it is not obligated to contribute under the 2007 Agreement because it is not a signatory to that agreement, and the 2007 Agreement, unlike all previous National Bituminous Coal Wage Agreements ("NBCWAs"), is not a true "successor agreement," as required for the "evergreen clause" of the Trust to impose a continuing obligation. At the time the UMWA and the BCOA negotiated the 2007 Agreement, Consolidation Coal Company ("Consol"), along with its affiliates, was the sole remaining member of the BCOA. All other members of the BCOA had previously withdrawn from the multi-employer bargaining unit.

Therefore, unlike *all* previous NBCWAs, the 2007 Agreement was negotiated not by a multi-employer bargaining unit, but by a single company, Consol. Other companies *later* signed separate agreements adopting some of the terms of the 2007 Agreement as they related to the Trust only after they were coerced to do so by UMWA-threatened strikes or other economic action. The 2007 Agreement is therefore not a "successor" national agreement and is not binding on Freeman under the terms of the evergreen clause. In the alternative, if the Court finds that Freeman is obligated to pay the rates set forth in the 2007 Agreement, Freeman seeks in Count II of its complaint to recover damages from BCOA for negotiating unfair and unreasonable Trust contributions in violation of its duties of good faith and fair dealing to Freeman. As shown

below, in negotiating the 2007 Agreement, BCOA deliberately abused its position to gain an unfair competitive advantage for its sole member, Consol, because Consol was better positioned than other companies to absorb the increased benefit contribution obligations.

Before they produced any discovery in this case, the Trustees, BCOA, and UMWA ("the opposing parties") filed motions for summary judgment on the issue of Freeman's liability to make contributions to the Trust. BCOA also has moved for summary judgment on the damages claim in Count II of Freeman's complaint. The opposing parties argue that *United Mine Workers of America 1974 Pension Trust v. Pittston*, 782 F. Supp. 658, *aff'd*, 984 F.2d 469 (D.C. Cir. 1993) ("*Pittston*") is *stare decisis* and conclusive of all the issues in this case. As set forth more fully below, *Pittston*, which held that an agreement between a single company and the UMWA cannot be a "successor agreement" under the terms of the evergreen clause, only highlights why summary judgment should be denied and additional discovery allowed in this case.

The opposing parties' discussion of *Pittston* is selective at best, ignoring two key holdings that underscore why denial of summary judgment is appropriate and discovery must be allowed to proceed. First, the *Pittston* court held that in order to determine the meaning of the evergreen clause, it would need to consider extrinsic evidence on the issue of the drafters' intent. 782 F. Supp. at 663-64. Indeed, the *Pittston* court allowed two full years of discovery on these issues. *Id*. at 664 n.11, 665 n.15. Here, the Trustees seek to thwart Freeman's efforts to obtain discovery as to the meaning and intent of the evergreen clause even though this case raises issues that were not addressed in *Pittston*, or in the declarations submitted in that case. In particular, this action raises two new issues: (1) whether an agreement between the UMWA and the BCOA can still be a "successor" agreement even if the BCOA is no longer a multi-employer bargaining unit; and (2) whether a single-company agreement can somehow be transformed after the fact

3

into a "successor" national agreement, when other unwilling coal companies are coerced, frequently through strikes or threats of strikes, to sign "me too" agreements.

Second, in *Pittston*, the court found and the Trustees and their affiants *admitted repeatedly* that the continuing obligation of the evergreen clause did *not* impose perpetual obligations to contribute to the Trust. Rather, the evergreen clause was intended to apply only when true successor agreements to the NBCWAs were negotiated between the UMWA, representing the union, and the BCOA, which was then a *multi-employer* bargaining unit. 984 F.2d at 472. Now, the Trustees make just the opposite argument. They argue it is irrelevant whether the 2007 Agreement is a true "successor agreement" and that Freeman is obligated by the Trust documents to follow the 2007 Agreement even though it is a single-company agreement. The Trustees' inconsistent arguments raise at least genuine issues of material fact requiring additional discovery regarding the application of *Pittston* to this case and whether the current agreement between Consol/BCOA and the UMWA is a true "successor agreement."

The opposing parties also submit the declarations of Cecil Roberts of the UMWA and Charles Perkins of the BCOA to support their claim that the 2007 Agreement is a successor national agreement. These submissions make it even clearer that there are disputed issues of material fact. Freeman is entitled to depose these declarants and to seek other discovery regarding the circumstances surrounding the negotiation of the 2007 Agreement to determine whether it is truly a successor agreement within the meaning and intent of the evergreen clause. Indeed, Freeman already has substantial evidence that refutes these declarations including evidence showing: (1) when the UMWA negotiated the 2007 Agreement it believed it was negotiating only a single-company agreement with Consol; (2) one of Consol's goals in negotiating the 2007 Agreement was to drive up costs for other coal companies in order to gain

4

an unfair competitive advantage; (3) the other coal companies signed "me too" agreements reluctantly and only after being threatened by the UMWA with strikes against the companies; and (4) there was no reasonable justification for the substantial contribution rate increases in the 2007 Agreement.  Certainly neither the drafters of the evergreen clause nor the *Pittston* court ever envisioned that a binding "successor" national agreement would be found to exist under these inequitable circumstances.

Finally, the court should deny BCOA's motion relating to Count II of Freeman's complaint.  BCOA's motion makes the irreconcilable arguments that its negotiations have the power to bind Freeman, yet it was not acting as Freeman's agent and owes Freeman no duties.  BCOA cannot have it both ways.  The Central District of Illinois already rejected these arguments when it denied BCOA's motion to dismiss.  The BCOA also raises a host of arguments regarding the alleged reasonableness of the rates set by BCOA in the 2007 Agreement, which raise numerous factual issues that preclude summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment "ordinarily 'is proper only after the plaintiff has been given adequate time for discovery.'"  *Americable Int'l, Inc. v. Dep't of Navy*, 129 F.3d 1271, 1274 (D.C. Cir. 1997) (quoting *First Chicago Int'l v. United Exch. Co*., 836 F.2d 1375, 1380 (D.C. Cir. 1988)).  "Indeed, a reasonable opportunity to complete discovery before grappling with a summary judgment motion is the norm."  *Martin v. Malhoyt*, 830 F.2d 237, 256 (D.C. Cir. 1987).  Here, discovery has only just begun and the Court has ruled that fact discovery will continue until January 18, 2008.  *See* Scheduling Order at 1 (July 20, 2007).  "Particularly in a case such as this where discovery has been limited, 'in determining whether summary judgment is proper, a court ordinarily must look at the record in the light most favorable to the party opposing the motion,

drawing all inferences most favorable to that party.'" *Fludd v. United States Secret Serv.*, 771 F.2d 549, 554 (D.C. Cir. 1985) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 816 n.26 (1982)).

Thus, because this is a case in which Freeman has not yet had a meaningful opportunity to take discovery, this Court must be especially vigilant in drawing all inferences in Freeman's favor.  In the alternative, the Supreme Court has held that "[a]ny potential problem with such premature motions can be adequately dealt with under Rule 56(f), which allows a summary judgment motion to be denied, or the hearing on the motion to be continued, if the nonmoving party has not had an opportunity to make full discovery."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (footnote omitted).  Here, and as is more fully set forth in its Rule 56(f) motion, Freeman submits that the Court should deny the motions for summary judgment, or at the very least stay its ruling until Freeman has had the opportunity to complete fact discovery and to supplement its opposition.

## ARGUMENT

### I.    *PITTSTON* SUPPORTS DENIAL OF SUMMARY JUDGMENT AND THE OPPORTUNITY FOR FURTHER DISCOVERY IN THIS CASE.

The opposing parties argue that the issues in this case are the same issues as those decided in *Pittston*, and therefore summary judgment is mandated in this case.  But there are major differences between these two cases. In *Pittston*, several coal companies that had been signatories to an NBCWA withdrew from the BCOA, which at the time was a multi-employer collective bargaining unit, and negotiated individual collective bargaining agreements with the UMWA.  *See* 984 F.2d at 472.  These single-company agreements modified the companies' obligation to pay into the 1950 and 1974 Trusts.  *Id*.  When the Trustees sued to collect delinquent contributions from the companies based on the theory that the evergreen clause obligated them to continue paying into the Trusts at rates set by the then most recent NBCWA,

the coal companies contested the claim by arguing that their single-company agreements were "successor agreements" under the evergreen clause.  *See* 782 F. Supp. at 663.

In resolving this issue, the *Pittston* district court first stated that it would allow extrinsic evidence about the meaning of the evergreen clause.  *See* 782 F. Supp. at 663-64.  The court held that when interpreting collective bargaining agreements, extrinsic evidence of the meaning of disputed clauses, such as past practice, related agreements and bargaining history are quite properly considered to determine the parties' intentions, especially where the agreement is ambiguous.  *See id.* at 664 (citing *United Mine Workers of America 1950 Benefit Plan and Trust v. Bituminous Coal Operators' Ass'n*, 898 F.2d 177, 180-81 (D.C. Cir. 1990)).  In fact, the court allowed Pittston "two years to conduct discovery, knowing that the Court would likely consider extrinsic evidence."  *Id.* at 665 n.15.

In the *Pittston* litigation, the Trustees submitted the declarations of five people who took part in the negotiations of the evergreen clause.  (The Trustees resubmitted those same affidavits in this case.  *See* Exs. A-E, appended to Clark Decl. in support of Trustees' Mot. for Summ. J. [hereinafter "Tr. Mot."].)  Those declarations state that the intent of the evergreen clause was to ensure that all employers participating in the Trust would share equally in funding future benefits.  However, the declarants also repeatedly stated that the evergreen clause did not impose perpetual contribution obligations on employers.  Rather, an employer's obligation to comply with the contribution provisions would cease if no "successor" NBCWA was negotiated.  *See, e.g.,* Kempken Decl. ¶ 13 (appended as Ex. C to Clark Decl.) ("By requiring employers to continue to contribute according to the terms of successor NBCWAs, however, we did not create, and did not intend to create, an obligation to contribute to the Funds forever.  The obligation to contribute continues only so long as successor NBCWAs are negotiated by BCOA

and UMWA, and require contributions to the Funds.  If a successor NBCWA is not negotiated by BCOA and the UMWA, or if a successor NBCWA does not require contributions to the Funds, then the evergreen clause does not require any continuing contributions."); Shaner Decl. ¶ 6 (appended as Ex. B to Clark Decl.) ("Any employer that signed the 1978 NBCWA was being obligated to contribute to the Funds at the NBCWA-established rate, and that obligation was to continue so long as successor NBCWAs were negotiated by the BCOA and the UMWA and required such contributions.").

Consistent with its declarations, the Trustees repeatedly represented to the *Pittston* court that the continuing obligation to contribute set forth in the evergreen clause was not indefinite or perpetual but would continue "only as long as BCOA and the UMWA continued to set contribution rates in *successor* NBCWAs."  Ex. A to Freeman Mot, Trustees' Mem. in Supp. of their Mot. for Summ. J. and in Opp'n to Rawl's Mot. to Dismiss or in the Alternative for Summ. J., at PT-00119, *In re United Mine Workers of America Employee Ben. Plans Litigation*, No. 88-969 (D.D.C. March 8, 1991) (emphasis added) [hereinafter "Ex. A to Freeman Mot."]; *see also id.* at PT-00137 (arguing that contribution obligations continued only "as long as there are successor national agreements setting contribution rates for the Funds"); *id.* at PT-00142-43 (arguing that the rate set in each NBCWA expired at the end of that NBCWA and the new contribution rates would not take effect until the "successor NBCWA was in place").  Needless to say, these judicial admissions are entirely inconsistent with the arguments the Trustees now make to this Court – that Freeman is required to contribute to the Trust regardless of whether the 2007 Agreement is a "successor agreement" to prior NBCWAs.  *See* Tr. Mot. 19 ("Freeman …[is] obligated by the evergreen clause to make those contributions – wholly without regard to the question whether the 2007 NBCWA is a 'successor agreement' to the prior NBCWAs.")

The *Pittst*on court granted the Trust's motion for summary judgment, holding that (1) individual collective bargaining agreements with the UMWA could not be "successor agreements" within the meaning of the evergreen clause, and (2) only subsequent NBCWAs could be "successor agreements" within the meaning of the evergreen clause.  782 F. Supp. at 664, *aff'd*, 984 F.2d at 473-474.  The court also found that the obligation to contribute continued only as long as successor NBCWAs were in place.  *See* 782 F. Supp. 2d at 669-70.  These rulings were then affirmed by the D.C. Circuit.  *See* 984 F.2d 469 (D.C. Cir. 1993).

Significantly, because it was not at issue in that case, the *Pittston* court never decided precisely what requirements were necessary for an agreement to qualify as a successor NBCWA.  The *Pittston* court did not conclude that *any* agreement negotiated by the BCOA, even if it is no longer a multi-employer bargaining unit, is still a "successor agreement."  Nor did it decide that any agreement subsequently denominated a "National Bituminous Coal Wage Agreement," even if negotiated by a single company, was necessarily a "successor agreement." As discussed more fully in Part II, *infra*, those questions raise many issues of disputed fact on which discovery is necessary.

Therefore, the Court should reject the opposing parties' principal argument – that *Pittston* mandates the grant of summary judgment in favor of the opposing parties.  Unlike *Pittston*, the issue in this case is whether an agreement negotiated by BCOA, when it is no longer a multi-employer unit but represents only a single company, still qualifies as a "successor NBCWA" under the terms of the evergreen clause.  Freeman intends to take discovery on this issue and has

already served related requests for production, interrogatories, and deposition notices on this issue.[1]

## II.   WHETHER THE 2007 AGREEMENT IS A SUCCESSOR AGREEMENT RAISES GENUINE ISSUES OF MATERIAL FACT.

As shown above, the history and purpose of the evergreen clause, as interpreted by this Court in *Pittston*, establish that employers are not obligated to contribute to the Trust until and unless a "successor agreement" is negotiated.  *See Pittston*, 984 F.2d at 472 ("the evergreen clause obligates the Coal Companies to continue contributing to the trusts at the levels established in successor NBCWAs").  The opposing parties argue that the 2007 Agreement is a successor agreement, because (1) it was negotiated by the BCOA, even though at the time the BCOA was only a single company and not a multi-employer bargaining unit; (2) the BCOA negotiated all previous NBCWAs; and (3) 31 non-BCOA companies later adopted the 2007 Agreement via "me too" agreements.  Tr. Mot. 20-24; BCOA Memo. in Support of Mot. for Summ. J. 11-13 [hereinafter "BCOA Mot."]; UMWA Memo. in Support of Mot. for Summ. J.7-11 [hereinafter "UMWA Mot."].

---

[1] Moreover, for the reasons set forth in Monterey Coal Company's memorandum in opposition to the opposing parties' motions for summary judgment, there is a disputed issue of fact as to whether Article VIII.B.(4) of the Trust, the separate "discontinuance of contributions" provision, supersedes and negates the opposing parties' reliance on the evergreen clause.  In the alternative, to the extent that the Trustees argue that the 2002 NBCWA's special 0.75 cent per hour rate for new employers defeats Monterey's argument, there would exist a disputed issue of fact as to whether the unequal contribution rates of the 2002 NBCWA effectively nullified the evergreen clause.  In *Pittston*, the court held that "[h]aving reviewed the voluminous evidence of the negotiating history of the evergreen clause, the Court is convinced that the clause was intended to ensure that all participating employers would contribute equally to the Trusts…."  782 F. Supp. at 667.  This basis for the evergreen clause was destroyed when the 2002 NBCWA set unequal contribution rates for employers paying into the 1974 Pension Trust.  *See* Ex. T to Freeman Mot., 2002 NBCWA, Article XX, Section (d) (establishing a contribution rates of zero cents per hour for employers that had the obligation to contribute prior to 2002 and a contribution rate of 75 cents per hour for employers that first became obligated to contribute on or after January 1, 2002).

By submitting their own declarations on these issues, the opposing parties effectively concede that this question raises factual issues. Indeed, the Trustees admit that "the characteristics that are necessary for an agreement to be considered an NBCWA" are not defined in the NBCWA and therefore "it is necessary to consider other factors external to the underlying NBCWA itself" including "the understandings of, and the actions of, the relevant players in the organized sector of the bituminous coal mining industry." Tr. Mot. 21. The Trustees then refer to a 17-page declaration of current UMWA President Cecil E. Roberts, submitted by the UMWA, *see* Roberts Decl. (appended as Ex. 1 to UMWA Mot.). Tr. Mot. 21-24.

In his declaration, Mr. Roberts discusses the negotiation of the 2007 Agreement. He states the following regarding the UMWA's intent in negotiating the 2007 Agreement:

- Both the UMWA and the BCOA were concerned with compliance with the Pension Protection Act of 2006 ("PPA"). Roberts Decl. ¶ 14.

- The UMWA wanted to increase pension benefits in the 2007 Agreement and the Unions sought and obtained an increase in the pension accrual for active and retired employees. *Id.* ¶¶ 15, 16.

- "Throughout our negotiations with the BCOA in 2006, it was the UMWA's intention that it would negotiate a labor contract with the BCOA, the 2007 NBCWA, which would establish the industry standard . . . just as the UMWWA and BCOA had done in the 2002 and prior NBCWAs. Consequently . . . I stated that the UMWA intended the contract to be an industry-wide agreement and that we were going to provide the coal companies that were not members of BCOA with an opportunity to sign the agreement." *Id.* ¶ 22.

- The Union considers the 2007 Agreement to establish the standards for the organized bituminous coal industry. *Id.* ¶ 26.

Mr. Roberts' declaration also describes how other companies later signed "me too" agreements adopting some of the terms of the 2007 Agreement, at least as they related to the Trust: "In relatively short order . . . all of the major coal operators in our industry signed on to the relevant provisions of the 2007 NBCWA." *Id.* ¶ 23. He then identifies six companies that entered into

agreements mirroring the 2007 Agreement from January through April 2007.   *Id.*   Based on Mr.

Roberts' statements, the Trustees have advised this Court:  "The employer community response

to this UMWA solicitation was overwhelmingly positive."  Tr. Mot. 23.

In its motion, BCOA argues, without citing any authority, that:  "There is no minimum

membership requirement for BCOA" and "there is no authority suggesting that BCOA, however,

constituted, cannot negotiate with the UMWA an NBCWA that sets the pattern for the industry."

BCOA Mot. 13.  BCOA argues that its role in the coal industry is well established and has been

recognized by numerous courts.  *Id*. at 14.  The BCOA also submits the Declaration of Charles

Perkins, which states that the BCOA agreed to raise the contribution rates because of UMWA

demands and the requirements of the PPA.[2]

All of the evidence and arguments offered by the opposing parties on this issue raise

material issues of disputed fact.  The defendants have not yet had the opportunity to depose Mr.

Roberts or Mr. Perkins and all of the relevant BCOA and UMWA documents relating to the

negotiation of the 2007 Agreement have not been produced.   The defendants have not yet had

the opportunity to depose other negotiators of the 2007 Agreement or to subpoena those 31 other

companies who – according to the Trustees – responded "overwhelmingly positively" to the

2007 Agreement.   However, although full discovery is required, Freeman is already in

---

[2] BCOA also argues that it had authority to negotiate the 2007 Agreement under a provision of the NBCWA stating that "[i]n the event BCOA ceases to exist, or in the event that more than 50% of the tonnage membership of BCOA on the Effective Date [of the NBCWA] has withdrawn prior to the time when the BCOA is required or permitted to take action under this Article [XX], then such action may be taken by majority vote, based on tonnage, of Employers who were BCOA members on the Effective Date."  BCOA Mot. 13.  That is a straw man argument.  Freeman does not argue that BCOA has ceased to exist.  BCOA certainly does exist but it is comprised of only one company and is no longer a multi-employer bargaining association.  Therefore, it cannot negotiate a successor NBCWA within the meaning of the evergreen clause.

possession of substantial evidence that refutes the Roberts and Perkins declarations and the opposing parties' arguments on this issue, including evidence reflecting the following:

**The 2007 Agreement is a single-company agreement.**

There is substantial evidence that the 2007 Agreement is a single-company agreement, including evidence that when the UMWA was negotiating the 2007 Agreement with the BCOA, it believed and acted as if it was negotiating only a single-company agreement with Consol.  The evidence includes the following:

- Ex. A to UMWA Mot.:  UMWA Press Release (Dec. 21, 2006) ("The agreement will, at the outset, be between the UMWA and Consol …, which is the only company currently in the BCOA.").

- Ex. B. to Freeman Mot.:  *An Historic Contract:  An Interview with President Roberts, United Mine Workers Journal* 9 (Jan/Feb 2007) ("Bargaining [for the 2007 Agreement] last year was complicated by an exodus from the BCOA that left Consol Energy as its sole remaining member.  . . . That is one reason why we negotiated with Consol first.").

- Ex. C. to Freeman Mot.:  Barry Cassell, UMWA Locals Approve Contract, Setting Stage For Non-Consol Talks, *Power & Coal – Operations & Strategy* (Dec. 22, 2006) ("With a new contract with CONSOL Energy Inc., now in hand, the United Mine Workers of America will be trying over the next few weeks to get several other coal companies to sign into this five-year agreement.").

- Ex. D. to Freeman Mot.:  Declaration of William D. Stanhagen (Oct. 3, 2007) During the 2007 Agreement negotiations, Consol directed the BCOA essentially as an "extension of Consol."  Stanhagen Decl. ¶ 7.

- Ex. Q to Freeman Mot.:  *A .T. Massey Coal Co*., Case No. 9-CA-21448, NLRB Advice Memorandum (April 23, 1985) (former BCOA member companies who were all commonly owned constituted a "single employer" under federal labor law where there was also common control of their negotiations with the UMWA).

- Perkins Decl. ¶ 7 (appended to BCOA Mot.) (identifying Consolidation Coal and its affiliates as "commonly owned").

- Ex. R to Freeman Mot.: Amendment No. 1 to Consol's Form S-3 Registration Statement under the Securities Act of 1933 (as filed with the SEC on July 30, 2003) (demonstrating all Consol-affiliated companies currently in the BCOA had Consol executives as presidents).

- Ex. S to Freeman Mot., Form 10-K for Consol Energy, Inc., Annual Report Pursuant to Section 13 or 15(d) of the Securities and Exchange Act of 1934 for the fiscal year ending December 31, 2006, at 160 (identifying executives of Consol Energy, Inc.).

## Consol/BCOA sought an unfair competitive advantage in negotiating the 2007 Agreement.

Freeman has substantial evidence that Consol increased rates to gain an unfair, competitive advantage over other coal companies, including Freeman, and to drive up their costs. The evidence includes the following:

- "[O]ne of Consol's goals for the negotiation of the 2007 Agreement was to gain a competitive advantage over other coal companies that would be bound by the Agreement by using the Agreement to drive up benefit costs." Ex. D. to Freeman Mot., Stanhagen Decl. ¶ 9.

- "Consol's goal of increasing benefit costs was rooted in the knowledge that long wall operators, like Consol, could more easily absorb the increased costs, while mine operators using the continuous mining method could not absorb the increased benefits costs." *Id*. ¶ 10.

- "[T]his would give Consol the ability to absorb the market" left by coal operators struggling to remain competitive and financially viable." *Id*. ¶ 11.

## Other employers were coerced to sign "me too" agreements patterned after the 2007 Agreement.

Freeman has substantial evidence rebutting the opposing parties' argument that "[t]he employer community response to this UMWA solicitation was overwhelmingly positive." Tr. Mot. 23. Indeed, Freeman has submitted evidence showing that the industry response to the 2007 Agreement was not, in fact, "overwhelmingly positive" and that there was not a "single unionized coal company that wanted to have an agreement with the UMWA that would contain these increases to the UMWA 1974 Pension Plan rates." Ex. G to Freeman Mot., Austin Decl. ¶ 4. Moreover, the UMWA forced other coal companies to sign "me too" agreements adopting

some of the terms of its so-called "national" agreement only by striking or threatening strikes or

other economic action. The evidence includes the following:

- Ex. A to UMWA Mot.: UMWA Press Release (Feb. 9, 2007) (discussing "looming strike" against Peabody Energy because it would not sign a "me too" agreement).

- Ex. A to UMWA Mot.: UMWA Press Release (April 12, 2007) (discussing UMWA strike against Foundation Coal because it would not sign on to "national" pattern agreement).

- Ex. B. to Freeman Mot.: *An Historic Contract: An Interview with President Roberts, United Mine Workers Journal* 9 (Jan/Feb 2007) (explaining how the UMWA was in the process of communicating to "hold-out [non-BCOA member] operators" that such "hold-out operators" needed "to come on board and sign ["me too" agreements] as soon as possible" and that the UMWA was "preparing and training [its] local union leaders and members for the alternative [*i.e.*, strikes or other economic action] in case they do not").

- Ex. I to Freeman Mot.: *Business Wire*, Foundation Coal Addresses Possible Strike (April 2, 2007) (stating that the UMWA would strike Foundation mines unless it signed a "me too" agreement patterned on the 2007 National Agreement).

- Ex. J to Freeman Mot.: *Business Wire*, Cumberland and Emerald Remain Ready To Sign 2007 National Wage Agreement (April 6, 2007) (stating that the mining companies were ready to sign "me too" agreements so that striking employees would return to work).

- Ex. G to Freeman Mot.: Austin Decl. ¶ 4 ("After the UMWA had signed the 2007 wage agreement with Consol, other company officials of unionized coal companies complained about the new contract. They were especially concerned about the UMWA 1974 Pension Plan contribution rates. . . . I do not know of a single unionized coal company that wanted to have an agreement with the UMWA that would contain these increases to the UMWA 1974 Pension Plan contribution rates. . . . Rather, most company officials . . . were eager to learn of any strategies to avoid agreeing to make similar increases in their respective contracts with the UMWA.").

**<u>There is no reasonable justification for the 2007 Agreement rate increase.</u>**

Freeman has substantial evidence that refutes the opposing parties' arguments that the exorbitant increase in rates set by the 2007 Agreement was justified because of UMWA demands and/or the PPA. The evidence includes the following:

- The PPA did not compel the BCOA or the UMWA to increase rates under the Trust. The PPA only addresses funding issues for multi-employer plans with less than 80% funding starting in 2008 or an accumulated funding deficiency starting in 2008. *See* Pension Protection Act of 2006, Pub. L. No. 109-280, §202(b), 120 Stat. 780 (2006). Prior to the 2007 Agreement, by its own actuaries' calculations, the Trust was over 91% funded. Taking into account the benefit increases in the 2007 Agreement, the Trust is now over 83% funded according to its actuaries. *See* Ex. E to Freeman Mot., *Letter Regarding the Effects of the 2007 Agreement on the 1974 Pension Plan,*    PT-04042 (providing the PPA 2006 funded percentage).

- The 2007 Agreement's contribution rates are not relatively low by historical standards. In the agreements negotiated in the last 20 years, the highest actual rate of contribution into the Trust was 0.75 dollars per hour, which is much lower than the 2007 Agreement's actual rates of contribution, which range from $2.00 per hour to $5.50 per hour. *See* Roberts Decl. ¶ 18 (appended to UMWA Mot.); Ex. F to Freeman Mot., 2007 Agreement, Article XX.

- After the 2007 Agreement was signed, other coal company officials were especially concerned about the Trust contribution rates. These contribution rates were much higher than anyone expected. Ex. G to Freeman Mot., Austin Decl. ¶ 4 (Oct. 19, 2007).

- The Trust was fully funded (or very near it) from about 1999 until 2002 when the 2002 NBCWA provided for benefit increases. The actuarial valuation reports recently produced in discovery appear to show that the financial condition of the Plan has not materially changed from the range it experienced from 2002 through 2006, so there appears to be no valid justification for the unprecedented increase in rates. In fact, the Trust is better funded now than it was four years ago when the BCOA and UMWA agreed to a zero contribution rate. *Compare* Ex. E to Freeman Mot., *Letter Regarding the Effects of the 2007 Agreement on the 1974 Pension Plan,* PT-04043 (identifying the unfunded vested benefits as of July 1, 2006 that fully reflect the effects of the 2007 Agreement), *with* Ex. H to Freeman Mot., *UMWA 1974 Pension Plan Actuarial Valuation Report as of July 1, 2003,* PT-02903 (identifying the unfunded vested benefits as of June 30, 2003).

16

BCOA argues that it has always negotiated NBCWAs and its role in the coal industry is well established. Yet prior to the 2007 Agreement, BCOA was at all times a multi-employer organization, which the courts repeatedly recognized.[3] This was no longer the case in 2006, when Consol/BCOA negotiated the 2007 Agreement.

Finally, the opposing parties confuse multi-employer bargaining with mere pattern bargaining. "Multi-employer bargaining is collective bargaining between more than one employer or an association of employers with a group or groups of unions as distinct from single employer bargaining." THE DEVELOPING LABOR LAW 712 (John E. Higgins ed., BNA Books 2006); *see also* Matthew W. Finkin, *Representation of Employees within the Firm: The United States Report*, 54 AM. J. OF COMP. L. 395, 398 (2006) (explaining that it is possible for several employers to form an association to bargain with a single union for a master, multi-employer agreement). The agreement that is ultimately reached through multi-employer bargaining is a multi-employer agreement and binds those employers who consented to bargaining by group action. Pattern bargaining, on the other hand, involves the initial negotiation of a master wage agreement with a "target" employer or employer group (resulting in either a single employer

---

[3] *See* Multiemployer Pension Plan Amendments Act of 1979: Hearings on S. 1076 before the Committee on Labor and Human Resources, 96th Cong. 594 (1979) (statement of Joseph P. Brennan, President, Bituminous Coal Operators' Association) ("[BCOA] is a multiemployer bargaining unit that represents employers in negotiations with United Mine Workers of America in the bituminous coal industry."); *see also Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 443 (2002) (BCOA "was created as a multiemployer bargaining association and primary representative for the coal operators in their negotiations with the UMWA"); *Eastern Enterprises v. Apfel*, 524 U.S. 498, 506 (1998) (BCOA was a "multiemployer bargaining association" that was the "primary representative of coal operators in negotiations with the Union"); *Ramsey v. United Mine Workers of America*, 401 U.S. 302, 305 n.2 (1971) (BCOA "was formed as a multi-employer collective-bargaining unit in 1950"); *Connors v. Link Coal Co., Inc.*, 970 F.2d 902, 903 (D.C. Cir. 1992) (BCOA was a "multi-employer association of coal producers").

master agreement or a multi-employer master agreement) and subsequent negotiation of identical or substantially similar separate agreements with other employers in the industry.[4]

As *Pittston* makes clear, and as further discovery will demonstrate, only a multi-employer agreement can be a successor agreement within the meaning of the evergreen clause.   The 2007 Agreement is not a successor agreement because it was not negotiated by a multi-employer unit and the fact that the agreement was only belatedly adopted – through coercion – by other coal companies cannot transform a single-company agreement into a "successor agreement" under the evergreen clause.[5]

## III.    THE OPPOSING PARTIES' AMENDED TRUST ARGUMENT IS INCONSISTENT WITH *PITTSTON* AND RAISES GENUINE ISSUES OF MATERIAL FACT.

As shown above, the key issue in this case – whether a purported NBCWA negotiated by single company is a successor agreement under the terms of the evergreen clause – was not addressed by the *Pittston* court, raises a host of disputed issues of material fact, and warrants additional discovery.   Based on the new declarations they submitted, the opposing parties presumably understand this.   Accordingly, they make an additional argument that they never

---

[4] *See* Matthew W. Finkin, *Representation of Employees within the Firm: The United States Report*, 54 AM. J. OF COMP. L. 395, 398 (2006) (explaining that in pattern bargaining, "the lead employer strikes a bargain with the lead (or pattern-setting union)" and other employers will not subsequently give that union (or other unions) more than was secured by the union and the lead employer and that this practice results in "the bargain struck by a single employer with a single union and binding only on those parties…set[ting] the economic terms for all"); *see also* Aditi Bagchi, *Unions and the Duty of Good Faith in Employment Contracts*, 112 YALE L. J. 1881, 1901 n.49 (2003) (defining pattern bargaining as a process "whereby all employers in a sector agree to follow a union agreement with the largest firms").

[5] Moreover, additional discovery is needed to determine the extent to which the "me too" agreements signed by other coal companies differs from the 2007 Agreement, which would be further indication that the 2007 Agreement is not a national agreement.  *See* UMWA Mot. 9-10 (admitting that not all "me too" agreements signed by other coal companies mirrored the 2007 Agreement in all respects).

made in *Pittston,* one that is diametrically at odds with what they – and their declarants – told the *Pittston* court. The opposing parties now argue that, regardless of whether the 2007 Agreement is a "successor agreement," Freeman must make contributions into the Trust at the rates specified in the 2007 Agreement because (1) the evergreen clause mandates that employers who have been or are signatory to it must "comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time…" and (2) the Trust was amended effective January 1, 2007 to require the same employers to contribute to the Trust at rates specified in the 2007 Agreement. *See* Tr. Mot. 15-19; BCOA Mot. 10.

This new argument raises many of the same disputed issues of material fact discussed earlier. First, as the *Pittston* court already found, extrinsic evidence is necessary to interpret the meaning of the evergreen clause. 782 F. Supp. at 664. As shown in Part I above, the evidence submitted by the Trustees in *Pittston* incontrovertibly demonstrated that the drafters intended that employers would be bound only by a *successor* NBCWA; if there was no successor NBCWA, then the evergreen clause would no longer apply. *See supra* p. 7-8 (citing Shaner Decl. ¶ 6; Kempken Decl. ¶ 13).

There has been little discovery in this case on the intent and meaning of the evergreen clause, but the evidence that does exist, and was submitted to and accepted by the *Pittston* court, shows that if there is no successor NBCWA, then the intent of the drafters was that the evergreen clause would not require continuing contributions. At a minimum, under *Pittston*, Freeman is entitled to take discovery on the Trustees' brand new interpretation of the evergreen clause.

In addition, the Trustees should be barred from even asserting this new argument. As shown in Part I above, the Trustees specifically argued in *Pittston* that the contribution obligation of the evergreen clause would continue "as long as BCOA and the UMWA continued to set

contribution rates in *successor* NBCWAs." Ex. A to Freeman Mot. at PT-00120 (emphasis added); *see id*. at PT-00137 (arguing that contribution obligations continued only "as long as there are successor national agreements setting contribution rates for the Funds"); *id.* at PT-00142-43 (arguing that the rate set in each NBCWA expired at the end of that NBCWA and the new contribution rates would not take effect until the "successor NBCWA was in place"). Based on these admissions and arguments from the *Pittston* case, the Trustees may not now argue that it is irrelevant whether the 2007 Agreement is a successor agreement. *See Pittston*, 782 F. Supp. at 674 (court may consider a judicial admission as evidence in another case); *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("'[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" (quoting *Davis v. Wakelee*, 156 U.S. 680, 689, (1895)).

Finally, there are genuine issues of material fact regarding whether the Trust was properly "amended" in 2007 within the meaning of the evergreen clause. The evergreen clause cannot bind employers to the "terms and conditions" of the Trust "as amended from time to time" when the Trust is amended by UMWA and a single employer or the agent of a single employer. *See* 1974 Pension Trust at Article X (Ex. D, appended to Stover Decl. in support of Tr. Mot.) ("Any action of the *Employers* which may, or must, be taken… [under the Evergreen Clause] may be taken by BCOA.") (emphasis added); *id.* at Article XI ("The *Employers* and the Union, by joint action, reserve the right at any time and from time to time to modify or amend in whole or part any or all of the provisions of this instrument….") (emphasis added). Because BCOA is no longer an association of "employers," but a shell for a single company, the intent of

the parties regarding the proper party to amend the Trust documents for purposes of the continuing contribution obligation presents genuine issues of material fact for trial.

## IV.    FREEMAN'S REFUSAL TO CONTRIBUTE AT THE RATES SET BY THE 2007 AGREEMENT DOES NOT "IMPERIL THE 1974 TRUST'S VERY EXISTENCE."

The Trustees' final argument is that if Freeman were not forced to make contributions into the Trust at the rates set in the 2007 Agreement, this would "imperil the 1974 Pension Trust's very existence." Tr. Mot. 28. They also suggest that allowing Freeman to withdraw from its evergreen clause obligations would "leave the burden for funding the pension and health benefits of retired miners to the remaining participating employers [in BCOA]." *Id*. at 25 (quoting *Pittston*, 782 F. Supp. at 667). This argument is pure hyperbole, designed to distract the Court from the real issues in this case.

Congress long ago secured the Trust's existence by requiring that employers who cease participation in a multi-employer plan pay their *pro rata* share of unfunded benefit liability. In 1980 Congress passed the Multiemployer Pension Plan Amendments Act ("MPPAA"), amending the Employee Retirement Income Security Act of 1974, to provide increased pension protection for multi-employer plans. 29 U.S.C. §§ 1381-1461. Among other things, the amendments imposed new financial requirements on employers who choose to cease their participation in multi-employer plans. Employers who cease to have an obligation to contribute to multi-employer plans are generally liable to the plan for their share of the plan's underfunding. This liability is known as withdrawal liability. 29 U.S.C. § 1381. The requirement that a withdrawing employer pay withdrawal liability to a multi-employer plan ensures that the multi-employer plan will not suffer any loss because of the withdrawal.

Therefore, the Trust is not "imperiled" if the Court holds that the Consol-negotiated 2007 Agreement is not binding on Freeman.   Under MPPAA, if an employer no longer has an obligation to contribute to the Trust, then the Trust can assess withdrawal liability against the employer.   That employer would then be responsible for and required to pay its share of the Trust's funding deficiency measured at the time of withdrawal.   There would be no impact on the Trust's financial status because the employer would be paying to the Trust a required monthly payment that is set by the MPPAA based on the highest contribution rate and average contributions over a period of years.   The Court should give no weight to the Trustees' claims that a failure to force Freeman to abide by the terms of the 2007 Agreement, a single-company agreement, would signal the end of the Trust.

## V.    WHETHER BCOA BREACHED ITS DUTIES TO FREEMAN RAISES GENUINE ISSUES OF MATERIAL FACT.

In Count II, Freeman contends that if the Court determines that it must pay contributions at the rates set by the 2007 Agreement, then it will necessarily have concluded that BCOA was acting as Freeman's agent and that BCOA therefore owes Freeman the duties of an agent to its principal.   Thus, the only issue left for the Court's determination will be whether BCOA breached those duties, which is necessarily a highly fact-bound question. *See, e.g., Ohio River Valley Environmental Coalition, Inc. v. Callaghan*, 133 F. Supp. 2d 442, 448 (S.D. W.Va. 2001) ("The breach of duties . . . necessarily revolve around fact-intensive disputes, and not so much questions of law.").

In response, BCOA argues that it owed no duties to Freeman and that it did not breach any duties.   BCOA's motion reflects a deep internal contradiction.   On the one hand, it vehemently argues that it has the capacity to bind Freeman and other former employers to whatever rates it negotiates with the UMWA.   On the other hand, it argues that it owes no duties

to Freeman and other former employers to negotiate those rates fairly or to take into account the interests of those former employers. This cannot be the case. As courts have noted, in multi-employer bargaining, "an employer or group of employers has a right to expect that his or their interests will be fairly represented in negotiations and that their interests will not be totally sacrificed in the interest of the majority." *NLRB v. Siebler Heating & Air Conditioning, Inc.*, 563 F.2d 366, 371 (8th Cir. 1977); *see also ITO Corp. of Baltimore v. NLRB*, 818 F.2d 1108, 1112 (4th Cir. 1987) (holding that once a multi-employer bargaining unit is formed, it "has both the authority and the duty to bargain with the Union *on behalf of all of the employers within the multiemployer group* . . . . Accordingly, none of the employers can limit, on a unilateral basis, the authority of . . . their designated bargaining agent." (emphasis added)); *NLRB v. Custom Wood Specialties, Inc.*, 622 F.2d 381, 385 (8th Cir. 1980) ("an employer [i]s free to revoke the authority of a [multi-employer] bargaining agent whose conduct was disloyal to the vital interests of the employer"). Here, Freeman's interests were not sacrificed in the interest of the majority, but rather in the interests of a minority of one – its competitor Consol.

BCOA's motion repeats the exact same arguments it lost on its motion to dismiss before Judge Scott of the Central District of Illinois. *First*, BCOA argues that this Court should decline to exercise supplemental jurisdiction over Freeman's state-law claim. But Judge Scott already rejected this argument and this Court should do the same. *See Freeman United Coal Mining Co. v. United Mine Workers of America*, No. 07-3048, 2007 WL 1549489, at *5-6 (C.D. Ill. May 25, 2007). Moreover, BCOA has ignored that Freeman's claim is pled under both state law and the federal common law of Section 301 of the Labor Management Relations Act ("LMRA"). BCOA's duties arise from its relationship with Freeman with respect to contracts governed by LMRA § 301. Because BCOA's duties arise from the parties' relationship surrounding

23

collective-bargaining agreements, this Court can look to, and develop, federal common law in giving Freeman a remedy for BCOA's breaches of its duties. *See Teamsters National Automotive Transporters Industry Negotiating Comm. v. Troha,* 328 F.3d 325, 330 (7th Cir. 2003) ("When the purpose of the lawsuit effectuates the goals of § 301, then it is appropriate for the federal common law to embrace such suits.").[6]

*Second*, BCOA argues that this Court can decide whether it has any agency obligations to Freeman as a matter of law. But Judge Scott already ruled that the "establishment and scope of an agency is a factual issue." *Freeman*, 2007 WL 1549489, at *6. Judge Scott found that Freeman's claim "put at issue the parties' intent in 1978 when the Evergreen Clause was added to the 1974 Pension Fund Trust and the NBCWA." *Id.* Indeed, she characterized the question as "whether BCOA agreed, in exchange for that perpetual agreement by the coal companies [to contribute under the evergreen clause], to act as the agent for these companies in all future negotiations with the UMWA." *Id.* Clearly, the parties' intent regarding the authority of BCOA

---

[6] Under federal common law, the relationship between a multi-employer bargaining unit and the members for whom it is bargaining is clothed with elements of agency. *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 865 (7th Cir. 1998) ("The basic law of agency … is a crucial component in our analysis."). In the specific context of BCOA's ability to raise contribution rates to the 1974 Plan – the very issue presented here – courts have recognized that BCOA may act as an "agent" for the companies that will pay the contributions. *See UMWA v. Bituminous Coal Operators Ass'n,* 898 F.2d 177, 181 (D.C. Cir. 1990) (noting that in the guarantee clause, "authority [is] placed in the employers' agent, the BCOA, to raise the contribution rate"). It is well established that an agency relationship carries with it duties that are fiduciary in nature. *See* RESTATEMENT (SECOND) OF AGENCY §13 (1958). These include the general duties of acting in good faith and not favoring the interests of others over the interests of Freeman. *See id.* In the context of multi-employer bargaining units, federal courts have recognized the existence of these specific duties. *See, e.g.*, *Siebler*, 563 F.2d at 371 ("Multi-employer bargaining will work only when the interests of all parties to the bargaining are fairly represented."); *Resort Nursing Home & Kingsbridge Heights Rehab. Care Ctr. v. NLRB*, 389 F.3d 1262, 1269-70 (D.C. Cir. 2004) (where a multi-employer bargaining association violates an agreement to provide notice to its members before beginning negotiations "common law agency principles" apply and "the employers remedy would be against its agent").

to negotiate on behalf of its former members presents a material issue of disputed fact about which Freeman is entitled to discovery.

*Third*, Judge Scott rejected BCOA's next argument that "any agency ended when Freeman withdrew from the BCOA in 1997." *Id.* As Judge Scott held, "[t]he 1997 withdrawal, alone, does not establish that Freeman cannot prove the continued existence of an agency relationship for the limited purpose of negotiating pension fund contribution rates." *Id.* Further, she found that if Freeman was obligated to make contributions pursuant to the 2007 Agreement negotiated by the BCOA, then "the parties clearly intended that some obligations would survive the termination of Freeman's membership in the BCOA." *Id.* Freeman's obligations cannot survive the termination of its membership in the BCOA if the BCOA's duties do not also survive. Again, this clearly presents a material issue of disputed fact.[7]

*Fourth*, this Court should reject BCOA's contention that because Freeman "exercised no control over the conduct of BCOA in its negotiation of the 2007 NBCWA," BCOA could not have owed any duties to Freeman. BCOA Mot. 20. Although Freeman may not have exercised any actual control over BCOA during the 2007 negotiations, Freeman's "right of control" and right to demand that BCOA represent its interests fairly is exactly the issue presented here. *See Presidential Motor Yacht Corp. v. President Marine, Ltd.*, 753 F. Supp. 7, 13 (D.D.C. 1990). And the "right to control" in an agency relationship is a "question of fact." RESTATEMENT (THIRD) OF AGENCY § 7.03 cmt. d(2). Judge Scott already recognized this in holding that the question presented was "whether BCOA agreed, in exchange for that perpetual agreement by the

---

[7] Freeman's July 29, 1997 letter resigning its membership in BCOA (quoted at BCOA Mot. 18) does not change the analysis. Although Freeman withdrew the authority it had granted BCOA in the past to negotiate with the UMWA on Freeman's behalf, under *Pittston*, BCOA allegedly continued to possess authority to negotiate contribution rates on behalf of all employers (including Freeman) that had been signatories to past NBCWAs.

coal companies [to contribute under the evergreen clause], to act as the agent for these companies in all future negotiations with the UMWA." *Freeman*, 2007 WL 1549489, at *6.

*Fifth*, BCOA argues that Freeman cannot establish a claim for breach of good faith and fair dealing under D.C. law. BCOA acknowledges that D.C. law recognizes a cause of action for breach of the implied covenant of good faith and fair dealing in all contracts, but argues that because there is no existing contract between BCOA and Freeman, it cannot owe Freeman any duties. *See* BCOA Mot. 20-21. But BCOA ignores that even if there is no express contract currently existing between it and Freeman, there may be an implied contract under the theory Judge Scott identified. *See Freeman*, 2007 WL 1549489, at *6 (inquiring "whether BCOA agreed, in exchange for that perpetual agreement by the coal companies [to contribute under the evergreen clause], to act as the agent for these companies in all future negotiations with the UMWA"). "An implied contract is a contract in which the terms of the parties' agreement are inferred from the circumstances of conduct of the parties, even though the terms of the contract are not expressed in words." *Ames v. HSBC Bank USA, N.A.*, No. 06-2039, 2007 WL 1404443, at *2 (D.D.C. May 11, 2007) (citing *Brown v. Brown*, 524 A.2d 1184, 188 n. 5 (D.C.1987); *Riggs v. Aetna Ins. Co.*, 454 A.2d 818, 821 (D.C.1983)). An implied contract, just like an express contract, contains an implied covenant of good faith and fair dealing. *See id.* at *2-*3. Whether an implied contract exists between BCOA and Freeman and whether the implied covenant of good faith and fair dealing was breached present material issues of disputed fact for trial.[8]

---

[8] BCOA argues that it did not breach any duty owed to Freeman because Freeman was "not singled out or treated any differently" from other coal companies with respect to the Trust. BCOA Mot. 21. That argument also raises factual issues. Freeman certainly was treated differently from the only other coal company that matters here – Consol – which controlled the

*Finally*, both BCOA and the Trustees argue that the contributions in the 2007 Agreement are not unreasonable because (1) Freeman was not required to make contributions from 1998 to 2006, (2) the new contributions are relatively low by historical standards, (3) the PPA increased funding requirements for the 1974 Plan and (4) supposedly every coal company but Freeman and Monterey has shown a willingness to sign on to the 2007 Agreement.[9]  Each of those arguments raises obvious issues of disputed fact.

As already discussed above, the evidence shows that all other coal companies were shocked by the higher rates and signed on to the 2007 Agreement only reluctantly after they were threatened by the UMWA.  Moreover, there appears to be no reasonable justification for the substantially-increased rates in the 2007 Agreement.[10]  The PPA did not compel the BCOA or

---

negotiations with UMWA in order to gain a competitive advantage over other coal companies. *See* Ex. D to Freeman Mot., Stanhagen Decl. ¶ 9.

[9] BCOA cites *UMWA Health and Retirement Funds v. Robinson*, 455 U.S. 562, 574 (1982), for the proposition that "there is no general standard of reasonableness that the courts are authorized to apply in reviewing the terms of a collective bargaining agreement."  BCOA Mot. 23.  BCOA's argument misapplies *Robinson* and distorts the nature of Freeman's argument in this case.  At issue in *Robinson* was whether § 302(c)(5) of the Labor Management Relations Act imposed a reasonableness requirement on a collective bargaining agreement's allocation of benefits among beneficiaries. *See* 455 U.S. at 570.  The Supreme Court held that § 302(c)(5) did not impose a reasonableness requirement and the court had no power to modify the collective bargaining agreement's terms in such a case.  *Id*. at 574-76.  Unlike *Robinson*, Freeman is not asking the Court to engage in a reasonableness analysis without basis in law.  Nor is Freeman asking the Court to alter the 2007 Agreement's rates.  Rather, Freeman is asking the Court to find that BCOA owed Freeman fiduciary duties and that such duties were breached, in part, by the BCOA's negotiation of unreasonable and anti-competitive contribution rates.

[10] In fact, evidence indicates that the increases (1) are for already retired individuals and (2) are compensating for questionable transfers of monies from the Trust to the UMWA 1993 Benefit Plan ("1993 Plan"), a medical benefit plan. *See* Ex. E to Freeman Mot., *Letter Regarding Effects of the 2007 Agreement on the 1974 Pension Plan*, at PT-04042 (approximately 60 to 70% of the estimated $576 million increase in unfunded actuarial accrued liability is due to increased benefits to already retired miners); Ex. P to Freeman Mot., *UMWA 1974 Pension Plan Actuarial Valuation Report as of July 1, 2006*, at PT-03017 (2006 hardship payments from the 1974 Plan to participants covered by the 1993 Benefit Plan increased the actuarial accrued liability of the

the UMWA to increase rates under the Trust. The PPA only addresses funding issues for multi-employer plans with less than 80% funding or an accumulated funding deficiency starting in 2008. *See* Pension Protection Act of 2006, Pub. L. No. 109-280, §202(b), 120 Stat. 780 (2006). Prior to the 2007 Agreement, the Trust was over 91% funded according to its actuaries. *See* Ex. E to Freeman Mot., *Letter Regarding the Effects of the 2007 Agreement on the 1974 Pension Plan,* at PT-04042 (providing the PPA 2006 funded percentage). Taking into account the benefit increases in the 2007 Agreement, the Trust is now over 83% funded according to its actuaries. *See id.*

In addition, the 2007 Agreement's contribution rates are not relatively low by historical standards. In the NBCWA agreements negotiated in the last 20 years, the highest actual rate of contribution into the Trust was 0.75 dollars per hour, which is much lower than the 2007 Agreement's actual rates of contribution, which range from $2.00 per hour to $5.50 per hour. Even accepting the CPI adjusted contribution rates as stated in the Roberts Declaration, the highest rate of contribution during the same time period was $1.13 per hour – a rate substantially lower than the highest actual rate ($5.50) specified in the 2007 Agreement. *See* Roberts Decl. ¶ 18 (appended to UMWA Mot.); Ex. F. to Freeman Mot., 2007 Agreement, Article XX.

---

plan); *id.* at PT-03030 (summarizing the hardship payments to 1993 Plan beneficiaries from 2002 to 2006); *see also* Internal Revenue Code §§ 401(a), (h), 420 (indicating that money transfers from the Trust to the 1993 Plan may be unlawful because the Internal Revenue Code does not permit the use of pension plan funds to pay for medical benefits unless the pension plan, among other requirements, has substantial excess pension assets over liabilities). The pensions of already retired employees are permissive rather than mandatory subjects of bargaining over which neither Consol nor Freeman are required to bargain with the UMWA. *See Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 159 (1971). Moreover, Freeman has not participated in the 1993 Plan since 1998. Discovery is necessary to determine both what Consol received in return for agreeing to bargain over a permissive subject of bargaining and the extent to which the money transfers depleted the funds.

Finally, the Trust was fully funded (or very near it) from about 1999 until 2002 when the 2002 NBCWA provided for benefit increases.[11]   The actuarial valuation reports recently produced in discovery appear to show that the financial condition of the Plan has not materially changed from 2002 through 2006, so there appears to be no valid justification for the unprecedented increase in rates.[12]   The only thing that has changed in the past five years is that BCOA now represents just one company – Consol – and is no longer a multi-employer unit.

## <u>CONCLUSION</u>

For the reasons set forth herein, Freeman respectfully requests that this Court deny the opposing parties' motions for summary judgment, or in the alternative, grant Freeman's motion under Rule 56(f) and defer ruling on the motions until Freeman has had the opportunity to conduct meaningful discovery in this case.

Respectfully submitted,



__/s/ Susan C. Levy_____

---

[11] *See* Ex. K to Freeman Mot., *UMWA 1974 Pension Plan Actuarial Valuation Report as of July 1, 2000,* at PT-02738 (identifying the unfunded vested benefits of the Plan as of June 30, 2000); Ex. L to Freeman Mot., *UMWA 1974 Pension Plan Actuarial Valuation Report as of July 1, 2001*, at PT-02795 (identifying the unfunded vested benefits of the Plan as of June 30, 2001); Ex. M to Freeman Mot., *UMWA 1974 Pension Plan Actuarial Valuation Report as of July 1, 2002,* at PT-02849 (identifying the unfunded vested benefits of the Plan as of June 30, 2002).

[12] Ex. M to Freeman Mot., *UMWA 1974 Pension Plan Actuarial Valuation Report as of July 1, 2002,* at PT-02849 (identifying the unfunded vested benefits of the Plan as of June 30, 2002); Ex. H to Freeman Mot., *UMWA 1974 Pension Plan Actuarial Valuation Report as of July 1, 2003,* at  PT-02903 (identifying the unfunded vested benefits as of June 30, 2003); Ex. N to Freeman Mot., *UMWA 1974 Pension Plan Actuarial Valuation Report as of July 1, 2004,* at PT-02956 (identifying the unfunded vested benefits as of June 30, 2004);  Ex. O to Freeman Mot., *UMWA 1974 Pension Plan Actuarial Valuation Report as of July 1, 2005,* at PT-03008 (identifying the unfunded vested benefits as of June 30, 2005); Ex. P to Freeman Mot., *UMWA 1974 Pension Plan Actuarial Valuation Report as of July 1, 2006,* at PT-03063 (identifying the unfunded vested benefits as of June 30, 2006).

Paul M. Smith
DC Bar No. 358870
Jessica Ring Amunson
DC Bar No. 497223
JENNER & BLOCK LLP
601 13th Street, NW
Washington, DC 20005
Tel:    (202) 639-6000
Fax:    (202) 661-4993
psmith@jenner.com
jamunson@jenner.com

Susan C. Levy (*pro hac vice*)
Aaron M. Forester (*pro hac vice*)
JENNER & BLOCK LLP
333 North Wabash Avenue
Chicago, IL 60611
Tel:    (312) 923-2772
Fax:    (312) 840-7772
slevy@jenner.com
aforester@jenner.com

Michael W. Robinson
DC Bar No. 437979
Gregory J. Ossi
DC Bar No. 460243
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, VA 22182
Tel:    (703) 760-1600
Fax:    (703) 812-8949
mwrobinson@jenner.com
gjossi@jenner.com

***Counsel for Freeman United
Coal Mining Company***

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2007, I caused a copy of the foregoing to be filed with the court's Electronic Case Filing (ECF) system, which will automatically send notice of the filing to counsel of record in this case.

_____/s/ Paul M. Smith_____
Paul M. Smith
DC Bar No. 358870
JENNER & BLOCK LLP
601 13th Street, NW
Washington, DC 20005
Tel:     (202) 639-6000
Fax:     (202) 661-4993
psmith@jenner.com

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
Huntington Division

UNITED MINE WORKERS OF AMERICA          )
1974 PENSION TRUST, et al.,             )
                                        )
            Plaintiffs,                 )
                                        )
            v.                          )    Civil Action
                                        )    No. 3:90-0890
RAWL SALES & PROCESSING CO.,            )
                                        )
            Defendant.                  )
_____)

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO RAWL'S MOTION TO DISMISS
OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

PRELIMINARY STATEMENT

In 1978, the coal industry and the United Mine Workers of America ("UMWA"), faced with a severe problem in funding health and pension benefits for retired miners, adopted a farsighted solution.

The problem the parties faced was that the industry-wide funds providing these benefits were in dire financial shape, and there was a great danger that individual companies would seek to end their participation in the funds or to reduce their rates of contribution. If that were to happen, the Funds would continue to be required to provide benefits to the employees of those employers, while the burden of funding the benefits would fall on other employers who continued to contribute to the Funds.

PT-00119

000110

- 2 -

At the urging of the Bituminous Coal Operators Association ("BCOA"), the UMWA agreed to new trust provisions designed specifically to eliminate the threat of withdrawals and cut-rate contributions.[1/]  The trust documents were amended to add a clause, unique to these Funds, which provided (i) that any employer who chose to participate in any of the trusts as of 1978 would be obligated to contribute to the trust in accordance with the specific terms set forth in the National Bituminous Coal Wage Agreement ("NBCWA") negotiated by BCOA and the UMWA, and (ii) that this contribution obligation would continue not only during the life of the 1978 NBCWA, but as long as BCOA and the UMWA continued to set contribution rates in successor NBCWAs.

This continuing-contribution provision -- sometimes referred to as the "Evergreen Clause" -- was incorporated into the 1978 NBCWA, and again into the 1981 NBCWA.  The companies named in the instant Complaint, which have merged into defendant Rawl, were signatories to the 1981 NBCWA, and thus were contractually bound to the continuing-contribution obligation.

In 1988, Rawl and the UMWA proceeded to do precisely what the BCOA had feared in 1978, and precisely what the Evergreen Clause was designed to prohibit:  they executed collective bargaining agreements which purport first to reduce, and then

---

1/    BCOA is a multiemployer bargaining association.  BCOA and the UMWA are the settlors of the trusts, through trust agreements which are reached in connection with periodic collective bargaining for the National Bituminous Coal Wage Agreements.

PT-00120

000113

- 3 -

to eliminate altogether, Rawl's obligations to contribute to
the industry-wide funds. In embarking on this course Rawl has
not set up any new benefit plans for its already-retired
employees. Those employees receive benefits from two of the
plaintiff Funds. But, if Rawl's gambit succeeds, the
contributions to pay for these benefits, and for the benefits
of all other eligible beneficiaries throughout the industry,
will be paid solely by the other employers, who are honoring
their continuing-contribution obligations, and not by Rawl.

In its summary judgment motion Rawl asks the Court to
blind itself to these facts. Most of Rawl's memorandum is
written as if the Evergreen Clause had never been adopted.
Rawl never discusses the facts that bear on the meaning of the
clause, and Rawl does not so much as mention the clause until
page 30 of its memorandum -- at which point it misleadingly
quotes only a portion of the language, and offers a series of
suggestions as to the meaning of the clause that are
unconvincing and unsupported by any evidence.

We will show in this memorandum that the meaning of the
continuing-contribution obligation Rawl assumed in 1978 is
clear: Rawl is obligated to continue to contribute to the
Funds at the uniform rates set by BCOA and the UMWA in the
NBCWAs, as long as the NBCWAs continue to set such rates; and
Rawl is not free to renege on that commitment by negotiating
its own separate arrangements with the UMWA. Accordingly,
plaintiffs' motion for summary judgment should be granted, and
Rawl's motion should be denied.

PT-00121

000112

- 4 -

## STATEMENT OF UNDISPUTED FACTS

A.   The Funds, and the Principle of Uniform Benefits and
     Uniform Contributions On Which the Funds Are Based.

This case involves four multiemployer benefit funds:  the
United Mineworkers of America 1974 Pension Trust ("1974 Pension
Fund"), the United Mineworkers of America 1974 Benefit Plan and
Trust ("1974 Benefit Fund"), the United Mineworkers of America
1950 Pension Trust ("1950 Pension Fund"), and the United
Mineworkers of America 1950 Benefit Plan and Trust ("1950
Benefit Fund").  The 1950 Pension Fund and the 1950 Benefit
Fund provide pension, health and death benefits to miners who
retired prior to December 31, 1975, and their dependents and
survivors.  The 1974 Pension Fund provides pension benefits to
miners who retired after December 31, 1975, and their
dependents and survivors.  The 1974 Benefit Fund provides
health and death benefits to miners who retired after
December 31, 1975, from companies that are no longer "in
business," see Declaration of Roger M. Haynes, ¶¶5, 6; and
courts have held that this Fund must also provide benefits to
the post-1975 retirees of certain companies which, although
still in operation, are no longer signatory and are not
providing health benefits to their own retirees.  See infra at
16.

The plan and trust documents that govern each of the Funds
are periodically negotiated between the BCOA and the UMWA in
connection with the negotiation of each National Bituminous
Coal Wage Agreement.  See Declaration of Donald E. Pierce, Jr.,

PT-00122

P000113

- 5 -

¶2.  All members of BCOA, through the NBCWA, participate in the Funds.  Employers that are not members of BCOA are also allowed to participate.  This is generally accomplished by means of "wrap around" or "me too" contracts, in which the UMWA and non-BCOA employers essentially put their own cover around the NBCWA and sign onto its terms.  Haynes Decl. ¶9.

There is a high degree of employee mobility and employer turnover in the coal industry, and these facts have important ramifications for the Funds.  It is not uncommon for a miner to work for many different employers during the course of his career.  And, employers are created and disappear as coal deposits are found and are mined out.  Thus, it is difficult to identify the primary companies that employed many of the retired miners.  What is more, many of the companies who have beneficiaries in the Funds are out of business and are no longer making contributions.  The Funds, however, are obligated to provide benefits to every eligible beneficiary, even if the company or companies for which he worked are no longer in business and are not making any contributions.  Haynes Decl. ¶6.

Unlike many other multiemployer funds, the UMWA Funds operate on the fundamental concept that all eligible employees receive uniform benefits, and that all participating employers are required to pay a uniform contribution rate.  Haynes Decl. ¶7.  Because the benefit structure in the Funds is uniform, if any employer is allowed to contribute to the Funds at a lower rate, or not at all, the other employers contributing to the Funds will end up carrying that employer's share of the load.

PT-00123

8000114

- 6 -

Id. ¶12. Obviously, employers will not be willing to participate in the Funds if they are subject to having to pick up the obligations of employers who choose to pay less than their share; and such an unwillingness to participate would ultimately lead to the Funds' demise. Id. Accordingly, it has long been an objective of BCOA that employers -- once they choose to participate in the Funds and the Funds therefore become obligated to provide benefits to their employees -- should not be free to withdraw or to contribute to the Funds at reduced rates. Id.

      B.   The Adoption of the Evergreen Clause, and Rawl's Agreement to the Clause.

The possibility that employers might seek to withdraw from the Funds or to contribute at reduced rates was a particularly acute concern of BCOA at the time of the negotiation of the 1978 NBCWA, and it was in those negotiations that the provisions on which the Trustees base their claim were adopted.

During the term of the 1974 NBCWA, the Funds had run into severe financial difficulty. The Funds, however, had to keep paying benefits to eligible beneficiaries. The 1950 Benefit Plan ran out of money at several points, and during the spring and summer of 1977 the trustees were forced to lower benefit levels. By December 1977 the 1950 Funds were effectively broke and health benefits were terminated completely. At that point a lengthy nationwide strike erupted. Haynes Decl. ¶14.

As BCOA entered negotiations for the 1978 NBCWA, the two pension funds had a total of about $6 billion in unfunded

PT-00124

8000115

- 7 -

liabilities, and it was recognized that the two 1950 Funds in particular would be entering the term of a new contract deeply in debt. Id. ¶15. See also Declaration of K.L. Young, ¶3. BCOA was strongly concerned that many contributing employers, including not only those under wrap-around contracts but even some BCOA members, might try to shift their share of this liability to the remaining employers by negotiating cut-rate contributions or by ceasing all contributions. This would leave the remaining employers to pay the full share of the load for all Fund beneficiaries, including employees of the employers who had ceased or reduced their contributions. Haynes Decl. ¶15. Id. Although the UMWA in the past had professed agreement with the fundamental proposition that for each of the Trusts, uniform benefits would be funded by uniform rates of contributions, BCOA realized that there was nothing in the trust documents that would expressly prohibit the UMWA from negotiating different contribution arrangements with some employers, at the expense of others. Id. BCOA set out to cure that defect in the 1978 negotiations.

The outcome of those negotiations is described in the declarations of five persons who were involved in the

PT-00125

000116

- 8 -

negotiations, on behalf of both BCOA[2/] and the UMWA,[3/] and in numerous contemporaneous documents filed with those declarations.  The uncontroverted evidence establishes the following facts.

BCOA's negotiators told the UMWA "that BCOA needed an express provision in the trust agreements that would keep individual employers from pulling out and leaving the remaining employers holding the bag, and that BCOA also needed an express provision that any employer participating in the Funds must make contributions at the uniform rate set in the NBCWA." Haynes Decl. ¶16.  See also Pierce Decl. ¶7; Young Decl. ¶5; Shaner Decl. ¶¶4-5; Kempken Decl. ¶¶5-6.

In response to BCOA's statements, the UMWA assured the negotiators that BCOA had nothing to worry about because the UMWA would not negotiate any deals that would have the effect of permitting one group of employers to dump liabilities on the

---

[2/]    See Declarations of Roger M. Haynes, David W. Kempken, B.M. Shaner and K.L. Young.  Mr. Haynes was the chairman of BCOA's committee on employee benefits, and served as BCOA's chairman on the benefits subcommittee in the national negotiations leading to the NBCWAs of 1971, 1974, 1978, 1981, and 1984.  Haynes Decl. ¶¶3-4.  Messrs. Kempken, Shaner and Young also served on those committees, with Young acting as one of the principal negotiators for BCOA at the Benefits Subcommittee level.  Kempken Decl. ¶¶2-4; Shaner Decl. ¶2; Young Decl. ¶2.

[3/]    See Declaration of Donald E. Pierce, Jr.  Mr. Pierce is presently a trustee of the Funds.  After serving as Assistant Director of Research for the UMWA for more than three years, he was retained by the UMWA from the Fall of 1976 to March 1985 as a consulting economist and as a consultant on issues related to health and retirement benefits.  In that capacity he participated on behalf of the UMWA in the 1977-78 negotiations with BCOA.  Pierce Decl. ¶3.  BCOA regarded Pierce as "the UMWA's chief benefits spokesman."  Kempken Decl. ¶¶7, 11; Haynes Decl. ¶16.

000117

- 9 -

remaining employers. Haynes Decl. ¶16. BCOA replied that although it understood the UMWA's current position to be as the Union negotiators stated, BCOA needed to have a provision establishing these requirements in the trust documents themselves. Id. See also Pierce Decl. ¶7.

The parties proceeded to draft language to address BCOA's concerns. See Haynes Decl. ¶17; Pierce Decl. ¶8. The provisions were drafted for inclusion in the plan and trust documents, so that they would bind all employers who agreed to participate in the Trusts, not just those who were BCOA members or who signed an agreement identical to the NBCWA. Haynes Decl. ¶19; Pierce Decl. ¶8.

The key provision that emerged was the continuing-contribution clause, often referred to as the "Evergreen Clause." The clause appears in the trust documents for each of the four trusts, in identical terms except for minor variations to identify each trust. Haynes Decl. ¶17. The text, as it appeared in the 1978 revision of Article XII of the 1950 Benefit Plan and Trust, is as follows, id.:

> Any Employer who employed any participant eligible for coverage under, or who receives or received benefits under, the 1950 Benefit Plan and Trust, or any Employer who was or is required to make, or who has made or makes contributions to the 1950 Benefit Plan and Trust, is obligated and required to comply with the terms and conditions of the 1950 Benefit Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto. [Emphasis supplied].

PT-00127

■000118

- 10 -

The meaning of this clause is explained in each of the five declarations that have been submitted by persons involved in negotiating and drafting the clause, and is further supported by negotiating documents that are exhibits to those declarations.

K.L. Young, one of BCOA's principal negotiators at the Benefits Subcommittee level, states the matter as follows in his declaration (¶¶6, 8, 11):

> The intent of the evergreen clause was to ensure by contract (1) that each employer that voluntarily agreed to participate in the Funds in 1978 would contribute to the Funds at the uniform rate established under the NBCWA, and (2) that each employer that signed the 1978 NBCWA would continue to contribute to the Funds in the future, and at the rate established under the NBCWA, so long as successor NBCWAs were negotiated by the UMWA and BCOA and required such contributions.

> \*    \*    \*    \*

> The intent and effect of the evergreen clause were discussed with UMWA negotiators on many occasions during the 1977-78 negotiations.  It was discussed in terms of ensuring that the Funds would not become a "last man's club" with respect to employer contribution obligations.  By the term "last man's club," we were referring to a situation where fewer and fewer employers were left paying for the benefits costs of employers that had withdrawn from the Funds or employers that were not contributing their fair share.  We were not forcing any employer to participate in the Funds, but wanted to ensure that if an employer chose to participate in 1978 or thereafter, that employer would have to participate on the same terms as all other participating employers.  An expression that we used in the negotiations to convey this point was, "If you want to play ball in our park [i.e., the Funds], you have to play by our rules [i.e., the contributions required by the NBCWA and trust documents]."

PT-00128

2000119

- 11 -

\*     \*     \*     \*

The evergreen clause requires any
employer that signed the NBCWA of 1978 to
make the contributions required under the
NBCWA of 1978, "as amended from time to
time, and any successor agreements
thereto."  The term "successor agreements"
was intended to·refer to successor NBCWAs
negotiated by the UMWA and BCOA, not to
individual agreements negotiated between
the UMWA and individual coal companies.  In
other words, to ensure that the Funds'
uniform benefits would be provided by
uniform contribution rates, the negotiating
parties agreed that the "successor
agreements" on which contributions were to
be based would be successor national
agreements negotiated by BCOA and the UMWA,
and not individual company agreements.

David Kempken expresses the same understanding in his

declaration, and confirms that in the negotiations the UMWA

made it clear that the Union understood the Evergreen Clause to

have precisely the meaning described by Young and Kempken.  See

Kempken Decl. ¶¶5, 7, 9, 13.[4/]  The same facts are related by

_____

[4/]  As Kempken puts it (id. ¶7, 9):

The evergreen clause was discussed
with UMWA negotiators on several occasions,
including the UMWA's chief benefits
spokesman, Don Pierce.  The UMWA was well
aware of the clause's purpose and effect.
The evergreen clause was discussed with the
UMWA in terms of ensuring that the Funds
would not become a "last man's club" where
one company's benefits costs could be
shifted to another, or where industry—wide
benefits costs could be transferred to a
few remaining employers.  UMWA
representatives clearly stated and agreed
that each employer participating in the
Funds was being required to bear a fair
share of the Funds' liabilities, and that

PT-00129

(Footnote continued on next page)

3000120

- 12 -

B.M. Shaner and Roger Haynes.  <u>See</u> Shaner Decl. ¶6; Haynes
Decl. ¶¶18, 19, 21.[5]

_____

(Footnote continued from previous page)

[4]     no employer or group of employers would be
permitted to negotiate special deals that
would permit them to dump their retiree
benefits costs into the Funds, for payment
by the remaining employers.

                *       *       *       *

         In agreeing to the evergreen clause,
the UMWA recognized the importance of
requiring employers' contribution
obligations to continue beyond the term of
their particular collective bargaining
agreements with the UMWA, and the
importance of requiring uniform
contribution rates.  The UMWA clearly
stated and agreed that the Funds would not
become a last man's club where
ever-increasing costs were being
transferred to an ever-decreasing number of
employers.  The evergreen clause was
negotiated to prevent this situation from
occurring, and to protect BCOA members from
getting caught "holding the bag" after
other employers deserted the Funds.

    Kempken adds that in the <u>1981</u> negotiations, "the UMWA
reiterated its agreement that the evergreen clause requires
employers to continue contibuting to the Funds beyond the term
of any individual employer's agreement with the UMWA."  <u>Id</u>.
¶11.  <u>See</u> note 6 <u>infra</u>.

[5]  Two other provisions adopted in the trust documents at the
same time also reflect the uniform-contribution requirement.
One provision states that contributions "shall be paid solely
by the Employers in accordance with Article XX of the National
Bituminous Coal Wage Agreement of 1974 as amended from time to
time, and any successor agreements to that specific
agreement."  <u>See</u> Pierce Decl. ¶9.  The other provision revises
the definition of "Wage Agreement" to state that a non-NBCWA
collective bargaining agreement "entered into between the
United Mine Workers of America and any employer in the
bituminous coal industry, which contract provides that

(Footnote continued on next page)

PT-00130

Ⱀ000121

- 13 -

As the declarations of those four BCOA representatives make clear, the UMWA shared BCOA's understanding of the meaning of the Evergreen Clause. UMWA negotiator Donald Pierce, speaking for the UMWA, described the clause as follows in congressional testimony in 1979:

> We think it is imperative that existing, participating employers in multiemployer plans be kept in the fold. In the last negotiations, the Mine Workers and the operators added the following parallel language to each of the plans in trust, and that language, which I shall not quote, essentially obligated all present employers who were contributing to the multiemployer plans, to continue contributing into the future based on contributions called for in successor agreements to the National Bituminous Coal Wage Agreement, whether or not that particular employer remained signatory to the Wage Agreement.

> By attempting to insure that as many employers as possible remained, the union, of course, was helping to guarantee that an ever-increasing liability would not be added to employers who might remain, had other employers abandoned the plan.

Pierce Decl. ¶11 and Exhibit A thereto.

Pierce expressed the same understanding in an affidavit he provided to the NLRB in 1981:

> It was our belief . . that in negotiating the 1978 Agreement, we were making a contractual commitment, not just for the three (3) year term of the 1978

---

(Footnote continued from previous page)

5/contributions shall be made to or benefit payments made from this Plan," shall be considered to be a "Wage Agreement . . . solely for the purpose of determining who is required to make contributions to, and receive benefits under, the [Fund]" -- i.e., not for the purpose of determining the contribution rate. See Haynes Decl. ¶¶20-21.

PT-00131

000122

- 14 -

> Agreement, but also thereafter with the
> contribution rates still to be set in our
> BCOA negotiations.  Thus, for example, a
> 1978 BCOA member (and, thus, a signatory to
> the 1978 National Agreement), who might
> have subsequently negotiated a separate
> agreement with the UMWA in 1978, would
> already have committed itself, as a
> signatory to the 1978 National Agreement,
> to continue to contribute royalties under
> the 1981 National Agreement . . . .

Pierce Decl. ¶12 and Exhibit B thereto.[6/]

Harry Huge, who was a special counsel to the UMWA

negotiating team in the 1978 negotiations, see Pierce Decl. ¶6,

described the Evergreen Clause in the same terms in a 1979

report to the President's Commission on Coal:

> BCOA thus bargained for, and the UMWA
> accepted, a provision which was intended to
> lock all members of the BCOA in 1978 into
> the 1950 and 1974 Pension Funds for the
> unlimited future.

See appendix to Declaration of Deborah C. Malamud, at 9.

Rawl acknowledges that each of the companies named in the

Complaint that have merged into Rawl were signatories to the

1981 NBCWA, and Rawl admits that the Trust documents were

"incorporated by reference and made a part of th[at]

Agreement."  Rawl Memo. at 3-4, quoting Rawl's Exhibit 1 (the

---

[6/]    Bargaining notes of the 1981 negotiations between BCOA and
the UMWA show that Pierce expressed in those negotiations the
same understanding of the meaning of the Evergreen Clause as
was expressed in his congressional testimony and his NLRB
affidavit:  "This language [the Evergreen Clause] requires
anyone who ever contributed to contribute into the future."
Kempken Decl. ¶¶11, 12 and Attachment 3 thereto.

000123

- 15 -

1981 NBCWA) at 82-83.[7/]  The Evergreen Clause was thus incorporated into Rawl's 1981 contract.[8/]

### C. Rawl's Effort to Renege on its Contribution Obligations.

The expiration date of the 1981 NBCWA was September 30, 1984.  See Rawl's Exhibit 1 at 162.  Rawl did not sign the subsequently negotiated 1984 and 1988 NBCWAs; after signing the 1981 NBCWA, Rawl did not sign any agreement with the UMWA until October 30, 1988, when it executed the "1988 Labor Agreements."  See Rawl Memo. at 4.

The 1988 Labor Agreements do not provide for any contributions by Rawl to either the 1950 or the 1974 Benefit Funds.  See Rawl's Exhibit 2 at 137-147.  With respect to the two Pension Funds, the 1988 Labor Agreements state that Rawl must contribute for only part of the period from October 1, 1984 to January 31, 1988, and at rates lower than those set in

---

[7/]   Rawl further states that two of the companies -- Rocky Hollow and P.M. Charles -- were members of BCOA at the time, and remained members until 1984. Affidavit of Arch H. Runyon, ¶10.  The other companies involved here signed wrap-around contracts adopting the terms of the 1981 NBCWA.  Rawl does not dispute that it is responsible for the contribution obligations of each of these companies, and we therefore refer to the companies collectively as "Rawl."

[8/]   The clause as it stood in 1981 was the same as the 1978 clause quoted supra at 9, except that the following words were added at the end:  "including, but not limited to, the National Bituminous Coal Wage Agreement of 1981."  See Rawl's Exhibit 7, Art. XII; Kempken Decl. ¶12.  The clause as so amended is reproduced in full at p. 22 infra.

000124

- 16 -

the NBCWA.[9/]  The 1988 Labor Agreements state that Rawl's
obligation to contribute to the two pension funds "shall
forever cease as of 12:01 a.m. February 1, 1988."  Rawl's
Exhibit 2 at 138-39.

Although the 1988 Labor Agreements require Rawl to set up
its own pension plan and insurance program for _active_
employees, _id_. at 139-147, the agreements do not establish any
benefit programs for Rawl's _retirees_.  _Id_.  That omission, of
course, is the point of Rawl's whole maneuver.  For, as Rawl
well knows, the Funds must continue to provide benefits to
miners who have retired from Rawl notwithstanding Rawl's
refusal to contribute.  Indeed, Rawl is seeking to _increase_ the
benefit obligations of the plaintiff Funds to Rawl's retirees.
Employers that are signatory to the NBCWA provide health
benefits to their own post-1975 retirees through
single-employer plans.  _See_ 1988 NBCWA, Art. XX(c)(3)(i),
Rawl's Exhibit 10 at 15.  However, when such an employer is no
longer signatory to the NBCWA or an equivalent agreement and is
no longer providing health benefits to its own retirees, courts
have held that the 1974 Benefit Fund must provide benefits to

---

[9/]    The 1988 Labor Agreements do not require any contributions
for the period from October 1, 1984 to January 11, 1986, except
as to P.M. Charles Coal Company.  _See_ Rawl's Exhibit 2 at 138;
Affidavit of Arch H. Runyon, ¶40.  For the period from
January 12, 1986 to January 31, 1988, the 1988 Labor Agreements
state that Rawl will contribute to the 1950 Pension Fund at a
rate of 25¢ per ton, _see_ Rawl's Exhibit 2 at 138, which is far
below the 1984 NBCWA rate of $1.11 per ton, _see_ Rawl's Exhibit
11 at 114.  For that same period, the 1988 Labor Agreements
provide for contributions to the 1974 Pension Fund at rates
that are the same as those set in the 1984 NBCWA.  _See_ Rawl's
Exhibit 2 at 138; Rawl's Exhibit 11 at 114-15.

PT-00134

000125

- 17 -

those retirees, as long as the 1974 Benefit Fund continues. See United Mine Workers of America v. Nobel, 720 F. Supp. 1169 (W.D. Pa. 1989), aff'd 902 F.2d 1558 (3d Cir. 1990), cert. denied, No. 90-464 (March 4, 1991). Rawl's 1988 Labor Agreements, by providing no further health benefits to its retirees, leave those retirees to rely on the 1974 Benefit Fund for their health care, while only the other companies in the industry, and not Rawl, make contributions to pay for those benefits.10/

Thus, while Rawl complains that the Trustees are seeking to hold Rawl to the contribution rates "set by Rawl's competitors in the coal industry," Rawl Memo. at 2, what Rawl is trying to do here is to arrange things so that Rawl's competitors will pay for the benefits provided to Rawl's own retirees.

Rawl's attempt to withdraw from the Funds has come at a time when the Benefit Funds have substantial and growing deficits -- in excess of $15 million for the 1974 Benefit Fund and in excess of $75 million for the 1950 Benefit Fund. Declaration of Jerry N. Clark ("Clark Decl.") ¶7. If Rawl's gambit is allowed to succeed, the Funds will have to pay

---

10/ Of course, in addition to refusing to contribute for the benefits provided by the Funds to Rawl's own retirees, Rawl is also refusing to contribute for the benefits provided by the Funds to other retirees, including the thousands of retired miners whose former employers have gone out of business and are no longer making contributions. It was a fundamental tenet of the 1978 trust amendments that providing benefits to these "orphaned" miners was an industry-wide responsibility, which should be borne by all employers who participated in the Fund as of 1978 or thereafter. See Young Decl. ¶5; Kempken Decl. ¶6.

PT-00135

B00012ε

- 18 -

benefits to beneficiaries -- including Rawl's retirees -- now and into the future, without receiving any contributions from Rawl.  In the parlance of those who negotiated the Evergreen Clause, Rawl will have left the rest of the industry "holding the bag."  Haynes Decl. ¶16; Kempken Decl. ¶9.

## ARGUMENT

### Introduction

The position of the plaintiff Trustees in this case is straightforward:  in 1981 Rawl executed an agreement (the 1981 NBCWA) which provided that Rawl would continue to make contributions to the Funds at the rates established by BCOA and the UMWA, not only during the term of the 1981 NBCWA but after the expiration date of that agreement, as long as successor NBCWAs continued to set contribution rates.  The Trustees' position is based on the language of the trust documents that were incorporated by reference into the 1981 NBCWA, including most particularly the "Evergreen Clause," and the negotiating history of the relevant provisions.

Rawl's response, for all its vehemence, is an exercise in avoidance.  Rawl never discusses the facts bearing on the adoption of the Evergreen Clause, and Rawl does not even mention the clause itself until virtually the end of its memorandum, at page 30.  And, Rawl's memorandum consists for the most part of a series of overblown and plainly incorrect legal propositions, each of which the Company itself ultimately abandons.

PT-00136

000127

- 19 -

Thus, at one point Rawl presents a lengthy argument to the effect that an obligation to contribute to a benefit fund cannot possibly be enforceable beyond the expiration of the collective bargaining agreement that establishes the obligation. See Rawl Memo. at 12-17. But a few pages later, Rawl acknowledges that such an obligation can indeed "survive the expiration of the agreement," if the agreement so provides. Id. at 19.

Similarly, Rawl begins its brief with an argument that the Labor Agreements it negotiated in 1988 served to eliminate, as a matter of law, any obligation on Rawl's part to contribute to the Funds. Id. at 6-12. But that argument, too, soon falls by the wayside; for Rawl spends much of its memorandum urging (albeit largely by ignoring the key provisions) that the 1981 NBCWA did not contain any promise by the Company to continue contributing into the future. See id. at 20-26, 30-33. In advancing that contention Rawl seems to recognize that if the 1981 agreement did contain such a promise, Rawl was not free to renege on it in the 1988 Labor Agreements.

To cut through the confusion Rawl has sought to engender, we begin our argument by showing in Part I that Rawl did indeed enter into a contractual commitment that the Company would continue to contribute to the Funds in accordance with the terms set out in the NBCWAs, not just during the life of the 1981 NBCWA, but as long as there are successor national agreements setting contribution rates for the Funds. We then show in Part II that that contractual commitment remains

- 20 -

enforceable notwithstanding the expiration of the 1981 NBCWA and the execution of the 1988 Labor Agreements, and that it does not violate the labor laws in any respect.  Finally, in Part III we show that plaintiffs are not collaterally estopped by the recent decision of the District Court for the District of Columbia in the Island Creek/Drummond Coal litigation.

I.    IN THE 1981 NBCWA, RAWL AGREED TO CONTINUE TO CONTRIBUTE TO THE FUNDS NOT ONLY DURING THE TERM OF THAT NBCWA, BUT ALSO IN ACCORDANCE WITH THE TERMS OF SUCCESSOR NBCWAs.

A.  It is not at all unusual for employers to enter into contractual commitments with respect to retirement benefits which commitments continue in effect after the expiration of the collective bargaining agreement in which the commitment appears.  See, e.g., Keffer v. H.K. Porter Co., Inc., 872 F.2d 60 (4th Cir. 1989), affirming this Court's decision in Keffer v. Connors Steel Co., 110 CCH Labor Cases ¶10,877 (S.D.W. Va. Oct. 6, 1986); Smith v. ABS Industries, Inc., 890 F.2d 841 (6th Cir. 1989); United Steelworkers of America v. Connors Steel, 855 F.2d 1499, 1504-05 (11th Cir. 1988), cert. denied, 489 U.S. 1096 (1989); Local 150-A, UFCW v. Dubuque Packing Co., 756 F.2d 66, 70 (8th Cir. 1985); UAW v. Cadillac Malleable Iron Co., 728 F.2d 807 (6th Cir. 1984); UAW v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir. 1983), cert. denied, 465 U.S. 1007 (1984).

As this Court noted in Keffer, "[w]hether an employer's obligation to provide benefits to its retirees continues beyond the expiration of the underlying collective bargaining agreement depends upon the intent of the parties," and "whether

- 21 -

the parties intended such an employer's obligation to continue beyond the expiration of the collective bargaining agreement is primarily a question of contract interpretation." 110 CCH Labor Cases ¶10,877, at page 23,585, quoting District 29, UMWA v. Royal Coal Co., 768 F.2d 588, 590 (4th Cir. 1985), cert. denied, 485 U.S. 935 (1988). The Court of Appeals reiterated this point in virtually identical language. See 872 F.2d at 62.[11]

_____

11/  Rawl maintains that employer obligations "do not survive the expiration of the agreement absent a clear intention of the parties." Rawl Memo. at 19, quoting Royal Coal Co., 768 F.2d at 592, in turn quoting District 17, UMWA v. Allied Corp., 735 F.2d 121, 127 (4th Cir. 1984). We submit that if a "clear intention" must be shown, the "clear intention" of the parties in this case, expressed in the Evergreen Clause, was to create obligations that survive the expiration of the 1981 NBCWA. See infra at 22-31. But in any event, the courts have not subjected claims such as the Trustees advance here to any special standard of "clear intention," and there would be no basis for such a requirement.

    The decisions of this Court and of the Fourth Circuit in Keffer hold that the question whether a particular obligation continues after the expiration of a collective bargaining agreement is a matter of contract interpretation to be decided in the same manner as any contract question. See also Yard-Man, supra, 716 F.2d at 1481 n.2 (explicitly rejecting a "clear manifestation of intent" requirement); Dubuque Packing, supra, 756 F.2d at 69-70 (finding that benefits continued after contract expiration even though "the agreements are not unambiguous"). Certainly in the area of retirement benefits, it is not at all surprising that an obligation would continue beyond the term of a particular collective bargaining agreement, and this is especially unsurprising in the context of a multiemployer fund. See infra at 34-35. There is consequently no basis for any kind of presumption to the contrary.

    The passing statement in Allied Corp. regarding "clear intention," quoted in Royal Coal, predates Keffer and should not be overread. The statement is dictum: the court noted in the very next sentence that the evidence "clearly show[ed]"

(Footnote continued on next page)

PT-00139

000130

- 22 -

In this case the 1981 NBCWA, to which Rawl was a signatory, plainly required contributions beyond the term of that agreement. As we have seen, the 1981 NBCWA incorporated by reference the Evergreen Clause, which provides as follows:

> Any Employer who employed any participant eligible for coverage under, or who receives or received benefits under, the 1950 Benefit Plan and Trust, or any Employer who was or is required to make, or who has made or makes contributions to the 1950 Benefit Plan and Trust, is obligated and required to comply with the terms and conditions of the 1950 Benefit Trust, as amended from time to time, including, but not limited to, <u>making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1981</u>.

<u>See</u> <u>supra</u> at 9; <u>see</u> <u>also</u> <u>supra</u> n. 8.

The plain meaning of that language is that signatories to the 1981 NBCWA must comply with the contribution requirements contained not only in the 1981 NBCWA, but in subsequent NBCWAs as well. And, although we submit that the meaning of the Evergreen Clause is so clear as not to require resort to

_____

(Footnote continued from previous page)

11/that the benefits in question were not intended to continue, <u>see</u> 735 F.2d at 127, and the court was therefore not faced with the question of how to resolve a closer case. Furthermore, the precedent cited in <u>Allied Corp.</u> on this point, <u>Local 1251, UAW v. Robertshaw Controls Co.</u>, 405 F.2d 29 (2d Cir. 1968), does <u>not</u> require clear intent; it states that obligations may extend beyond the term of the contract if "the agreement . . . so provide[s] or [is] susceptible of such construction." <u>Id.</u> at 33.

PT-00140

000131

- 23 -

extrinsic evidence, the plain meaning of the clause is
emphatically confirmed by the history of its negotiation and
adoption, as described in the declarations of Messrs. Haynes,
Kempken, Young, Shaner and Pierce. See supra at 10-14. We
urge the Court to read those five declarations in full. They
present, in the words of key actors for both BCOA and the UMWA,
a detailed, coherent, and consistent picture of precisely why
the clause was adopted, and what it means. Furthermore, the
declarations are supported by contemporaneous documents that
corroborate the declarants' understanding. See, e.g., Young
Decl. ¶9; Kempken Decl. ¶¶8, 11; Shaner Decl. ¶¶4, 7; Pierce
Decl. ¶¶11, 12; and exhibits cited thereat.12/

    Finally, we note that the D.C. Circuit certainly appears
to read the Evergreen Clause as we do. In UMWA 1950 Benefit
Plan and Trust v. BCOA, 898 F.2d 177 (D.C. Cir. 1990), the
court noted that "several coal companies, which have not signed
the 1988 Agreement [i.e., the 1988 NBCWA], signed prior
Agreements," and the court stated that "[t]he evergreen clause
requires these companies to contribute to the 1950 Benefit
Trust at the rate established by successor Agreements." Id. at
178 (emphasis added). By referring to successor "Agreements"
with a capital "A," the court was plainly referring to the

---

12/  Although some of the Rawl subsidiaries were not BCOA
members in 1981 and instead signed "me too" contracts, see
supra note 7, "[i]t is in the nature of a me too contract that
the intent relevant to its interpretation is that of the leader
(the BCOA), not that of the follower . . . ." BCOA v. Connors,
867 F.2d 625, 635 (D.C. Cir. 1989).  "[The] intention [of the
me too company] is therefore irrelevant." Id.

000132

- 24 -

NBCWAs, as the opinion elsewhere makes clear.  <u>See</u> <u>id</u>. at
181-82.

    B.    In the face of the facts we have described -- or, more
accurately, by ignoring the Evergreen Clause and all of the
facts concerning its adoption -- Rawl concocts a series of
arguments all of which attempt to deprive the clause of its
meaning.

    Rawl begins by proclaiming that the 1981 NBCWA did not
establish any contribution obligations extending beyond the
term of that NBCWA.  <u>See</u> Rawl Memo. at 18-23.  But that cannot
be correct, because the Evergreen Clause expressly requires
employers to contribute in accordance with "successor
agreements," "including but not limited to the 1981 NBCWA," and
thus the clause unquestionably creates an obligation that
extends beyond the term of the 1981 Agreement.

    Rawl's confusion on this point stems from a
misapprehension of the import of language found in various
parts of Article XX, section (d) of the 1981 NBCWA, which
refers to certain contribution obligations as "ending when this
Agreement is terminated" or as being in effect "during the term
of this Agreement."  <u>See</u> Rawl Memo. at 20-21.

    It is absolutely correct that the contribution rates
specified in section (d) of the 1981 NBCWA were to be in effect
only during the term of that Agreement.  The rates set in the
1981 NBCWA would "end[] when th[at] Agreement is terminated,"
because new rates would be set in the <u>1984</u> NBCWA.  We do not
contend that the Evergreen Clause operates to extend the

PT-00142

2000133

- 25 -

contribution rates of the 1981 NBCWA beyond the **expiration** date of that Agreement; rather, what the Evergreen Clause **means** is that once the 1981 NBCWA expired and the successor **NBCWA** was in place, signatories to the 1981 Agreement were bound **to the** contribution terms set in the <u>1984</u> NBCWA.  That is **precisely** the point made by Donald Pierce in his 1981 NLRB **affidavit,** see <u>supra</u> at 13, and none of the contractual language **cited** by Rawl is inconsistent with this interpretation.13/

In short, the fact that certain of the **obligations of** signatory employers -- such as the obligation to **contribute** at the 1981 rates -- terminated when the 1981 NBCWA **terminated,** does not mean that <u>other</u> obligations which did <u>not</u> **include** such a termination date -- particularly, the Evergreen Clause -- likewise terminated.  <u>Cf</u>. <u>Carriers Container Council Inc. v.</u> <u>Mobile Steamship Association, Inc.</u>, 896 F.2d 1330, 1339 (11th Cir. 1990) ("a general term clause in a collective **bargaining** agreement does not imply a cutoff date for other clauses of the

---

13/  Thus, the fact that an **employer's** "sole obligation <u>under . . . Section [d]</u> . . . shall be to contribute the amount specified in th[at] section," <u>see</u> Art. XX, Section **(d)(3)** (emphasis added), quoted in Rawl Memo. at 20, does not suggest that employers do not have continuing obligations under <u>other</u> sections -- particularly sections (b) and (c), which are the sections incorporating the trust documents that include the Evergreen Clause, <u>see</u> Rawl's Exhibit 1 at 82-83.  Similarly, section (h), which contains a guarantee of benefits, states that in order to fully fund these guaranteed benefits BCOA may increase the rate of contributions "during the term of this Agreement," and such increased contributions shall then be made by all signatory employers "during the term of this Agreement."  <u>See</u> Rawl's Exhibit 1 at 98.  Once again, the point made in text holds true: the Evergreen Clause does not, of itself, serve to extend section (h) beyond the life of the 1981 NBCWA, but it <u>does</u> bind Rawl and other signatories to the contribution rates that may be required under similar clauses in the <u>1984</u> NBCWA and successor agreements thereto.

PT-00143

000134

agreement that have no durational language"), <u>modified on other grounds</u>, 904 F.2d 28 (11th Cir. 1990); <u>Yard-Man</u>, <u>supra</u>, 716 F.2d at 1482-83 (evidence of intent that benefits would continue "outweigh[s] any contrary implications derived from a routine duration clause terminating the agreement generally").

The cases cited at pages 24-26 of Rawl's memorandum are not to the contrary.  <u>District 29, UMWA v. Royal Coal Co.</u>, 768 F.2d 588 (4th Cir. 1985), did not involve contributions to the industry-wide trusts, and thus did not involve the Evergreen Clause at all; rather, the provisions at issue in that case dealt with the obligation of signatory employers to establish certain single-employer plans, to which the Evergreen Clause does not apply.  In <u>BCOA v. Connors</u>, 867 F.2d 625 (D.C. Cir. 1989), the court simply held that a provision in the 1984 NBCWA requiring contributions at $1.11 per ton "during the life of this Agreement" did not permit employers to cease making contributions at that rate during the life of the Agreement merely because the trust had become fully funded.  And, in <u>Keffer v. H.K. Porter Co.</u>, <u>supra</u>, where the court found that benefits to active employees which were to be provided "during the life of this Agreement" did not extend beyond that date, there were no clauses providing, or even suggesting, that those benefits would continue; thus the case sheds no light on the interpretation of the Evergreen Clause or any comparable clause.  Finally, in the arbitration decision and the NLRB

- 27 -

letters cited at page 25 of Rawl's memorandum, there is no discussion of the Evergreen Clause.14/

Thus, Rawl stretches far beyond the mark when it urges this Court to give <u>stare decisis</u> effect to decisions that simply do not address the Evergreen Clause or any comparable provision.

C.  When Rawl finally deigns, beginning at page 30 of its memorandum, to discuss the Evergreen Clause, Rawl advances an untenable interpretation of the clause.

Rawl argues that the clause merely provides that an employer must comply with whatever contribution requirements happen to be found in any collective bargaining agreement the employer chooses to sign, even if the agreement calls for contributions at rates lower than the NBCWA, or no contributions at all.  Rawl Memo. at 30-33.  That interpretation, of course, is utterly at odds with the uncontroverted evidence describing how and why the clause was negotiated.  Nor is it a reasonable interpretation of the words of the clause.

---

14/  Furthermore, the letters from the NLRB that are cited by Rawl simply convey the decisions of the NLRB General Counsel not to file a complaint.  Such a refusal to issue a complaint is "not an adjudication by the Board."  <u>Miller Brewing v. Brewery Workers Local 9</u>, 739 F.2d 1159, 1166 (7th Cir. 1984) (<u>en banc</u>), <u>cert. denied</u>, 469 U.S. 1160 (1985).  Moreover, actions of the NLRB should not be given great weight in the enforcement of the Evergreen Clause, because Congress "deliberately chose to leave the enforcement of collective agreements 'to the usual processes of law,'" rather than to the NLRB.  <u>Charles Dowd Box Co. v. Courtney</u>, 368 U.S. 502, 513 (1962).

000136

- 28 -

Rawl's theory rests on two propositions, neither of which is tenable.

First, where the Evergreen Clause obligates employers to make contributions "required under" the NBCWAs, Rawl reads that phrase as applying only to signatory employers, on the ground that only signatory employers are required by the provisions of the NBCWAs to make any contributions. This is logic-chopping of much too fine a variety. The phrase "contributions required under" the NBCWA is most naturally read, in context, to refer to "contributions at the rates required under" the NBCWA. The phrase must be tortured unduly to yield the reading Rawl suggests -- "contributions by employers who are required to contribute under" the NBCWA.[15/] And, in any event, Rawl's reading cannot be squared with the extensive uncontroverted evidence presented in the declarations and the contemporaneous documents. On Rawl's reading, employers were free not only down the road, but even in 1978, to contribute to the Funds at any special rates they could negotiate with the UMWA, and were not bound to contribute at the NBCWA rates unless they chose to

_____

15/  Rawl tortures the language all the more when, through a misleading use of elipsis, it quotes the Evergreen Clause as purportedly "refer[ring] to 'Employers . . . making contributions required under the [NBCWA].'"  See Rawl Memo. at 33.  What the clause actually says is that "Any Employer who employed any participant . . . or . . . who was or is required to make, or who has made or makes contributions to the . . . Trust, is obligated and required to comply with the terms and conditions of the . . . Trust, as amended from time to time, including making the contributions required under the [NBCWA] . . ., and any successor agreements thereto . . . ." (emphasis supplied).  See supra at 22.  Thus the word "making" does not qualify the word "employers," as Rawl's elipsis would suggest, but defines the obligation of all employers that have participated in the Trust.

PT-00146

2000137

- 29 -

sign the NBCWA.  All the evidence shows that such a state of affairs is precisely what the negotiators were acting to prohibit when they adopted the Evergreen Clause in 1978.  See supra at 7-14.

In the same spirit, Rawl would read the reference in the Evergreen Clause to "successor agreements" as referring to any agreement an individual company manages to negotiate.  But the clause refers to "successor agreements thereto," i.e., successor agreements to the 1978 NBCWA.  The 1978 NBCWA was a national multiemployer agreement negotiated by BCOA, and the natural reading of the clause is that successor agreements "thereto" are successor national agreements.  The negotiators confirm that this was indeed the intent.  See Haynes Decl. ¶18; Young Decl. ¶11; Kempken Decl. ¶13.16/

It is quite impossible to examine the Evergreen Clause in its entirety, let alone the extrinsic evidence, and conclude that the clause was intended to serve only the very narrow purpose posited by Rawl.

Acording to Rawl, the clause adds nothing to an employer's obligations, and merely gives the Trustees a "contractual right of action" against employers who are "already obligated" to make contributions.  Rawl Memo. at 33-34.  But the Trustees

---

16/  Rawl notes that a law firm advising the Trustees once expressed the opinion that "successor agreement" might be read to refer to any agreement.  But the firm did not purport to have considered the negotiating history and purpose of the Evergreen Clause, see Rawl's Exhibit 8; and the Trustees declined to adopt the firm's opinion.  The Trustees' vote on this question came after a discussion that covered the Evergreen Clause and its history.  See Rawl's Exhibit 9 at 3-4.

B000138

- 30 -

already <u>had</u> such a right of action, <u>see</u> <u>Lewis v. Benedict Coal</u>

<u>Corp.</u>, 361 U.S. 459 (1960);[17] and the Haynes Declaration

soundly debunks the notion that the Evergreen Clause had the

limited purpose Rawl suggests:

> The evergreen clause was not a "technical"
> provision to assist the Funds in collecting
> delinquent contributions, and was not
> discussed in those terms.  It was an
> important provision negotiated to make sure
> that any coal operator that voluntarily
> agreed to participate in the Funds in 1978
> could not simply walk away from the Funds
> and leave its retirees behind, or negotiate
> cut-rate contributions with the UMWA, at
> the expense of the remaining employers.

Haynes Decl. ¶19.

Furthermore, if the Evergreen Clause were intended merely

to mean that any employer that signs any kind of contract

requiring contributions to the Trusts must comply with that

contract, there would have been no need for most of the words

the clause contains.  If Rawl's theory of the purpose of the

clause were correct, the clause would simply have referred to

any collective bargaining agreement;[18] but instead it refers

specifically to <u>the NBCWA and successor agreements thereto</u>.

And, the clause would simply have referred to any employer who

signs a contract in 1981 or thereafter; but instead it contains

the much more detailed language referring to <u>employers who are</u>

---

[17]  <u>Lewis v. Benedict Coal</u> was an action brought by the
Trustees of the predecessor of these very trusts.

[18]  Such language, referring to any "applicable collective
bargaining agreement between the parties," was what was
contained in the trust documents in <u>Schneider Moving & Storage
Co. v. Robbins</u>, 466 U.S. 364, 368-69 & n.8 (1984).  Rawl's
assertion that the <u>Robbins</u> clause is "similar" to the Evergreen
Clause, <u>see</u> Rawl Memo. at 34, is therefore plainly wrong.

PT-00148

8000139

- 31 -

participating or have participated in the Funds.  See supra at

22; and see Shaner Decl. ¶7.  This language, which Rawl

studiously deletes from its truncated quotations of the

clause,19/ reflects the true nature of the clause:  employers,

having participated in the Funds -- and therefore having had

employees who may draw ongoing benefits from the Funds -- must

continue to make contributions.

   In sum, the language of the Evergreen Clause supports the

Trustees' position, and the declarations and contemporaneous

documents leave no room for doubt:  Rawl's obligation to

contribute to the Funds did not end with the expiration of the

1981 NBCWA.20/

---

19/  See Rawl Memo. at 30, 33; and see note 15 supra.

20/  Rawl seeks to stir up a doubt by arguing that the
Trustees' prior conduct is more consistent with Rawl's view of
the Evergreen Clause than with plaintiffs' position.  See Rawl
Memo. at 26-30.  Rawl refers (i) to cases in which the Funds,
in claiming withdrawal liability from certain employers other
than Rawl and its associated companies, did not cite the
Evergreen Clause, which arguably would have undercut the Funds'
withdrawal liability claim, id. at 26-27, and (ii) to a letter
sent to Big Bottom Coal, see Rawl Exhibit 6, which was promptly
disavowed by the Funds because it had been sent in error, see
Exhibit A to Clark Declaration.  But the question of the
meaning and application of the Evergreen Clause is, in large
part, a question of law, and it is not surprising that a
party's view on such a question might change over time --
particularly given the fact that legal advice is not
infallible.  See note 16 supra (discussing Trustees' rejection
of one firm's advice with respect to the question of Rawl's
contributions).  In any event, since early 1988, when the
Trustees undertook a full analysis of the Evergreen issue, they
have been fully consistent in their interpretation and
application of the clause.  See Clark Decl. ¶¶2-4.

   With remarkable disingenuity, Rawl complains that after
its constituent companies "established and contributed to

(Footnote continued on next page)

- 32 -

II.  RAWL'S COMMITMENT TO CONTINUE CONTRIBUTING TO **THE FUNDS** AT
THE RATES SET IN THE NATIONAL AGREEMENTS IS **ENFORCEABLE** IN
THIS COURT.

    A.  Rawl Was Not Free in the 1988 Labor Agreements to
       Renege on its Continuing-Contribution Obligations.

    Rawl begins its argument with an assertion that the 1988
Labor Agreements are "fatal to plaintiffs' claims," because
"employers and unions are free to negotiate collective-
bargaining contracts covering any pertinent subject that is not
unlawful." Id. at 6-12.  Although, as noted, Rawl appears
ultimately to abandon this argument, see supra at 19, we pause
to demonstrate that the argument is entirely without merit.

    1.  The cases upon which Rawl relies, id. at 6-8, stand
only for the proposition that the courts are not free to impose
"a reasonableness standard" on collective bargaining

------

(Footnote continued from previous page)

20/single-employer pension plans, and . . . provided their own
health and welfare plans at great expense," the plaintiff
Trustees "allowed the Companies to continue funding these
plans, and allowed their own alleged claims against the
Companies to accrue further." Rawl Memo. at 29.  There are two
problems with Rawl's assertion.  First, Rawl has been well
aware of the Funds' potential claim since the Trustees refused
in 1988 to accept the contribution terms contained in the 1988
Labor Agreements.  See Rawl's Exhibit 9.  Second, the health
and welfare plans Rawl has provided "at great expense" do not
provide any benefits to the retirees who receive health and
welfare benefits from the Funds.  Rawl's plans provide benefits
only to active employees, see Rawl's Exhibit 2 at 143-47, and
the Funds provide benefits only to retired employees.  (Indeed,
all employers that participate in the Funds provide health
benefits to their own active employees through single-employer
plans.  See Rawl's Exhibit 1 at 83 (Art. XX(c)(3)(i)).  Thus,
there is no basis for Rawl's pretense that the Funds' claims
would subject the Company to duplicative benefit obligations.

PT-00150

000141

- 33 -

agreements.  See UMWA Health & Retirement Funds v. Robinson, 455 U.S. 562, 570 (1982).[21/]  The cases certainly do not stand for the proposition that the execution of a collective bargaining agreement operates to extinguish the contracting parties' obligations to other parties; and there is nothing in federal labor policy or in any other legal doctrine that would give a collective bargaining agreement such overriding force.

The Supreme Court has explicitly recognized this point in the context of employee benefits, noting that a union and an individual employer cannot wipe out every employer obligation merely by negotiating a new agreement.  See Chemical Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 181 (1971).  For example, "[u]nder established contract principles, vested retirement rights may not be altered [through collective bargaining] without the pensioner's consent."  Id. at 181 n.20 (1971).  See also Yard-Man, supra, 716 F.2d at 1482 n.8.  The same holds true of other contractual commitments of an employer with respect to a benefit fund.  See, e.g., Central States Pension Fund v. PYA/Monarch of Texas, Inc., 851 F.2d 780, 783 n.2 (5th Cir. 1988) ("the union and PYA/Monarch could not have

_____

21/  We would point out that one of Rawl's citations -- to a portion of Justice Goldberg's concurrence in Humphrey v. Moore, 375 U.S. 335, 353 (1964) -- is particularly ill-chosen, because it does not reflect the view of the Court in that case. Justice Goldberg, in arguing (albeit not in the context of a multiemployer benefit fund) that a union and employer should always be free to modify, amend or supplement their agreement, was disagreeing with the Court's majority view that "an individual employee can claim that the collective bargaining contract is violated because the parties have made a grievance settlement going beyond the strict terms of the existing contract."  Id. at 355.

PT-00151

000142

- 34 -

altered the [collective bargaining agreement] to the detriment of the pension fund"); Kemmis v. McGoldrick, 706 F.2d 993, 997 (9th Cir. 1983) (a "written modification of employee benefit provisions" would be permissible if it were "assented to by the third-party beneficiary employee benefit trustees"); Lewis v. Harcliff Coal Co., 237 F. Supp. 6, 8 (W.D. Pa. 1965) ("modification of the contract by subsequent novation" is not a good defense to the trustees' suit for welfare fund contributions).

Where a multiemployer trust is involved, it is particularly clear that an individual employer and a union are not free to modify all contribution requirements. As the Supreme Court observed in Central States Pension Fund v. Central Transport Inc., 472 U.S. 559, 576 (1985), "a union's arrangements with a particular employer might compromise the broader interests of the plan as a whole." See also Local 597, Pipe Fitters' Welfare Fund v. Mosbeck Industrial Equipment, Inc., 856 F.2d 837, 843 (7th Cir. 1988).[22/]  Because "[e]ach of the participating unions and employers has an interest in the prompt collection of the proper contributions from each employer," Schneider Moving & Storage Co. v. Robbins, 466 U.S.

---

[22/]  The danger that a union might negotiate individual arrangements that are inimical to the overall interests of a multiemployer trust is particularly acute where, as here, most of the beneficiaries of the trust have been retired for years, and many worked for employers who are out of business. See supra at 5. A union may be tempted or pressured to subordinate the interests -- and the contractual rights -- of such retirees to the interests of active employees, particularly where, as here, the latter have been engaged in a long and grueling strike that the union desperately wishes to end.

PT-00152

000143

- 35 -

364, 373 (1984), it should not lightly be assumed **that the**
multiemployer arrangement tolerates individual **agreements** that
could cause a "diminution of the fund." Id. See **also** id. at
373 n.17, quoting Lewis v. Benedict Coal Co., 361 **U.S.** 459, 489
(1960) (unreasonable to assume that the multiemployer **group** was
"willing to risk the threat of diminution of the **fund in** order
to protect those of their number who might have **become** involved
in local labor difficulties"). "Simply put, benefit **plans** must
be able to rely on the contribution promises of **employers**
because plans must pay out to beneficiaries, **whether or** not
employers live up to their obligations." Benson v. Brower's
Moving & Storage, Inc., 907 F.2d 310, 314 (2d Cir.), cert.
denied, 111 S. Ct. 511 (1990). See also BCOA v. Connors, 867
F.2d 625, 633 (D.C. Cir. 1989); Central States, etc. Pension
Fund v. Gerber Truck Service, 870 F.2d 1148, 1151 **(7th Cir.**
1989) (en banc).

Thus, Rawl's contention that an employer and **a union are**
always free to modify the employer's contribution obligations
to a multiemployer trust, without regard to the interests and
contractual rights of the beneficiaries, the trustees, and the
other participating employers, is plainly incorrect.

The essence of the continuing-contribution obligation to
which Rawl agreed in the 1981 NBCWA was that Rawl **would** not
negotiate contribution arrangements different from those
contained in the agreements negotiated by BCOA, either during
the term of the 1981 NBCWA or thereafter. That commitment by
Rawl did not run only to the UMWA. It ran to the Plan

PT-00153

▓000144

- 36 -

participants and Trustees as third party beneficiaries, <u>see</u>,
<u>e.g.</u>, <u>Benson v. Brower's Moving & Storage</u>, <u>supra</u>, 907 F.2d at
313; and, the obligation may run as well as to "the BCOA and to
every other [participating] employer." <u>UMWA 1950 Benefit Plan
and Trust v. BCOA</u>, 898 F.2d 177, 182 n.7 (D.C. Cir. 1990).  The
UMWA was not free to bargain that commitment away, any more
than the Union could bargain away the vested retirement rights
of individual pensioners, <u>see</u> <u>Pittsburgh Plate Glass</u>, <u>supra</u>, or
any other contractual commitment of Rawl to third parties.

The cases cited at page 8 of Rawl's Memorandum are not to
the contrary.  In neither <u>Laborers Health & Welfare Trust Fund
v. Advanced Lightweight Concrete Co.</u>, 484 U.S. 539 (1988), nor
<u>Rozay's Transfer v. Local Freight Drivers, Local 1208</u>, 850 F.2d
1321 (9th Cir. 1988), <u>cert. denied</u>, 109 S. Ct. 1768 (1989), was
there any contention that the employers had made a contractual
commitment to continue making pension fund contributions after
the expiration of the collective bargaining agreement; and
neither case involved any provision, like the Evergreen Clause,
establishing such a contractual commitment.  Rather, what was
at issue in both cases was an employer's duty under the
National Labor Relations Act not to change terms and conditions
of employment, even where no contractual rights exist, until
the employer has bargained to impasse.  <u>See</u> <u>Advanced
Lightweight Concrete</u>, 484 U.S. at 543-44 n.5.  When the courts
stated in those cases that a union could reduce or waive "the
employer's postcontract obligations to contribute to the

000145

- 37 -

pension fund," id. at 553, see also Rozay's Transfer, 850 F.2d
at 1333, the "postcontract obligations" to which the courts
were referring were those flowing to the union from the NLRA,
not those flowing to third parties from any contractual
commitment such as the Evergreen Clause.  Thus, Advanced
Lightweight Concrete and Rozay's Transfer state only that a
union may waive "[the] union's right under the NLRA," id. at
1333 (emphasis added); they do not suggest that a union may
waive a third party's rights under a contract.

As for the dictum Rawl quotes from Sinai Hospital of
Baltimore v. National Benefit Fund, 697 F.2d 562, 567 (4th Cir.
1982), referring to an employer's right to withdraw from future
participation in a benefit fund, the court was simply
describing what parties "[n]ormally" provide in collective
bargaining agreements.  Id.  We do not suggest for a minute
that collective bargaining agreements "normally" contain
anything like the Evergreen Clause; to our knowledge, the
clause is unique.  Most assuredly, no such clause was involved
in Sinai Hospital, and the case does not suggest that an
employer is free to withdraw from participation in a benefit
trust notwithstanding a continuing-contribution clause such as
is at issue here.

In sum, there is no support for Rawl's argument that third
party rights to benefit fund contributions are subject to
elimination willy-nilly whenever an employer and a union decide
that a different arrangement is more desirable.  Contractual
provisions requiring continuing contributions to multiemployer

000146

- 38 -

benefit funds, like other provisions creating third party rights, cannot be abrogated at will.[23]

---

[23]  Rawl's position is inconsistent not only with the labor cases we have cited, but with fundamental principles of contract law.

The basic common law rule regarding modification of third-party rights is clearly expressed by the Second Restatement of Contracts:

> Discharge or modification of a duty to an intended beneficiary by conduct of the promisee or by a subsequent agreement between promisor and promisee is ineffective if a term of the promise creating the duty so provides.

Restatement (Second) Contracts, § 311(1) (1981).

The Second Restatement is equally clear in explaining that "a term of the promise" which operates to foreclose modification of a duty to a third-party beneficiary need not take the form of an explicit provision in the written agreement:

> [T]he power of the parties to make . . . an agreement [precluding variation of a duty to a beneficiary] is not restricted by special formal requirements.  The agreement need not be explicit:  omission of a standard clause reserving a power of modification may manifest an intention to preclude modification; reservation of a limited power may negate a broader power; usage of trade or course of dealing may supply a term precluding modification.

Id., § 311, Comment b.  Thus, "the Restatement (Second) bases the determination of the question of the power to revoke upon the settled contract principle of determining the intention of the parties when there is no express power to revoke . . ., [and] [i]n determining that question, the whole agreement and the facts and circumstances surrounding the parties at the time the agreement was made are to be considered." McDaniel Title Co. v. Lemons, 626 S.W.2d 686, 692 (Mo. App. 1981).

These principles are applicable here, because in labor cases, "traditional rules for contractual interpretation are applied as long as their application is consistent with federal

(Footnote continued on next page)

PT-00156

000147

- 39 -

2.  Rawl next contends that the claim the Trustees are asserting in this suit is nothing but a "request [that] the Court . . . declare the 1988 Labor Agreements invalid;" and Rawl argues that "the Court lacks jurisdiction to do so." Rawl Memo. at 10.  This argument is a makeweight.

Rawl cites several cases for the unexceptional proposition that federal courts "do not have jurisdiction over suits to determine the validity of collective-bargaining agreements." Those cases simply apply the literal language of § 301 of the LMRA, which states that the federal courts have jurisdiction over suits "<u>for violation of</u> contracts between an employer and a labor organization." <u>See A.T. Massey Coal Co. v. UMWA</u>, 799 F.2d 142, 145 (4th Cir. 1986) (emphasis added), <u>cert. denied,</u> 481 U.S. 1033 (1987); and see the other cases cited in Rawl's Memo. at 11-12.  Because an action seeking a declaration that a contract is invalid is not a suit "for violation of" a contract, § 301 does not confer jurisdiction over such an action.  <u>A.T. Massey</u> at 146.

_____

(Footnote continued from previous page)

23/labor policies." <u>Yard-Man</u>, <u>supra</u>, 716 F.2d at 1479. Accord, <u>United Paperworkers v. Champion International Corp.</u>, <u>supra</u>, 908 F.2d 1252, 1256 (5th Cir. 1990).  <u>See Schneider Moving & Storage Co. v. Robbins</u>, <u>supra</u>, 466 U.S. at 371 (relying on Second Restatement of Contracts in case brought under § 301 and ERISA); <u>UMWA Health and Retirement Funds v. Robinson</u>, <u>supra</u>, 455 U.S. at 574 (relying on Second Restatement of Trusts in ERISA case).  As the discussion in text indicates, nothing in federal labor policy is inconsistent with the Restatement approach to this question.

PT-00157

000148

- 40 -

Aside from the fact that this claim is brought under ERISA as well as under § 301,[24/] the rule cited by Rawl is simply not pertinent here.  Plaintiffs plainly have brought suit "for violation of" a labor agreement:  the Complaint explicitly alleges that Rawl's failure to make the contributions in question "is a breach of contractual obligations under the 1981 Wage Agreement."  Complaint, ¶30.  And, the remedy sought by the Trustees is "the full amount of delinquent contributions owed," not a declaration that the 1988 Labor Agreements are invalid.  See Complaint, p. 11.[25/]  This is, in sum, a

---

[24/]  ERISA gives the federal courts jurisdiction over any action by a fiduciary to enforce "the terms of the plan" or "the terms of a collectively bargained agreement."  See §§ 502(a)(3), 515, 29 U.S.C. §§ 1132(a)(3), 1145.  This is obviously such an action.

[25/]  Rawl is simply wrong in asserting that "Plaintiffs request the Court to declare the 1988 Labor Agreements invalid."  Rawl Memo. at 10; see also id. at 12.  No such request appears in the Complaint; the paragraphs cited by Rawl merely state that the 1988 Labor Agreements "were legally ineffective to modify or discharge the obligation that defendant's five former subsidiaries undertook in the 1981 Wage Agreement to continue making contributions . . . ."  Complaint, ¶29.  This is an allegation that the continuing-contribution obligation contained in the 1981 NBCWA survived the expiration of that NBCWA and was not extinguished by the 1988 Labor Agreements; it is not an allegation that the 1988 Labor Agreements, as such, are "invalid."  Of course, even if plaintiffs had made an allegation of invalidity, it would remain the case that the Complaint seeks relief "for violation of" the contractual continuing-contribution commitment, and the Court therefore has jurisdiction.

Rawl gains no support from Huessner v. National Gypsum Co., 887 F.2d 672 (6th Cir. 1989), cited at pages 11-12 of the Company's memorandum.  In Huessner the plaintiffs did not allege that the collective bargaining agreement on which they relied contained any provisions that were intended to survive the expiration of the agreement.  Rather, the plaintiffs argued

(Footnote continued on next page)

PT-00158

8000149

- 41 -

straightforward § 301/ERISA suit for breach of a promise to make benefit fund contributions, over which the Court plainly has jurisdiction.

B. The Expiration of the 1981 NBCWA is Not Fatal to Plaintiffs' Claims.

At pages 13-15 of its memorandum Rawl asserts that it has no enforceable contribution obligations "[b]ecause the 1981 NBCWA has expired and Plaintiffs have not alleged a breach of any existing collective-bargaining agreement." Yet, at page 19 Rawl acknowledges that in proper circumstances an employer's benefit fund obligations can "survive the expiration of the agreement"; and Rawl then proceeds to devote some seventeen pages to an attempt to demonstrate that this is not such a case. See Rawl Memo. at 19-35.

---

(Footnote continued from previous page)

25/that the entire agreement should be deemed to have remained in effect because a subsequent agreement had been "procured . . . through fraud, duress, coercion, and intimidation and because [the company] had breached its duty to bargain in good faith . . . ." Id. at 675-676. Thus, in Huessner, unlike this case, plaintiffs' claims could not go forward unless the court first declared that the subsequent contract was void in all respects. Assuming arguendo that Huessner was rightly decided, it is distinguishable on that ground.

Because, as we have noted, the Trustees are seeking to enforce the commitment made in the 1981 NBCWA, rather than to "attack" the 1988 Labor Agreements as such, Rawl misses the point in declaring that "collective-bargaining agreements are virtually immune from attack." Rawl Memo. at 10. In any event, none of the cases cited by Rawl suggests that a collective bargaining agreement which purports to abrogate third party rights is "virtually immune from attack." See supra at 32-38.

PT-00159

8000150

- 42 -

Thus, notwithstanding the argument at pages 13-15 of its memorandum, Rawl apparently recognizes that the expiration of the 1981 NBCWA, of itself, is <u>not</u> fatal to plaintiffs' claims and does <u>not</u> deprive the Court of jurisdiction. And, whatever Rawl may be trying to suggest, the caselaw is clear:  as we have shown, an employer's obligations with respect to employee benefits may -- and often do -- survive the expiration of a collective bargaining agreement, and the federal courts have jurisdiction to enforce such continuing obligations.  <u>See</u> <u>supra</u> at 20.

None of the cases cited in Rawl's Memorandum at 13-15 is to the contrary:  Rawl has again cited only cases in which no claim was made that any of the employer's contractual commitments was intended to survive expiration of the contract -- no doubt because those cases did not involve any provisions remotely resembling the Evergreen Clause.  Consequently, all of the points in Rawl's Memorandum at 14-17 are strawmen, to which no extended response is warranted.[26/]

------------------------------------------------------------

26/  Thus, Rawl asserts that the Trustees' claims "are premised . . ., not on contract, but rather on the labor law concept that certain obligations survive the expiration of a contract under NLRA § 8(a)(5)." <u>Id</u>. at 14.  Proceeding from that assertion, Rawl argues that "[t]he NLRB, not a federal court, has primary jurisdiction to determine whether an employer has violated the NLRA . . . ." <u>Id</u>.  But it could not be clearer that the Trustees' claims <u>are</u> based on contract, and are <u>not</u> (as in <u>Advanced Lightweight Concrete</u>, <u>see</u> <u>supra</u> at 36), based on the NLRA.  The "primary jurisdiction" argument is therefore off the mark.

Rawl next asserts that "ERISA, like the LMRA," does not "confer jurisdiction" over any claim based on an "expired"

(Footnote continued on next page)

PT-00160

⬛000151

- 43 -

C.   Plaintiffs Are Not Interfering With Rawl's Right to
     <u>Bargain and to Select its Own Bargaining Representatives.</u>

Rawl asserts that the Trustees' position interferes with

Rawl's right to engage in collective bargaining, <u>see</u> Rawl Memo

at 23, and deprives the Company of the right to select its own

bargaining representatives, <u>id</u>. at 35-37.  These arguments are

frivolous.

The Trustees certainly do not deny that employee benefits

constitute a mandatory subject of bargaining.  What we seek to

_____

(Footnote continued from previous page)

26/contract.  <u>Id</u>.  But, just as with Rawl's argument under the
LMRA, the cases Rawl cites in support of its ERISA argument,
<u>id</u>. at 14-15, did not involve provisions at all comparable to
the Evergreen Clause, nor was any claim advanced in those cases
that a party had entered into a contractual commitment to make
contributions beyond the expiration date of the collective
bargaining agreement.  As shown in note 24, <u>supra</u>, this Court
unquestionably has ERISA jurisdiction in this case.

Finally, Rawl asserts that the <u>trust agreements</u> do not
provide a "contractual jurisdictional base . . . separate and
apart from th[e] [1981 NBCWA]."  <u>Id</u>. at 15.  Although Rawl
develops this argument at length, <u>id</u>. at 15-17, it is beside
the point.  We do not contend that the trust documents provide
§ 301 jurisdiction "separate and apart from" the NBCWA
(although the trust documents by themselves <u>would</u> support
jurisdiction under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3),
which refers to "the terms of the <u>plan</u>," not only the terms of
a <u>contract</u>).  Rather, the provisions upon which we rely were
incorporated into the 1981 NBCWA, and those provisions, <u>as a
matter of contract</u>, survived the expiration of the 1981 NBCWA.
Once again, the cases Rawl cites do not, as Rawl would have it,
lay down a "rule" that a court lacks jurisdiction if a trust
agreement is "incorporated in an expired labor contract."  <u>See</u>
Rawl Memo. at 16.  A trust agreement that is incorporated in a
labor contract constitutes a term of that contract, and, like
any term of the contract, the obligations it creates survive
the expiration of the contract if the parties so intend.  <u>See</u>
<u>supra</u> at 20.  Rawl persists in citing cases where there simply
was no evidence of such an intent.

PT-00161

000152

- 44 -

enforce is <u>the product of bargaining</u>: the 1981 **NBCWA**.  To hold

that that agreement, by its terms, binds Rawl into **the** future

does not violate any right or duty to bargain.  **Virtually** <u>every</u>

collective bargaining agreement sets terms that **cannot be**

reopened for at least some period of time, and **nothing in** the

National Labor Relations Act limits how long that **period** may

be.[27]

---

[27]  In a footnote Rawl suggests that the **Evergreen Clause** is
an unenforceable contract because it has an "indefinite" **term.**
<u>See</u> Rawl Memo. at 35 n.17.  **This** contention is **without merit.**

     In the first place, the issue here is not the **duration** of
an entire contract, but of **one** contractual obligation.  And,
even putting that point aside, there is nothing "indefinite"
about the duration of Rawl's contribution obligation under the
Evergreen Clause.  That obligation continues as long as -- but
<u>only</u> as long as -- BCOA and the UMWA set national contribution
rates for the trusts.

     The law is clear that "if a contract is terminable upon
the occurrence of some event, neither party may **terminate** it at
will."  <u>First Commodity Traders Inc. v. Heingold Commodities,</u>
<u>Inc.</u>, 766 F.2d 1007 (7th Cir. 1985); <u>Payroll Express Corp. v.</u>
<u>Aetna Casualty & Surety Co.</u>, 659 F.2d 285 (2nd Cir. 1981);
<u>Warner-Lambert Pharmacy Co. v. John J. Reynolds, Inc.</u>, 178 F.
Supp. 655 (S.D.N.Y. 1959), <u>aff'd</u>, 280 F.2d 197 (2d Cir. 1960).
(To give but one example, it is quite common for employers to
obligate themselves to furnish retiree health benefits for
their employees' lifetime -- an obligation that will terminate
only when the last employee dies.  The cases cited supra at 20
involve such lifetime benefit commitments; and those cases
establish that such commitments are not terminable at will.)

     In any event, the proposition that contracts of indefinite
duration are terminable at will is simply a rule of
construction that can be overcome by evidence of a contrary
intent.  <u>See</u>, <u>e.g.</u>, <u>Hodge v. Evans Financial Corp.</u>, 707 F.2d
1566, 1568 (D.C. Cir. 1983) ("[t]hough the classic assumption
of the law is that the parties intend a contract of indefinite
term to be terminable at will, basic principles of contract law
inform us that the parties can contract otherwise"); <u>Holt v.</u>
<u>St. Louis Union Trust Co.</u>, 52 F.2d 1068, 1070 (4th Cir. 1931)

(Footnote continued on next page)

PT-00162

000153

- 45 -

Nor are the Trustees seeking to compel Rawl to select BCOA as its bargaining agent, or in any way violating NLRA § 8(b)(1)(B), as Rawl suggests. The Evergreen Clause does not require Rawl to select any particular bargaining agent; it simply provides that Rawl must contribute to the Funds as provided in the NBCWAs. And, even if this were viewed as the selection of a bargaining agent -- which it is not -- the Trustees (who in any event are not a labor organization and are therefore not covered by § 8(b)(1)(B))[28] are not seeking to "restrain or coerce" Rawl to agree to this arrangement, see § 8(b)(1)(B); they are simply seeking to enforce the agreement Rawl has already made. No case, including those cited by Rawl at pages 36-37 of its memorandum, suggests that there is anything unlawful in this. To the contrary, just as an employer may agree to peg benefit levels or contributions to the consumer price index, or to national or local averages, or to other such measures, the employer may agree to peg benefits and contributions to the levels adopted generally in an

---------------

(Footnote continued from previous page)

[27] (courts will avoid construing a contract to create a perpetual obligation "'in the absence of circumstances showing that perpetual forbearance or forbearance for some other time was intended'") (quoting Williston on Contracts § 38). As we have shown, the Evergreen Clause was clearly intended to create an obligation that would endure as long as national contribution rates were negotiated for the industry-wide Trusts.

[28]  Section 8(b)(1)(B), 29 U.S.C. § 158(b)(1)(B), makes it an unfair labor practice "for a labor organization or its agents . . . to restrain or coerce . . . an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances."

PT-00163

000154

- 46 -

industry -- here, the NBCWA levels.  Such arrangements are quite common, see, e.g., <u>Carpenters 46 Northern California Counties Conference Board v. Jones & Anderson</u>, 125 **LRRM** 3455, 3457 (Cal. App. 1987), and they are certainly lawful.

In sum, all of Rawl's efforts to find a legal justification for its decision to renege on its **Evergreen** commitment are unavailing.  Rawl has simply breached a lawful commitment, and must be held accountable.

### III. THE DECISION IN THE <u>ISLAND CREEK/DRUMMOND</u> **LITIGATION** DOES NOT COLLATERALLY ESTOP THE TRUSTEES' CLAIMS **IN THIS CASE.**

In a supplemental memorandum, Rawl has argued that the recent decision of Judge Harris of the District Court for the District of Columbia in the consolidated cases of <u>Connors v. Island Creek Corp.</u> and <u>Connors v. Drummond Coal Co.</u>, Civil Action Nos. 87-1210 SSH, 87-1973 SSH (D.D.C. January 17, 1991) ("<u>Island Creek</u>") "decides the very issue upon which the Plaintiffs premise their claim in the instant case," such that "Plaintiffs are collaterally estopped from relitigating the issue of evergreen liability."  <u>See</u> Rawl's Supplemental Memorandum in Support of its Motion to Dismiss or in the Alternative for Summary Judgment ("Rawl Supp. Memo.") at 2. Rawl is incorrect.

It is certainly true that <u>Island Creek</u> involved an effort by the Trustees to enforce the Evergreen Clause.  But in defending against the Trustees' claims, the defendants in <u>Island Creek</u> relied on an argument that has not been made, and cannot be made, by Rawl in this case.

PT-00164

█000155

- 47 -

    The <u>Island Creek</u> case involved only one of the Funds:  the
1950 Pension Fund.  That fund became fully funded in May 1987
-- meaning that according to actuarial projections it became
capable of meeting all of its currently negotiated benefit
obligations out of current assets and anticipated investment
income.  See <u>Bituminous Coal Operators' Assn. v. Connors</u>, 867
F.2d 625, 628 (D.C. Cir. 1989).  At oral argument on the
motions for summary judgment in <u>Island Creek</u>, lead counsel for
the <u>Island Creek</u> defendants repeatedly stressed that the
fully-funded status of the 1950 Pension Fund made the <u>Island
Creek</u> case fundamentally different from cases, such as this
one, that involve trusts that are <u>not</u> fully funded.

    Thus, counsel stated that the UMWA and the employers
"bargained to enter [the collective bargaining agreement
involved in <u>Island Creek</u>, known as the EESP] on one condition
precedent <u>that distinguishes this case from all of the other
cases</u>; and that is that the [EESP], which we want Your Honor to
enforce, would only take effect upon the full funding of the
1950 Pension Fund Plan."  Transcript at 7 (emphasis added).29/
The fact that the EESP provided for reduced contributions to
the 1950 Pension Fund only upon its reaching full funding was
significant, counsel argued, because reducing contributions to
a fully-funded pension trust could not possibly harm either the
actuarial soundness of the fund, the fund's ability to provide

_____

29/  The transcript is Exhibit 2 to Rawl's Supplemental
Memorandum.

- 48 -

full benefits to its beneficiaries, or the economic interests of other contributing employers. Transcript at 7-8.

In repeating the point that the EESP "was only to take effect after full funding had occurred and there could be no actuarial harm to the 1950 Pension Fund," Transcript at 11, counsel explained the repetition by stating "<u>I say this because it is important</u>." <u>Id</u>. (emphasis added). Judge Harris apparently thought it was important, too: he immediately asked for and was given confirmation that "full funding [was] achieved before the [reduced] rate came into effect." <u>Id</u>. Counsel went on to state once again that the EESP parties had bargained for a reduced contribution rate "without any harm to the 1950 Pension Fund beneficiaries or the employers who were contributing." <u>Id</u>. at 13.

In closing his argument, counsel for the <u>Island Creek</u> defendants relied even more pointedly on the fully-funded status of the 1950 Pension Fund. Counsel argued that the fact that the EESP agreement "was done at absolutely no economic detriment, no actuarial harm, to the 1950 Fund," Transcript at 14, meant that "[t]here is nothing in the record . . . that stands in the way of entering . . . summary judgment" in <u>Island Creek</u>. Transcript at 13. Most significantly, counsel acknowledged that "it may very well complicate things in other cases where there is alleged actuarial harm," Transcript at 16 -- cases such as this one, in which the trusts seeking contributions are <u>not</u> fully funded. And counsel for the <u>Island Creek</u> defendants forcefully urged Judge Harris not to let

- 49 -

himself "be influenced by that" in deciding <u>Island Creek</u>.
<u>Id</u>.30/

    Lead counsel for defendants in <u>Island Creek</u> used the
opportunity for rebuttal to drive home the position that the
fully-funded status of the 1950 Pension Fund distinguishes
<u>Island Creek</u> from cases where full funding has not been
achieved:

> [T]here is that impression that I believe
> the Trustees would leave with you that
> we're slipping away in some sweetheart
> scenario to the detriment of other
> employers. <u>I said this case was different
> from the others; it very much is</u>. There
> was no contract until full funding was
> achieved. <u>You heard me say that perhaps
> too often</u>. That was to prevent the
> economic harm that Ms. Clark had introduced
> in a completely different case with a
> completely different fund. I tried to
> emphasize, anticipating this, that I wanted
> to say what wasn't present here. This EESP
> did not decrease beneficiary pensions nor
> did it increase employer contributions.

Transcript at 49-50 (emphasis added).

    In short, the <u>Island Creek</u> defendants took the unequivocal
position at argument that the fully-funded status of the 1950
Pension Fund makes <u>Island Creek</u> "very much" different from
cases such as this one. Judge Harris may well have accepted

---

30/  Counsel for the Fund argued that although the 1950 Pension
Fund is fully funded, "the question of whether the fund is
fully funded or may suffer some actuarial harm cannot be the
occasion for deciding the general rule of law that would apply
in these circumstances." Transcript at 41. Judge Harris did
not appear persuaded by that position, however. Rather, while
the Funds' counsel explained the broader implications of the
defendants' theories for funds that were not fully funded,
Transcript at 32, Judge Harris sought clarification from the
Funds' counsel, as he had from defense counsel, that the 1950
Pension Fund <u>was in fact</u> fully funded. Transcript at 31.

PT-00167

2000158

- 50 -

that argument and premised his decision on the undisputed fact that the 1950 Pension Fund was fully funded. There is absolutely no basis for concluding that Judge Harris, who granted summary judgment in favor of the Island Creek defendants, disagreed with the distinction they drew. Judge Harris did not set forth the reasons for his decision, see Exhibit 1 to Rawl Supp. Memo., and it is entirely possible that the decision rested on the point, urged so vigorously by the Island Creek defendants, that the case involved a fully funded trust.

For this reason, although plaintiffs certainly do not agree with Judge Harris' decision in Island Creek, and will appeal that decision to the D.C. Circuit, Judge Harris' decision does not have collateral estoppel effect in this case. It is hornbook law that collateral estoppel applies only to "an issue . . . actually and necessarily determined." Montana v. United States, 440 U.S. 147, 153 (1979). See also Board of County Supervisors v. Scottish & York Ins. Services, 763 F.2d 176, 179 (4th Cir. 1985). In Island Creek, under the facts presented in the case and the arguments advanced, the only issue "actually and necessarily determined" was that the employers and the UMWA could negotiate reduced contributions to a fully funded trust. Whether the same would hold true where, as here, a trust is not fully funded is an issue that was not

PT-00168

000159

- 51 -

"actually and necessarily determined" in <u>Island Creek</u>.
Collateral estoppel therefore does not apply.<u>31</u>/

### CONCLUSION

Plaintiffs' motion for summary judgment should be granted, and defendants' motion should be denied.

Respectfully submitted,

_____
SUSAN CANNON-RYAN
Caldwell, Cannon-Ryan & Riffee
Post Office Box 4347
Charleston, W. VA  25364-4347
(304) 925-2100

_____
IAN LANOFF
JULIA PENNY CLARK
JEREMIAH A. COLLINS
Bredhoff & Kaiser
1000 Connecticut Avenue, N.W.
Suite 1300
Washington, D.C.  20036
(202) 833-9340

Attorneys for Plaintiffs

_____

<u>31</u>/  Because the argument just stated makes it clear that collateral estoppel does not apply, we need not address whether the other prerequisites for collateral estoppel would be satisfied here.

PT-00169

000160

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Confidentiality Agreement and Protective Order for the Listed Documents, Plaintiffs' Motion for Summary Judgment and Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment and in Opposition to Rawl's Motion to Dismiss or in the Alternative for Summary Judgment (with supporting declarations) was served by Federal Express on this 8th day of March, 1991 on the following:

Paul M. Thompson, Esq.
Gregory B. Robertson, Esq.
Michael S. Wilson, Esq.
Hunton & Williams
P.O. Box 1535
Richmond, Virginia   23212

Forrest H. Roles, Esq.
Smith, Heenan & Althen
One Valley Square
Suite 1380
Charleston, WV   25301

Deborah C. Malamud

PT-00170

A000161

# Exhibit B

# An Historic Contract

AN INTERVIEW WITH **President Roberts**



PHIL SMITH

The *UMW Journal* recently sat down with President Roberts to discuss his appraisal of the Bituminous Coal Operators Association (BCOA) contract and negotiations with other coal companies.

**Q. How do you view the new BCOA agreement?**

**A.** It is the strongest contract in decades. We had a mandate from the delegates to our convention last April to improve pensions and preserve health care. Our rank-and-file members had also made it clear they expected a significant increase in wages. We were able to achieve all those goals, and then some.

**Q. How did the legislative victory with the Coal Act funding make a difference?**

**A.** From almost the moment the Coal Act was passed back in 1992, there have been attacks on it and its funding. Many of us were part of the struggle to defend it. We were on the picket line at Pittston, where 4,000 of us went to jail fighting for health care. We were on the picket line again in '93. We protested and went to jail when they cut off retirees' health care at Bethlehem Steel, and again at Horizon.

But then, in one of its final acts before adjourning last year, Congress provided secure funding for all UMWA retirees covered by the Coal Act for the foreseeable future. And they went even further. For the first time, retirees who receive their benefits from the 1993 Benefit Plan will be included under the federal Coal Act umbrella. Thanks to the long and hard work of our union activists and lobbyists, we were then free to focus on improving pensions and wages and other issues that were important to our members.

**Q. There are still some of the former BCOA companies that haven't signed the contract. What's the UMWA's response?**

**A.** We are telling those companies to sign quickly or face some pretty unpleasant consequences.

Bargaining last year was complicated by an exodus from the BCOA that left Consol Energy as its sole remaining member. Nonetheless, those companies are still part of the UMWA Health and Retirement Funds, and are required to abide by the pension improvements contained in the BCOA deal. That is one reason why we negotiated with Consol first.

We have reached agreements with several non-BCOA companies. However, others have not agreed to the contract. Those companies need to know that there is a limit to our patience.

Thousands of UMWA members have been working under the terms of the old BCOA contract since the year began. That situation can't go on for much longer. We are telling these holdout operators to come on board and sign this agreement as soon as possible. We are also letting them know that we are preparing and training our local union leaders and members for the alternative in case they do not.

It's my sincere hope that by the time this issue of the *UMW Journal* gets into members' mailboxes, we'll have agreements with all the other companies. We're working very hard to do that.

But if the companies don't step up to the plate, then the members at those companies where there is no agreement need to be prepared for the next step, and we will be talking with them and their local union leaders about what that step may include. ∎

# __Exhibit C__

# SNL*i*

**Power & Coal - Operations and Strategy**
**UMWA locals approve contract, setting stage for non-CONSOL talks**
December 22, 2006 9:35 AM ET
By Barry Cassell

SNL EXTRA

With a new contract with CONSOL Energy Inc. now in hand, the United Mine Workers of America will be trying over the next few weeks to get several other coal companies to sign into this five-year agreement.

In voting on Dec. 21, all union locals with labor contracts that are about to expire voted on a new agreement with the Bituminous Coal Operators' Association. The BCOA, which used to represent several coal operators in labor talks, is down to only CONSOL after Peabody Energy Corp. pulled out earlier this year to pursue separate talks.

In the Dec. 21 voting, the deal with CONSOL got an average of 80% support from union members. No local turned down the agreement, though the voting was close in a couple of unnamed locals, said UMWA spokesman Phil Smith. The CONSOL locals were voting directly to approve the contract, while the locals for other companies were lodging an advisory vote that the union will use in its negotiations with those companies.

"This is an historic vote for the UMWA," union President Cecil Roberts said. "Never before has a contract been ratified by such a wide margin. There are no concessions, no givebacks in this agreement. There are only gains for current members, retirees and their families."

The union said it will present the agreement to the other coal companies between now and mid-January. "This agreement is going to be the industrywide agreement, as far as the UMWA is concerned," Roberts said. "That's our message to the other companies. It is a fair agreement for our members, and we believe it is fair for the companies as well. The level of support the members gave the agreement with their ratification vote speaks for itself, and we hope that the other companies are listening."

Roberts added, "Miners at companies which have not yet signed the agreement will report to work on Jan. 2 and will continue to work until told otherwise by the International Union." He noted that under federal labor law the terms and conditions of the national contract negotiated in 2002 will continue in full force and effect until a new agreement is reached with those companies.

The five-year agreement calls for a 20% across-the-board increase in wages over the life of the agreement and a $1,000 bonus to be paid immediately. When wage roll-ups and other improvements in the contract are factored in, the overall hourly cost of this agreement will increase by 32%.

"This is the largest wage increase we've negotiated since 1974," Roberts said. "It's front-loaded, so members will see an immediate benefit in their paycheck. Over the life of the agreement, a miner working at the top rate will see over $32,000 more in his paycheck for just working straight time."

Underground miners working at the top rate will be earning $24.42 per hour in the final year of the contract. The training rate for new miners will be $22.77 per hour in the last year of the agreement.

Pensions for future retirees will be increased by $10 per month per year of service over the life of the agreement, and pensions for current retirees have been raised as well. "A miner who retires with 30 years of service at the end of the term of this agreement will see almost a $600-per-month increase in his pension check," Roberts said.

The UMWA also addressed an agreement that has some of the other coal companies angry, which requires increased payments into the 1974 Pension Fund. At least some of the coal producers bound by this increase do not think the fund needs financial help. "By the end of the agreement in 2011, the companies will have made over $500 million in contributions to the pension plan," said the UMWA.

Even though the agreement is initially with CONSOL, other companies with unionized operations like Peabody, Foundation Coal Holdings Inc. and Jim Walter Resources Inc. will be bound by the pension improvements and pension contribution rates because they are part of the UMWA Health and Retirement Funds, which includes the UMWA 1974 Pension Fund.

Any company with a union contract that expires at the end of this year will now be asked to sign into this new deal, with the union having leverage because of the fact that it has now settled with CONSOL and a strike that hits any of them will not hurt CONSOL. CONSOL has a number of unionized mines that are covered by this contract, including several big Pittsburgh-seam mines in Northern Appalachia and the Emery mine in Utah.

Of note is that not all mines of affected companies face labor talks. For example, Peabody has UMWA-represented mines in the West, but they are under a separate contract and the BCOA deal only affects some of Peabody's Midwest and Eastern operations. Foundation has a number of nonunion mines, while the deal does affect all of JWR's big longwall mines in Alabama.

Site content and design Copyright © 2007, SNL Financial LC
Usage of this product is governed by the License Agreement.

SNL Financial LC, One SNL Plaza, PO Box 2124, Charlottesville, Virginia 22902, (434) 977-1600

# <u>Exhibit D</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Michael H. Holland, Micheal W. Buckner )
B.V. Hyler and Steven F. Schaab as )
Trustees of the United Mine Workers of )
America 1974 Pension Trust )
)
        Plaintiffs )
)
       v. )
)
Freeman United Coal Mining, Co., et al., )    Case No. 07-cv-00490 (PLF/AK)
)
       Defendants. )
)
_____)
)
Freeman United Coal Mining Co. )
)
       Plaintiff )
)
                         )    Case No. 07-cv-1050 (PLF/AK)
)
       v. )
)
United Mineworkers of America, et al. )
)
       Defendants. )
)
_____)

## DECLARATION OF WILLIAM D. STANHAGEN

I, William D. Stanhagen, declare:

1.     I am a former employee of Consol Energy, Inc. ("Consol") and was employed by Consol from 1977 until my retirement in 2006. I currently reside in Pittsburgh, Pennsylvania. I have personal knowledge of the matters stated herein, and if called to testify, could and would testify competently thereto.

2.     During my employment with Consol, I held the following positions: Vice President/General Manager of Consol's Real Estate/Land Group and, then, President of CNX Land Resources, Inc.

3.      In November 2000, I assumed the position of President of CNX Land Resources, Inc., an affiliate of Consol.  I held that position until my retirement in 2006.

4.      As part of my responsibilities as an executive officer of Consol Energy, I served on the strategic planning committee and attended weekly strategic planning meetings with other Consol executives.  The strategic planning committee, which was comprised of approximately five to six individuals, met to discuss various corporate matters, including, but not limited to, labor and employment issues.

5.      In 2006, the strategic planning committee members included the following individuals:  Peter B. Lilly, who was then the Chief Operating Officer – Coal and is now President, Coal Group; Patricia Lang, who was then Vice-President of Human Resources; and myself.

6.      Through my activities as an officer of Consol, as well as in my activities as a member of the strategic planning committee, I became familiar with the Bituminous Coal Operators' Association ("BCOA") and Consol's activities with regard to that organization.

7.      While I was an officer of Consol and while I was serving on the strategic planning committee, it became apparent to me that Consol effectively controlled BCOA.  I was aware that the only remaining members of BCOA were Consol affiliates.  While I know that executive officers of Consol participated in the strategy discussions and actual negotiations for the wage agreement denominated as the National Bituminous Coal Wage Agreement of 2007 ("2007 Agreement"), I am unaware of representatives from the BCOA itself who did so as well.  Consol's control over the BCOA permits Consol to direct the BCOA essentially as an extension of Consol.

8.    In or about early 2006, on a day following a negotiation over the 2007 Agreement in Washington, DC, I arrived at the Consol Board Meeting Room for a strategic planning committee meeting.  I arrived early along with Consol's then Vice-President of Human Resources, Patricia Lang, and had a conversation with her.

9.    During my conversation with Ms. Lang, she informed me that she had just returned from Washington D.C. where she was participating in negotiations for the 2007 Agreement with the United Mine Workers of America ("UMWA").  Ms. Lang stated that one of Consol's goals for the negotiation of the 2007 Agreement was to gain a competitive advantage over other coal companies that would be bound by the Agreement by using the Agreement to drive up benefit costs.

10.    Ms. Lang explained that Consol's goal of increasing benefits costs was rooted in the knowledge that long wall operators, like Consol, could more easily absorb the increased costs, while mine operators using the continuous mining method could not absorb the increased benefits costs.  This differential arises because the continuous mining method requires more personnel per ton of coal produced.

11.    Ms. Lang further explained that this strategy would give Consol the ability to "absorb the market" left by coal operators struggling to remain competitive and financially viable.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on

10/3/07 .

William D. Stanhagen

# Exhibit E

02/09/07 Letter re Effects of 2007 Agreement on 1974 Pension Plan

PT-04040

# MERCER
### Human Resource Consulting

1166 Avenue of the Americas
New York, NY 10036-2708
212 345 7087  Fax 212 345 7414
carol.gramer@mercer.com
www.mercerHR.com

February 9, 2007

Ms. Ghislaine Sonies
Investment Manager
UMWA Health & Retirement Funds
2121 K Street, NW
Washington, DC  20037

Subject:
**Effects of 2007 Agreement on 1974 Pension Plan**

Dear Ghislaine:

The enclosed exhibits estimate July 1, 2006 valuation results for the 1974 Pension Plan as if the effects of the 2007 Agreement had been fully reflected. Exhibits 1 and 2 provide liabilities and costs and Exhibit 3 provides a benefit payout projection. In addition, please verify that Exhibit 4 Summary of Plan Provisions conforms to your understanding of the terms of the Agreement.

Sincerely,

*Carol R. Gramer*

Carol R. Gramer, ESA, EA, MAAA

CRG:HL:FGK:JMG:JLA:ar

Copy:
J. Alpert, P. Couture, J. Goldburd, F. Kemp, H. Loewy

Enclosures

The information contained in this document (including any attachments) is not intended by Mercer to be used, and it cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code that may be imposed on the taxpayer.

j:\umwa\doc\other\07\agree_71pp.doc

**MMC**  Marsh & McLennan Companies

**EXHIBIT 1**

**1974 PENSION PLAN**
**2006 ACTUARIAL VALUATION RESULTS**
**(Amounts in Thousands)**

| Funding | 7/1/06 Valuation | 7/1/2006 Valuation Fully Reflecting Effects of 2007 Agreement |
|---|---|---|
| 1) Market Value of Assets | $5,983,734 | $5,983,734 |
| 2) Actuarial Value of Assets | 5,802,713 | 5,802,713 |
| 3) Actuarial Present Value of Projected Benefits | 6,547,755 | 7,125,954 |
| 4) Unfunded Frozen Actuarial Accrued Liability | 1,501,484 | 2,077,473[1] |
| 5) Normal Cost | (181,166) | (180,637) |
| 6) Actuarial Gain/(Loss) | 219,810 | 219,810 |
| 7) Vested Benefits Charge | 14,742 | 63,637 |
| 8) Net Charges to Funding Standard Account (includes Normal Cost) | 213,191 | 260,289 |
| 9) Credit Balance | 2,120,700 | 2,120,700 |
| 10) Contribution for Minimum Funding = ((8)-(9), but not less than zero) | 0 | 0 |
| 11) Contribution for 30-Year Funding[2] | 0 | 0 |
| 12) Maximum Tax-deductible Contribution[3] | 5,152,326 | 6,149,632 |
| 13) RPA '94 Interest Rate (net of administrative expenses) | 5.77% | 5.77% |
| 14) RPA '94 Current Liability | 7,804,890 | 8,474,311 |
| 15) RPA '94 Current Liability Funded Percentage = (2)÷(14) | 74.35% | 68.47% |
| 16) PPA '06 Liability (Unit Credit Method and Funding Assumptions) | 6,366,078 | 6,976,895 |
| 17) PPA '06 Funded Percentage = (2)÷(16) | 91.15% | 83.17% |

---

[1] *The estimated $576 million increase in unfunded actuarial accrued liability can be broken down as follows: $10 increase in benefit formula - $187 million, $15/$5 increase for pensioners, future pensioners, and surviving spouses - $196 million, one-time single sum payments - $171 million, and lump sum death benefits - $22 million.*

[2] *Includes one half year of interest, since contributions are assumed to be paid uniformly over the year.*

[3] *Includes a full year of interest, regardless of the actual dates of payment of contributions.*

**EXHIBIT 1 (cont'd)**

**1974 PENSION PLAN**
**2006 ACTUARIAL VALUATION RESULTS**
**(Amounts in Thousands)**

| | 7/1/06 Valuation | 7/1/2006 Valuation Fully Reflecting Effects of 2007 Agreement |
|---|---|---|
| **Unfunded Vested Benefits** | | |
| 1) Actuarial Present Value of Vested Benefits – PBGC Basis[4] | $7,094,627 | $7,749,037 |
| 2) Market Value of Assets | 5,983,734 | 5,983,734 |
| 3) Percentage Funded = (2)÷(1) | .843418 | .772191 |
| 4) Unfunded Vested Benefits = (1)-(2) | 1,110,893 | 1,765,303 |
| **Accumulated Plan Benefits** | | |
| 1) Actuarial Present Value of Accumulated Plan Benefits | | |
| (a) Vested Benefits | | |
| Active Participants | $1,303,333 | $1,552,708 |
| Non-retired Disabled Participants | 186 | 205 |
| Terminated Vested Participants | 778,984 | 811,081 |
| Retired Participants | 4,241,007 | 4,399,363 |
| Spouses Receiving Benefits | 709,683 | 745,201 |
| Preretirement Spouses' Benefits | 21,753 | 24,736 |
| Lump Sum Death Benefits | 122,899 | 148,199 |
| One-time Single Sum Payments | 39,681 | 215,743 |
| Social Security Supplement | 0 | 0 |
| Total Vested | 7,217,526[5] | 7,897,236 |
| (b) Nonvested Benefits | | |
| Active Participants and Preretirement Spouses' Benefits | 68,151 | 80,637 |
| Disability Benefits | 45,510 | 53,563 |
| Lump Sum Death Benefits | 1,106 | 1,335 |
| One-Time Single Sum Payments | 12,318 | 12,318 |
| Total Nonvested | 127,085[6] | 147,853 |
| (c) Total = (a)+(b) | 7,344,611 | 8,045,089 |
| 2) Net Assets Available for Benefits (Market Value) | 5,983,734 | 5,983,734 |
| 3) Excess of (1) over (2) | 1,360,877 | 2,061,355 |

Note: The interest and expense assumptions are the PBGC annuity interest rate in effect on June 30 (6.2% for 20 years and 1 4.75% thereafter), and the PBGC expense charge as described in Appendix C to Part 4044 of the PBGC Regulations.

---

[4] *PBGC annuity interest rate in effect on June 30 (6.2% for 20 years and 4.75% thereafter), and the PBGC expense charge as described in Appendix C to Part 4044 of the PBGC Regulations.*
[5] *Based on benefits accrued on valuation date.*
[6] *Based on benefits determined using service at the valuation date and the ultimate benefit levels included in the 2002 Agreement. For 2006, these benefit levels are the same as those used for determining vested benefits.*

PT-04043

**EXHIBIT 2**

**1974 PENSION PLAN**
**2006 ACTUARIAL VALUATION RESULTS**
**IF THE ENTRY AGE NORMAL METHOD WAS ADOPTED ON JULY 1, 1984**
**(Amounts in Thousands)**

| Funding | 7/1/06 Valuation | 7/1/2006 Valuation Fully Reflecting Effects of 2007 Agreement |
|---|---|---|
| 1) Market Value of Assets | $5,983,734 | $5,983,734 |
| 2) Actuarial Value of Assets | 5,802,713 | 5,802,713 |
| 3) Actuarial Present Value of Projected Benefits | 6,547,755 | 7,125,954 |
| 4) Actuarial Accrued Liability | 6,533,379 | 7,109,368 |
| 5) Unfunded Actuarial Accrued Liability | 730,666 | 1,306,655 |
| 6) Normal Cost | 3,047 | 3,513 |
| 7) Actuarial Gain/(Loss) | 316,214 | 316,214 |
| 8) Vested Benefits Charge | 14,742 | 63,637 |
| 9) Net Charges to Funding Standard Account (includes Normal Cost) | 102,006 | 149,041 |
| 10) Credit Balance | 1,135,960 | 1,135,960 |
| 11) Contribution for Minimum Funding = ((9)-(10), but not less than zero) | 0 | 0 |
| 12) Contribution for 30-Year Funding[1] | 64,499 | 113,334 |
| 13) Maximum Tax-deductible Contribution[2] | 5,152,326 | 6,149,632 |

---

[1]  *Includes one half year of interest, since contributions are assumed to be paid uniformly over the year.*

[2]  *Includes a full year of interest, regardless of the actual dates of payment of contributions.*

PT-04044

**EXHIBIT 3**

**1974 PENSION PLAN**
**ESTIMATED BENEFIT PAYMENTS**
**(Amounts in Thousands)**

| Plan Year Beginning July 1 | 7/1/06 Valuation | 7/1/06 Valuation Fully Reflecting Effects of 2007 Agreement |
|---|---|---|
| 2006 | $579,197 | $593,052 |
| 2007 | 540,167 | 602,535 |
| 2008 | 553,029 | 621,317 |
| 2009 | 563,335 | 635,960 |
| 2010 | 571,537 | 648,804 |
| 2011 | 577,443 | 657,636 |
| 2012 | 581,293 | 617,583 |
| 2013 | 583,722 | 621,682 |
| 2014 | 584,783 | 624,179 |
| 2015 | 583,553 | 624,109 |
| 2016 | 579,472 | 620,725 |
| 2017 | 572,862 | 614,438 |
| 2018 | 564,409 | 606,061 |
| 2019 | 553,861 | 595,338 |
| 2020 | 541,329 | 582,419 |
| 2021 | 526,708 | 567,206 |
| 2022 | 510,645 | 550,412 |
| 2023 | 493,759 | 532,707 |
| 2024 | 476,195 | 514,249 |
| 2025 | 458,288 | 495,399 |
| 2026 | 440,086 | 476,199 |
| 2027 | 421,702 | 456,781 |
| 2028 | 403,204 | 437,207 |
| 2029 | 384,595 | 417,487 |
| 2030 | 365,951 | 397,686 |
| 2031 | 347,239 | 377,783 |
| 2032 | 328,562 | 357,883 |
| 2033 | 309,910 | 337,968 |
| 2034 | 291,337 | 318,104 |
| 2035 | 272,898 | 298,340 |
| 2036 | 254,639 | 278,727 |
| 2037 | 236,655 | 259,376 |
| 2038 | 219,005 | 240,340 |
| 2039 | 201,755 | 221,705 |
| 2040 | 184,967 | 203,535 |
| 2041 | 168,716 | 185,907 |
| 2042 | 153,067 | 168,900 |
| 2043 | 138,093 | 152,592 |
| 2044 | 123,853 | 137,053 |
| 2045 and beyond | 554,389 | 617,879 |

**DRAFT**

**EXHIBIT 4**

**SUMMARY OF PLAN PROVISIONS**
**(BASED ON NATIONAL BITUMINOUS COAL WAGE AGREEMENT OF 2007)**

<u>Class of Employee Covered</u>: All eligible persons retiring on or after December 31, 1975, or becoming totally disabled due to a mine accident on or after December 6, 1974.

<u>Effective Date</u>: December 6, 1974.

<u>Date of Last Amendment</u>: August 15, 2006.

<u>Normal Retirement</u>:

<u>Eligibility</u>: The earlier of (a) or (b):

a)  Age 62 with 10 years of signatory service or 20 years of credited service. Signatory service is defined as time during which a participant worked as an employee in a classified job for an employer signatory to the bituminous coal wage agreement then in effect. The plan limits the amount of non-signatory service which may be recognized by the benefit formula. In addition to the 20-year credited service requirement, the participant must have the following service with an employer signatory to the bituminous coal wage agreement:

| Date of Retirement | Years of Signatory Service Required | Maximum Number of Years of Non-Signatory Service Includable in Credited Service |
|---|---|---|
| Before 1/1/1977 | 5 | 15 |
| 1/1/1977 to 12/31/1977 | 6 | 14 |
| 1/1/1978 to 12/31/1978 | 7 | 13 |
| 1/1/1979 to 12/31/1979 | 8 | 12 |
| 1/1/1980 to 12/31/1980 | 9 | 11 |
| 1/1/1981 and after | 10 | 10 |

b)  Age 65 with 5 years of signatory service.

1

PT-04046

**DRAFT**

Benefit:                Monthly Benefit for Each Year of Service

### Retirements or Terminations Prior to 10/1/1984

|  | From 1/1/1976 to 12/31/1976 | From 1/1/1977 to 3/26/1978 | From 3/27/1978 to 6/6/1981 | From 6/7/1981 to 6/6/1983 | From 6/7/1983 to 9/30/1984 |
|---|---|---|---|---|---|
| Credited Non-Signatory Service: | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 | $ 7.50 |
| Credited Signatory Service: | | | | | |
| 1st 10 Years | 12.00 | 12.50 | 13.50 | 14.50 | 15.50 |
| 2nd 10 Years | 12.50 | 13.00 | 14.00 | 15.00 | 16.00 |
| 3rd 10 Years | 13.00 | 13.50 | 14.50 | 15.50 | 16.50 |
| In Excess of 30 Years | 13.50 | 14.00 | 15.00 | 16.00 | 17.00 |

### Retirements or Terminations From 10/1/1984 Through 1/31/1988

|  | From 10/1/1984 to 9/30/1987 | From 10/1/1987 to 1/31/1988 |
|---|---|---|
| Credited Non-Signatory Service: | $ 7.50 | $ 7.50 |
| Credited Signatory Service: | | |
| 1st 10 Years | 16.50 | 17.00 |
| 2nd 10 Years | 17.00 | 17.50 |
| 3rd 10 Years | 17.50 | 18.00 |
| In Excess of 30 Years | 18.00 | 18.50 |

2

PT-04047

**DRAFT**

Retirements or Terminations On or After 2/1/1988

The sum of (a) plus (b) plus (c) plus (d) plus (e).

| | From 2/1/1988 to 1/31/1991 | From 12/16/1993 to 12/31/1997 Pension Application Authorized | | After 8/16/1996 | From 1/1/1998 to 12/31/1999 | From 1/1/2000 to 12/31/2001 | From 1/1/2002 to 12/31/2003 | From 1/1/2004 to 12/31/2005 | From 1/1/2006 to 12/31/2006 | From 1/1/2007 to 12/31/2008 | From 1/1/2009 to 12/31/2010 | On or After 1/1/2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | From 2/1/1991 to 12/15/1992 | On or Before 8/16/1996 | | | | | | | | | |
| (a) Credited Non-Signatory Service: | $7.50 | $10.00 | $10.00 | $12.00 | $12.00 | $14.00 | $18.00 | $20.00 | $24.00 | $28.00 | $32.00 | $34.00 |
| (b) Credited Signatory Service Earned Prior to 2/1/1989: | | | | | | | | | | | | |
| 1st 10 Years | 20.00 | 22.50 | 26.50 | 28.50 | 32.50 | 34.50 | 38.50 | 40.50 | 44.50 | 48.50 | 52.50 | 54.50 |
| 2nd 10 Years | 20.50 | 23.00 | 27.00 | 29.00 | 33.00 | 35.00 | 39.00 | 41.00 | 45.00 | 49.00 | 53.00 | 55.00 |
| 3rd 10 Years | 21.00 | 23.50 | 27.50 | 29.50 | 33.50 | 35.50 | 39.50 | 41.50 | 45.50 | 49.50 | 53.50 | 55.50 |
| In Excess of 30 Years | 21.50 | 24.00 | 28.00 | 30.00 | 34.00 | 36.00 | 40.00 | 42.00 | 46.00 | 50.00 | 54.00 | 56.00 |
| (c) Credited Signatory Service Earned From 2/1/1989 Through 1/31/1990: | 27.50 | 30.00 | 34.00 | 36.00 | 40.00 | 42.00 | 46.00 | 48.00 | 52.00 | 56.00 | 60.00 | 62.00 |
| (d) Credited Signatory Service Earned From 2/1/1990 Through 12/15/1993: | 32.00 | 34.50 | 38.50 | 40.50 | 44.50 | 46.50 | 50.50 | 52.50 | 56.50 | 60.50 | 64.50 | 66.50 |
| (e) Credited Signatory Service Earned On or After 12/16/1993: | N/A | N/A | 41.50 | 43.50 | 47.50 | 49.50 | 53.50 | 55.50 | 59.50 | 63.50 | 67.50 | 69.50 |

3

PT-04048

**DRAFT**

| | |
|---|---|
| Form of Payment: | Unmarried participants: Benefit payments are made during the participant's lifetime (life annuity).<br><br>Married participants: Unreduced benefits are paid during the lifetime of the participant with 75% of the unreduced benefit continued to an eligible spouse after the participant's death (postretirement surviving spouse benefit). |

**Early Retirement:**

| | |
|---|---|
| Eligibility: | Age 55 with 10 years of signatory service or 20 years of credited service (including the required amount of signatory service). |
| Benefit: | Benefit as defined for Normal Retirement if pension commences at age 62. If benefit commences before age 62, the benefit is equal to the Normal Retirement benefit reduced ¼% for each month that retirement precedes age 62. |
| Form of Payment: | Same as Normal Retirement. |

**Disability Retirement:**

| | |
|---|---|
| Eligibility: | Disablement is due to a mine accident on or after December 6, 1974 while in a classified signatory job and the participant is eligible for social security disability benefits as a result of such accident, and: |

1) Normal disability benefit: at least 10 years of signatory service prior to retirement.

2) Minimum disability benefit: less than 10 years of signatory service prior to retirement.

**Benefit:**

| | |
|---|---|
| Normal: | The benefit calculated in accordance with the Normal Retirement Benefit schedule in effect at retirement. |

Minimum:

| Retirement Date | Benefit Amount |
|---|---|
| Prior to 3/27/1978 | $125.00 |
| 3/27/1978 to 6/6/1981 | 135.00 |
| 6/7/1981 to 6/6/1983 | 145.00 |
| 6/7/1983 to 9/30/1984 | 155.00 |
| 10/1/1984 to 9/30/1987 | 165.00 |
| 10/1/1987 to 1/31/1988 | 170.00 |
| 2/1/1988 to 1/31/1990 | 190.00 |
| 2/1/1990 to 12/31/1997 | 200.00 |
| 1/1/1998 to 12/31/2001 | 215.00 |
| 1/1/2002 to 12/31/2006 | 230.00 |
| 1/1/2007 to 12/31/2008 | 245.00 |
| On or After 1/1/2009 | 250.00 |

4

PT-04049

**DRAFT**

Form of Payment:    Same as Normal Retirement.

Deferred Vested Retirement – Regular:

Eligibility:    Termination of employment after completion of 5 (10, for participants who do not have an hour of signatory service on or after July 1, 1999) years of signatory service or 20 years of credited service (as defined under Normal Retirement eligibility) before the age requirement for Early Retirement has been met.

Benefit:    Benefit calculated in accordance with the Normal Retirement Benefit schedule in effect on the last day of credited service (actuarially reduced for Early Retirement). With 20 years of credited service, there is a minimum monthly benefit of $180.00.

Form of Payment:    Married participant with at least 20 years of credited service:  unreduced postretirement surviving spouse benefit.

Married participant with less than 20 years of credited service:  50% joint and survivor benefit which is actuarially equivalent to a life annuity, if elected.

Single participant:  life annuity.

Deferred Vested Retirement – Special:

Eligibility:    Cessation of work on or after June 7, 1981, between ages 50 and 55, after 20 years of signatory service and either (1) laid off and not refused recall, or (2) terminated under Article III, Section (j) of the Wage Agreement (or physically unable to perform regular work) and not employed in coal industry thereafter.

Benefit:    Benefit calculated in accordance with the Normal Retirement Benefit schedule in effect on the last day of credited service (if paid after age 55 and before age 62: benefit reduced by ¼% for each month payment commencement precedes age 62).

Form of Payment:    Same as Deferred Vested Retirement – Regular.

Deferred Vested Retirement – Enhanced 1996:

Eligibility:    Cessation of work on or after December 16, 1993, before age 55, after 20 years of signatory service, either (1) laid off and not refused recall, or (2) terminated under Article III, Section (j) of the Wage Agreement (or physically unable to perform regular work) and not employed in coal industry thereafter, and the participant's pension benefits are not in pay status on or before August 16, 1996.

Benefit:    Same as Deferred Vested Retirement – Special.

5

**DRAFT**

Form of Payment:    Same as Deferred Vested Retirement – Regular.

Deferred Vested Retirement – Special Permanent Layoff Pension:

Eligibility:    Last day of credited service on or after January 1, 1998, before age 55, after 20 years of signatory service and either (1) permanently laid off due to a mine closing, or (2) permanently laid off (i.e., on layoff status at least 180 days and not refused recall).

Benefit:    Benefit calculated in accordance with the Normal Retirement Benefit schedule in effect on the last day of credited service, determined as if the participant were age 55 (for purposes of applying a reduction for Early Retirement).

Form of Payment:    Same as Deferred Vested Retirement – Regular.

Special 30-and-Out Layoff Pension:

Eligibility:    Last day of credited service on or after January 1, 2002, after 30 years of signatory service, and laid off and not refused recall. If not actively at work as of December 31, 2001 (because of a layoff), either (1) earned at least 250 hours of credited signatory service following return to work, or (2) returned to active employment as the result of a bona fide job opening.

Benefit:    Benefit calculated in accordance with the Normal Retirement Benefit schedule in effect on the last day of credited service, without actuarial reduction on account of age.

Form of Payment:    Same as Deferred Vested Retirement – Regular.

30-and-Out Pension:

Eligibility:    Last day of credited service on or after January 1, 2003, after 30 years of signatory service. If not actively at work as of December 31, 2001 (because of layoff), either (1) earned at least 250 hours of credited signatory service following return to work, or (2) returned to active employment as the result of a bona fide job opening.

Benefit:    Same as Special 30-and-Out Layoff Pension.

Form of Payment:    Same as Deferred Vested Retirement – Regular.

6

PT-04051

**DRAFT**

Pension Increases:

a) Pension increases for participants who retired prior to 2/1/1988, other than those with: a) Minimum Disability Retirement Pensions or, for increases prior to 2/1/1988. b) Deferred Vested Retirement pensions.

| Effective Date of Increase | Increase Applicable to Retirements Prior to | Amount of Monthly Pension Increase |
|---|---|---|
| 1/1/1977 | 12/31/1976 | $ 10.00 |
| 4/1/1978 | 3/27/1978 | 10.00 |
| 4/1/1979 | 3/27/1978 | 10.00 |
| 4/1/1980 | 3/27/1978 | 5.00 |
| 7/1/1981 | 6/7/1981 | 10.00 |
| 7/1/1982 | 6/7/1981 | 10.00 |
| 7/1/1983 | 6/7/1981 | 5.00 |
| 10/1/1984 | 10/1/1984 | 10.00 |
| 10/1/1987 | 10/1/1984 | 10.00 |
| 2/1/1988 | 2/1/1988 | 20.00 |
| 2/1/1990 | 2/1/1988 | 10.00 |

b) Minimum Disability Retirement pensions for participants who retired prior to 2/1/1988, as follows:

| Effective Date of Increase | Increase Applicable to Retirements Prior to | Amount of Monthly Pension Increase |
|---|---|---|
| 4/1/1978 | 3/27/1978 | $ 5.00 |
| 4/1/1979 | 3/27/1978 | 5.00 |
| 4/1/1980 | 3/27/1978 | 2.50 |
| 7/1/1981 | 6/7/1981 | 5.00 |
| 7/1/1982 | 6/7/1981 | 5.00 |
| 7/1/1983 | 6/7/1981 | 2.50 |

| Effective Date of Increase | Increase Applicable to Retirements Prior to | Amount of Monthly Pension |
|---|---|---|
| 10/1/1984 | 10/1/1984 | $160.00 |
| 10/1/1987 | 10/1/1984 | 170.00* |
| 2/1/1988 | 2/1/1988 | 190.00 |
| 2/1/1990 | 2/1/1988 | 200.00 |
| 1/1/1998 | 1/1/1998 | 215.00 |
| 1/1/2002 | 1/1/2002 | 230.00 |

\* $165 if approved after October 1, 1984.

7

PT-04052

**DRAFT**

c) Minimum pensions for surviving spouses of pensioners (other than deferred vested pensioners not eligible for the Deferred Vested Retirement--Special benefit for increases prior to February 1, 1988) who died prior to February 1, 1988:

| Effective Date of Increase | Increase Applicable to Retirements Prior to | Amount of Monthly Pension Increase |
|---|---|---|
| 10/1/1984 | 10/1/1984 | $ 5.00 |
| 10/1/1987 | 10/1/1984 | 5.00 |

| Effective Date of Increase | Increase Applicable to Retirements Prior to | Amount of Monthly Pension Increase |
|---|---|---|
| 2/1/1988 | 2/1/1988 | (1/31/1988 amount + $10) x 1.5 |
| 2/1/1990 | 2/1/1988 | (1/31/1988 amount + $15) x 1.5 |

d) Pensions of participants eligible for a Deferred Vested Retirement--Regular pension who ceased work prior to June 7, 1981 and satisfy the criteria for a Deferred Vested Retirement--Special pension are recomputed (prospectively only) using the ¼% reduction and the Normal Retirement benefit schedule in effect on the last day of credited service. Pensions of such participants are increased by any increases applicable to Early Retirement pensioners which occurred after the date of retirement and application for pension.

e) A monthly benefit increase of $15 is provided to all pensioners and surviving spouses in pay status, and to all terminated vested participants (not yet in pay status), on January 1, 1998.

f) A monthly benefit increase of $15 is provided to all pensioners and surviving spouses in pay status, and to all terminated vested participants (not yet in pay status), on January 1, 2002.

g) A monthly benefit increase of $15 is provided to all pensioners and surviving spouses in pay status, and to all terminated vested participants (not yet in pay status), on January 1, 2007.

h) A monthly benefit increase of $5 is provided to all pensioners and surviving spouses in pay status, and to all terminated vested participants (not yet in pay status), on January 1, 2009.

<u>Preretirement Surviving Spouse Benefit</u>:

<u>Eligibility</u>:    Eligible for an immediate pension at time of death, except Deferred Vested participants, who must also have 20 years of Credited Service.

<u>Benefit</u>:    75% of the pension that the participant would have received had he elected a pension on the day preceding his death.

<u>Form of Payment</u>:    Life annuity to eligible spouse.

8

**DRAFT**

Preretirement Joint and Survivor Annuities:

|  |  |
|---|---|
| Eligibility: | Not eligible for a Preretirement Surviving Spouse Benefit and either qualifies for a pension or has 5 (10, for participants who do not have an hour of signatory service on or after July 1, 1999) years of signatory service. |
| Benefit: | A percentage of the pension that the participant would have received had he separated from service on the day of his actual death, and survived to retire at age 55 (or current age at death, if later) and died on the next day. The percentage is 50% for participants who qualify for a pension and 75% for other participants. |
| Form of Payment: | Life annuity to eligible spouse, first payable at the later of date of death or the month the participant would have attained age 55. |

Special Surviving Spouse Benefit:

|  |  |
|---|---|
| Eligibility: | January 1, 1998 surviving spouses who 1) were married to a miner who died as a result of a mine accident during the term of the 1978 or 1981 Wage Agreement (with 10 years of credited service) and who was not in Construction Industry Service at time of death, 2) never remarried, and 3) never received a monthly surviving spouse benefit. |
| Benefit: | Lump sum of $10,000 on February 1, 1998 plus monthly benefit of $100 beginning February 1, 1998 and continuing until remarriage or death. |

Lump Sum Death Benefit:

|  |  |
|---|---|
| Eligibility: | Regular and disabled pensioners (other than those receiving a deferred vested pension based on less than 20 years of credited service) whose death occurs on or after February 1, 1991, and whose last service was with an employer signatory to an agreement providing for such benefits. Effective February 1, 1993, pensioners who are eligible beneficiaries of the UMWA Combined Benefit Fund are not eligible for lump sum death benefits from this plan. |
| Benefit: | For deaths on or after January 1, 2007: lump sum equal to $8,500 for the named beneficiary who is the surviving spouse or an eligible dependent, and $7,000 for any other named beneficiary. For deaths during 2002-2006, the amounts are $7,000 and $6,000, respectively. For deaths during 1998-2001, the amounts are $6,000 and $5,000, respectively. For deaths prior to 1998, the amounts are $5,000 and $4,000 respectively. |

One-time Single Sum Payments:

|  |  |
|---|---|
| Eligibility: | Regular and disabled pensioners and surviving spouses whose pension is in pay status on the day before the payment date. |

PT-04054

**DRAFT**

Benefit:

One-time single sum payments of $500 for regular pensioners, $290 for disabled pensioners, and $375 for surviving spouses, payable on each of the following payment dates: February 1, 1991 and December 16 of 1993, 1994, and 1995.

One-time single sum payments of $525 for regular pensioners, $315 for disabled pensioners, and $400 for surviving spouses, payable on December 16 of 1996 and 1997 and November 1 of 1999, 2000, and 2001.

One-time single sum payments of $550 for regular pensioners and $425 for disabled pensioners and surviving spouses, payable on November 1 of 2002, 2003, and 2004.

One-time single sum payments of $565 for regular pensioners and $440 for disabled pensioners and surviving spouses, payable on November 1 of 2005 and 2006.

One-time single sum payments of $2,250 for any pensioner, disabled miner not yet eligible for immediate pension benefits, or surviving spouse, who is eligible for benefits from the UMWA 1993 Benefit Plan, payable on or before April 1, 2002 and January 1 of 2003, 2004, 2005, and 2006.

One-time single sum payments of $3,350 for any pensioner, disabled miner not yet eligible for immediate pension benefits, or surviving spouse, who is eligible for and receiving benefits from the UMWA 1993 Benefit Plan on June 30, 2005, payable in July 2005.

One-time single sum payments of $3,350 for any pensioner, disabled miner not yet eligible for immediate pension benefits, or surviving spouse, who is eligible for and receiving benefits from the UMWA 1993 Benefit Plan on July 31, 2006, payable in September 2006.

One-time single sum payments of $565 for regular pensioners and $440 for disabled pensioners and surviving spouses, payable on November 1 of 2007, 2008, and 2009.

One-time single sum payments of $580 for regular pensioners and $455 for disabled pensioners and surviving spouses, payable on November 1 of 2010 and 2011.

Social Security Supplement:

Eligibility:

Pensioners and surviving spouses whose last signatory employer is obligated to current Agreement benefits and who also meet the following requirements:
- pensioners and surviving spouses who are not eligible for unreduced Social Security benefits,
- entitled to Employer-provided benefits under the Employer Plan and subject to such plan's annual deductible, and
- ineligible for Medicare disability benefits.

Deferred vested pensioners with less than 20 years of service are not eligible for the supplement.

Benefit:

Lump sum social security supplement of $1,000 payable on each January 1 of years 1994-2006 (or a pro-rata portion based on length of eligibility within the calendar year).

10

PT-04055

# Exhibit F



National Bituminous Coal
Wage Agreement of 2007

Art. XX

shall not be construed to apply to Employees whose regular job duties include the relief of other Employees for short periods of time which do not exceed thirty (30) minutes for each occurrence during the basic workday. For such relief periods, however, the Employee providing relief shall be paid the higher rate.

## Article XX—HEALTH AND RETIREMENT BENEFITS

### Section (a) General Purpose

This Article makes provision for pension, health and other benefits for Employees covered by this Agreement, and for former Employees who were covered under the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such Employees. The benefits to be provided are as set forth under separate plans and trusts referred to in Sections (b) and (c) of this Article.

A general description of the benefits to be provided appears immediately following this Article. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

Pursuant to the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), the health benefits (and in some cases the death benefits) provided to retirees who were age and service eligible as of February 1, 1993,

Art. XX

and who actually retired by September 30, 1994, are guaranteed by an Act of Congress. The Coal Act, which was enacted with the active support of the United Mine Workers of America and the BCOA, requires responsible employers to provide and pay for those benefits for life. Although, under certain circumstances, employers are permitted to adopt cost containment and managed care programs, the levels of benefits provided to retirees and dependents covered by the Coal Act are fixed by law, and may not be changed by any employer.

Benefits under the Coal Act are provided either by the employer who was providing those benefits on February 1, 1993, or by two newly-created Funds: the United Mine Workers of America Combined Benefit Fund and the United Mine Workers of America 1992 Benefit Plan. Those benefits are not governed by this Agreement.

For purposes of this Article, the 1950 Pension Plan and Trust and the 1974 Pension Plan and Trust shall be a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund).

Each participant and beneficiary shall be entitled only to the pension benefits provided in and paid from either the 1950 Pension Plan and Trust or the 1974 Pension Plan and Trust and each participant, beneficiary and dependent shall be entitled only to the benefits provided in and paid from the 1993 Benefit Trust, or the individual benefit plans referred to in Section

Art. XX

(c). An individual that is entitled to health benefits from a plan maintained pursuant to the Coal Act will receive benefits from such plan, and not from a plan maintained pursuant to this Article. In addition, an individual that is entitled to death benefit coverage from the United Mine Workers of America Combined Benefit Fund shall not be entitled to death benefit coverage from any plan maintained pursuant to this Article.

The general purpose of the plans referred to in this Article shall be to provide health care for working and retired miners and their dependents; pensions for miners upon their retirement; health care and financial support for eligible disabled miners; and financial support for surviving spouses and surviving dependents provided by each of the Trusts and Plans referred to in this Article.

Except as otherwise specifically set forth in this Article, it is agreed that the Trusts referred to in this Article are irrevocable Trusts created pursuant to, and within the scope of, Section 302(c) of the Labor-Management Relations Act, 1947, and shall endure as long as the purposes for their creation shall exist.

*Section (b) 1950 Pension Plan and Trust*

(1) The United Mine Workers of America 1950 Pension Trust ("1950 Pension Trust") is incorporated by reference and made a part of this Agreement. The United Mine Workers of America 1950 Pension Plan (the "1950 Pension Plan") is incorporated by refer-

142

Art. XX

ence and made a part of this Agreement. The pensions to be paid from the 1950 Pension Trust are as set forth in the 1950 Pension Plan.

(2) Pursuant to the requirements of the Coal Act, the United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Benefit Trust") and the United Mine Workers of America 1974 Benefit Plan and Trust (the "1974 Benefit Trust") were merged into the United Mine Workers of America Combined Benefit Fund (the "Combined Fund"). The Combined Fund is governed by the terms of the Coal Act, and is not maintained pursuant to this Article. Health benefits for individuals who would be eligible for benefits under the 1950 Benefit Plan but for the passage of the Coal Act and who are not entitled to benefits under the Coal Act will be provided by the 1993 Benefit Fund during the term of this Agreement.

(3) Upon the discharge of all its obligations, any remaining assets in the 1950 Pension Trust shall, upon termination of such Trust, be transferred to the 1974 Pension Trust.

*Section (c) 1974 Pension Plan and Trust, 1993 Benefit Plan and Trust, and Employer Benefit Plans*

(1) The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1974 Pension Trust are

143

## Art. XX

as set forth in the United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan"), which is incorporated by reference and made a part of this Agreement. This Plan is a continuation of the pension program of the 1950 Fund and was effective December 6, 1974.

(2) The United Mine Workers of America 1993 Benefit Trust ("1993 Benefit Trust") is incorporated by reference and made a part of this Agreement. The 1993 Benefit Trust provides certain health benefits, not including pension benefits, and the terms and conditions under which those benefits will be provided are as set forth in the plan under the 1993 Benefit Trust and under the terms of this Article.

(3)(i) Each signatory Employer shall establish and maintain an Employee benefit plan to provide, implemented through an insurance carrier(s), health and other non-pension benefits for its Employees covered by this Agreement as well as pensioners under the 1974 Pension Plan and Trust whose last signatory classified employment was with such Employer and who are not eligible to receive benefits from a plan maintained pursuant to the Coal Act. The benefits provided by the Employer to its eligible Participants pursuant to such plan shall be guaranteed during the term of this Agreement by that Employer at levels set forth in such plan. The plans established pursuant to this subsection are incorporated by reference and made a part of this Agreement, and the terms and

144

## Art. XX

conditions under which the health and other non-pension benefits will be provided under such plans are as to be set forth in such plans.

(ii) The 1993 Benefit Plan and Trust provides health and other non-pension benefits during the term of this Agreement to any retired miner (or the eligible dependent of such retired or deceased miner) who meets the conditions of one of the following:

(a) The retired miner is described in Section (b)(2).

(b) The retired miner separated from classified employment prior to December 16, 1993, would be eligible to receive benefits from the 1974 Benefit Plan but for the passage of the Coal Act, and is not entitled to benefits under the 1993 Benefit Plan, and whose last signatory employer was no longer deriving revenue from the production of coal on December 16, 1993.

(c) The miner is retired under the 1974 Pension Plan or any successor plan(s) thereto, last worked in signatory classified employment for an Employer who was obligated to contribute and contributed to the 1993 Benefit Trust at the rates specified in Section (d) and would otherwise cease to receive the health and other non-pension benefits provided herein because such last signatory Employer (including successors and assigns) is no longer in business. An Employer's obligation to contribute at the rates specified in Section (d) must be in effect on the date the Employer is first considered to be "no longer in business." For purposes of determining eligibility

145

Art. XX

under the 1993 Benefit Plan and Trust, the Employer is considered to be "no longer in business" only if the Employer meets the conditions of (I) and (II) below. The parties expressly intend that each of the requirements of (I) and (II) be met.

(I) The Employer has ceased all mining operations and has ceased employing persons under this Wage Agreement, with no reasonable expectation that such operations will start up again; and

(II) The Employer is financially unable (through either the business entity that has ceased operations as described in subparagraph (a) above, including such company's successors or assigns, if any, or any other related division, subsidiary, or parent corporation, regardless of whether covered by this Wage Agreement or not) to provide health and other non-pension benefits to its retired miners and surviving spouses.

In the case of an otherwise qualifying last signatory Employer that first became obligated to contribute to the 1993 Trust after December 31, 2001, within the meaning of Section (d) (1)(iii) of this Article, and that did not contribute to the 1993 Benefit Trust substantially all amounts owed and at the rates specified in Section (d), eligible retired miners and dependents shall receive only limited coverage under a separate program of benefits designed by the Plan's Trustees. The Trustees shall design the program taking into account the need for the Plan to remain sol-

Art. XX

vent throughout the term of this Agreement, while providing more complete benefits for individuals whose last signatory Employer met the "substantially all" contribution requirement of this Article.

Each Employer is required to maintain, and make available to the Trustees, those business and financial records that may be necessary to determine whether the eligibility requirements of the 1993 Benefit Trust have been satisfied. If a miner's last signatory Employer ceases to provide health benefits as required under Section (c)(3)(i) of this Article, and the Trustees are investigating whether the Employer is "no longer in business" within the meaning of Section (c)(3)(ii)(c) of this Article, the Employer shall make available to the Trustees those business and financial records that may be necessary to the "no longer in business" determination, including but not limited to financial statements, tax returns, bank statements, coal production and sales data, and information on equipment and other property and assets of the signatory Employer. The Trustees shall make their initial determination of whether an Employer is "no longer in business" no later than 90 days following receipt of such business and financial records, as practicable.

(d) The retired miner worked under the terms of the 1974 NBCWA (but not under the terms of the 1978 NBCWA), has been or would have been denied a benefit by the UMWA 1974 Benefit Plan solely because the miner did not work under the terms of a

Art. XX

1978 or subsequent NBCWA; and is not eligible to receive benefits under the Coal Act.

The Union and Trustees shall assist and fully cooperate with the Employers in obtaining all necessary opinion letters, exemptions, or rulings from the Department of Labor, the Internal Revenue Service or other applicable federal agencies, in order to implement the provisions of this subsection so as to ensure compliance with all applicable federal laws and regulations and ensure the deductibility for income tax purposes of any and all contributions made by signatory Employers to the 1993 Benefit Trust and the individual health plans referred to in this Section.

*Section (d)* **Contributions by Employers**

(1) During the life of this Agreement, for the periods of time indicated below, each signatory Employer (including those engaged in the production of coal and those not engaged in the production of coal) shall contribute to the Trusts referred to in this Article the amounts specified below based on cents per hours worked by each of the Employer's Employees who perform classified work under this Agreement.

(i) Into the 1950 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per hour on each such hour worked;

(ii) Into the 1974 Pension Trust: for the period beginning on the Effective Date and ending December

148

Art. XX

31, 2007, $2.00 per hour on each such hour worked; for the period beginning on January 1, 2008 and ending on December 31, 2008, $3.50 per hour on each such hour worked; for the period beginning on January 1, 2009 and ending on December 31, 2009, $4.25 per hour on each such hour worked; for the period beginning on January 1, 2010 and ending on December 31, 2010, $5.00 per hour on each such hour worked; and for the period beginning on January 1, 2011 and ending when this Agreement is terminated, $5.50 per hour on each such hour worked.

(iii) Into the 1993 Benefit Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 50¢ per hour on each such hour worked for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1993 Benefit Trust meeting the required standard of such Trust; and 75¢ per hour on each such hour worked for any Employer that became obligated to contribute for the first time on or after January 1, 2002; in addition, for the period from the Effective Date to December 31, 2010, each signatory Employer shall be required to contribute to the 1993 Benefit Trust any amount required under section 402(h)(5)(B)(ii) of the Surface Mining Control and Reclamation Act of 1977, as amended, as calculated by the Trustees of the 1993 Benefit Plan

149

Art. XX

and assessed pro rata based on the employers' hours worked for which contributions are required. A signatory Employer shall not be obligated to contribute to the 1993 Benefit Trust unless its obligation meets the requirements of this paragraph.

(iv) In addition to the contributions indicated above, during the life of the Agreement, each signatory Employer shall, for the periods of time indicated below, contribute to the Trusts established in this Article in the amounts shown below based on cents per ton on each ton of two thousand (2,000) pounds of bituminous coal after production by another operator, procured or acquired by such Employer for use or for sale on which contributions to the appropriate Trusts as provided for in this Article have not been made (amounts shown below include cents per hours worked contributions converted to tonnage equivalents).

(a) Into the 1950 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per ton on each such ton.

(b) Into the 1974 Pension Trust: for the period beginning on the Effective Date and ending on December 31, 2007, 38.5¢ per ton on each such ton; for the period beginning January 1, 2008 and ending on December 31, 2008, 67.0¢ per ton on each such ton; for the period beginning January 1, 2009 and ending on December 31, 2009, 82.0¢ per ton on each such ton; for the period beginning January 1, 2010 and ending

150

Art. XX

on December 31, 2010, 96.0¢ per ton on each such ton; and for the period beginning January 1, 2011 and ending when this Agreement is terminated, $1.06 per ton on each such ton; and

(c) Into the 1993 Benefit Trust: for the period beginning on January 1, 2007 and ending on December 31, 2007, 10¢ per ton on each such ton for any Employer, including related persons to such Employer, within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1993 Benefit Trust meeting the required standard of such Trust; and 14.5¢ per ton on each such ton for any Employer that became obligated to contribute for the first time on or after January 1, 2002.

The parties hereto mutually agree that, if at any time during the term of this Agreement a court or tribunal of competent jurisdiction determines by a final decision that is not appealable that the provision appearing in paragraph (iv) just preceding is invalid or in violation of the National Labor Relations Act, 1947, as amended, or other Federal or state law, the parties shall, at the option of and upon demand by the Union, without affecting the integrity of any other provision of this Section or any other provision of the National Bituminous Coal Wage Agreement, meet and engage in good faith negotiations to agree upon a clause to be inserted into this Agreement in replacement of the provision found invalid or unlawful.

151

(v) In the event the BCOA ceases to exist, or in the event that more than 50% of the tonnage membership of BCOA on the Effective Date has withdrawn prior to the time when the BCOA is required or permitted to take action under this Article, then such action may be taken by a majority vote, based on tonnage, of Employers who were BCOA members on the Effective Date.

(vi) At any time during the term of this Wage Agreement, the Bituminous Coal Operators' Association may reallocate the contributions to be paid under the respective subdivisions (i) and (ii) in this Section, which reallocation will increase the cents per hour to be contributed into the 1950 Pension Trust and correspondingly will decrease the cents per hour to be contributed by the Employers into the 1974 Pension Trust, or which will increase the cents per hour to be contributed into the 1950 Pension Trust and correspondingly will decrease the cents per hour to be contributed by the Employers into the 1974 Pension Trust, provided that notice shall be given to the Union, and to the Trustees (who shall in turn notify all contributing Employers) of the cents per hour to be allocated to each such Trust at least 30 days prior to the date the contributions become due and owing to the date the respective Trusts. No reallocation of the contributions to be paid to the two Trusts shall be made which will increase the total combined contributions required by this Article to be made by the Employers to those two Trusts;

(vii) Hours of work for purposes of Employer contributions to the plans and trusts described in this Article shall include all hours worked, or fractions thereof, by Employees in a classified job covered by this Agreement. Hours actually worked for which a premium pay of any type is provided shall be treated for purposes of Employer contributions to the Trusts as though worked on a straight-time basis. Reporting pay for hours not actually worked shall not be included for the purpose of making Employer contributions to the Trust.

(2) The sole obligation under this Section of any Employer signatory hereto shall be to contribute the amounts specified in this Section.

(3) The obligation to make payments to the Trusts specified in this Article shall become effective on the dates specified in the respective Subdivisions (i) through (iv) of this Section, and the first payments are to be made on the 10th day of each month after such specified dates, and thereafter continuously on the 10th day of each succeeding calendar month.

(4) It shall be the duty of each of the Employers signatory hereto to keep current said payments due to the Trusts, and to furnish to the International Union, United Mine Workers of America and to the Trustees of those Trusts a monthly statement showing on a mine-by-mine basis the full amounts due hereunder and the tons of coal produced, procured or acquired for use or for sale and the hours worked with respect to which the

Art. XX

amounts are payable. Payments to those Trusts shall be made by check payable, as appropriate, to:

"Trustees of the United Mine Workers of America 1950 Pension Trust"

"Trustees of the United Mine Workers of America 1974 Pension Trust"

"Trustees of the United Mine Workers of America 1993 Benefit Trust"

The Trustees are hereby authorized to require each signatory Employer to make payment of all contributions to the 1993 Benefit Trust, the 1950 Pension Trust and the 1974 Pension Trust by a single check made payable in such manner as may be specified by the Trustees.

(5) Payments shall be delivered or mailed to such location as designated by the Trustees of those Trusts.

(6) Failure of any Employer signatory hereto to make full and prompt payments to the Trusts specified in this Article in the manner and on the dates herein provided shall be deemed a violation of this Agreement. This obligation of each Employer signatory hereto, which is several and not joint, to so pay such sums shall be a direct and continuing obligation of said Employer during the life of this Agreement and it shall be deemed a violation of this Agreement, if any mine, preparation plant or other facility to which this Agreement is applicable shall be sold, leased, subleased, assigned, or otherwise disposed of

Art. XX

for the purpose of avoiding any of the obligations hereunder.

(7) Each Employer agrees to give proper notice to the President of the appropriate local union by the 18th day of each month that the Employer has made the required payment to the Trusts for the previous month, as required by this Article, or is delinquent in such payment, such notice to set forth the amount paid to the Trusts, or the amount of the delinquency, the tonnage procured or acquired for use or for sale and the hours worked with respect to the mine or mines under the jurisdiction of such local union. Each Employer agrees to give notice to the appropriate President of the Local Union by the 18th day of each month that the Employer has made the appropriate payment to the insurance carrier for the Employer benefit plan established under (c)(3) above, or is delinquent in such payment.

(8) Title to all the monies paid into and/or due and owing to the Trusts specified in this Article shall be vested in and remain exclusively in the Trustees of those Trusts. It is the intention of the parties hereto that those Trusts shall constitute irrevocable trusts and that no benefits or money payable from those Trusts shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and that any attempt so to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be void.

Art. XX

(9) It is understood that the individual Employees of Employers agree, through their representative, the United Mine Workers of America, to surrender any personal or individual right to or interest in monies paid or required to be paid to the Trusts pursuant to this Agreement.

(10) Any judgment obtained by the Trustees of the Trusts established pursuant to this Agreement for a default giving rise to damages accruing to more than one of the Trusts established hereunder shall be allocated by the Trustees among such Trusts in proportion to the amounts owing to each which gave rise to such judgment.

*Section (e)* **Responsibilities and Duties of Trustees**

(1) The 1950 Pension Trust, the 1974 Pension Trust, and the 1993 Benefit Trust shall each be administered by a Board of four Trustees, two of whom shall be appointed by the Employers and two of whom shall be appointed by the Union. Either party may, but shall not be required to, appoint an individual to serve as a Trustee on more than one Trust. One of the Trustees appointed by the Union shall be the Chairman. Each Board of Trustees shall perform its duties in accordance with the requirements, terms and conditions of each such Trust.

(2) It is the intent and purpose of the contracting parties that full cooperation shall be given by each of them to one another, to the Trustees provided for

156

Art. XX

under this Article, and to all affected mine workers, to the eventual coordination and development of policies and working agreements necessary or advisable for the effective operation of the Trusts and Plans.

(3) Action which may be required by the Employers in connection with any matter hereunder, including but not limited to the removal or appointment of a Trustee, may be taken by BCOA.

(4) All covenants, rights and obligations accruing to the Trusts, and the Benefit Plan, and the Trustees of the Pension and Benefit Trusts and Plans, and all breaches, violations and/or defaults of any provision of this Article pertaining to the Trusts and Plans, the Trust Agreements, or Pension Plans, shall be enforced by the Trustees, at their discretion, through any and all available legal means, without first exhausting the grievance and arbitration procedures set forth in this Agreement.

(5) Disputes arising under this Agreement with regard to the Employer benefit plan established in (c)(3) above shall be referred to the Trustees. The Trustees shall develop procedures for the resolution of such disputes. In the event the Trustees decide such dispute, such decision of the Trustees shall be final and binding on the parties. If the Trustees are unable to resolve the dispute, such dispute shall be referred to a permanent three-member arbitration panel selected by mutual agreement of the UMWA and the BCOA and maintained by the Trustees. A

157

Art. XX

dispute referred in this manner shall be decided by one member of the arbitration panel, determined on a rotating basis, whose decision shall be final and binding on the parties. Precedent under the resolution of disputes mechanism previously in place shall remain in effect, and the panel shall be required to cooperate to assure the consistent interpretation of provisions under the Employer Plans under this Article. Such disputes shall not be processed under the provisions of Article XXIII (Settlement of Disputes).

## Section (f). Audits, Reports and Notices

(1) It is agreed by the contracting parties that annual independent audits of the Trusts shall be made by independent certified public accountants to be designated by the Trustees of the Trusts. A statement of the results of such audits shall be sent to the contracting parties and shall be made available upon written request to any working or retired miner or to any beneficiary either by mail or at the principal office of the Trusts, or at such other place as may be designated by the Trustees.

(2) If the Trustees determine that there is reasonable cause to question the accuracy of the sums paid under Section (d) of this Article, or of any verification thereof made by an Employer for a given monthly or annual period, the Employer shall, upon written request by the Trustees, make available for inspection and/or copying at reasonable times and places to a

158

Art. XX

representative of the Trustees, those records which are necessary to verify the accuracy of the sums paid.

(3) A complete accounting, on a mine-by-mine basis, of contributions received by the Trusts under this Article shall be furnished by the Trustees, at least on a quarterly basis, to the International Union. Such an accounting will also be supplied to the District and Local offices of the Union with respect to the mine or mines under their jurisdiction. Such accounting shall include tonnages of coal procured or acquired for use or for sale, and hours worked with respect to which contributions were paid, together with an identification of any period or periods in which contributions were delinquent, showing the amounts of such delinquencies. The Trustees shall take such action as they deem appropriate to collect any such delinquencies, and shall advise the International Union and the appropriate Districts and Locals of the Union, on at least a monthly basis, of such delinquencies, as long as such delinquencies continue.

(4) Upon the written request of any International, District or Local officer of the Union, the Trustees shall make available within seven (7) days of receipt of such request an up-to-date accounting of contributions made and delinquencies outstanding, in respect to any mine or related facility with respect to which such officer has union jurisdiction.

(5) The Trustees shall furnish the Employers and the Union with such other documentation and information as provided for in each of the Trusts described herein.

159

Art. XX

Section (g) **Administration of Trusts**

(1) Each Employer shall make available to the Trustees within a reasonable time such information as the Trustees may determine to be reasonably required for the purpose of administering the Trusts and Plans.

(2) The Trustees shall respond to all written requests for information, applications, and other communications from beneficiaries within 15 working days from their receipt at the office of the Trusts. A response from the Trustees may be either a telephonic communication or a letter acknowledging receipt of such communication from the beneficiary. A pension application must be initially approved or denied within 12 weeks of the receipt of the application. The foregoing shall not apply in the event of delays caused by conditions beyond the control of the Trustees.

(3) The Trustees shall police and monitor the rolls of those entitled to benefits from the Trusts. On at least a quarterly basis, the Trustees shall have available a complete listing of current beneficiaries, identified by UMWA district and local union jurisdiction, if applicable. The Trustees shall promptly investigate and determine the eligibility or ineligibility of any beneficiary whose right to receive benefits from the Trusts has been challenged by an Officer of the International, District or Local Union or by any Employer.

160

Art. XX

In the event that a beneficiary or beneficiaries shall be determined to be ineligible for health care or other benefits, the Trustees shall take prompt action to correct the situation.

(4) The Trustees are authorized, upon prior written approval by the Employers and the Union, to make such changes in the Plans and Trusts hereunder as they may deem to be necessary or appropriate.

They are also authorized and directed, after adequate notice and consultation with the Employers and Union, to make such changes in the Plans and Trusts hereunder, including any retroactive modifications or amendments, which shall be necessary:

(a) to obtain all necessary determination letters or rulings from the Internal Revenue Service or other applicable federal agencies so as to ensure compliance with all applicable federal laws and regulations and ensure the continued qualification of the 1950 and 1974 Pension Plans and Trusts and the deductibility for income tax purposes of any and all contributions made by signatory Employers to such Trusts as paid or incurred;

(b) to conform the terms of each Plan and Trust to the requirements of ERISA, or any other applicable federal law, and the regulations issued thereunder;

(c) to obtain determination letters from the Internal Revenue Service that the two Pension Plans will each meet the requirements of Section 401 of the Internal Revenue Code and the Trusts thereun-

161

Art. XX

der will be exempt under Section 501(a) of such Code and that the 1993 Benefit Trust will be exempt under Section 501(c)(9) of such Code;

(d) to establish the deductibility for income tax purposes of any and all contributions made by the signatory operators to the Pension Trusts and Benefit Trust as paid or incurred; or

(e) to comply with all applicable court or government decisions or rulings.

In addition to the foregoing, the 1993 Benefit Plan Trustees shall have the authority to make any amendments to the plan of benefits of the 1993 Benefit Plan and Trust that they deem necessary and appropriate.

## Section (h) Guarantee of 1950 and 1974 Plans and Trusts

Notwithstanding any other provisions in this Agreement the Employers hereby agree to fully guarantee the pension benefits provided by the 1950 Pension Fund and the 1974 Pension Fund, during the term of this Agreement.

In order to fully fund these guaranteed benefits, the BCOA may increase, not decrease (except as provided in Section (d)(1)), the rate of contributions to be made to the 1950 Pension Fund and the 1974 Pension Fund during the term of this Agreement. These contributions, which may be adjusted from time to time, shall be made by all Employers signatory hereto during the term of this Agreement.

162

Art. XX

In addition, each signatory Employer hereby agrees to fully guarantee the health benefits provided under its own Employer Plan described in Section (c)(3)(i) of this Article XX during the term of this Agreement.

## GENERAL DESCRIPTION OF THE HEALTH AND RETIREMENT BENEFITS

The following is a general description of certain information contained in the UMWA 1950 Pension Plan and Trust, the UMWA 1974 Pension Plan and Trust, and the individual Employer's benefit plan. This description is intended merely to highlight certain information; it is not a complete statement of all of the provisions of the Plans and Trusts, nor is it intended to be a Summary Plan Description as defined in the Employee Retirement Income Security Act of 1974, and is qualified in its entirety by, and subject to the more detailed information contained in the Plans and Trusts, copies of which are on file and available for inspection at the offices of the UMWA Health & Retirement Funds, 2121 K Street, NW, Washington, D.C. 20037. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

The benefits provided by the 1993 Benefit Trust may be amended from time to time, as determined by the 1993 Benefit Plan Trustees, subject to the following restrictions, and to the terms of the Trust:

163

Art. XX

(a) Benefits under the 1993 Benefit Trust shall only be those that can be provided from the assets of the Trust, but there shall be no benefit improvements during the term of this Agreement, and the total package of benefits under the Plan shall not exceed the value of the benefits provided under the individual Employer Plan pursuant to the terms of the 2002 Wage Agreement.

(b) No beneficiary shall be eligible for any benefit that is more generous than the retiree medical benefit contractually required to be provided under the individual employer benefit plan maintained by the last signatory Employer.

(c) For those beneficiaries who are not actually enrolled in the 1993 Benefit Plan as of December 31, 2006, within the meaning of section 402(b)(2)(C) and (D) of the Surface Mining Control and Reclamation Act of 1977, as amended, the Trustees must monitor the assets of the 1993 Benefit Trust in order to provide benefits, and shall address the Plan's overall financial status, including the stream of benefit obligations as well as the projected income from all available resources, and take prudent and appropriate actions consistent with their duties and obligations under the Trust and Plan documents, including, if necessary reducing benefits. If the Trustees do not act to reduce Plan benefits when and as required, then the Executive Director of the UMWA Health & Retirement Funds (or if such position is vacant, the highest ranking staff member working exclusively on health

164

benefit plan matters) shall adopt such benefit reductions effective immediately.

The parties expressly agree that the language references to "for life" and "until death" that are retained in this General Description are intended to mean that each Employer will provide, for life, only the benefits of its own eligible retirees who retire during the term of this Agreement. A retiree shall be considered to be a retiree of an Employer if his last signatory classified employment was with such Employer. The benefits and benefit levels provided by an Employer under its Employer Plan are established for the term of this Agreement only, and may be jointly amended or modified in any manner at any time after the expiration or termination of this Agreement.

However, under no circumstances will an Employer be responsible to provide benefits or to contribute toward the provision of benefits, through the 1993 Benefit Trust or any other plan, trust or mechanism, to former employees and retirees (or their spouses, surviving spouses or dependents) of any other Employer beyond the term of this Agreement.

The following general description does not apply to plans maintained pursuant to the Coal Act.

### (1) PENSIONS FOR MINERS RETIRED UNDER THE 1950 PENSION PLAN:

Beginning on the Effective Date, pension benefits are according to the following schedules:

165

## Art. XX

(a) For pensioners with at least 20 years of credited service who retired on other than a disability pension, the pension is $420 per month, increasing to $425 per month effective January 1, 2009. Any such pensioner whose pension is in pay status as of October 31, 2007 shall be issued by November 1, 2007, by separate check from the 1950 Pension Plan, a one-time single sum payment of $565. Any such pensioner whose pension is in pay status as of October 31, 2008 shall be issued by November 1, 2008, by separate check from the 1950 Pension Plan, a one-time single sum payment of $565. Any such pensioner whose pension is in pay status as of October 31, 2009 shall be issued by November 1, 2009, by separate check from the 1950 Pension Plan, a one-time single sum payment of $565. Any such pensioner whose pension is in pay status as of October 31, 2010, by separate check from the 1950 Pension Plan, a one-time single sum payment of $580. Any such pensioner whose pension is in pay status as of October 31, 2011 shall be issued by November 1, 2011, by separate check from the 1950 Pension Plan, a one-time single sum payment of $580.

(b) For pensioners who retired on a disability pension, the pension is $262.50 per month, increasing to $267.50 per month effective January 1, 2009. Any such disability pensioner whose pension is in pay status as of October 31, 2007 shall be issued by November 1, 2007, by separate check from the 1950 Pension

166

## Art. XX

Plan, a one-time single sum payment of $440. Any such disability pensioner whose pension is in pay status as of October 31, 2008 shall be issued by November 1, 2008, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440. Any such disability pensioner whose pension is in pay status as of October 31, 2009 shall be issued by November 1, 2009, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440. Any such disability pensioner whose pension is in pay status as of October 31, 2010, by separate check from the 1950 Pension Plan, a one-time single sum payment of $455. Any such disability pensioner whose pension is in pay status as of October 31, 2011 shall be issued by November 1, 2011, by separate check from the 1950 Pension Plan, a one-time single sum payment of $455. Such pensioner will be entitled to retain his Health Services Card for life. Upon his death, his widow will retain a Health Services card until her death or remarriage.

Any pensioner who is receiving a disability pension or a pension with at least twenty years of credited service under this Plan is entitled to receive health benefits until death. A widow is entitled to receive health benefits until her death or remarriage.

(c) For all other pensioners and future pensioners, the benefit is increased by $15 per month, and by an additional $5 per month effective January 1, 2009.

167

## Art. XX

Any such pensioner whose pension is in pay status as of October 31, 2007 shall be issued by November 1, 2007, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440. Any such pensioner whose pension is in pay status as of October 31, 2008 shall be issued by November 1, 2008, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440. Any such pensioner whose pension is in pay status as of October 31, 2009 shall be issued by November 1, 2009, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440. Any such pensioner whose pension is in pay status as of October 31, 2010 shall be issued by November 1, 2010, by separate check from the 1950 Pension Plan, a one-time single sum payment of $455. Any such pensioner whose pension is in pay status as of October 31, 2011 shall be issued by November 1, 2011, by separate check from the 1950 Pension Plan, a one-time single sum payment of $455.

### (1A) 1950 WIDOWS' PENSION:

A Widow's Pension is provided through the 1950 Pension Plan to widows of miners who were receiving a 1950 pension at the time of their death. The benefit is $170 per month, increasing to $175 per month effective January 1, 2009. Existing as well as future widows of 1950 Pensioners will receive this benefit.

168

## Art. XX

Any widow whose 1950 pension is in pay status as of October 31, 2007, shall be issued by November 1, 2007, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440. Any widow whose 1950 pension is in pay status as of October 31, 2008 shall be issued by November 1, 2008, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440. Any widow whose 1950 pension is in pay status as of October 31, 2009, by separate check from the 1950 Pension Plan, a one-time single sum payment of $440. Any widow whose 1950 pension is in pay status as of October 31, 2010 shall be issued by November 1, 2010, by separate check from the 1950 Pension Plan, a one-time single sum payment of $455. Any widow whose 1950 pension is in pay status as of October 31, 2011 shall be issued by November 1, 2011, by separate check from the 1950 Pension Plan, a one-time single sum payment of $455.

### (2) PENSIONS FOR MINERS WHO RETIRED UNDER THE 1974 PENSION PLAN PRIOR TO THE EFFECTIVE DATE:

Pension benefits for pensioners who retired prior to the Effective Date are according to the following schedules:

(a) For pensioners who retired on other than a minimum disability pension, the pension is increased by $15 per month, and by an additional $5 per month ef-

169

Art. XX

fective January 1, 2009. Such pensioner will be entitled to retain his Health Services card for life. Upon his death, his widow will retain a Health Services card until her death or remarriage.

(b) For pensioners who retired on a minimum disability pension, the pension is $245 per month, increasing to $250 per month effective January 1, 2009. Such pensioner will be entitled to retain his Health Services card for life. Upon his death, his widow will retain a Health Services card until her death or remarriage.

(c) Any pensioner who retired on other than a disability pension and whose pension is in pay status as of the Effective Date shall receive an increase in his pension of $15 per month, and by an additional $5 per month effective January 1, 2009. Any pensioner who retired on other than a disability pension, and whose pension is in pay status as of October 31, 2007 shall be issued by November 1, 2007, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565. Any pensioner who retired on other than a disability pension and whose pension is in pay status as of October 31, 2008 shall be issued by November 1, 2008, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565. Any pensioner who retired on other than a disability pension and whose pension is in pay status as of October 31, 2009 shall be issued by November 1, 2009, by separate check from the 1974 Pension Plan,

170

Art. XX

a one-time single sum payment of $565. Any pensioner who retired on other than a disability pension and whose pension is in pay status as of October 31, 2010 shall be issued by November 1, 2010, by separate check from the 1974 Pension Plan, a one-time single sum payment of $580. Any pensioner who retired on other than a disability pension and whose pension is in pay status as of October 31, 2011 shall be issued by November 1, 2011, by separate check from the 1974 Pension Plan, a one-time single sum payment of $580.

Any pensioner whose disability pension is in pay status as of the Effective Date shall receive an increase in his disability pension of $15 per month, and by an additional $5 per month effective January 1, 2009. Any pensioner whose disability pension is in pay status as of October 31, 2007 shall be issued by November 1, 2007, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any pensioner whose disability pension is in pay status as of October 31, 2008 shall be issued by November 1, 2008, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any pensioner whose disability pension is in pay status as of October 31, 2009 shall be issued by November 1, 2009, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any pensioner whose disability pension is in pay status as of October 31, 2010 shall be issued by

171

Art. XX

November 1, 2010, by separate check from the 1974 Pension Plan, a one-time single sum payment of $455. Any pensioner whose disability pension is in pay status as of October 31, 2011 shall be issued by November 1, 2011, by separate check from the 1974 Pension Plan, a one-time single sum payment of $455.

(d) For surviving spouses of 1974 pensioners, the benefit is increased by $15 per month, and by an additional $5 per month effective January 1, 2009. A surviving spouse whose survivor pension is in pay status as of October 31, 2007 shall be issued by November 1, 2007, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. A surviving spouse whose survivor pension is in pay status as of October 31, 2008 shall be issued by November 1, 2008, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. A surviving spouse whose survivor pension is in pay status as of October 31, 2009 shall be issued by November 1, 2009, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. A surviving spouse whose survivor pension is in pay status as of October 31, 2010 shall be issued by November 1, 2010, by separate check from the 1974 Pension Plan, a one-time single sum payment of $455. A surviving spouse whose survivor pension is in pay status as of October 31, 2011 shall be issued by November 1, 2011, by separate

172

Art. XX

check from the 1974 Pension Plan, a one-time single sum payment of $455. Such surviving spouse will retain a Health Services card until her death or remarriage.

(3) PENSIONS FOR MINERS WHO RETIRE ON OR AFTER THE EFFECTIVE DATE:

A working miner who retires on or after the Effective Date and who is eligible for a pension under the terms of this Agreement will receive pension benefits based upon the 1974 Pension Plan. Subject to (4) below, full credit is provided for years worked as a classified Employee in mines of signatory Employers.

The earliest retirement age is 55. A miner may retire at 55 with 10 or more years of signatory service.

Pension benefits are increased as a miner accumulates years of signatory service. Benefits are also increased based upon a miner's age at the time of retirement with maximum benefits payable to miners who retire at the age of 62 or more.

In order to calculate the amount of a retirement benefit, it is necessary to add:

(1) the benefit amount for signatory service earned prior to February 1, 1989 ("Pre-1989 signatory service");

(2) the amount for signatory service earned between February 1, 1989, and January 31, 1990 ("1989 signatory service");

173

Art. XX

(3) the amount for signatory service earned on or after February 1, 1990 and before December 16, 1993 ("Post-1989 signatory service"); and

(4) the amount for signatory service earned on or after December 16, 1993 ("Post-1993 signatory service").

The retirement benefit for signatory service earned prior to February 1, 1989, is the following:

$48.50 per month multiplied by the years of Pre-1989 signatory service for the first 10 such years, plus

$49.00 per month multiplied by the years of Pre-1989 signatory service for the second 10 such years, plus

$49.50 per month multiplied by the years of Pre-1989 signatory service for the third 10 such years, plus

$50.00 per month multiplied by the years of Pre-1989 signatory service for each such year over 30.

The retirement benefit for signatory service earned from February 1, 1989, to January 31, 1990, is $56.00 for a year of 1989 signatory service.

The retirement benefit for signatory service earned from February 1, 1990, to December 16, 1993, is $60.50 per year of Post-1989 signatory service.

The retirement benefit for signatory service earned on or after December 16, 1993 is $63.50 per year of Post-1993 signatory service.

For a working miner who retires on or after Janu-

174

---

Art. XX

ary 1, 2009, and who is eligible for a pension under the terms of this Agreement, each dollar amount specified above is increased by $4.00. For a working miner who retires on or after January 1, 2011, and who is eligible for a pension under the terms of this Agreement, each dollar amount specified above is increased by an additional $2.00.

To estimate your pension, use the table on pages 303-309.

Any pensioner whose pension (other than a disability pension) is in pay status as of the Effective Date shall receive an increase in his pension of $15 per month, and an additional increase of $5 per month effective January 1, 2009. Any pensioner whose pension (other than a disability pension) is in pay status as of October 31, 2007 shall be issued by November 1, 2007, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565. Any pensioner whose pension (other than a disability pension) is in pay status as of October 31, 2008 shall be issued by November 1, 2008, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565. Any pensioner whose pension (other than a disability pension) is in pay status as of October 31, 2009 shall be issued by November 1, 2009, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565. Any pensioner whose pension (other than a disability pension) is in pay status as of October 31, 2010 shall be

175

## Art. XX

issued by November 1, 2010, by separate check from the 1974 Pension Plan, a one-time single sum payment of $580. Any pensioner whose pension (other than a disability pension) is in pay status as of October 31, 2011 shall be issued by November 1, 2011, by separate check from the 1974 Pension Plan, a one-time single sum payment of $580.

### (4) SIGNATORY SERVICE:

Effective as of the calendar year 1978, each miner who works at least 1,000 hours in a calendar year as a classified Employee with a signatory Employer will receive credit for a full year of signatory service for the purpose of determining the amount of the pension. Time spent performing contractual obligations (such as safety inspections, mine committee work, etc.) shall be considered as hours worked in the schedule below. Time spent performing work for the UMWA, its districts and local unions in lieu of regular scheduled classified work for the Employer shall be considered as hours worked in the schedule below.

A person who is eligible to receive sickness and accident benefits will receive credit as hours worked in the schedule below, for the period of eligibility. Each miner who works less than 1,000 hours in a calendar year as a classified Employee with a signatory Employer will receive credit for the above purpose for a percentage of a year calculated in accordance with the following schedule:

| Hours Worked | Percentage of a Year of Signatory Service |
| --- | --- |
| less than 250 | 0 |
| 250-499 | 25% |
| 500-749 | 50% |
| 750-999 | 75% |
| 1,000 or more | 100% |

176

## Art. XX

For the purpose of calculating benefits and/or determining vesting, employment with the United Mine Workers of America, following classified employment with an Employer, shall be treated as signatory service, provided that the employee does not receive a pension from the United Mine Workers of America Pension Plan based on such service.

Notwithstanding the foregoing, a classified Employee working on the weekend/holiday crew as provided in Appendix C shall receive credit for a percentage of a year calculated in accordance with the following schedule:

| Hours Worked | Percentage of a Year of Signatory Service |
| --- | --- |
| less than 200 | 0 |
| 200-399 | 25% |
| 400-599 | 50% |
| 600-799 | 75% |
| 800 or more | 100% |

Special Rule for 1993—For the calendar year 1993, a classified Employee who participated in an

177

Art. XX

authorized strike following expiration of the 1988 Wage Agreement, or who was laid off as a direct result of such an authorized strike, and who worked at least 500 hours will receive credit for a full year of signatory service.

(5) PENSIONS FOR DISABLED MINERS:

A miner who becomes permanently and totally disabled as a result of a mine accident occurring after the Effective Date will become eligible for pension benefits in accordance with the following schedule:

(a) If a miner has less than ten years of signatory service at the time of retirement, the miner will receive a $245 per month pension, increased to $250 per month effective January 1, 2009. Such pensioner will be entitled to retain a Health Services card for life. Upon his death, his widow will retain a Health Services card until her death or remarriage.

(b) If a miner has ten years or more of signatory service at the time of retirement, the miner will receive the greater of the minimum pension payable to a miner with less than ten years of signatory service or a pension based upon the years of signatory service which the miner has accumulated at the time of retirement calculated in accordance with the benefit schedule in (3) above. Such pensioner will be entitled to retain a Health Services card for life. Upon his death, his widow will retain a Health Services card until her death or remarriage.

178

Art. XX

(c) Any miner whose disability pension under this section is in pay status as of the Effective Date shall receive an increase in his disability pension of $15 per month, and an additional $5 per month effective January 1, 2009. Any pensioner whose disability pension under this section is in pay status as of October 31, 2007 shall be issued by November 1, 2007, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any pensioner whose disability pension is in pay status as of October 31, 2008 shall be issued by November 1, 2008, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any pensioner whose disability pension is in pay status as of October 31, 2009 shall be issued by November 1, 2009, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any pensioner whose disability pension is in pay status as of October 31, 2010 shall be issued by November 1, 2010, by separate check from the 1974 Pension Plan, a one-time single sum payment of $455. Any pensioner whose disability pension is in pay status as of October 31, 2011 shall be issued by November 1, 2011, by separate check from the 1974 Pension Plan, a one-time single sum payment of $455.

(6) PENSIONS FOR SURVIVING SPOUSES:

The 1974 Pension Plan provides for Surviving Spouse pensions. Benefits for an eligible surviving spouse will be payable in accordance with the following:

179

## Art. XX

(a) If, on or after the Effective Date, a working miner dies (regardless of cause) and would have been eligible for an immediate pension had the miner retired on the date of death, the surviving spouse will be eligible for a pension equal to 75% of the pension the miner would have received, and will receive this pension until death. Such surviving spouse will be entitled to retain a Health Services card until death or remarriage.

(b) Upon the death of a pensioner, other than a deferred vested pensioner with less than 20 years of service, the surviving spouse of such pensioner will receive a pension equal to 75% of the pensioner's pension until death. Such surviving spouse will be entitled to retain a Health Services card until death or remarriage.

(c) If a miner working on or after the Effective Date becomes eligible for a pension, other than a deferred vested pension with less than 20 years of service, at any time thereafter, upon his death after age 55, the surviving spouse will be entitled to receive a Surviving Spouse pension equal to 75% of the miner's pension until death. Such surviving spouse will be entitled to retain a Health Services card until death or remarriage.

(d) If a miner had completed 10 years of credited service, died as a result of a mine accident during the term of the 1978 or 1981 Wage Agreement, and was not covered by a Surviving Spouse pension (or by

## Art. XX

any other monthly benefit payable to a surviving spouse under a Wage Agreement), the surviving spouse, if she has never remarried and is surviving on the first day of the month following the Effective Date, will be entitled to receive a lump sum in the amount of $10,000, plus $100 for each month beginning with the first month following the Effective Date and continuing until her remarriage or death.

(e) Any surviving spouse whose survivor pension is in pay status as of the Effective Date shall receive an increase in her survivor pension of $15 per month, and an additional $5 per month effective January 1, 2009.

Any surviving spouse whose survivor pension is in pay status as of October 31, 2007 shall be issued by November 1, 2007, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

Any surviving spouse whose survivor pension is in pay status as of October 31, 2008 shall be issued by November 1, 2008, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

Any surviving spouse whose survivor pension is in pay status as of October 31, 2009 shall be issued by November 1, 2009, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

Any surviving spouse whose survivor pension is in pay status as of October 31, 2010 shall be issued by November 1, 2010, by separate check from the 1974 Pension Plan, a one-time single sum payment of $455.

Any surviving spouse whose survivor pension is in pay

Art. XX

status as of October 31, 2011 shall be issued by November 1, 2011, by separate check from the 1974 Pension Plan, a one-time single sum payment of $455.

### (6A) PRE-RETIREMENT SURVIVOR'S PENSION:

The Plan also provides a 75% survivor's pension for the spouse of a working miner with 10 years of vested pension rights who dies before retirement age. The pension benefit will be payable to the surviving spouse at the time the miner would have attained age 55.

Any surviving spouse whose survivor's pension is in pay status as of the Effective Date shall receive an increase in her survivor's pension of $15 per month, and an additional $5 per month effective January 1, 2009.

Any surviving spouse whose survivor pension is in pay status as of October 31, 2007 shall be issued by November 1, 2007, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

Any surviving spouse whose survivor pension is in pay status as of October 31, 2008 shall be issued by November 1, 2008, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

Any surviving spouse whose survivor pension is in pay status as of October 31, 2009 shall be issued by November 1, 2009, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440.

Any surviving spouse whose survivor pension is in pay status as of October 31, 2010 shall be issued by No-

Art. XX

vember 1, 2010, by separate check from the 1974 Pension Plan, a one-time single sum payment of $455.

Any surviving spouse whose survivor pension is in pay status as of October 31, 2011 shall be issued by November 1, 2011, by separate check from the 1974 Pension Plan, a one-time single sum payment of $455.

### (7) DEFERRED VESTED OR SPECIAL PENSIONS:

(a) If after the Effective Date a working miner ceases working for any reason, except as provided in (b) below, after completing at least 10 years of signatory employment, and before age 55, the miner will be eligible to receive a pension at age 62, or an actuarially reduced pension at any time after 55. This pension will be calculated in accordance with (3) above.

(b) If after the Effective Date a working miner ceases working and meets the following criteria:

(i) had 20 years of signatory service on date last worked;

(ii) had attained the age of 50 on the date last worked; and either

(iii) had been laid off and had not refused a recall to the mine from which he was laid off, or

(iv) had been terminated under Article III, Section (i) of the Wage Agreement (or if the miner had not been terminated, there had been a deterioration in physical condition which prevented the miner from performing his regular work as determined by a panel

Art. XX

of three physicians, if the degree of such physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter, then the miner will be eligible to receive a pension at age 62, or a pension at any time after age 55, reduced by one-quarter of one percent for each full month between the date on which pension benefits begin and the date the miner attains age 62.

(c) Any miner who ceased work prior to the Effective Date, is eligible to receive a deferred vested pension under the 1974 Pension Plan and satisfies the criteria in (b) above shall have his pension recomputed using the one-quarter of one percent reduction based on the formula in effect at his retirement. Such pensioner shall have his pension increased by any increases applicable to Age 55 Retirement which occurred after the date of his retirement and application for pension. Any increase under this paragraph shall be applied prospectively only.

(d) If on or after January 1, 2007, a working miner ceases performing classified work and meets the following criteria:

(i) he had 20 years of signatory service on his date last worked;

(ii) he had been laid off and had not refused a recall to the mine from which he was laid off; or

(iii) he had been terminated under Article III, Section (j) of the Wage Agreement (or if the miner had not been terminated, there had been a deterioration in

184

Art. XX

physical condition which prevented the miner from performing his regular work as determined by a panel of three physicians, if the degree of physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter; and

(iv) his pension is not in pay status on or before August 16, 1996;

then the miner will be eligible to receive a pension at age 62, or a pension at any time after age 55, reduced by one-quarter of one percent for each full month between the date on which pension benefits begin and the date the miner attains age 62.

(e) Special Permanent Layoff Pension.—If on or after January 1, 2007, a working miner ceases performing classified work and meets the following criteria:

(i) he had 20 years of signatory service on his date last worked and was less than age 55; and

(ii)(A) he has been permanently laid off under circumstances in which his Employer has permanently closed the mine, or

(B) he has been permanently laid off;

then the miner will be eligible to receive a pension computed under the provisions of (3) above, calculated as if he were then age 55. In the case of a layoff described in (ii)(A) above, the pension will be effective on the first day of the first month following both the layoff and the filing of a pension application. In the case of a layoff described in (ii)(B) above, the pension will be effective on the first day of the first

185

Art. XX

month following both a period of 180 days after the layoff and the filing of a pension application. A miner will be considered to have been "permanently laid off" under (ii)(B) if he has been on layoff status for at least 180 days, and has not refused a recall to the mine from which he was laid off. A miner who receives this special permanent layoff pension benefit, or any other pension benefit under this Article, forfeits all seniority, panel, and recall rights.

(f) Special 30-and-Out Layoff Pension—If a working miner meets the following criteria:

(i) his last day of credited service under the 1974 Pension Plan is on or after January 1, 2002; and

(ii) he had at least 30 years of signatory service on such last day of credited service;

(iii) he has been laid off and has not refused a recall to the mine from which he was laid off; and

(iv) if, because of a layoff, he was not actively at work as of December 31, 2001:

(I) he earned at least 250 hours of credited signatory service following his return to work, or

(II) he returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not for the purpose of entitling the Participant to this Special 30-and-Out layoff pension benefit;

then the miner will be eligible to receive a pension computed under the provisions of (3) above, but with no actuarial reduction on account of age.

186

Art. XX

(g) 30-and-Out Pension—If a working miner meets the following criteria:

(i) his last day of credited service under the 1974 Pension Plan is on or after January 1, 2007; and

(ii) he had at least 30 years of signatory service on such last day of credited service; and

(iii) if, because of a layoff, he was not actively at work as of December 31, 2001:

(I) he earned at least 250 hours of credited signatory service following his return to work, or

(II) returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not for the purpose of entitling the Participant to this 30-and-Out pension benefit;

then the miner will be eligible to receive a pension computed under the provisions of (3) above, but with no actuarial reduction on account of age.

(h) The Surviving Spouse pension described in paragraph (6) does not apply to the surviving spouse of a miner receiving a deferred vested pension with less than 20 years of service.

(i) Any such miner whose pension is in pay status as of the Effective Date shall receive an increase in his pension of $15 per month, and an additional $5 per month effective January 1, 2009. Any such pensioner whose pension is in pay status as of October 31, 2007 shall be issued by November 1, 2007, by separate

187

Art. XX

check from the 1974 Pension Plan, a one-time single sum payment of $565. Any such pensioner whose pension is in pay status as of October 31, 2008 shall be issued by November 1, 2008, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565. Any such pensioner whose pension is in pay status as of October 31, 2009 shall be issued by November 1, 2009, by separate check from the 1974 Pension Plan, a one-time single sum payment of $565. Any such pensioner whose pension is in pay status as of October 31, 2010 shall be issued by November 1, 2010, by separate check from the 1974 Pension Plan, a one-time single sum payment of $580. Any such pensioner whose pension is in pay status as of October 31, 2011 shall be issued by November 1, 2011, by separate check from the 1974 Pension Plan, a one-time single sum payment of $580.

(i) The surviving spouse of such miner whose survivor's pension is in pay status as of the Effective Date shall receive an increase in her survivor's pension of $15 per month, and an additional $5 per month effective January 1, 2009. Any such surviving spouse whose survivor's pension is in pay status as of October 31, 2007 shall be issued by November 1, 2007, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any such surviving spouse whose survivor's pension is in pay status as of October 31, 2008 shall be issued by November 1, 2008, by separate check from the 1974 Pension Plan, a

188

Art. XX

one-time single sum payment of $440. Any such surviving spouse whose survivor's pension is in pay status as of October 31, 2009 shall be issued by November 1, 2009, by separate check from the 1974 Pension Plan, a one-time single sum payment of $440. Any such surviving spouse whose survivor's pension is in pay status as of October 31, 2010 shall be issued by November 1, 2010, by separate check from the 1974 Pension Plan, a one-time single sum payment of $455. Any such surviving spouse whose survivor's pension is in pay status as of October 31, 2011 shall be issued by November 1, 2011, by separate check from the 1974 Pension Plan, a one-time single sum payment of $455.

### (7A) PENSION BONUSES:

(a) The one-time single sum pension payments set forth in this Article are not intended as an ongoing feature of either the 1950 or 1974 Pension Plan, and the Plans shall have no obligation to provide payments of this type other than those expressly provided for in this Article and in the Plans.

(b) Non-Duplication — No individual shall be entitled to receive a single sum pension payment on any given date under more than one provision of this Article.

### (8) LIFE AND ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS:

Life and Accidental Death and Dismemberment Insurance benefits are provided by the Employer for

189

Art. XX

working miners in accordance with the following schedule.

(a) Upon the death of a working miner due to other than violent, external and accidental means on or after the Effective Date, life insurance benefits in the amount of $80,000 will be paid to the miner's named beneficiary. Spouses who are not eligible for surviving spouse pension benefits, will continue eligibility for a Health Services card (also covers dependents) until remarriage or for 60 months, whichever occurs first.

(b) Upon the death of a working miner due solely to violent, external and accidental means on or after the Effective Date, life insurance in the amount of $160,000 will be paid to the miner's named beneficiary. Spouses who are not eligible for surviving spouse pension benefits, will continue eligibility for a Health Services card (also covers dependents) until remarriage or for 60 months, whichever occurs first.

(c) If a working miner should lose 2 or more members due to violent, external and accidental means on or after the Effective Date, the miner shall receive a $100,000 dismemberment benefit. If a working miner shall lose one member due solely to violent, external and accidental means on or after the Effective Date, the miner shall receive a $50,000 dismemberment benefit. A member for the purpose of this benefit is (i) a hand at or above the wrist, (ii) a foot at or above the ankle or (iii) total loss of vision in one eye.

Art. XX

(d) Accidental death or dismemberment benefits are not payable if caused in whole or in part by disease, bodily or mental infirmity, ptomaine or bacterial infection, hernia, suicide, intentional self-inflicted injury, insurrection or acts of war or is caused by or results from committing or attempting to commit a felony.

(9) PENSIONER'S DEATH BENEFITS:

(a) Upon the death on or after the Effective Date of a pensioner who has retired under the 1950 Pension Plan, and who is not a participant in the Combined Benefit Fund, a $8,500 death benefit will be paid by the 1950 Pension Plan to his widow, or, in the absence of a widow to his dependents, if any; otherwise a $7,000 death benefit will be paid by the 1950 Pension Plan to his nearest survivor.

(b) Upon the death on or after the Effective Date of a pensioner under this Agreement who retired under the 1974 Pension Plan, with other than a deferred vested pension based on less than 20 years of credited service, a $8,500 death benefit will be paid by the 1974 Pension Plan to the named beneficiary of the deceased retiree if such named beneficiary is a surviving spouse or dependent relative; otherwise, a death benefit of $7,000 will be paid by the 1974 Pension Plan to the named beneficiary of such deceased retiree. For purposes of this paragraph, "a pensioner under this Agreement" means a pensioner who is not entitled to benefits from the Combined Fund, is not entitled to death

Art. XX

benefit coverage from a plan maintained by his employer, and who meets one of the following conditions:

  i)   the pensioner is a participant in the 1992 Benefit Plan;

  ii)   the pensioner is a participant in the 1993 Benefit Trust;

  iii)   the pensioner is a participant in an individual employer plan maintained pursuant to the Coal Act and whose last signatory employer ceased producing and/or processing coal prior to December 16, 1993;

  iv)   the pensioner was entitled to death benefit coverage from the 1974 Pension Plan on February 1, 1993 (or would have been had he been retired or eligible to retire on that date); or

  v)   the pensioner's last signatory employer (the employer for whom such pensioner last worked in signatory classified employment) is a current 1974 Pension Plan contributor signatory to the 2007 NBCWA or to an agreement (including prior agreements, where applicable) requiring a contribution obligation with respect to the 1974 Pension Plan that is identical to the contribution obligation set forth in the 2007 NBCWA (or prior NBCWAs, where applicable).

192

---

Art. XX

**(10) HEALTH CARE:**

Health care benefits provided under the Employer Benefit Plan are guaranteed during the term of this Agreement subject to the terms of this Agreement at the level of benefits provided in the Employer Benefit Plan.

  (a) Notwithstanding any other provisions of Article IV of this Agreement, the parties agree that an Employer may establish a 2007 New Inexperienced Miners' Optional Work Schedule as set forth in Appendix D of this Agreement.

  (b)(i) Working miners will be provided health benefits through their individual Employer's benefit plan maintained pursuant to this Article.

  (ii) Notwithstanding the foregoing, a new inexperienced miner entering the bituminous coal mining industry for the first time on or after the Effective Date who does not have a State Miner's Certification dated prior to the Effective Date shall receive monthly Enhanced Premium Contributions ($1.00 per hour worked) from the Employer to the UMWA Cash Deferred Savings Plan of 1988 (CDSP) as provided in Article XXB, Section (d)(4). So long as permitted under the IRC without adverse tax consequences, an Employee shall be entitled to make a one-time, irrevocable election to have Enhanced Premium Contributions ($1.00 per hour worked) made to the CDSP as provided in Article XXB (d)(4). An Employee subject to Enhanced Premium Contributions shall not be entitled to health care following his retirement date, based on service with the Employer, ex-

193

## Art. XX

cept as a Disabled Employee or a Pensioner receiving a Disability Retirement Pension (including a Minimum Disability Retirement Pension).

(c) Pensioners, other than deferred vested pensioners with less than 20 years of service, pensioners receiving a Special Permanent Layoff Pension, pensioners receiving a Special 30-and-Out Layoff Pension, and pensioners receiving a 30-and-Out Pension, retired under the 1974 Pension Plan will be provided health benefits through the Employer from which they retired. Pensioners entitled to benefits from a plan maintained pursuant to the Coal Act will receive benefits from such plan.

(d) Pensioners receiving a Special Permanent Layoff Pension, or a Special 30-and-Out Layoff Pension, will be provided health benefits from their Employers in accordance with the layoff benefits otherwise provided under this Wage Agreement; subsequently, upon reaching age 55, such pensioners shall receive health benefits from their Employers. Pensioners receiving a 30-and-Out Pension will, upon reaching age 55, receive health benefits from their Employers.

(e) Pensioners, both regular and disabled, their surviving spouses and dependents, who are described in Section (c)(3)(ii) will have benefits provided under the 1993 Benefit Plan and Trust.

(f) Pregnancy benefits will be provided in the same manner as for any other disability.

(g) Only benefits for prescription drugs (only those

194

drugs requiring a prescription for dispensing) are provided.

(h) Spouses of working miners who died, who are not eligible for Surviving Spouse pension benefits, will continue eligibility for health care until remarriage, or for 60 months, whichever occurs first.

(i) Deferred vested pensioners with less than 20 years of service under the 1974 Pension Plan and miners who will receive a pension with less than 20 years of service under the 1950 Pension Plan are ineligible for health care. Disability pensioners under both the 1950 and 1974 Pension Plans will continue to receive their Health Services card.

(j) Disabled or retarded children of Health Services cardholders will be covered for life, so long as a surviving parent holds the card.

(k) Spouses of disabled employees who had more than 20 years of service, and died prior to receiving a pension and after receiving all Sickness and Accident Benefits, and who are not eligible for Surviving Spouse pension benefits, will continue eligibility for health care until remarriage, or for 36 months, whichever occurs first.

## Explanatory Note on Employer Provided Health Plans

Active miners and their surviving spouses and dependents, and pensioners, their dependents, and surviving spouses receiving pensions from the 1974

195

Art. XX

Pension Plan, will receive health care provided by their Employer through insurance carriers. A Health Services card identifying the Participant's eligibility for benefits under the health plan shall be provided by the Employer.

The Trustees of the UMWA Health and Retirement Funds shall resolve any disputes, as provided in Section (e)(5), including excessive fee disputes, to assure consistent application of the health plan provisions in the Employer Benefit Plans and of the managed care programs authorized by this Agreement.

**Enhanced Cost Containment Program**

In an effort to address the problems generated by the ever-increasing cost of health care, while maintaining a high level of benefits, the parties have mutually agreed to adopt managed care and cost containment programs.

a. Coordination of Benefits

If an individual is covered as a dependent under both the Employer Benefit Plan and under a plan maintained by a different employer, the benefits of the two plans will be coordinated so that no more than the total charges for covered medical goods and services will be paid. In no event will the Employer Benefit Plan be required to pay more than it otherwise would have paid without regard to this provision. The health plan shall coordinate benefits in ac-

196

Art. XX

cordance with the "birthday rule" adopted by the National Association of Insurance Commissioners.

b. Generic Drug Substitution

If a Beneficiary uses a brand name drug when a generic equivalent is available, the Beneficiary is responsible for the difference in cost between the generic drug and the brand name drug, in addition to the normal copayment. A generic drug will not be considered "available" unless it has been approved by the federal Food and Drug Administration. In addition, if the prescribing physician determines that use of a brand name drug is medically necessary, the generic drug will not be considered "available," and there will be no additional payment by the Beneficiary for the use of the brand name drug.

c. Health Care Participating Provider Lists (PPL)

The Employer may implement Participating Provider Lists (PPLs) of physicians, hospitals, pharmacies and other providers, subject to the following requirements.

1. Initial Certification and Recertification—All Participating Provider Lists (PPLs) must be certified prior to their implementation to ensure that they meet the required standards, and recertified at least once during the term of this Agreement, in accordance with a procedure to be agreed-to between the UMWA

197

Art. XX

and the BCOA. The costs of certification and recertification will be borne by the Employer.

2. Ongoing Review—Continued compliance of each PPL with the required standards will be subject to ongoing review.

3. Criteria—A PPL established by an Employer must meet the necessary criteria. The following is a general statement of the required elements:

4. Choice—Each covered individual will have the freedom to select any provider within the PPL, regardless of whether that provider is a generalist or specialist.

5. Reduction of Paperwork and Prohibition on Prepayment—Eligible individuals utilizing PPL providers shall, to the extent possible, not be required to fill out or submit claims forms. In addition, such individuals shall not be required to pay a PPL provider any amount other than the copayment permitted under this Agreement.

6. Quality Certification—All providers must meet quality standards.

7. Accessibility

   a. Providers will be available within a reasonable distance. Where possible, this means that a covered individual will not

198

Art. XX

have to travel more than 20 to 30 minutes to receive general medical care.

   b. There will be adequate numbers of providers in the different specialties to ensure that each member will have a sufficient choice.

   c. Providers must be available to see covered individuals within a reasonable period, depending upon the nature of the problem.

8. Breadth of Scope—The PPL shall include adequate diversification of specialties and facilities.

9. Additional Specialties—The program must have provision for going outside the PPL for necessary specialties and/or facilities that are not contained within the PPL, at no additional cost to the covered individual.

10. Other Outside Referrals—The program must have provision for referral outside the PPL where particular medical services can be better provided elsewhere in the opinion of the referring PPL provider, at no additional cost to the covered individual.

11. Emergencies—Emergency treatment is covered in full (subject to applicable copayments) whether or not provided within the PPL.

12. Beneficiaries Outside PPL Area—A Beneficiary who lives outside an area served by the PPL shall be permitted to utilize non-PPL

199

Art. XX

providers without incurring additional co-payments. For purposes of determining the Beneficiary's copayments, utilization of such non-PPL providers shall be considered to be within the PPL.

13. Transition—Out of PPL—If a Beneficiary has begun to undergo a course of treatment with a non-PPL provider prior to the establishment of the PPL (or with a PPL provider that leaves the PPL), completion of that course of treatment will not be considered "out of PPL" as follows:

   a. for an acute condition (including pregnancy, treatment for cancer, etc.), for the duration of the specific course of treatment.

   b. for a chronic condition, for up to six months.

14. Viability—A PPL must be viable, both financially and otherwise, in order to ensure that it will continue to be able to appropriately serve the participant population.

15. Internal Review—Each PPL must have internal mechanisms (including physician peer review) to resolve member complaints and to ensure that the highest quality standards are maintained.

16. Precertification—Precertification for services (including hospitalization) performed

200

Art. XX

by PPL providers are the responsibility of the provider, and not the covered individual. In addition, precertification in the event a covered individual is referred to a provider outside the PPL is the responsibility of the PPL provider making the referral.

Failure to precertify a non-emergency hospital admission to a non-PPL hospital (other than by referral from a PPL provider) or certain other specified inpatient and out-patient procedures performed by a non-PPL provider, will subject the Beneficiary to a $300 deductible.

17. Out of PPL Costs

   a. Hospitalization—Benefits for inpatient treatment by a non-PPL hospital are paid at 90% of the in-PPL rates. The Beneficiary is responsible for the remainder of the charges.

   b. Doctor Visits—Each office visit to a non-PPL physician is subject to a $20 copayment.

   c. The maximum total out-of-pocket expense under a and b above is $1,600 per family per year in addition to the precertification penalties.

18. Prescription Drugs—Prescription drugs will be provided through the PPL at a reduced copayment of $5.00. Prescriptions bought Out of PPL

201

Art. XX

are subject to a $10.00 copayment. Mail order prescription drugs, where available, will be provided at no copayment. (See chart below.)

d. Each Employer agrees to provide the Union with information sufficient to evaluate the effectiveness of the cost containment programs adopted pursuant to this Article. Such information will be provided no less than annually, and shall include a detailed statement of utilization and costs associated with the Employer Benefit Plans.

The following co-payments are required under the Employer Benefit Plan:

| | In PPL | Out of PPL |
|---|---|---|
| Prescription Drugs | $5.00 per prescription | $10.00 per prescription |
| Prescription Drugs—Mail Order (where available) | $0 per prescription | Not Applicable |
| Prescription Drugs—Brand Name Where Generic is Available | $5.00 Plus Additional Cost of Brand Name Drug | $10.00 Plus Additional Cost of Brand Name Drug |
| Physician Charges | $12.00 per office visit | $20.00 per office visit |

202

| | | Art. XX |
|---|---|---|
| Hospital — and Related Charges | $0 | Balance over 90% of PPL Charges |

In addition:

a. No family will have to pay more than $240 for In PPL Physician office visits in any year.

b. No family will have to pay more than $1,600 in combined Out of PPL Hospital and Related Charges and Out of PPL Physician office visits.

For Out of PPL services, and for services provided prior to the establishment of PPLs, claim forms will be available at most hospitals, clinics, and physician offices. Generally, nothing more is required than signing the forms authorizing the hospital, clinic, or physician to bill the insurance carrier for the services rendered. The insurance carrier will keep individual records for each Participant and dependent and will notify the Participant of the co-payments credited to his account. The hospital, clinic, or physician will bill the Participant for the co-payment amount until the maximum is reached. In some instances, when the Employee pays for services or drugs, the bills should be obtained and submitted with the claim form according to the instructions on the form. If the annual co-payment maximum has been reached, the carrier will remit to the Participant the full payment for covered benefits.

Where possible, for In PPL services, no claim forms will be required. The PPL provider will generally be responsible for the submission of claims and

203

Art. XX

other paperwork to the insurance carrier. Although a PPL provider may require payment by the Beneficiary of permitted co-payments, such a provider may not require payment by a Beneficiary of amounts that exceed the permitted co-payments.

Covered drug prescriptions may be filled at drug-stores, clinics and hospital prescription offices.

In an effort to address the problems generated by the ever-increasing cost of prescription drugs, while recognizing the importance of prescription drugs and their value in managing employee health care, and while maintaining a high level of benefits, the parties have mutually agreed to adopt managed care and cost containment programs such as the program below.

e. The UMWA and BCOA will mutually agree to the appointment and retention of a third party Pharmacy Expert. The individual appointed must have actively practiced as a pharmacist and currently be a registered pharmacist. The Pharmacy Expert cannot be an employee of any Pharmacy Benefit Manager or Pharmaceutical Manufacturer. The Pharmacy Review Board composed of one member appointed by the UMWA, one member appointed by the Employer, and the Pharmacy Expert.

1. The Pharmacy Review Board will certify the formulary, which is a list of preferred drug products (PDP). All PDP's that are currently being used must be certified. The initial certification process must be

Art. XX

completed within 120 days after the appointment of a Pharmacy Expert. An Employer may continue to use the current PDP of its Plan during the selection of a Pharmacy Expert and during the 120-day certification process. Certification of the PDP will be based on the following criteria:

a. The PDP was recommended by the P&T Committee at the Employer's Pharmacy Benefits Manager (PBM).

b. The Pharmacy Expert, as a member of the Pharmacy Review Board, should evaluate the PDP based on the following standards of quality:

Safety, Efficacy, Comparison Studies, Approved Indications, Adverse Effects, Contraindications/Warnings/Precautions, Pharmacokinetics, Patient Administration/Compliance Considerations, Medical Outcome and Pharmacoeconomic Studies.

2. Election, Removal or Change of the Pharmacy Expert.

a. The Pharmacy Expert must be selected within 120 days after the Effective Date of this Agreement.

b. The Pharmacy Expert can be removed and/or replaced at any time subject to the mutual agreement of the UMWA and BCOA. The current Pharmacy Expert will remain in his or her position until a replacement is selected. The replacement process cannot exceed 120 days.

3. Ongoing Review

a. The PDP will be reviewed annually.

Art. XX

b. Interim review will be performed as necessary, if mutually agreed upon by the UMWA and the Employer.

c. Changes in the PDP may only be adopted as part of an annual or interim review.

4. The Employer will communicate changes in the PDP to plan participants and network physicians. Any change to the PDP will be communicated 90 days prior to taking effect. If a participant fills a prescription for a non-PDP drug, a communication will be sent to both the physician and the individual outlining the appeal process and the surcharge for additional purchases. If no appeal is received within 30 days, the next refill of the drug will be subject to a $7.50 surcharge, and each following refill of that drug will be subject to a $15 surcharge. If an appeal is filed, surcharges are suspended for 60 days, or until the date of the resolution of the appeal, if later.

5. Funding

BCOA has the authority to reallocate up to $0.02 per hour worked from future contributions to the Training & Education Fund to the ROD Trust to cover the expenses of the Formulary Review Program.

6. Appeal Process

The decision of the Pharmacy Review Board shall be binding. There will be an appeal process for beneficiaries that are requesting to use a non-PDP drug and not pay a surcharge.

Art. XX

Each Participant will receive a "Summary Plan Description" booklet. Each year a financial report of the Plan will be provided to each Participant.

(11) VISION CARE:

Vision care is provided for Employees, disabled Employees, Pensioners, surviving spouses, and their dependents, covered with a Health Services card through the Employer Benefit Plan. Coverage under the plan is identical to that provided in the 2002 Agreement, increased by 10% effective January 1, 2007, and by 10% effective January 1, 2010.

(12) HEALTH CARE COST CONTAINMENT:

The Union and the Employers recognize that rapidly escalating health care costs, including the costs of medically unnecessary services and inappropriate treatment, have a detrimental impact on the health benefit program. The Union and the Employers agree that a solution to this mutual problem requires the cooperation of both parties, at all levels, to control costs and to work with the health care community to provide quality health care at reasonable costs. The Union and the Employers are, therefore, committed to fully support appropriate programs designed to accomplish this objective. This statement of purpose in no way implies a reduction of benefits or additional costs for covered services provided miners, pensioners and their families.

**Art. XX**

In any case in which a provider attempts to collect excessive charges or charges for services not medically necessary, as defined in the Plan, from a Beneficiary, the Plan Administrator or its agent shall, with the written consent of the Beneficiary, attempt to resolve the matter, either by negotiating a resolution or defending any legal action commenced by the provider. Whether the Plan Administrator or its agent negotiates a resolution of a matter or defends a legal action on a Beneficiary's behalf, the Beneficiary shall not be responsible for any legal fees, settlements, judgments or other expenses in connection with the case, but may be liable for any services of the provider which are not provided under the Plan. The Plan Administrator or its agent shall have sole control over the conduct of the defense, including the determination of whether the claim should be settled or an adverse determination should be appealed. The protections of this paragraph shall not apply in the case of any service or supply obtained from a non-PPL source, until the out-of-pocket maximum is reached.

**(13) NATIONAL HEALTH CARE:**

Notwithstanding any other provision of this Article, in the event the United States Government enacts a system of comprehensive national health care that provides an alternative means of providing benefits required under this Article, then either the UMWA or the BCOA may, without affecting the integrity of any

208

other provision of this Agreement, reopen this Agreement for the purpose of negotiating modifications to the Employer Plan, the 1993 Benefit Plan and Trust, or both. Additionally, the 1993 Benefit Trust may be renegotiated at the termination of this Agreement.

**Art. XXA**

## Article XXA—DENTAL PLAN

### INTRODUCTION

The Plan provides dental benefits for Employees and their eligible Dependents at a cost to each Employee of $2 per month payable on a payroll deduction basis, or if applicable as a reduction in the Employee's Sickness and Accident Benefits if such Employee is disabled and receiving such Benefits during the particular month.

### TABLE OF CONTENTS

SECTION I Definitions
SECTION II Eligibility
A. Employees
B. Effective Date of Coverage
C. Eligible Dependents
SECTION III Benefits
A. Payment of Benefits
B. Maximum Benefits
C. Claims Not Requiring Predetermination of Benefits
D. Claims Requiring Predetermination of Benefits
E. Covered Dental Expenses

209

# **Exhibit G**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Michael H. Holland, Micheal W. Buckner )<br>B.V. Hyler and Steven F. Schaab as )<br>Trustees of the United Mine Workers of )<br>America 1974 Pension Trust )<br>)<br>**Plaintiffs** )<br>v. )<br>)<br>Freeman United Coal Mining, Co., et al., )<br>)<br>**Defendants.** )<br>_____)<br>)<br>Freeman United Coal Mining Co. )<br>)<br>**Plaintiff** )<br>)<br>v. )<br>)<br>United Mineworkers of America, et al. )<br>)<br>**Defendants.** )<br>)<br>_____) | Case No. 07-cv-00490 (PLF/AK)<br><br><br><br><br><br>Case No. 07-cv-1050 (PLF/AK) |

## <u>DECLARATION OF THOMAS J. AUSTIN</u>

I, Thomas J. Austin, declare:

1.     I am the Vice President of Human Resources of Springfield Coal Company, LLC, a coal company headquartered in Springfield, Illinois.  Springfield currently operates the Crown III mine whose miners are represented by the United Mine Workers of America.  I currently reside in Springfield, Illinois.  I have personal knowledge of the matters stated herein, and if called to testify, could and would testify competently thereto.

2.      For the past 32 years, I have worked in various management positions in the human resources and safety area at Springfield and its predecessor unionized coal companies.

3.      Prior to announcement of a new wage agreement signed by Consol and the UMWA there was much speculation in the industry about these negotiations.    The consensus I heard was that likely there may be an increase of about $.75 to $1.00.

4.      After the UMWA had signed the 2007 wage agreement with Consol, other company officials of unionized coal companies complained about the new contract.  They were especially concerned about the UMWA 1974 Pension Plan contribution rates. These contribution rates were much higher than anyone expected.  I do not know of a single unionized coal company that wanted to have an agreement with the UMWA that would contain these increases to the UMWA 1974 Pension Plan contribution rates.  I am not aware of any company that wanted to sign an agreement with the UMWA that would have the same terms as the agreement Consol made with the UMWA.  Rather, most company officials I talked to or heard from were eager to learn of any strategies to avoid agreeing to make similar increases in their respective contracts with the UMWA

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

10/19/07 .

_____
Thomas J. Austin

# <u>Exhibit H</u>

## Withdrawal Liability and Accounting Information

### Unfunded Vested Benefits, June 30, 2003

Withdrawal liability calculations require a determination of the Plan's unfunded vested benefits as of the end of a plan year. The unfunded vested benefits as of June 30, 2003 are as follows:

| | | |
|---|---|---|
| 1) | Actuarial Present Value of Vested Benefits – PBGC Immediate Rate plus 1% Interest Assumption (4.5%) | $8,846,894,000 |
| 2) | Market Value of Assets | 5,352,376,000 |
| 3) | Percentage Funded on PBGC Basis = (2)÷(1) | 0.605001 |
| 4) | Percentage Unfunded on PBGC Basis = 1.0-(3) | 0.394999 |
| 5) | Actuarial Present Value of Vested Benefits – 7.5% Interest Assumption | 6,490,264,000 |
| 6) | Unfunded Vested Benefits on Blended Interest Assumptions = (4)x(5) | $2,563,648,000 |

---

PT-02903

Section 2.7

## Withdrawal Liability and Accounting Information *(continued)*

### Accumulated Plan Benefits, June 30, 2003

Statement of Financial Accounting Standards No. 35 requires a statement of the actuarial present value of accumulated plan benefits. The net assets available for benefits and the actuarial present value of accumulated plan benefits as of June 30, 2003 are as follows:

1) Actuarial Present Value of Accumulated
   Plan Benefits:

   a) Vested Benefits[16]

   | | |
   |---|---:|
   | Active Participants | $1,587,879,000 |
   | Non-retired Disabled Participants | 438,000 |
   | Terminated Vested Participants | 1,120,414,000 |
   | Retired Participants | 4,261,881,000 |
   | Spouses Receiving Benefits | 741,028,000 |
   | Preretirement Spouses' Benefits | 29,958,000 |
   | Lump Sum Death Benefits | 115,807,000 |
   | One-time Single Sum Payments | 160,561,000 |
   | Social Security Supplement | 13,865,000 |
   | Total Vested | 8,031,831,000 |

   b) Nonvested Benefits[17]

   | | |
   |---|---:|
   | Active Participants and Preretirement Spouses' Benefits | 242,666,000 |
   | Disability Benefits | 62,570,000 |
   | Lump Sum Death Benefits | 1,133,000 |
   | Total Nonvested | 306,369,000 |

   c) Total = (a)+(b)  —  8,338,200,000

2) Net Assets Available for Benefits (Market Value)  —  5,352,376,000

3) Excess of (1) over (2)  —  $ 2,985,824,000

---

[16] *The value of nonforfeitable benefits for withdrawal liability calculations on page 47 excludes actuarial liability for lump sum death benefits. A portion of this liability is included in the value of vested benefits for disclosure under SFAS 35. The present value of vested benefits is based on benefit levels in effect on June 30, 2003.*

[17] *The present value of nonvested benefits is based on benefits determined using service at the valuation date and the ultimate benefit levels included in the 2002 Agreement.*

PT-02904

## Withdrawal Liability and Accounting Information *(continued)*

On June 30, 2002, the actuarial present value of accumulated plan benefits was $7,738,471,000. This exceeded the net assets available for benefits by $2,014,509,000. On June 30, 2003, the difference between the actuarial present value of accumulated plan benefits and the net assets available for benefits increased to $2,985,824,000.

### Actuarial Basis

For purposes of this demonstration, vested accumulated plan benefits are valued on the Unit Credit Actuarial Cost Method using the assumptions described in Section 1.3, except that there is no discount for disability and the actuarial interest assumption is the blended interest assumption, using the PBGC immediate lump sum interest rate in effect on June 30, 2003 plus 1% (4.5% for 2003) as the interest assumption to value vested benefits funded by plan assets, and a 7.5% actuarial interest assumption to value unfunded vested benefits. Nonvested accumulated plan benefits are valued on the Unit Credit Funding Method using all the assumptions described in Section 1.3, except that the actuarial interest assumption is 7.5%. Vested accumulated plan benefits include all retirement, disability, and death benefits accrued on June 30, 2003. Nonvested accumulated plan benefits reflect the ultimate benefit levels included in the 2002 Agreement. In terms of the actuarial present value of accumulated plan benefits, the blended interest assumption is equivalent to a single actuarial interest assumption of approximately 5.8%.

PT-02905

## Withdrawal Liability and Accounting Information *(continued)*

### Net Change in Actuarial Present Value of Accumulated Plan Benefits

The sources of the net change in the total actuarial present value of accumulated plan benefits during the plan year ended June 30, 2003 are as follows:

| | |
|---|---:|
| Actuarial Present Value of Accumulated Plan Benefits at June 30, 2002 | $7,738,471,000 |
| Increase (decrease) attributable to: | |
| Increase for interest due to decrease in discount period | 441,575,000 |
| Assumption changes | 246,848,000 |
| Benefit increases | 242,054,000 |
| Benefits paid | (485,302,000) |
| Benefits accumulated (including actuarial gain/loss) | 154,554,000 |
| Actuarial Present Value of Accumulated Plan Benefits at June 30, 2003 | $8,338,200,000 |

PT-02906

**Appendix**

**2003 ACTUARIAL VALUATION RESULTS**
**IF A POSITIVE NORMAL COST WAS ESTABLISHED AS OF JULY 1, 1984**
**1974 PENSION PLAN**

**Funding (July 1, 2003)**

| | | |
|---|---|---|
| 1) | Market Value of Assets | $5,352,376,000 |
| 2) | Actuarial Value of Assets | 5,619,995,000 |
| 3) | Actuarial Present Value of Projected Benefits | 6,678,426,000 |
| 4) | Actuarial Accrued Liability | 6,672,158,000 |
| 5) | Unfunded Actuarial Accrued Liability (Surplus) | 1,052,163,000 |
| 6) | Normal Cost | 1,329,000 |
| 7) | Actuarial Gain/(Loss) | (309,111,000) |
| 8) | Vested Benefits Charge | 72,813,000 |
| 9) | Net Charges to Funding Standard Account (includes Normal Cost) | 126,760,000 |
| 10) | Credit Balance as of June 30, 2003 | 1,251,008,000 |
| 11) | Contribution for Minimum Funding[18] ((9)-(10), but not less than zero) | 0 |
| 12) | Contribution for 30-Year Funding[18] | 89,703,000 |
| 13) | Maximum Tax-deductible Contribution[19] | 3,193,661,000 |

---

[18] *Includes one half year of interest, since contributions are assumed to be paid uniformly over the year.*

[19] *Includes a full year of interest, regardless of the actual dates of payment of contributions.*

PT-02907

# Exhibit I

**Look**Smart

FindArticles > Business Wire > April 2, 2007 > Article > Print friendly

**Foundation Coal Addresses Possible Strike**

LINTHICUM HEIGHTS, Md. -- Foundation Coal Holdings, Inc. (NYSE:FCL) today provided additional information regarding a potential work stoppage sanctioned by the United Mine Workers of America (UMWA) at three Foundation operating affiliates: Cumberland Coal Resources, LP (Cumberland), Emerald Coal Resources, LP (Emerald), and Wabash Mine Holding Company (Wabash). Each of these distinct entities has its own collective bargaining agreement with the UMWA, and each has been conducting collective bargaining through designated agents since January 2007. The UMWA has authorized a work stoppage at the operations of all three entities at 12:01 a.m., Wednesday April 4, 2007. Wabash, Emerald and Cumberland each believe the work stoppage is unwarranted and will impose unnecessary burdens on the affected employees, their families, their customers and the local communities.

In December 2006 the UMWA announced it had completed the negotiation with the Bituminous Coal Operators Association for a new five year collective bargaining agreement (National Agreement). This agreement replaced the 2002 National Agreement, which for most companies expired on December 31, 2006. For historical reasons, Wabash's labor agreement did not expire until 11:59 p.m. on March 31, 2007 and the contracts for Emerald and Cumberland each expired 24 hours later. The 2007 National Agreement was ratified with an unprecedented 80 percent vote in December 2006. The National Agreement provides for a 20 percent wage increase over the 5 year term, a $1,000 signing bonus paid immediately, increased pension benefits, increased pension plan contributions, and it preserves full health care benefits for active and retired employees.

After the December 2006 vote which ratified the National Agreement, the UMWA stated in a press release that "Never before has a contract been ratified by such a wide margin." It went on to add, "This agreement is going to be the industry-wide agreement, as far as the UMWA is concerned. That's our message, to the other companies. It is a fair agreement for our members, and we believe it is fair for the companies as well." Various other entities whose contracts expired on January 1, 2007 have signed the National Agreement with the UMWA long after that expiration date. After several of those agreements were reached, the UMWA has publicly reiterated that the National Agreement was the contract to be signed and that "it's also a fair agreementO for every other coal companyO"

Well before their 2002 contracts were set to expire, the two Pennsylvania based affiliates bargaining with the UMWA--Cumberland and Emerald--each confirmed that the National Agreement was indeed the agreement signed by its competitors, and that there were no side agreements that might put Cumberland and Emerald at a competitive disadvantage. With this confirmation, they separately in writing notified the UMWA in February 2007, almost six weeks before their 2002 national agreements were set to expire, that they were willing to sign the 2007 National Agreement.

As reconfirmed in bargaining sessions over the last few days, Cumberland and Emerald remain ready to sign the National Agreement, which would keep nearly 1,000 workers in Pennsylvania on the job. They remain optimistic the UMWA will sign the contract it has endorsed as the "industry-wide agreement" that would allow so many of their members to work uninterrupted under the very favorable terms of the new agreement.

Through no fault of its employees, Wabash is in a different situation. As a result of many factors such as geology, aged infrastructure, the need to convey materials and coal more than 10 miles underground, and regionally soft market conditions, Wabash has not been profitable or competitive. The Wabash Mine, which lost more than $26 million in calendar year 2006, faces ongoing losses in 2007 and requires both significant capital investment and operational cost reductions to have an opportunity to return to profitability. Its outlook is clouded further by current weak market conditions, existing lower cost competitors, and the entrance of new, lower cost competitors in the region who are likely to have a competitive market

advantage.

This cost structure at Wabash is not a new issue. During the last round of contract negotiations in 2002, Cumberland and Emerald signed separate contracts that were in line with the 2002 National Bituminous Coal Wage Agreement. However, Wabash did not sign the 2002 National Bituminous Coal Wage Agreement. Rather, in an effort to remain competitive, it conducted separate negotiations on wages, health care matters and other items. The Wabash contract was ultimately voted on and signed in 2003, reflecting the different economic and operational realities of this mine. Because of these different operational realities, Wabash is not in a position to operate under the 2007 National Agreement. As such, during collective bargaining Wabash has provided to the UMWA economic models of its projected performance in light of anticipated factors and costs. In negotiations Wabash continues to explain and clarify this information and to gather additional information requested by the UMWA. Its bargaining agents also have made proposals of the types of contract concessions which would be needed so as to possibly justify the huge capital infusion that could potentially make the Wabash mine competitive.

The UMWA has publicly stated that it will strike all three mines unless Wabash also signs the 2007 National Agreement. It has also publicly maintained that Wabash, based in Illinois, is part of a "single employer" with the Emerald and Cumberland mines based in Pennsylvania. This is absolutely not the case and these three operations have separately negotiated and executed their own collective bargaining agreements for more than three decades. They do not share equipment, employees, customers, day-to-day management, or any of the other factors used to establish a 'single employer' status with Wabash.

Peter Vietti, a spokesman noted, "A strike is an unfavorable outcome for everyone, particularly the employees, their families, and the communities in which they live. We truly hope the UMWA reconsiders its position, signs the 2007 National Agreement contracts with Cumberland and Emerald it initially demanded be signed, and allows their employees to continue to work while good faith discussions continue with respect to the Wabash mine."

Foundation Coal Holdings, Inc., through its affiliates is a major U.S. coal producer with 14 coal mines and related facilities in Pennsylvania, West Virginia, Illinois, and Wyoming. Through its subsidiaries Foundation Coal employs approximately 3,150 people and produces approximately 72 million tons annually, largely for utilities generating electricity. Foundation's corporate offices are in Linthicum Heights, MD.

COPYRIGHT 2007 Business Wire
COPYRIGHT 2007 Gale Group

# Exhibit J



# Cumberland and Emerald Remain Ready to Sign 2007 National Wage Agreement.

From: Business Wire  |  Date: 4/6/2007



LINTHICUM HEIGHTS, Md. -- Foundation Coal Holdings, Inc. (NYSE:FCL) affiliates, Cumberland Coal Resources, LP (Cumberland) and Emerald Coal Resources, LP (Emerald) are separately conducting negotiations with the United Mine Workers of America (UMWA). Today, each of these employers has provided additional comments regarding the ongoing strike at the Cumberland and Emerald mines in southwestern Pennsylvania. Hourly workers represented by the UMWA walked off the job at 12:01 AM on April 4, 2007.

Cumberland and Emerald remain hopeful that talks with the UMWA will result in an agreement to sign the 2007 National Bituminous Coal Wage Agreement (National Agreement) thereby allowing nearly 1,000 striking Cumberland and Emerald employees to return to work. The UMWA has endorsed the National Agreement as the "industry-wide agreement" to be signed by all operating UMWA represented mines. After confirming they would be in the same competitive position as their peers, who also signed the same National Agreement, Cumberland and Emerald separately notified the UMWA of their willingness to sign that same agreement on February 21, 2007. This notification came long before their 2002 contracts expired in order to provide certainty to their workforces. Most other entities that signed the National Agreement did so well after their contracts expired.

In response to comments made earlier by UMWA president, Cecil Roberts, regarding the recent profitability of the two mines, spokesman for Cumberland and Emerald, Peter Vietti, said, "All the companies that signed the National Agreement were more profitable in recent years, and that is why the UMWA was able to negotiate such an exceptional National Agreement. This profitability is good for everyone."

Vietti added, "The Cumberland and Emerald mines have been profitable operations in the last few years, thanks both to the hard work of their dedicated employees and the significant investment the companies have made in assets and technology. During the five-year term of their just expired collective bargaining agreements, Emerald invested over $110 million and Cumberland invested over $145 million to enhance safety and remain competitive. Due in large part to this ongoing investment, the number of hourly employees increased over 13 percent in this same period. Just as important, the profitably of the mines provides the cash flow needed to support very generous employee benefits, including medical benefits, that are paid by Cumberland and Emerald to their employees and current and future retirees."

Vietti further noted, "The companies, their employees, and the local communities are in this business together, and they hope the profitability continues. This allows them to purchase millions of dollars in goods and services from local businesses, to support various charitable donations, and enhances their ability to support community wide efforts such as the new aquatic center."

Although market conditions are inevitably cyclical, Cumberland and Emerald have benefited from a strong market in recent years. In just the last three years the average price for coal from the northern Appalachia region has ranged from the mid-twenties to over fifty dollars per ton. Although the raises the employees receive over the next five years are certain, the business cycle is not.

Just as the UMWA has stated on numerous occasions, Cumberland and Emerald believe the National Agreement will provide an exceptional wage and benefit package for their employees. Employees will receive a 20 percent wage increase, a $1,000 signing bonus, and enhanced pension benefits. When wage roll-ups and other improvements are factored in, the overall hourly cost to Cumberland and Emerald for signing the National Agreement will be increased by 32 percent.

"These mines have enjoyed success in recent years, and Cumberland and Emerald believe the National Agreement allows their employees to share in that success," said Vietti. "This is the same agreement their regional competitors have signed, and Cumberland and Emerald are comfortable they will not be competitively disadvantaged by signing it

as well. On a level playing field, their employees can compete with anyone. These entities need the ability to provide a competitive, reliable source of coal to their utility and industrial customers. In the end, customers who buy the coal must be convinced of a mine's ability to compete, remain profitable and supply coal without interruption."

Vietti concluded, "Nobody benefits from a strike, and both of these employers remain ready to sign the National Agreement. Timely resumption of operations benefits our employees, their families, and the communities in which they live. A quick resolution is in everyone's best interests."

Foundation Coal Holdings, Inc., through its affiliates is a major U.S. coal producer with 13 coal mines and related facilities in Pennsylvania, West Virginia, and Wyoming. Through its subsidiaries Foundation Coal employs approximately 3,000 people and produces approximately 72 million tons annually, largely for utilities generating electricity. Foundation's corporate offices are in Linthicum Heights, MD.

COPYRIGHT 2007 Business Wire

For permission to reuse this article, contact Copyright Clearance Center.

HighBeam™ Research, Inc. © Copyright 2007. All rights reserved.

# Exhibit K

# Withdrawal Liability and Accounting Information

### Unfunded Vested Benefits, June 30, 2000

Withdrawal liability calculations require a determination of the Plan's unfunded vested benefits as of the end of a plan year. The unfunded vested benefits as of June 30, 2000 are as follows:

| | | |
|---|---|---|
| 1) | Actuarial Present Value of Vested Benefits--PBGC Immediate Rate plus 1% Interest Assumption (6.25%) | $6,735,190,000 |
| 2) | Market Value of Assets | 7,176,614,000 |
| 3) | Percentage Funded on PBGC Basis = (2)÷(1) | 1.000000 |
| 4) | Percentage Unfunded on PBGC Basis = 1.0- (3) | 0.00 |
| 5) | Actuarial Present Value of Vested Benefits--7.5% Interest Assumption | 5,925,345,000 |
| 6) | Unfunded Vested Benefits on Blended Interest Assumptions = (4)x(5) | $0 |

PT-02738

*Section 2.7*

# Withdrawal Liability and Accounting Information *(continued)*

### Accumulated Plan Benefits, June 30, 2000

Statement of Financial Accounting Standards No. 35 requires a statement of the actuarial present value of accumulated plan benefits. The net assets available for benefits and the actuarial present value of accumulated plan benefits as of June 30, 2000 are as follows:

1)     Actuarial Present Value of Accumulated
        Plan Benefits:

        a)    Vested Benefits[16]

| | |
|---|---:|
| Active Participants | $1,641,506,000 |
| Non-retired Disabled Participants | 606,000 |
| Terminated Vested Participants | 1,158,292,000 |
| Retired Participants | 3,194,591,000 |
| Spouses Receiving Benefits | 613,115,000 |
| Preretirement Spouses' Benefits | 29,726,000 |
| Lump Sum Death Benefits | 97,724,000 |
| One-time Single Sum Payments | 90,223,000 |
| Social Security Supplement | 7,131,000 |
|    Total Vested | 6,832,914,000 |

        b)    Nonvested Benefits

| | |
|---|---:|
| Active Participants | 102,721,000 |
| Preretirement Spouses' Benefits | 193,000 |
| Disability Benefits | 99,293,000 |
| Lump Sum Death Benefits | 1,129,000 |
| Social Security Supplement | 1,654,000 |
|    Total Nonvested | 204,990,000 |

        c)    Total = (a)+(b)                      7,037,904,000

2)    Net Assets Available for Benefits (Market Value)        7,176,614,000

3)    Excess of (1) over (2)                       $ (138,710,000)

PT-02739

---

[16]    *The value of nonforfeitable benefits for withdrawal liability calculations on page 51 excludes actuarial liability for lump sum death benefits. A portion of this liability is included in the value of vested benefits for disclosure under SFAS 35.*

## Withdrawal Liability and Accounting Information *(continued)*

On June 30, 1999, the actuarial present value of accumulated plan benefits was $7,634,468,000. This exceeded the net assets available for benefits by $804,906,000. On June 30, 2000, net assets exceeded the actuarial present value of accumulated plan benefits by $138,710,000.

### <u>Actuarial Basis</u>

For purposes of this demonstration, vested accumulated plan benefits are valued on the Unit Credit Actuarial Cost Method using the assumptions described in Section 1.3, except that there is no discount for disability and the actuarial interest assumption is the blended interest assumption, using the PBGC immediate lump sum interest rate in effect on June 30, 2000 plus 1% (6.25% for 2000) as the interest assumption to value vested benefits funded by plan assets, and a 7.5% actuarial interest assumption to value unfunded vested benefits. Nonvested accumulated plan benefits are valued on the Unit Credit Funding Method using all the assumptions described in Section 1.3, except that the actuarial interest assumption is 7.5%. Accumulated plan benefits include all retirement, disability, and death benefits accrued on June 30, 2000. In terms of the actuarial present value of accumulated plan benefits, the blended interest assumption is equivalent to a single actuarial interest assumption of approximately 6.3%.

**PT-02740**

## Withdrawal Liability and Accounting Information *(continued)*

### Net Change in Actuarial Present Value of Accumulated Plan Benefits

The sources of the net change in the total actuarial present value of accumulated plan benefits during the plan year ended June 30, 2000 are as follows:

| | |
|---|---:|
| Actuarial Present Value of Accumulated Plan Benefits at June 30, 1999 | $7,634,468,000 |
| Increase (decrease) attributable to: | |
| Increase for interest due to decrease in discount period | 400,347,000 |
| Change in interest assumption | (477,602,000) |
| Change in other assumptions | (86,783,000) |
| Benefits paid | (401,142,000) |
| Benefits accumulated (including actuarial gain/loss) | (31,384,000) |
| Actuarial Present Value of Accumulated Plan Benefits at June 30, 2000 | $7,037,904,000 |

PT-02741

---

**Appendix**

### 2000 ACTUARIAL VALUATION RESULTS
### IF A POSITIVE NORMAL COST WAS ESTABLISHED AS OF JULY 1, 1984
### 1974 PENSION PLAN

**Funding (July 1, 2000)**

| | | |
|---|---|---:|
| 1) | Market Value of Assets | $7,176,614,000 |
| 2) | Actuarial Value of Assets | 7,133,754,000 |
| 3) | Actuarial Present Value of Projected Benefits | 6,210,461,000 |
| 4) | Actuarial Accrued Liability | 6,202,564,000 |
| 5) | Unfunded Actuarial Accrued Liability (Surplus) | (931,190,000) |
| 6) | Normal Cost | 1,641,000 |
| 7) | Actuarial Gain/(Loss) | 450,018,000 |
| 8) | Vested Benefits Charge | 0 |
| 9) | Net Charges to Funding Standard Account (includes Normal Cost) | (55,091,000) |
| 10) | Credit Balance as of June 30, 2000 | 973,939,000[17] |
| 11) | Contribution for Minimum Funding[18] ((9)-(10), but not less than zero) | 0 |
| 12) | Contribution for 30-Year Funding[18] | 0 |
| 13) | Full Funding Limitation | 0 |
| 14) | Maximum Tax-deductible Contribution[19] | 0 |

**PT-02742**

---

[17] *Adjusted from $1,083,540,000 to set unfunded accrued liability to $0 on and after July 1, 1997 for purposes of setting up and amortizing minimum charge and credit bases.*

[18] *Includes one half year of interest, since contributions are assumed to be paid uniformly over the year.*

[19] *Includes a full year of interest, regardless of the actual dates of payment of contributions.*

# Exhibit L

## Withdrawal Liability and Accounting Information

### Unfunded Vested Benefits, June 30, 2001

Withdrawal liability calculations require a determination of the Plan's unfunded vested benefits as of the end of a plan year. The unfunded vested benefits as of June 30, 2001 are as follows:

| | | |
|---|---|---|
| 1) | Actuarial Present Value of Vested Benefits--PBGC Immediate Rate plus 1% Interest Assumption (6%) | $6,946,213,000 |
| 2) | Market Value of Assets | 6,562,782,000 |
| 3) | Percentage Funded on PBGC Basis = (2)÷(1) | .944800 |
| 4) | Percentage Unfunded on PBGC Basis = 1.0-(3) | .055200 |
| 5) | Actuarial Present Value of Vested Benefits--7.5% Interest Assumption | 5,967,096,000 |
| 6) | Unfunded Vested Benefits on Blended Interest Assumptions = (4)x(5) | $ 329,384,000 |

PT-02795

## Withdrawal Liability and Accounting Information *(continued)*

### Accumulated Plan Benefits, June 30, 2001

Statement of Financial Accounting Standards No. 35 requires a statement of the actuarial present value of accumulated plan benefits. The net assets available for benefits and the actuarial present value of accumulated plan benefits as of June 30, 2001 are as follows:

1)  Actuarial Present Value of Accumulated
    Plan Benefits:

|   |   |   |   |
|---|---|---|---:|
| a) | Vested Benefits[16] | | |
| | | Active Participants | $1,373,837,000 |
| | | Non-retired Disabled Participants | 531,000 |
| | | Terminated Vested Participants | 1,180,068,000 |
| | | Retired Participants | 3,599,163,000 |
| | | Spouses Receiving Benefits | 640,748,000 |
| | | Preretirement Spouses' Benefits | 27,325,000 |
| | | Lump Sum Death Benefits | 87,750,000 |
| | | One-time Single Sum Payments | 65,752,000 |
| | | Social Security Supplement | 4,742,000 |
| | | Total Vested | 6,979,916,000 |
| | | | |
| b) | Nonvested Benefits | | |
| | | Active Participants | 89,107,000 |
| | | Preretirement Spouses' Benefits | 164,000 |
| | | Disability Benefits | 74,336,000 |
| | | Lump Sum Death Benefits | 1,025,000 |
| | | Social Security Supplement | 465,000 |
| | | Total Nonvested | 165,097,000 |
| | | | |
| c) | Total = (a)+(b) | | 7,145,013,000 |

2)  Net Assets Available for Benefits (Market Value)  6,562,782,000

3)  Excess of (1) over (2)  $  582,231,000

PT-02796

---

[16]  *The value of nonforfeitable benefits for withdrawal liability calculations on page 51 excludes actuarial liability for lump sum death benefits. A portion of this liability is included in the value of vested benefits for disclosure under SFAS 35.*

## Withdrawal Liability and Accounting Information *(continued)*

On June 30, 2000, the value of net assets available for benefits was $7,176,614,000. This exceeded the actuarial present value of accumulated plan benefits by $138,710,000. On June 30, 2001, the actuarial present value of accumulated plan benefits exceeded net assets by $582,231,000.

### Actuarial Basis

For purposes of this demonstration, vested accumulated plan benefits are valued on the Unit Credit Actuarial Cost Method using the assumptions described in Section 1.3, except that there is no discount for disability and the actuarial interest assumption is the blended interest assumption, using the PBGC immediate lump sum interest rate in effect on June 30, 2001 plus 1% (6% for 2001) as the interest assumption to value vested benefits funded by plan assets, and a 7.5% actuarial interest assumption to value unfunded vested benefits. Nonvested accumulated plan benefits are valued on the Unit Credit Funding Method using all the assumptions described in Section 1.3, except that the actuarial interest assumption is 7.5%. Accumulated plan benefits include all retirement, disability, and death benefits accrued on June 30, 2001. In terms of the actuarial present value of accumulated plan benefits, the blended interest assumption is equivalent to a single actuarial interest assumption of approximately 6.2%.

PT-02797

## Withdrawal Liability and Accounting Information *(continued)*

Net Change in Actuarial Present Value of Accumulated Plan Benefits

The sources of the net change in the total actuarial present value of accumulated plan benefits during the plan year ended June 30, 2001 are as follows:

| | |
|---|---|
| Actuarial Present Value of Accumulated Plan Benefits at June 30, 2000 | $7,037,904,000 |
| Increase (decrease) attributable to: | |
|     Increase for interest due to decrease in discount period | 414,668,000 |
|     Change in interest assumption | 116,253,000 |
|     Change in other assumptions | (4,650,000) |
|     Benefits paid | (436,546,000) |
|     Benefits accumulated (including actuarial gain/loss) | 17,384,000 |
| Actuarial Present Value of Accumulated Plan Benefits at June 30, 2001 | $7,145,013,000 |

PT-02798

**Appendix**

### 2001 ACTUARIAL VALUATION RESULTS
### IF A POSITIVE NORMAL COST WAS ESTABLISHED AS OF JULY 1, 1984
### 1974 PENSION PLAN

**Funding (July 1, 2001)**

| | | |
|---|---|---:|
| 1) | Market Value of Assets | $6,562,782,000 |
| 2) | Actuarial Value of Assets | 6,890,921,000 |
| 3) | Actuarial Present Value of Projected Benefits | 6,151,362,000 |
| 4) | Actuarial Accrued Liability | 6,145,184,000 |
| 5) | Unfunded Actuarial Accrued Liability (Surplus) | (745,737,000) |
| 6) | Normal Cost | 1,288,000 |
| 7) | Actuarial Gain/(Loss) | (264,189,000) |
| 8) | Vested Benefits Charge | 0 |
| 9) | Net Charges to Funding Standard Account (includes Normal Cost) | (18,413,000) |
| 10) | Credit Balance as of June 30, 2001 | 1,112,840,000 |
| 11) | Contribution for Minimum Funding[17] ((9)-(10), but not less than zero) | 0 |
| 12) | Contribution for 30-Year Funding[17] | 0 |
| 13) | Full Funding Limitation | 0 |
| 14) | Maximum Tax-deductible Contribution[18] | 0 |

---

[17]    *Includes one half year of interest, since contributions are assumed to be paid uniformly over the year.*

[18]    *Includes a full year of interest, regardless of the actual dates of payment of contributions.*

PT-02799

# Exhibit M

## Withdrawal Liability and Accounting Information

**Unfunded Vested Benefits, June 30, 2002**

Withdrawal liability calculations require a determination of the Plan's unfunded vested benefits as of the end of a plan year.  The unfunded vested benefits as of June 30, 2002 are as follows:

| | | |
|---|---|---:|
| 1) | Actuarial Present Value of Vested Benefits – PBGC Immediate Rate plus 1% Interest Assumption (5.5%) | $7,885,416,000 |
| 2) | Market Value of Assets | 5,724,412,000 |
| 3) | Percentage Funded on PBGC Basis = (2)÷(1) | .725949 |
| 4) | Percentage Unfunded on PBGC Basis = 1.0-(3) | .274051 |
| 5) | Actuarial Present Value of Vested Benefits – 7.5% Interest Assumption | 6,447,831,000 |
| 6) | Unfunded Vested Benefits on Blended Interest Assumptions = (4)x(5) | $1,767,035,000 |

PT-02849

# Withdrawal Liability and Accounting Information *(continued)*

### Accumulated Plan Benefits, June 30, 2002

Statement of Financial Accounting Standards No. 35 requires a statement of the actuarial present value of accumulated plan benefits. The net assets available for benefits and the actuarial present value of accumulated plan benefits as of June 30, 2002 are as follows:

1)      Actuarial Present Value of Accumulated Plan Benefits:

     a)     Vested Benefits[18]

| | |
|---|---:|
| Active Participants | $1,570,820,000 |
| Non-retired Disabled Participants | 493,000 |
| Terminated Vested Participants | 1,118,180,000 |
| Retired Participants | 3,867,923,000 |
| Spouses Receiving Benefits | 701,450,000 |
| Preretirement Spouses' Benefits | 27,560,000 |
| Lump Sum Death Benefits | 114,509,000 |
| One-time Single Sum Payments | 187,130,000 |
| Social Security Supplement | 17,891,000 |
| Total Vested | 7,605,956,000 |

     b)     Nonvested Benefits

| | |
|---|---:|
| Active Participants and Preretirement Spouses' Benefits | 67,738,000 |
| Disability Benefits | 63,340,000 |
| Lump Sum Death Benefits | 1,437,000 |
| Total Nonvested | 132,515,000 |

     c)     Total = (a)+(b)            7,738,471,000

2)      Net Assets Available for Benefits (Market Value)       5,724,412,000

3)      Excess of (1) over (2)          $ 2,014,059,000

PT-02850

---

[18] *The value of nonforfeitable benefits for withdrawal liability calculations on page 48 excludes actuarial liability for lump sum death benefits. A portion of this liability is included in the value of vested benefits for disclosure under SFAS 35.*

---

## Withdrawal Liability and Accounting Information (continued)

On June 30, 2001, the actuarial present value of accumulated plan benefits was $7,145,013,000. This exceeded the net assets available for benefits by $582,231,000. On June 30, 2002, the difference between the actuarial present value of accumulated plan benefits and the net assets available for benefits increased to $2,014,059,000.

### Actuarial Basis

For purposes of this demonstration, vested accumulated plan benefits are valued on the Unit Credit Actuarial Cost Method using the assumptions described in Section 1.3, except that there is no discount for disability and the actuarial interest assumption is the blended interest assumption, using the PBGC immediate lump sum interest rate in effect on June 30, 2002 plus 1% (5.5% for 2002) as the interest assumption to value vested benefits funded by plan assets, and a 7.5% actuarial interest assumption to value unfunded vested benefits. Nonvested accumulated plan benefits are valued on the Unit Credit Funding Method using all the assumptions described in Section 1.3, except that the actuarial interest assumption is 7.5%. Accumulated plan benefits include all retirement, disability, and death benefits accrued on June 30, 2002. In terms of the actuarial present value of accumulated plan benefits, the blended interest assumption is equivalent to a single actuarial interest assumption of approximately 6.1%.

PT-02851

## Withdrawal Liability and Accounting Information *(continued)*

### Net Change in Actuarial Present Value of Accumulated Plan Benefits

The sources of the net change in the total actuarial present value of accumulated plan benefits during the plan year ended June 30, 2002 are as follows:

| | |
|---|---:|
| Actuarial Present Value of Accumulated Plan Benefits at June 30, 2001 | $7,145,013,000 |
| Increase (decrease) attributable to: | |
| Increase for interest due to decrease in discount period | 410,286,000 |
| Assumption changes | 29,930,000 |
| Benefit increases | 485,752,000 |
| Benefits paid | (455,291,000) |
| Benefits accumulated (including actuarial gain/loss) | 122,781,000 |
| Actuarial Present Value of Accumulated Plan Benefits at June 30, 2002 | $7,738,471,000 |

PT-02852

**Appendix**

### 2002 ACTUARIAL VALUATION RESULTS
### IF A POSITIVE NORMAL COST WAS ESTABLISHED AS OF JULY 1, 1984
### 1974 PENSION PLAN

<u>Funding (July 1, 2002)</u>

| | | |
|---|---|---|
| 1) | Market Value of Assets | $5,724,412,000 |
| 2) | Actuarial Value of Assets | 6,010,633,000 |
| 3) | Actuarial Present Value of Projected Benefits | 6,653,422,000 |
| 4) | Actuarial Accrued Liability | 6,646,551,000 |
| 5) | Unfunded Actuarial Accrued Liability (Surplus) | 635,918,000 |
| 6) | Normal Cost | 1,435,000 |
| 7) | Actuarial Gain/(Loss) | (924,090,000) |
| 8) | Vested Benefits Charge | 37,215,000 |
| 9) | Net Charges to Funding Standard Account (includes Normal Cost) | 67,513,000 |
| 10) | Credit Balance as of June 30, 2002 | 1,225,310,000 |
| 11) | Contribution for Minimum Funding[19] ((9)-(10), but not less than zero) | 0 |
| 12) | Contribution for 30-Year Funding[19] | 54,872,000 |
| 13) | Maximum Tax-deductible Contribution[20] | 2,463,440,000 |

[19] *Includes one half year of interest, since contributions are assumed to be paid uniformly over the year.*

[20] *Includes a full year of interest, regardless of the actual dates of payment of contributions.*

PT-02853

# Exhibit N

## Withdrawal Liability and Accounting Information

### Unfunded Vested Benefits, June 30, 2004

Withdrawal liability calculations require a determination of the Plan's unfunded vested benefits as of the end of a plan year.  The unfunded vested benefits as of June 30, 2004 are as follows:

| | | |
|---|---|---:|
| 1) | Actuarial Present Value of Vested[16] Benefits -- PBGC Annuity Rate plus 1% Interest Assumption (5.3% for 20 years and 6% thereafter) | $7,571,703,000 |
| 2) | Market Value of Assets | 5,789,811,000 |
| 3) | Percentage Funded = (2)÷(1) | 0.764664 |
| 4) | Unfunded Vested Benefits = (1)-(2) | 1,781,892,000 |

PT-02956

---

[16] *Includes the PBGC expense charge as described in Appendix C to Part 4044 of the PBGC Regulations.*

*Section 2.7*

# Withdrawal Liability and Accounting Information *(continued)*

### Accumulated Plan Benefits, June 30, 2004

Statement of Financial Accounting Standards No. 35 requires a statement of the actuarial present value of accumulated plan benefits. The net assets available for benefits and the actuarial present value of accumulated plan benefits as of June 30, 2004 are as follows:

1)  Actuarial Present Value of Accumulated
    Plan Benefits:

    a)  Vested Benefits[17]

    |  |  |
    |---|---:|
    | Active Participants | $1,379,732,000 |
    | Non-retired Disabled Participants | 357,000 |
    | Terminated Vested Participants | 1,026,460,000 |
    | Retired Participants | 4,282,652,000 |
    | Spouses Receiving Benefits | 724,814,000 |
    | Preretirement Spouses' Benefits | 26,108,000 |
    | Lump Sum Death Benefits | 151,169,000 |
    | One-time Single Sum Payments | 121,130,000 |
    | Social Security Supplement | 10,450,000 |
    | Total Vested | 7,722,872,000 |

    b)  Nonvested Benefits[18]

    |  |  |
    |---|---:|
    | Active Participants and Preretirement Spouses' Benefits | 219,623,000 |
    | Disability Benefits | 57,115,000 |
    | Lump Sum Death Benefits | 1,517,000 |
    | Total Nonvested | 278,255,000 |

    c)  Total = (a)+(b)  —  8,001,127,000

2)  Net Assets Available for Benefits (Market Value)  —  5,789,811,000

3)  Excess of (1) over (2)  —  $2,211,316,000

PT-02957

---

[17] *The value of nonforfeitable benefits for withdrawal liability calculations on page 47 excludes actuarial liability for lump sum death benefits. A portion of this liability is included in the value of vested benefits for disclosure under SFAS 35. The present value of vested benefits is based on benefit levels in effect on June 30, 2004.*

[18] *The present value of nonvested benefits is based on benefits determined using service at the valuation date and the ultimate benefit levels included in the 2002 Agreement.*

---

## Withdrawal Liability and Accounting Information *(continued)*

On June 30, 2003, the actuarial present value of accumulated plan benefits was $8,338,200,000. This exceeded the net assets available for benefits by $2,985,824,000. On June 30, 2004, the difference between the actuarial present value of accumulated plan benefits and the net assets available for benefits decreased to $2,211,316,000.

### Actuarial Basis

For purposes of this demonstration, vested accumulated plan benefits are valued on the Unit Credit Actuarial Cost Method using the assumptions described in Section 1.3, except that there is no discount for disability, the actuarial interest assumption is the PBGC annuity interest rate in effect on June 30, 2004 plus 1% (5.3% for 20 years and 6% thereafter), and administrative expenses are reflected by using the PBGC loading charge as described in Appendix C to Part 4044 of the PBGC Regulation ($200 per participant plus 5% of the first $200,000 of liability plus .78% of the liability over $200,000). Nonvested accumulated plan benefits are valued on the Unit Credit Actuarial Cost Method using the assumptions described in Section 1.3, except that the actuarial interest and administrative expenses assumptions are the same as those used for vested accumulated plan benefits. Vested accumulated plan benefits include all retirement, disability, and death benefits accrued on June 30, 2004; nonvested accumulated plan benefits reflect the ultimate benefit levels included in the 2002 Agreement.

PT-02958

*Section 2.7*

## Withdrawal Liability and Accounting Information *(continued)*

### Net Change in Actuarial Present Value of Accumulated Plan Benefits

The sources of the net change in the total actuarial present value of accumulated plan benefits during the plan year ended June 30, 2004 are as follows:

| | |
|---|---:|
| Actuarial Present Value of Accumulated Plan Benefits at June 30, 2003 | $8,338,200,000 |
| Increase (decrease) attributable to: | |
| Increase for interest due to decrease in discount period | 451,408,000 |
| Assumption changes | (393,128,000) |
| Benefits paid | (512,010,000) |
| Benefits accumulated (including actuarial gain/loss) | 116,657,000 |
| Actuarial Present Value of Accumulated Plan Benefits at June 30, 2004 | $8,001,127,000 |

PT-02959

**Appendix**

2004 ACTUARIAL VALUATION RESULTS
IF A POSITIVE NORMAL COST WAS ESTABLISHED AS OF JULY 1, 1984
1974 PENSION PLAN

Funding (July 1, 2004)

| | | |
|---|---|---|
| 1) | Market Value of Assets | $5,789,811,000 |
| 2) | Actuarial Value of Assets | 5,541,276,000 |
| 3) | Actuarial Present Value of Projected Benefits | 6,533,802,000 |
| 4) | Actuarial Accrued Liability | 6,527,097,000 |
| 5) | Unfunded Actuarial Accrued Liability (Surplus) | 985,821,000 |
| 6) | Normal Cost | 1,423,000 |
| 7) | Actuarial Gain/(Loss) | 49,098,000 |
| 8) | Vested Benefits Charge | 27,772,000 |
| 9) | Net Charges to Funding Standard Account (includes Normal Cost) | 133,145,000 |
| 10) | Credit Balance as of June 30, 2004 | 1,213,998,000 |
| 11) | Contribution for Minimum Funding[19] ((9)-(10), but not less than zero) | 0 |
| 12) | Contribution for 30-Year Funding[19] | 84,232,000 |
| 13) | Maximum Tax-deductible Contribution[20] | 2,431,820,000 |

---

[19] *Includes one half year of interest, since contributions are assumed to be paid uniformly over the year.*

[20] *Includes a full year of interest, regardless of the actual dates of payment of contributions.*

PT-02960

# <u>Exhibit O</u>

## Withdrawal Liability and Accounting Information

**Unfunded Vested Benefits, June 30, 2005**

Withdrawal liability calculations require a determination of the plan's unfunded vested benefits as of the end of a plan year. The unfunded vested benefits as of June 30, 2005 are as follows:

| | | |
|---|---|---|
| 1) | Actuarial Present Value of Vested[17] Benefits – PBGC Annuity Rate plus 1% Interest Assumption (4.7% for 20 years and 5.75% thereafter) | $8,027,348,000 |
| 2) | Market Value of Assets | 5,832,510,000 |
| 3) | Percentage Funded = (2)÷(1) | 0.726580 |
| 4) | Unfunded Vested Benefits = (1)-(2) | $2,194,838,000 |

PT-03008

---

[17] *Includes the PBGC expense charge as described in Appendix C to Part 4044 of the PBGC Regulations.*

# Withdrawal Liability and Accounting Information *(continued)*

### Accumulated Plan Benefits, June 30, 2005

Statement of Financial Accounting Standards No. 35 requires a statement of the actuarial present value of accumulated plan benefits. The net assets available for benefits and the actuarial present value of accumulated plan benefits as of June 30, 2005 are as follows:

1) Actuarial Present Value of Accumulated
   Plan Benefits:

   a) Vested Benefits[18]

   | | |
   |---|---:|
   | Active Participants | $1,472,769,000 |
   | Non-retired Disabled Participants | 270,000 |
   | Terminated Vested Participants | 981,705,000 |
   | Retired Participants | 4,670,000,000 |
   | Spouses Receiving Benefits | 773,402,000 |
   | Preretirement Spouses' Benefits | 26,166,000 |
   | Lump Sum Death Benefits | 145,800,000 |
   | One-time Single Sum Payments | 97,661,000 |
   | Social Security Supplement | 5,375,000 |
   | Total Vested | 8,173,148,000 |

   b) Nonvested Benefits[19]

   | | |
   |---|---:|
   | Active Participants and Preretirement Spouses' Benefits | 223,654,000 |
   | Disability Benefits | 55,275,000 |
   | Lump Sum Death Benefits | 1,612,000 |
   | Total Nonvested | 280,541,000 |

   c) Total = (a)+(b)                                          8,453,689,000

2) Net Assets Available for Benefits (Market Value)           5,832,510,000

3) Excess of (1) over (2)                                     $2,621,179,000

**PT-03009**

---

[18] *The value of nonforfeitable benefits for withdrawal liability calculations on page 47 excludes actuarial liability for lump sum death benefits. A portion of this liability is included in the value of vested benefits for disclosure under SFAS 35. The present value of vested benefits is based on benefit levels in effect on June 30, 2005.*

[19] *The present value of nonvested benefits is based on benefits determined using service at the valuation date and the ultimate benefit levels included in the 2002 Agreement.*

---

---

**Section 2.7**

## Withdrawal Liability and Accounting Information *(continued)*

On June 30, 2004, the actuarial present value of accumulated plan benefits was $8,001,127,000. This exceeded the net assets available for benefits by $2,211,316,000. On June 30, 2005, the excess of the actuarial present value of accumulated plan benefits over the net assets available for benefits increased to $2,621,179,000.

### Actuarial Basis

For purposes of this demonstration, vested accumulated plan benefits are valued on the Unit Credit Actuarial Cost Method using the assumptions described in Section 1.3, except that there is no discount for disability, the actuarial interest assumption is the PBGC annuity interest rate in effect on June 30, 2005 plus 1% (4.7% for 20 years and 5.75% thereafter), and administrative expenses are reflected by using the PBGC loading charge as described in Appendix C to Part 4044 of the PBGC Regulation ($200 per participant plus 5% of the first $200,000 of liability plus .72% of the liability over $200,000). Nonvested accumulated plan benefits are valued on the Unit Credit Actuarial Cost Method using the assumptions described in Section 1.3, except that the actuarial interest and administrative expenses assumptions are the same as those used for vested accumulated plan benefits. Vested accumulated plan benefits include all retirement, disability, and death benefits accrued on June 30, 2005; nonvested accumulated plan benefits reflect the ultimate benefit levels included in the 2002 Agreement.

**PT-03010**

*Section 2.7*

## Withdrawal Liability and Accounting Information *(continued)*

### Net Change in Actuarial Present Value of Accumulated Plan Benefits

The sources of the net change in the total actuarial present value of accumulated plan benefits during the plan year ended June 30, 2005 are as follows:

| | |
|---|---:|
| Actuarial Present Value of Accumulated Plan Benefits at June 30, 2004 | $8,001,127,000 |
| Increase (decrease) attributable to: | |
| Increase for interest due to decrease in discount period | 408,598,000 |
| Assumption changes | 494,350,000 |
| Benefit Increases | 11,476,000 |
| Benefits paid | (531,624,000) |
| Benefits accumulated (including actuarial gain/loss) | 69,762,000 |
| Actuarial Present Value of Accumulated Plan Benefits at June 30, 2005 | $8,453,689,000 |

**PT-03011**

**Appendix**

### 2005 ACTUARIAL VALUATION RESULTS
### IF A POSITIVE NORMAL COST WAS ESTABLISHED AS OF JULY 1, 1984
### 1974 PENSION PLAN

**Funding (July 1, 2005)**

| | | |
|---|---|---|
| 1) | Market Value of Assets | $5,832,510,000 |
| 2) | Actuarial Value of Assets | 5,639,119,000 |
| 3) | Actuarial Present Value of Projected Benefits | 6,578,208,000 |
| 4) | Actuarial Accrued Liability | 6,568,504,000 |
| 5) | Unfunded Actuarial Accrued Liability | 929,385,000 |
| 6) | Normal Cost | 2,070,000 |
| 7) | Actuarial Gain/(Loss) | 196,733,000 |
| 8) | Vested Benefits Charge | 25,657,000 |
| 9) | Net Charges to Funding Standard Account (includes Normal Cost) | 132,876,000 |
| 10) | Credit Balance as of June 30, 2005 | 1,168,232,000 |
| 11) | Contribution for Minimum Funding[21] ((9)-(10), but not less than zero) | 0 |
| 12) | Contribution for 30-Year Funding[21] | 80,166,000 |
| 13) | Maximum Tax-deductible Contribution[22] | 2,193,978,000 |

---

[21] *Includes one half year of interest, since contributions are assumed to be paid uniformly over the year.*

[22] *Includes a full year of interest, regardless of the actual dates of payment of contributions.*

PT-03014

# Exhibit P

## Highlights

This report has been prepared for the Board of Trustees of the United Mine Workers of America ("UMWA") 1974 Pension Trust by Mercer Human Resource Consulting to:

1.  Present the results of a valuation of the United Mine Workers of America 1974 Pension Plan as of July 1, 2006;

2.  Review experience under the plan for the year ended June 30, 2006;

3.  Provide to the plan sponsor the acceptable range of contributions under the plan for the year beginning July 1, 2006 and

4.  Provide reporting and disclosure information for governmental agencies and other interested parties.

The report is divided into two parts. **Section 1** describes the basis of the valuation. It summarizes the plan provisions, provides information relating to the plan participants, and describes the funding methods and actuarial assumptions used in determining liabilities and costs.

The following changes since the July 1, 2005 valuation are significant:

1)  All benefit increases specified in the National Bituminous Coal Wage Agreement of 2002 are fully reflected for funding and withdrawal liability. For the 2005 valuation, the benefit increases effective January 1, 2006 were reflected on a pro rata basis for funding and were fully reflected in the actuarial present value of nonvested accumulated plan benefits (but they were not reflected for withdrawal liability).

2)  The plan was amended on August 15, 2006 to provide one-time single sum hardship payments of $3,350 in September 2006 to participants covered by the 1993 Benefit Plan. This provision increased the actuarial accrued liability by $12,547,000.

3)  The interest assumption used to calculate withdrawal liability and accounting information was revised to be the PBGC annuity interest rates (6.2% for 20 years and 4.75% thereafter as of June 30, 2006). For the 2005 valuation, 1% was added to the PBCG annuity interest rates.

4)  The total number of reported active participants decreased by 0.2% from 12,361 in the prior year to 12,340. The total number of reported plan participants was relatively unchanged, decreasing slightly from 207,737 participants to 207,107 participants.

5)  There was a net actuarial gain from experience during the plan year ended June 30, 2006 of $219,810,000. The gain was primarily the result of the effect of greater-than-expected investment income on an actuarial value of assets basis offset by losses from mortality, retirement, rehires, and data.

6)  There were no other changes in actuarial cost methods. However, it should be noted that this valuation contains a negative Normal Cost. We note the possibility that the Internal Revenue Service may formally disapprove negative Normal Costs. If this occurs, there would not be any effect on the adequacy of current contribution levels in meeting minimum funding requirements. Further, there would not be any effect on Unfunded Vested Benefits or Withdrawal Liability calculations. The potential effects of eliminating negative Normal Costs are summarized in an Appendix to this report. Complete descriptions of the actuarial assumptions and cost methods are shown in Section 1.3.

PT-03017

## Summary of Plan Provisions (continued)

<u>Benefit:</u>

One-time single sum payments of $500 for regular pensioners, $290 for disabled pensioners, and $375 for surviving spouses, payable on each of the following payment dates: February 1, 1991 and December 16 of 1993, 1994, and 1995.

One-time single sum payments of $525 for regular pensioners, $315 for disabled pensioners, and $400 for surviving spouses, payable on December 16 of 1996 and 1997 and November 1 of 1999, 2000, and 2001.

One-time single sum payments of $550 for regular pensioners and $425 for disabled pensioners and surviving spouses, payable on November 1 of 2002, 2003, and 2004.

One-time single sum payments of $565 for regular pensioners and $440 for disabled pensioners and surviving spouses, payable on November 1 of 2005 and 2006.

One-time single sum payments of $2,250 for any pensioner, disabled miner not yet eligible for immediate pension benefits, or surviving spouse, who is eligible for benefits from the UMWA 1993 Benefit Plan, payable on or before April 1, 2002 and January 1 of 2003, 2004, 2005, and 2006.

One-time single sum payments of $3,350 for any pensioner, disabled miner not yet eligible for immediate pension benefits, or surviving spouse, who is eligible for and receiving benefits from the UMWA 1993 Benefit Plan on June 30, 2005, payable in July 2005.

One-time single sum payments of $3,350 for any pensioner, disabled miner not yet eligible for immediate pension benefits, or surviving spouse, who is eligible for and receiving benefits from the UMWA 1993 Benefit Plan on July 31, 2006, payable in September 2006.

<u>Social Security Supplement:</u>

<u>Eligibility:</u>

Pensioners and surviving spouses whose last signatory employer is obligated to current Agreement benefits and who also meet the following requirements:

- pensioners and surviving spouses who are not eligible for unreduced Social Security benefits,
- entitled to Employer-provided benefits under the Employer Plan and subject to such plan's annual deductible, and
- ineligible for Medicare disability benefits.

Deferred vested pensioners with less than 20 years of service are not eligible for the supplement.

<u>Benefit:</u>

Lump sum social security supplement of $1,000 payable on each January 1 of years 1994-2006 (or a pro-rata portion based on length of eligibility within the calendar year).

PT-03030

## Withdrawal Liability and Accounting Information

**Unfunded Vested Benefits, June 30, 2006**

Withdrawal liability calculations require a determination of the plan's unfunded vested benefits as of the end of a plan year. The unfunded vested benefits as of June 30, 2006 are as follows:

| | | |
|---|---|---|
| 1) | Actuarial Present Value of Vested[17] Benefits – PBGC Annuity Rate Interest Assumption (6.2% for 20 years and 4.75% thereafter) | $7,094,627,000 |
| 2) | Market Value of Assets | 5,983,734,000 |
| 3) | Percentage Funded = (2)÷(1) | 0.843418 |
| 4) | Unfunded Vested Benefits = (1)-(2) | $1,110,893,000 |

**PT-03063**

---

[17] *Includes the PBGC expense charge as described in Appendix C to Part 4044 of the PBGC Regulations.*

---

# Withdrawal Liability and Accounting Information *(continued)*

### Accumulated Plan Benefits, June 30, 2006

Statement of Financial Accounting Standards No. 35 requires a statement of the actuarial present value of accumulated plan benefits. The net assets available for benefits and the actuarial present value of accumulated plan benefits as of June 30, 2006 are as follows:

1) Actuarial Present Value of Accumulated Plan Benefits:

    a)   Vested Benefits[18]

| | |
|---|---:|
| Active Participants | $1,303,333,000 |
| Non-retired Disabled Participants | 186,000 |
| Terminated Vested Participants | 778,984,000 |
| Retired Participants | 4,241,007,000 |
| Spouses Receiving Benefits | 709,683,000 |
| Preretirement Spouses' Benefits | 21,753,000 |
| Lump Sum Death Benefits | 122,899,000 |
| One-time Single Sum Payments | 39,681,000 |
| Social Security Supplement | 0 |
| Total Vested | 7,217,526,000 |

    b)   Nonvested Benefits[19]

| | |
|---|---:|
| Active Participants and Preretirement Spouses' Benefits | 68,151,000 |
| Disability Benefits | 45,510,000 |
| Lump Sum Death Benefits | 1,106,000 |
| Single Sums | 12,318,000 |
| Total Nonvested | 127,085,000 |

    c)   Total = (a)+(b)      7,344,611,000

2) Net Assets Available for Benefits (Market Value)    5,983,734,000

3) Excess of (1) over (2)    $1,360,877,000

---

[18] *The value of nonforfeitable benefits for withdrawal liability calculations on page 47 excludes actuarial liability for lump sum death benefits. A portion of this liability is included in the value of vested benefits for disclosure under SFAS 35. The present value of vested benefits is based on benefit levels in effect on June 30, 2006.*

[19] *The present value of nonvested benefits is based on benefits determined using service at the valuation date and the ultimate benefit levels included in the 2002 Agreement. For the 2006 valuation, it includes one-time single sum hardship payments of $3,350 per plan amendment dated August 15, 2006.*

## Withdrawal Liability and Accounting Information *(continued)*

On June 30, 2005, the actuarial present value of accumulated plan benefits was $8,453,689,000. This exceeded the net assets available for benefits by $2,621,179,000. On June 30, 2006, the excess of the actuarial present value of accumulated plan benefits over the net assets available for benefits decreased to $1,360,877,000.

### Actuarial Basis

For purposes of this demonstration, vested accumulated plan benefits are valued on the Unit Credit Actuarial Cost Method using the assumptions described in Section 1.3, except that there is no discount for disability, the actuarial interest assumption is the PBGC annuity interest rate in effect on June 30, 2006 (6.2% for 20 years and 4.75% thereafter), and administrative expenses are reflected by using the PBGC loading charge as described in Appendix C to Part 4044 of the PBGC Regulation ($200 per participant plus 5% of the first $200,000 of liability plus .87% of the liability over $200,000). Nonvested accumulated plan benefits are valued on the Unit Credit Actuarial Cost Method using the assumptions described in Section 1.3, except that the actuarial interest and administrative expenses assumptions are the same as those used for vested accumulated plan benefits. Vested accumulated plan benefits include all retirement, disability, and death benefits accrued on June 30, 2006; nonvested accumulated plan benefits reflect the ultimate benefit levels included in the 2002 Agreement. (For 2006, vested and nonvested accumulated plan benefit levels are the same.)

PT-03065

## Withdrawal Liability and Accounting Information *(continued)*

### Net Change in Actuarial Present Value of Accumulated Plan Benefits

The sources of the net change in the total actuarial present value of accumulated plan benefits during the plan year ended June 30, 2006 are as follows:

| | |
|---|---|
| Actuarial Present Value of Accumulated Plan Benefits at June 30, 2005 | $8,453,689,000 |
| Increase (decrease) attributable to: | |
| Increase for interest due to decrease in discount period | 382,888,000 |
| Assumption changes | (983,090,000) |
| Benefit increases | 12,318,000 |
| Benefits paid | (551,458,000) |
| Benefits accumulated (including actuarial gain/loss) | 30,264,000 |
| Actuarial Present Value of Accumulated Plan Benefits at June 30, 2006 | $7,344,611,000 |

PT-03066

---

**Appendix**

### 2006 ACTUARIAL VALUATION RESULTS
### IF A POSITIVE NORMAL COST WAS ESTABLISHED AS OF JULY 1, 1984
### 1974 PENSION PLAN

<u>Funding (July 1, 2006)</u>

| | | |
|---|---|---:|
| 1) | Market Value of Assets | $5,983,734,000 |
| 2) | Actuarial Value of Assets | 5,802,713,000 |
| 3) | Actuarial Present Value of Projected Benefits | 6,547,755,000 |
| 4) | Actuarial Accrued Liability | 6,533,379,000 |
| 5) | Unfunded Actuarial Accrued Liability | 730,666,000 |
| 6) | Normal Cost | 3,047,000 |
| 7) | Actuarial Gain/(Loss) | 316,214,000 |
| 8) | Vested Benefits Charge | 14,742,000 |
| 9) | Net Charges to Funding Standard Account (includes Normal Cost) | 102,006,000 |
| 10) | Credit Balance as of June 30, 2006 | 1,135,960,000 |
| 11) | Contribution for Minimum Funding[21] ((9)-(10), but not less than zero) | 0 |
| 12) | Contribution for 30-Year Funding[21] | 64,499,000 |
| 13) | Maximum Tax-deductible Contribution[22] | 5,152,326,000 |

---

[21] *Includes one half year of interest, since contributions are assumed to be paid uniformly over the year.*

[22] *Includes a full year of interest, regardless of the actual dates of payment of contributions.*

PT-03069

---

# Exhibit Q



**UNITED STATES GOVERNMENT**
**National Labor Relations Board**

# Memorandum

TO   :   Emil Farkas, Director
          Region 9

DATE:   April 23, 1985

FROM :   Harold J. Datz, Associate General Counsel
          Division of Advice

SUBJECT:   A. T. Massey Coal Co., Inc. et al.
          Case 9-CA-21448-1 thru 9
                9-CA-21449-1 thru 4
                9-CA-21450-1 thru 9

      These cases were submitted for advice as to (1) whether a parent
corporation and certain of its subsidiary corporations constitute a single
employer; (2) if so, whether they violated Section 8(a)(5) by refusing to
acknowledge such single employer status in collective bargaining for a
contract. In addition, and apart from the single employer issues, there
are issues of (3) whether any of the companies violated Section 8(a)(5) by
failing to provide information requested by the Union, and whether any of
the companies unlawfully failed to bargain about the decision to close
certain mines.

## I.  Background

      A. T. Massey Coal Co. ("A.T. Massey") was a family held coal
company purchased by St. Joe Minerals Corp. in 1974. In 1980 St. Joe
Minerals and Scallop Coal Corp., a member of the Royal Dutch Shell group
formed a joint venture which acquired A. T. Massey Coal Co. St. Joe
contributed its coal assets and Scallop contributed $680 million in cash
and installments. 1/ A. T. Massey is the sole or majority owner of
approximately 60 corporate subsidiaries, most of which are coal mines or
coal processing facilities (referred to herein as operating companies).
As will be detailed herein, these operating companies are organized into
"Resource Groups," with an A. T. Massey company functioning as the head of
each resource group. In addition, A.T. Massey also owns subsidiaries
which provide services to all the subsidiaries. Among such service
companies are Massey Coal Sales, Inc., a coal brokerage company which
develops customers and negotiates contracts for the domestic sale of
coal, 2/ and Massey Coal Services, Inc. which makes available professional
services relating to engineering and the administration of benefits.

---

1/  St. Joe Minerals subsequently merged with Fluor Corp in 1981.
2/  Contracts negotiated by Massey Coal Sales, Inc. may be filled by coal
    produced by "non-Massey" mines. A.T. Massey asserts that
    approximately 35% of the coal sold by Massey Sales over the last
    several years has come from such mines.



Buy U.S. Savings Bonds Regularly on the Payroll Savings Plan

        For several years, the United Mine Workers of America (the "Union")
has represented employees at at least 16 of the Massey operating companies in
three or four Resource Groups. 3/    These companies were all signatories to the
1981-1984 National Bituminous Coal Wage Agreement ("NBCWA") negotiated by the
Union and the Bituminous Coal Operators Association (the "BCOA"), a
multiemployer association.  Some of the A.T. Massey companies were members of
the BCOA; others had individually agreed to be bound by the terms of that
agreement.  It is undisputed that each company was a separate signatory to the
1981 NBCWA and that each constitutes a separate appropriate bargaining unit.

        In late 1983 and early 1984 those companies 4/  which were members of
the BCOA timely withdrew from that association and all notified the Union of
their desire to negotiate individually for a successor to the NBCWA which was
to expire on September 30, 1984.  In June, the companies began requesting the
Union to schedule negotiating sessions.  In July, the Union sent each of the
companies a notice of termination of the NBCWA and an extensive request for
information.  The companies were informed that if they desired to sign a letter ·
of intent to be bound by the 1984 NBCWA to be negotiated with the BCOA, it
would not be necessary to provide the requested information. 5/  The companies
declined to sign the letter of intent and responded to the information
request.  The Union does not allege any violations with respect to the
companies' compliance with this request.

        In early August, the Union appointed a single negotiating team for
negotiating with all the Massey subsidiaries.  The companies rejected a Union
invitation to meet jointly on August 20.  Accordingly, the Union has met

_____

3/  In the "Wyomac" group the Union represents employees at Winston Coal Co.,
    M & B Coal Co., Robinson Phillips Coal Co., Simron Fuel Co., Shannon
    Pocahontas Mining Co., Royalty Smokeless Coal Co./Trace Fork Coal Co. (two
    separate corporations which admit to being a single employer), and Big Bear
    Mining Co.  In the "Rawl" group the Union represents employees at Sprouse
    Creek Processing Co., Big Bottom Coal Co., Tall Timber Coal Co., Pikco
    Mining Co. and Rocky Hollow Coal Co.  In the "Pike County" group the Union
    represents employees at Joboner Coal Co., TCH Coal Co., and Hopkins Creek
    Coal Co. (Hopkins Creek signed the agreement negotiated by the Union and
    the BCOA in 1984 and is not the subject of any of the instant charges.)
    The Union also represents employees at Dehue Coal Corp. which may or may
    not be part of the Rawl Group.  The Union also has collective bargaining
    relationships with a few additional subsidiaries in Pennsylvania, but the
    negotiations with these companies are not the subject of the instant
    charges.
4/  Hereinafter "the companies" refers to the fifteen signatory companies
    (excluding Hopkins Creek Coal Co.) listed in n. 3, supra.
5/  This letter was sent to all signatories of the 1981 NBCWA which had
    withdrawn from the BCOA and/or expressed a desire to negotiate
    individually; this group includes hundreds of companies not affiliated with
    A.T. Massey.

Case 1:07-cv-00490-PLF   Document 57-18   Filed 10/22/2007   Page 4 of 28

separately with each company. Negotiation sessions began on Thursday, August 16. Before the contract expired on September 30, the Union held meetings with 4 to 7 companies each week. 6/

The Union has insisted throughout the negotiations that the companies are part of a single employing entity comprised of the entities in the Resource Groups and A.T. Massey. While the Union does not dispute that each company comprises a separate bargaining unit, it has demanded that the head of each Resource Group and A.T. Massey acknowledge their single employer status at the bargaining table and that the companies bargain over certain proposals regarding transfer and job bidding (referred to herein as "panel rights" proposals) as a single employer. The Union has further submitted to the signatory companies, the Resource Group heads and to A.T. Massey requests for information regarding the relationship among all these companies. (This request is referred to herein as the "second" or "single employer" information request). The Union has filed charges alleging that all these companies violated Section 8(a)(5) by refusing to bargain as a single employer, specifically by refusing to bargain over panel rights as a single employer and by failing to supply the requested information. The Union further contends that certain of the operating companies have violated Section 8(a)(5) by refusing to supply financial information requested by the Union when they demanded concessions on the grounds that they were losing money. These companies are Winston, Big Bear, Shannon Pocahontas, Robinson Phillips, Simron and M & B. Finally, the Union contends that certain companies, which announced that they were closing their mines when the union rejected their concession proposals, violated Section 8(a)(5) by refusing to bargain over the decision to close.

The signatory companies all contend that they are separate employers and consequently have no authority or obligation to bargain about panel rights at other companies. A. T. Massey and the Resource Group heads deny that they are a single employer with the signatory companies and contend that they therefore have no obligation to bargain with the Union regarding these companies or to respond to the Union's information requests. 7/

All the respondent companies further argue that the extensiveness of the Union's information requests, its delays in scheduling negotiating sessions and its statements away from the bargaining table all demonstrate that the Union lacks a good faith intent to reach agreement and that its bargaining demands and information requests are made only to punish the companies for having withdrawn from the BCOA.

---

6/ During the week of September 24 only two sessions were held, both on Friday September 28. The Union cancelled sessions scheduled for Monday through Thursday because it was conducting a ratification vote on the proposed 1984 NBCWA which had just been negotiated with the BCOA.

7/ The signatory companies' defenses regarding the information request, based on relevance, compliance, and confidentiality, vary from company to company and will be detailed below.

II.  Single Employer

A.  Interrelation of Companies within the Resource Groups

1.  <u>Wyomac Group</u>.  This group is headed by Wyomac Coal Co., a non-signatory company and includes the following signatory companies:  Robinson Phillips, Shannon Pocahontas, Big Bear, Winston, Simron, M & B, and Royalty Smokeless/Trace Fork.  All companies are subsidiaries of A.T. Massey; Wyomac Coal Co. holds a partnership interest in M & B.  Four of these companies--Robinson Phillips, Big Bear, Simron and M & B --share a common president, Norman Lester.  In addition, W.B. Massey serves as Secretary and/or member of the Board of Directors for at least seven of the Wyomac signatory companies.

With respect to labor relations matters, managers of the individual companies direct the employees of those companies in the day-to-day performance of their duties and process grievances at the first and second step.  Grievances at the third step are handled by Wyomac Human Resources Manager John Harsanyi.  Arbitrations -- the fourth step -- are handled by Harsanyi or consultant Tom Woolwine.  On occasion, employees of one subsidiary have been "loaned" to another.  That is, the employee was paid by his original company but performed service for another company.  Gary Hurd, a Robinson Phillips employee has accepted applications for employment at both Robinson Phillips and Simron.  In separate negotiations, the companies have in the past granted employees limited panel rights to other companies within the group.

In the recent collective bargaining for a contract, Harsanyi has been a member of the negotiating teams for all the Wyomac group companies.  In addition, Norman Lester has been the only other company representative for the four companies of which he is president. 8/  Finally, in late September Harsanyi, Todd Kiscaden an employee of Massey Services, and Knox Cline, superintendent of Winston met with employees at shift change and discussed the company's financial posture and its claim that it would not operate under the BCOA agreement.

With respect to the management and operation of the Wyomac companies, the operating companies assert that each mine president or superintendent (often the same person) is responsible for the operation of the mine.  Wyomac admits that it was created to provide support services to the companies within the group.  Specifically, it provides accounting, engineering and administrative services, including calculation of payroll, benefits and other costs, purchasing, surveying, applications for permits and in one instance a request for exemption for all the companies from government safety regulations.  James Joyce, who was president of Wyomac until June 1984 allegedly stated that he spent most of his time at the various mines within the Wyomac group and that heads of resource groups like himself were "gods" within the group, having broad authority to run their operating companies as they saw fit. 9/

--------

8/  The third member of the team is a lawyer.  Three Wyomac companies are represented by George J. Oliver.  The other Wyomac companies are represented by another law firm.

9/  As noted infra, although Resource heads might be "gods" within each Resource group, they often take direction from Massey itself.

Cases 9-CA-21448-1-9, et al.          - 5 -

        In the past Wyomac has announced policies that appear to be applicable
to the other companies in the group. A 1979 memorandum, regarding use of
Company vehicles, was issued by the Wyomac Director of Health and Safety. It
applies to all persons assigned a company car or who are employees of Wyomac
and/or any other company "under the contract" of Wyomac. The memorandum was
distributed to all salaried personnel of Robinson Phillips, Simron and
Winston. Similarly, an undated booklet, "Safety Practices, Rules, Regulations,
and Procedures for Royalty Smokeless Employees"is also entitled "'Safety
Practices,' 'Rules, Regulations and Procedures' for Employees of Wyomac Coal
Co. and all Operations of the Wyomac Coal Company Divisions."

        Those mines within the group which do not have processing facilities
sell their coal to processing companies within the group, but the companies
assert these sales are arms length transactions.

        Robinson Phillips, Winston and Simron share a common office and office
equipment in Marianni, W. Va., with an office staff which performs bookkeeping
and personnel clerical functions. Each of these mines also maintains a
separate mine office.

        There is evidence that some supervisory personnel have moved from one
of the companies to another. 10/ Supervisors of all these companies appear to
be covered by the same pension plan and receive credit under the plan for prior
service with other companies within the group. Similarly, there is evidence of
interchange of equipment within the group. The companies contend, however,
that free loans of equipment between arms'-length entities are common within
the industry. It is thus not clear what, if any, significance should be
attributed to the interchange of equipment.

2. Rawl Group. This group is headed by the non-signatory Rawl Sale & 
Processing, Inc. and includes signatory companies Sprouse Creek, Tall Timber,
Rocky Hollow, Pikco and Big Bottom. All of these companies are wholly owned
subsidiaries of A.T. Massey. W. B. Massey, Paul Barbery (General Counsel of
Massey Services) and Paul Sobolewski (an officer of A.T. Massey) sit on the
Board of Directors of each company. 11/ Until recently Sidney Young III was
president of Rawl and president or Board member of most of the operating
companies in the group. (He now works for a company unrelated to A. T.
Massey.)

        With respect to labor relations, applicants for employment at any of
the Rawl group facilities submit applications and are interviewed at the Rawl
facility. Interviews for all companies are conducted by a panel consisting of
Arch Runyon--who has been introduced to the Union as an employee of Blackberry
Creek and is also referred to as Personnel Director of Rawl--, other Rawl
personnel staff and one or more presidents of operating companies, selected on
a rotating basis. There is some evidence that employees working for one
company have been carried on another company's records. Employees have no
panel rights within the group. Managers at the individual companies direct

---

10/ It may be that the "transfers" are accomplished by having these individuals
     formally terminate their employment at one company and become hired by the
     other.
11/ Sobolewski may not be a member of the Board of Pikco.

employees in day-to-day performance of their work and process grievances at the first and second step. Runyon handles grievances for all the companies at the third and fourth (arbitration) step. Runyon is also a member of the negotiating team of each company in the current negotiations.

With respect to integration of operations, the signatory companies are all "contract mines" for Rawl or for Blackberry Creek Coal Co., another A. T. Massey subsidiary in the group which employs no unit employees and has never been signatory to an agreement with the Union. In fact, Blackberry Creek seems to share some of the functions performed by the Resource Group head company. Rawl admits that it provides administrative and professional services such as engineering, bookkeeping, payroll and accounting and safety training to the operating companies in the group. Blackberry Creek provides engineering and bookkeeping services to the companies under contract to it. 12/ Rawl owns the coal processing facility operated by Sprouse Creek. It leases the facility and equipment to Sprouse Creek. Rawl also has one contract mining arrangement at the present time--with Rocky Hollow. 13/ Blackberry Creek owns or leases all the lands on which Tall Timber, Big Bottom and Pikco operate. 14/ It provides the equipment used at these mines. All or almost all of the coal mined by Rocky Hollow, Tall Timber, Big Bottom and Pikco is processed at Sprouse Creek. Tall Timber and Pikco told the Union that its coal is stockpiled at Blackberry Creek which arranges for its transport to Sprouse Creek and sales to customers.

The Union presented some evidence of interchange of equipment within the group. As with similar evidence regarding Wyomac, the significance of this evidence is not clear. (See supra p 5). Supervisory personnel have worked for more than one of the companies but the companies contend that each terminated his employment at one company before being newly hired at another.

3. Dehue. Dehue Coal Company was purchased by A. T. Massey in 1982 from Jones & Laughlin. 15/ Although Rawl Sales & Processing provides some services to Dehue, the company contends it is not considered part of the Rawl Resource Group. In the 1983 Keystone Coal Industry Manual, an industry publication, however, the Massey advertisement refers to Dehue as "Massey's newest acquisition in the Rawl Resource Group." Dehue president, Richard Zigman, was previously employed as a project engineer by Rawl Sales & Processing. Prior to Zigman the company president was Sidney Young III (who had also been president of Rawl and other subsidiaries in the Rawl Group). As with all the other Massey subsidiaries, W. B. Massey is the Secretary of Dehue.

---

12/ Rawl charges the companies 10 cents per ton of coal for these services. This charge apparently does not vary with the frequency of the use of services. There is no evidence regarding the financial arrangement between Blackberry Creek and its contract mines.

13/ In the past Rawl has entered into contract mining arrangements with other companies as well.

14/ Blackberry Creek also currently has contract mine arrangements with other companies, some of which are not A. T. Massey subsidiaries.

15/ When it was owned by Jones & Laughlin, Dehue was signatory to the 1981 NBCWA. It retained all the former employees after the purchase by A.T. Massey and remained a signatory to the 1981 NBCWA.

Zigman told the Union during negotiations that most of Dehue's coal is sold through Massey Sales. About half of its production goes to Jones & Laughlin pursuant to a long term contract negotiated by Young. The other half is sold on the spot market to customers developed by Massey Coal Sales. Proceeds for all sales go directly to a Richmond accounting firm retained by A.T. Massey to keep books and records for all its companies. Dehue's payroll records are kept at the Dehue offices but all other financial records are kept in Richmond.

Rawl provides engineering services to Dehue. Some equipment has also been purchased from Rawl but there is no indication this was not a bona fide arms length sale.

With respect to labor relations, although Rawl personnel director Arch Runyon handled some grievances for Dehue shortly after it was acquired by A. T. Massey, Dehue contends that all such matters are now handled by Dehue's personnel manager. The company retained the same insurance carrier which had provided health benefits when the company was owned by Jones & Laughlin. 16/ There is no evidence of employee interchange with other Massey subsidiaries and no evidence regarding the company's hiring practices. The negotiating team consists of Zigman, another Dehue manager and attorney Forest Roles of the Smith, Heenan firm.

4. Pike County Group. This group is headed by non-signatory Pike County Coal Co., Inc., and includes signatory companies, TCH, Joboner and Hopkins Creek. 17/ All of these companies are wholly owned subsidiaries of A.T. Massey. 18/ Until recently Scott Kiscaden was president of both Pike County Coal Co. and TCH and Charles Hibbits was president of both Joboner and Hopkins Creek.

Information regarding the operation of the companies has been obtained from depositions recently taken from: Scott Kiscaden, president of Pike County, Tommy Dales, president/superintendent of Joboner, 19/ Randy May, president/superintendent of TCH, and Jess Justice, president/superintendent of Hopkins Creek. 20/

With respect to labor relations, Dales of Joboner testified that he consults Roger Cantrell, Pike County Safety Director, when he has labor problems regarding safety; other grievances he resolves on his own. Justice of Hopkins Creek testified that although he is responsible for the final decision on labor relations problems, he will consult with Cantrell, May, Dales or Kiscaden if he is dealing with a matter he has not previously encountered.

---

16/ After the sale Dehue switched from a straight premuim to a self insured program administered by the carrier.

17/ As noted at n. 3 supra, Hopkins Creek elected to remain in the ECOA in 1984 and is party to the 1984 NBCWA.

18/ In a deposition taken recently Scott Kiscaden, president of Pike County Coal testified that Sycamore Mining Co., an A.T. Massey subsidiary, holds the stock of Joboner.

19/ Dales' health insurance identification card states his employer is TCH.

20/ These depositions were taken by the Union in connection with a Section 303 suit filed by TCH against the Union.

Roger Cantrell handles step three grievances and arbitrations for all these companies. Justice further testified that he did not make the decision to give Hopkins Creek employees a vacation bonus and does not know who did.  Justice did not make the 1983 decision to close a section of the mine and to layoff employees and does not know who did. 21/ Cantrell also conducts all safety training for employees of these companies.  In the current negotiations, Cantrell is a member of the negotiating team for TCH and Joboner.

With respect to management and integration of operations, the companies assert that the president/superintendent of each mine is independently responsible for its operation. However, there is evidence that these officials are not independently responsible. May of TCH testified he had no idea as to his profit per ton of coal and could not recall the contract price per ton for coal sold or transferred nor could he recall the production cost per ton at TCH. May considers TCH "a Massey operation" and states "it is understood" he answers to Kiscaden. Dales of Joboner testified that all of Joboner's coal is transported to TCH, that he receives no check for proceeds of the sale of coal. He does not keep the company's books and does not know who does. He signs checks only for the company's payroll and does not know where the money for the payroll comes from. He does not know if the company maintains any other bank accounts and he has no access to funds other than the payroll account. He does not pay for supplies or equipment purchased for the mine and does not know who does. Kiscaden testified that Pike County tracks the weekly costs of Joboner and Hopkins Creek and gives each mine a monthly report. Dales testified he receives a weekly cost sheet from Buddy Glenn, the comptroller for Pike County, showing Joboner's expenses compared to its income. Jess Justice of Hopkins Creek testified that all of Hopkins Creek Coal is delivered to TCH. He does not know whether there is any contract written or oral, between Hopkins Creek and TCH regarding this arrangement. Hopkins Creek does not receive funds from TCH for this coal and Justice does not know from whom Hopkins Creek receives money. He does not know the price the mine receives for its coal or what the company's profit is. He knows the cost of producing coal from weekly cost sheets. He does not know who prepares them; he receives them from Randy May (president of TCH). Justice signs the paychecks for all employees of the company but he does not know who sets his salary or how it was determined that he would receive a raise. Similarly he does not know whether he is covered by a pension plan, life insurance or Workers Compensation and does not know whether the company's health insurance plan is a self insured program. He does not pay for purchase of equipment or supplies for the mine. Pike County admits that it provides engineering and accounting services to the companies in the group. The companies are charged a fee per ton.

21/ He was superintendent but not president of Hopkins Creek at that time.

5. _Other evidence._ The Massey Doctrine is a document prepared by E. Morgan Massey, president of A.T. Massey. It purports to be a statement of the "philosophy of Massey Coal Company," and a "planning framework for defining reponsibilities in a manner designed to achieve its corporate objectives effectively and responsibly." The document articulates a management strategy based on resource units as the corporate operating unit. The document defines a "resource unit" as "a geographically contained pool of coal reserves, labor, capital and management" and further as "one or more coal properties within a reasonable proximity in a common labor market under a single management organization with a separately assigned or identified quantity of capital available." The management strategy recommended is to "organize Massey Coal Company into decentralized mining operations (resources units) with support functions, including engineering, accounting, purchasing and personnel, as close to the operation as is practical."

A.T. Massey admits that "The Massey Doctrine" was prepared by Morgan Massey but contends that it was merely a set of recommendations drafted in 1982 at the request of the partnership which had recently taken over A.T. Massey. 22/ It contends that the document was never adopted by the A.T. Massey Board of Directors. However, to the extent that the document purports to be descriptive of facts which exist, rather than prescriptive of policies that Morgan Massey recommends, the document is admissible as evidence of how the companies operate. Of course, as to prescriptive matters, there is a need to produce evidence that a particular recommendation in the Doctrine has been implemented. This matter is further discussed infra.

B.  Relation of A.T. Massey with Resource Groups
    and Operating Companies

The Union alleges that A.T. Massey, in conjunction with its service subsidiaries Massey Services and Massey Coal Sales, constitute an integrated enterprise with the operating companies so as to be considered a single employer.

First, with respect to ownership and financial control, all of the companies share a common ownership in that A.T. Massey is owned by the St. Joe/Scallop joint venture and the remaining companies are subsidiaries of A.T. Massey. By virtue of its ownership of the operating companies, A.T. Massey appoints the officers and boards of directors of the companies. William Blair Massey, who is Secretary of the operating companies, also holds that office in A.T. Massey and Massey Coal Sales. Paul Barbery and Stanley Sobolewski, who as noted above, sit on the boards of several of the Rawl group companies, are respectively, Sr. Vice President/ General Counsel and Vice-President-Planning and Development/Treasurer of A.T. Massey.

With respect to integration of operations and management, as noted above, the companies contend the officials of each operating company have total responsibility for the operation of their companies. In contrast, the Massey Doctrine articulates a corporate strategy of management at the resource group level for the production of coal. The Doctrine also sets forth a sales strategy at still a higher level. In this regard, it describes a

---

22/ See p. 1, supra.

Cases 9-CA-21448-1-9, et al.        - 10 -

"regionalized" sales strategy for handling sales planning and direction and contract service and administration through the three Massey sales companies: Massey Coal Sales (for sales in the U.S. and Canada), Massey Coal Export Co. (for sales to all other countries) and Tennessee Consolidated Coal Co. (for sales of Tennessee-and Alabama-produced coal to all areas). Furthermore, the Doctrine acknowledges that a decentralization policy is limited by the need to coordinate the decentralized units in keeping with the "overall objectives, plans and controls [of] overall management." Accordingly, "a strong centralized policy making team is necessary to develop market planning, production, financial and human resource planning and control." Thus, the Doctrine assigns to "central staff" responsibility for "developing and implementing guidelines and developing overall strategies and action plans, predicting future sales needs and directing overall sales planning." And, it concludes:

> The following responsibilities clearly belong to the central management team
>
> * Corporate Planning
>
>> --Sales analysis and planning
>> --Financial analysis and planning
>> --Tax planning
>> --Human resource planning
>
> * Financial Control
>
>> --Corporate reporting
>> --Internal audit
>
> *Corporate and Legal Administration
> *Resource Unit Development and Control
>
>> --Explorations
>> --Operations Control
>
> *Public, Government, Partnership Relations
> (emphasis added)

As noted above, A.T. Massey denies that the Massey Doctrine was ever adopted in its entirety. The following independent evidence in addition to the descriptions of the Resource Groups in Part A, supra, is relevant to show the implementation of the Doctrine's recommendation that A.T. Massey retain a central management function.

"The Massey Story II" a 1983 sales publication of A.T. Massey describes the operation of the "Massey organization." Under the heading "Massey Operating Headquarters" the document states "To effectively manage A.T. Massey's vast resources of coal, labor and capital, Massey provides direction and support to its Resource Groups through its executive offices in Richmond, Virginia and three regionally located operating service groups: Massey Coal Services in Beckley, West Virginia; Pennsylvania Mine Services in McMurray, Pennsylvania and Tennessee Consolidated Coal in Jasper, Tennessee."

Further evidence of central control by Massey is found in statements made by James Joyce, former president of Wyomac and since June 1984, a consultant to Wyomac. 23/ According to Joyce, 24/ Massey operates with a "centralized . . . policy team that plans virtually everything." The team included the Vice-President of Finance, John Smith who was formerly A.T. Massey Vice President of Mining and is now President of Massey Services, and E. Morgan Massey, himself. Joyce and other Resource Group heads attended regular monthly "operating" meetings with these A.T. Massey officials. Topics for discussion included the financial condition of companies, safety issues and labor relations. Joyce further stated that "division heads" [i.e. resource group heads] could be called into other "policy team" meetings when a matter under discussion affected their division or they had particular expertise. The division heads also participated in annual corporate level planning meetings. The division head would prepare a financial analysis for his company and would present five and ten year plans including financial forecasts for the division, expansion plans, need for capital outlay, total money needed for the division, anticipated return on investments and forecasts for the number of employees. These budgets were subject to approval and modification by Morgan Massey and Smith.

Joyce stated that division managers had broad authority to run their operating companies as they saw fit but on many occasions they would consult directly with Mr. Massey regarding a particular decision.

Scott Kiscaden, president of Pike County, corroborates Joyce in some respects. In a deposition in the TCH litigation Kiscaden testified that he answers primarily to John W. Smith, whom Kiscaden described as director of all mining operations.

In a related vein, John Smith testified regarding the function of Massey Services in an August 1983 deposition pursuant to litigation between Marrowbone Development Co., another Massey subsidiary, and the Union. At that time, Smith was the president of Marrowbone as well as the Vice President of Mining for A.T. Massey and a Vice President of Massey Coal Services. He testified that the function of Massey Services is to provide mining expertise services to the Massey companies. Specifically, Massey Services provides "mining consultation services, preparation services, some legal services, benefits administration services, geological services." When asked to name the companies he deals with as part of his job at Massey Services, Smith's response

---

23/ The statement was made to a person who furnished the Region with an affidavit.

24/ Wyomac asserted that it considered Joyce a company representative and refused to make him available for an interview by the Region. In view of this position and Joyce's continuing relationship to Wyomac, it was concluded that the report of his statements constitutes an admission within the meaning of Rule 801 (d)(2)(d) and is not hearsay. That is, even though Joyce was no longer president of Wyomac when he made the statement, the company asserts that he continues to be an agent of the company and it should be argued that his consultant relationship is based on his experience with the company and accordingly his statement comes within the scope of the agency he held at the time he made the statement.

included most of the companies involved in the instant case. 25/ Similarly, Bob Martin, Massey Services prep plant expert, frequently visited the Sprouse Creek prep plant and in mid-1984 discussed with the workers the need to replace the vibrator. After observing its operation, he said it could not be repaired and stated. "I'll see that there is a new one."

With respect to integrated marketing, the 1984 Keystone Manual lists Massey Coal Sales Co. as the sales agent for most of the companies in the instant charge. 26/ Moreover, there is some evidence that A.T. Massey or Massey Coal Sales ultimately controls these contracts, not the operating companies. Kiscaden testified that in March 1983 TCH lost a long term contract to supply coal to "Consumer Power." At around the same time Rawl entered into a written contract to supply coal to Consumer Power. TCH continued to supply coal, filling the Rawl contract after March 1983. Kiscaden tesitifed that he never discussed this arrangement with Rawl, only with Consumer Power and with Ellis Dusenbury of Massey Coal Sales. To Kiscaden's knowledge, TCH does not compensate Rawl for its right to fill the Rawl contract.

Finally, in communications to investors, customers, employees and the public, Massey represents that it is a single enterprise with its subsidiaries. The 1984 Fluor Fact Book reports production and reserves of the A.T. Massey Coal Co. broken down by its "divisions." 27/ Similarly, a 1983 Fluor presentation to security analysts speaks of "Massey's" coal reserves and states "we", that is, St. Joe, "operat[ing] through A.T. Massey," mine "from 23 mines and we have 17 preparation plants" (emphasis added). The report goes on to distinguish Massey production from other coal brokered by Massey but produced by other firms. Similarly, A.T. Massey entries in the Keystone Manual call "Massey Coal" a "full service company" and refer to the "team effort" of Massey Coal Sales, Massey Coal Export Co., A.T. Massey and the "widespread coal production network." Another entry states "Massey subsidiaries collectively are now the second largest producer in the East." The operating subsidiaries display the Massey "Flaming M" logo on various official items such as company buildings, publications distributed to employees, badges, stickers, hats and other items distributed as safety awards or other incentives. The A.T. Massey company newsletter reports on activities of the operating companies and refers to individuals employed by the operating companies as A.T. Massey people.

With respect to control of labor relations, Joyce stated that Massey arranges for training in labor relations for supervisory and managerial employees in all the operating companies. He further stated that a Massey benefits committee consisting of John Smith, Paula Lowe, the A.T. Massey Vice President for Human Resources, an accountant and "someone from legal" would

---

25/ Specifically, the list included Rawl, Blackberry Creek, TCH, Pike County Coal, Sprouse Creek Processing, Rocky Hollow, Shannon Pocahontas, Big Bear, Robinson Phillips, Winston. The testimony does not seem to be an exhaustive list of the Massey companies which use Massey Services.

26/ In the Wyomac group: Big Bear, Robinson Phillips, Royalty Smokeless, Trace Fork, Shannon Pocahontas; in the Rawl group: Rawl Sales & Processing, Blackberry Creek, Sprouse Creek and Dehue; in the Pike County group: TCH.

27/ To the same effect is "The Massey Story" a sales document.

make decisions regarding benefits for all salaried employees and non-union wage employees in the Massey subsidiaries. Joyce further stated that although division heads are authorized to make decisions regarding layoffs, he would consult with Morgan Massey before implementing a layoff if it would affect the entire Massey operation. Joyce states that labor relations were among the topics covered in the monthly operating meetings.

With respect to collective bargaining, Joyce stated that the decision of the signatory companies to withdraw from the BCOA and negotiate independently was discussed at monthly operating meetings. He said that the plan "from the beginning was to go non-union." Joyce stated that he had been a prime advocate for that approach. He further stated there was no disagreement among the Resource Group members about withdrawing from the BCOA. Morgan Massey attended these meetings and listened to the discussion but did not make the direct decision. He "supported the recommendations of the division heads." In addition, lawyers were brought into these meetings to "school" the participants as to how to conduct themselves in negotiations. When asked whether "Massey" hired the lawyers, Joyce replied, "I'm not sure he [Morgan] did. That would come under Mr. Barbery." Paul Barbery is a vice-president and General Counsel of A.T. Massey. 28/ Joyce also pointed out that these lawyers could then be hired by a division head to handle labor matters for his group.

Joyce also described preparation of negotiating demands. He and Wyomac Personnel Director Harsanyi met with the general managers of the operating companies, compiled a list, in rank order, of the 10 most important items for a contract and noted those that were strike issues. Joyce submitted these lists to David Smith of the Smith, Heenan law firm. Joyce said that the division heads had the responsibility to decide whether to offer to work under the old agreement but that they "would have talked with Mr. Massey personally" before making such a decision.

At the October 22 bargaining session with M & B, Union negotiator Phalen questioned who was calling the shots in the negotiations. According to an affidavit from Union negotiator Larry Harless, Barbara Krause, attorney for M & B, replied "that they may have to check with somebody to make decisions at the bargaining table but M & B was a separate company."

During the negotiations, copies of newspaper articles critical of the Union have been mailed to Robinson Phillips employees anonymously. The Region has concluded that these were mailed by Massey Services.

C.  Analysis--Single Employer

As discussed above, all of the operating companies are owned by A.T. Massey; they are held out to the public as part of the Massey Coal operation; and they are significantly dependent on the Resource Group and Massey for financing, operational assistance, marketing, and development and implementation of labor relations policy. In these circumstances, A. T. Massey and the Resource Groups must be considered part of a single employing entity

_28/ In 1982, Barbery circulated a memorandum to all the operating companies instructing them that it was company policy not to respond to a request for certain information from the Union pension fund.

with the signatory operating companies. Accordingly, complaint should issue, absent settlement, alleging that the signatory companies, the Resource Group heads and A. T. Massey violated Section 8(a)(5) by refusing to acknowledge their status as a single employer at the bargaining table and by refusing to bargain over panel rights as a single employer.

        The legal standards for determining single employer are clear. Nominally separate corporations may be found to be a single employer where they constitutue a single integrated enterprise. The controlling criteria to which the Board and courts look in determining this issue are whether the ostensibly separate entities share common ownership, common management, interrelation of operations and centralized control of labor relations. Radio & Broadcast Technicians Local 1264, IBEW v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 256 (1965). Entities will not be found to be single employers merely because one has the potential power or authority to control the other. Los Angeles Newspaper Guild Local 69 (Hearst Corp.), 185 NLRB 303, 304 (1970), enf'd 443 F.2d 1173 (9th Cir. 1971) cert. denied, 404 U.S. 1018 (1972). But where there is "something more in the form of common control, . . . denoting an actual as distinct from a merely potential, integration of operations and management polices," the entities may be found to be a single employer. Miami Newspaper Pressman's Local No. 46 v. NLRB, 322 F.2d 405, 408 (D.C. Cir. 1963). Accord, Royal Typewriter Co., 209 NLRB 1006, 1009-1012 (1974), enf'd 533 F.2d 1030 (8th Cir. 1976); The Arundel Corp., 252 NLRB 397, 399 (1980); Overton Markets, 142 NLRB 615, 619 (1963). See also Teamsters Local 560 (Curtin Matheson Scientific, Inc.), 248 NLRB 1212, 1214 (1980).

        Moreover, the fact that a local entity is accorded a degree of autonomy in control of day-to-day operations does not preclude a finding of single employer status among entities which are otherwise integrated. Sakrete of Northern California, Inc., 137 NLRB 1220, 1223-1224 (1962), enfd. 332 F.2d 902 (9th Cir. 1964), cited with approval in Broadcast Service of Mobile, 380 U.S. at 256. Accord, Royal Typewriter, 209 NLRB at 1010. In sum, where the control exercised by one entity over another, ostensibly separate, entity is not characteristic of an arm's length relationship between unrelated companies it is appropriate to find a single employer relationship. Blumenfeld Theatres Circuit, 240 NLRB 206, 215 (1979), enf'd 626 F.2d 865 (9th Cir. 1980). Accord: Penntech Papers, Inc., 263 NLRB 264, 282 (1982), enf'd 706 F.2d 18 (1st Cir. 1983). See also Local 627, Int'l Union of Operating Engineers v. NLRB (Peter Kiewit Sons, Inc.), 518 F.2d 1040, 1046-1047 (D.C. Cir. 1975); affd. on this point 425 U.S. 800 (1976). NLRB v. Local 810, Teamsters (Sid Harvey, Inc.), 460 F.2d 1, 5-6 (2d Cir. 1972).

        Applying these principles to the evidence set forth supra, we note initially the uncontradicated fact of common ownership. Although common ownership of these companies is not, in itself, sufficient to establish single employer status, it signifies a relationship and authority among entities that does not exist among separately owned companies and is therefore indicative of single employer status. This is particularly true in the instant case where A.T. Massey not only holds all the stock of the operating companies but also directly, or through the Resource Groups, provides the operating capital for many of the companies. Thus, in the Rawl Group neither Sprouse Creek nor the contract mine operations have made any investment in land or equipment.

Similarly, the testimony of the president/superintendents of the Pike County
operating companies establishes that they do not arrange for the financing of
purchases for their mines and, indeed, do not even know the source of the
financing. 29/

        Second, the operating companies can be viewed as parts of an
integrated operation engaged in the production, sale and distribution of coal
for A.T. Massey, and to that end these companies are subject to the direction
and control from the Resource Groups and the Massey corporate level staff.
Thus, Massey's public descriptions of its enterprise portray the operating
companies as part of a single integrated operation. Further, it is clear that
the individual operating companies do not function as self-contained entities
even with respect to the operation of their respective mines. Employees have
been interchanged within the Resource Groups. Operating mines within each
Resource Group have no staff to perform engineering, accounting, bookkeeping
and other administrative functions necessary to the operation of the mine. The
evidence submitted shows that the Resource Groups and Massey Services were
created for the purpose of performing, and do perform these functions for the
operating companies. There is no evidence that individual mine superintendents
have ever departed from these arrangements. Similarly, the superintendents do
not independently arrange for the processing and sale of their coal but deliver
it (or rely on other operating companies to deliver it) to Massey owned
processing plants for processing and ultimate sale to customers developed by
Massey Coal Sales. Again there is no evidence that mine superintendents
exercise any independent decision making with respect to the processing or sale
of the coal for their mines. Indeed, the example of the Consumer Power
contract indicates that Massey Coal Sales will arrange for contracts to be
filled from subsidiaries other than the contracting subsidiary without
consulting the contracting subsidiary.

        It further appears that although Resource Group heads have broad
authority regarding the operation of their Group, they are themselves
nevertheless subject to direction from the Massey corporate level. The
evidence from "The Massey Story II", the statements of Pike County president
Kiscaden and, most importantly, the statements attributed to former Wyomac
president Joyce regarding the monthly operating meetings and the annual
planning meetings all suggest the implementation of that portion of the Massey
Doctrine which assigns to a central management staff responsibility for overall
policy planning and control of operations.

        There is evidence of common management in that officials of A.T.
Massey serve as directors on the boards of the Resource Groups and the
operating companies and that many of the companies within a particular Resource

_____
29/ The Region should also introduce any similar evidence that it discovers
regarding the Wyomac Group companies and any evidence regarding the
financing arrangements between the Resource Groups and A.T. Massey. The
evidence submitted regarding the financial arrangements between A.T. Massey
and its Marrowbone subsidiary was not considered probative of A.T. Massey's
relationship with the subsidiaries in the instant case. However, evidence
that the operating companies or Resource Groups in the instant case operate
on a similar cash advance system would be relevant. See Royal Typewriter
Co., 209 NLRB at 1007 and 1010.

Group now share, or in the recent past have shared, common presidents. 30/ The president is the official that the company contends is responsible for operations.

Finally, there is ample evidence that the development and implementation of labor relations policy for the operating companies are subject to the direction and control of the Resource Groups and Massey corporate level staff. The Joyce statement indicates that benefits for salaried and non-union hourly employees are determined and administered on the Massey corporate level. The companies admit that managerial personnel in the Wyomac group are covered by the same pension plan and receive credit for prior service with Massey subsidiaries. There is further evidence that other, albeit not all, Massey subsidiaries participate in the plan. Further, Joyce's statement indicates that labor relations were among the topics discussed at the monthly operating meetings and that staff of A.T. Massey arrange for training in labor relations for managerial and supervisory personnel at all levels. This is consistent with the Massey Doctrine which reserves for central staff responsibility for human resources planning.

With respect to the unit employees in the operating companies, it is clear that processing applications for employment and hiring decisions are handled at the group level in the Rawl group and shared among operating companies in other groups as well. Within all groups there have been occasions in which employees ostensibly employed by one company have performed services for another company or have been carried on the books of another company. The statements of Joyce and Justice indicate that decisions to layoff are made above the operating company level, and, if significant, are made in consultation with the Massey level. Safety training is conducted by Resource Group personnel. Grievance processing at the third and fourth step is handled by Resource Group personnel.

Finally, with respect to the current contract negotiations, it would appear that the operating companies have not acted independently with respect to the decision to withdraw from the BCOA, the development of negotiation proposals, the conduct of negotiations or dealings with employees. According to Joyce, a joint strategy "to go non-union" 31/ was arrived at by the Resource Group heads at monthly operating meetings attended by Morgan Massey and other corporate staff. Lawyers were brought into these meetings by someone at the Massey level to instruct the Resource Group heads on how to conduct themselves in negotiations. Joyce further stated that Resource Group personnel were involved in the development of negotiating proposals and it is clear that the Resource Group personnel are participating as members of the negotiating team in the current negotiations. Moreover, both Joyce's statement that a proposal to extend the old agreement would have to be discussed with Morgan Massey before being offered to the Union and Krause's statement that M & B negotiators may have to check with somebody to make decisions at the bargaining table imply that the companies' positions at the bargaining table are subject to review by Massey level representatives. Similarly, as noted above pp. 4 and 13, Massey Services has been involved in communicating to unit employees the companies' bargaining positions.

---

30/ Lester in the Wyomac group, Young in Rawl, and Kiscaden and Hibbits in Pike County.

31/ We understand this to refer to the decision to withdraw from the BCOA.

Based on the foregoing, it was concluded that the operating companies the Resource Groups and A.T. Massey share common ownership, common management, common control of operations and common control over significant aspects of labor relations and accordingly must be viewed as a single employer. As such, Wyomac, Rawl, Blackberry Creek, Pike County and A.T. Massey are all obliged to recognize and bargain with the Union in the units in which the Union is recognized as the representative. For this reason it was concluded that the operating companies' insistence in negotiations that they are separate employers and the refusal by the Resource Group heads and A.T. Massey to acknowledge their single employer status in bargaining constitutes a refusal to bargain. 32/

Furthermore in view of the conclusion that all of these companies constitute a single employer, by taking the position that they do not have authority to bargain about panel rights at any but their own operating company, the operating companies have further violated Section 8(a)(5) by refusing to bargain over a mandatory subject of bargaining. Thus it should be argued that the Union's panel rights proposal seeks to insure continued employment of unit employees in the event of the closure of their facility and is therefore a term or condition of employment within the meaning of Section 8(d). See Royal Typewriter Corp., 209 NLRB at 1015; NLRB v. Transmarine Navigation Corp., 380 F.2d 933, 939 and cases cited (9th Cir. 1967). Contrary to the companies' suggestion, Utility Workers Local 11, 203 NLRB 230 (1973) is inapposite. Here, unlike Utility Workers, the current evidence does not establish any insistence merging the bargaining units or conditioning agreement in one unit on obtaining agreement in all units. Rather, the Union agreed to the companies' demand to bargain separately. The Union has simply demanded, in each unit in which it is bargaining, that the employer agree that it will grant panel rights in all other units in the event of a closure. As noted above, however, this is a demand relating to the placement of unit employees in the event of a shut-down. The fact that the placement is to be outside the unit does not gainsay the essential point that it is a proposed benefit for unit employees. To be sure, the Union has made an identical demand in every unit in which it is bargaining and has indicated that panel rights are the central issue to these negotiations. But as the Board made clear in Utility Workers, a Union does not violate Section 8(b)(3) by engaging in pattern bargaining. 203 NLRB at 239. Further, the Union in that case was found to have acted unlawfully because it delayed and impeded negotiations and withheld settlement in some units in order to accomplish its aim of achieving a pattern agreement. That is not the case here. Indeed, because each operating company has refused to acknowledge that it has the authority, as part of a single employing entity, to grant panel rights in other units, for its employees, it has been the companies who have stifled the chances for an agreement in any unit.

Finally, we find unsupported the defense that the Union is not intent on reaching agreement but only on punishing the companies for having withdrawn from the BCOA. As discussed above, all of the proposals relate to mandatory subjects of bargaining in appropriate bargaining units. There is no independent evidence that the Union will not enter into a contrasct if its bargaining demands are met. And, at present, there is insufficient evidence to

32/ As the Union concedes, it cannot lawfully insist that any particular representative of A.T. Massey and the Resource Groups come to the bargaining table. These entities could meet their bargaining obligation by delegating to the operating companies full authority to bargain on their behalf.

establish that the Union's proposals are designed to be punitive. 33/
Consequently, the companies' defense must be rejected. 34/

III.  Single Employer Information Request ("Second Information Request")

The Union presented its second information request during either its
first or second meeting with each operating company.  This request asked each
company to identify:  (1) the company's officers and directors and the names of
other Massey-related companies in which they held similar positions; (2) the
individuals who performed labor relations functions for the company and other
Massey-related companies; (3) its customers who were then, or were formerly,
customers of any other Massey-related company; (4) individuals who performed
clerical, administrative, bookkeeping, managerial, engineering, sales,
estimating and other services for the company and any other Massey-related
company; (5) any common insurance carrier for the company and any other Massey
related company; (6) any equipment transactions between the company and any
other Massey-related company; (7) any employees, supervisors or managers who
transferred between the company and any other Massey-related company; and
(8) the entire hiring procedure used by the company.

Upon receipt of this request, each company responded that the
information was not relevant to the ongoing collective bargaining.  The Union
replied that the information was necessary for several purposes:  (1) to
formulate bargaining proposals concerning panel rights, common committees to
deal with health and safety, grievance and mine communication matters, common
health benefits, and common job training; (2) to ascertain the identity of the
employer with which it was bargaining; and (3) to determine which mines it
could picket without incurring Section 303-8(b)(4)(B) liability.

The final responses of the operating companies varied; some provided
none of the information requested, some provided some information; and some
provided virtually all.  All of the companies continued to question the
relevance of the information and some asserted other justification for refusing
to provide the information, such as compliance, confidentiality, the Union's
alleged bad faith bargaining, and mootness because a company had closed.

---

33/ It was further concluded that the Union's delays in commencing negotiations
and the lapse of time between bargaining sessions with each company did not
constitute refusals to meet at reasonable times in view of the unusual
demands on the Union's time created by massive defection from the BCOA and
in view of the insistence of the individual companies in the instant case
to meet separately.

34/ We reach this conclusion based on the evidence submitted by the companies
in defense to the Section 8(a)(5) charge.  Several of the companies
recently filed Section 8(b)(3) charges raising similar allegations.  It may
be that these companies will adduce additional evidence on this point.
After its investigation of these charges, the Region should submit these
cases to Advice, together with its view as to whether the additional
evidence supports this defense to the 8(a)(5) charge.

On October 26, the Union served the same information requests upon A.T. Massey Coal Company and the operating companies heading each resource group. These companies have completely refused to provide any information, on the ground that they are not the employers of Union-represented employees.

We have concluded that the information requested was relevant to collective bargaining. An employer's duty to bargain in good faith includes the duty to provide the union with requested information that is relevant to the negotiation and administration of a collective bargaining agreement. 35/ In Associated General Contractors of California, 242 NLRB 891 (1979), enfd. 633 F.2d 766 (9th Cir. 1980), the Board emphasized that relevance is the key to the union's right to receive information and that relevance should be judged on a broad "discovery-type" standard to permit the union to evaluate for itself which claims to press in bargaining. In keeping with this view the Board has held that information concerning terms and conditions of employment within the bargaining unit is presumptively relevant. Information regarding matters outside the bargaining unit must be provided only upon an affirmative showing of relevance. 36/ Specifically, the Board has found information necessary to establish single employer status relevant to collective bargaining if the union can show an objective factual basis for its belief that such a status exists. 37/ In the instant case, the Union has already submitted substantial evidence that provides an objective factual basis that single employer status exists among Massey, the resource groups, and the operating companies. 38/ Further, since the Union's proposals for Massey-wide panel rights are a key issue in the negotiations, the information necessary to fully establish single employer status is particularly relevant the instant case. For, the legitimacy and force of the Union's arguments in favor of panel rights are based on its single employer claim. 39/

Further, while events subsequent to an information request may make the request moot, 40/ the relevance of the information in the instant case is not mooted by the intervening decision of some companies to close. Although individual companies may close, evidence concerning the manner in which they operated while they were open will help to resolve how the entire Massey complex operates and thus such evidence will shed light on the single employer issue. Further, single employer status is relevant to proposals the Union might make during effects bargaining on such matters as seniority and transfer rights (i.e. panel rights) and the funds available for severance pay. 41/ It

---

35/ NLRB v. Truitt Mfg. Co., 351 U.S. 149, 152 (1956); NLRB v. Acme Industrial Co., 385 U.S. 432, 435-436 (1967).

36/ Ohio Power Company, 216 NLRB 987, 991 (1975).

37/ Leonard B. Hebert, Jr., 259 NLRB 881, 889 (1981); Echemia, Inc., 272 NLRB No. 178 (1984), slip op. at p. 5..

38/ Most of the evidence supporting the conclusion in Section II was provided by the Union.

39/ The fact that the Union might use the information for non-bargaining purposes is not a valid basis for denying the information. Where the Union has a valid reason for obtaining the information, the fact that it may be used for other reasons does not negate the employer's obligation to provide it. E.I. DuPont de Nemours, 264 NLRB 48, 51 (1982).

40/ Glazers Wholesale Drug Co., 211 NLRB 1063.

41/ NLRB v. Transmarine Navigation Corp., 380 F.2d 933, 939 (9th Cir. 1967).

is obviously necessary for the Union to know exactly whom it can look to for bargaining on these matters, particulary where the immediate employer (the operating company) is going out of business. Finally, as discussed infra, the closing itself was unlawful in one instance.

Accordingly, it was concluded that the requested single employer information was relevant to collective bargaining.  Thus, the signatory operating companies were obligated to provide the information requested, absent any of the valid defenses articulated below.  Further, because it has been established that A.T. Massey and the Resource Groups and their companies are single employers, it was concluded that they, too, had an obligation to provide the requested information, also absent any defenses discussed below.

Various companies allege that bad faith bargaining by the Union justifies their refusal to provide the information. However, as discussed supra, pp. 17-18, there is insufficient evidence at present to establish that the Union's intent was not to reach agreement but to punish the Massey companies for withdrawing from the BCOA. Accordingly, it was concluded that the assertion of bad faith bargaining is not a valid defense for any of the companies herein.

With respect to compliance, several of the operating companies have contended that at least some of they provided all or substantially all of the information and/or that the Union has expressed satisfaction with the scope of the information given. For those companies where this is true, this a complete defense to this aspect of the charge. This principle is applied infra to individual companies.

With respect to confidentiality, several operating companies assert that at least some of the information requested was confidential, and that they asked the Union to agree to restrict the use of the information to collective bargaining and to return it after bargaining has ended. They contend that the Union's refusal to agree privileged their refusal to provide the information. It is well established that an employer's legitimate and substantial interest in keeping relevant information confidential may privilege its refusal to comply with the union's request. 42/  Whether the employer is so privileged turns on whether it has made a reasonable and good faith offer to accommodate its need for secrecy with the union's need for this relevant information. 43/ Where the employer has a legitimate interest in confidentiality of its business records, it may expect reasonable limitations to be placed upon the publicity and distribution of the documents provided. 44/  Further, while the demands for confidentiality in the instant case cover all the information requested, including some public information not normally considered confidential, other information such as customer lists might well be regarded as confidential.  In these circumstances, it was concluded that the Union was obligated to respond to the companies' proposals on since bargaining between the parties could best

---

42/ Detroit Edison v. NLRB,  440 U.S. 301 (1979).
43/ See General Dynamics Corp., 268 NLRB 1432 (1984); General Counsel
    Memorandum 78-22, dated April 9, 1979, at p. 2.
44/ East Texas Fire Protection Co., 265 NLRB 173 (1982).

identify the valid confidentiality claims and enable the parties to reach an agreement to accomodate their respective interests. 45/ Thus, where the Union has refused to engage in bargaining over restriction on the use of the requested information, the company has a valid defense to a Section 8(a)(5) charge.

The foregoing principles will be applied to the conduct of each company as set forth below. Several companies are grouped together, where their conduct, and that of the Union, are similar. The Region should act according to the instructions given with respect to each company or group thereof:

1. <u>TCH and Joboner Coal Companies.</u> These companies have asserted that the information requested was irrelevant to collective bargaining. They also assert that the Union refused to agree that the information would not be provided to competitors or used for purposes other than collective bargaining and refused to agree that such information would be returned after bargaining was completed. 46/ The companies here noted that they were particularly concerned about releasing the customer list requested by the union. The companies offered to participate on a subcommittee to negotiate the confientiality issues; the Union refused. While the claim of irrelevance is invalid, it was concluded that these two companies have a valid confidentiality defense. By offering to bargain about accomodating this confidentiality interest with the Union's interests in obtaining the information, the companies have attempted to make the accommodation contemplated by <u>Detroit Edison.</u> When the Union refused to bargain on this subject the companies were privileged to withhold the information. Thus, the Section 8(a)(5) charge concerning the second information request to TCH and Joboner should be dismissed, absent withdrawal.

2. <u>Big Botton Coal Co., Sprouse Creek Processing Co., Pikco Mining Co., Tall Timber Coal Co., Rocky Hollow Coal Co.</u> The operating companies here assert no defense other than that they have substantially complied with the Union's requests. 47/ While the Union claims that each of these companies failed to provide parts of the information requested, the companies argue only that they have provided all relevant information and that the remaining information had no relevance to assisting the Union to make its proposals. However, as concluded supra, relevance is not a valid defense in the instant case. Therefore, complaint should issue, absent settlement, alleging that these companies violated Section 8(a)(5) and (1) by refusing to provide all of the information requested by the Union.

3. <u>Dehue Coal Corporation.</u> In this case it appears that the company has provided only the information it believed was relevant to the panel rights issue. Since as discussed supra all the requested information was deemed

---

45/ <u>Minnesota Mining & Manufacturing Co.</u>, 261 NLRB 27, 31-32 (1982), enfd. 111 LRRM 3078 (D.C. Cir. 1982) and 113 LRRM 3163 (D.C. Cir. 1983).

46/ The Union's attorney in negotiations excused himself from bargaining because he did not wish to see information at the bargaining table that he was attempting to obtain in a lawsuit concerning these companies.

47/ In the case of Rocky Hollow Coal Co., the Region notes that it was unclear whether the second information request was ever served. However, in its position statement, this Employer does not dispute that the request was served.

to be relevant to collective bargaining it would appear that the company has no compliance defense. The company asserts that it told the Union that it wished to negotiate a confidentiality agreement but that the Union refused, saying that while it would not intentionally disclose the information to competitors, it would use the information for any purpose that it wished. Thus, it appears that this Employer may have a valid confidentiality defense. The Region should investigate which items the Employer refused to disclose and what confidentiality proposal it made and resolve the allegation, applying the Detroit Edison analysis set forth above. If Advice issues remain it should resubmit the case.

4. Royalty Smokeless Coal Company. This company agreed to be bound by whatever contract is signed by M & B Coal Company; As to the information request, it asked for a confidentiality agreement and agreed to provide the information if the Union showed its relevance. The Region notes that the Union apparently did not follow up on this request. Because of the Union's apparent abandonment of its request, this aspect of the charge as to Royalty Smokeless should be dismissed, absent withdrawal.

5. Big Bear Mining Company, Shannon Pocahontas Coal Corporation. Both of these companies assert that the Union has failed to respond to their offers to negotiate a confidentiality agreement. In addition, Shannon Pocahontas claims that its closure makes the request moot. With respect to the confidentiality defense, at this time the companies have offered no statement other than their position letter to support their assertion; the Union's affidavits are silent on the matter. We assume the companies are prepared to offer an affidavit in support of their position. If so the charges should be dismissed, absent withdrawal. If their assertion cannot be supported, complaint should issue, absent settlement. Shannon Pocahontas' mootness defense should be rejected on the grounds discussed supra.

6. M & B Coal Company. This company asserts no defense other than that it would wait for an NLRB ruling on whether the information was relevant. Accordingly, complaint should issue as to this company, absent settlement.

7. Winston Coal Company, Simron Fuel Company. These companies have refused to provide any of the information requested, alleging that it is irrelevant and that the request became moot after their mines closed. As noted supra, these are not valid defenses. Accordingly, complaint should issue as to these companies, absent settlement.

8. Robinson-Phillips Coal Company. In this case, the company claimed that it substantially complied with the Union's second information request. However, it has failed to provide information on customers, common services and transfer of superivsors, informing the Union that it would not do so until the Board rules on relevance. In addition, the company claims that it asked the Union for assurances of confidentiality but that the Union refused. In response, the Union says that it suggested that a committee be formed to discuss confidentiality but that the company instead decided to wait for the Board's ruling. It appears that the Region credits the Union in this respect. Finally, the company asserts that its closure moots the information request. As noted supra, this is not the case. Thus, there are no valid defenses available to this company, so complaint should issue, absent settlement.

9.  A.T. Massey and the Resource Groups.  These companies raise no defenses other than that they are not parts of a single employer complex with the operating companies and, possibly, that the information request is irrelevant to collective bargaining.  Because it has been concluded that their single employer claims have been refuted by the evidence, there is no valid defense available to Massey and the Resource Groups.  Therefore, their refusal to provide the requested information violates Section 8(a)(5) and (1) and complaint should issue, absent settlement.

IV.  The Decisions to Close and Requests for
     Financial Information

A. FACTS

        Six of the companies in the Wyomac group sought concessions from the Union and when the Union rejected concessions, four of these companies announced their mines would close.  The Union alleges that the companies violated Section 8(a)(5) by failing to bargain over the decisions to close and by failing to provide financial information requested by the Union. 46/

Winston-- On September 18 or 19, at the second negotiating session between Winston and the Union, company representatives announced that the mine would be closed effective September 30, 1984 due to the depletion of the reserves at the mine.  The Union concedes that at the time of the announcement there were no more than four months of work left at the mine and the Region has concluded that the decision was based on lack of work.

        The parties met on September 28, October 10, and October 23 to bargain over effects of the decision to close.  During the October 23 session the Union presented a written proposal regarding effects and requested that the company open its books.  The company refused, contending that the Union was not entitled to the information.

Big Bear- On October 8, at the fourth negotiating session between the Union and Big Bear, the company made an extensive statement about its financial condition, asserting that the company was losing 1-1 1/2 million dollars per year and that the future of the company depended on the outcome of the negotiations.  In response to a question from the company the Union asserted that its position was that it would not grant concessions.  The company then made a wage benefit proposal with five alternative mixes of wage and benefits, all less than the existing agreement.  Union representative Harless said the Union would want to see the company's books.  Company representative Oliver responded that if the Union would agree in principle to negotiate concessions, the company would let the Union see the books.  Harless replied that the Union had the right to see the book in order to make that decision.  Before the meeting ended, the parties reiterated their positions--the company asserting it needed 25% concessions and the Union citing Union President Trumka's opposition to concessions.  The parties adhered to these positions in the fifth session on October 24; the company specified monetary figures for its five alternatives; the Union rejected the company's proposals and asserted it would not negotiate a concession contract.  The Union again asked to see the company's books and the company responded that it would open its books only if the Union first agreed to negotiate a contract along the lines of the proposals it had made.

46/ The Union also alleges that these closures were discriminatorily
    motivated.  The Region finds no merit in this allegation and that issue was
    not submitted for Advice.

Shannon Pocahontas. At the fourth negotiating session between these parties on October 8, Company attorney Oliver stated that the company had lost $3 1/2 million in the previous year, it saw no change in income in the future and it was going to propose concessions from the current contract. Union representative Phalen stated the Union would not accept a concessionary contract. The company offered to sell the mine to the Union at a price the Union considered unrealistic. Oliver stated that if the company did not get concessions it would close the mine. He asked if concessions would be made; Phalen responded that this was not likely. Oliver then made a proposal similar to that which he had made on behalf of Big Bear. Union attorney Harless asked to see the company books. The company responded that it would agree to open the books only if the Union agreed to negotiate a concessionary contract. Harless responded that the Union had a right to see the books so it could determine its course of action.

At the next bargaining session on October 24, the company repeated its assertion that it needed concessions; it asserted it did not intend to continue losing money. The parties again discussed a sale of the mine at terms the Union considered reasonable. The company then presented the same proposal that Big Bear had made to the Union, reiterating that it needed concessions. The Union rejected the company's proposals stating that it rejected any other concessionary proposals. The Union again asked to see the company books. The company responded it would open the books only if the Union would agree in principle to negotiate a concessionary contract along the lines of the company's proposal. When Phalen responded that it was the Union's position not to agree to a concessionary contract, Oliver announced that the company would close effective immediately.

Robinson Phillips. At the fifth negotiating session between the parties, on October 9, company attorney Krause stated that the company was losing money and that because of low market demand for the low volatility metalurgical coal produced at Robinson Phillips, the only way the company could survive was with concessions from the Union. She told the Union that the company would make concessionary proposals and asked if the union would agree to concessions. Union representative Phalen responded that the Union would not agree to concessions. Krause repeated her arguments that the company was losing money and needed concessions. Phalen again stated the Union would not agree to concessions. The company then took a short break; when it returned to the table it announced tht the mine was closing effective that day. The company offered to engage in effects bargaining. The Union concedes that it did not request to see the company's books at that meeting. There is no evidence that it asked to see the books in subsequent meetings.

Simron. At the third bargaining session between the parties, in the afternoon of October 9, company attorney Krause repeated the position she had taken that morning on behalf of Robinson Phillips, asserting that there would be jobs at Simron with lower wages and benefits or no jobs at all and unless the Union agreed to concessions the mine would close. The Union representatives took a short break; when they returned to the table Union representative Phalen stated the Union could not agree to any concessions. Krause responded that, in those circumstances, Simron had no alternative but to close immediately. Harless' affidavit does not reflect that at this meeting the Union asked the company to open its books.

The parties met again on October 22, to bargain over the effects of the closure. Harless states that at this meeting he again asked to see the company books. The company took the position that it had no obligation to produce the books.

M & B. At the third negotiating session between the parties, on October 10, the company asserted that it needed to reduce wages and benefits to be economically viable. Company attorney Krause presented proposals similar to the alternatives proposed by Big Bear. The Union rejected the proposals. The Union asked to see the books. Krause said the books would be made available if the Union first agreed to negotiate a contract along the lines of the company's proposal. Union attorney Harless responded that he believed the Union was entitled to see the books before making that decision.

## B. Analysis-Decision to Close

In view of the conclusion that the companies which closed are but individual parts of a larger single employer, these closures were not tantamount to a total going out of business. Thus, the issue of whether there is a duty to bargain is governed by Otis Elevator, 269 NLRB No. 162 (1984). That is, whether the company was required to bargain about the decision depends upon whether the decision turned on labor costs and whether the decision was amenable to resolution through the collective bargaining process.

Applying these principles to the instant case it was concluded that, inasmuch as Winston's decision to close was based on the depletion of the reserves in its mine, this decision was not amenable to change through the collective bargaining process. See Otis Elevator, 269 NLRB No. 162 (1984). Accordingly, absent withdrawal, the Region should dismiss the allegation that Winston violated Section 8(a)(5) by refusing to bargain about this decision.

With respect to the decisions of Shannon-Pocahontas, Robinson Phillips and Simron, it was concluded that the companies' statements at the bargaining table detailed above, make clear that the decisions to close these facilities turned on whether the Union would agree to reductions in labor costs. Accordingly, under the Otis Elevator analysis these decisions were mandatory subjects of bargaining.

It was further concluded that Robinson Phillips and Simron fulfilled their duty to bargain over this decision. Thus, both companies sought concessions from the union and made clear that the company's survival depended on obtaining concessions. 49/ The Union rejected the company's proposals and made no further inquiries or proposals directed toward the company's announced

---

49/ Simron explicitly warned the Union that it would close absent concessions. Robinson Phillips told the Union that the only way the company could survive was with concessions. It was concluded that the Robinson Phillips statement was sufficient to put the Union on notice of the significance of the company's request.

intention. 50/  In these circumstances, it was concluded that these companies had no further obligation to bargain before implementing their decisions to close and the Region should dismiss these allegations, absent withdrawal.

It was concluded, however, that Shannon-Pocahontas has not satisfied its obligation to bargain about the decision to close its facility.  In the negotiations with this company, the Union responded to the company's requests for concessions by requesting to see the company's books.  Since, as detailed below, we have concluded that this information was relevant to the company's concessionary proposals, and the company itself tied the decision to close to the Union's acceptance or rejection of concessions, it could not satisfy its obligation to bargain about the decision to close without having afforded the Union an opportunity to review and evaluate the information relevant to the company's bargaining proposal.  Accordingly, complaint should issue, absent settlement alleging that the Employer violated Section 8(a)(5) by refusing to bargain about its decision to close Shannon Pocahontas.

## C.  Anaylsis-Refusal to provide financial information

The Union asked five companies to open their books. 51/  Its requests to Big Bear, Shannon Pocahontas and M & B were made in response to these companies' assertions that they needed concessions because they were losing money.  The Union's requests for financial information from  Winston and Simron were made only after these companies announced their decisions to close and the parties had commenced effects bargaining.  The companies contend that they had no duty to provide the information because the Union had taken the position that it would not grant concessions.  In the companies' view, this position renders the companies' financial status irrelevant.  Shannon Pocahontas, Winston and Simron further contend that the request was rendered moot as to those companies which closed, because contract concessions were no longer an issue in bargaining.

It is well established that when an employer pleads poverty or an inability to pay during collective bargaining negotiations, financial data substantiating its plea becomes relevant to bargaining and the employer has an obligation under Section 8(a)(5) to provide such information upon the Union's request.  NLRB v. Truitt Mfg. Co., 351 U.S. 149, 152-153 (1956).  Clearly, in the instant case the companies' claims that they needed concessions because they were losing money rendered the financial records relevant.

The fact that the Union refused to abandon its no-concessions policy before receiving the companies financial information did not negate the relevance of the requested information.  Under Truitt, such information is relevant in order to enable the Union to determine whether it should soften its

---

50/ As distinguished from its response to Shannon Pocahontas, the Union did not request financial information from Simron until after the company announced its decision to close and the parties had begun effects bargaining.

51/ In the absence of evidence that the Union requested Robinson Phillips to open its books, the allegation that that company refused to furnish financial information should be dismissed absent withdrawal.

demands.  In the instant case, the companies sought to place the cart before the horse; they sought a commitment to concessions as a condition precedent for furnishing the information.  Concededly, the disclosure of the information may not persuade the Union to alter its policy.  On the other hand, it may do so. And, it is certain that the Union will not grant concessions absent the information.  Thus, if the process of collective bargaining is to proceed with respect to the companies' proposals, the Union must be able knowledgeably to consider those proposals, to determine the extent to which it should urge employees to agree to the proposed concessions or to develop alternative proposals of its own.  It cannot perform these functions without the information.  Teleprompter Corp., 227 NLRB 705, 706-707 and cases cited therein (1977), enf'd 507 F.2d 4 (1st Cir. 1977).  Accordingly, it was concluded that complaint should issue, absent settlement, alleging that Big Bear, Shannon Pocahontas and M & B violated Section 8(a)(5) by refusing to provide the requested information.

With respect to the Union's request for financial information from Winston and Simron, however, there is no evidence that these companies have claimed an inability to pay with respect to any effects bargaining proposals. Accordingly, these companies' financial status is not relevant to any matter about which the parties are bargaining. 52/  Accordingly, the allegation that these companies violated Section 8(a)(5) by refusing to provide information should be dismissed, absent withdrawal.

H.J.D.

---

52/ As noted above, Winston had no obligation to bargain about its decision to close and Simron fulfilled its obligation.  Shannon Pocahontas' closure did not render the information irrelevant, however, because that company, by refusing to provide the information to support its concessions proposals, failed to fulfill its obligation to bargain over the decision.

# Exhibit R

<u>Table of Contents</u>

As filed with the Securities and Exchange Commission on July 30, 2003

Registration No. 333- 105739

# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549
## Amendment No. 1 to
# FORM S-3
## REGISTRATION STATEMENT
### UNDER THE SECURITIES ACT OF 1933

# CONSOL ENERGY INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **51-0337383** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

# CARDINAL STATES GATHERING COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Virginia** | **73-1394037** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

# CENTRAL OHIO COAL COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Ohio** | **31-5488703** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

# CHURCH STREET HOLDINGS, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **51-0344312** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

# CNX GAS COMPANY LLC
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Virginia** | **31-1782401** |
| (State or other jurisdiction of. incorporation or organization) | (I.R.S. Employer Identification No.) |

# CNX LAND RESOURCES INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **25-1871851** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

Table of Contents

# CNX MARINE TERMINALS INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **25-1385259** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

# CONRHEIN COAL COMPANY

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Pennsylvania** | **25-1406541** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

# CONSOL DOCKS INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **25-1693670** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

# CONSOL FINANCIAL INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **51-0395375** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

# CONSOL OF CANADA INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **98-0013773** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

# CONSOL OF KENTUCKY INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **94-2524120** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

# CONSOL PENNSYLVANIA COAL COMPANY

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **25-1402386** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

ii

Table of Contents

# CONSOLIDATION COAL COMPANY

(Exact name of registrant as specified in its charter)

**Delaware**
(State or other jurisdiction of
incorporation or organization)

**13-2566594**
(I.R.S. Employer
Identification No.)

# CONSOL SALES COMPANY

(Exact name of registrant as specified in its charter)

**Delaware**
(State or other jurisdiction of
incorporation or organization)

**25-1670342**
(I.R.S. Employer
Identification No.)

# EIGHTY-FOUR MINING COMPANY

(Exact name of registrant as specified in its charter)

**Pennsylvania**
(State or other jurisdiction of
incorporation or organization)

**25-1695903**
(I.R.S. Employer
Identification No.)

# GREENE ENERGY LLC

(Exact name of registrant as specified in its charter)

**Pennsylvania**
(State or other jurisdiction of
incorporation or organization)

**74-3009179**
(I.R.S. Employer
Identification No.)

# HELVETIA COAL COMPANY

(Exact name of registrant as specified in its charter)

**Pennsylvania**
(State or other jurisdiction of
incorporation or organization)

**25-1180531**
(I.R.S. Employer
Identification No.)

# ISLAND CREEK COAL COMPANY

(Exact name of registrant as specified in its charter)

**Delaware**
(State or other jurisdiction of
incorporation or organization)

**55-0479426**
(I.R.S. Employer
Identification No.)

# IC COAL, INC.

(Exact name of registrant as specified in its charter)

**Delaware**
(State or other jurisdiction of
incorporation or organization)

**95-2917408**
(I.R.S. Employer
Identification No.)

iii

Table of Contents

# JEFFCO COAL COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Pennsylvania**<br>(State or other jurisdiction of<br>incorporation or organization) | **25-1383924**<br>(I.R.S. Employer<br>Identification No.) |

# KEYSTONE COAL MINING CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Pennsylvania**<br>(State or other jurisdiction of<br>incorporation or organization) | **25-1323822**<br>(I.R.S. Employer<br>Identification No.) |

# LAUREL RUN MINING COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Virginia**<br>(State or other jurisdiction of<br>incorporation or organization) | **54-0892422**<br>(I.R.S. Employer<br>Identification No.) |

# LEATHERWOOD, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Pennsylvania**<br>(State or other jurisdiction of<br>incorporation or organization) | **25-1604505**<br>(I.R.S. Employer<br>Identification No.) |

# McELROY COAL COMPANY
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of<br>incorporation or organization) | **25-1553551**<br>(I.R.S. Employer<br>Identification No.) |

# MTB INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of<br>incorporation or organization) | **25-1674211**<br>(I.R.S. Employer<br>Identification No.) |

iv

Table of Contents

# NEW CENTURY HOLDINGS, INC.

(Exact name of registrant as specified in its charter)

**Delaware**
(State or other jurisdiction of incorporation or organization)

**51-0344312**
(I.R.S. Employer Identification No.)

# QUARTO MINING COMPANY

(Exact name of registrant as specified in its charter)

**Ohio**
(State or other jurisdiction of incorporation or organization)

**34-1048622**
(I.R.S. Employer Identification No.)

# RESERVE COAL PROPERTIES COMPANY

(Exact name of registrant as specified in its charter)

**Delaware**
(State or other jurisdiction of incorporation or organization)

**25-1582519**
(I.R.S. Employer Identification No.)

# ROCHESTER & PITTSBURGH COAL COMPANY

(Exact name of registrant as specified in its charter)

**Pennsylvania**
(State or other jurisdiction of incorporation or organization)

**25-0761480**
(I.R.S. Employer Identification No.)

# SOUTHERN OHIO COAL COMPANY

(Exact name of registrant as specified in its charter)

**West Virginia**
(State or other jurisdiction of incorporation or organization)

**55-0403282**
(I.R.S. Employer Identification No.)

# THE WHITE STAR COAL CO., INC.

(Exact name of registrant as specified in its charter)

**New York**
(State or other jurisdiction of incorporation or organization)

**25-1111594**
(I.R.S. Employer Identification No.)

# TWIN RIVERS TOWING COMPANY

(Exact name of registrant as specified in its charter)

**Delaware**
(State or other jurisdiction of incorporation or organization)

**25-1181155**
(I.R.S. Employer Identification No.)

v

**Table of Contents**

# UNITED EASTERN COAL SALES CORPORATION

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Pennsylvania** | **25-0849890** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

# WINDSOR COAL COMPANY

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **West Virginia** | **13-5488703** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

and

# WOLFPEN KNOB DEVELOPMENT COMPANY, as Guarantors

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Virginia** | **25-1391218** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

---

**CONSOL Energy Inc.**
**Consol Plaza**
**1800 Washington Road**
**Pittsburgh, PA 15241-1421**
**(412) 831-4000**

(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

---

**Stephen E. Williams, Esq.**
**Vice President – General Counsel**
**CONSOL Energy Inc.**
**Consol Plaza**
**1800 Washington Road**
**Pittsburgh, PA 15241-1421**
**(412) 831-4000**

(Name, address, including zip code and telephone number, including area code of agent for service)

---

*Copies to:*

Steven L. Wasserman, Esq.
Piper Marbury Rudnick & Wolfe LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 835-6000

**Approximate date of commencement of proposed sale to the public**: As soon as practicable after this Registration Statement becomes effective

If the only securities being registered on this form are being offered pursuant to dividend or interest reinvestment plans, please check the following box. ☐

If any of the securities being registered on this form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended (the "Securities Act"), other than securities offered only in connection with dividend or interest reinvestment plans, check the following box. ☒

vi

Table of Contents

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐_____

If this form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐_____

If delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box. ☐

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities To Be Registered | Amount To Be Registered [1] | Proposed Maximum Offering Price Per Share [1] | Proposed Maximum Aggregate Offering Price [1] [2] [3] | Amount of Registration Fee |
|---|---|---|---|---|
| Debt Securities (3) | | | | |
| Common Stock (3) | | | | |
| Preferred Stock (3) | | | | |
| Depositary Shares (3) | | | | |
| Stock Purchase Units (3) | | | | |
| Stock Purchase Contracts (3) | | | | |
| Warrants (3) (4) | | | | |
| Guarantees of Debt Securities of CONSOL Energy Inc. by the Guarantors (5) | | | | |
| Total | | | $    800,000,000 | $    64,720(6) |

(1) Not applicable pursuant to Form S-3 General Instruction II(D).
(2) These figures are estimates made solely for the purpose of calculating the registration fee pursuant to Rule 457(o). If any debt securities are issued at an original issue discount, such greater principal amount as shall result in an aggregate initial offering price equal to the amount to be registered. If any debt securities are issued with a principal amount denominated in a foreign currency or composite currency, such principal amount as shall result in an aggregate initial offering price equivalent thereto in U.S. dollars at the time of initial offering.
(3) In addition to the securities issued directly under this registration statement, we are registering an indeterminate number of shares of common stock, preferred stock and depositary shares as may be issued upon conversion or exchange of the securities issued directly under this registration statement. No separate consideration will be received for any shares of common stock, preferred stock or depositary shares so issued upon conversion or exchange.
(4) Includes warrants to purchase common stock, warrants to purchase preferred stock and warrants to purchase debt securities.
(5) No separate consideration will be received for any guarantees. Pursuant to Rule 457(n), no separate fee is required to be paid in respect of guarantees of the debt securities which are being registered concurrently.
(6) Registration fee was paid in connection with the initial filing of this Registration Statement on Form S-3, filed May 30, 2003 (file no. 333-105739).

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act, or until the registration statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents

The information in this prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

**SUBJECT TO COMPLETION, DATED JULY 30, 2003**

**$800,000,000**

# CONSOL Energy Inc.

Debt Securities

Common Stock

Preferred Stock

Depositary Shares

Stock Purchase Units

Stock Purchase Contracts

Warrants to Purchase Debt Securities,

Preferred Stock or Common Stock

---

We will provide the specific terms for each of these securities in supplements to this prospectus. You should read carefully this prospectus and any supplement before you invest.

Our common stock is listed on the New York Stock Exchange under the symbol "CNX".

---

**Investing in our securities involves risk. See " Risk Factors" beginning on page 4**

**This prospectus may not be used to complete sales of securities unless it is accompanied by a prospectus supplement.**

---

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

The date of this prospectus is          , 2003.

## TABLE OF CONTENTS

|  | Page |
|---|---|
| PROSPECTUS SUMMARY | 1 |
| RATIO OF EARNINGS TO FIXED CHARGES | 1 |
| ABOUT THIS PROSPECTUS | 3 |
| RISK FACTORS | 4 |
| FORWARD-LOOKING STATEMENTS | 14 |
| USE OF PROCEEDS | 14 |
| SECURITIES WE MAY OFFER | 14 |
| DESCRIPTION OF DEBT SECURITIES | 14 |
| DESCRIPTION OF COMMON STOCK AND PREFERRED STOCK | 23 |
| DESCRIPTION OF DEPOSITARY SHARES | 26 |
| DESCRIPTION OF STOCK PURCHASE UNITS AND STOCK PURCHASE CONTRACTS | 28 |
| DESCRIPTION OF WARRANTS TO PURCHASE DEBT SECURITIES | 28 |
| DESCRIPTION OF WARRANTS TO PURCHASE COMMON STOCK OR PREFERRED STOCK | 29 |
| PLAN OF DISTRIBUTION | 30 |
| LEGAL MATTERS | 31 |
| EXPERTS | 31 |
| WHERE YOU CAN FIND MORE INFORMATION | 31 |

You should rely only on the information contained in this document or to which we have referred you. We have not authorized anyone to provide you with information that is different. This document may only be used where it is legal to sell these securities. The information in this document may only be accurate on the date of this document.

ii

Table of Contents

## PROSPECTUS SUMMARY

You should read the entire prospectus, including the information set forth in "Risk Factors," and all the information incorporated by reference, before making an investment decision.

### CONSOL Energy

We are a multi-fuel energy producer and energy services provider which primarily serves the electric power generation industry in the United States. That industry generates two-thirds of its output by burning coal or gas, the two fuels we produce. As of December 31, 2002, we produced high-Btu bituminous coal from 22 mining complexes in the United States, Canada and Australia. Bituminous coal is the most common type of coal and has a moisture content less than 20% by weight and heating value of 10,500 to 14,000 Btu per pound. Btu is a measure of energy required to raise the temperature of one pound of water by one degree Fahrenheit. Our coal generally has a high Btu content which creates more energy per unit when burned than coals with lesser Btu content. As a result, coals with greater Btu content can be more efficient to use. We also produce pipeline-quality coalbed methane gas primarily from our coal properties in Virginia. We believe that the use of coal and gas to generate electricity will grow as demand for power increases. For the twelve months ended December 31, 2002, our coal operations accounted for 88% of our revenues, our gas operations accounted for 7% of our revenues and our other operations accounted for 5% of our revenues.

Historically, we rank among the largest coal producers in the United States based upon total production, revenue, net income and operating cash flow. Our total production, including our portion of production from equity affiliates for the twelve months ended December 31, 2002, was 66 million tons. Our United States production of 63 million tons of coal in the twelve months ended December 31, 2002, accounted for approximately 6% of the total tons produced in the United States and 13% of the total tons produced east of the Mississippi River during that year. We are one of the premier coal producers in the United States by several measures:

- We mine more high-Btu bituminous coal than any other United States producer;

- We are the largest coal producer, in terms of tons produced, east of the Mississippi River;

- We export more coal from the United States than any other coal producer or trading company;

- We have the second largest amount of recoverable coal reserves among United States coal producers; and

- We are the largest United States producer of coal from underground mines.

We also operate a large coalbed methane gas company based on both its proved reserves and its current daily production. Our industry position is highlighted by several measures:

- We possess a large coalbed methane reserve base with 1.1 trillion cubic feet of proved reserves of gas;

- We currently have 134 million cubic feet of average daily coalbed methane gas production;

- We operate more than 1,300 wells connected by approximately 740 miles of gathering lines and associated infrastructure; and

- Our facilities have the capacity to transport 250 million cubic feet of gas per day.

CONSOL Energy was organized as a Delaware corporation in 1991 and is currently a holding company for 56 direct and indirect wholly owned subsidiaries, principally engaged in the mining and sale of bituminous coal and the production and sale of coalbed methane gas. Our address is CONSOL Plaza, 1800 Washington Road, Pittsburgh, Pennsylvania 15241-1421 and our telephone number is (412) 831-4000.

### RATIO OF EARNINGS TO FIXED CHARGES

The following table sets forth our ratio of earnings to fixed charges for the periods indicated. For purposes of computing the ratio of earnings to fixed charges, earnings represent earnings from continuing operations before income taxes plus fixed charges. Fixed charges include (a) interest on indebtedness (whether expensed or capitalized), (b) amortization of debt discounts and premiums and capitalized

1

**Table of Contents**

expenses related to indebtedness and (c) the portion of rent expense we believe to be representative of interest.

| Computation of Ratio of Earnings to Fixed Charges | Three Months Ended March 31, 2003 | Twelve Months Ended December 31, | | Six Months Ended December 31, | | Twelve months Ended June 30, | | Six Months Ended June 30, 1999 | Twelve Months Ended December 31, 1998 |
|---|---|---|---|---|---|---|---|---|---|
| | | 2002 | 2001 | 2001 | 2000 | 2001 | 2000 | | |
| Ratio of Earnings to Fixed Charges | (1) | (2) | 4.59 | (3) | 1.85 | 4.54 | 2.70 | 2.19 | 4.93 |

(1)   The deficiency of earnings to cover fixed charges was $10.7 million.
(2)   The deficiency of earnings to cover fixed charges was $30.6 million.
(3)   The deficiency of earnings to cover fixed charges was $20.4 million.

2

Table of Contents

## ABOUT THIS PROSPECTUS

This prospectus is part of a registration statement that we filed with the SEC using a "shelf" registration process. Under this shelf process, we may offer, from time to time, in one or more offerings:

- debt securities;
- shares of our common stock;
- shares of our preferred stock;
- depositary shares;
- stock purchase units;
- stock purchase contracts; or
- warrants to purchase our debt securities, common stock or preferred stock.

The total offering price of these securities will not exceed $800,000,000.

This prospectus provides you with a general description of the securities we may offer. Each time we offer securities, we will provide you with a prospectus supplement that will describe the specific amounts, prices and terms of the securities we offer. The securities may be sold for U.S. dollars, foreign denominated currency or currency units. Amounts payable with respect to any securities may be payable in U.S. dollars or foreign-denominated currency or currency units as specified in the prospectus supplement. Our debt securities may be guaranteed by some or all of our subsidiaries as specified in the prospectus supplement. The prospectus supplement also may add, update or change information contained in this prospectus.

We may sell the securities to or through underwriters, dealers or agents or directly to purchasers. We and our agents reserve the sole right to accept and to reject in whole or in part any proposed purchase of securities. The prospectus supplement, which we will provide to you each time we offer securities, will provide the names of any underwriters, dealers or agents involved in the sale of the securities, and any applicable fee, commission or discount arrangements with them. See "Plan of Distribution."

3

Table of Contents

# RISK FACTORS

Investing in our securities will be subject to risks, including risks inherent in our business. The value of your investment may decline and could result in a loss. You should carefully consider the following factors as well as other information contained and incorporated by reference in this prospectus before deciding to invest in our securities.

*We have a significant amount of debt compared to our stockholders' equity, which limits our flexibility, imposes restrictions on us and could hinder our ability to compete and meet future capital and liquidity needs.*

We are highly leveraged. At December 31, 2002, we had outstanding approximately $701 million in aggregate principal amount of indebtedness, including capital leases, and total stockholders' equity of $162 million. We have become highly leveraged as a result of our policy of paying dividends. Since 1992, we have paid dividends aggregating $1.2 billion, approximately the amount of our aggregate net income for the same period.

The degree to which we are leveraged could have important consequences to us, including the following:

- a substantial portion of our cash flow must be used to pay interest on our indebtedness and therefore is not available for use in our business;

- our high degree of indebtedness increases our vulnerability to changes in general economic and industry conditions;

- our ability to obtain additional financing for working capital, capital expenditures, general corporate purposes or other purposes could be impaired;

- because some of our borrowings are short-term or at variable rates of interest, we are vulnerable to interest rate fluctuations, which could result in our incurring higher interest expenses if interest rates increase; and

- our failure to comply with covenants and restrictions contained in the terms of our borrowings could lead to a default which could cause all or a significant portion of our debt to become immediately payable; and

Stockholders' equity was reduced by comprehensive losses of approximately $56 million in 2002 and $37 million in 2001. These losses relate primarily to minimum pension liability as a result of the negative return on plan assets for non-contributory defined benefit retirement plans covering substantially all employees not covered by multi-employer retirement plans. Comprehensive losses are calculated annually and reflect a number of factors including conditions in the stock markets and interest rates. We cannot predict whether we will be required to recognize such losses in the future. Further comprehensive losses would erode our stockholders' equity and possibly preclude our paying dividends, which likely would adversely affect our stock price.

*Recent changes in our credit ratings could adversely affect our costs and expenses.*

The credit ratings of our long term debt recently have been downgraded and Standard and Poor's has classed our long-term debt as BB+, a high yield rating. This could adversely affect our ability to borrow and result in more restrictive borrowing terms, including increased borrowing costs, more restrictive covenants and the extension of less open credit. This in turn could affect our internal cost of capital estimates and therefore operational decisions.

4

Table of Contents

*In recent periods our operating results have deteriorated and we may incur losses in future periods.*

Although we reported net income for each of the twelve months ended December 31, 2002, the six months ended December 31, 2001 and the twelve months ended June 30, 2001, net income was attributable to income tax benefits in the periods ended December 31, 2002 and 2001 and benefited substantially from export sales excise tax resolution in the twelve months ended June 30, 2001. For the twelve months ended December 31, 2002 and the six months ended December 31, 2001, we incurred losses before income tax benefits of $40.4 million and $19.6 million, respectively. Our recent results reflect a number of factors, including a decrease in tons of coal sold as a result of effects of higher than usual customer inventory levels, decreased average sales price for gas in the industrial sector and lower demand for gas during the winter heating season that resulted in high levels of gas storage. These and other conditions beyond our control could continue to affect our business and we may incur losses in the future.

*We may be unable to comply with restrictions imposed by our credit facilities and other debt agreements, which could result in a default under these agreements.*

Our credit facility imposes a number of restrictions on us. A failure to comply with these restrictions could adversely affect our ability to borrow under our credit facilities or result in an event of default under these agreements and other debt. Our credit facility contains financial and other covenants that create limitations on our ability to, among other things, borrow the full amount under our credit facilities, incur additional debt, and require us to maintain various financial ratios and comply with various other financial covenants. These financial covenants include a funded debt ratio that requires that we maintain a ratio of total indebtedness for borrowed money as of the last day of each quarter to total earnings before interest, taxes, depreciation and amortization and excluding any extraordinary gains or losses for the four quarters ended on that date of not more than 3 to 1 and a ratio for the last four consecutive quarters of total earnings before interest, taxes, depreciation and amortization and excluding any extraordinary gains or losses to total interest payable (including amortization of debt discount) on indebtedness for borrowed money of not less than 4.5 to 1. Our ability to comply with these restrictions depends upon our operating results, which recently have deteriorated from earlier periods and which continue to be affected by the sluggish economy and other events beyond our control. As a result, we may be unable to comply with these covenants and other restrictions in our credit facility. In the event of a default, our lenders could terminate their commitments to us and declare all amounts borrowed, together with accrued interest and fees, immediately due and payable. If this were to occur, we might not be able to pay these amounts, or we might be forced to seek an amendment to our debt agreements which could make the terms of these agreements more onerous for us. Failure to comply with these restrictions, even if waived by our bank lenders, also could adversely affect our credit ratings, which could increase the costs of debt financings to us and impair our ability to obtain additional debt financing.

*We may not be able to maintain our competitive position because coal and gas markets are highly competitive and are affected by factors beyond our control.*

We compete with coal producers in various regions of the United States for domestic sales, and we compete both with domestic and foreign coal producers for sales in international markets. Demand for our coal by our principal customers is affected by the price of competing coal and alternative fuel supplies, including nuclear, natural gas, oil and renewable energy sources, such as hydroelectric power. We sell coal to foreign electricity generators and to the more specialized metallurgical coal market, both of which are significantly affected by international demand and competition.

*A significant decline in the prices we receive for our coal and gas could adversely affect our operating results and cash flows.*

Our results of operations are highly dependent upon the prices we receive for our coal and gas, which are closely linked to consumption patterns of the electric generation industry and certain industrial and residential patterns where gas is the principal fuel. Extended or substantial price declines for coal or gas would adversely affect our operating results for future periods and our ability to generate cash flows necessary to improve productivity and expand operations. For example, in calendar years 1998 and 1999, demand for coal decreased because of the warm winters in the northeastern United States. This resulted in increased inventories that caused pricing decreases in 1999. Substantially all of our natural gas production is sold at market sensitive prices. Prices for natural gas are subject to volatile trading patterns.

*We may not be able to produce sufficient amounts of coal to fulfill our customers' requirements, which could harm our customer relationships.*

5

Table of Contents

We may not be able to produce sufficient amounts of coal to meet customer demand, including amounts that we are required to deliver under long-term contracts. Our inability to satisfy our contractual obligations could result in our customers initiating claims against us. Our inability to satisfy demand could otherwise harm our relationships with our customers.

### If the coal or gas industry experiences overcapacity in the future, our profitability could be impaired.

During the mid-1970s and early 1980s, a growing coal market and increased demand for coal attracted new investors to the coal industry, spurred the development of new mines and resulted in added production capacity throughout the industry, all of which led to increased competition and lower coal prices. Increases in coal prices similarly could encourage the development of expanded capacity by new or existing coal producers. Any overcapacity could reduce coal prices in the future. Increased prices for gas typically stimulate additional exploration and often result in additional supplies brought to market. Increased gas supply could reduce gas prices in the future.

### If customers do not extend existing contracts or enter into new long-term contracts for coal, the stability and profitability of our operations could be affected.

During the twelve months ended December 31, 2002, approximately 82% of the coal we produced was sold under contracts with terms of one year or more. If a substantial portion of our long-term contracts are modified or terminated, we would be adversely affected to the extent that we are unable to find other customers at the same level of profitability. In general, our long-term contracts have a two to three year average term. The profitability of our long-term coal supply contracts depends on a variety of factors, which vary from contract to contract and fluctuate during the contract term, and includes our production costs and other factors. Price changes, if any, provided in long term supply contracts are not intended to reflect our cost increases, and therefore increases in our costs may reduce our profit margins. In addition, in periods of declining market prices, provisions for adjustment or renegotiation of prices and other provisions may increase our exposure to short-term coal price volatility. As a result, we may not be able to obtain long-term agreements at favorable prices (compared to either market conditions, as they may change from time to time, or our cost structure) and long-term contracts may not contribute to our profitability.

### We depend on two customers for a significant portion of our revenues and the loss of one or both of these customers could adversely affect us.

During the twelve months ended December 31, 2002, Allegheny Energy accounted for approximately 15% of our total revenue and American Electric Power accounted for approximately 11% of our total revenue. Our business and operating results could be adversely affected if either one of these customers does not continue to purchase the same amount of coal or gas as it has purchased from us in the past or on terms, including pricing, it has under existing agreements.

### Some of our long-term contracts require us to supply all of our customers' coal needs. If these customers' coal requirements decline, our operating results may be adversely affected.

We have requirements contracts with certain customers which require us to supply all of those customers' coal needs but allow the customers to defer or vary the amount of coal that they accept. During 2002, the reduction in the amount required by certain of these customers contributed to the reduction in our earnings when we could not find alternative customers at the same price and volume levels. If these or other customers with requirements contracts need less coal in the future, it could adversely affect our operating results.

### The creditworthiness of our customer base has declined.

Our ability to receive payment for coal or gas sold depends on the creditworthiness of our customers. In general, the creditworthiness of our customers has declined. If this trend were to continue, the number of customers with acceptable credit profiles could decline.

### We may not be able to accomplish acquisitions effectively, which requires us to outbid competitors, obtain financing on acceptable terms and integrate acquired operations.

The energy industry is a rapidly consolidating industry, with many companies seeking to consummate acquisitions and increase their market share. In this environment, we compete and will continue to compete with many other buyers for acquisitions. Some of those competitors may be able to outbid us for acquisitions because they have greater financial resources. As a result of these and other factors, future acquisitions may not be available to us on attractive terms. Our ability to consummate any acquisition will be subject to various conditions, including the negotiation of satisfactory agreements and obtaining necessary regulatory approvals and financing. Once any

6

Table of Contents

acquisition is completed, we may not be able to achieve expected operating benefits through cost reductions, increased efficiency and integration with our existing operations. As a result, our operating results may be adversely affected.

***Disputes with our customers concerning contracts can result in litigation, which could result in our paying substantial damages.***

From time to time, we have disputes with our customers over the provisions of long-term contracts relating to, among other things, coal quality, pricing and quantity. We may not be able to resolve any future disputes in a satisfactory manner, which could result in our paying substantial damages.

***Coal mining is subject to conditions or events beyond our control, which could cause our quarterly or annual results to deteriorate.***

Our coal mining operations are predominantly underground mines. These mines are subject to conditions or events beyond our control that could disrupt operations, affect production and the cost of mining at particular mines for varying lengths of time and have a significant impact on our operating results. These conditions or events have included:

- variations in thickness of the layer, or seam, of coal;

- amounts of rock and other natural materials and other geological conditions;

- equipment failures or repair;

- fires and other accidents; and

- weather conditions.

***We face numerous uncertainties in estimating our economically recoverable coal and gas reserves, and inaccuracies in our estimates could result in lower than expected revenues, higher than expected costs and decreased profitability.***

There are numerous uncertainties inherent in estimating quantities and values of economically recoverable coal and gas reserves, including many factors beyond our control. As a result, estimates of economically recoverable coal and gas reserves are by their nature uncertain. Information about our reserves consists of estimates based on engineering, economic and geological data assembled and analyzed by our staff. The majority of our gas reserves have been reviewed by independent experts, Ralph E. Davis Associates, Inc. and Data and Consulting Services, a division of Schlumberger. None of our coal reserves have been reviewed by independent experts.

Some of the factors and assumptions which impact economically recoverable reserve estimates include:

- geological conditions;

- historical production from the area compared with production from other producing areas;

- the assumed effects of regulations and taxes by governmental agencies;

- assumptions governing future prices; and

- future operating costs.

Each of these factors may in fact vary considerably from the assumptions used in estimating reserves. For these reasons, estimates of the economically recoverable quantities of coal and gas attributable to a particular group of properties, and classifications of these reserves based on risk of recovery and estimates of future net cash flows, may vary substantially. Actual production, revenues and expenditures with respect to our reserves will likely vary from estimates, and these variances may be material. As a result, our estimates may not accurately reflect our actual reserves.

***The exploration for, and production of, gas is an uncertain process with many risks.***

The exploration for and production of gas involves numerous risks. The cost of drilling, completing and operating wells for coalbed methane or other gas is often uncertain, and a number of factors can delay or prevent drilling operations or production, including:

7

Table of Contents

- unexpected drilling conditions;

- pressure or irregularities in formations;

- equipment failures or repairs;

- fires or other accidents;

- adverse weather conditions;

- pipeline ruptures or spills;

- compliance with governmental requirements; and

- shortages or delays in the availability of drilling rigs and the delivery of equipment.

Our future drilling activities may not be successful, and we cannot be sure that our drilling success rates will not decline. Unsuccessful drilling activities could result in higher costs without any corresponding revenues. Also, we may not be able to obtain any options or lease rights in potential drilling locations that we identify which, among other things, could prevent us from producing gas at potential drilling locations.

***The coal beds from which we produce methane gas frequently contain water which may hamper our ability to produce gas in commercial quantities.***

Methane is the primary commercial component of natural gas produced in traditional natural gas wells, but other hydrocarbons are produced as well. The amount of coalbed methane that can be commercially produced depends upon the coal quality, the original gas content of the coal seam, the thickness of the seam, the reservoir pressure, the rate at which gas is released from the coal, and the existence of any natural fractures through which the gas can follow to the well bore. However, coal beds frequently contain water that must be removed in order for the gas to detach from the coal and flow to the well bore. Our ability to remove and dispose of sufficient quantities of water from the coal seam will determine whether or not we can produce gas in commercial quantities.

***Disruption of rail, barge and other systems which deliver our coal, or of pipeline systems which deliver our gas, or increase in transportation costs could make our coal or gas less competitive.***

Coal producers depend upon rail, barge, trucking, overland conveyor and other systems to provide access to markets. Disruption of transportation services because of weather-related problems, strikes, lock-outs or other events could temporarily impair our ability to supply coal to customers and adversely affect our profitability. Transportation costs represent a significant portion of the delivered cost of coal and, as a result, the cost of delivery is a critical factor in a customer's purchasing decision. Increases in transportation costs could make our coal less competitive.

The marketability of our gas production partly depends on the availability, proximity and capacity of pipeline systems owned by third parties. Unexpected changes in access to pipelines could adversely affect our operations.

***Government laws, regulations and other legal requirements relating to protection of the environment and health and safety matters increase our costs of doing business and may restrict our operations.***

We are subject to laws, regulations and other legal requirements enacted or adopted by federal, state and local, as well as foreign, authorities relating to protection of the environment and health and safety matters, including those legal requirements that govern discharges of substances into the air and water, the management and disposal of hazardous substances and wastes, the cleanup of contaminated sites, groundwater quality and availability, plant and wildlife protection, reclamation and restoration of mining properties after mining is completed and control of surface subsidence from underground mining. Complying with these requirements, including the terms of our permits, has had, and will continue to have, a significant effect on our costs of operations and competitive position. In addition, we could incur substantial costs, including clean up costs, fines and civil or criminal sanctions and third party damage claims for personal injury, property damage, wrongful death, or exposure to hazardous substances, as a result of violations of or liabilities under environmental laws.

For example, we incur and will continue to incur significant costs associated with the investigation and remediation of environmental contamination under the federal Comprehensive Environmental Response, Compensation, and Liability Act (Superfund) and similar state statutes and have been named as a potentially

8

Table of Contents

responsible party at Superfund sites in the past. Our costs for these matters, which currently relate predominantly to one site, could exceed our current accruals, which were $2.9 million at December 31, 2002. The discovery of additional contaminants or the imposition of additional clean-up obligations or other liabilities could result in substantially greater costs than we have estimated.

***We must obtain governmental permits and approvals for mining operations, which can be a costly and time consuming process and result in restrictions on our operations.***

Regulatory authorities exercise considerable discretion in the timing and scope of permit issuance. Requirements imposed by these authorities may be costly and time consuming and may result in delays in the commencement or continuation of exploration or production operations. For example, we often are required to prepare and present to federal, state and local authorities data pertaining to the effect or impact that proposed exploration for or production of coal may have on the environment. Further, private individuals and the public at large possess rights to comment on and otherwise engage in the permitting process, including through intervention in the courts. Accordingly, the permits we need may not be issued, or if issued, may not be issued in a timely fashion, or may involve requirements which restrict our ability to conduct our mining operations or to do so profitably.

***The characteristics of coal may make it difficult for coal users to comply with various environmental standards related to coal combustion. As a result, they may switch to other fuels, which would affect the volume of our sales.***

Coal contains impurities, including sulfur, mercury, chlorine and other regulated elements or compounds, many of which are released into the air when coal is burned. Stricter environmental regulations of emissions from coal-fired electric generating plants could increase the costs of using coal thereby, reducing demand for coal as a fuel source and the volume of our coal sales. Stricter regulations could make coal a less attractive fuel alternative in the planning and building of utility power plants in the future.

For example, in order to meet the federal Clean Air Act limits for sulfur dioxide emissions from electric power plants, coal users may need to install scrubbers, use sulfur dioxide emission allowances (some of which they may purchase), blend high sulfur coal with low sulfur coal or switch to other fuels. Each option has limitations. Lower sulfur coal may be more costly to purchase on an energy basis than higher sulfur coal depending on mining and transportation costs. The cost of installing scrubbers is significant and emission allowances may become more expensive as their availability declines. Switching to other fuels may require expensive modification of existing plants. Because higher sulfur coal currently accounts for a significant portion of our sales, the extent to which power generators switch to low-sulfur fuel could materially affect us if we cannot offset the cost of sulfur removal by lowering the costs of delivery of our higher sulfur coals on an energy equivalent basis.

Other new and proposed reductions in emissions of mercury, nitrogen oxides, particulate matter or greenhouse gases may require the installation of additional costly control technology or the implementation of other measures, including switching to other fuels. These new and proposed reductions will make it more costly to operate coal-fired plants and could make coal a less attractive fuel alternative to the planning and building of utility power plants in the future. For example, the Environmental Protection Agency would require reduction of nitrogen oxide emissions in 22 eastern states and the District of Columbia and of particulate matter emissions over the next several years. In addition, Congress and several states are now considering legislation to further control air emissions of multiple pollutants from electric generating facilities and other large emitters. To the extent that any new requirements affect our customers, this could adversely affect our operations and results.

***We have significant reclamation and mine closure obligations. If the assumptions underlying our accruals are materially inaccurate, we could be required to expend greater amounts than anticipated.***

The Surface Mining Control and Reclamation Act establishes operational, reclamation and closure standards for all aspects of surface mining as well as most aspects of deep mining. We accrue for the costs of current mine disturbance and of final mine closure, including the cost of treating mine water discharge where necessary. Estimates of our total reclamation and mine-closing liabilities, which are based upon permit requirements and our experience, were $391 million at December 31, 2002. On January 1, 2003, CONSOL Energy adopted Statement of Financial Accounting Standards No. 143 (SFAS 143) to account for the costs related to the closure of mines and gas wells and the reclamation of the land upon exhaustion of coal and gas reserves. This statement requires the fair value of an asset retirement obligation be recognized in the period in which it is incurred if a reasonable estimate of fair value can be made. The present value of the estimated asset retirement costs are capitalized as part of the carrying amount of the long-lived asset. As a result of this change in accounting principle, we recognized a gain of $5 million, net of a tax cost of $3 million. At the time of adoption, total assets, net of accumulated depreciation, increased

9

approximately $59 million, and total liabilities increased approximately $51 million. These amounts recorded upon adoption are dependent upon a number of variables, including the estimated future retirement costs, estimated proved reserves, assumptions involving profit margins, inflation rates, and the assumed credit-adjusted risk-free interest rates. Furthermore, these obligations are unfunded. If these accruals are insufficient or our liability in a particular year is greater than currently anticipated, our future operating results could be adversely affected.

*Federal, state and local authorities extensively regulate our gas production activities.*

The gas industry is subject to extensive legislation and regulation, which is under constant review for amendment or expansion. Any changes may affect, among other things, the pricing or marketing of gas production. State and local authorities regulate various aspects of gas drilling and production activities, including the drilling of wells (through permit and bonding requirements), the spacing of wells, the unitization or pooling, of gas properties, environmental matters, safety standards, market sharing and well site restoration. If we fail to comply with statutes and regulations, we may be subject to substantial penalties, which would decrease our profitability.

*Deregulation of the electric utility industry could have unanticipated effects on our industry.*

Deregulation of the electric utility industry will enable purchasers of electricity to shop for the lowest cost suppliers. If our electric power generator customers become more sensitive to long-term price or quantity commitments in a more competitive environment, it may be more difficult for us to enter into long-term contracts and could subject our revenue stream to increased volatility which may adversely affect our profitability. Deregulation of the power industry may have other consequences for our industry, such as efforts to reduce coal prices, which may have a negative effect on our operating results.

*The passage of legislation responsive to the Framework Convention on Global Climate Change or similar governmental initiatives could result in restrictions on coal use.*

The United States and more than 160 other nations are signatories to the 1992 Framework Convention on Global Climate Change which is intended to limit or capture emissions of greenhouse gases, such as carbon dioxide. In December 1997, in Kyoto, Japan, the signatories to the convention established a binding set of emissions targets for developed nations. Although the specific emissions targets vary from country to country, the United States would be required to reduce emissions to 93% of 1990 levels over a five-year budget period from 2008 through 2012. If the Kyoto Protocol or other comprehensive legislation focusing on greenhouse gas emissions is enacted by the United States, it could have the effect of restricting the use of coal. Other efforts to reduce emissions of greenhouse gases and federal initiatives to encourage the use of natural gas also may affect the use of coal as an energy source.

*We are subject to the federal Clean Water Act and similar state laws which impose treatment, monitoring and reporting obligations.*

The federal Clean Water Act and corresponding state laws affect coal mining operations by imposing restrictions on discharges into regulated waters. Permits requiring regular monitoring and compliance with effluent limitations and reporting requirements govern the discharge of pollutants into regulated waters. New requirements under the Clean Water Act and corresponding state laws could cause us to incur significant additional costs that adversely affect our operating results.

*We have significant obligations for long-term employee benefits for which we accrue based upon assumptions which, if inaccurate, could result in our being required to expend greater amounts than anticipated.*

We provide various long-term employee benefits to inactive and retired employees. We accrue amounts for these obligations. At December 31, 2002, the current and non-current portions of these obligations included:

- post retirement medical and life insurance ($1.5 billion);

- coal workers' black lung benefits ($462 million); and

- workers' compensation ($317 million)

These obligations have been estimated based on assumptions, which are described in the notes to our consolidated financial statements included in our Annual Report on Form 10-K for the year ended December 31, 2002. However, if our assumptions are inaccurate, we could be required to expend greater amounts than anticipated. These obligations are unfunded, except for coal workers' black lung, of which approximately 8% was funded at December

10

<u>**Table of Contents**</u>

31, 2002. In addition, several states in which we operate consider changes in workers' compensation laws from time to time. Such changes, if enacted, could adversely affect us.

*New regulations have expanded the definition of black lung disease and generally made it easier for claimants to assert and prosecute claims, which could increase our exposure to black lung benefit liabilities.*

In January 2001, the United States Department of Labor amended the regulations implementing the federal black lung laws to give greater weight to the opinion of a claimant's treating physician, expand the definition of black lung disease and limit the amount of medical evidence that can be submitted by claimants and respondents. The amendments also alter administrative procedures for the adjudication of claims, which, according to the Department of Labor, results in streamlined procedures that are less formal, less adversarial and easier for participants to understand. These and other changes to the federal black lung regulations could significantly increase our exposure to black lung benefits liabilities.

In recent years, legislation on black lung reform has been introduced but not enacted in Congress. It is possible that this legislation will be reintroduced for consideration by Congress. If any of the proposals included in this or similar legislation is passed, the number of claimants who are awarded benefits could significantly increase. Any such changes in black lung legislation, if approved, may adversely effect our business, financial condition and results of operations.

*Fairmont Supply Company, our subsidiary, is a co-defendant in various asbestos litigation cases which allege that Fairmont distributed industrial supply products containing asbestos. To date, payments by Fairmont with respect to asbestos cases have not been material. However, there cannot be any assurance that payments in the future with respect to asbestos cases will not be material.*

One of our subsidiaries, Fairmont Supply Company, which distributes industrial supplies, currently is defending against approximately 21,900 asbestos claims in state courts in Pennsylvania, Ohio, West Virginia, Maryland, New Jersey and Mississippi. Because a very small percentage of products manufactured by third parties and supplied by Fairmont in the past may have contained asbestos and many of the pending claims are part of mass complaints filed by hundreds of plaintiffs against a hundred or more defendants, it has been difficult for Fairmont to determine how many of the cases actually involve valid claims or plaintiffs who were actually exposed to asbestos-containing products supplied by Fairmont. In addition, while Fairmont may be entitled to indemnity or contribution in certain jurisdictions from manufacturers of identified products, the availability of such indemnity or contribution is unclear at this time and, in recent years, some of the manufacturers named as defendants in these actions have sought protection from these claims under bankruptcy laws. Fairmont has no insurance coverage with respect to these asbestos cases. To date, payments by Fairmont with respect to asbestos cases have not been material. However, payments in the future with respect to pending or future asbestos cases could be material to the financial position, results of operations or cash flows of CONSOL Energy.

*We have been informed by insurance companies that, unless provided with collateral, they no longer will issue surety bonds that we and other coal mining companies are required by law to obtain.*

Various federal or state laws and regulations require us to obtain surety bonds or to provide other assurance of payment for certain of our long-term liabilities including mine closure or reclamation costs, workers' compensation and other post employment benefits. We, along with other participants in the coal industry, have been informed by the insurance companies that they no longer will provide surety bonds for workers' compensation and other post employment benefits without collateral. We have satisfied our obligations under these statutes and regulations, by providing letters of credit or other assurances of payment. However, letters of credit can be significantly more costly to us than surety bonds. The issuance of letters of credit under our bank credit facilities also reduces amounts that we can borrow under our bank credit facilities for other purposes.

*We are a holding company and conduct substantially all of our operations through subsidiaries. If our debt securities are not guaranteed by our subsidiaries or if the guarantees are released, the debt securities will be our obligations exclusively and our ability to service the debt securities will depend upon us receiving distributions or similar payments from our subsidiaries through which we conduct all of our operations.*

Generally, creditors of our subsidiaries will have claims to their assets and earnings that are superior to the claims of creditors of the Company, except to the extent the claims of the Company's creditors are guaranteed by our subsidiaries. Our debt securities may not be guaranteed or may provide for the release of guarantees of the debt securities by our subsidiaries in certain circumstances, including, for example, if guarantees of our bank borrowings

11

Table of Contents

are released and such subsidiaries have no other indebtedness, as defined. Because substantially all of our operations are conducted through subsidiaries, our cash flow and therefore our ability to service debt, including the debt securities, primarily would depend upon the earnings of our subsidiaries and the distribution of those earnings to, or upon loans or other payments of funds by those subsidiaries to, us. Our subsidiaries are separate and distinct legal entities and have no obligation to pay any amounts due pursuant to the debt securities or to make any funds available to us to repay our obligations, whether by dividends, loans or other payments. In addition, the payment of dividends and the making of loans and advances to us by our subsidiaries may be subject to statutory or contractual restrictions, will be contingent upon the earnings of those subsidiaries and subject to various business considerations.

*Guarantees may not be enforceable because of fraudulent conveyance laws.*

The obligation of each of the guarantors of the debt securities may be subject to review under state, federal or foreign fraudulent conveyance or transfer laws. Under state and federal laws, if a court, in a lawsuit by an unpaid creditor or representative of creditors of a guarantor, such as a trustee in bankruptcy or such guarantor debtor-in-possession, were to find that, at the time such obligation was incurred, such guarantor, among other things:

- did not receive fair consideration or reasonably equivalent value therefore; and
- either
    - was insolvent;
    - was rendered insolvent;
    - was engaged in a business or transaction for which its assets constituted unreasonably small capital; or
    - intended to incur, or believed that it would incur, debts beyond its ability to pay as such debts matured;

a court could void such guarantor's obligation under its guarantee, and direct the return of any payments made under the guarantee to such guarantor or to a fund for the benefit of its creditors.

Moreover, regardless of the factors identified above, such court could void such obligation, and direct such repayment, if it found that the obligation was incurred with the intent to hinder, delay, or defraud such guarantor's creditors. In that event, the holder of the debt securities would have to look for payment from other guarantors whose guarantee obligations had not been voided.

The measure of insolvency for purposes of the above will vary depending upon the law of the jurisdiction being applied. Generally, however, an entity would be considered insolvent:

- if the sum of its debts is greater than the fair value of all of its property;
- if the present fair salable value of its assets is less than the amount that will be required to pay its probable liability on its existing debts as they become absolute and mature; or
- it could not pay its debts as they become due.

*There may not be an active trading market for our debt securities. If an active trading market does not develop for the debt securities, you may not be able to resell them.*

There may not be an active trading market for our debt securities and none may develop. The debt securities may not be listed on any securities exchange. The trading price may depend upon prevailing interest rates, the market for similar securities, and other factors, including general economic conditions and our financial condition, performance and prospects. If an active trading market does not develop, you may not be able to resell your debt securities at their fair market value or at all.

*RWE Rheinbraun AG beneficially owns a total of approximately 74% of our common stock and is able to control significant business decisions.*

RWE Rheinbraun AG beneficially owns a total of approximately 74% of our outstanding shares of common stock. It is able to direct the election of all of the members of our board of directors and exercise a controlling

12

Table of Contents

influence over our business and affairs, including any determination with respect to major business transactions. RWE Rheinbraun AG is a subsidiary of RWE AG. Because RWE AG is an independent German energy company, conflicts of interest between us and RWE AG may arise. Some of our officers and directors may have ownership interests or other positions with RWE AG, or its affiliates, which could also lead to a conflict of interest.

*Our Restated Certificate of Incorporation limits the liability of RWE Rheinbraun AG to other stockholders and to us for engaging in activities or lines of business similar to ours or for pursuing opportunities that might otherwise be available to us.*

Our Restated Certificate of Incorporation provides that RWE Rheinbraun AG has the right to:

- engage in the same or similar activities or lines of business as us;

- do business with our potential or actual customers or suppliers; and

- employ or otherwise engage or solicit for such purpose any of our officers, employees or directors.

Neither RWE Rheinbraun AG nor any of its officers, directors, employees or agents will be liable to us, our stockholders, or any other person for breach of any fiduciary duty or duty of loyalty by reason of any such activities of RWE Rheinbraun AG. If RWE Rheinbraun AG acquires knowledge of a potential transaction or matter that may be a corporate opportunity for both it and us, RWE Rheinbraun AG does not have any duty to communicate or offer such corporate opportunity to us, under our Restated Certificate of Incorporation. If RWE Rheinbraun AG rejects a corporate opportunity, it has no obligation to offer such corporate opportunity to us.

*Our share price may decline due to shares eligible for future sale.*

As of the date of this Prospectus, RWE Rheinbraun AG beneficially owns a total of 57,997,357 shares of our common stock. RWE Rheinbraun AG has registration rights which would require us to register sales of its shares under the Securities Act. We cannot predict the effect, if any, that future sales of shares of our common stock, or the availability of such shares for sale, would have on the market price prevailing from time to time. Sales by RWE Rheinbraun AG of substantial amounts of our common stock in the public market, or the perception that such sales could occur, could adversely affect prevailing market prices for our common stock. Such a reduction in the market price of our common stock could impair our ability to raise additional capital through future public offerings of our equity securities.

13

Table of Contents

## FORWARD-LOOKING

Some statements in this prospectus or any prospectus supplement, and the documents incorporated by reference in this prospectus or any prospectus supplement are known as "forward-looking statements," as that term is used in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. Forward-looking statements may relate to, among other things, future performance generally, business development activities, future capital expenditures, financing sources and availability and the effects of regulation and competition.

When we use the words "believe," "intend," "expect,: "may," "will," "should," "anticipate," "could," "estimate," "plan," "predict," "project," or their negatives, or other similar expressions, the statements which include those words are usually forward-looking statements. When we describe strategy that involves risks or uncertainties, we are making forward-looking statements.

We warn you that forward-looking statements are only predictions. Actual events or results may differ as a result of risks that we face, including those set forth in the sections of this prospectus called "Risk Factors." Those are representatives of factors that could affect the outcome of the forward-looking statements. These and the other factors discussed elsewhere in this prospectus or any prospectus supplement and the documents incorporated by reference in them are not necessarily all of the important factors that could cause our results to differ materially from those expressed in our forward-looking statements. Forward-looking statements speak only as of the date they are made and we undertake no obligation to update them.

## USE OF PROCEEDS

Except as described in any prospectus supplement, the net proceeds from the sale of the securities will be added to our general funds and used for general corporate purposes, including, among other things, additions to working capital, repayment or redemption of existing indebtedness and financing of capital expenditures, joint ventures and acquisitions. We continually identify, evaluate and discuss with others acquisition opportunities within the coal and gas industries, both in the United States and in other areas. We continually evaluate potential acquisition candidates and intend to continue to pursue transactions in support of our acquisition strategy. However, we have not reached any agreements, commitments or understandings for any future acquisitions other than those arrangements, if any, as described in documents incorporated by reference or in prospectus supplements.

When we offer a particular series of securities, the prospectus supplement relating to that offering will describe the intended use of the net proceeds received from that offering. We will retain broad discretion in the use of the net proceeds.

## SECURITIES WE MAY OFFER

We may offer debt securities, shares of common stock, shares of preferred stock, depositary shares, stock purchase units, stock purchase contracts or warrants to purchase common stock, preferred stock or debt securities, or any combination of the foregoing, either individually or as units consisting of one or more securities. We may offer up to $800,000,000 of securities under this prospectus. If securities are offered as units, we will describe the terms of the units in a prospectus supplement.

## DESCRIPTION OF DEBT SECURITIES

We may offer any combination of senior debt securities or subordinated debt securities. Debt securities are unsecured obligations to repay advanced funds. We may issue senior debt securities and

14

Table of Contents

subordinated debt securities under separate indentures between us, as issuer, and the trustee or trustees under any such indenture identified in the prospectus supplement related to that offering.

The prospectus supplement will describe the particular terms of any debt securities we may offer. The following summaries of the debt securities and the indentures are not complete. We urge you to read the description of the debt securities and the indentures included in the prospectus supplement. The summaries contained in this prospectus, together with the description of debt securities offered and related indentures or indenture supplements included in the applicable prospectus supplement, will provide the material terms of the debt securities and of the indentures.

## General

We may issue debt securities in one or more separate series. We may specify a maximum aggregate principal amount for the debt securities of any series. The debt securities will have terms that are consistent with the applicable indenture. Senior debt securities will be unsecured and unsubordinated obligations and will rank equal with all our other unsecured and unsubordinated debt. Each series of subordinated debt securities will be subordinated and junior in right of payment to the extent and manner described in the prospectus supplement related to that debt.

The applicable indenture might not limit the amount of other debt that we may incur and might not contain financial or similar restrictive covenants. The applicable indenture might not contain any provision to protect holders of debt securities against a sudden or dramatic decline in our ability to pay our debt.

The prospectus supplement will describe the debt securities and the price or prices at which we will offer the debt securities. The description will include:

- the title and form of the debt securities;

- any limit on the aggregate principal amount of the debt securities or the series of which they are a part;

- the person to whom any interest on a debt security of the series will be paid;

- the date or dates on which we must repay the principal;

- the rate or rates at which the debt securities will bear interest, if any, the date or dates from which interest will accrue, and the dates on which we must pay interest;

- if applicable, the duration and terms of the right to extend interest payment periods;

- the place or places where we must pay the principal and any premium or interest on the debt securities;

- the terms and conditions on which we may redeem any debt security, if at all;

- any obligation to redeem or purchase any debt securities, and the terms and conditions on which we must do so;

- the denominations in which we may issue the debt securities;

- the manner in which we will determine the amount of principal of or any premium or interest on the debt securities;

- the currency in which we will pay the principal of and any premium or interest on the debt securities;

- the principal amount of the debt securities that we will pay upon declaration of acceleration of their maturity;

15

Table of Contents

- the amount that will be deemed to be the principal amount for any purpose, including the principal amount that will be due and payable upon any maturity or that will be deemed to be outstanding as of any date;
- if applicable, that the debt securities are defeasible and the terms of such defeasance;
- if applicable, the terms of any right to convert debt securities into, or exchange debt securities for, shares of common stock or other securities or property;
- whether we will issue the debt securities in the form of one or more global securities and, if so, the respective depositaries for the global securities and the terms of the global securities;
- the subordination provisions that will apply to any subordinated debt securities;
- any addition to or change in the events of default applicable to the debt securities and any change in the right of the trustee or the holders to declare the principal amount of any of the debt securities due and payable; and
- any addition to or change in the covenants in the applicable indenture.

We may sell the debt securities at a substantial discount below their stated principal amount. We will describe U.S. federal income tax considerations, if any, applicable to debt securities sold at an original issue discount in the prospectus supplement. An "original issue discount security" is any debt security sold for less than its face value, and which provides that the holder cannot receive the full face value if maturity is accelerated. The prospectus supplement relating to any original issue discount securities will describe the particular provisions relating to acceleration of the maturity upon the occurrence of an event of default. In addition, we will describe U.S. federal income tax or other considerations applicable to any debt securities that are denominated in a currency or unit other than U.S. dollars in the prospectus supplement.

## Guarantees

As described in the applicable prospectus supplement, payment of the principal of, premium, if any, and interest on, the debt securities may be guaranteed by some or all of our subsidiaries. Each guarantee will be a full and unconditional, joint and several obligation of the guarantor subsidiary issuing that guarantee.

The indenture may provide that in the event any guarantee would constitute or result in a violation of any applicable fraudulent conveyance or similar law of any relevant jurisdiction, the liability of the guarantor subsidiary under that guarantee will be reduced to the maximum amount, after giving effect to all other contingent and other liabilities of that guarantor, permissible under the applicable fraudulent conveyance or similar law. If any guarantor subsidiary makes a payment under its guarantee, the guarantor subsidiary will be entitled to a contribution from us and each other guarantor subsidiary in a pro rata amount based on the respective net worth of us and each guarantor subsidiary at the time of that payment.

The guarantor subsidiaries will account for a specified percentage of our total assets and total revenues.

## Optional Redemption

Except as set forth in the applicable prospectus supplement, the debt securities may be redeemed, in whole or in part, at our option, at any time or from time to time. Except as set forth in the applicable prospectus supplement, the redemption price for the debt securities to be redeemed on any redemption date will be equal to the greater of the following amounts:

16

Table of Contents

- 100% of the principal amount of the debt securities being redeemed on the redemption date; or

- the sum of the present values of the remaining scheduled payments of principal and interest on the debt securities being redeemed on that redemption date (not including any portion of any payments of interest accrued to the redemption date) discounted to the redemption date on a semiannual basis at the Treasury Rate (as defined below), plus 45 basis points, as determined by the Reference Treasury Dealer (as defined below), plus in each case, accrued and unpaid interest on the debt securities to the redemption date.

"Comparable Treasury Issue" means the United States Treasury security selected by the Reference Treasury Dealer as having a maturity comparable to the remaining term of the debt securities to be redeemed that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of comparable maturity to the remaining term of the debt securities.

"Comparable Treasury Price" means, with respect to any redemption date, (A) the average of the Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest such Reference Treasury Dealer Quotations, or (B) if the Trustee obtains fewer than three such Reference Treasury Dealer Quotations, the average of all such Quotations.

"Reference Treasury Dealer" means (A) specified investment banking or other firms (or their respective affiliates which are Primary Treasury Dealers), and their respective successors; provided, however, that if any of those entities ceases to be a primary U.S. government securities dealer in New York City (a "Primary Treasury Dealer"), we will substitute for those entities another Primary Treasury Dealer; and (B) any other Primary Treasury Dealer(s) selected by us.

"Reference Treasury Dealer Quotation" means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the trustee, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the trustee by such Reference Treasury Dealer at 5:00 p.m. (New York City time) on the third business day preceding such redemption date.

"Treasury Rate" means, with respect to any redemption date, the rate per annum equal to the semiannual equivalent yield to maturity of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date.

Notwithstanding the foregoing, installments of interest on debt securities that are due and payable on interest payment dates falling on or prior to a redemption date will be payable on the interest payment date to the registered holders as of the close of business on the relevant record date according to the debt securities and the applicable indenture. The redemption price will be calculated on the basis of a 360-day year consisting of twelve 30-day months.

We will mail notice of any redemption at least 30 days, but not more than 60 days, before the redemption date to each registered holder of the debt securities to be redeemed. Once notice of redemption is mailed, the debt securities called for redemption will become due and payable on the redemption date and at the applicable redemption price, plus accrued and unpaid interest to the redemption date.

On and after the redemption date, interest will cease to accrue on the debt securities or any portion of the debt securities called for redemption (unless we default in the payment of the redemption price or accrued interest). On or before the redemption date, we will deposit with a paying agent (or the trustee) money sufficient to pay the redemption price of and accrued interest on the debt securities to be

17

Table of Contents

redeemed on that date. If less than all of the debt securities are to be redeemed, the debt securities to be redeemed will be selected by lot by the Depository Trust Company in the case of debt securities represented by a global security, or by the trustee by a method the trustee deems to be fair and appropriate in the case of debt securities that are not represented by a global security.

Except as set forth in the applicable prospectus supplement, the debt securities will not be entitled to the benefit of any mandatory redemption or sinking fund.

### Conversion and Exchange Rights

The prospectus supplement will describe, if applicable, the terms on which you may convert debt securities into or exchange them for common stock or other securities or property. The conversion or exchange may be mandatory or may be at your option. The prospectus supplement will describe how the number of shares of common stock or other securities or property to be received upon conversion or exchange would be calculated.

### Subordination of Subordinated Debt Securities

Except as set forth in the applicable prospectus supplement, the subordinated debt securities are subordinated and junior in right of payment to all our senior indebtedness. If:

- we default in the payment of any principal, or premium, if any, or interest on any senior indebtedness when the same becomes due and payable, whether at maturity or at a date fixed for prepayment or declaration or otherwise; or

- an event of default occurs with respect to any senior indebtedness permitting the holders thereof to accelerate the maturity thereof and written notice of such event of default, requesting that payments on subordinated debt securities cease, is given to us by the holders of senior indebtedness;

then unless and until the default in payment or event of default shall have been cured or waived or shall have ceased to exist, no direct or indirect payment, in cash, property or securities, by set-off or otherwise, will be made or agreed to be made on account of the subordinated debt securities or interest thereon or in respect of any repayment, redemption, retirement, purchase or other acquisition of subordinated debt securities.

Except as set forth in the applicable prospectus supplement, in the event of:

- any insolvency, bankruptcy, receivership, liquidation, reorganization, readjustment, composition or other similar proceeding relating to us, our creditors or our property;

- any proceeding for our liquidation, dissolution or other winding-up, voluntary or involuntary, whether or not involving insolvency or bankruptcy proceedings;

- any assignment by us for the benefit of creditors; or

- any other marshaling of our assets;

all present and future senior indebtedness, including, without limitation, interest accruing after the commencement of the proceeding, assignment or marshaling of assets, will first be paid in full before any payment or distribution, whether in cash, securities or other property, will be made by us on account of subordinated debt securities. In that event, any payment or distribution, whether in cash, securities or other property, other than our securities or of any other corporation provided for by a plan of reorganization or readjustment, the payment of which is subordinate, at least to the extent provided in the subordination provisions of the subordinated debt securities, to the payment of all senior indebtedness at

18

Table of Contents

the time outstanding and to any securities issued in respect of the senior indebtedness under any such plan of reorganization or readjustment and other than payments made from any trust described in "Defeasance" below, which would otherwise, but for the subordination provisions, be payable or deliverable in respect of subordinated debt securities, including any such payment or distribution which may be payable or deliverable by reason of the payment of any other of our indebtedness being subordinated to the payment of subordinated debt securities will be paid or delivered directly to the holders of senior indebtedness, or to their representative or trustee, in accordance with the priorities then existing among such holders until all senior indebtedness shall have been paid in full. No present or future holder of any senior indebtedness will be prejudiced in the right to enforce subordination of the indebtedness evidenced by subordinated debt securities by any act or failure to act on our part.

The term "senior indebtedness" is defined as the principal, premium, if any, and interest on:

- all indebtedness, whether outstanding on the date of the issuance of subordinated debt securities or thereafter created, incurred or assumed, which is for money borrowed, or which is evidenced by a note or similar instrument given in connection with the acquisition of any business, properties or assets, including securities;

- any indebtedness of others of the kinds described in the first bullet point above for the payment of which we are responsible or liable as guarantor or otherwise; or

- amendments, renewals, extensions and refunding of any such indebtedness;

unless in any instrument or instruments evidencing or securing such indebtedness or pursuant to which the same is outstanding, or in any such amendment, renewal, extension or refunding, it is expressly provided that such indebtedness is not superior in right of payment to subordinated debt securities. The senior indebtedness will continue to be senior indebtedness and entitled to the benefits of the subordination provisions irrespective of any amendment, modification or waiver of any term of the senior indebtedness or extension or renewal of the senior indebtedness.

If we experience a bankruptcy, dissolution or reorganization, holders of senior indebtedness may receive more, ratably, and holders of subordinated debt securities may receive less, ratably, than our other creditors. The applicable indenture for subordinated debt securities may not limit our ability to incur additional senior indebtedness.

## Form, Exchange and Transfer

We will issue debt securities only in fully registered form, without coupons, and, unless the prospectus supplement indicates otherwise, only in denominations of $1,000 and integral multiples thereof. The holder of a debt security may elect, subject to the terms of the applicable indenture and the limitations applicable to global securities, to exchange them for other debt securities of the same series of any authorized denomination and of similar terms and aggregate principal amount.

Holders of debt securities may present them for exchange as provided above or for registration of transfer, duly endorsed or with the form of transfer duly executed, at the office of the transfer agent we designate for that purpose. We will not impose a service charge for any registration of transfer or exchange of debt securities, but we may require a payment sufficient to cover any tax or other governmental charge payable in connection with the transfer or exchange. We will name the transfer agent in the prospectus supplement. We may designate additional transfer agents or rescind the designation of any transfer agent or approve a change in the office through which any transfer agent acts, but we must maintain a transfer agent in each place in which we will pay on debt securities.

If we redeem the debt securities, we will not be required to issue, register the transfer of or exchange any debt security during a specified period prior to mailing a notice of redemption. We are not

19

required to register the transfer of or exchange any debt security selected for redemption, except the unredeemed portion of the debt security being redeemed.

**Global Securities**

The debt securities may be represented, in whole or in part, by one or more global securities that will have an aggregate principal amount equal to that of all debt securities of that series. Each global security will be registered in the name of a depositary identified in the prospectus supplement. We will deposit the global security with the depositary or a custodian, and the global security will bear a legend regarding the restrictions on exchanges and registration of transfer.

No global security may be exchanged in whole or in part for debt securities registered, and no transfer of a global security in whole or in part may be registered, in the name of any person other than the depositary or any nominee or successor of the depositary unless:

- the depositary is unwilling or unable to continue as depositary; or
- the depositary is no longer in good standing under the Exchange Act or other applicable statute or regulation.

The depositary will determine how all securities issued in exchange for a global security will be registered.

As long as the depositary or its nominee is the registered holder of a global security, we will consider the depositary or the nominee to be the sole owner and holder of the global security and the underlying debt securities. Except as stated above, owners of beneficial interests in a global security will not be entitled to have the global security or any debt security registered in their names, will not receive physical delivery of certificated debt securities and will not be considered to be the owners or holders of the global security or underlying debt securities. We will make all payments of principal, premium and interest on a global security to the depositary or its nominee. The laws of some jurisdictions require that some purchasers of securities take physical delivery of such securities in definitive form. These laws may prevent you from transferring your beneficial interests in a global security.

Only institutions that have accounts with the depositary or its nominee and persons that hold beneficial interests through the depositary or its nominee may own beneficial interests in a global security. The depositary will credit, on its book-entry registration and transfer system, the respective principal amounts of debt securities represented by the global security to the accounts of its participants. Ownership of beneficial interests in a global security will be shown only on, and the transfer of those ownership interests will be effected only through, records maintained by the depositary or any such participant.

The policies and procedures of the depositary may govern payments, transfers, exchanges and others matters relating to beneficial interests in a global security. We and the trustee will assume no responsibility or liability for any aspect of the depositary's or any participant's records relating to, or for payments made on account of, beneficial interests in a global security.

**Payment and Paying Agents**

Unless the prospectus supplement indicates otherwise, we will pay principal and any premium or interest on a debt security to the person in whose name the debt security is registered at the close of business on the regular record date for such interest.

Unless the prospectus supplement indicates otherwise, we will pay principal and any premium or interest on the debt securities at the office of our designated paying agent. Unless the prospectus

20

**Table of Contents**

supplement indicates otherwise, the corporate trust office of the trustee will be the paying agent for the debt securities.

Any other paying agents we designate for the debt securities of a particular series will be named in the prospectus supplement. We may designate additional paying agents, rescind the designation of any paying agent or approve a change in the office through which any paying agent acts, but we must maintain a paying agent in each place of payment for the debt securities.

The paying agent will return to us all money we pay to it for the payment of the principal, premium or interest on any debt security that remains unclaimed for a specified period. Thereafter, the holder may look only to us for payment, as an unsecured general creditor.

## Covenants

Covenants with respect to any series of debt securities will be set forth in the applicable prospectus supplement.

## Events of Default

The following will be events of default:

- the Company fails to pay interest when due and such failure continues for 30 days and the time for payment has not been properly extended or deferred;
- the Company fails to pay the principal or any premium when due and the time for payment has not been properly extended or deferred;
- the Company or any Guarantor fails to observe or perform any other covenant contained in the debt securities or the guarantees, and such failure continues for a specified number of days after we receive written notice from the trustee or holders of a specified percentage of the aggregate principal amount of the debt securities of that series;
- certain events in bankruptcy, insolvency or reorganization; and
- any other event of default specified in the applicable prospectus supplement.

If an event of default occurs and is continuing, the trustee or the holders of a specified percentage in aggregate principal amount of the outstanding securities of that series may declare the debt securities of that series due and payable immediately. In case of an event of default resulting from certain events of bankruptcy, insolvency or reorganization, the principal and premium of all outstanding debt securities will become and be immediately due and payable without any declaration or other act by the trustee or any holder of outstanding debt securities. Under certain circumstances, the holders of a majority in principal amount of the outstanding debt securities of that series may rescind any such acceleration with respect to the debt securities and its consequences.

The holders of a majority in principal amount of the debt securities of that series may waive any default or event of default with respect to the debt securities and its consequences, except defaults or events of default regarding payment of principal, any premium or interest, other than by acceleration. A waiver will eliminate the default.

Except for certain duties in case of an event of default, the trustee will not be obligated to exercise any of its rights or powers at the request or direction of any of the holders, unless the holders have offered the trustee reasonable indemnity. If they provide this indemnification, the holders of a majority in aggregate principal amount of the outstanding securities of any series may direct the time, method and place of conducting any proceeding for any remedy available to the trustee or exercising any trust or power conferred on the trustee with respect to the debt securities of that series.

No holder of a debt security of any series may institute any proceeding with respect to the applicable indenture, or for the appointment of a receiver or a trustee, or for any other remedy, unless:

21

Table of Contents

- the holder has previously given the trustee written notice of a continuing event of default;
- the holders of a specified percentage in aggregate principal amount of the outstanding securities of that series have made a written request upon the trustee, and have offered reasonable indemnity to the trustee, to institute the proceeding;
- the trustee has failed to institute the proceeding for a specified period of time after its receipt of the notification; and
- the trustee has not received a direction inconsistent with the request within a specified number of days.

## Modification of Indenture

We and the trustee may change the applicable indenture without the consent of any holders to:

- fix any ambiguity, defect or inconsistency in the applicable indenture;
- evidence the succession of another corporation to the Company or a guarantor subsidiary and the assumption by such party of the obligations of the Company or a guarantor subsidiary;
- provide for uncertificated debt securities in addition to or in place of certificated debt securities;
- add to the covenants for the benefit of all or any series of debt securities;
- add to, delete from, or revise the conditions, limitations, and restrictions on the authorized amount, terms, or purposes of issue, authentication, and delivery of debt securities set forth in the applicable indenture;
- change anything that does not materially adversely affect the rights of any holder of debt securities;
- provide for the issuance of and establish the form and terms and conditions of the debt securities of any series, establish the form of any certifications required or add to the rights of any holders of any series of debt securities;
- add any additional events of default for the benefit of all or any series;
- provide for the appointment of a successor trustee; or
- to provide for the addition or release of a guarantor subsidiary in respect of a guarantee as provided in the applicable indenture.

The following changes may only be made with the consent of each affected holder:

- extending the fixed maturity of any debt securities of any series;
- reducing the principal amount of any debt securities of any series;
- reducing the rate or extending the time of payment of interest of any debt securities of any series;
- reducing any premium payable upon redemption; or
- reducing the percentage of debt securities outstanding required to consent to any amendment to the applicable indenture or to the debt securities or guarantees.

## Defeasance

To the extent stated in the prospectus supplement, we may elect to apply the provisions in the applicable indenture relating to defeasance and discharge of indebtedness, or to defeasance of restrictive covenants, if any, to the debt securities of any series. The applicable indenture may provide that, subject to conditions specified in such indenture, we may elect either:

- legal defeasance, whereby we are discharged from any and all obligations with respect to the debt securities, except as may be otherwise provided in such indenture; or

Table of Contents

- covenant defeasance, whereby we are released from certain restrictive covenants, if any, contained in such indenture.

We may do so in either case by depositing with the trustee as trust funds, cash, or government securities which through the payment of principal and interest in accordance with their terms will provide money, in an amount sufficient to pay the principal and any premium and interest on the debt securities and all other sums payable by us under the applicable indenture in connection with the debt securities. This type of a trust may only be established if, among other things, we have delivered to the trustee an opinion of counsel meeting the requirements set forth in the applicable indenture.

## Notices

We will mail notices to holders of debt securities as indicated in the prospectus supplement.

## Title

We may treat the person in whose name a debt security is registered as the absolute owner, whether or not such debt security may be overdue, for the purpose of making payment and for all other purposes.

## Governing Law

The applicable indenture and the debt securities will be governed by and construed in accordance with the laws of the state of New York.

### DESCRIPTION OF COMMON STOCK AND PREFERRED STOCK

The following is a description of the common stock and preferred stock we may offer under this prospectus. The summaries contained in this prospectus, together with the description of common stock and preferred stock included in the applicable prospectus supplement, will provide the material terms of the common stock and preferred stock.

## Common Stock

We are authorized to issue 500,000,000 shares of common stock. The holders of common stock are entitled to one vote per share on all matters submitted to a vote of the stockholders. Cumulative voting of shares of common stock is prohibited, which means that the holders of a majority of shares voting for the election of directors can elect all members of our board of directors. Except as otherwise required by applicable law, a majority vote is sufficient for any act of stockholders. The holders of common stock are entitled to receive ratably such dividends, if any, as may be declared from time to time by our board of directors out of funds legally available for the payment of dividends. In the event of our liquidation, dissolution, or winding up, the holders of common stock are entitled to share ratably in all assets remaining after payment of liabilities and amounts owed to holders of preferred stock. The holders of common stock have no preemptive or conversion rights or other subscription rights, and there are no redemption or sinking fund provisions applicable to the common stock.

The rights, preferences and privileges of holders of our common stock are subject to, and may be injured by, the rights of the holders of shares of any series of preferred stock that we may designate and issue in the future. The issuance of preferred stock could decrease the amount of earnings and assets available for distribution to holders of common stock or adversely affect the rights and powers of the holders of common stock, including their voting rights.

23

Table of Contents

## Preferred Stock

We are authorized to issue up to 15,000,000 shares of preferred stock having rights senior to our common stock. Our board of directors is authorized to establish the powers, rights, preferences, privileges and designations of one or more series of preferred stock without further stockholder approval, including:

- dividend rights;

- conversion rights;

- voting rights;

- redemption rights and terms of redemption; and

- liquidation preferences.

The rights, preferences, privileges and restrictions of the preferred stock of each series will be fixed by a certificate of designation relating to each series. The prospectus supplement relating to each series will specify the terms of the preferred stock, including:

- the maximum number of shares in the series and the distinctive designation;

- the terms on which dividends will be paid, if any;

- the terms on which the shares may be redeemed, if at all;

- the liquidation preference, if any;

- the terms of any retirement or sinking fund for the purchase or redemption of the shares of the series;

- the terms and conditions, if any, on which the shares of the series will be convertible into, or exchangeable for, shares of any other class or classes of capital stock;

- the voting rights, if any, on the shares of the series; and

- any or all other preferences and relative, participating, operational or other special rights or qualifications, limitations or restrictions of the shares.

We will describe the specific terms of a particular series of preferred stock in the prospectus supplement relating to that series. The description of preferred stock above and the description of the terms of a particular series of preferred stock in the prospectus supplement are not complete. You should refer to the applicable certificate of designation for complete information. The prospectus supplement will contain a description of U.S. federal income tax consequences relating to the particular series of preferred stock.

## Possible Anti-Takeover Effects

### Section 203 of Delaware Law.

We are a Delaware corporation subject to Section 203 of the Delaware General Corporation Law. Section 203 provides that a corporation generally may not engage in any business combination with any interested stockholder for a period of three years following the time that such stockholder became an interested stockholder. Section 203 applies unless:

- prior to the time a stockholder becomes an interested stockholder, the board of directors of the corporation approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;

24

Table of Contents

- upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced (excluding certain shares); or
- on or after such date the stockholder became an interested stockholder, the business combination is approved by the board of directors of the corporation and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66 2/3% of the outstanding voting stock which is not owned by the interested stockholder.

An "interested stockholder" is defined to include:

- any person that is the owner of 15% or more of the outstanding voting stock of the corporation or is an affiliate or associate of the corporation and was the owner of 15% or more of the outstanding voting stock of the corporation at any time within the three-year period immediately prior to the relevant date; and
- the affiliates and associates of any such person.

Section 203 defines a business combination to include:

- any merger or consolidation involving the corporation and the interested stockholder;
- any sale, transfer, pledge or other disposition of 10% or more of the assets of the corporation involving the interested stockholder;
- certain transactions that result in the issuance or transfer by the corporation of any stock of the corporation to the interested stockholder;
- any transaction involving the corporation that increases the proportionate share of the stock of any class or series of the corporation beneficially owned by the interested stockholder; or
- the receipt by the interested stockholder of any loans, advances, guarantees, pledges or other financial benefits provided through the corporation. In general, Section 203 defines an interested stockholder as any entity or person beneficially owning 15% or more of the outstanding voting stock of the corporation and any entity or person affiliated with or controlling or controlled by such entity or person.

Under certain circumstances, these provisions could have the effect of delaying, deferring or preventing a change in control of our company during the three-year period or reducing the price that certain investors might be willing to pay in the future for shares of our common stock, although the stockholders may elect to exclude a corporation from the restrictions imposed under Section 203.

*Blank Check Preferred Stock*

The rights, preferences and privileges of holders of our common stock are subject to, and may be injured by, the rights of the holders of shares of any series of preferred stock that we may designate and issue in the future. The issuance of preferred stock could have the effect of delaying, deferring or preventing a change of control including transactions in which the stockholders might otherwise receive a premium for their shares over the then current market prices.

25

Table of Contents

**Transfer Agent and Registrar**

The transfer agent and registrar for our common stock is First Chicago Trust Company of New York.

## DESCRIPTION OF DEPOSITARY SHARES

The following summarizes the terms of depositary shares we may offer. The summaries contained in this prospectus, together with the description of the depositary shares included in the applicable prospectus supplement, will provide the material terms of the depositary shares.

### General

We may, at our option, elect to offer fractional interests in shares of preferred stock, rather than shares of preferred stock. If we exercise that option, we will provide for a depositary to issue receipts for depositary shares, each of which will represent a fractional interest in a share of preferred stock.

The shares of preferred stock underlying the depositary shares will be deposited under a separate deposit agreement between us and a bank or trust company depositary that has its principal office in the U.S. The prospectus supplement will include the name and address of the depositary. Subject to the terms of the deposit agreement, each owner of a depositary share will be entitled, in proportion to the applicable fractional interest in a share of preferred stock, to all the rights and preferences of the underlying preferred stock, including dividend, voting, redemption, conversion and liquidation rights. Depositary receipts will be issued for depositary shares.

The depositary may issue temporary depositary receipts substantially identical to, and entitling the holders to all the rights pertaining to, the definitive depositary receipts. Definitive depositary receipts will then be prepared thereafter and temporary depositary receipts may be exchanged for definitive depositary receipts at our expense.

Upon surrender of depositary receipts and payment of the charges provided in the deposit agreement, the depositary will deliver the whole shares of preferred stock underlying the depositary shares.

### Dividends and Other Distributions

The depositary will distribute all cash dividends or other cash distributions on the preferred stock, rounded to the nearest cent, to the record holders of depositary shares in proportion to the numbers of such depositary shares owned by them on the relevant record date. Fractions of one cent not so distributed will be added to the next sum received by the depositary for distribution to record holders of depositary shares.

In the event of a non-cash distribution, the depositary will, if feasible, distribute property received by it to the record holders of depositary shares entitled to them. If the distribution is not feasible, the depositary may sell the property and distribute the net proceeds to such holders.

### Redemption of Depositary Shares

If we redeem the preferred stock underlying the depositary shares, the depositary will redeem the depositary shares from the proceeds of the redemption of the preferred stock held by the depositary. The depositary will mail notice of redemption not less than 30 or more than 60 days prior to the date fixed for redemption to the record holders of the depositary shares. The redemption price per depositary share will be equal to the applicable fraction of the redemption price per share payable with respect to the preferred stock. Whenever we redeem shares of preferred stock held by the depositary, the depositary will redeem

26

**Table of Contents**

the corresponding depositary shares as of the same redemption date. If less than all the depositary shares are to be redeemed, the depositary will select by lot or pro rata which depositary shares will be redeemed.

After the redemption, the depositary shares called for redemption will no longer be deemed to be outstanding. All rights of the holders of the depositary shares will cease, except the right to receive the money or other property to which the holders are entitled upon redemption and surrender of the depositary receipts for their depositary shares.

### Voting the Preferred Stock

The depositary will mail to the holders of depositary shares the information contained in any notice of meeting at which the holders of preferred stock are entitled to vote. Each record holder of depositary shares on the record date for the preferred stock may instruct the depositary to exercise its voting rights with respect to the depositary shares. The depositary will attempt to vote the number of shares of preferred stock underlying such depositary shares in accordance with these instructions. We will agree to take any action required to enable the depositary to vote the depositary shares. The depositary will abstain from voting shares of preferred stock to the extent it does not receive instructions from the holders of depositary shares relating to that preferred stock.

### Amendment and Termination of the Deposit Agreement

We and the depositary may amend the form of depositary receipt and any provision of the deposit agreement at any time. However, neither of us can make any amendment that would materially and adversely alter the rights of the existing holders of depositary shares without approval by the record holders of at least a majority of the outstanding depositary shares. We or the depositary may terminate a deposit agreement only if:

- all outstanding depositary shares relating thereto have been redeemed; or
- there has been a final distribution to the holders of preferred stock and to the holders of the related depositary shares in the event of our liquidation, dissolution or winding up.

### Charges of Depositary

We will pay all transfer and other taxes and governmental charges arising solely from the depositary arrangements. We will pay charges of the depositary in connection with the initial deposit of the preferred stock and any redemption of the preferred stock. Holders of depositary shares will pay transfer and other taxes and governmental charges and any other charges listed in the deposit agreement as holders' charges.

### Miscellaneous

The depositary will forward to the holders of depositary shares all reports and communications that we are required to furnish to the holders of the preferred stock.

Neither we nor the depositary will be liable if the law or any circumstance beyond its control prevents it from performing its obligations under the deposit agreement. We and the depositary will be required only to perform their duties in good faith. They will not be obligated to prosecute or defend any legal proceeding regarding any depositary shares or preferred stock unless the holders of those securities provide them with satisfactory indemnity. They may rely on written advice of counsel or accountants, or information provided by persons presenting preferred stock for deposit, holders of depositary shares or other persons believed to be competent and on documents believed to be genuine.

27

Table of Contents

**Resignation and Removal of Depositary**

The depositary may resign at any time by delivering notice to us, and we may at any time remove the depositary. Any such resignation or removal will take effect when a successor depositary is established.

## DESCRIPTION OF STOCK PURCHASE UNITS
## AND STOCK PURCHASE CONTRACTS

The following summarizes the general terms of stock purchase units and stock purchase contracts we may issue. The summaries contained in this prospectus, together with the description of stock purchase units and stock purchase contracts included in the applicable prospectus supplement, will provide the material terms of the stock purchase units and stock purchase contracts.

We may issue stock purchase contracts, including contracts obligating holders to purchase from us, and us to sell to the holders, a specified number of shares of common stock or preferred stock at a future date or dates. We may fix the consideration per share of common stock or preferred stock at the time we issue the stock purchase contracts, or the consideration may be determined by referring to a specific formula stated in the stock purchase contracts. We may issue the stock purchase contracts separately or as a part of stock purchase units consisting of a stock purchase contract and debt securities, preferred securities or debt obligations of third parties, including U.S. Treasury securities, which secure the holders' obligations to purchase the common stock or preferred stock under the stock purchase contracts. The stock purchase contracts may require us to make periodic payments to the holders of the stock purchase units or vice versa. These payments may be unsecured or prefunded on some basis. The stock purchase contracts may require holders to secure their obligations in a specified manner.

## DESCRIPTION OF WARRANTS TO PURCHASE DEBT SECURITIES

The following summarizes the terms of the warrants to purchase debt securities we may offer. The summaries contained in this prospectus, together with the description of warrants to purchase debt securities and indentures included in the applicable prospectus supplement, will provide the material terms of the warrants to purchase debt securities and of the indenture.

**General**

We may issue debt warrants evidenced by debt warrant certificates independently or together with any securities offered by any prospectus supplement. If we offer debt warrants, the prospectus supplement will describe the terms of the warrants, including:

- the offering price, if any;
- the designation, aggregate principal amount and terms of the debt securities purchasable upon exercise of the warrants and the terms of the applicable indenture under which the debt securities will be issued;
- if applicable, the designation and terms of the debt securities with which the debt warrants are issued and the number of debt warrants issued with each debt security;
- if applicable, the date on and after which the debt warrants and the related securities will be separately transferable;
- the principal amount of debt securities purchasable upon exercise of one debt warrant and the price at which the principal amount of debt securities may be purchased upon exercise;
- the dates on which the right to exercise the debt warrants begins and expires;

28

Table of Contents

- U.S. federal income tax consequences;

- whether the warrants represented by the debt warrant certificates will be issued in registered or bearer form;

- the currencies in which the offering price and exercise price are payable; and

- if applicable, any antidilution provisions.

You may exchange debt warrant certificates for new debt warrant certificates of different denominations and may present debt warrant certificates for registration of transfer at the corporate trust office of the debt warrant agent, which will be listed in the prospectus supplement. Warrantholders do not have any of the rights of holders of debt securities, except to the extent the consent of warrantholders may be required for certain modifications of the terms of the applicable indenture or form of the debt security, as the case may be, and the series of debt securities issuable upon exercise of the debt warrants. In addition, warrantholders are not entitled to payments of principal of and interest, if any, on the debt securities.

### Exercise of Debt Warrants

You may exercise debt warrants by surrendering the debt warrant certificate at the corporate trust office of the debt warrant agent, with payment in full of the exercise price. Upon the exercise of debt warrants, the debt warrant agent will, as soon as practicable, deliver the debt securities in authorized denominations in accordance with your instructions and at your sole cost and risk. If less than all the debt warrants evidenced by the debt warrant certificate are exercised, the agent will issue a new debt warrant certificate for the remaining amount of debt warrants.

## DESCRIPTION OF WARRANTS TO PURCHASE COMMON STOCK OR PREFERRED STOCK

The following summarizes the terms of common stock warrants and preferred stock warrants we may issue. The summaries contained in this prospectus, together with the description of warrants to purchase common stock or preferred stock in the applicable prospectus supplement, will provide the material terms of the warrants to purchase common stock or preferred stock.

### General

We may issue stock warrants evidenced by stock warrant certificates under a stock warrant agreement independently or together with any securities we offer by any prospectus supplement. If we offer stock warrants, the prospectus supplement will describe the terms of the stock warrants, including:

- the offering price, if any;

- if applicable, the designation and terms of the preferred stock purchasable upon exercise of the preferred stock warrants;

- the number of shares of common or preferred stock purchasable upon exercise of one stock warrant and the initial price at which the shares may be purchased upon exercise;

- the dates on which the right to exercise the stock warrants begins and expires;

- U.S. federal income tax consequences;

- call provisions, if any;

- the currencies in which the offering price and exercise price are payable; and

- if applicable, the antidilution provisions of the stock warrants.

29

Table of Contents

The shares of common stock or preferred stock we issue upon exercise of the stock warrants will, when issued in accordance with the stock warrant agreement, be validly issued, fully paid and nonassessable.

**Exercise of Stock Warrants**

You may exercise stock warrants by surrendering to the stock warrant agent the stock warrant certificate, which indicates your election to exercise all or a portion of the stock warrants evidenced by the certificate. Surrendered stock warrant certificates must be accompanied by payment of the exercise price in the form of cash or a check. The stock warrant agent will deliver certificates evidencing duly exercised stock warrants to the transfer agent. Upon receipt of the certificates, the transfer agent will deliver a certificate representing the number of shares of common stock or preferred stock purchased. If you exercise fewer than all the stock warrants evidenced by any certificate, the stock warrant agent will deliver a new stock warrant certificate representing the unexercised stock warrants.

**No Rights as Stockholders**

Holders of stock warrants are not entitled to vote, to consent, to receive dividends or to receive notice as stockholders with respect to any meeting of stockholders, or to exercise any rights whatsoever as stockholders of CONSOL Energy.

## PLAN OF DISTRIBUTION

We may sell the securities through underwriters or dealers, through agents, or directly to one or more purchasers. The prospectus supplement will describe the terms of the offering of the securities, including:

- the name or names of any underwriters, if any;
- the purchase price of the securities and the proceeds we will receive from the sale;
- any underwriting discounts and other items constituting underwriters' compensation;
- any initial public offering price;
- any discounts or concessions allowed or reallowed or paid to dealers; and
- any securities exchange or market on which the securities may be listed.

Only underwriters named in the prospectus supplement are underwriters of the securities offered by the prospectus supplement.

If underwriters are used in the sale, they will acquire the securities for their own account and may resell them from time to time in one or more transactions at a fixed public offering price or at varying prices determined at the time of sale. We may offer the securities to the public through underwriting syndicates represented by managing underwriters or by underwriters without a syndicate. Subject to certain conditions, the underwriters will be obligated to purchase all the securities of the series offered by the prospectus supplement. Any public offering price and any discounts or concessions allowed or reallowed or paid to dealers may change from time to time.

We may sell securities directly or through agents we designate from time to time. We will name any agent involved in the offering and sale of securities and we will describe any commissions we will pay the agent in the prospectus supplement. Unless the prospectus supplement states otherwise, our agent will act on a best-efforts basis for the period of its appointment.

30

We may authorize agents or underwriters to solicit offers by certain types of institutional investors to purchase securities from us at the public offering price set forth in the prospectus supplement pursuant to delayed delivery contracts providing for payment and delivery on a specified date in the future. We will describe the conditions to these contracts and the commissions we must pay for solicitation of these contracts in the prospectus supplement.

We may provide agents and underwriters with indemnification against certain civil liabilities, including liabilities under the Securities Act, or contribution with respect to payments that the agents or underwriters may make with respect to such liabilities. Agents and underwriters may engage in transactions with, or perform services for, us in the ordinary course of business.

All securities we offer other than common stock will be new issues of securities with no established trading market. Any underwriters may make a market in these securities, but will not be obligated to do so and may discontinue any market making at any time without notice. We cannot guarantee the liquidity of the trading markets for any securities.

## LEGAL MATTERS

Piper Rudnick LLP, New York, New York, will provide us with an opinion as to legal matters in connection with the securities we are offering.

## EXPERTS

The financial statements as of December 31, 2002 and for the year then ended incorporated in this Prospectus by reference to the Annual Report on Form 10-K, as amended, for the year ended December 31, 2002 have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent accountants, given on the authority of said firm as experts in auditing and accounting.

The consolidated financial statements of CONSOL Energy Inc. incorporated in this Prospectus by reference from CONSOL Energy Inc.'s Annual Report (Form 10-K) at December 31, 2001 and June 30, 2001, and for the periods of six months ended December 31, 2001 and the twelve months ended June 30, 2001 and 2000 have been audited by Ernst & Young LLP, independent auditors, as set forth in their report thereon incorporated herein by reference. Such consolidated financial statements are incorporated herein by reference in reliance upon such report given on the authority of such firm as experts in accounting and auditing.

## WHERE YOU CAN FIND MORE INFORMATION

We are subject to the reporting requirements of the Securities Exchange Act of 1934 and, in accordance with that Act, file annual and quarterly reports, proxy statements and other information with the Securities and Exchange Commission. These reports, proxy statements and other information may be inspected and copies of these materials may be obtained upon payment of fees at the Public Reference Room maintained by the Commission at 450 Fifth Street, N.W., Washington, D.C. 20549. You may obtain information on the operation of the Public Reference Room by calling the Commission at 1-800-SEC-0330. In addition, we are required to file electronic versions of these materials with the Commission through the Commission's Electronic and Data Gathering, Analysis and Retrieval system. The Commission maintains a World Wide Web site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding registrants that file electronically with the Commission. Our common stock is listed on the New York Stock Exchange, and reports and other information concerning us may be inspected at the New York Stock Exchange, Inc. at 20 Broad Street, New York, New York 10005.

We have filed with the Commission a registration statement on Form S-3 under the Securities Act of 1933. This prospectus does not contain all of the information set forth in the registration statement and the exhibits thereto. The Commission allows us to "incorporate by reference" the information we file

31

Table of Contents

with it, which means that we can disclose important information to you by referring to those documents. We incorporate by reference the documents listed below and any filings made with the Commission under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 after the initial filing of this registration statement that contains this prospectus and prior to the time that we sell all the securities offered by this prospectus. Any statement contained in this prospectus or in a document incorporated or deemed to be incorporated by reference in this prospectus shall be modified or superseded for purposes of this prospectus to the extent that a statement contained in this prospectus or in any subsequently filed document which is incorporated by reference in this prospectus modifies or supersedes that statement. A statement so modified or superseded will not be deemed, except as so modified or superseded, to be a part of this prospectus.

Copies of the registration statement, including all exhibits to it, may be obtained from the Commission's principal office in Washington, D.C. upon the payment of the fees prescribed by the Commission, or may be examined without charge at the offices of the Commission described above. Copies of these materials may also be obtained from the EDGAR database.

The following documents filed by us with the Commission pursuant to the Exchange Act are incorporated by reference herein:

1. Our Annual Report on Form 10-K, as amended, for the fiscal year ended December 31, 2002, filed March 21, 2003 (file no. 001-14901);

2. Our Quarterly Report on Form 10-Q for the quarter ended March 31, 2003, filed May 9, 2003 (file no. 001-14901); and

3. The description of the common stock contained in our Registration Statement on Form 8-A, filed March 24, 1999 (file no. 001-14901).

We will provide to each person to whom a copy of this prospectus is delivered, upon the written or oral request of such person, without charge, a copy of any or all of the documents that are incorporated herein by reference. Requests should be directed to: CONSOL Energy Inc. 1800 Washington Road, Pittsburgh, PA 15241-1421, Attention: General Counsel.

32

Table of Contents

## Part II
## INFORMATION NOT REQUIRED IN PROSPECTUS

### Item 14. Other Expenses of Issuance and Distribution.

The following table sets forth the estimated expenses to be incurred by us in connection with the issuance and distribution of the securities being registered, other than underwriting discounts and commission.

| | |
|---|---:|
| Securities and Exchange Commission Registration Fee | $64,720 |
| Legal Fees and Expenses | * |
| Accounting Fees and Expenses | * |
| Miscellaneous | * |
| Total | $    * |

---

\*    To be completed by amendment.

### Item 15. Indemnification of Directors and Officers.

Limitation of Liability and Indemnification Matters

As permitted by applicable provisions of the Delaware General Corporation Law, the Restated Certificate of Incorporation contains a provision eliminating, to the fullest extent permitted by the Delaware General Corporation Law as it exists or may in the future be amended, the liability of a director to CONSOL Energy and its stockholders for monetary damages for breaches of fiduciary duty as a director except for:

- any breach of the director's duty of loyalty to CONSOL Energy or its stockholders;

- acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of laws;

- payment of dividends, stock purchases or redemptions that violate the Delaware General Corporation Law; or

- any transaction from which the director derived an improper personal benefit.

CONSOL Energy's By-laws also provide that any present or prior director, officer, employee or agent of CONSOL Energy shall be indemnified by CONSOL Energy as of right to the full extent permitted by the Delaware General Corporation Law against any liability, cost or expense asserted against and incurred by such person by reason of his serving in such capacity. This right to indemnification includes the right to be paid the expenses incurred in defending any action, suit or proceeding in advance of its final disposition.

RWE AG maintains insurance coverage for directors, officers and employees of CONSOL Energy for certain liabilities incurred in connection with the performance of their duties, including for securities laws violations. CONSOL maintains insurance coverage for claims against directors, officers, and employees for certain liabilities, including, with respect to employees, for alleged violations of federal and state securities laws and regulations.

II-1

## 16. Exhibits

| Exhibit No. | Description |
|---|---|
| 1.1† | Form of Underwriting Agreement |
| 3.1* | Certificate of Incorporation of the Registrant |
| 3.2** | Bylaws of the Registrant |
| 4.1*** | Specimen Common Stock Certificate |
| 4.2**** | Indenture, dated March 7, 2002, among CONSOL Energy Inc., certain subsidiaries of CONSOL Energy Inc. and The Bank of Nova Scotia Trust Company of New York, as trustee. |
| 4.3***** | Supplemental Indenture No. 1, dated March 7, 2002, among CONSOL Energy Inc., certain subsidiaries of CONSOL Energy Inc. and The Bank of Nova Scotia Trust Company of New York, as trustee. |
| 4.4† | Form of Subordinated Indenture |
| 4.5† | Form of Deposit Agreement |
| 4.6† | Form of Stock Purchase Contract |
| 4.7† | Form of Warrant |
| 4.8† | Form of Certificate of Designation with respect to Preferred Stock |
| 5.1†† | Opinion of Piper Rudnick LLP |
| 12.1†† | Statement of Computation of Ratio of Earnings to Fixed Charges |
| 23.1 | Consent of PricewaterhouseCoopers LLP, Independent Accountants |
| 23.2 | Consent of Ernst & Young LLP, Independent Auditors |
| 23.3† | Consent of Piper Rudnick LLP (included in Exhibit 5.1) |
| 23.4 | Consent of Ralph E. Davis Associates, Inc., Independent Petroleum Engineers |
| 23.5 | Consent of Data and Consulting Services, a division of Schlumberger, Independent Petroleum Engineers |
| 24.1 | Powers of Attorney (included on signature page) |
| 25.1† | Statement of Eligibility on Form T-1 under the Trust Indenture Act of 1939, as amended |

| | |
|---|---|
| † | To be filed by amendment or as an exhibit to a report pursuant to Section 13(a), 13(c) or 15(d) of the Exchange Act. |
| †† | Previously filed. |
| * | Incorporated by reference to Exhibit 3.1 to Amendment No. 2 to Registration Statement Form S-1 (Registration No. 333-68987) filed on March 24, 1999. |
| ** | Incorporated by reference to Exhibit 3.2 to Amendment No. 2 to Registration Statement Form S-1 (Registration No. 333-68987) filed on March 24, 1999. |
| *** | Incorporated by reference to Exhibit 4.1 to Amendment No. 2 to Registration Statement Form S-1 (Registration No. 333-68987) filed on March 24, 1999. |
| **** | Incorporated by reference to Exhibit 4.1 to Form 10-K (file number 333-68987) filed on March 29, 2002 ( the "Form 10-K"). |
| ***** | Incorporated by reference to Exhibit 4.2 to the Form 10-K. |

II-2

**Table of Contents**

**Item 17. Undertakings**

(a) The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the Registration Statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than 20% change in the maximum aggregate offering price, set forth in the "Calculation of Registration Fee" table in the effective registration statement; and

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

*provided, however,* that paragraphs (i) and (ii) above do not apply if the information required to be included in a post-effective amendment by those paragraphs is contained in periodic reports filed with or furnished to the Commission by the registrant pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference into the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof; and

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(b) The undersigned registrant hereby undertakes that, for purposes of determining any liability under the Securities Act, each filing of the registrant's annual report pursuant to Section 13(a) or Section 15(d) of the Securities Exchange Act (and, where applicable, each filing of an employee benefit plan's annual report pursuant to Section 15(d) of the Exchange Act) that is incorporated by reference in the registration statement shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(c) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question of whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

(d) The undersigned registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act of 1933, the information omitted from the form of prospectus filed as part of a registration statement in reliance upon Rule 430A and contained in the form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of the registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act of 1933, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(e) The undersigned registrant hereby undertakes to file an application for the purpose of determining the eligibility of the trustee to act under subsection (a) of Section 310 of the Trust Indenture

II-3

**Table of Contents**

Act in accordance with the rules and regulations prescribed by the Commission under Section 305(b)(2) of the Act.

II-4

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

CONSOL ENERGY INC.

By: /s/ J. Brett Harvey

J. Brett Harvey,
President and Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ J. Brett Harvey<br><br>J. Brett Harvey | President and Chief Executive Officer and Director (Principal Executive Officer) | July 29, 2003 |
| *<br><br>William J. Lyons | Senior Vice President and Chief Financial Officer (Principal Financial and Accounting Officer) | July 29, 2003 |
| *<br><br>John L. Whitmire | Chairman of the Board of Directors | July 29, 2003 |
| *<br><br>Christoph Koether | Director | July 29, 2003 |
| *<br><br>Philip W. Baxter | Director | July 29, 2003 |
| *<br><br>Berthold Bonekamp | Director | July 29, 2003 |
| *<br><br>Bernd J. Breloer | Director | July 29, 2003 |
| *<br><br>Rolf Zimmermann | Director | July 29, 2003 |
| *<br><br>Patricia A. Hammick | Director | July 29, 2003 |

* By:    /s/ Stephen E. Williams

Stephen E. Williams,
Attorney-in-Fact

II-5

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

CARDINAL STATES GATHERING COMPANY
by CNX Gas Company LLC, its sole partner,

by Consolidation Coal Company, its sole member

By: /s/ J. Brett Harvey

J. Brett Harvey,
President and Chief Executive Officer

CONSOLIDATION COAL COMPANY

By: /s/ J. Brett Harvey

J. Brett Harvey,
President and Chief Executive Officer

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities indicated with respect to Consolidation Coal Company and on the dates indicated:

| | | |
|---|---|---|
| /s/ J. Brett Harvey | President and Director (Principal Executive Officer) | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ William J. Lyons | Vice President and Controller and Director (Principal Financial and Accounting Officer) | July 29, 2003 |
| William J. Lyons | | |
| /s/ Peter B. Lilly | Chief Operating Officer—Coal and Director | July 29, 2003 |
| Peter B. Lilly | | |
| /s/ Stephen E. Williams | Vice President and Secretary and Director | July 29, 2003 |
| Stephen E. Williams | | |

II-6

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

CENTRAL OHIO COAL COMPANY

By: /s/ Peter B. Lilly

Peter. B. Lilly,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| /s/ Peter B. Lilly | President and Director (Principal Executive Officer) | July 29, 2003 |
|---|---|---|
| Peter B. Lilly | | |
| /s/ William J. Lyons | Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ Stephen E. Williams | Director | July 29, 2003 |
| Stephen E. Williams | | |

II-7

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

CHURCH STREET HOLDINGS, INC.

By: /s/ Christoph Koether

Christoph Koether,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| /s/ Christoph Koether | President and Director (Principal Executive Officer) | July 29, 2003 |
|---|---|---|
| Christoph Koether | | |
| /s/ William J. Lyons | Vice President and Controller and Director (Principal Financial and Accounting Officer) | July 29, 2003 |
| William J. Lyons | | |
| /s/ Stephen E. Williams | Director | July 29, 2003 |
| Stephen E. Williams | | |

II-8

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

CNX GAS COMPANY LLC
by Consolidation Coal Company,
its sole member

By:     /s/ J. Brett Harvey
―――――――――――――――――――
J. Brett Harvey,
President and Chief Executive Officer

CONSOLIDATION COAL COMPANY

By:     /s/ J. Brett Harvey
―――――――――――――――――――
J. Brett Harvey,
President and Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities indicated with respect to Consolidation Coal Company and on the dates indicated:

| | | |
|---|---|---|
| /s/ J. Brett Harvey<br>―――――――――――――――――<br>J. Brett Harvey | President and Director<br>(Principal Executive Officer) | July 29, 2003 |
| *<br>―――――――――――――――――<br>William J. Lyons | Vice President and Controller and Director<br>(Principal Financial and Accounting Officer) | July 29, 2003 |
| *<br>―――――――――――――――――<br>Peter B. Lilly | Chief Operating Officer—Coal and Director | July 29, 2003 |
| /s/ Stephen E. Williams<br>―――――――――――――――――<br>Stephen E. Williams | Vice President and Secretary and Director | July 29, 2003 |
| *<br>―――――――――――――――――<br>Christoph Koether | Director | July 29, 2003 |
| *<br>―――――――――――――――――<br>John M. Reilly | Director | July 29, 2003 |
| *<br>―――――――――――――――――<br>Ronald E. Smith | Director | July 29, 2003 |

* By:     /s/ Stephen E. Williams
―――――――――――――――――
Stephen E. Williams,
Attorney-in-Fact

II-9

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

CNX LAND RESOURCES INC.

| | |
|---|---|
| By: | /s/ William D. Stanhagen |
| | William D. Stanhagen, President |

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities indicated with respect to Consolidation Coal Company and on the dates indicated:

| | | |
|---|---|---|
| /s/ William D. Stanhagen | President and Director (Principal Executive Officer) | July 29, 2003 |
| William D. Stanhagen | | |
| /s/ William J. Lyons | Vice President and Controller (Principal Financial and Accounting Officer) | July 29, 2003 |
| William J. Lyons | | |
| /s/ Ronald E. Smith | Chairman of the Board of Directors | July 29, 2003 |
| Ronald E. Smith | | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |

II-10

Table of Contents

### SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

CNX MARINE TERMINALS INC.

By:     /s/ Ronald G. Stovash
_____
Ronald G. Stovash,
President

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ Ronald G. Stovash | President and Director | July 29, 2003 |
| Ronald G. Stovash | (Principal Executive Officer) | |
| * | Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| * | Director | July 29, 2003 |
| J. Brett Harvey | | |
| * | Director | July 29, 2003 |
| Stephen E. Williams | | |

*By:     /s/ Stephen E. Williams
_____
Stephen E. Williams
Attorney-in-Fact

II-11

Table of Contents

### SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

CONRHEIN COAL COMPANY
by Consolidation Coal Company, its
    General Partner

By:    /s/ J. Brett Harvey
_____

    J. Brett Harvey,
    President and Chief Executive Officer

CONSOLIDATION COAL COMPANY

By:    /s/ J. Brett Harvey
_____

    J. Brett Harvey,
    President and Chief Executive Officer

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities indicated with respect to Consolidation Coal Company and on the dates indicated:

| Signature | Capacity | Date |
|---|---|---|
| /s/ J. Brett Harvey<br>_____<br>J. Brett Harvey | President and Director<br>(Principal Executive Officer) | July 29, 2003 |
| *<br>_____<br>William J. Lyons | Vice President and Controller and Director<br>(Principal Financial and Accounting Officer) | July 29, 2003 |
| *<br>_____<br>Peter B. Lilly | Chief Operating Officer—Coal and Director | July 29, 2003 |
| /s/ Stephen E. Williams<br>_____<br>Stephen E. Williams | Vice President and Secretary and Director | July 29, 2003 |
| *<br>_____<br>John M. Reilly | Director | July 29, 2003 |
| *<br>_____<br>Christoph Koether | Director | July 29, 2003 |
| *<br>_____<br>Ronald E. Smith | Director | July 29, 2003 |

* By:    /s/ Stephen E. Williams
        _____

        Stephen E. Williams,
        Attorney-in-Fact

II-12

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

CONSOL DOCKS INC.

By:    /s/ Ronald G. Stovash
    ───────────────────────────────
    Ronald G. Stovash,
    President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| /s/ Ronald G. Stovash | President and Director | July 29, 2003 |
| --- | --- | --- |
| Ronald G. Stovash | (Principal Executive Officer) | |
| /s/ William J. Lyons | Principal Financial and Accounting Officer and Director | July 29, 2003 |
| William J. Lyons | | |
| /s/ Stephen E. Williams | Director | July 29, 2003 |
| Stephen E. Williams | | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |

II-13

**Table of Contents**

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

CONSOL FINANCIAL INC.

By:     /s/ J. Brett Harvey
_____

J. Brett Harvey,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ J. Brett Harvey | President and Director | July 29, 2003 |
| J. Brett Harvey | (Principal Executive Officer) | |
| /s/ William J. Lyons | Vice President and Controller | July 29, 2003 |
| William J. Lyons | (Principal Financial and Accounting Officer) | |
| /s/ Christoph Koether | Director | July 29, 2003 |
| Christoph Koether | | |
| /s/ Stephen E. Williams | Director | July 29, 2003 |
| Stephen E. Williams | | |

II-14

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

CONSOL OF CANADA INC.

By:    /s/ Peter B. Lilly

Peter B. Lilly,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| /s/ Peter B. Lilly | President and Director | July 29, 2003 |
|---|---|---|
| Peter B. Lilly | (Principal Executive Officer) | |
| /s/ William J. Lyons | Vice President and Controller | July 29, 2003 |
| William J. Lyons | (Principal Financial and Accounting Officer) | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ William G. Rieland | Director | July 29, 2003 |
| William G. Rieland | | |

II-15

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

CONSOL OF KENTUCKY INC.

By:     /s/ Peter B. Lilly

Peter B. Lilly,
President

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| /s/ Peter B. Lilly | President and Director (Principal Executive Officer) | July 29, 2003 |
|---|---|---|
| Peter B. Lilly | | |
| * | Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| * | Director | July 29, 2003 |
| J. Brett Harvey | | |
| * | Director | July 29, 2003 |
| Stephen E. Williams | | |

* By:     /s/ Stephen E. Williams

Stephen E. Williams,
Attorney-in-Fact

II-16

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

CONSOL PENNSYLVANIA COAL COMPANY

By:    /s/ Peter B. Lilly

Peter B. Lilly,
President

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ Peter B. Lilly | President and Director (Principal Executive Officer) | July 29, 2003 |
| Peter B. Lilly | | |
| * | Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| * | Director | July 29, 2003 |
| J. Brett Harvey | | |
| * | Director | July 29, 2003 |
| Stephen E. Williams | | |

* By:    /s/ Stephen E. Williams

Stephen E. Williams,
Attorney-in-Fact

II-17

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

CONSOLIDATION COAL COMPANY

By: /s/ J. Brett Harvey
_____
J. Brett Harvey, President

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| /s/ J. Brett Harvey | President and Director (Principal Executive Officer) | July 29, 2003 |
| J. Brett Harvey | | |
| * | Vice President and Controller and Director (Principal Financial and Accounting Officer) | July 29, 2003 |
| William J. Lyons | | |
| * | Chief Operating Officer – Coal and Director | July 29, 2003 |
| Peter B. Lilly | | |
| /s/ Stephen E. Williams | Vice President and Secretary and Director | July 29, 2003 |
| Stephen E. Williams | | |
| * | Director | July 29, 2003 |
| Christoph Koether | | |
| * | Director | July 29, 2003 |
| John M. Reilly | | |
| * | Director | July 29, 2003 |
| Ronald E. Smith | | |

* By:    /s/ Stephen E. Williams
_____
Stephen E. Williams,
Attorney-in-Fact

II-18

Table of Contents

# SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003

CONSOL SALES COMPANY

By: /s/ Ronald G. Stovash

Ronald G. Stovash,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ Ronald G. Stovash | President and Director (Principal Executive Officer) | July 29, 2003 |
| Ronald G. Stovash | | |
| /s/ William J. Lyons | Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ William G. Rieland | Director | July 29, 2003 |
| William G. Rieland | | |
| /s/ Peter B. Lilly | Director | July 29, 2003 |
| Peter B. Lilly | | |

II-19

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

EIGHTY-FOUR MINING COMPANY

By: /s/ Peter B. Lilly

Peter B. Lilly,
President

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ Peter B. Lilly | President and Director | July 29, 2003 |
| Peter B. Lilly | (Principal Executive Officer) | |
| * | Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| * | Director | July 29, 2003 |
| J. Brett Harvey | | |
| * | Director | July 29, 2003 |
| Stephen E. Williams | | |
| * | Director | July 29, 2003 |
| Ronald E. Smith | | |

\* By:   /s/ Stephen E. Williams

Stephen E. Williams,
Attorney-in-Fact

II-20

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

GREENE ENERGY LLC
by Consolidation Coal Company,
its member

By: /s/ J. Brett Harvey
_____
J. Brett Harvey,
President and Chief Executive Officer

CONSOLIDATION COAL COMPANY

By: /s/ J. Brett Harvey
_____
J. Brett Harvey,
President and Chief Executive Officer

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities indicated with respect to Consolidation Coal Company and on the dates indicated:

| | | |
|---|---|---|
| /s/ J. Brett Harvey | President and Director (Principal Executive Officer) | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ William J. Lyons | Vice President and Controller and Director (Principal Financial and Accounting Officer) | July 29, 2003 |
| William J. Lyons | | |
| /s/ Peter B. Lilly | Chief Operating Officer – Coal and Director | July 29, 2003 |
| Peter B. Lilly | | |
| /s/ Stephen E. Williams | Vice President and Secretary and Director | July 29, 2003 |
| Stephen E. Williams | | |
| /s/ Christoph Koether | Director | July 29, 2003 |
| Christoph Koether | | |
| /s/ John M. Reilly | Director | July 29, 2003 |
| John M. Reilly | | |

/s/ Ronald E. Smith        Director        July 29, 2003

Ronald E. Smith

II-21

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003

HELVETIA COAL COMPANY

By: /s/ Peter B. Lilly

Peter B. Lilly,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| /s/ Peter B. Lilly | President and Director (Principal Executive Officer) | July 29, 2003 |
|---|---|---|
| Peter B. Lilly | | |
| /s/ William J. Lyons | Vice President and Director (Principal Financial and Accounting Officer) | July 29, 2003 |
| William J. Lyons | | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |

II-22

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003

ISLAND CREEK COAL COMPANY

By: /s/ Peter B. Lilly

Peter B. Lilly,
President

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| /s/ Peter B. Lilly | President and Director (Principal Executive Officer) | July 29, 2003 |
| --- | --- | --- |
| Peter B. Lilly | | |
| * | Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| * | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ Stephen E. Williams | Director | July 29, 2003 |
| Stephen E. Williams | | |

* By:    /s/ Stephen E. Williams

Stephen E. Williams,
Attorney-in-Fact

II-23

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003

IC COAL, INC.

By: /s/ Ronald E. Smith
_____
Ronald E. Smith,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| /s/ Ronald E. Smith | President | July 29, 2003 |
|---|---|---|
| Ronald E. Smith | (Principal Executive Officer) | |
| /s/ William J. Lyons | Vice President and Controller | July 29, 2003 |
| William J. Lyons | (Principal Financial and Accounting Officer) | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ Stephen E. Williams | Director | July 29, 2003 |
| Stephen E. Williams | | |
| /s/ Christoph Koether | Director | July 29, 2003 |
| Christoph Koether | | |

II-24

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

JEFFCO COAL COMPANY

By: /s/ Marshall W. Hunt
_____

Marshall W. Hunt,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| /s/ Marshall W. Hunt | President (Principal Executive Officer) | July 29, 2003 |
|---|---|---|
| Marshall W. Hunt | | |
| /s/ William J. Lyons | Vice President and Controller (Principal Financial and Accounting Officer) | July 29, 2003 |
| William J. Lyons | | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ Stephen E. Williams | Director | July 29, 2003 |
| Stephen E. Williams | | |
| /s/ Ronald E. Smith | Director | July 29, 2003 |
| Ronald E. Smith | | |

II-25

Table of Contents

### SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003

KEYSTONE COAL MINING CORPORATION

By: /s/ Peter B. Lilly

Peter B. Lilly,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ Peter B. Lilly | President and Director (Principal Executive Officer) | July 29, 2003 |
| Peter B. Lilly | | |
| /s/ William J. Lyons | Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ Christoph Koether | Director | July 29, 2003 |
| Christoph Koether | | |

II-26

**Table of Contents**

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003

LAUREL RUN MINING COMPANY

By: /s/ Ronald E. Smith

Ronald E. Smith,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ Ronald E. Smith | President and Director | July 29, 2003 |
| Ronald E. Smith | (Principal Executive Officer) | |
| /s/ William J. Lyons | Controller | July 29, 2003 |
| William J. Lyons | (Principal Financial and Accounting Officer) | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ Christoph Koether | Director | July 29, 2003 |
| Christoph Koether | | |

II-27

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003

LEATHERWOOD, INC.

By: /s/ Ronald E. Smith

Ronald E. Smith,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, his substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ Ronald E. Smith | President and Director | July 29, 2003 |
| Ronald E. Smith | (Principal Executive Officer) | |
| /s/ William J. Lyons | Controller | July 29, 2003 |
| William J. Lyons | (Principal Financial and Accounting Officer) | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ Marshall W. Hunt | Director | July 29, 2003 |
| Marshall W. Hunt | | |

II-28

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003

MCELROY COAL COMPANY

By: /s/ Peter B. Lilly

Peter B. Lilly,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ Peter B. Lilly | President and Director (Principal Executive Officer) | July 29, 2003 |
| Peter B. Lilly | | |
| /s/ William J. Lyons | Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ Stephen E. Williams | Director | July 29, 2003 |
| Stephen E. Williams | | |

II-29

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003

MTB INC.

By: /s/ Marshall W. Hunt

Marshall W. Hunt,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| /s/ Marshall W. Hunt | President and Director (Principal Executive Officer) | July 29, 2003 |
| Marshall W. Hunt | | |
| /s/ William J. Lyons | Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| /s/ William D. Stanhagen | Director | July 29, 2003 |
| William D. Stanhagen | | |
| /s/ Stephen E. Williams | Director | July 29, 2003 |
| Stephen E. Williams | | |

II-30

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003

NEW CENTURY HOLDINGS, INC.

By: /s/ Christoph Koether

Christoph Koether, President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ Christoph Koether | President and Director (Principal Executive Officer) | July 29, 2003 |
| Christoph Koether | | |
| /s/ William J. Lyons | Vice President and Controller and Director Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ Stephen E. Williams | Director | July 29, 2003 |
| Stephen E. Williams | | |

II-31

Table of Contents

### SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003

QUARTO MINING COMPANY

By:    /s/ Peter B. Lilly

Peter B. Lilly,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ Peter B. Lilly<br>Peter B. Lilly | President and Director<br>(Principal Executive Officer) | July 29, 2003 |
| /s/ William J. Lyons<br>William J. Lyons | Vice President and Controller<br>(Principal Financial and Accounting Officer) | July 29, 2003 |
| /s/ J. Brett Harvey<br>J. Brett Harvey | Director | July 29, 2003 |
| /s/ Christoph Koether<br>Christoph Koether | Director | July 29, 2003 |

II-32

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

RESERVE COAL PROPERTIES COMPANY

By:   /s/ Marshall W. Hunt

Marshall W. Hunt,
President

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ Marshall W. Hunt | President and Director (Principal Executive Officer) | July 29, 2003 |
| Marshall W. Hunt | | |
| * | Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| * | Director | July 29, 2003 |
| J. Brett Harvey | | |
| * | Director | July 29, 2003 |
| John W. Schlueter | | |
| * By:   /s/ Stephen E. Williams | | |
| Stephen E. Williams, Attorney-in-Fact | | |

II-33

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

ROCHESTER & PITTSBURGH COAL COMPANY

By:    /s/ J. Brett Harvey

J. Brett Harvey,
President

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| /s/ J. Brett Harvey | President and Director (Principal Executive Officer) | July 29, 2003 |
| J. Brett Harvey | | |
| * | Vice President and Controller (Principal Financial and Accounting Officer) | July 29, 2003 |
| William J. Lyons | | |
| /s/ Stephen E. Williams | Vice President and Secretary and Director | July 29, 2003 |
| Stephen E. Williams | | |
| * | Director | July 29, 2003 |
| Christoph Koether | | |
| * | Director | July 29, 2003 |
| Ronald E. Smith | | |
| * By:    /s/ Stephen E. Williams | | |
| Stephen E. Williams, Attorney-in-Fact | | |

II-34

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

SOUTHERN OHIO COAL COMPANY

By:    /s/ Peter B. Lilly

Peter B. Lilly,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ Peter B. Lilly | President and Director (Principal Executive Officer) | July 29, 2003 |
| Peter B. Lilly | | |
| /s/ William J. Lyons | Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ Stephen E. Williams | Director | July 29, 2003 |
| Stephen E. Williams | | |

II-35

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003

THE WHITE STAR COAL CO., INC.

By:  /s/ William G. Rieland

William G. Rieland,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| /s/ William G. Rieland | President and Director (Principal Executive Officer) | July 29, 2003 |
| --- | --- | --- |
| William G. Rieland | | |
| /s/ William J. Lyons | Vice President and Controller Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ Stephen E. Williams | Director | July 29, 2003 |
| Stephen E. Williams | | |

II-36

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003

TWIN RIVERS TOWING COMPANY

By:    /s/ Ronald G. Stovash

Ronald G. Stovash,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ Ronald G. Stovash | President and Director (Principal Executive Officer) | July 29, 2003 |
| Ronald G. Stovash | | |
| /s/ William J. Lyons | Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ Stephen E. Williams | Director | July 29, 2003 |
| Stephen E. Williams | | |

II-37

**Table of Contents**

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003

UNITED EASTERN COAL SALES CORPORATION

By:    /s/ William G. Rieland
_____
William G. Rieland,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ William G. Rieland<br>_____<br>William G. Rieland | President and Director<br>(Principal Executive Officer) | July 29, 2003 |
| /s/ William J. Lyons<br>_____<br>William J. Lyons | Vice President and Controller<br>(Principal Financial and Accounting Officer) | July 29, 2003 |
| /s/ J. Brett Harvey<br>_____<br>J. Brett Harvey | Director | July 29, 2003 |
| /s/ Stephen E. Williams<br>_____<br>Stephen E. Williams | Director | July 29, 2003 |

II-38

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003

WINDSOR COAL COMPANY

By:     /s/ Peter B. Lilly

Peter B. Lilly,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| /s/ Peter B. Lilly | President and Director (Principal Executive Officer) | July 29, 2003 |
| --- | --- | --- |
| Peter B. Lilly | | |
| /s/ William J. Lyons | Principal Financial and Accounting Officer | July 29, 2003 |
| William J. Lyons | | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ Stephen E. Williams | Director | July 29, 2003 |
| Stephen E. Williams | | |

II-39

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended, the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Pittsburgh, Pennsylvania on July 29, 2003.

WOLFPEN KNOB DEVELOPMENT COMPANY

By:     /s/ Peter B. Lilly

Peter B. Lilly,
President

KNOW BY ALL MEN BY THESE PRESENTS that each person whose signature appears below hereby constitutes appoints J. Brett Harvey and Stephen E. Williams, and each of them acting singly, as his true and lawful attorney-in-fact and agent with full power of substitution and resubstitution, to act, without the other, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this Registration Statement, including any subsequent registration statement for the same offering that may be filed under Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or any of them, their substitute may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated:

| | | |
|---|---|---|
| /s/ Peter B. Lilly | President (Principal Executive Officer) | July 29, 2003 |
| Peter B. Lilly | | |
| /s/ William J. Lyons | Principal Financial and Accounting Officer and Director | July 29, 2003 |
| William J. Lyons | | |
| /s/ J. Brett Harvey | Director | July 29, 2003 |
| J. Brett Harvey | | |
| /s/ Ronald E. Smith | Director | July 29, 2003 |
| Ronald E. Smith | | |

II-40

Table of Contents

## Exhibit Index

| Exhibit No. | Description |
|---|---|
| 1.1† | Form of Underwriting Agreement |
| 3.1* | Certificate of Incorporation of the Registrant |
| 3.2** | Bylaws of the Registrant |
| 4.1*** | Specimen Common Stock Certificate |
| 4.2**** | Indenture, dated March 7, 2002, among CONSOL Energy Inc., certain subsidiaries of CONSOL Energy Inc. and The Bank of Nova Scotia Trust Company of New York, as trustee |
| 4.3***** | Supplemental Indenture No. 1, dated March 7, 2002, among CONSOL Energy Inc., certain subsidiaries of CONSOL Energy Inc. and The Bank of Nova Scotia Trust Company of New York, as trustee. |
| 4.4† | Form of Subordinated Indenture |
| 4.5† | Form of Deposit Agreement |
| 4.6† | Form of Stock Purchase Contract |
| 4.7† | Form of Warrant |
| 4.8† | Form of Certificate of Designation with respect to Preferred Stock |
| 5.1† | Opinion of Piper Rudnick LLP |
| 12.1†† | Statement of Computation of Ratio of Earnings to Fixed Charges |
| 23.1 | Consent of PricewaterhouseCoopers LLP, Independent Accountants |
| 23.2 | Consent of Ernst & Young LLP, Independent Auditors |
| 23.3† | Consent of Piper Rudnick LLP (included in Exhibit 5.1) |
| 23.4 | Consent of Ralph E. Davis Associates, Inc., Independent Petroleum Engineers |
| 23.5 | Consent of Data and Consulting Services, a division of Schlumberger, Independent Petroleum Engineers |
| 24.1 | Powers of Attorney (included on signature page) |
| 25.1† | Statement of Eligibility on Form T-1 under the Trust Indenture Act of 1939, as amended |

| | |
|---|---|
| † | To be filed by amendment or as an exhibit to a report pursuant to Section 13(a), 13(c) or 15(d) of the Exchange Act. |
| †† | Previously filed. |
| * | Incorporated by reference to Exhibit 3.1 to Amendment No. 2 to Registration Statement Form S-1 (Registration No. 333-68987) filed on March 24, 1999. |
| ** | Incorporated by reference to Exhibit 3.2 to Amendment No. 2 to Registration Statement Form S-1 (Registration No. 333-68987) filed on March 24, 1999. |
| *** | Incorporated by reference to Exhibit 4.1 to Amendment No. 2 to Registration Statement Form S-1 (Registration No. 333-68987) filed on March 24, 1999. |
| **** | Incorporated by reference to Exhibit 4.1 to Form 10-K (file number 333-68987) filed on March 29, 2002 ( the "Form 10-K"). |
| ***** | Incorporated by reference to Exhibit 4.2 to the Form 10-K. |

II-41

# **Exhibit S**

Form 10-K                                                                                                      Page 1 of 189

10-K 1 d10k.htm FORM 10-K

<u>Table of Contents</u>

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-K

---

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

For the fiscal year ended December 31, 2006;

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____

Commission file number: 001-14901

---

# CONSOL ENERGY INC.
### (Exact name of registrant as specified in its charter)

| **Delaware** | **51-0337383** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**Consol Plaza**
**1800 Washington Road**
**Pittsburgh, Pennsylvania 15241**
(Address of principal executive offices including zip code)

**Registrant's telephone number including area code: 412-831-4000**

---

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of exchange on which registered |
|---|---|
| Common Stock ($.01 par value) | New York Stock Exchange |
| Preferred Share Purchase Rights | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (Section 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See

---

Table of Contents

## PART III

**Item 10.** *Directors and Executive Officers and Corporate Governance.*

The information required by this Item is incorporated herein by reference to the information under the captions "Proposal #1—Nominations for Election of Directors," "General Information—The Board of Directors and Its Committees—The Board of Directors," "General Information—The Board of Directors and Its Committees—Membership and Meetings of the Board of Directors and Its Committees" and Section 16(a) "Beneficial Ownership Reporting Compliance" in the Proxy Statement for the annual meeting of shareholders to be held on May 2, 2007 (the "Proxy Statement").

*Executive Officers of CONSOL Energy*

The following is a list of CONSOL Energy's executive officers, their ages as of February 15, 2007 and their positions and offices held with CONSOL Energy.

| Name | Age | Position |
| --- | --- | --- |
| J. Brett Harvey | 56 | President and Chief Executive Officer and Director |
| Nicholas J. DeIuliis | 38 | President and Chief Executive Officer—CNX Gas Corporation |
| Jack A. Holt | 58 | Senior Vice President—Safety |
| Bart J. Hyita | 48 | Chief Operating Officer—Coal |
| Peter B. Lilly | 58 | President—Coal Group |
| William J. Lyons | 58 | Chief Financial Officer |
| P. Jerome Richey | 57 | General Counsel and Secretary |
| Ronald E. Smith | 58 | Executive Vice President and Chief Operating Officer—CNX Gas Corporation |
| Robert P. King | 54 | Senior Vice President—Administration |

*J. Brett Harvey* has been President and Chief Executive Officer and a Director of CONSOL Energy since January 1998.

*Nicholas J. DeIuliis* was Senior Vice President—Strategic Planning of CONSOL Energy from November 2004 until August 2005. Prior to that time, Mr. DeIuliis served as Vice President Strategic Planning from April 2002 until November 2004, Director—Corporate Strategy from October 2001 until April 2002, Manager—Strategic Planning from January 2001 until October 2001 and Supervisor—Process Engineering from April 1999 until January 2001. He has been a director and President and Chief Executive Officer of CNX Gas Corporation since June 30, 2005. He resigned from his position with CONSOL Energy as of August 8, 2005.

*Jack A. Holt* has been Senior Vice President—Safety since November 2004. Prior to that time, Mr. Holt served as Vice President—Safety, Human Resources and Organizational Development from November 2001 until November 2004 and Vice President—Safety from June 2000 until November 2001. Mr. Holt joined CONSOL Energy in 1972.

*Bart J. Hyita* has been Chief Operating Officer—Coal since February 2, 2007. Prior to that Mr. Hyita served as Senior Vice President—Planning and Administration from November 2005 until February 2, 2007, Senior Vice President—Coal Operations from August 2005 until November 2005, Vice President—Operations Support and Planning from August 2004 until August 2005, Vice President—Coal Operations Support and Planning from March 2002 until August 2004 and Vice President—Mining Operations Support from September 2001 until March 2002.

*Peter B. Lilly* has been President—Coal Group since February 1, 2007. Prior to that, Mr. Lilly was Chief Operating Officer of CONSOL Energy from October 2002 until February 1, 2007. Prior to joining CONSOL Energy, Mr. Lilly served as President and Chief Executive Officer of Triton Coal Company LLC and Vulcan Coal Holdings LLC from 1998 until 2002.

160

Table of Contents

*William J. Lyons* has been Chief Financial Officer of CONSOL Energy since February 2001. From January 1995 until February 2001, Mr. Lyons held the position of Vice President—Controller for CONSOL Energy. Mr. Lyons joined CONSOL Energy in 1976.

*P. Jerome Richey* has been General Counsel and Secretary since March 2005. Prior to joining CONSOL Energy, Mr. Richey, for more than five years, was a shareholder in the Pittsburgh office for the law firm of Buchanan Ingersoll & Rooney PC.

*Ronald E. Smith* was Executive Vice President—Gas Operations, Land Resources and Engineering Services of CONSOL Energy from April 1992 until August 2005. Mr. Smith became Chief Operating Officer of CNX Gas Corporation on June 30, 2005 (and an Executive Vice President of CNX Gas Corporation on December 5, 2005) and resigned from his position with CONSOL Energy as of August 8, 2005. Mr. Smith joined CONSOL Energy in 1972.

*Robert P. King* has been Senior Vice President—Administration since February 2, 2007. Prior to that time, he served as Vice President—Land since August 2006. Prior to joining CONSOL Energy, Mr. King was Vice President of Interwest Mining Company (a subsidiary of PacifiCorp). Mr. King joined PacifiCorp in November 1990.

CONSOL Energy has a written Code of Business Conduct that applies to CONSOL Energy's Chief Executive Officer (Principal Executive Officer), Chief Financial Officer (Principal Financial Officer) and others. The Code of Business Conduct is available on CONSOL Energy's website at *www.consolenergy.com*. The code is filed as Exhibit 14 to this Annual Report on Form 10-K.

**Item 11.    *Executive Compensation.***

The information required by this Item is incorporated by reference to the information under the captions "General Information—The Board of Directors and Its Committees—Compensation of Directors," "General Information—the Board of Directors and Its Committees—Compensation Committee Interlocks and Insider Participation," "Executive Compensation and Stock Option Information," and "Potential Payments Upon Termination or Change in Control Agreements" in the Proxy Statement.

**Item 12.    *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.***

The information required by this Item is incorporated by reference to the information under the caption "Beneficial Ownership of Securities" in the Proxy Statement.

**Item 13.    *Certain Relationships and Related Transactions and Director Independence.***

The information requested by this Item is incorporated by reference to the information under the caption "Certain Relationships and Related Party Transactions" and "Determination of Director Independence" in the Proxy Statement.

**Item 14.    *Principal Accounting Fees and Services.***

The information required by this Item is incorporated by reference to the information under the captions "Accountants and Audit Committee—Audit Fees," "Accountants and Audit Committee—Audit Related Fees," "Accountants and Audit Committee—Tax Fees," "Accountants and Audit Committee—All Other Fees" and "Accountants and Audit Committee—Audit Committee Pre-Approval of Audit and Permissible Non-audit Services" in the Proxy Statement.

161

# Exhibit T



National Bituminous Coal
Wage Agreement of 2002

Art. XX

1978 or subsequent NBCWA; and is not eligible to receive benefits under the Coal Act.

The Union and Trustees shall assist and fully cooperate with the Employers in obtaining all necessary opinion letters, exemptions, or rulings from the Department of Labor, the Internal Revenue Service or other applicable federal agencies, in order to implement the provisions of this subsection so as to ensure compliance with all applicable federal laws and regulations and ensure the deductibility for income tax purposes of any and all contributions made by signatory Employers to the 1993 Benefit Trust and the individual health plans referred to in this Section.

Section (d) Contributions by Employers

(1) During the life of this Agreement, for the periods of time indicated below, each signatory Employer (including those engaged in the production of coal and those not engaged in the production of coal) shall contribute to the Trusts referred to in this Article the amounts specified below based on cents per hours worked by each of the Employer's Employees who perform classified work under this Agreement.

(i) Into the 1950 Pension Trust: for the period beginning on the Effective Date and ending when this Agreement is terminated, 0.0¢ per hour on each such hour worked;

(ii) Into the 1974 Pension Trust: for the period beginning on the Effective Date and ending when this

148

Art. XX

Agreement is terminated, 0.0¢ per hour on each such hour worked for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1974 Pension Trust meeting the required standard of such Trust; and $0.75 per hour on each such hour worked for any Employer that became obligated to contribute for the first time on or after January 1, 2002.

(iii) Into the 1993 Benefit Trust: for the period beginning on the Effective Date and ending the day prior to the first anniversary of the Effective Date, 13¢ per hour on each such hour worked for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to make contributions to the 1993 Benefit Trust meeting the required standard of such Trust; and 75¢ per hour on each such hour worked for any Employer that became obligated to contribute for the first time on or after January 1, 2002; and for the period beginning on the first anniversary of the Effective Date and ending when this Agreement is terminated, 50¢ per hour on each such hour worked for any Employer, including related persons to such Employer within the meaning of Section 9701(c)(2) of the Internal Revenue Code, that initially entered into an agreement prior to January 1, 2002 to

149

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————

| | |
|---|---|
| Michael H. Holland, Micheal W. Buckner, B.V. Hyler and Steven F. Schaab as Trustees of the United Mine Workers of America 1974 Pension Trust,   ) ) ) ) ) | |
| Plaintiffs,   ) ) | |
| v.   ) ) | |
| ) | Case No. 07-cv-00490 (PLF/AK) |
| Freeman United Coal Mining Company, et al.,   ) ) | |
| Defendants.   ) | |

———————————————————————

| | |
|---|---|
| Freeman United Coal Mining Company,   ) ) | |
| Plaintiff,   ) ) | Case No. 07-cv-01050 (PLF/AK) |
| v.   ) ) | |
| United Mine Workers of America, et al.,   ) ) | |
| Defendants.   ) | |

———————————————————————

## <u>FREEMAN UNITED COAL MINING COMPANY'S STATEMENT OF ISSUES SETTING FORTH ALL MATERIAL FACTS AS TO WHICH THERE IS A GENUINE ISSUE NECESSARY TO BE LITIGATED</u>

Pursuant to LcvR 56.1 and LcvR 7(h) Freeman United Coal Mining Company ("Freeman") hereby submits this statement of issues setting forth all material facts as to which there is a genuine issue necessary to be litigated. As set forth more fully below and in Freeman's Rule 56(f) motion and accompanying affidavit of Susan C. Levy, Freeman is unable to comply fully with LcvR 56.1's requirement that Freeman "include references to the parts of the record relied on to support the statement" because discovery has just commenced and is not yet completed in this matter.

1

## MATERIAL FACTS AS TO WHICH THERE
## IS A GENUINE ISSUE TO BE LITIGATED

1.      Freeman disputes that it is obligated to make the contributions required by the

2007 National Bituminous Coal Wage Agreement ("2007 Agreement") negotiated by the United

Mine Workers of America ("UMWA") and Bituminous Coal Operators' Association ("BCOA")

because 2007 Agreement is not a "successor agreement" to the 1978 National Bituminous Coal

Wage Agreement ("NBCWA") as required by the evergreen clause of the 1974 Pension Trust

("Trust").

2.      The opposing parties argue that the 2007 Agreement is a successor agreement,

because (1) it was negotiated by the BCOA, even though at the time the BCOA was only a single

company and not a multi-employer collective bargaining unit; (2) the BCOA negotiated all

previous NBCWAs; and (3) 31 non-BCOA companies later adopted the 2007 Agreement via

"me too" agreements.  In support of their arguments on this issue, the opposing parties rely on

the declarations of UMWA President Cecil E. Roberts and BCOA Secretary-Treasurer Charles S.

Perkins, III.  The opposing parties' arguments raise material issues of disputed fact.  Freeman has

not yet had the opportunity to depose Mr. Roberts or Mr. Perkins and all relevant UMWA and

BCOA documents have not yet been produced.  Freeman has also not yet had the opportunity to

depose other negotiators of the 2007 Agreement or to subpoena those 31 other companies who –

according to Michael H. Holland, Micheal W. Buckner, B.V. Hyler and Steven F. Schaab as

Trustees of the United Mine Workers of America 1974 Pension Trust ("Trustees") – responded

"overwhelmingly positively" to the 2007 Agreement.

3.      Although full discovery is required, Freeman already has substantial evidence that

refutes these declarations including evidence showing: (1) when the UMWA negotiated the 2007

Agreement it believed it was just negotiating a single company agreement with Consolidation

Coal Company ("Consol"); (2) there was no reasonable justification for the substantial contribution rate increases in the 2007 Agreement; (3) one of Consol's goals in negotiating the 2007 Agreement was to drive up costs for other coal companies in order to gain an unfair competitive advantage; and (4) the other coal companies that later adopted the terms of the 2007 Agreement via separate "me too" agreements did so reluctantly and only after being threatened by the UMWA with strikes against the companies. *See* Freeman Mot. 12-17.

4.       In Count II, Freeman contends that if the Court determines that Freeman must pay contributions at the rates set by the 2007 Agreement, then it will necessarily have concluded that BCOA was acting as Freeman's agent in setting those rates and that BCOA therefore owes Freeman the duties of an agent to its principal.  Whether BCOA breached those duties raises disputed issues of fact.  Freeman contends that BCOA breached those duties because Consol controlled the negotiations with UMWA on BCOA's behalf and "one of Consol's goals for the negotiation of the 2007 Agreement was to gain a competitive advantage over other coal companies that would be bound by the Agreement by using the Agreement to drive up benefit costs."  Ex. D to Freeman Mot., Stanhagen Decl. ¶ 9.  Further, "Consol's goal of increasing benefit costs was rooted in the knowledge that long wall operators, like Consol, could more easily absorb the increased costs, while mine operators using the continuous mining method could not absorb the increased benefit costs."  *Id.* ¶ 10.  Freeman uses the continuous mining method and is thus one of the employers Consol targeted.  Consol then planned to "'absorb the market' left by coal operators struggling to remain competitive and finally viable."  *Id.* ¶ 11.

5.       The opposing parties argue that the contributions in the 2007 Agreement are not unreasonable because (1) Freeman was not required to make contributions from 1998 to 2006;

(2) the new contributions are relatively low by historical standards; (3) the PPA increased

funding requirements for the 1974 Plan; and (4) supposedly every coal company but Freeman

and Monterey has shown a willingness to adopt the terms of the 2007 Agreement, at least as the

terms relate to contributions to the Trust.  Each of those arguments raises disputed issues of

material fact.    *See* Freeman Mot. 26-28.

6.    Freeman sets forth below its responses to each of the opposing parties' statements

of material facts not in dispute.

## RESPONSE TO UMWA'S STATEMENT
## OF MATERIAL FACTS NOT IN DISPUTE

1.    The United Mine Workers of America is a labor organization established in 1890
for the purpose of securing safe and just working conditions for coal miners and other workers
through collective bargaining and legislation, and for the purpose of preserving opportunities for
gainful and humane employment in the nation's coal mines, processing plants and associated
facilities.  The Union has active and retired members throughout the United States and Canada.
See Declaration of Cecil E. Roberts ("Roberts Declaration"), at ¶ 2. (A copy of the Roberts
Declaration is attached hereto as Exhibit 1.)

**FREEMAN RESPONSE:**  Freeman does not dispute the statements in ¶ 1.

2.    The UMWA is comprised of the International Union and its constituent Local
Unions. The International Union maintains District Offices as divisions, whose geographic
boundaries have been determined by the International Executive Board, in which the supreme
executive and judicial powers of the International Union are vested in accordance with the
Constitution of the International Union effective April 13, 2006.  Within each District, the
International Union charters Local Unions, which have localized jurisdiction over members at a
particular coal mining or other facility represented by the UMWA.  An individual's membership
in the UMWA consists of membership in the Local Union, the District in whose territory the
Local Union is located, and the International Union. See Roberts Declaration, at ¶ 3.

**FREEMAN RESPONSE:**  Freeman does not dispute the statements in ¶ 2.

3.    Since approximately 1950, the International Union has been responsible for
negotiating the National Bituminous Coal Wage Agreement ("NBCWA") on a regular basis with
the Bituminous Coal Operators Association ("BCOA"), a multiemployer association of coal
producers. The NBCWA establishes the industry standard for wages and terms and conditions
for an overwhelming majority of our members working in the coal industry. It sets that standard
in two ways: immediately for those companies that are members of BCOA, and subsequently
through a process by which other companies -- at UMWA's urging -- agree to accept the terms of
the NBCWA as their own. Companies that accept the terms of the NBCWA are sometimes

4

described as "me-too" companies (agreements with these companies sometimes involved placing a new cover on the NBCWA and including possible differences in some of the local provisions for the "me-too" company's own workforce). The group of employers who ultimately accept the terms of the NBCWA represents approximately 75% of our active membership in the coal mining industry. Within the past twenty-five years, the National Agreement has been negotiated and renewed, with any mutually agreed upon modifications, in 1974, 1978, 1981, 1984, 1988, 1993, 1998, 2002 and 2007. Each of these agreements provided health and retirement benefits for UMWA members. See Roberts Declaration, at ¶ 6.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 3, and therefore Freeman disputes the same. Further responding, Freeman disputes that the BCOA was a multi-employer association in 2006 and 2007. Moreover, Freeman disputes that this paragraph, if true, is material. A single company agreement, the 2007 Agreement, cannot be transformed into a "successor agreement" after the fact when other unwilling coal companies are coerced, frequently through strikes or threats of strikes, to sign "me too" agreements. Freeman disputes that the 2007 Agreement set the industry standard. Freeman disputes that the 2007 Agreement is a "national agreement" because it was negotiated by the UMWA and the BCOA, which is no longer a multi-employer collective bargaining unit, but instead represents a single company, Consol.

4.      From 1950 to 1974, all health and retirement benefits were provided by a single multiemployer fund, the UMWA Welfare and Retirement Fund. In 1974, after the passage of ERISA, the UMWA and the BCOA agreed to separate that fund into distinct pension and benefits plans. The 1950 Pension Plan and Trust was created to provide pension benefits to miners (and their dependents and survivors) who retired prior to December 31, 1975. The UMWA 1974 Pension Plan and Trust was created to provide pension benefits to miners (and their dependents and survivors) who retired after December 31, 1975. These pension plans, together with several retiree health care benefit plans, were collectively referred to as the "UMWA Health and Retirement Funds" or "the Funds." See Roberts Declaration, at ¶ 7

**FREEMAN RESPONSE:** Freeman does not dispute the statements in ¶ 4.

5.      From their inception, the UMWA and the BCOA have been the settlors of the UMWA Health and Retirement Funds. As settlors the UMWA and the BCOA are the parties with the authority to amend the plan and trust documents. Since 1978, the UMWA and BCOA have included contractual language (appearing as Art. XX (d)(vi)(a) in the 2002 NBCWA) that

has specified how provisions requiring action by the BCOA would be satisfied in the event the BCOA ceased to exist — in which case the authority of the Employer Settlor would fall to those Employers with the majority of BCOA tonnage at the time the 2002 NBCWA became effective. See Roberts Declaration, at ¶ 8.

**FREEMAN RESPONSE:** Freeman disputes ¶ 5 to the extent it suggests that BCOA was authorized to make the 2007 amendments to the plan and trust documents. For purposes of the evergreen clause's continuing contributions obligation, BCOA did not have authority to amend the plan and trust documents because it is comprised of a single employer, Consol. This paragraph is also immaterial because Freeman does not allege that BCOA has ceased to exist, but that it is no longer a multi-employer collective bargaining unit.

6.    The UMWA and the BCOA have amended the plan and trust documents shortly after reaching agreement on each new NBCWA, in order to ensure that the plan and trust documents reflect all relevant, collectively-bargained modifications in "the terms and conditions of" the Trust. Thus, following this practice, the UMWA and the BCOA amended the plan and trust documents shortly after reaching agreement on the 1978, 1981, 1984, 1988, 1993, 1998, 2002, and 2007 NBCWAs. Specifically in this regard, the UMWA and the BCOA adopted various amendments to the plan and trust documents governing the 1974 Pension Trust on February 7, 2007—making those amendments effective as of January 1, 2007 so as to coincide with the January 1, 2007 effective date of the 2007 NBCWA. See Roberts Declaration, at ¶ 9.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 6, and therefore Freeman disputes the same. Further responding, Freeman disputes BCOA was authorized to amend the plan and trust documents because BCOA at the time was not a multi-employer collective bargaining unit, but represented a single company, Consol. Freeman disputes that the 2007 Agreement is a successor "national agreement" because it was negotiated by the BCOA, which is no longer a multi-employer collective bargaining unit, but instead represents a single company, Consol.

7.    Unlike many other multiemployer benefit plans, the underlying concept of the UMWA Funds is that all eligible employees receive uniform benefits, and that all participating employers are required to pay a uniform contribution rate. Starting in 1974 and continuing to the present day, the UMWA and the BCOA have agreed that the benefit levels and the contribution rates to the trusts would be contractually established and maintained. Every NBCWA negotiated since 1974 has contained both the contribution rates to the pension trusts and the precise level of

benefits provided by the pension plans, and have been uniform for all currently signatory employers and for all beneficiaries. See Roberts Declaration, at ¶ 10.

**FREEMAN RESPONSE:**  The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶7, and therefore Freeman disputes the same.  Further responding, Freeman does not deny that *Pittston* held that the purpose of evergreen clause was to ensure equal contributions.  Freeman disputes that "continuing to the present day, the UMWA and the BCOA have agreed that the benefit levels and the contribution rates to the trusts would be contractually established and maintained."  Freeman disputes that "[e]very NBCWA negotiated since 1974 has contained both the contribution rates to the pension trusts and the precise level of benefits provided by the pension plans, and have been uniform for all currently signatory employers and for all beneficiaries" to the extent that all NBCWAs have been uniform for all currently signatory employers.  The 2002 NBCWA established unequal contribution rates.  Specifically, the 2002 NBCWA established two separate contribution rates for employers paying into the 1974 Pension Trust: zero cents per hour for employers that had the obligation to contribute prior to 2002 and 75 cents per hour for employers that first became obligated to contribute on or after January 1, 2002.  *See* Ex. T. to Freeman Mot., 2002 NBCWA, Article XX, Section (d).

8.     During negotiations for the 1978 NBCWA, the bargaining parties agreed upon certain provisions to ensure the financial stability of the health and retirement funds. These provisions were adopted because of a shared UMWA and BCOA concern that employers should not be able to withdraw from the Trust Funds and leave liability for benefit obligations on the remaining employers. In addition to agreeing on a provision that required that all employers pay the same level of contributions, the parties adopted a clause that became known as the "evergreen" provision. That clause, which was inserted in the controlling plan and trust documents, provides that any employer who employed a participant eligible for benefits from the 1974 Pension Plan (as well as the other pension and benefit plans) or any employer that was obligated to make contributions to the Plan was "obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto." See Roberts Declaration, at ¶ 11.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 8, and therefore Freeman disputes the same. Further responding, Freeman disputes this statement because there has been no discovery regarding the negotiations for the 1978 NBCWA, other than certain discovery relating to the *Pittston* litigation. This action raises two new issues that were not addressed in *Pittston*: (1) whether an agreement between the UMWA and the BCOA can still be a "successor" agreement even if the BCOA is no longer a multi-employer bargaining unit; and (2) whether a single-company agreement can somehow be transformed after the fact into a "successor" national agreement, when other unwilling coal companies are coerced, frequently through strikes or threats of strikes, to sign "me too" agreements.

9.     As set forth in the UMWA Constitution, the President of the UMWA, International Union is provided the authority to chair all bargaining. Cecil E. Roberts has been president of the UMWA, International Union since his election in 1995. Prior to being elected President, Mr. Roberts served in the office of Vice President of the UMWA, International Union beginning in 1982. Thus, in his capacity as either Vice-President or President of the UMWA, International Union, Mr. Roberts has participated in the UMWA negotiations with BCOA for each successive NBCWA, i.e., 1984, 1988, 1993 (including the 1996 reopener), 1998, 2002 and 2007 NBCWAs. In bargaining for the 1998 and 2002 NBCWAs and, most recently, the 2007 NBCWA, Mr. Roberts directly negotiated on a one-on-one basis with the Chairman of the BCOA. In 2006, the BCOA Chairman was Peter Lilly. Mr. Lilly is also the Chief Operating Officer of Consolidation Coal Company. In 2002, the Chairman of the BCOA Negotiating Committee was J. Brett Harvey, who was the President of Consolidation Coal Company at the time. In 1998, the Chairman of the BCOA Negotiating Committee was B.R. Brown, who was then the Chairman of Consolidation Coal. See Roberts Declaration, at ¶12.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 9, and therefore Freeman disputes the same. Further responding, Freeman disputes that the 2007 Agreement is a successor "national agreement" because it was negotiated by the UMWA and the BCOA, which is no longer a multi-employer collective bargaining unit, but instead represents a single company, Consol.

10.    In the 2006 negotiations for a successor agreement to the 2002 NBCWA, the BCOA represented Central Ohio Coal Company, Consolidation Coal Company, Eight-Four Mining Company, Helvetia Coal Company, Island Creek Coal Company, Keystone Coal Mining Corporation, Laurel Run Mining Company, McElroy Coal Company, Quarto Mining Company, Southern Ohio Coal Company, and Windsor Coal Company. These employers represented over 50% of the tonnage of the BCOA membership on the effective date of the 2002 NBCWA. See Roberts Declaration, at ¶ 13.

**FREEMAN RESPONSE:**  The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 10, and therefore Freeman disputes the same.  Further responding, Freeman disputes that the 2006 negotiations were for a successor agreement to the 2002 NBCWA.  Freeman disputes that the 2007 Agreement is a successor "national agreement" because it was negotiated by the UMWA and the BCOA, which is no longer a multi-employer collective bargaining unit, but instead represents a single company, Consol.  Though 11 nominally distinct companies are listed in the 2007 Agreement as those upon whose behalf the BCOA negotiated the 2007 Agreement, they are all Consol affiliates.

11.    In negotiating for the 2007 NBCWA, the UMWA and the BCOA addressed the matter of the appropriate level of contributions that employers participating in the 1974 Pension Plan would be required to make over the life of the new contract. Both the Union and the BCOA were concerned with compliance with the Pension Protection Act of 2006, P.L. 109-280, federal legislation enacted in August 2006 to enhance and protect retirement savings for millions of Americans covered by traditional defined benefit plans. Unlike previous statutes, the PPA directs the timing of corrective actions that are required to avoid funding problems with multiemployer pension plans and imposes an obligation to take action as soon as funding problems are projected to occur within a specified time in the future. The requirement of early intervention is imposed by categorizing the funding level of the pension plan and imposing obligations depending on the plan's status. In general the statute requires a multiemployer pension plan to fully fund all benefits, and that if it either fails to remain above 80% funded or is projected to suffer funding deficiencies in the future, the law mandates certain actions that may include additional contributions and benefit modifications. See Roberts Declaration, at ¶14.

**FREEMAN RESPONSE:**  The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 11, and therefore Freeman disputes the same.  Further responding, the Pension Protection Act of 2006 (PPA) is a complex statute that imposes certain funding requirements on multi-employer pension plans.   The PPA

categorizes the funding level of multi-employer pension plans and imposes obligations based upon a plan's funding status as of that plan year if the funding level falls below certain benchmarks. The PPA requires certain actions if a multiemployer plan is less than 80% funded starting in 2008 or if the plan has an accumulated funding deficiency or is projected to have an accumulated funding deficiency in any of the six succeeding plan years. Freeman disputes this paragraph to the extent that it suggests the increase in contribution rates in the 2007 Agreement was required by the PPA.

12.    Consistent with the UMWA efforts throughout the course of the Roberts administration, the Union entered into the 2006 negotiations with the intention to negotiate an increase in pension benefits for its members in the 2007 NBCWA. The imperative to increase pension benefits reflected the actions of the membership at the UMWA International Conventions in 2003 and 2006. At the 2006 Convention, the membership overwhelmingly passed a Constitutional Mandate to negotiate increased pension benefits in the upcoming NBCWA negotiations. Article 1 of the UMWA Constitution was amended to include the goal "The improvement in pensions for our active, laid-off and retired members, as well as maintaining current levels of health care coverage, shall remain the top priorities of the United Mine Workers of America," With this directive from the UMWA Convention, the Union was committed to improving the pension benefits for its active and retired members. Because of this intention to secure increased pension benefits, as well as the new legal requirements regarding the need for increased funding of the Pension Plan, the Union understood that there would need to be an increase in the required employer contributions to the Pension Plan. See Roberts Declaration, at ¶ 15

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 12, and therefore Freeman disputes the same.

13.    In light of these concerns, the Union sought, and obtained in the 2007 NBCWA, an increase in the pension accrual for active employees of an additional $10 per month per year of service (over the term of the contract) over the benefits provided in 2006. The 2007 NBCWA also provided pension increases of $20 a month (over the term of the contract) to existing retirees and widows and provided them with a one-time annual lump sum bonus for each of the five years of the contract. The benefit improvements increased the liability of the 1974 Plan by approximately $600 million. See Roberts Declaration, at ¶ 16.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 13, and therefore Freeman disputes

the same. Further responding, Freeman disputes that the 2007 Agreement is a successor "national agreement" because it was negotiated by the UMWA and the BCOA, which is no longer a multi-employer collective bargaining unit, but instead represents a single company, Consol.

14. During the course of our negotiations, Mr. Lilly and Mr. Roberts discussed the contribution levels required to comply with the Pension Protection Act's funding levels as well as the UMWA's demand for increased pension benefits. Mr. Lilly provided Mr Roberts with actuarial calculations performed by the BCOA's actuaries, AON, to achieve the necessary funding for the 1974 Pension Plan to remain above the 80% statutory requirement for the period 2007 through 2011. Mr. Roberts referred these actuarial reports to Micheal Buckner, who the Union presently retains as a benefits consultant, for review. Mr. Buckner shared the calculations with the UMWA's actuaries, Watson Wyatt. Mr. Buckner reported back to Mr. Roberts that the projections provided by the BCOA were reasonably based, and consequently the UMWA and BCOA reached agreement on the matter of the level of contributions to the 1974 Pension Plan. See Roberts Declaration, at ¶ 17.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 14, and therefore Freeman disputes the same.

15. Pursuant to this agreement, the employers were required to contribute $2.00 per hour to the 1974 Pension Plan beginning January 1, 2007, and increasing over the 5-year term of the contract to $5.50 per hour. Under the 1978 NBCWA, the contribution rates established for the 1974 and 1950 Pension Plans were based upon a combination of tons of coal produced and hours worked. Under that Agreement, Article XX(d) provided that the BCOA had the authority to require the entire contribution amount based upon an hourly contribution rate, using a tonnage equivalent to convert the tonnage rate to an hourly rate. In 1988, contributions based upon tonnage were generally eliminated in favor of exclusively hourly contributions. The following table shows the contribution rates to the 1950 and 1974 Pension Plans, the rates converting any tonnage rate into its hourly equivalent, and the rate in today's dollars adjusted for inflation (using the inflation calculator located on the Bureau of Labor Statistics web site at http://vvwvv.bls.gov/cpi/):

|  | 1950 Pension | | 1974 Pension | | | |
|---|---|---|---|---|---|---|
|  | Per Ton | Per Hour | Per Ton | Per Hour | Total Hourly Equivalent | CPI Adjusted |
|  |  |  |  |  | 1978 NBCWA | |
| March 27, 1978-March 26, 1979 | $0.950 |  | $0.080 | $0.750 | $2.280 | $7.29 |
| March 27, 1979-March 26, 1980 | $0.950 |  | $0.080 | $0.760 | $2.295 | $6.57 |

| | | | | | | |
|---|---|---|---|---|---|---|
| March 27, 1980-End of Agreement | $0.950 | | $0.080 | $0.750 | $2.295 | $5.82 |
| 1981 NBCWA | | | | | | |
| June 7, 1981-June 6, 1982 | $0.950 | | $0.080 | $1.037 | $2.685 | $6.17 |
| June 7, 1982-June 6, 1983 | $1.110 | | $0.080 | $0.997 | $2.901 | $6.26 |
| June 7, 1983-End of Agreement | $1.110 | | $0.080 | $1.017 | $2.920 | $6.11 |
| 1984 NBCWA | | | | | | |
| October 1, 1984-September 30, 1985 | $L110 | | $0.070 | $1.030 | $3.690 | $715 |
| October 1, 1985-September 30, 1986 | $1.110 | | $0.066 | $0.970 | $3.654 | $6.94 |
| October 1, 1986-September 30, 1987 | $1.110 | | $0.066 | $0.970 | $3.680 | $6.75 |
| October 1, 1987-End of Agreement | $1.100 | | $0.066 | $1.020 | $3.711 | $6.53 |
| **1988 NBCWA** | | | | | | |
| February 1, 1988-January 31, 1989 | | $0.000 | | $0.470 | $0.470 | $0.83 |
| February 1, 1990-End of Agreement | | $0.000 | | $0.710 | $0.710 | $1.13 |
| 1993 NBCWA | | | | | | |
| December 16, 1993-End of Agreement | | $0.000 | | $0.750 | $0.750 | $1.08 |
| 1998 NBCWA | | | | | | |
| January 1, 1998-End of Agreement | | $0.000 | | $0.750 | $0.750 | $0.96 |
| 2002 NBCWA | | | | | | |
| January 1, 2002-December 31, 2002 | | $0.000 | | $0.000 | $0.000 | $0.00 |
| January 1, 2003-End of Agreement | | $0.000 | | $0.000 | $0.000 | $0.00 |

On June 30, 2007, the 1950 Pension Plan merged into the 1974 Pension Plan. Consequently, the rate payable to the 1974 Pension Plan today can only fairly be compared to the total pension contribution rates owed to the 1950 and 1974 Pension Plans under earlier agreements. As the table shows, the pension contribution owed under the 1978 NBCWA, the 1981 NBCWA and the 1984 NBCWA was higher than the current rate, reaching as high as $3.71 by the end of the term of the 1984 NBCWA.  Adjusted for inflation, in today's dollars, the rate payable under each of those contracts far exceeded the highest rate payable under the 2007 NBCWA. See Roberts Declaration, at ¶ 18.

**FREEMAN RESPONSE:**  The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 15, and therefore Freeman disputes the same.  Further responding, Freeman does not dispute that the contribution rates in sentence one are correct, but to the extent that this sentence implies that Freeman is required to contribute at such rates, Freeman disputes those allegations.  Freeman disputes any characterizations of Article XX(d)(1) that is inconsistent with its language that provided that the BCOA had authority

to "change or convert the cents per ton basis of funding …to a different method of funding so

long as such alternate method produces the equivalent contribution to the that provided herein on

a cents per ton basis."  Freeman disputes the table purportedly showing the contribution rates to

the 1950 and 1974 Pension Plans.  Freeman disputes that "the rate payable to the 1974 Pension

Plan today can only fairly be compared to the total pension contribution rates owed to the 1950

and 1974."

16.    Furthermore, the employers have not made any contributions to the Pension Plan since mid-1998. This nearly nine-year hiatus in pension contributions was pursuant to the provisions of the NBCWA. The 1998 NBCWA provided that once the Pension Plan reached a certain level of funding, the contribution rate would drop to $0.00 an hour and $0.00 per ton for existing signatories. Around July 1998, the 1974 Pension Plan achieved the anticipated level of funding and from that point, through the expiration of the 2002 NBCWA on December 31, 2006, signatory employers were required to report hours but make no contributions to the Plan. From that time through December 31, 2006, the miners working for signatory employers (including those at Freeman United and Monterey Coal) continued to earn pension credit toward vesting and for purposes of determining the amounts that the 1974 Pension Trust will be obligated to pay them after they retire, even though the employers were making no contributions. Consequently, by the time negotiations for the 2007 NBCWA began, the Union did not believe it was unfair to the employers to seek a pension increase as well as a contribution increase given the fact that signatory employers had experienced a nine-year hiatus from the obligation to make any contributions to the Pension Plan. See Roberts Declaration, at ¶19.

**FREEMAN RESPONSE:**  The opposing parties have not produced discovery sufficient

for Freeman to respond to all of the statements contained in ¶ 16, and therefore Freeman disputes

the same.  Further responding, Freeman disputes that the 2007 Agreement is a successor

"national agreement" because it was negotiated by the UMWA and the BCOA, which is no

longer a multi-employer collective bargaining unit, but instead represents a single company,

Consol.

17.    On December 15, 2006 a tentative agreement between the UMWA and the BCOA for a new, five-year agreement effective January 1, 2007 was announced. The Union informed its membership that the agreement was the culmination of months of hard work and that there had been significant hurdles to overcome, particularly in the areas of pensions, retiree health care and wages. Nevertheless, the Union reported that the parties were able to overcome the obstacles and hammer out an agreement. The contract provided for a 20% increase in wages over the life of the agreement and a $1,000 wage bonus that was payable immediately. In fact, it was the largest

wage increase the Union negotiated since 1974. See Roberts Declaration, at ¶ 20.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 17, and therefore Freeman disputes the same.

18.    Upon concluding negotiations with the BCOA in mid-December 2006, the UMWA notified all Local Unions whose members had been employed under the 2002 NBCWA, whether for companies that had been members of the BCOA in 2002 or companies (like Monterey) that had signed "me-too" agreements, and scheduled contract explanation meetings for December 19 and ratification votes on December 21, 2006. On December 21, each of the Local Unions voted on whether to accept the terms of the 2007 NBCWA. The only exception concerned several smaller coal companies (like Freeman) that were signatory to "me too" agreements that would only expire a year or more later than the December 31, 2006 expiration date of the NBCWA. The Union's members collectively ratified the 2007 NBCWA by an overwhelming margin of votes. As stated above, the members that ratified the 2007 NBCWA represent approximately 75% of the Union's active membership in the coal mining industry. See Roberts Declaration, at ¶ 21.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 18, and therefore Freeman disputes the same. Further responding, Freeman disputes that its agreement is a "me too" agreement. Freeman disputes that those portions of this statement concerning other coal companies, if true, are material. A single company agreement, the 2007 Agreement, cannot be transformed into a "successor agreement" after the fact when other unwilling coal companies are coerced, frequently through strikes or threats of strikes, to sign "me too" agreements.

19.    In announcing the results of the ratification votes, the Union stated that it intended the contract to be an industry-wide agreement and that it was going to provide the coal companies that were not members of BCOA with an opportunity to sign the agreement. See Roberts Declaration, at ¶ 22.

**FREEMAN RESPONSE:** Freeman does not dispute the statements in ¶ 19, but disputes that this statement, if true, is material. A single company agreement, the 2007 Agreement, cannot be transformed into a "successor agreement" after the fact when other unwilling coal

companies are coerced, frequently through strikes or threats of strikes, to sign "me too" agreements.

20.    After the ratification vote was held, the UMWA notified the non-BCOA companies who had been signatory to the 2002 NBCWA, or who had signed "me-too" agreements, and requested that they agree to the provisions of the National Agreement. The UMWA advised these companies that the terms had already been ratified and they could accept the provisions of the National Agreement without an additional ratification vote. In relatively short order following the nationwide ratification vote, all of the major coal operators in the industry signed on to the relevant provisions of the 2007 NBCWA. For example, Jim Walter Resources signed a contract mirroring the National Agreement on January 17, 2007. The miners covered by this agreement had participated in the ratification vote in December. Similarly, the mines operated by Peabody Energy, which produce a significant portion of the tonnage in the organized coal industry, signed agreements mirroring the National Agreement in February 2007. Magnum Coal Company, the parent of Apogee Coal Co., also signed on in February. PinnOak Resources and the Pittsburg & Midway Coal Mining Company signed similar agreements in March 2007. Negotiations with Foundation Coal Holdings, Inc., the parent of Cumberland Coal Resources LP and Emerald Coal Resources LP came to the same result in April 2007. See Roberts Declaration, at ¶ 23.

**FREEMAN RESPONSE:**  The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 20, and Freeman therefore disputes the same.  Further responding, Freeman disputes that those portions of this statement concerning other coal companies, if true, are material.  A single company agreement, the 2007 Agreement, cannot be transformed into a "successor agreement" after the fact when other unwilling coal companies are coerced, frequently through strikes or threats of strikes, to sign "me too" agreements.

21.    Although several of the non-BCOA companies requested bargaining to address issues particular to their operations, all of those who had agreed to the terms of the 2002 NBCWA (with Monterey being the sole exception) ultimately executed the 2007 NBCWA; some with minor modifications in areas other than the 1974 Pension Plan. In addition to the employers directly signatory to the 2007 NBCWA, the following agreed to be bound by its terms, or to otherwise accept the obligation to contribute to the UMWA Health and Retirement Funds at the rates specified in Article XX of the NBCWA:

a.    Homer City Coal Processing Corporation

b.    Pinnacle Mining Company, LLC

c.      Pinnacle Land Company, LLC

d.      Long Branch Energy

e.      Laurel Coal Corp.

f.      Mountain Edge Mining Inc., LLC

g.      Pine Ridge Coal Company, LLC

h.      Rivers Edge Mining, Inc.

i.      Colony Bay Coal Company

j.      Mountain View Coal Company, LLC

k.      Apogee Coal Company, LLC

l.      Hobet Mining LLC

m.      Eastern Associated Coal LLC

n.      Peabody Coal Company, LLC

o.      Pittsburg & Midway Coal Mining Company

p.      Emerald Coal Resources, LP

q.      Cumberland Coal Resources, LP

r.      Litwar Processing Company, LLC

s.      Transervice Inc.

t.      Keystone Service Industries Inc.

u.      Bluestone Coal Corporation.

v.      Double Bonus Coal Company

w.      Justice Energy Company

x.      Dynamic Energy Inc.

y.      R&S Coal Company

z.      Ohio Valley Coal Company

aa.      Conesville Coal Preparation Company

      bb.     Jim Waiter Resources, Inc.

      cc.     Drummond Company LLC

      dd.     Oak Grove Resources LLC

      ee.     Oak Grove Land Company LLC

See Roberts Declaration, at ¶ 24.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 21, and Freeman therefore disputes the same. Further responding, Freeman disputes that those portions of this statement concerning other coal companies, if true, are material. A single company agreement, the 2007 Agreement, cannot be transformed into a "successor agreement" after the fact when other unwilling coal companies are coerced, frequently through strikes or threats of strikes, to sign "me too" agreements.

      22.     In addition to the 11 employers represented by BCOA in 2006 that are identified in paragraph 10 above, the BCOA represented 12 other employers during negotiations for the 2002 NBCWA Seven of those 12 employers, Apogee Coal Co., Colony Bay Coal Company, Eastern Associated Coal Corp., Hobet Mining, Mountain View Coal Company, Peabody Coal Company and Pine Ridge Coal Company, subsequently adopted the terms of the 2007 NBCWA. The five remaining employers, Affinity Mining Company, Kent Coal Company, Martinka Coal Company, Squaw Creek Coal Company and Sterling Smokeless Coal Company, are no longer operating. See Roberts Declaration, at ¶ 25.

      **FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 22, and therefore Freeman disputes the same. Further responding, Freeman disputes the statement that the BCOA represented "11 employers" in 2006. It represented only one, Consol.

      23.     In sum, during decades of collective bargaining, the UMWA and the BCOA have established and maintained, through the National Bituminous Coal Wage Agreement, the prevailing contractual standards for the industry. The UMWA develops bargaining positions with membership input obtained through meetings and conventions, while the BCOA has its own internal processes for developing its bargaining positions. Consistent with its long-standing

practice, the Union considers the 2007 NBCWA to establish the standards for the organized bituminous coal industry. The UMWA negotiated and ratified it as such and, not surprisingly, the 2007 NBCWA has been treated by the organized bituminous coal industry as the industry standard. See Roberts Declaration, at ¶ 26.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 23, and therefore Freeman disputes the same. Further responding, Freeman disputes ¶ 23's assertion that the 2007 Agreement is consistent with UMWA's long-standing practice. Freeman disputes that the 2007 Agreement is a successor "national agreement" because it was negotiated by the UMWA and the BCOA, which is no longer a multi-employer collective bargaining unit, but instead represents a single company, Consol.

24.     As of July 2007, there are approximately 360 UMWA members working at the Freeman United mines and 260 members working at the Monterey operations. See Roberts Declaration, at ¶ 27.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 24, and therefore Freeman disputes the same. Further responding, Freeman does not dispute that in July 2007, there were approximately 360 UMWA members working at Freeman United mines. However, to the extent that the statement indicates that this is currently the case, Freeman disputes the same.

25.     Freeman United withdrew from the BCOA in 1997. See Complaint, at ¶ 21. Prior to its withdrawal, Freeman United had been a member of the BCOA since 1966. During that time, it was signatory to the all of the NBCWAs negotiated by the BCOA. After Freeman United left the BCOA, the Union engaged in collective bargaining for successor agreements directly with Freeman. See Complaint, at ¶ 21. See Roberts Declaration, at ¶ 28.

**FREEMAN RESPONSE:** Freeman does not dispute the statements contained in ¶ 25 except to the extent that it implies the Freeman's individual agreements were "successor agreements."

26.     Freeman's current collective bargaining agreement with the UMWA expires in January 2008. See Complaint, at ¶ 21. Similar to predecessor agreements, the contract provides

pension credits under the 1974 Pension Plan to Freeman's active employees and pension benefits from the 1974 Pension Plan to Freeman's retirees and their eligible dependents, including the increased benefits established in the 2007 NBCWA. Among other things, Freeman's collective bargaining agreement incorporates by reference the terms and conditions of the 1974 Pension Plan. Article XX(c) of Freeman's agreement states in relevant part:

> The United Mine Workers of America 1974 Pension Trust (" 1974 Pension Trust") is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1974 Pension Trust are set forth in the United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan"), which is incorporated by reference and made a part of this Agreement.

See Roberts Declaration, at ¶ 29.

**FREEMAN RESPONSE:**    Freeman disputes the allegations in ¶ 26.    Further responding, Freeman's Agreement does not provide for its employees to receive the increased benefits in the 2007 Agreement; rather it only provides for Freeman's employees to receive benefits under the terms of the 1974 Pension Plan, as appropriately amended.  Freeman disputes that the 2007 Agreement is a successor "national agreement" because it was negotiated by the UMWA and the BCOA, which is no longer a multi-employer collective bargaining unit, but instead represents a single company, Consol.

27.    Monterey Coal was a member of BCOA from at least 1974 through 1988 and withdrew from the BCOA during the term of the 1988 NBCWA. During that time it was signatory to all the NBCWAs negotiated by the BCOA. After Monterey left the BCOA, the Union engaged in collective bargaining for successor agreements directly with Monterey, with Monterey signing "me-too" agreements in 1993, 1998 and 2002The UMWA-represented employees at Monterey Coal are working under the terms and conditions of the 2002 Agreement. Similar to predecessor agreements, the contract provides pension credits under the 1974 Pension Plan to Monterey's active employees and pension benefits from the 1974 Pension Plan to Monterey's retirees and their eligible dependents, including the increased benefits established in the 2007 NBCWA. Among other things, Monterey's collective bargaining agreement incorporates by reference the terms and conditions of the 1974 Pension Plan. Article XX(c) of Monterey's agreement states in relevant part:

> The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1974 Pension Trust are set forth in the United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan"), which is incorporated by reference and made a part of

this Agreement.

See Roberts Declaration, at ¶ 30.

**FREEMAN RESPONSE:**  The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 27, and therefore Freeman disputes the same.

## <u>RESPONSE TO THE BCOA'S STATEMENT</u><br><u>OF MATERIAL FACTS NOT IN DISPUTE</u>

Freeman does not dispute the statements in ¶¶ 1-5, 7, 9-10, 12.

6.    The 1974 Pension Plan and 1974 Pension Trust continue to include the evergreen clause, which currently states as follows:

> Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who as or is required to make, or has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978 as amended from time to time and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2007.

Stover Decl., Exhibit E at Art. VIII. B. (16), and Exhibit F at Art. X.

**FREEMAN RESPONSE:**  Freeman does not dispute that ¶ 6 contains an accurate excerpt from the evergreen clause.  Further responding, Freeman disputes that the 2007 Agreement is a successor "national agreement" because it was negotiated by the UMWA and the BCOA, which is no longer a multi-employer collective bargaining unit, but instead represents a single company, Consol.

8.    The contribution to the 1974 Pension Plan and Trust required under the NBCWA of 2007, effective January 1, 2007, is $2.00 per hour for each hour of classified work during calendar year 2007.  Perkins Decl. ¶24; Roberts Decl. ¶ 18, Freeman Answer in 07-cv-490 at ¶ 23.

**FREEMAN RESPONSE:** To the extent that ¶ 8 implies that the 2007 Agreement is a national agreement to which Freeman is bound, Freeman disputes the statements in ¶ 8. Freeman disputes that the 2007 Agreement is a successor "national agreement" because it was negotiated by the UMWA and the BCOA, which is no longer a multi-employer collective bargaining unit, but instead represents a single company, Consol.

9.    Although Freeman's retirees are receiving from the 1974 Pension plan the pension benefits negotiated in the 2007 NBCWA, Freeman has not made any contributions to the 1974 Pension Trust from January 1, 2007 to the present. Freeman Answer in 07-cv-490 at ¶ 1.

**FREEMAN RESPONSE:** Freeman disputes that the 2007 Agreement is a successor "national agreement" because it was negotiated by the UMWA and the BCOA, which is no longer a multi-employer collective bargaining unit, but instead represents a single company, Consol. Further responding, Freeman disputes that even if true, ¶ 9 is material

11.    Freeman did not authorize BCOA to negotiate on its behalf, and Freeman did not exercise any control over BCOA, when BCOA negotiated with the UMWA for the NBCWA of 2007. Perkins Decl. ¶ 17.

**FREEMAN RESPONSE**: Freeman disputes the statements contained in ¶ 11. To the extent that the Court finds that the evergreen clause binds Freeman to contribution rates set by the BCOA, then Freeman continues to have the right to control BCOA when setting contribution rates to the Trust.

13.    In December 2006, BCOA and the UMWA reached agreement on the terms of a new collective bargaining agreement, titled the National Bituminous Coal Wage Agreement of 2007 ("2007 NBCWA"). Freeman Complaint in 07-cv-1050 at ¶ 30; Freeman Answer in 07-cv-490 at ¶ 22; Perkins Decl. ¶ 37; Roberts Decl. ¶ 20.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 13, and therefore Freeman disputes the same. Further responding, Freeman disputes that the 2007 Agreement is a successor "national agreement" because it was negotiated by the UMWA and the BCOA, which is no

longer a multi-employer collective bargaining unit, but instead represents a single company, Consol.

14.    The UMWA conducted a national ratification vote on the 2007 NBCWA whereby approximately 75% of the UMWA membership nationwide, working for BCOA and non-BCOA companies, voted on and ratified the 2007 NBCWA.  Roberts Decl. ¶ 20.

**FREEMAN RESPONSE:**  The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 14, and therefore Freeman disputes the same.  Further responding, Freeman disputes that the 2007 Agreement is a "national agreement" because it was negotiated by the UMWA and the BCOA, which is no longer a multi-employer collective bargaining unit, but instead represents a single company, Consol.

15.    More than 30 non-BCOA companies, including virtually all the major coal operators in the unionized sector of the bituminous coal industry, have agreed to the terms of the 2007 NBCWA (some with minor modifications in areas other than the 1974 Pension Plan) and have accepted the obligation to contribute to the 1974 Pension Plan at the $2.00 per hour rate specified in the 2007 NBCWA.  Roberts Decl. ¶ 23-24; Perkins Decl. ¶ 14.

**FREEMAN RESPONSE:**  The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 15, and therefore Freeman disputes the same.  Further responding, Freeman disputes that those portions of this statement concerning other coal companies, if true, are material.  A single company agreement, the 2007 Agreement, cannot be transformed into a "successor agreement" after the fact when other unwilling coal companies are coerced, frequently through strikes or threats of strikes, to sign "me too" agreements.

16.    After the 2007 negotiations were concluded, the 1974 Pension Plan's actuaries from Mercer Human Resource Consulting performed an analysis of the financial condition of the 1974 Pension Plan reflecting the effects of what had been negotiated in the 2007 NBCWA.  The February 9, 2007 Mercer analysis estimated that, as of July 1, 2006, in light of the negotiated benefit changes, the actuarial value of the 1974 Pension Plan's assets was approximately $5.8 billion and its liability was approximately $6.98 billion within the meaning of the Pension Protection Act of 2006.  Perkins Decl. ¶ 43.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 16, and therefore Freeman disputes the same. Further responding, Freeman does not dispute that the February 9, 2007 Mercer analysis appears to report that as of July 1, 2006, taking into account the benefit changes to the Trust, that the actuarial value of the Trust's assets were approximately $5.8 billion and its liability was approximately $6.98 billion under a method of valuation that the Mercer analysis states is allowed under the Pension Protection Act of 2006. However, Freeman has not had an opportunity to conduct discovery necessary to respond to the substance of ¶ 16, and therefore disputes the same.

## RESPONSE TO 1974 PENSION TRUST AND ITS TRUSTEES STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.      Freeman United Coal Mining Company ("Freeman") and Monterey Coal Company ("Monterey") have signed multiple National Bituminous Coal Wage Agreements ("NBCWA") containing—by incorporation of the 1974 Pension Trust plan and trust documents—a contractual provision known as the "evergreen clause." One of those NBCWAs signed by both Freeman and Monterey was the 1984 NBCWA, which incorporated by reference the evergreen clause as follows:

> Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Wage Agreement of 1978 as amended from time to time, and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1984.

Declaration of Cecil E. Roberts ("Roberts Decl.") ¶¶ 11, 28-30; Declaration of Dale Stover ("Stover Decl.") ¶ 3, Exh. A (1974 Pension Plan) at Art. VIII § B(16) & Exh. B (1974 Pension Trust) at Art. X.

**FREEMAN RESPONSE:** Freeman does not dispute the statements in ¶ 1

2.      The most recent UMWA collective bargaining agreements to which Freeman and Monterey are parties also incorporate the 1974 Pension Trust plan and trust documents by reference, and thus include the evergreen clause. The version of the evergreen clause in those

agreements is identical to the one quoted in paragraph 1 above, except that the final clause reads "including, but not limited to, the National Bituminous Coal Wage Agreement of 2002." Roberts Decl. ¶¶ 29-30; Stover Decl. ¶ 3, Exh. C (1974 Pension Plan) at Art. VIII, § B (16) & Exh. F (1974 Pension Trust) at Art. X.

**FREEMAN RESPONSE:** Freeman does not dispute the statements in ¶ 2

3.       Exhibits E and F to the Stover Declaration, respectively, are copies of the plan and trust documents as the UMWA and the BCOA amended them effective January 1, 2007.

**FREEMAN RESPONSE***:* Freeman does not dispute the statements in ¶ 3 except to the

extent they suggest that the Trust was properly amended in 2007**.**

4.       Exhibits C and D to the Stover Declaration, respectively, are copies of the plan and trust documents as they were in effect immediately before the UMWA and the BCOA amended them effective January 1, 2007.

**FREEMAN RESPONSE:** Freeman does not dispute the statements in ¶ 4 except to the

extent they suggest that the Trust was properly amended in 2007.

5.       In mid-December 2006, the UMWA and the BCOA reached a tentative agreement on the terms of a new national agreement—titled the National Bituminous Coal Wage Agreement of 2007 ("2007 NBCWA"). Roberts Decl., ¶¶ 6, 20-21. The UMWA thereupon made arrangements for national ratification of the 2007 NBCWA. *Id.* ¶ 21. Specifically, the UMWA scheduled ratification votes by each Local Union whose members had been employed under the 2002 NBCWA—whether for companies that had been members of the BCOA in 2002 or companies (like Monterey) that had signed "me too" agreements—in which each of the Local Unions voted on whether to accept the terms of the 2007 NBCWA. *Id.* The only exception concerned several smaller coal companies (like Freeman) that were signatory to "me too" agreements that were scheduled to expire a year or more after the December 31, 2006 expiration date of the 2002 NBCWA. *Id.*

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient

for Freeman to respond to all of the statements contained in ¶ 5, and therefore Freeman disputes

the same.   Further responding, Freeman disputes that the 2007 Agreement is a successor

"national agreement" because it was negotiated by the UMWA and the BCOA, which is no

longer a multi-employer collective bargaining unit, but instead represents a single company,

Consol.  Freeman also disputes that in 2006 the BCOA had the ability to negotiate a national

agreement because it was no longer a multi-employer collective bargaining unit, but represented

a single company, Consol.  Freeman also disputes that its individual agreement is a "me too" agreement.

6.    These UMWA members, representing approximately 75% of UMWA's active membership in the coal mining industry, ratified the 2007 NBCWA. *Id*.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 6, and therefore Freeman disputes the same.  Further responding, Freeman disputes that the 2007 Agreement is a successor "national agreement" because it was negotiated by the UMWA and the BCOA, which is no longer a multi-employer collective bargaining unit, but instead represents a single company, Consol.  Freeman further states that the statements contained in ¶ 6, if true, are immaterial.

7.    After this nationwide ratification process, the UMWA approached non-BCOA companies that previously had agreed to be bound by the terms of the 2002 NBCWA in an effort to secure their agreement to the terms of the 2007 NBCWA. (Monterey was one such non-BCOA company, but Freeman was not, since at that time Freeman was operating under an agreement with a later, January 2008 expiration date.) In this connection, the UMWA told the non-BCOA companies that if they signed an agreement committing themselves to the terms of the 2007 NBCWA, it would not be necessary for the UMWA to submit that agreement for a separate ratification vote by the company's employees, inasmuch as the terms of the 2007 NBCWA already had been approved in the nationwide ratification process. Roberts Decl. ¶¶ 21-23, 29.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 7, and therefore Freeman disputes the same.  Further responding, Freeman disputes that the 2007 Agreement is a successor "national agreement" because it was negotiated by the UMWA and the BCOA, which is no longer a multi-employer collective bargaining unit, but instead represents a single company, Consol.  Freeman disputes that those portions of this statement concerning other coal companies, if true, are material.  A single company agreement, the 2007 Agreement, cannot be transformed into a "successor agreement" after the fact when other unwilling coal companies are coerced, frequently through strikes or threats of strikes, to sign "me too" agreements.

25

8.      Although several of the non-BCOA companies requested bargaining to address issues particular to their operations, all of those who had agreed to the terms of the 2002 NBCWA (with Monterey being the sole exception) ultimately agreed to the terms of the 2007 NBCWA; some with minor modifications in areas other than the 1974 Pension Plan. *Id*. ¶ 24.

**FREEMAN RESPONSE:** The opposing parties have not produced discovery sufficient for Freeman to respond to all of the statements contained in ¶ 8, and therefore Freeman disputes the same.  Further responding, Freeman disputes that the 2007 Agreement is a successor "national agreement" because it was negotiated by the UMWA and the BCOA, which is no longer a multi-employer collective bargaining unit, but instead represents a single company, Consol.  Freeman disputes that this statement, if true, is material.  A single company agreement, the 2007 Agreement, cannot be transformed into a "successor agreement" after the fact when other unwilling coal companies are coerced, frequently through strikes or threats of strikes, to sign "me too" agreements.

9.      The 2007 NBCWA set a contribution rate of $2.00 per manhour worked to the 1974 Pension Trust beginning January 1, 2007, and increasing over the 5-year term of the contract to $5.50 per hour. Id. ¶

**FREEMAN RESPONSE:** Freeman does not dispute the statements in ¶ 9 except to the extent that they imply that the 2007 Agreement was a national agreement.  Freeman disputes that the 2007 Agreement is a successor "national agreement" because it was negotiated by the UMWA and the BCOA, which is no longer a multi-employer collective bargaining unit, but instead represents a single company, Consol.

10.      Freeman has not contributed to the 1974 Pension Trust since the new rate became effective on January 1, 2007. 1974 Pension Trust Complaint ("Complaint") ¶ 1; Answer of Defendant Freeman United Coal Mining Company ¶ 1.

**FREEMAN RESPONSE:** Freeman does not dispute the statements in ¶ 10.

11.      Monterey has not contributed to the 1974 Pension Trust since the new rate became effective on January 1, 2007. Complaint ¶ 1; Answer of Defendant Monterey Coal Company ¶ 1.

**FREEMAN RESPONSE:** Freeman does not dispute the statements in ¶ 11.


Respectfully submitted,


__/s/ Susan C. Levy_____

Paul M. Smith
DC Bar No. 358870
Jessica Ring Amunson
DC Bar No. 497223
JENNER & BLOCK LLP
601 13th Street, NW
Washington, DC 20005
Tel:     (202) 639-6000
Fax:     (202) 661-4993
psmith@jenner.com
jamunson@jenner.com

Susan C. Levy (*pro hac vice*)
Aaron M. Forester (*pro hac vice*)
JENNER & BLOCK LLP
333 North Wabash Avenue
Chicago, IL 60611
Tel:     (312) 923-2772
Fax:     (312) 840-7772
slevy@jenner.com
aforester@jenner.com

Michael W. Robinson
DC Bar No. 437979
Gregory J. Ossi
DC Bar No. 460243
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Vienna, VA 22182
Tel:     (703) 760-1600
Fax:     (703) 812-8949
mwrobinson@jenner.com
gjossi@jenner.com

***Counsel for Freeman United
Coal Mining Company***