## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Michael H. Holland, *et al.*,      ) | |
|                              ) | |

Michael H. Holland, *et al.*,                                )
                                                             )
                           Plaintiffs,                       )
                                                             )
        v.                                                   )
                                                             )   Case No. 07-cv-490 (PLF)
Freeman United Coal Mining Company,                          )
*et al.*,                                                     )
                                                             )
                           Defendants.                       )
_____)
Freeman United Coal Mining                                   )
Company,                                                     )
                                                             )
        Plaintiff,                                           )   Case No. 07-cv-1050 (PLF)
                                                             )
        v.                                                   )
                                                             )
United Mine Workers of                                       )
America, *et al.*,                                            )
                                                             )
                           Defendants.                       )
_____)

## REPLY MEMORANDUM IN SUPPORT OF
## THE UNITED MINE WORKERS OF AMERICA 1974 PENSION TRUST'S
## MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM
## IN OPPOSITION TO DEFENDANTS' RULE 56(f) MOTIONS

Plaintiffs United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust" or "Trust") and its Trustees hereby submit this Memorandum in connection with their motion for summary judgment on the issue of liability of defendant Freeman United Coal Mining Company ("Freeman") and Monterey Coal Company ("Monterey") under the "evergreen clause" to make contributions to the Trust at the rates set in the 2007 National Bituminous Coal Wage

Agreement ("NBCWA") between the United Mine Workers of America ("UMWA") and the Bituminous Coal Operators' Association ("BCOA").

We show in this Memorandum that the 1974 Pension Trust's entitlement to summary judgment on the issue of liability is clear, and that there is no prospect that Freeman and Monterey could adduce facts through additional discovery that would enable them to avoid summary judgment in the Trust's favor. This Memorandum thus does double duty as a Reply Memorandum in support of the Trust's summary judgment motion, and a Memorandum in Opposition to Freeman's and Monterey's Rule 56(f) motions to deny or continue the Trust's summary judgment motion pending the completion of discovery.

### ARGUMENT

I.  **AS A MATTER OF LAW, THE EVERGREEN CLAUSE OBLIGATES FREEMAN AND MONTEREY TO MAKE CONTRIBUTIONS TO THE TRUST AT THE RATES SET IN THE 2007 NBCWA, AND THERE IS NO PROSPECT THAT FREEMAN AND MONTEREY COULD ADDUCE FACTS THROUGH ADDITIONAL DISCOVERY THAT WOULD ENABLE THEM TO ESCAPE THAT OBLIGATION.**

A.      In our opening brief, we established that in *United Mine Workers of Am. 1974 Pension Trust v. Pittston*, 984 F.2d 469, 473 (D.C. Cir. 1993) ("*Pittston*"), the Court of Appeals for this Circuit definitively determined the meaning and enforceability of the evergreen clause "as a matter of law"—by holding that *every* coal company employer that has signed an NBCWA between the UMWA and the BCOA containing the evergreen clause has thereby assumed a "fully enforceable," *id.* at 479, obligation

> to make continuing contributions to the [UMWA] trusts; and this obligation include[s] an agreement to make contributions at

2

> [the] rates specified in subsequent NBCWAs, without regard to
> whether the employer [is] still a party to the subsequent
> agreements.

*Id.* at 474.  *See* Memorandum of Points and Authorities in Support of the [1974
Pension Trust's] Motion for Summary Judgment on the Issue of Liability ("Pl.
Mem.") (Dkt. #46)[1] at 2, 4-10.  And, we further established:  (i) that both
Freeman and Monterey have signed multiple NBCWAs between the UMWA and
the BCOA containing the evergreen clause, *see* Pl. Mem. at 2-3; and (ii) that
under the familiar principle of *stare decisis*, Freeman and Monterey are bound
by the *Pittston* court's decision respecting the meaning and enforceability of the
evergreen clause, *see id.* at 10-12.

　　It bears emphasis at the outset that neither Freeman nor Monterey has
disputed *any* of the foregoing propositions in their respective memoranda in
opposition to the Trust's summary judgment motion.  *See* Freeman['s]
Opposition to the Motions for Summary Judgment Filed by the 1974 Pension
Trust, [UMWA, and BCOA] ("Freeman Mem.") (Dkt. 57); Monterey['s]
Memorandum of Points and Authorities in Opposition to the Motion for
Summary Judgment Filed by the Trustees of the [Trust] and in Support of
Monterey's Alternative Motion that the Court Deny the Trustees' Motion in
Order to Permit Discovery ("Monterey Mem.") (Dkt. # 55).

　　We went on in our opening brief to rebut certain arguments that we
anticipated (based on their pleadings) Freeman and Monterey would make in
an effort to escape their obligation under the evergreen clause "to make

---

[1] Unless otherwise noted, all docket citations are to case number 07-cv-490.

continuing contributions to," *Pittston*, 984 F.2d at 474, the Trust.  *See* Pl. Mem. at 12-28.  In their opposition memoranda, Freeman and Monterey do *not* make the arguments that we anticipated and rebutted at pages 12-14 & 19-20 of our opening brief—*viz.*, Freeman's arguments respecting its 2003 agreement with the UMWA and the "guarantee clause" therein, and Monterey's argument respecting its failure to reach a new agreement with the UMWA.  That being so, we regard these arguments as abandoned, and do not address them any further herein.

B.     The *one* argument suggested by their pleadings that Freeman and Monterey *do* press forcefully in their opposition memoranda is the argument that they have no contribution obligation to the Trust under the evergreen clause because the 2007 NBCWA providing for such contributions does not qualify as a "successor agreement" within the meaning of the evergreen clause.  We showed in our opening brief that this "non-successor-agreement" argument fails as a matter of law for *two* independent reasons—*either* of which is sufficient *standing alone* to defeat Freeman's and Monterey's effort to escape their obligation under the evergreen clause "to make continuing contributions to," *Pittston*, 984 F.2d at 474, the Trust.  *See* Pl. Mem. at 15-19 (reason #1); *id.* at 20-24 (reason #2).  We now show that Freeman and Monterey have done *nothing* in their opposition memoranda to contravene the Trust's showing on *either* of these two separate points.

1.     The first reason that Freeman's and Monterey's non-successor-agreement argument fails is that it rests on a false premise—*viz.*,

4

that the obligation of evergreen clause signatory employers is limited to the obligation to make the contributions required by "successor agreements" to the 1978 NBCWA.  To reiterate, the evergreen clause expressly provides, in the plainest of language, that signatory employers are "obligated and required to comply with *the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to,* making the contributions required under the [NBCWA] of 1978 . . . and any successor agreements thereto."  *See* Pl. Mem. at 6 (emphasis added).  And, it is undisputed that the obligation to make contributions required under the 2007 NBCWA is a "term[ ] and condition of the 1974 Pension Plan and Trust," as the Plan and Trust was amended by the UMWA and the BCOA effective January 1, 2007.  As the 1974 Pension Trust explained in detail in its opening brief, the Trust's 2007 plan document addresses in three separate provisions employers' obligations to contribute to the Trust.  In each of those provisions, the plan document specifies that contributions shall be made in accord with the "National Bituminous Coal Wage Agreement of 2007."  Pl. Mem. at 18-19.

All this being so, we explained that it is clear as a matter of law that Freeman and Monterey are obligated by the evergreen clause to make the contributions required by the 2007 NBCWA—wholly without regard to whether the 2007 NBCWA qualifies as a "successor agreement" under the evergreen clause.  *See* Pl. Mem. at 15-19.

In response to the foregoing "[a]mended [t]rust [a]rgument," as Freeman dubs it, *see* Freeman Mem. at 18 (section title), Freeman makes two arguments

5

on the merits—neither of which is remotely availing.  *See infra* pp. 6-10 (subsections a & b).  Tacitly recognizing that reality, Freeman also makes a judicial estoppel argument—which is equally unavailing.  *See infra* pp. 10-13 (subsection c).[2]

   a. Freeman's first merits argument is that statements contained in two of the five declarations submitted by the Trust in the *Pittston* case and in the instant case create a genuine issue of material fact respecting "the intent of the drafters" of the evergreen clause to impose on signatory employers only the obligation to make contributions required by an agreement that qualifies as "a *successor* NBCWA."  *See* Freeman Mem. at 19 (emphasis in original).[3]  "At a minimum," says Freeman, it "is entitled to take" additional discovery in an effort to show that this was indeed "the intent of the drafters," particularly since "[t]here has been little discovery in this case on the intent and meaning of the evergreen clause."  *Id.*  This argument fails at every level.

 *First and foremost*, the plain language of the evergreen clause utterly belies Freeman's posit that "the intent of [its] drafters" was to impose on signatory employers only an obligation to make contributions required by an agreement that qualifies as "a *successor* NBCWA."  For as we have shown, and as it bears repeating once more, the evergreen clause expressly provides that signatory employers are "obligated and required to comply with the terms and

---

[2] Monterey does not offer any response of its own to the Trust's "amended trust argument"—but simply adopts Freeman's arguments on these points.  *See* Monterey Mem. at 2-3.

[3]  These statements are quoted at pp. 7-8 of Freeman's Memorandum.

conditions of the 1974 Pension Plan and Trust, as amended from time to time, *including, but not limited to*, making the contributions required under the [NBCWA] of 1978 . . . and any successor agreements thereto." (Emphasis added). Pl. Mem. at 6. Tellingly, Freeman does not even acknowledge that the italicized language is in the evergreen clause—much less make any effort to explain how its posit respecting "the intent of the [clause's] drafters" can be squared with that language.

 *Second*, the intent of the evergreen clause as shown by its plain language cannot be contravened—and thus placed in genuine issue for summary judgment purposes—by quoting statements in two of the Trust's five declarations out of context. Each of the Trust's five declarations speak at length about the intent of the evergreen clause, and each of those five declarations, read as a whole, gives the same account of what that intent was.[4] As the BCOA's lead negotiator of the evergreen clause, Roger M. Haynes, succinctly put it in his declaration, the intent of the evergreen clause was "to make sure that *any* coal operator that voluntarily agreed to participate in the Funds in 1978 *could not simply walk away from the Funds and leave its retirees behind*, or negotiate cut-rate contributions with the UMWA, *at the expense of*

---

[4] The five declarations in question are appended as Exhibits A-E to the Declaration of Julia Penny Clark, submitted on September 7, 2007 in support of the Trust's summary judgment motion (Dkt. #46-8) ("Clark Decl.").

*the remaining employers.*"  *See* Clark Decl., Exh. E (Declaration of Roger M.

Haynes ("Haynes Decl.")) ¶ 19 (emphasis added).[5]

The five declarations thus corroborate, rather than contravene, the

conclusion that flows ineluctably from the plain language of the evergreen

clause itself—*viz.*, that where, as here, the continuation of contributions to the

Trust by *all* coal operators "that voluntarily agreed to participate in the [Trust]

in 1978" remains a "term[ ] and condition[ ] of the . . . Trust, as amended,"

*none* of those coal operators is free "simply [to] walk away from the [Trust] and

leave [its] retirees behind . . . at the expense of the remaining employers."

*Third*, even taken in isolation, the declaration statements seized upon by

Freeman do not suffice to create a genuine issue of material fact respecting the

_____

[5] *Accord,* Clark Decl., Exh. D (Declaration of K.L. Young) ¶ 8 ("The intent and effect of the evergreen clause" was "to ensure that if an employer chose to participate in 1978 or thereafter, that employer would have to participate on the same terms as all other participating employers.  An expression that we used in the negotiations to convey this point was, 'If you want to play ball in our park [i.e., the Funds], you have to play by our rules [*i.e.,* the contributions required by the NBCWA *and trust documents*].") (bracketed material in original; emphasis added); *id.*, Exh. C (Declaration of David W. Kempken) ¶ 6 ("[O]ur intent [in the evergreen clause] was to make sure that if an employer voluntarily agreed with the UMWA to participate in the Funds and to provide benefits through the Funds to its employees and retirees, then that employer would pay its fair share of the Funds' expenses, and not dump its liabilities onto the remaining employers"); *id.*, Exh. B (Declaration of B.M. Shaner) ¶ 6 ("The evergreen clause was intended to protect BCOA member companies against other employers pulling out of the Funds and dumping their liabilities on the remaining employers."); *id.*, Exh. A (Declaration of Donald E. Pierce Jr.) ¶¶ 7-11 (The evergreen clause and its related plan and trust document provisions were intended to back up the UMWA's oral assurances at the bargaining table with iron-clad contract language "bind[ing] all employers who agreed to participate in the Trusts" to "pay the same levels of contributions that were required of BCOA members under the NBCWA," and precluding such employers from "withdraw[ing] from the Funds and leav[ing] liabilities as the responsibility of the remaining employers.").

intent of the evergreen clause.  As Freeman itself recognizes, the point of those

statements was that the evergreen clause was not intended to impose and does

not impose "*perpetual* contribution obligations on employers."  *See* Freeman

Mem. at 7 (emphasis added).   The Trust agrees wholeheartedly with that point,

and its "amended trust argument" is not to the contrary, inasmuch as under

that argument there is no contribution obligation to the Trust under the

evergreen clause if at some future time the plan and trust documents have not

been amended to impose such a contribution obligation.

*Fourth and finally*, given the clear intent of the evergreen clause as

shown by its plain language, and as corroborated by the Trusts' five

declarations, there is no prospect that Freeman could adduce facts through

additional discovery that would enable it to overcome the Trust's "amended

trust argument" and thereby escape its contribution obligation under the

evergreen clause.  Thus, Freeman's bald assertion that it "is entitled to take"

such additional discovery prior to a ruling on this ground for summary

judgment in the Trust's favor, *see* Freeman Mem. at 19, is not well taken and

should be rejected.[6]

---

[6] That said, Freeman is disingenuous in stating that "[t]here has been little
discovery in this case on the intent and meaning of the evergreen clause."  *See*
Freeman Mem. at 19.  While that statement is true insofar as it is limited to
*this case*, it ignores two salient facts detailed in the accompanying Second
Declaration of Julia Penny Clark:  (i) the Trust has provided Freeman a large
volume of discovery material "on the intent and meaning of the evergreen
clause" that was generated in the *Pittston* case and its companion cases,
including depositions of practically everyone who was involved in the 1978
negotiations that produced the evergreen clause; and (ii) Freeman was less
than prompt in sending lawyers to review that material.

b.    Freeman's second merits argument—that "there are genuine issues of material fact regarding whether the Trust was properly 'amended' in 2007 within the meaning of the evergreen clause," see Freeman Mem. at 20—is equally infirm.

Freeman's second argument is as follows:  since BCOA's membership now consists of only "a single employer" (Consol and its ten affiliated companies), the BCOA no longer has any authority under the plan and trust documents to amend the terms and conditions of the Trust so as to "bind" all "of the *Employers*" as a group.  *See id.* (quoting Articles X & XI of the Trust) (emphasis in original).  But this argument is inconsistent with the plan and trust documents.  As we showed in our opening brief, the plan and trust documents define the term "Employer" to include *any* Employer that signed an NBCWA from 1974 to the present, without regard to the Employer's current membership in the BCOA, and give "BCOA" the authority to act on behalf of all those Employers in amending the plan and trust.  *See* Pl. Mem. at 16-18. Freeman's unstated premise is that "BCOA" must mean an organization comprising employers that are not all affiliated with one another.  But there is no definition of "BCOA" in the plan or trust that supports such a premise, and there is no exception stating that if the 11 members of BCOA are all affiliated, BCOA can no longer exercise its authority to amend the plan and trust.  The plain language of the plan and trust defeats Freeman's argument.

c.    Like Freeman's first merits argument, Freeman's judicial estoppel argument, *see* Freeman Mem. at 19-20, fails at every level.

To begin with, although Freeman invokes the Supreme Court's decision in *New Hampshire v. Maine*, 532 U.S. 742 (2001), applying judicial estoppel, *see* Freeman Mem. at 20, that decision makes the point that "judicial estoppel 'is an equitable doctrine invoked by a court at its discretion,'" *see* 532 U.S. at 750 (internal quotations omitted). And, to this juncture at least, the Court of Appeals for this Circuit has *not* seen fit to exercise its discretion to recognize the judicial estoppel doctrine. *See Pittston*, *supra*, 984 F.2d at 477 ("[W]e have not previously embraced the doctrine of judicial estoppel in this circuit, and we decline to do so in this case.") (footnote omitted); *see also Smith v. District of Columbia*, 295 F. Supp.2d 53, 55 (D.D.C. 2003) ("[T]his Circuit has specifically rejected the principle of judicial estoppel: 'We conclude that the judicial estoppel doctrine has no vitality in this jurisdiction.'") (quoting *Konstantinidis v. Chen*, 626 F.2d 933, 938 (D.C. Cir. 1980)).[7]

In any event, even if this Circuit recognized the judicial estoppel doctrine, application of that doctrine plainly would *not* be appropriate in the circumstances presented here. The first requisite for application of the doctrine is the taking by a party of a "position" in Case #2 (here, the instant case) that is inconsistent with a "position" previously taken by that same party in Case #1 (here, the *Pittston* case). *See New Hampshire*, 532 U.S. at 750. In the *Pittston* case, however, it was undisputed that a "successor" NBCWA was in place that required contributions to each of the UMWA Funds including the

---

[7] Incredibly, Freeman cites Judge Hogan's decision in *Pittston* in support of its judicial estoppel argument, *see* Freeman Mem. at 20, without acknowledging what the D.C. Circuit had to say on the subject on appeal.

1974 Pension Trust—as Freeman itself is at pains to point out in its opposition brief, *see, e.g.,* Freeman Mem. at 9 ("Significantly, because it was not at issue in that case, the *Pittston* court never decided precisely what requirements were necessary for an agreement to qualify as a successor NBCWA.").  That being so, the Funds had no occasion to take and did not take any position at all in the *Pittston* litigation on the issue of what the evergreen clause obligates signatory employers to do in the asserted absence of a "successor" NBCWA—much less the position that Freeman attributes to the Funds (*i.e.*, that the continuing contribution obligation of evergreen clause signatory employers is limited to the obligation to make the contributions required by an agreement that qualifies as a "successor" NBCWA).

Equally to the point, a second requisite for application of the judicial estoppel doctrine is "judicial acceptance" of the "position" allegedly advocated by the party in Case #1.  *See New Hampshire*, 532 U.S. at 750.  But Freeman points to nothing and there is nothing in the *Pittston* court's decision that amounts to "judicial acceptance" of the "position" allegedly advocated by the Funds in that case.  Quite to the contrary, consistent with the plain language of the evergreen clause, the *Pittston* court held that

> these employers [who signed a prior NBCWA "incorporating the evergreen clause by reference"] agreed to be bound by the evergreen clause to make continuing contributions to the trusts; and this obligation *included* an agreement to make contributions at rates specified in subsequent NBCWAs, without regard to whether the employer was still a party to the subsequent agreements.

984 F.2d at 474 (emphasis added).

*         *         *         *

The long and short of the matter is this.  The UMWA and the BCOA
properly amended the 1974 Pension Trust effective January 1, 2007 to make
the payment of the contributions required by the 2007 NBCWA a "term[ ] and
condition[ ] of" the Trust, and under the plain language of the evergreen clause,
Freeman and Monterey are "obligated and required to comply with [that] term[ ]
and condition[ ] of" the Trust.  *On this ground alone*—as to which there is no
genuine issue of material fact, and no prospect of creating such a genuine
issue of material fact through additional discovery "on the intent and meaning
of the evergreen clause"—the Trust's motion for summary judgment should be
granted.

2.    In our opening brief we showed also that there is a fully
sufficient *alternative* ground for granting the Trust's motion for summary
judgment—*viz.*, that as a matter of law, the 2007 NBCWA *does* qualify as a
"successor agreement" under the evergreen clause.  *See* Pl. Mem. at 20-24.
And our showing on this point, stripped to its essence, was that the 2007
NBCWA was an agreement between the UMWA and the BCOA that was
designed to establish, and did in fact establish, the industry standard
respecting the terms and conditions of employment under which UMWA-
represented coal miners across the country would work during the period

covered by the agreement—and was to that extent a true *national* agreement in the same sense as every prior NBCWA between the UMWA and the BCOA.

Freeman and Monterey make several arguments in response to this showing by the Trust—including the argument that, at a minimum, "full discovery" surrounding the negotiation of the 2007 NBCWA and its acceptance as the industry standard by the employer community "is required" before the Trust's motion for summary judgment on this alternative ground properly can be ruled upon. *See* Freeman Mem. at 12; *see also* Monterey Mem. at 3. None of these arguments has merit.

a.      Freeman's first responsive argument centers on "substantial evidence" that the 2007 NBCWA between the UMWA and the BCOA, by its terms, and by the UMWA's own lights, was at its inception binding only on a single employer group (*i.e.*, Consol and its affiliates). *See* Freeman Mem. at 13-14. But we acknowledged this undisputed fact in our opening brief, *see* Pl. Mem. at 21, 23, and went on to show that it is immaterial to the legal issue at hand given that the terms of the 2007 NBCWA were ratified by the UMWA membership in a *nationwide* ratification process and subsequently accepted by *every* non-BCOA coal company (save Monterey) that previously had agreed to the terms of the 2002 NBCWA without any requirement of a separate ratification vote by the companies' employees. Freeman's first responsive argument is thus no response to the Trust's showing at all.

14

b.      To the extent that Freeman does attempt a response to
the Trust's showing, the sum and substance of its response is that there is
"substantial evidence"—which Freeman should be given the opportunity to
explore further in discovery—that the non-BCOA companies which signed on to
the terms of the 2007 NBCWA did so reluctantly and unhappily only after being
subjected to strikes, threatened strikes, and other "coercive" tactics by the
UMWA.  *See* Freeman Mem. at 2, 12, 14-15, 18.  But Freeman does not even
begin to explain the legal relevance of this "substantial evidence," and we
cannot imagine what that relevance might be.  As Roger Haynes recounted in
his declaration in the *Pittston* case, the 1978 NBCWA itself was the product of
"a nationwide strike . . . [which] lasted for more than three months."  Haynes
Decl. ¶ 14.  If the 1978 NBCWA was no less an NBCWA because the BCOA was
"coerced" into signing it, similar "coercion" does not keep a subsequent
agreement from being a successor to it.[8]

c.      Monterey, for its part, argues that the Trust's theory
respecting what qualifies as a true "successor" NBCWA is "fatal[ly] flaw[ed],"
Monterey Mem. at 6, inasmuch as it leaves unanswered a number of
hypothetical questions "such as how many companies must sign a mirror

---

[8] In support of its argument along these lines, Freeman pounces on the
statement in the Trust's opening brief that the employer community response
to the UMWA's effort to secure industry-wide acceptance of the terms of the
2007 NBCWA "was overwhelmingly positive."  *See* Freeman Mem. at 12, 14
(quoting Pl. Mem. at 23).  But Freeman has taken that statement entirely out of
context.  As the accompanying text in the Trust's brief makes clear, the Trust's
point was that every non-BCOA coal company (save Monterey) that previously
had agreed to the terms of the 2002 NBCWA did in fact sign on to the terms of
the 2007 NBCWA—not that they were eager or happy to do so.

agreement for the individual company agreement to become a 'national' contract, whether 'national' status depend[s] upon the number of companies, tonnage, or represented employees subject to a mirror agreement, the date upon which the unstated threshold for such status was reached, or any other factors bearing upon the satisfaction of a condition subsequent," *id.* at 7.  This argument is a red herring.

We readily concede that the hypothetical questions propounded by Monterey do not lend themselves to bright-line answers.  But we respectfully submit that Monterey's hypothetical questions are of purely academic interest in *this* case, given the undisputed fact of record that "mirror agreements" to the 2007 NBCWA were signed by *every* non-BCOA company (save Monterey itself) that previously had agreed to the terms of the 2002 NBCWA.  Whether an NBCWA that did not command this level of industry-wide acceptance would qualify as a "successor" NBCWA is a question that may never arise and that need not be answered here.

d.     Finally, Freeman and Monterey argue that the Trust's position on the "successor agreement" issue is inconsistent with the *Pittston* court's holding—and with statements contained in the five declarations submitted by the Trust in the *Pittston* case—"that an agreement between a single company and the UMWA cannot be a 'successor agreement' under the terms of the evergreen clause."  *See*  Freeman Mem. at 3; *see also* Monterey Mem. at 5-6.  But Freeman and Monterey have taken the *Pittston* court's holding and the quoted declaration statements entirely out of context.

The point made by the *Pittston* court and the Trust's declarants was that a *post*-NBCWA agreement between the UMWA and a single *non-BCOA* company "which included modifications of the[ ] [uniform] contribution [rates] to the trusts [set by the NBCWA itself]" could not qualify as a "successor agreement[]" under the evergreen clause. *See Pittston*, 984 F.2d at 472, 475. Neither the *Pittston* court nor the Trust's declarants stated or remotely implied that *an NBCWA itself* between the UMWA *and the BCOA* setting uniform contribution rates to the Trust in the first instance would not qualify as a "successor agreement" under the evergreen clause if the BCOA's membership at the time comprised the affiliates of only a single company.

*          *          *          *

In sum, Freeman and Monterey have done *nothing* to contravene the Trust's showing that it is entitled to summary judgment on the alternative ground that the 2007 NBCWA *does* qualify as a "successor agreement" under the evergreen clause.

C.    In a separate section of its opposition brief, Freeman responds to what it characterizes as the Trust's "final argument" in support of its motion for summary judgment—*viz.*, "that if Freeman were not forced to make contributions into the Trust at the rates set in the 2007, this would 'imperil the 1974 Pension Trust's very existence.'" *See* Freeman Mem. at 21 (quoting Pl. Mem. at 28). But that characterization of the Trust's "final argument" is inapt. The thrust of the Trust's "final argument" was that a ruling in Freeman's favor in this case would strike at the heart of the evergreen clause's animating

17

purpose to preclude coal companies that voluntarily agreed to participate in the UMWA Funds from deciding at some later date to withdraw from one or more of the Funds.  *See* Pl. Mem. at 25-28.  The Trust's further point that an interpretation of the evergreen clause allowing for such employer withdrawals would "imperil the 1974 Pension Trust's very existence" was in the nature of an aside prefaced by the word "[i]ndeed."  *See id.* at 28.

Notably, while vigorously attacking the Trust's aside, Freeman has nothing at all to say about the Trust's main point regarding the animating purpose of the evergreen clause.  That silence speaks volumes.

Moreover, even as to the Trust's aside, Freeman's vigorous attack badly misses the mark.  Freeman asserts that "[t]he requirement that a withdrawing employer pay withdrawal liability to a multi-employer plan ensures that the multi-employer plan will not suffer any loss because of the withdrawal." Freeman Mem. at 21.  However, the notion that statutory withdrawal liability is a perfect substitute for a requirement that employers continue making contributions is not borne out by either the legislative history of withdrawal liability or common sense.

The origin of withdrawal liability was the Multiemployer Pension Plan Amendments Act ("MPPAA").  In passing MPPAA, Congress hoped to "eliminat[e]. . . incentives for plan termination," because "[t]he capacity of a multiemployer plan to meet its benefit commitments depends on the maintenance of a stable or growing contribution base."  H.R. Rep. No. 96-869 at 51, 53 (1980), *reprinted in* 1980 U.S.C.C.A.N. 2918, 2919 & 2921-22.  One

reason for this is that each employer's withdrawal from a pension plan leaves behind a smaller base of participating employers, who will then be responsible for making up any future shortfall in the plan's funding. Thus, all other things being equal, each time an employer withdraws from a multi-employer pension plan, the remaining employers face increased risk that their own contributions to the plan will rise.

Withdrawal liability is calculated by, in essence, taking a snapshot of the plan close to the date of the withdrawal, and allotting to the withdrawing employer its share of the plan's unfunded vested benefits at the time of the snapshot. *See* 29 U.S.C. § 1381(b); *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 734 (withdrawing employers must "compensate a pension plan for benefits that have already vested with the employees at the time of the employer's withdrawal."). However, the extent to which a plan is funded fluctuates over time as its investment returns vary, and as the number of plan participants and benefit levels rise and fall. Thus, an employer who withdraws from a multi-employer pension plan during a year that the plan is fully funded will not be assessed any withdrawal liability. *See generally,* 29 U.S.C. § 1391. However, should the plan later face economic downturn, those employers who remained in the plan, and not the employers who have already withdrawn, will have the burden of contributing enough to meet ERISA's minimum funding standards. As the number of participating employers available to share this burden decreases, the incentives for remaining employers to withdraw in order to avoid rising liability increase.

For these reasons, Freeman is simply wrong in arguing that statutory withdrawal liability substitutes for the evergreen clause and ensures that the 1974 Pension Trust would not be harmed if employers were free to stop making contributions.[9]

## II. THERE IS NO MERIT IN MONTEREY'S ARGUMENT THAT WHAT IT CALLS THE "DISCONTINUANCE OF CONTRIBUTIONS" PROVISION IN THE 1974 PENSION PLAN "SUPERSEDES AND NEGATES THE TRUSTEES' RELIANCE ON THE EVERGREEN CLAUSE AS A BASIS FOR ITS CLAIM IN THIS CASE."

Monterey makes an additional argument in its opposition brief that we did not anticipate and address in our opening brief--*viz.*, that "[a] separate 'discontinuance of contributions' provision in the UMWA Pension Plan – which was not before the court in *Pittston* – supersedes and negates the Trustees' reliance on the evergreen clause as a basis for its claim in this case."  Monterey Mem. at 13.[10]  This argument gives new meaning to the words "last ditch."

Monterey concedes that what it calls the "discontinuance of contributions" clause was first included in the *original* 1974 Pension Trust plan document--four years before the inception of the evergreen clause.  Monterey Mem. at 13.  The clause states as follows:

---

[9] In fact, Freeman is already obligated to pay withdrawal liability to the 1974 Pension Trust because it has recently permanently ceased mining activity and sold its assets to another entity.  Thus, Freeman's argument in this case is especially cynical given that, should Freeman succeed in this lawsuit, the result would be to reduce its withdrawal liability payments by more than $1,000,000 per year.  *See* Second Declaration of Dale Stover, ¶¶ 3, 7 & 8.

[10] Freeman adopts Monterey's additional argument, but makes no independent argument on this point.  *See* Freeman Mem. at 10 n.1.

> Upon the termination of this Plan or the complete discontinuance
> of contributions to the 1974 Pension Trust, this Plan shall remain
> in force and effect for the period necessary to complete the
> payment of benefits in accordance with the terms of this Plan to
> the extent assets in the 1974 Pension Trust are available to pay
> such benefits.

1974 Pension Trust Plan Document, Article VIII § B(4) (Att. 2 to Monterey

Mem.) (Dkt. #55-4).

Monterey asserts that this language must be read *in pari materia* with

the evergreen clause, with the effect of canceling all obligations under the

evergreen clause as of July 2002, the date on which the 2002 NBCWA set

employers' contribution rate at zero for the term of that NBCWA.  Monterey

Mem. at 15.

Even without delving into the meaning of the "discontinuance" clause, it

is apparent that it does not "supersede and negate" the Evergreen Clause.  As

Monterey implicitly acknowledges, the "discontinuance" clause appears only in

the plan document, and not in the trust document.  Monterey Mem. at 13.  By

contrast, the evergreen clause has been included in *both* the plan *and* trust

documents since 1978.  Declaration of Cecil E. Roberts (Dkt # 17-3, case no.

07-cv-1050) ("Roberts Decl.") ¶ 8.  If the "discontinuance" clause had been

intended to modify the contribution obligation that the evergreen clause

creates, it is not plausible that it would have been included only in the plan

document.

In any event, Monterey's interpretation of the clause in the plan

document badly misses the mark.  Monterey argues that an NBCWA setting the

contribution rate at zero for the term of that NBCWA triggers the "discontinuance" clause because the clause does not explicitly "say" that it applies only if the intent of the parties to the NBCWA is to discontinue contributions "permanent[ly]".  Monterey Mem. at 14.  This argument ignores both the plain language of the "discontinuance" clause and applicable regulations defining the term "complete discontinuance of contributions" for all ERISA-covered pension plans.

An ERISA regulation governing employee retirement plans such as the 1974 Pension Trust requires that:

> In order for a pension, profit-sharing, or stock bonus trust to satisfy the requirements of section 401 [of the Internal Revenue Code [*i.e.,* to qualify as a tax-exempt trust], *the plan of which such trust forms a part must expressly provide* that, upon the termination of the plan or upon the complete discontinuance of contributions under the plan, the rights of each employee to benefits accrued to the date of such termination or discontinuance, to the extent then funded, or the rights of each employee to the amounts credited to his account at such time, are nonforfeitable.

26 C.F.R § 1.401-6(a)(1)-(2)(i)(emphasis added).  This regulation was in effect when the 1974 Pension Trust was first created, and a simple comparison of the language shows that the "discontinuance" clause was adopted to satisfy the regulation's requirement.[11]

This being so, the terms that the "discontinuance" clause borrowed from the regulations must be given the same meaning that they have in the regulations.  The regulations specify that "a *complete discontinuance* of

---

[11] Review of the plan document (Att. 3 to Monterey Mem.) (Dkt. # 55-5) reveals that the "discontinuance" clause is the only clause that satisfies this regulation.

contributions under the plan is contrasted with a *suspension* of contributions under the plan, which is merely a *temporary cessation* of contributions by the employer." *Id.* § 1.401-6(c)(1) (emphasis added). Thus, the phrase "complete discontinuance of contributions" explicitly does *not* cover *temporary* suspensions of contributions. To the contrary, it provides for those situations in which employers essentially terminate a plan by intentionally, *and permanently*, walking away from it—albeit without following ERISA's termination procedures.[12]

It is undisputed on the record before this Court that the zero contribution rate to the 1974 Pension Trust—initially imposed under the 1998 NBCWA and continued through the term of the 2002 NBCWA owing to the Trust's adequate funding status throughout that period—was only *temporary*, and was *not* intended to herald the end of the Trust by any means. Quite the contrary, during the entire period that the contribution rate was set at zero, 1974 Pension Trust participants continued not only to receive their benefits, but also to accrue additional

---

[12] Cases interpreting the phrase "complete discontinuance of contributions" in the context of an analogous regulation under the Internal Revenue Code, 26 C.F.R. § 1.411(d)-2, which applies to certain employee benefit plans other than pension plans, have consistently rejected the notion that even a lengthy suspension of contributions qualifies as a "complete discontinuance." *Fenster v. Tepfer & Spitz, Ltd.*, 301 F.3d 851, 859 (7th Cir. 2002) (no complete discontinuance of contributions where company was "on hold" and therefore not contributing to plan, since it appeared that company might re-start its operations once litigation had concluded); *see also Babb v. Olney Paint Co.*, 764 F.2d 240, 243 (4th Cir. 1985) (no complete discontinuance of contributions where employer, who had failed to contribute to profit-sharing plan in a year, nonetheless added new employees to it).

benefits to be paid in the future.  Declaration of Charles S. Perkins, III (Dkt # 19-4, case no. 07-cv-1050) ¶ 35; *see also* Roberts Decl. ¶ 19.

Furthermore, the parties to the 1998 and 2002 NBCWAs included a "guarantee clause" in both agreements, pursuant to which the zero contribution rate could have been raised if necessary to ensure that participants received benefits at the levels promised to them in the NBCWA without interruption.  *See Unity Real Estate v. Hudson*, 178 F.3d 649, 654 (3d Cir. 1999) (the guarantee clause "obligate[s] signatories to make sufficient contributions to maintain benefits at the negotiated levels during the period of agreement.")  The inclusion of that guarantee clause in the 1998 and 2002 NBCWAs further belies the notion that the UMWA and the BCOA intended permanently to walk away from the 1974 Pension Trust by setting the contribution rate to the Trust at zero in those agreements.

In short, there is no plausible reading of the "discontinuance" clause in the plan document that relieves participating coal companies of their obligations under the evergreen clause.

## CONCLUSION

For the foregoing reasons, as well as those set forth in their initial memorandum, the Motion for Summary Judgment on the Issue of Liability by the 1974 Pension Trust and its Trustees should be granted.

Respectfully submitted,

|  |  |
|---|---|
| DAVID W. ALLEN<br>General Counsel<br>D.C. Bar No. 81638<br>LARRY D. NEWSOME<br>Associate General Counsel<br>D.C. Bar No. 254763<br>CHRISTOPHER F. CLARKE<br>Senior Assistant General<br>Counsel<br>D.C. Bar No. 441708<br>UMWA HEALTH &<br>RETIREMENT FUNDS<br>Office of the General Counsel<br>2121 K Street, N.W.<br>Washington, D.C. 20037<br>Telephone: 202-521-2238 | ___/s/_____<br>JULIA PENNY CLARK<br>D.C. Bar No. 269609<br>ANDREW D. ROTH<br>D.C. Bar No. 414038<br>CHARLOTTE GARDEN<br>D.C. Bar No. 489040<br>Bredhoff & Kaiser P.L.L.C.<br>805 Fifteenth Street N.W.<br>Suite 1000<br>Washington, DC 20005<br>Telephone: 202-842-2600<br><br>*Counsel for Michael H. Holland,<br>Micheal W. Buckner, B.V. Hyler<br>and Steven F. Schaab and the<br>United Mine Workers of America<br>1974 Pension Trust* |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 13, 2007, I filed electronically the foregoing document with the Clerk of the Court using the ECF system. This document was also served via First Class mail on the following counsel: Gregory James Ossi, Jessica Ring Amunson, Michael W. Robinson, Aaron Micah Forester, Paul March Smith, Susan Cohen Levy, Deborah Stern, John R. Mooney, Mark J. Murphy, Richard Carey Welch, Peter Buscemi, Stanley F. Lechner, John R. Woodrum.


<u>/s/ Julia Penny Clark</u>

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Michael H. Holland, *et al.* )<br><br>Plaintiffs, )<br><br>v. )<br><br>Freeman United Coal Mining Company, )<br>*et al.*, )<br><br>Defendants. )<br>————————————————————)<br>Freeman United Coal Mining )<br>Company, )<br><br>Plaintiff, )<br><br>v. )<br><br>United Mine Workers of )<br>America, *et al.*, )<br><br>Defendants. )<br>———————————————————— ) | Case No. 07-cv-490 (PLF)<br><br><br><br><br><br><br><br><br>Case No. 07-cv-1050 (PLF) |

## SECOND DECLARATION OF JULIA PENNY CLARK

I, Julia Penny Clark, declare as follows:

1.     I am an adult resident of Maryland.  I make this declaration based on my personal knowledge of the facts set forth herein.

2.     On August 6, 2007, I received via electronic mail a copy of Freeman United Coal Mining Company's First Request for Production of Documents to Defendant United Mine Workers of America 1974 Pension Trust.  Among other things, Freeman United Coal Mining Company ("Freeman") requested that the United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") produce the following documents:

- Any submissions made to any court regarding the meaning, interpretation or intent of the parties regarding the Evergreen Clause . . . including any supporting materials such as exhibits, testimony, affidavits, or declarations, whether submitted to the court by the 1974 Pension Trust or some other party.

- [A]ll documents regarding the meaning or interpretation of the phrase "and any successor agreement thereto" contained in the Evergreen Clause, or regarding the intent of the parties in the use of the phrase.

- [A]ll statements, including affidavits and all drafts of affidavits, of any individual participating in the negotiation of the Evergreen Clause in possession of the 1974 Pension Trust regarding the meaning, interpretation or intent of the parties with respect to the Evergreen Clause.

3.     In late August, the 1974 Pension Trust informed Freeman's attorneys that it had it its possession a large number of potentially responsive documents, but that most of these documents previously had been produced to the 1974 Pension Trust by third parties and were subject to protective orders entered in either *In re United Mine Workers of America Employee Benefit Plans Litig.*, D.D.C. MDL-886 ("MDL") or *Connors v. Island Creek Corp.*, D.D.C. No. 87-1210 ("Island Creek"). Therefore, the 1974 Pension Trust informed Freeman that production of these documents was contingent on obtaining permission from the relevant third parties to turn the documents over to Freeman.

4.     Two of these parties, the BCOA and UMWA, agreed that the 1974 Pension Trust could produce those documents that they had previously produced to the 1974 Pension Trust pursuant to a protective order, provided the 1974 Pension Trust did so pursuant to a new protective order entered in this case.  I initially advised Freeman's

counsel, Paul Smith, that I understood that Bethlehem Energy Company, which had also previously produced to the 1974 Pension Trust documents that were responsive to Freeman's request, was no longer in existence, as it had been the subject of a liquidation proceeding in bankruptcy. I advised Mr. Smith that, as Bethlehem was no longer able to waive the terms of the protective order, I would consent to a motion to compel the 1974 Pension Trust to produce those documents that Bethlehem had produced in the earlier litigation. Mr. Smith agreed to limit its request, at that time, to documents that had been produced to the 1974 Pension Trust by those three parties. BCOA's counsel later brought to my attention that the Bethlehem bankruptcy proceeding had not yet been closed, and we advised Mr. Smith that for Bethlehem, as for the other coal companies that had produced documents subject to protective order in the earlier litigation, we would produce the documents of any producing party if Freeman obtained that party's consent. Freeman has not subsequently provided us with the consent of any other party to produce documents from the earlier litigation.

5.      This Court entered a protective order on October 2, 2007. *See* dkt. # 53 (case no. 07-cv-490).

6.      On October 3, the 1974 Pension Trust sent to counsel for Freeman and for Monterey Coal Company a letter indicating that, by October 8, the third-party documents from BCOA and UMWA that Freeman had requested would be available at the offices of the 1974 Pension Trust's counsel (and that some boxes would be available even before then). A copy of that letter is attached to this declaration as Exhibit 1.

7.      However, attorneys for Freeman did not begin reviewing these materials—approximately 15 boxes' worth of documents—until Monday, October 29, 2007. The

3

materials that we provided to them for review on that date included all documents that we were able to identify as having been produced by BCOA or by UMWA in the original evergreen proceeding and the associated cases that were litigated from 1988 into the late 1990s. They included transcripts of depositions of each of the BCOA and UMWA 1978 negotiators whose declarations were attached to my First Declaration (filed September 7, 2007), as well as all of the other witnesses who are listed on Attachment 2, including many negotiators on both sides of the bargaining table in the negotiations that led to the evergreen clause. Freeman's counsel completed their review of these materials on Friday, November 2, 2007.

8.     Attorneys for Freeman requested that the 1974 Pension Trust provide copies of approximately four boxes of documents. The 1974 Pension Trust provided those copies to Freeman today.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington DC, this 13th day of November, 2007.

Julia Penny Clark

4

Exhibit 1

**BREDHOFF & KAISER, P.L.L.C.**
*Attorneys & Counselors*
**805 Fifteenth Street, N.W.**
**Washington, D.C. 20005-2207**
**(202) 842-2600**
**Facsimile: (202) 842-1888**
**http://www.bredhoff.com**
cgarden@bredhoff.com

Robert M. Weinberg
Jeffrey L. Gibbs
Julia Penny Clark
Jeffrey R. Freund
W. Gary Kohlman
Jeremiah A. Collins
Mady Gilson
Bruce R. Lerner
Andrew D. Roth
John M. West
Douglas L. Greenfield
Roger Pollak
Anne Ronnel Mayerson
Leon Dayan
Alice O'Brien
Devki K. Virk
Robert Alexander

Kathleen Keller
Abigail V. Carter
Matthew Clash-Drexler
Jennifer L. Hunter
Charlotte Garden
Joshua B. Shiffrin
Benjamin Takis

———

Laurence Gold
Patricia Polach
Susan G. Lahne
Todd E. Edelman
Sarah M. Fox

Of Counsel

Elliot Bredhoff
(1921 - 2004)
Henry Kaiser
(1911 - 1989)

October 3, 2007

**Via Electronic and First-Class Mail**
Aaron Forester
JENNER & BLOCK, LLP
330 N. Wabash Avenue
Chicago, IL 60611-7603

Re:  **Holland et al. v. Freeman United Coal Mining Company,**
**et al., Case No. 07-cv-00490**
**Freeman United Coal Mining Company v. UMWA, et al.,**
**Case No. 07-cv-1050**

Dear Counsel:

I write regarding Freeman United's First Request For Production of Documents to Defendant United Mine Workers of America 1974 Pension Trust. In response to your request, we have culled from our files approximately fifteen banker's boxes of potentially responsive documents. The bulk of these documents were produced to the UMWA Health and Retirement Funds by the BCOA or UMWA in *In re United Mine Workers of America Employee Benefit Plans Litig.*, D.D.C. MDL-886 ("*MDL*") (and the individual cases that were eventually consolidated therein) and *Connors v. Island Creek Corp.*, D.D.C. No. 87-1210 ("*Island Creek*"), and are related to bargaining. Additionally, we have also identified as responsive certain depositions that were taken during the course of the *MDL* and *Island Creek* cases.

Because of the quantity and condition of these documents, it would be excessively time-consuming and costly to copy them and, where applicable, stamp them confidential pursuant to the protective order entered today in the *Freeman* cases. Doing so also would mean that we would need additional preparation time before actually producing the documents for your review. In

October 3, 2007
Page 2

order to make the documents available to you at the earliest possible date, we propose that counsel from Freeman United and Monterey review the documents in our offices without preliminary copying or stamping. We ask that counsel agree to treat the documents that we make available for that review (to the extent stamped confidential in any of the prior cases) as covered by the protective order that was entered this week in the *Freeman* cases, and flag for copying those materials that you want. We will then arrange to have the documents you request bates numbered and (if confidential) stamped pursuant to the *Freeman* protective order, before we provide copies to you. If there are particular documents that you want to receive right away, we should be able to arrange for copying, numbering and stamping of smaller sets of documents within 48 hours after you ask for them.

The documents will be available for your review starting on October 8, 2007, and several boxes of documents will be available even earlier. Please contact Charlotte Garden or our legal assistant, Ahuva Battams, to arrange a date and time to review the documents.

Sincerely,

Julia Penny Clark

**BREDHOFF & KAISER, P.L.L.C.**
*Attorneys & Counselors*
**805 Fifteenth Street, N.W.**
**Washington, D.C.  20005-2207**
**(202) 842-2600**
**Facsimile:  (202) 842-1888**
**http://www.bredhoff.com**
cgarden@bredhoff.com

Robert M. Weinberg
Jeffrey L. Gibbs
Julia Penny Clark
Jeffrey R. Freund
W. Gary Kohlman
Jeremiah A. Collins
Mady Gilson
Bruce R. Lerner
Andrew D. Roth
John M. West
Douglas L. Greenfield
Roger Pollak
Anne Ronnel Mayerson
Leon Dayan
Alice O'Brien
Devki K. Virk
Robert Alexander

Kathleen Keller
Abigail V. Carter
Matthew Clash-Drexler
Jennifer L. Hunter
Charlotte Garden
Joshua B. Shiffrin
Benjamin Takis

———
Laurence Gold
Patricia Polach
Susan G. Lahne
Todd E. Edelman
Sarah M. Fox

Of Counsel
———
Elliot Bredhoff
(1921 – 2004)
Henry Kaiser
(1911 - 1989)

October 3, 2007

**Via Electronic and First-Class Mail**
John R. Woodrum
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, PC
2400 N Street, Fifth Floor
Washington, DC 20037

Re:   **Holland et al. v. Freeman United Coal Mining Company,**
**et al., Case No. 07-cv-00490**
**Freeman United Coal Mining Company v. UMWA, et al.,**
**Case No. 07-cv-1050**

Dear Counsel:

I write regarding Freeman United's First Request For Production of
Documents to Defendant United Mine Workers of America 1974 Pension Trust.
In response to your request, we have culled from our files approximately fifteen
banker's boxes of potentially responsive documents.  The bulk of these
documents were produced to the UMWA Health and Retirement Funds by the
BCOA or UMWA in *In re United Mine Workers of America Employee Benefit
Plans Litig.*, D.D.C. MDL-886 ("*MDL*") (and the individual cases that were
eventually consolidated therein) and *Connors v. Island Creek Corp.*, D.D.C. No.
87-1210 ("*Island Creek*"), and are related to bargaining.  Additionally, we have
also identified as responsive certain depositions that were taken during the
course of the *MDL* and *Island Creek* cases.

Because of the quantity and condition of these documents, it would be
excessively time-consuming and costly to copy them and, where applicable,
stamp them confidential pursuant to the protective order entered today in the
*Freeman* cases.  Doing so also would mean that we would need additional

October 3, 2007
Page 2

preparation time before actually producing the documents for your review.  In order to make the documents available to you at the earliest possible date, we propose that counsel from Freeman United and Monterey review the documents in our offices without preliminary copying or stamping.  We ask that counsel agree to treat the documents that we make available for that review (to the extent stamped confidential in any of the prior cases) as covered by the protective order that was entered this week in the *Freeman* cases, and flag for copying those materials that you want.  We will then arrange to have the documents you request bates numbered and (if confidential) stamped pursuant to the *Freeman* protective order, before we provide copies to you.  If there are particular documents that you want to receive right away, we should be able to arrange for copying, numbering and stamping of smaller sets of documents within 48 hours after you ask for them.

The documents will be available for your review starting on October 8, 2007, and several boxes of documents will be available even earlier.  Please contact Charlotte Garden or our legal assistant, Ahuva Battams, to arrange a date and time to review the documents.

Sincerely,

Julia Penny Clark

Exhibit 2

| Deponent | Date |
|----------|------|
| | |
| Barker, Stonie | 9/8/1994 |
| Brennan, Joseph | 12/21/1993 |
| Brennan, Joseph | 2/7/1994 |
| Brown, Bobby | 6/22/1994 |
| Church, Sam | 6/17/1994 |
| Clark, Jerry | 10/12/1993 |
| Connors, Joseph | 10/28/1993 |
| Dean, Paul | 10/19/1992 |
| Dean, Paul | 1/18/1994 |
| Deneen, Terrence | 1/8/1994 |
| Eller, Kenneth | 11/17/1994 |
| Feibusch, Morris | 1/27/1994 |
| Hanrahan, William | 12/30/1993 |
| Hanrahan, William | 10/20/1994 |
| Hanrahan, William | 7/25/1995 |
| Hartman, William | 10/14/1994 |
| Haynes, Roger | 12/28/1993 |
| Haynes, Roger | 2/9/1994 |
| Holland, Michael | 8/9/1994 |
| Holland, Michael | 9/15/1993 |
| Holland, Michael | 12/20/2003 |
| Johnston, Bruce | 6/16/1994 |
| Kempken, David W. | 12/22/1993 |
| Klein, Daniel | 10/5/1994 |
| MDL Dep. Ex. Vol 1, 2, 3 | |
| MDL Dep. Ex. Vol 4, 5, 6 | |
| MDL Dep. Ex. Vol 4, 5, 6 | |
| MDL Dep. Ex. Vol 5 | |
| Miller, Willliam | 10/26/1992 |
| Miller, Willliam | 10/27/1994 |
| Northrop, Herbert | 11/22/1994 |
| Pierce, Donald | 12/7/1993 |
| Pierce, Donald | 12/10/1993 |
| Pierce, Donald | 1/18/1994 |
| Pierce, Donald | 9/28/1994 |
| Pierce, Donald | 9/29/1994 |
| Roberts, Cecil | 7/6/1994 |
| Sansom, Robert | 11/3/1994 |
| Scott, Judith | 10/22/1993 |

| Shaner, Benjamin | 12/20/1993 |
| Trumka, Richard | 1/25/1994 |
| Vehar, August | 4/19/1994 |
| Young, Kenneth | 12/14/1993 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Michael H. Holland, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Case No. 07-cv-490 (PLF) |
| Freeman United Coal Mining Company, ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| Freeman United Coal Mining ) | |
| Company, ) | |
| ) | |
| Plaintiff, ) | Case No. 07-cv-1050 (PLF) |
| ) | |
| v. ) | |
| ) | |
| United Mine Workers of ) | |
| America, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**SECOND DECLARATION OF DALE STOVER**

I, Dale Stover, declare as follows:

1.       I am an adult resident of the State of West Virginia.  I make this declaration based on my personal knowledge of the facts set forth herein.

2.       I have been employed since January 2, 1980 by the United Mine Workers of America Health & Retirement Funds ("UMWA Funds").  Since November 3, 2003, I have held the position of Director of Finance and General Services (previously Comptroller).  As Director of Finance and General Services (as well as Comptroller), my responsibilities include monitoring

the calculation and payment of withdrawal liability to each of the funds—including the United

Mine Workers of America 1974 Pension Trust (the "1974 Pension Trust").

3.    In early September 2007, I learned that Freeman United Coal Mining Company

("Freeman") had discontinued operations and sold its assets. In a letter dated October 12, 2007,

Freeman's attorneys confirmed that the asset sale resulted in "the permanent cessation of

Freeman's coal mining activity." This letter is attached as Exhibit A to this declaration.

4.    Because Freeman has permanently ceased covered operations and sold its assets,

Freeman no longer has an ongoing obligation to contribute to the 1974 Pension Trust. Instead,

the asset sale triggered an obligation to pay withdrawal liability, which is a proportionate share

of the unfunded vested benefits for which the 1974 Pension Trust is liable.

5.    Withdrawing employers pay withdrawal liability owed to the 1974 Pension Trust

according to a payment schedule. That schedule is determined by applying a formula set forth in

the governing law and regulations. The amount that an employer must pay each year towards its

withdrawal liability is based, in part, on the highest contribution rate at which the employer was

obligated to contribute to the 1974 Pension Trust during the ten plan years up to and including

the year of the withdrawal.

6.    Therefore, the amount of Freeman's withdrawal liability payments will be

determined according to the highest contribution rate at which Freeman was obligated to

contribute to the 1974 Pension Trust between July 1, 1998 and June 30, 2008.

7.    The highest contribution rate set during that period is the $2.00 per hour rate that

was established in the 2007 NBCWA. Based on that rate, Freeman's annual withdrawal liability

payments are $1,843,370.00. A worksheet showing my staff's calculation of this amount is attached hereto as Exhibit B.

8.    However, if Freeman were not subject to the $2.00 per hour contribution rate, then its withdrawal liability payment amounts would be based on a contribution rate of $.75 per hour, as that is the next-highest rate at which Freeman was obligated to contribute during the relevant ten-year period. Based on that rate, Freeman's annual withdrawal liability payments would be $691,263.75. A worksheet showing my staff's calculation of this amount is attached hereto as Exhibit C.

9.    The same proportional relationship between annual withdrawal liability payments calculated with and without the $2.00 per hour rate would hold true for any other employer whose contributions to the Pension Trust are required only by the evergreen clause, and not by that employer's agreement to the 2007 NBCWA or other current agreement containing the same contribution rates.

10.    The 1974 Pension Trust does not yet have the data that will be required to calculate the principal amount of withdrawal liability for an employer withdrawing between 2007 and 2008. However, it is clear that Freeman's annual payments of that liability would be greatly reduced if Freeman is not obligated to contribute at the $2.00 per hour contribution rate.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Washington DC, this 13th day of November, 2007.

_Dale Stover_

Dale Stover

- 3 -

# EXHIBIT A

# VENABLE LLP

8010 Towers Crescent Drive, Suite 300
Vienna, Virginia 22182-2707

Telephone 703-760-1600
Facsimile 703-821-8949

www.venable.com

Gregory J. Ossi

703-760-1957

gjossi@venable.com

October 12, 2007

**VIA ELECTRONIC MAIL
AND OVERNIGHT DELIVERY**

**RECEIVED**

OCT 15 2007

OFFICE OF THE
GENERAL COUNSEL

Chris Clarke
United Mine Workers of America
  Health and Retirement Funds
2121 K Street, NW
Suite 350
Washington, DC 20037

Re:    Freeman United Coal Mining Company Questionnaire

Dear Chris:

Enclosed please find a completed questionnaire for Freeman United Coal Mining Company ("Freeman"). In response to the UMWA Health and Retirement Funds' specific questions regarding the sale of Freeman, we can confirm that the asset sale has resulted in the permanent cessation of Freeman's coal mining activity and that the asset sale does not conform to the requirements of Section 4204 of ERISA.

By responding and in its responses to this questionnaire, Freeman is neither waiving any of its rights or claims it made nor is it admitting to any claim, argument or demand made against it in the consolidated case *Holland et al v. Freeman United Coal Mining Co. et al* in the DC federal district court.

Please contact me if you have any additional questions.

Sincerely,

Gregory J. Ossi

Enclosures
cc:   Sheila Street

VIRGINIA    MARYLAND    WASHINGTON, DC

# EXHIBIT B

*ESTIMATE AT $2.00 FOR COMPARISON PURPOSES ONLY*

FREEMAN UNITED COAL MINING COMPANY
## ESTIMATED FY2008
## CALCULATION OF ANNUAL PAYMENT SCHEDULE
## 1974 PENSION PLAN

Tons produced and/or purchased and hours worked by plan year for which the
withdrawn employer has an obligation to contribute.

| PLAN YEARS | PRODUCED TONS | PURCHASED TONS | HOURS |
|---|---|---|---|
| 7/01/97 - 6/30/98 | 0.00 | 0.00 | 841,222.19 |
| 7/01/98 - 6/30/99 | 0.00 | 0.00 | 574,596.20 |
| 7/01/99 - 6/30/00 | 0.00 | 0.00 | 924,973.35 |
| 7/01/00 - 6/30/01 | 0.00 | 0.00 | 931,654.14 |
| 7/01/01 - 6/30/02 | 0.00 | 0.00 | 908,426.28 |
| 7/01/02 - 6/30/03 | 0.00 | 0.00 | 864,719.63 |
| 7/01/03 - 6/30/04 | 0.00 | 0.00 | 798,030.30 |
| 7/01/04 - 6/30/05 | 0.00 | 0.00 | 839,529.63 |
| 7/01/05 - 6/30/06 | 0.00 | 0.00 | 866,427.93 |
| 7/01/06 - 6/30/07 | 0.00 | 0.00 | 825,661.58 |

(1)  Average annual number of contribution base units for the period of 3
     consecutive plan years during the period of 10 consecutive plan years
     ending before the plan year in which the withdrawal occurs in which the
     number of contribution base units for which FREEMAN UNITED COAL MINING
     COMPANY has an obligation to contribute under the Plan is the highest

|  | 0.00 | 0.00 | 921,685.00 |
|---|---|---|---|

(2)  Highest royalty rate between  07/01/1998 and 06/30/2008
     for which the employer has an obligation to contribute unless the highest
     royalty rate during this period was zero in which case the most recent
     contribution royalty rate greater than zero for which any Employer had an
     obligation to contribute is used.

|  | 0.0000 | 0.670 | 2.000 |
|---|---|---|---|

(3)  Annual payment amount  (1) x (2)

|  | $0.00 | $0.00 | $1,843,370.00 |
|---|---|---|---|

     Total Annual Payment ........................................ $1,843,370.00

(4)  (3)/ 12 = Monthly payment amount ............................ $153,614.17

(5)  Amortization period assuming a (unknown)%
     net inherent interest rate, a principal
     of  $unknown (withdrawal liability), and an
     annual payment amount of $3,225,897.50 ...................... Unknown *

(6)  Number of full monthly payments ............................. Unknown *

(7)  Amount of last payment to complete obligation,
     including interest for the term. ............................ Unknown *

* This schedule is prepared at OGC-- Chris Clarke request dated 11/23/07 to calculate the Monthly Payment only.

INC74N08_MonthlyPymtSch-Freeman#173_(2.00)11-9-07.doc

# EXHIBIT C

*ESTIMATE AT $0.75 FOR COMPARISON PURPOSES ONLY*

FREEMAN UNITED COAL MINING COMPANY

### ESTIMATED FY2008
### CALCULATION OF ANNUAL PAYMENT SCHEDULE
### 1974 PENSION PLAN

Tons produced and/or purchased and hours worked by plan year for which the
withdrawn employer has an obligation to contribute.

| PLAN YEARS | PRODUCED TONS | PURCHASED TONS | HOURS |
|---|---|---|---|
| 7/01/97 - 6/30/98 | 0.00 | 0.00 | 841,222.19 |
| 7/01/98 - 6/30/99 | 0.00 | 0.00 | 574,596.20 |
| 7/01/99 - 6/30/00 | 0.00 | 0.00 | 924,973.35 |
| 7/01/00 - 6/30/01 | 0.00 | 0.00 | 931,654.14 |
| 7/01/01 - 6/30/02 | 0.00 | 0.00 | 908,426.28 |
| 7/01/02 - 6/30/03 | 0.00 | 0.00 | 864,719.63 |
| 7/01/03 - 6/30/04 | 0.00 | 0.00 | 798,030.30 |
| 7/01/04 - 6/30/05 | 0.00 | 0.00 | 839,529.63 |
| 7/01/05 - 6/30/06 | 0.00 | 0.00 | 866,427.93 |
| 7/01/06 - 6/30/07 | 0.00 | 0.00 | 825,661.58 |

(1)  Average annual number of contribution base units for the period of 3
     consecutive plan years during the period of 10 consecutive plan years
     ending before the plan year in which the withdrawal occurs in which the
     number of contribution base units for which FREEMAN UNITED COAL MINING
     COMPANY has an obligation to contribute under the Plan is the highest

     0.00          0.00          921,685.00

(2)  Highest royalty rate between  07/01/1998 and 06/30/2008
     for which the employer has an obligation to contribute unless the highest
     royalty rate during this period was zero in which case the most recent
     contribution royalty rate greater than zero for which any Employer had an
     obligation to contribute is used.

     0.0000          0.670          0.7500

(3)  Annual payment amount (1) x (2)

     $0.00          $0.00          $691,263.75

     Total Annual Payment          $691,263.75

(4)  (3)/ 12 = Monthly payment amount          $57,605.31

(5)  Amortization period assuming a (unknown)%
     net inherent interest rate, a principal
     of  $unknown (withdrawal liability), and an
     annual payment amount of $3,225,897.50          Unknown *

(6)  Number of full monthly payments          Unknown *

(7)  Amount of last payment to complete obligation,          Unknown *
     including interest for the term.

* This schedule is prepared at OGC– Chris Clarke request dated 11/23/07 to calculate the Monthly Payment only.

INC74N08_MonthlyPymtSch-Freeman#173_11-9-07.doc