**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————— )
Michael H. Holland, Michael W. Buckner,    )
B.V. Hyler and Steven F. Schaab as Trustees    )
of the United Mine Workers of America 1974    )
Pension Trust,    )
               Plaintiffs,    )
                         )
        v.    )
                         )    Case No. 07-cv-00490 (PLF/AK)
Freeman United Coal Mining Company,    )
                         )
              Defendants.    )
———————————————————— )
                         )
Freeman United Coal Mining Company,    )
                         )
             Plaintiff,    )    Case No. 07-cv-01050 (PLF/AK)
                         )
        v.    )
                         )
United Mine Workers of America,    )
                         )
              Defendants.    )
———————————————————— )

**MONTEREY COAL COMPANY'S SUPPLEMENTAL MEMORANDUM
OF POINTS AND AUTHORITIES IN OPPOSITION TO THE MOTION
FOR SUMMARY JUDGMENT FILED BY THE TRUSTEES OF THE
UNITED MINE WORKERS OF AMERICA 1974 PENSION TRUST**

In 1993, the Trustees prevailed in the *Pittston* case[1] by arguing that the evergreen clause

in the UMWA 1974 Pension Plan ("1974 Plan") as drafted in 1978 was intended to protect the

numerous employers in a multiemployer group from the actions of individual employers after

expiration of the group contract. The Trustees now seek the antithesis of the *Pittston* ruling.

They ask this Court to rule summarily that the evergreen clause compels all employers that have

—————————————
[1] *United Mine Workers of America 1974 Pension v. Pittston Co.*, 984 F.2d 469 (D.C. Cir.), *cert. denied*, 509 U.S. 924 (1993).

participated in the 1974 Plan to make contributions at rates agreed upon between the United Mine Workers of America ("Union") and one coal industry employer using the Bituminous Coal Operators' Association, Inc. ("BCOA") corporate shell as its surrogate.

Monterey Coal Company ("Monterey") did not promise by word or deed in 1978 to contribute to the 1974 Plan at rates established in a private agreement between one employer and the Union regardless of whether that employer applied its own name to the agreement or, operating through control of BCOA, called the agreement a National Bituminous Coal Wage Agreement ("NBCWA"). Monterey will refer to the putative 2007 NBCWA by its more appropriate name – the Consol Agreement.

The Trustees' argument amounts to a claim that Monterey's agreement thirty years ago to a provision intended to protect group interests must today be construed as an unequivocal consent to be bound by the unilateral action of one employer. When it is understood that the Consol Agreement is simply a private agreement between the Union and one employer, it becomes clear that the Trustees' effort to compel capitulation by Monterey to decisions made by that one employer is contrary to the language and purpose of the evergreen clause when drafted in 1978 and conflicts with fundamental concepts of federal labor law and collective bargaining. The Trustees' position also fails to account for the effect of the separate discontinuance of contributions clause, which supersedes the continuing effect of the evergreen clause once a NBCWA ceases to require contributions be made to the 1974 Plan. The Trustees' motion for summary judgment must be denied (hereinafter "Trustees' Motion").[2]

---

[2] Pursuant to the Court's Minute Entry dated February 25, 2008, this memorandum supplements Monterey's October 22, 2007 Memorandum of Points and Authorities in Opposition to the Motion for Summary Judgment filed by the Trustees of the United Mine Workers of America 1974 Pension Trust. Monterey continues to press the arguments made in such filings, including its Statement of Contested Material Facts. Additionally, Monterey notes that it is a party only in

# BACKGROUND

## A. Multiemployer Bargaining in the Coal Industry Between 1978 and 2002.

In 1978, the 1974 Plan was amended to insert the evergreen clause as a result of negotiations between the Union and the coal industry's principal multiemployer bargaining group, the Bituminous Coal Operators' Association. Complaint ¶ 19. The BCOA membership list appended to the 1978 NBCWA[3], attached hereto as Exhibit A, identifies nearly one hundred separate coal company employers and a number of smaller multiemployer bargaining groups each of which had numerous member companies.

At the time the 1978 NBCWA was entered into, federal law did not require employers that withdrew from an underfunded multiemployer pension plan to compensate the plan for any unfunded liability the plan might have at the time of the employer's withdrawal. In agreeing to the 1978 NBCWA, negotiators representing the scores of employers in BCOA recognized that a member company could withdraw from the multiemployer group and negotiate a successor agreement with the Union that provided for contributions to the 1974 Plan at a lesser rate than that specified in the NBCWA, or indeed, that provided for no contributions at all. *See Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146 (1941); *Pittston*, 984 F.2d at 474. (That was precisely the situation before the court in the *Pittston* case, because, notwithstanding the 1978 evergreen clause, the Union had entered into labor agreements with several employers after 1978 that

---

Case No. 07-cv-00490 and responds to the Trustees' Motion and Statement of Uncontested Facts in that action.

[3] From 1978 through 2002, the BCOA and Union periodically entered into contracts each of which was referred to as a National Bituminous Coal Wage Agreement. Monterey will refer to each such agreement as a NBCWA and will distinguish among such agreements by including the year in which a particular NBCWA was entered.

provided either for no contributions or for a lower contribution rate than required under the NBCWA.)

In order to prevent participating employers from negotiating a contract with the Union that provided for "non-conforming" contribution rates, BCOA obtained the Union's agreement in 1978 to insert into the 1974 Plan an evergreen, or "continuing contributions" clause that provided:

> Any Employer who employed any participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time and any successor agreements thereto . . . .

Complaint ¶ 19.

During the term of the 1978 NBCWA, Congress enacted the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). *See* 29 U.S.C. §§ 1381 *et seq.* MPPAA effectively addressed the "last man out" problem that was the BCOA's principal motivation for inserting the evergreen clause in the 1974 Plan two years earlier by giving multiemployer plans a statutory right to assess "withdrawal liability" in an amount equal to the withdrawing employer's proportionate share of the plan's unfunded vested liability.[4]

---

[4] *See* Declaration of Donald E. Pierce, Jr. dated February 27, 1991 (Dkt. No. 46-9 in Case No. 07-cv-00490) at 24 (attached as Exhibit A to the Declaration of Julia Penny Clark (Dkt. No. 46-8 in Case No. 07-cv-00490) (hereinafter "Clark Decl.")). Mr. Pierce was a a key figure in the *Pittston* case, and noted in his declaration: "Much like the subsequently enacted ERISA Amendments of [1980] the intent [of the evergreen clause] was to insure by contract that employers continue to fund their responsibilities past the term of the National Bituminous Coal Wage Agreement of 1978, at least through the term of any successor agreement to the 1978 Agreement."

Multiemployer plans themselves, rather than any government agency, assess and collect withdrawal liability. Indeed, in MPPA section 4219, 30 U.S.C. § 1399, Congress established a statutory amortization schedule for paying withdrawal liability that was intended to approximate the contribution stream lost as a result of the employer's withdrawal. *See e.g.*, *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp*, 522 U.S. 192, 196-7 (1997) (Under MPPAA payments of withdrawal liability "are set at a level that approximates the periodic contributions the employer had made before withdrawing from the plan.").

So effective was the tool provided by Congress that, when several coal industry employers ceased making contributions to the 1974 Plan after the 1978 NBCWA expired, the Trustees did not assert an evergreen claim against the companies. Instead, the Trustees asserted that the employers had ceased having an obligation to the 1974 Plan and successfully assessed withdrawal liability. *Pittston*, 984 F.2d at 475.

From the 1978 NBCWA through the 2002 NBCWA, the number of BCOA member companies declined but BCOA remained a multiemployer bargaining group. During bargaining for the 2002 NBCWA, at least twenty-three companies affiliated with three major coal producers (Consol, Peabody, and Apogee) were members of BCOA.[5]

As of the plan year ending June 30, 2000, the 1974 Plan was fully funded, and employers who withdrew in plan year 2001 were assessed no statutory withdrawal liability. Letter dated January 25, 2001 to John Woodrum, Heenan, Althen & Roles, from Carl F. Tennille, UMWA

---

[5] Only the Consol, Peabody, and Apogee companies executed the 2002 NBCWA. The list of BCOA members that signed the 2002 NBCWA is attached hereto as Exhibit B. Eight companies were direct or indirect subsidiaries of Peabody Holding Corp. Inc.: Affinity Mining Company, Colony Bay Coal Company, Eastern Associated Coal Corp., Mountain View Coal Company, Peabody Coal Company, Pine Ridge Coal Company, Squaw Creek Coal Company, and Sterling Smokeless Coal Company. Apogee Coal Company and Hobet Mining, Inc. were subsidiaries of Arch Coal Company. The remaining signatories were the Consol entities.

Health and Retirement Funds (attached hereto as Exhibit C). Significantly, the 2002 NBCWA provided that no contributions would be made to the 1974 Plan during the term of the Agreement. The Peabody and Apogee companies withdrew during the term of the 2002 NBCWA, which brought to an end the long history of multiemployer bargaining in the coal industry.

**B. BCOA Becomes An Instrumentality Of Consol.**

With the withdrawal of the Apogee and Peabody groups, only entities affiliated with Consolidation Coal Company remained in BCOA. Defendant Freeman United Coal Mining Company ("Freeman United") has presented the Court with a truly comprehensive filing regarding the status of Consolidation Coal Company and its affiliates (collectively "Consol") as a "single employer" for labor law purposes and Consol's use of the BCOA corporate shell for Consol's own purposes in 2006. Monterey will not burden the Court by duplicating Freeman United's filing but does incorporate such materials and the arguments made by Freeman United into its argument. The BCOA membership list appended to the Consol Agreement, attached hereto as Exhibit D, identifies the eleven Consol companies, only four of which were active when the Consol Agreement was entered.[6]

When labor law principles are applied to the facts presented in Freeman United's memorandum, a jury will be entitled to find: (1) Consol constituted a labor law single employer in bargaining in 2006; and (2) Consol used the corporate shell of BCOA to negotiate a single employer labor agreement for Consol's own purposes and for its own benefit. Thus, the jury may conclude that when the Union and "BCOA" announced agreement upon a purported 2007

---

[6] In response to Freeman United's Second Request for Interrogatories, the Trustees produced a chart showing, *inter alia*, the hours reported by each of the Consol entities to the UMWA Funds in 2006. The chart shows that six of the Consol entities did not report any hours in 2006 and a seventh, Windsor Coal Company, reported that it ceased operations on January 31, 2006.

NBCWA, they were in fact announcing an agreement between the Union and Consol. Indeed, the jury will hear the President of the Union confirm that fact for in announcing that the Union membership had voted to approve the Consol Agreement, the Union stated in its press release that:

> The agreement will, at the outset, be between the UMWA and Consol Energy, which is the only company currently in the BCOA. The union will present the agreement to the other coal companies between now and mid-January.
>
> * * *
>
> "We're going to give the other coal companies an opportunity to sign this agreement through the middle of January," Roberts said. "Hopefully they will do that. But if they don't, the union will make a determination at that time as to what action we will take."

Union Press Release dated Dec. 21, 2006 entitled "UMWA Members Ratify New National Bituminous Coal Wage Agreement In 'Historic' Vote" (Dkt. No. 17-2 in Case No. 07-cv-01050)(attached to Declaration of Cecil E. Roberts dated September 4, 2007 (Dkt. No. 17-2 in Case No. 07-cv-01050) (hereinafter "Roberts Decl.")).

### C. Monterey's Withdrawal from the 1974 Plan.[7]

Monterey mined coal in the Southern Illinois coal basin near Carlinville, Illinois, from 1970 until December 2007. Monterey was a member of BCOA in 1978, when the 1978 NBCWA was executed, but withdrew from BCOA during the term of the 1988 NBCWA. Thereafter, Monterey was a "me-too" signatory to the 1993, 1998, and 2002 NBCWAs. Monterey's last labor agreement with the Union terminated on December 31, 2006.

Before expiration of its labor agreement, Monterey unsuccessfully attempted to find a buyer for its mining operations. After its labor agreement terminated on December 31, 2006, Monterey continued to operate, and its Union-represented employees continued to work without a contract.

---

[7] The facts in this part C are set forth in the Declaration of Howard Schulz dated March 11, 2008, attached hereto as Exhibit E.

Having sought, but not found, a buyer for its mine throughout 2007, Monterey permanently closed the mine in December 2007. As a result of its withdrawal from the 1974 Plan, Monterey will pay withdrawal liability in accordance with the requirements of MPPAA. Thereafter, the 1974 Plan funding status may improve or decline according to the wisdom of the 1974 Plan's investments and the future administration of the 1974 Plan. Having participated in the 1974 Plan for over thirty years, Monterey leaves the 1974 Plan by funding, in accordance with federal law, its proportionate share of all unfunded benefits promised to Plan participants under the terms of the labor contracts signed by Monterey.

The outcome of this case will determine whether, in addition to assessing Monterey withdrawal liability as set forth in MPPAA, the Trustees may compel Monterey to also contribute to the 1974 Plan for hours worked in 2007 at the rates set forth in the single employer Consol Agreement, even though Monterey did not sign the Consol Agreement and is not otherwise subject to any obligation under labor law that required it to resume contributions to the 1974 Plan after December 31, 2006.[8]

## STANDARD OF REVIEW

The standard of review for a motion for summary judgment in a case involving contract interpretation was explicated in the *Pittston* case. The Circuit Court explained that a contract dispute "may be resolved as a matter of law if the contested agreement admits of only one

---

[8] Because Monterey was under no contractual obligation to contribute to the 1974 Plan on December 31, 2006, when its labor contract expired (or during the previous eight years for that matter), Monterey would have no labor law obligation to make contributions to the 1974 Plan in any event. Therefore, the *only* theory the Trustees can advance in support of their claim against Monterey in this case is that the evergreen clause means Monterey must nevertheless make contributions in 2007 at the rate set forth in a contract negotiated between the Union and a single employer. While it is true that the Trustees also assert an alternative "plan amendment" theory in their summary judgment brief, for the reasons set forth, *infra*, that claim is so contrived it merits no serious consideration as a separate basis for liability.

reasonable interpretation." *Pittston*, 984 F.2d at 473 (citing, *Connors v. Link Coal Co.*, 970 F.2d 902, 904 (D.C. Cir. 1992)).  Of course, the Court is not limited to reviewing the language of the contract and the parties may submit extrinsic evidence "that gives color to the words of the agreement or otherwise reveals the intent of the contracting parties at the time of the agreement." *Pittston*, 984 F.2d at 473.  Consequently, if the Court determines that there is a reasonable interpretation of the evergreen clause under which the Consol Agreement would not be a "successor agreement" to the 1978 NBCWA, summary judgment must be denied.  Summary judgment also must be denied if the Court determines that the separate discontinuance of contributions clause may reasonably be read to negate the effect of the evergreen clause with respect to an employer such as Monterey that does not sign a new labor agreement with the Union that requires renewed participation in the 1974 Plan.

In considering reasonable interpretations of the evergreen and discontinuance of contributions clauses, any doubt as to the existence of a genuine issue of material fact must be resolved against the Trustees, and Monterey must be given the benefit of all favorable inferences that may be drawn from facts presented to the Court.  *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1031 (D.C. Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)**;** *Mastro v. Potomac Elec. Power Co.,* 447 F.3d 843, 850 (D.C. Cir. 2006)).  Furthermore, this Court has recognized that summary judgment will not be granted in a case requiring the interpretation of an ambiguous contract.  *Potomac Elec. Power Co. v. Mirant Corp.*, 251 F. Supp. 2d 144, 149 (D.D.C. 2003) (citing *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995)).

**ARGUMENTS**

**I.**

**A JURY MAY REASONABLY FIND THAT THE TERM "SUCCESSOR NBCWA" AS USED IN 1978 BY A MULTIEMPLOYER GROUP WITH SCORES OF EMPLOYER MEMBERS DOES NOT CONSTITUTE AN UNEQUIVOCAL COMMITMENT TO MAKE CONTRIBUTIONS TO THE 1974 PLAN AT A RATE AGREED UPON IN A SINGLE EMPLOYER CONTRACT ENTERED BY CONSOL USING THE CORPORATE SHELL OF THE FORMER BARGAINING GROUP.**

The Trustees' own declarants have testified that the evergreen clause does not require perpetual contributions. It requires contributions only if a "successor NBCWA" is negotiated.[9] Further, as set forth below, federal labor law provides that an employer may be required to comply with the agreement of a separate employer only if such employer makes an unequivocal commitment to be bound by such third party agreement.

Therefore, the Trustees may prevail on summary judgment only if they demonstrate that the term "successor NBCWA" in the context of the adoption of the evergreen clause in 1978 can *only* reasonably be interpreted as manifesting an unequivocal agreement by Monterey and the other BCOA member companies in 1978 to be bound by an agreement negotiated by, and for, a single employer such as Consol. They do not succeed.

---

[9] David Kempken, who was a member of the BCOA Benefits Committee during the negotiations for the 1978 NBCWA declared in reference to the evergreen clause that:

> The obligation to contribute continues only so long as successor NBCWAs are negotiated by BCOA and the UMWA, and require contributions to the Funds. If a successor NBCWA is not negotiated by BCOA and the UMWA, or if a successor NBCWA does not require contributions to the Funds, then the evergreen clause does not require any continuing contributions.

Declaration of David W. Kempken dated March 15, 1991 (Dkt. No. 46-11 in Case No. 07-00490) ¶ 19 (attached as Exhibit C to the Clark Decl.) (hereinafter "Kempken Decl.").

**A.**    **Consol Is A Single Employer For Collective Bargaining Purposes And, In 2006, Consol Used BCOA As An Instrumentality For Its Own Bargaining With The Union To Arrive At A Single Employer Labor Agreement.**

The term "single employer" refers to a bedrock labor law principle in which commonly owned but separately incorporated entities are treated as if they were one employer for purposes of labor law. *South Prairie Constr. Co. v. Local No. 627, Int'l Union of Operating Eng'rs*, 425 U.S. 800, 802 (1976); *Radio & Television Broadcast Technicians Local Union 1264 v. Broadcast Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965) (per curiam); *Esmark, Inc. v. NLRB*, 887 F.2d 739, 753 (7th Cir. 1989); *NLRB v. Carson Cable TV*, 795 F.2d 879, 881 (9th Cir. 1986); *NLRB v. Browning-Ferris Industries*, 691 F.2d 1117, 1122 (3d. Cir. 1982); *Carpenters Local Union No. 1846 of the United Bhd. of Carpenters and Joiners of America  v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 504 (5th Cir. 1982); *Soule Glass and Glazing Co. v. NLRB*, 652 F.2d 1055, 1075 (1st Cir. 1981).  If affiliated entities constitute a single employer, federal labor law will ignore their separate corporate status and treat them as one employer for labor law purposes. *South Prairie Constr. Co.,* 425 U.S. at 802;  *Carson Cable TV*, 795 F.2d at 881; *Cuyahoga Wrecking Corp. v. Labors Int'l Union of North America, Local Union #210*, 644 F. Supp. 787, 882 (W.D.N.Y. 1986). Monterey need only briefly address Consol's single employer status and its use of BCOA in bargaining for its own Consol Agreement.

First, Freeman United presents overwhelming extrinsic evidence that the Consol entities functioned as a single employer in labor relations generally and as a single employer in the negotiation of the Consol Agreement specifically.  Freeman United further demonstrates beyond dispute that, under Consol's dominion and control, BCOA ceased observance of corporate form and was operated outside its own bylaws and the laws of the District of Columbia, its place of incorporation.  Indeed, as pointed out in the Freeman United filing, "BCOA" did not even bother

ratifying the Consol Agreement until May 2007 – that is, more than five months after its effective date.

Second, Consol's domination of BCOA for its own purposes in negotiating the Consol Agreement cannot be countered by the hypothetical suggestion that membership in BOCA was open to all Union companies. At least one major UMWA-represented coal company applied to join BCOA prior to the initiation of bargaining for the 2007 Consol Agreement, but was informed that BCOA was not interested in new members. *See* Declaration of Michael D. Hall, Director of Human Resources for Jim Walter Industries, dated March 7, 2008 (attached hereto as Exhibit F).

Third, the Trustees' Motion does not deal with the implications of Consol's status as a single employer and its use of BCOA as an instrumentality for private employer bargaining. Instead, the Trustees seek to avoid discussion of such matters by arguing that the Consol Agreement is a "national agreement" – a term that does not appear in the evergreen clause. In light of the standard of review for a motion for summary judgment, the Trustees' failure to discuss the implications of single employer bargaining, and the extrinsic evidence submitted by Freeman United, the Court should review the Trustees' Motion as if it were established that Consol is a single employer and used the BCOA corporate shell for negotiating its own labor agreement in 2006.[10]

---

[10] To the extent the Trustees might contend that they did assert a relevant statement of uncontested fact by asserting in Paragraph 5 of their Statement of Uncontested Facts that "the UMWA and BCOA reached a tentative agreement," Monterey has contested that assertion on the basis of the Consol's single employer status and use of BCOA as a mere instrumentality.

**B.**    **A Jury May Reasonably Find That The Term "Successor NBCWA" In The Evergreen Clause Negotiated In 1978 By A Multiemployer Bargaining Group Comprised Of Over One Hundred Separate Employers Does Not Constitute An Unequivocal Agreement By Monterey To Pay Contribution Rates Negotiated By Consol In A Private Agreement With The Union.**

   **1.**    **An employer is bound to a contract entered by another employer or by a multiemployer bargaining group only if the employer manifests an unequivocal intention to be bound by such other agreement.**

The right of employees and employers alike to choose whomever they wish to represent them in collective bargaining is fundamental to federal labor law. *General Electric Co. v. NLRB*, 412 F.2d 512 (2d Cir. 1969). Federal labor law permits formation of multiemployer bargaining groups only upon the mutual consent of all parties. *Retail Associate, Inc.*, 120 NLRB 388, 393 (1958); *See also* ABA Section of Labor and Employment Law, 1 THE DEVELOPING LABOR LAW 715-716 (John E. Higgins, Jr. et al. eds., 5th ed. 2006) (hereinafter "DEVELOPING LABOR LAW"). Thus, participation in multiemployer bargaining is purely voluntary and consensual, *United Fryer & Stillman, Inc.*, 139 NLRB 704, 708 (1962); *Artcraft Displays, Inc.*, 262 NLRB 1233, 1236 (1982), *clarified*, 263 NLRB 804 (1982), and, multiemployer bargaining is bargaining "in which more than one employer or an association of employers participate in common negotiations with a group or groups of unions as distinct from single-employer bargaining," THE DEVELOPING LABOR LAW at 712.

Absent an express statement or "unequivocal manifestation" of intent to be bound in a collective bargaining group, an employer cannot be compelled to join a multiemployer group or be bound by the contract negotiated by such a bargaining group. *Trustees of Chicago Painters and Decorators Pension, Health and Welfare, and Deferred Savings Plan Trust Funds v. LaCosta*, 397 F.3d 558, 563 (7th Cir. 2005); *Crane Sheet Metal, Inc. v. NLRB*, 675 F.2d 256, 259 (10th Cir. 1982); *Shearon Envtl. Design Co. v. Laborers' District Council of the Metro. Area of*

*Philadelphia and Vicinity, Laborers' Local 135*, 144 LRRM (BNA) 2770, 2773-74 (E.D. Pa. 1993); *Hunts Point Recycling Corp.*, 301 NLRB 751, 752 (1991); *Artcraft Displays*, 262 NLRB at 1236; *Etna Equip. Co.*, 236 NLRB 1578, 1578 (1978); *Moveable Partitions, Inc.*, 175 NLRB 915, 916 (1969); *International Photographers of the Motion Picture Industries, Local 659 of the Int'l Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada*, 197 NLRB 1187, 1189 n.9 (1972); *Van Eerden Co.*, 154 NLRB 496, 499 (1965).

Whether an employer has unequivocally manifested an intention to authorize the execution of a labor agreement binding on its behalf by another entity is fact intensive.  For example, the Tenth Circuit has found that payment of a membership fee to an association, the bylaws of which expressly authorized the association to enter into contracts, was insufficient to demonstrate an unequivocal commitment to allow representation by the association.  *Crane Sheet Metal*, 675 F.2d at 259.  *See Komatz Constr., Inc. v. NLRB*, 458 F.2d 317, 321 (8th Cir. 1972).[11]

Therefore, Monterey may be bound by the agreement of another entity such as Consol, regardless whether the entity is Consol directly or Consol using the name of BCOA, only if the Trustees show that in 1978 BCOA member companies, including Monterey, manifested

---

[11] Federal courts have sometimes referred to agency principles in considering manifestation of consent to be bound by an agreement negotiated by another entity, recognizing that "the 'unequivocal intent to be bound' principle must inform that analysis by requiring substantially more factual precision than might be true in other agency situations." *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 866 (7th Cir. 1998).  Were such an agency/labor law analysis used, virtually every factor would militate against a finding of unequivocal consent to be bound by a single employer as: (1) Monterey has not permitted a single employer to negotiate a binding labor contract on its behalf; (2) BCOA was always a multiemployer group for bargaining purposes prior to 2006; and (3) Consol did not act consistently with status as an agent of Monterey – Consol's negotiations were conducted secretly for Consol's private benefit without any consultation with, input from, or reports to Monterey or any other employer.

unequivocally an intention to be bound by an agreement negotiated by Consol for itself.  As demonstrated immediately below, the evergreen clause, and thus the term "successor NBCWA," resulted from group concerns about economically motivated actions individual employers might take after expiration of the 1978 NBCWA that would adversely affect group interests.  It was intended to protect a large group of employers against individual employer action, not the other way around.  As the Trustees' own declarations demonstrated in the *Pittston* case, the evergreen clause was entered into in 1978 to protect the many, many members of the group from the actions of single employers.  A reasonable jury may find that such an agreement does not constitute the expression of an unequivocal intention to be bound by the agreement of one employer or to accede to the bargaining decisions of that one employer.

> **2.      As the *Pittston* court recognized, the evergreen clause was added to the 1974 Plan in 1978 to protect group interests.  Acceptance of future group decisions to protect the interests of the group cannot *only* be construed as an unequivocal agreement to accept the decisions of one employer.**

According to Roger Haynes, a member of the BCOA standing committee on employee benefits and chairman of that committee from December 1971/January 1972 until mid-1979, in 1978 the BCOA and the Union concurred that an agreement between the Union and an individual company would not be a successor agreement to an NBCWA:

> 18.      This provision, sometimes referred to as the "evergreen" clause, was designed to require each employer that signed the NBCWA of 1978 to continue making contributions to the UMWA Funds, and at the rate set forth in the NBCWA, as long as the NBCWA of 1978 and "successor agreements thereto" required such contributions. The term "successor agreements thereto" was intended to be successor national agreements, and not agreements between the UMWA and an individual company. This concept of successor national agreements was discussed with the UMWA on numerous occasions, and the UMWA agreed to it without objection.

Declaration of Roger M. Haynes dated March 7, 1991 (Dkt. No. 46-13 in Case No. 07-00490) at 12 (attached as Exhibit E to the Clark Decl.) (emphasis added) (hereinafter, "Haynes 1991 Decl.").

In light of this statement by the Chairman of the BCOA Benefits Committee at the time when the BCOA and Union agreed upon the evergreen clause, it is virtually inconceivable that the members of BCOA were manifesting through the evergreen clause an intention to be bound by an individual employer's contract with the Union.  In fact, of course, it was commonly understood in 1978 that the companies participating in the 1974 Plan were agreeing only to accept later group agreements and were not agreeing to be bound by the individual decisions of a single employer.

David W. Kempken served on the BCOA-UMWA Benefits Subcommittee of the BCOA Benefits Committee when the BCOA and Union reached the language in question.  Mr. Kempken is as clear and unambiguous as Mr. Haynes.  Mr. Kempken declares:

> 13.    The term "successor agreement" in the evergreen clause was intended to refer to successor NBCWAs negotiated by BCOA and the UMWA, and not to other agreements negotiated by individual coal companies and the UMWA.

Kempken Decl. at 8.

In 1978, BCOA was a large, virtually industry-wide, multiemployer bargaining group, and Messrs. Haynes and Kempken were leaders in the negotiation of the evergreen clause. Indeed, the Trustees used the statements of Messrs. Haynes and Kempken in the *Pittston* case in support of the argument that employers participating in the 1974 Plan agreed to be bound by later group agreements for the protection of the group.

In light of the submission by the Trustees of sworn statements disavowing any notion that the evergreen clause was intended to permit later individual employer agreements, it is difficult to see how the Trustees could prevail at trial in arguing that the members of the multiemployer group intended to consent to one company setting contribution rates that would be binding on all

other companies.  For present purposes, it is clear that the intention of the parties drafting the evergreen clause in 1978 cannot **only** be found to manifest an unequivocal consent to be bound to the 1974 Plan contribution rates set forth in a contract between the Union and one company. Accordingly, this case is not subject to summary resolution.

**C.    The Trustees Cannot Convert The Single Employer Consol Agreement Into A Multiemployer Group Agreement By Calling It A National Contract**.

The Trustees argue that their interpretation of the term "successor agreement" turns upon the "characteristics" of a "true NBCWA."  This leads the Trustees to their argument that the Consol Agreement is a "national" agreement and, thus, a "true NBCWA."

Of course, the Trustees' reliance on their "national" agreement argument misses the issue before the Court.  As we have seen, the issue is the intention of the parties in 1978 when the evergreen clause was drafted and not how many entities agreed in 2007, under threat of a strike or other economic coercion by the Union, to sign an agreement similar or identical to the Consol Agreement.  Even if the Court were to assume *arguendo* that other employers voluntarily agreed to sign the Consol Agreement without the pressure of Union threats, such acceptances still would tell this Court nothing about the intent of signatories to the evergreen clause in 1978.[12]

---

[12] The Union and BCOA are of course careful in discussing the "national" scope of the Consol Agreement in their action with Freeman United.  The Supreme Court has held that an employer or group of employers cannot conspire with a union in order to force the terms of their agreement on a third party employer.  *Ramsey v. UMWA*, 401 U.S. 302 (1971); *UMWA v. Pennington*, 381 U.S. 657, 665 (1965) ("[W]e think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units.").  Moreover, an employer and union may not conspire to force a third party employer to accept only terms previously agreed upon by the employer and union for the competitive advantage of the employer and the benefit of the union.  *See, e.g., Brown v. Pro Football, Inc.*, 50 F.3d 1041, 1051 (D.C. Cir. 1995); *South-East Coal Co. v. Consolidation Coal Co.*, 434 F.2d 767, 775 (6th Cir. 1970), *cert. denied*, 402 U.S. 983 (1971).  Thus, neither the Union nor BCOA can make the argument that other employers were required by an agreement between Consol/BCOA and the Union to accept the Consol Agreement.

Union President Cecil Roberts testified that the Union would only accept what he called "NBCWA plus" contracts.  Deposition of Cecil E. Roberts dated February 14, 2008 (hereinafter "Roberts Dep.") at 134 (relevant portions of deposition are attached hereto as Exhibit G).  That "plus" factor for the Union is a "minus" factor for the Trustees.  It demonstrates as tellingly as if the Union had made concessions that the separate employers were engaged in independent bargaining with the Union.  Indeed, Monterey was not in an economic position to sign a "plus" agreement and its employees worked without a labor contract until the economically driven closure of the mine.

However, even were the Court to consider the issue as framed by the Trustees, the Trustees could not prevail on summary judgment.  Essentially, the Trustees preposterously assert that this Court should find by summary decision that a "true NBCWA" consists of: (1) a single employer agreement that (2) the Union then uses as a template in separate negotiations with numerous other employers on a one-by-one basis (3) because the single employer agreement (or similar agreement) was signed by many (but not all) such employers[13] for unidentified reasons including the threat of strike (4) even though many of the contracts are not identical to the single employer agreement[14] and (5) at least some of the companies engaged in separate bargaining

---

[13] Monterey did not sign the Consol Agreement and neither the Union nor Consol/BCOA has ever argued that Monterey was required to do so.  Monterey further notes that in its Complaint in 07-cv-00490 the Trustees also initially named as defendants seven companies in addition to Monterey and Freeman United.

[14] Acceptance by a separate employer of a contract similar to a multiemployer bargaining group contract does not make such employer a member of the multiemployer group or bound to the actual multiemployer group contract. *International Photographers of the Motion Picture Industries*, 197 NLRB at 1189 n.9; *Van Eerden Co.*, 154 NLRB at 499.

with the Union before the single employer agreement was reached.[15] Monterey suggests a simpler and far more natural definition of a "true NBCWA." A "true NBCWA" is a "true" multiemployer bargaining group agreement.

The significance of these two competing views is brought into sharp focus when the 1978 BCOA/UMWA negotiations are contrasted with the 2006 negotiations between Consol and the Union. In 1978, BCOA represented employers from every segment of the coal industry. Member companies operated in every coal producing region of the country, surface and underground miners were represented, as well as contract operators, and companies that had long-term sales contracts and those that sold on the spot market. BCOA was a true multiemployer group the members of which included large companies and small ones, ones that used traditional mining methods and ones that utilized the latest technology. Freeman United has documented that the 1978 NBCWA was a participatory process representative of the national bituminous coal industry.

In stark contrast, a single employer that uses highly productive longwall mining technology with unionized underground mines located mainly in Pennsylvania and northern West Virginia negotiated the Consol Agreement. No employer participating in any other sector of the industry was asked about any issues of concern, much less consulted with, apprised of, or allowed to participate in the discussions that resulted in the private Consol Agreement. The Consol Agreement, therefore, resulted from textbook single employer bargaining in its classic form.

---

[15] For example, in 2006 the Peabody companies that had been in BCOA when the 2002 NBCWA was entered, engaged in separate, albeit inconclusive, negotiations with the Union before Consol and the Union reached their agreement. Roberts Dep. at 105 -107 (Exhibit G at 105-107).

The facts in this case show that multiemployer bargaining no longer exists in the coal industry. The 2002 NBCWA marked the end of group bargaining, and with its demise, the Union was relegated to negotiating a labor contract with one employer, and then attempting to convince or force other companies to sign the same or a similar agreement. Consequently, the extrinsic evidence before the Court does not compel (or even support) the conclusion that the participating employers in 1978 thereby intended to give Consol or any other single employer permission to agree upon contribution rates to the 1974 Plan in its private negotiations with the Union that would bind all other employers, including Monterey, without their consent. [16]

---

[16] In Case No. 07-cv-01050, BCOA suggests that if Monterey and Freeman United are correct in their interpretation of the evergreen clause, Consol may nonetheless continue to negotiate a contribution rate that binds all employers that have participated in the 1974 Plan. As support, BCOA relies on Article XX, Section (d)(1)(v) of the 2002 NBCWA, which provides:

> In the event the BCOA ceases to exist, or in the event that more than 50% of the tonnage membership of BCOA on the Effective Date has withdrawn prior to the time when BCOA is required or permitted to take action *under this Article*, then such action may be taken by a majority vote, based on tonnage, of Employers who were BCOA members on the Effective Date. (Emphasis added)

Section (d)(1)(v) explicitly pertains to actions required or permitted under Article XX of the 2002 NBCWA. Of course, Article XX of the 2002 NBCWA terminated on December 31, 2006 and has no binding effect on employers such as Monterey that did not sign a new agreement containing this language. Moreover, actions "required or permitted" under Article XX do not include negotiating a new contribution rate for the 1974 Plan. Such actions do include a "reallocation" of contributions between different UMWA Plans. Obviously, however, that right is completely different from a right to agree upon a new collective bargaining agreement with higher contribution rates. This provision simply gives BCOA a right to administer the 1974 Plan on behalf of employers during the term of the 2002 NBCWA. Even assuming it authorizes Consol to function as the industry settlor of the 1974 Plan for purposes of section 302 of the LMRA, it does not constitute an unequivocal consent allowing Consol to set rates for the duration of the 1974 Plan's existence that are binding on other employers without their consent.

**II.**

**IN THE ABSENCE OF A SUCCESSOR AGREEMENT, CONTRIBUTION RATES AS SET IN THE 2002 NBCWA MAY NOT BE CHANGED BY SIMPLY AMENDING THE 1974 PLAN INSTRUMENT.**

The Trustees assert that, even if the Consol Agreement is not a successor NBCWA, the Union and Consol, through its instrumentality BCOA, may nevertheless increase the contribution rate for every employer that has ever participated in the 1974 Plan simply by amending the 1974 Plan Instrument to insert rates not reflected in any binding NBCWA. They stake this argument on an out of context reference to a phrase in the evergreen clause that employers are required "to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time." Trustees' Memorandum in Support of their Motion (hereinafter "Trustees' Mem.") at 15-16.

As we understand the thrust of the Trustees' argument, the evergreen forefathers were so prescient that in 1978 they included a phrase in the evergreen clause itself which they intended would survive even the end of multiemployer bargaining, and would operate to vest in a single employer a legally enforceable right to forever bind all other employers to that employer's wishes concerning the amount all other employers would have to pay to the 1974 Plan. Having now recognized this remarkable foresight, some thirty years after the fact, the Trustees have denominated it perpetual liability by Plan amendment, and introduced it in this case as the legal basis for forcing Monterey to make payments to the 1974 Plan without regard to whether Monterey agreed to follow the wishes of this single employer.

The Trustees may not sidestep collective bargaining obligations, federal labor law, and the 1974 Plan language so easily.

**A.    The Relationship Between A True NBCWA And The 1974 Plan Instrument.**

In 2002, as they had done for the six other NBCWAs entered between 1978 and 1998, the then-multiemployer group BCOA and the Union established contribution rates through collective bargaining for a successor NBCWA, and identified these rates in Article XX of the 2002 NBCWA.  The contribution rates to the various UMWA Funds, including the 1974 Plan, were stated as hourly rates in Article XX, section (d) Contributions by Employers, and the parties made it clear, as they had in the prior six NBCWAs, that a signatory's only obligation was to contribute at the rates specified in the 2002 NBCWA.  Thus, Article XX, section (d)(2) of the 2002 NBCWA provided:

> The sole obligation under this Section of any Employer signatory hereto shall be to contribute the amounts specified in this Section.

Shortly after ratification of the 2002 NBCWA, again just as had been done after each of the prior six NBCWAs, an amendment was made to the 1974 Plan to conform the 1974 Plan to the 2002 NBCWA rates – that is, the rates set in Article XX(d)(1)(ii) of the 2002 NBCWA.  To do so, Article VIII-Miscellaneous, Section B(8) ("Section B(8)") of the 1974 Plan Instrument was amended to provide:

> Contributions to the 1974 Pension Trust to fund the benefits under this Plan shall be paid solely by the Employers in accordance with Article XX of the National Bituminous Coal Wage Agreement of 2002, as amended from time to time, and any successor agreements to that specific Agreement.

1974 Plan, amended as of January 1, 2002 (hereinafter "2002 Plan Instrument"), at 30 (Dkt. No. 46-4 in Case No. 07-cv-00490) (attached as Exhibit C to the Declaration of Dale Stover (Dkt. No. 46-1 in Case No. 07-cv-00490)).

Per the custom and practice as established after each NBCWA from 1978 forward, the 1974 Plan Instrument did not state the actual monetary rate per hour; it simply conformed to the

contract contribution rate.  An employer could not even know the contribution rate just by looking at the 1974 Plan Instrument.

Further, pursuant to the same custom and practice, Section B(8) stated that the rate would be the rate in the 2002 NBCWA, or an amendment to the 2002 NBCWA, or a successor to the specific 2002 NBCWA.  Thus, Section B(8) not only conforms 1974 Plan language to the rate established in a true NBCWA but also establishes its own internal mechanism for rate changes by specifically referring to amendments to the 2002 NBCWA or a "successor NBCWA. "

Such a conforming amendment, of course, is consistent with the quoted NBCWA provision providing that the sole obligation of an employer is to contribute at NBCWA rates established in Article XX.  As the rate changed from NBCWA to NBCWA, the 1974 Plan routinely was amended to conform to the successor NBCWA contribution rate.

**B.**    **The Trustees' Claim.**

The Trustees seize upon the phrase "as amended from time to time" in the evergreen clause and argue that such language gave Consol and the Union the right to increase the contribution rate for all employers even if they did not reach a true "successor NBCWA."  The Trustees assert that Consol/BCOA and the Union amended the 1974 Plan in February 2007, retroactive to January 1, 2007, to set the contribution rates for the 1974 Plan at the rates in the Consol Agreement.[17]  They contend that, because the 1974 Plan has been amended, Monterey must pay at the Consol rates without regard to the existence of a true NBCWA.

---

[17] Consol and the Union apparently agreed in their private contract to amend Section B(8) of the 1974 Plan by inserting the words "2007 NBCWA" in lieu of the words "2002 NBCWA" in the same manner as the 1974 Plan was amended after the 2002 NBCWA.  As seen above, had the Consol Agreement been a true NBCWA, this would have been the customary procedure simply to conform the 1974 Plan to a true NBCWA rate.  Seeking a fallback from the position that the Consol Agreement is a true NBCWA, the Trustees now seek to exalt this ministerial act of document conformance to a freestanding, unchallengeable rate increase that provides a separate

Of course, if the Trustees proposition were correct, then BCOA and the Union, in their discretion and without observing any bylaw or Union Constitutional requirements pertaining to collective bargaining and ratification of agreements, could at any time since 1978 have changed substantive terms that had been reached in multiemployer bargaining by the expedient of a 1974 Plan amendment. Such a nonsensical reading of the 1974 Plan is contrary to labor law and policy, the established relationship between a true multiemployer NBCWA and the 1974 Plan, the history of multiemployer bargaining in the coal industry, and the language of the evergreen clause. Further, it would create irreconcilable conflicts between a true NBCWA and the 1974 Plan. It is nothing more than a contrivance advanced by the Trustees in an effort to circumvent the consequences of a judicial determination that the Consol Agreement does not constitute a "successor NBCWA" as the original parties to the evergreen clause envisioned and intended that term in 1978.

**C.    The Evergreen Clause Does Not Require Monterey To Contribute To The 1974 Plan At Rates Made By A Purported Plan Amendment Agreed Upon By Consol And The Union.**

**1.    Monterey did not manifest an unequivocal intention in 1978 to allow an individual employer such as Consol to represent or bind Monterey regarding contribution rates to the 1974 Plan. The attempt to establish rates by amending the 1974 Plan suffers the same fatal labor law infirmity as does the Trustees attempt to frame Consol's individual employer agreement as a "successor NBCWA."**

As discussed in more detail in Argument IV *infra*, benefit increases for retired employees are not a "mandatory" bargaining subject, and an employer is not required to bargain over such matters. However, when an employer and union do bargain over such benefits, bargaining rules and policies must apply. Consequently, regardless of whether the terms reached in bargaining

---

and independent basis for binding Monterey to contribute at the rate Consol established in the Consol Agreement.

are memorialized in a document called a "contract," "labor agreement," "memorandum of understanding," or "plan," an employer is only required to accept terms that it has negotiated for itself or that have been reached by a bargaining representative that the employer has "unequivocally" authorized to bargain on its behalf.

The Trustees cannot successfully use the ruse of labeling the result of single employer bargaining in 2007 as a "plan amendment" to dodge the fact that in 1978 Monterey and the other BCOA member companies did not unequivocally manifest an intention to allow a single employer such as Consol to use the BCOA corporate shell to negotiate contribution rates that would bind them without their consent. This is true whether the Trustees call the result of bargaining between the Union and Consol over contribution rates a phony "successor NBCWA" or call it a purported "plan amendment."

> **2.** **For purposes of the evergreen clause, 1974 Plan contribution rates are set in a NBCWA that results from real multiemployer bargaining and not by amending the 1974 Plan Instrument.**

Consol and the Union's amendment of the 1974 Plan in 2007 to incorporate the result of their private bargaining for the Consol Agreement simply tracked the custom and practice of true NBCWAs. It does not constitute a stand-alone basis for the Trustees' action against Monterey. Such custom and practice, along with the language of the 1974 Plan, demonstrates additional fatal errors in the Trustees' 1974 Plan amendment argument. The Trustees have used a declaration by Roger Haynes that, in part, emphasized that multiemployer group bargaining establishes contribution rates and benefits. Mr. Haynes declared:

> At all times since [1978], both the contribution rates and the benefits have been set in the national collective bargaining between UMWA and BCOA.

Declaration of Roger Haynes dated November 1988 at 6, *Connors v. Island Creek Corp.*, No. 87-1210 SSH (D.D.C) (attached hereto as Exhibit H) (hereinafter "Haynes 1988 Decl.").

Other declarations make the same point. For example, in a declaration filed in this action, Cecil Roberts, President of the Union, has declared:

> 9. The UMWA and the BCOA have amended the plan and trust documents shortly after reaching agreement on each new NBCWA, in order to ensure that the plan and trust documents *reflect all relevant, collectively-bargained modification in "the terms and conditions of" the Trust*.

Roberts Decl. at 4 (emphasis added).

Even Consol/BCOA agrees that amendments are made to the 1974 Plan Instrument to assure conformance with the terms of a true NBCWA. In a declaration filed in this action, Charles Perkins, the Secretary-Treasurer of BCOA, declared:

> 21. BCOA and the UMWA, as the 1974 Pension Plan's settlors, have the power to amend the 1974 Pension Plan and Trust documents *to reflect the agreement that was negotiated between BCOA and the UMWA in the NBCWA*.

Declaration of Charles S. Perkins, III dated September 7, 2007 (Dkt. No. 19-3 in Case No. 07-cv-1050) at 7 (attached as Exhibit 3 to Motion for Summary Judgment by BCOA (Dkt. No. 19)).

Certainly, therefore, rates are to be set in a true NBCWA. The 1974 Plan is then amended to conform to the true NBCWA. In fact, from 1978 through 2002, contribution rates uniformly were set in the NBCWA after true multiemployer bargaining and then the 1974 Plan simply was conformed to the true NBCWA. Of course, the Trustees understand that fact as their own Complaint undercuts their Plan amendment argument.

At Paragraph 21 of their Complaint, the Trustees plead, "The rate at which participating employers must contribute to the 1974 Pension Trust is a subject of bargaining . . . and *is set by each NBCWA*." (emphasis added.) Thus, the Trustees recognize that the rate is set in an NBCWA and not by 1974 Plan amendment.

Indeed, the Trustees' specific allegations against Monterey do not assert that Monterey has failed to contribute at rates established by an amendment to the 1974 Plan. Instead, the

Trustees assert at Paragraph 45 of the Complaint that "Pursuant to the Evergreen Clause, Monterey is obligated to make contributions . . . *at the rates set forth in the 2007 NBCWA*." (emphasis added.)  Although the Trustees error in asserting that Monterey must pay the Consol Agreement rates, they do not error in recognizing that contribution rates are set in collective bargaining and not by amendment of the 1974 Plan. [18]

Finally, in their Statement of Claim at Paragraph 71 of the Complaint, the Trustees again recognize the need for a "successor NBCWA."  They claim that the Defendants have failed to make "contributions . . . at the rates *required under all successor agreements* to the 1978 NBCWA."  (emphasis added.)  Thus, as framed by the Trustees, their own Complaint alleges only a failure to contribute at rates reached in a "successor agreement." [19]

If Consol/BCOA and the Union may change substantive aspects of the 1974 Plan without bargaining, the NBCWA would become irrelevant as far as the rate of contributions to the 1974 Plan is concerned.  For example, once the 2002 NBCWA was ratified, BCOA and the Union

_____

[18] The Trustees may not legitimately contort their pleading by claiming the words "rates set forth in the 2007 NBCWA" meant that Monterey was required to pay at the rates of the Consol Agreement because the 1974 Plan was incorporated by reference into the Consol Agreement. Even were the Trustees to propose such a rewriting of their Complaint, it would serve no purpose, as the Trustees cannot contend successfully that Monterey is a signatory to, or bound by, the Consol Agreement.  Moreover, as we will see, to the extent the Trustees may assert that the 1974 Plan was incorporated by reference into the 2002 NBCWA that Monterey did sign, the 1974 Plan that was incorporated into the 2002 NBCWA provided that the rates would be as set in the 2002 NBCWA or "successor agreements" to that Agreement.  Thus, the Trustees would only circle back to the inescapable need for a successor NBCWA.

[19] The Trustees' Complaint avers that Monterey violated a purported successor NBCWA. It does not aver that Monterey has violated a term of the 1974 Plan.  The Trustees assume for their 1974 Plan amendment argument that the Consol Agreement is not a successor NBCWA.  That being the case, there is no binding labor agreement into which the "amended" 1974 Plan could be incorporated, and a claim of a violation of the 1974 Plan could not be based upon a claim of a violation of a NBCWA.  Such a claim would have to be pled as a separate and discrete claim. Consequently, the Trustees' patently erroneous Plan amendment argument in any event should be dismissed because it is based upon a claim not articulated in the Complaint.

could have decided a few months later to amend Section B(8) of the 1974 Plan to impose a contribution rate of say $8.00 per hour without going through the collective bargaining process required for a true NBCWA, including consulting with the BCOA membership and obtaining ratification by Union members.

The unbroken practice has been that the rates set in a NBCWA are conformed in the 1974 Plan in a manner that only refers to the NBCWA. The statements of the Trustees' Declarants, the Trustees' Complaint, and the customs and practices followed though seven NBCWAs from 1978 through 2002 demonstrate that rates are only set in a true NBCWA and are not established through 1974 Plan amendments unrelated to NBCWA negotiations.

3.    **The language of the evergreen clause itself, especially when read in conjunction with Section B(8), demonstrates that binding rate changes must be made during the term of, and in the provisions of, a true NBCWA or a true successor NBCWA** .

The Trustees' focus upon the words "amended from time to time" as insufficient to deal with the method by which contribution rates are to be established, because the evergreen clause must be read in its entirety. Except for changes in dates of NBCWAs (and specifically identifying each successor NBCWA) the evergreen clause has not been changed from 1978 when it read:

> Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including but not limited to, *making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time and any successor agreements thereto*. (Emphasis added.)

Read in its entirety and in conjunction with Section B(8), the evergreen clause does not contemplate an amendment to the 1974 Plan contribution rate outside of a true NBCWA. The

evergreen clause explicitly refers to the obligation to make contributions, and such reference is to "making the contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time and any successor agreements thereto." Thus, the evergreen clause itself evidences that contribution rates are to be established in true NBCWAs.

In doing so, the evergreen clause tracks the procedure for amending rates set forth in Section B(8). Like Section B(8), the evergreen clause envisions a conforming amendment to contribution rates established in an NBCWA, either during the term of an extant NBCWA or in a successor NBCWA. The language of the evergreen clause itself does not support a binding rate change made only via an amendment to Section B(8) without a corresponding change in a true NBCWA. Indeed, as discussed in paragraph 4 below, such an event would permit the occurrence of irreconcilable conflicts between a true NBCWA and the 1974 Plan Instrument. The drafters of the 1974 Plan could not have intended the occurrence of such conflicts.

**4.    The Trustees' expanded construction of the right to amend the 1974 Plan creates inconsistencies between the substantive provisions of a true NBCWA and the 1974 Plan.**

The only place the 1974 Plan is conformed to an NCBWA regarding contribution rates is Section B(8). There, the 1974 Plan simply states that the contribution rates will be the rates established in the relevant true NBCWA. As we have demonstrated, that section has its own internal provision as to how rates are to be changed – namely by amending a current NBCWA or negotiating a new NBCWA – a procedure that accords with the practice of setting rates in true multiemployer bargaining.

If the Trustees interpretation were correct, then BCOA and the Union would have been empowered to create a conflict between a true NBCWA and the 1974 Plan because they could have changed the rates to be paid the 1974 Plan by amending Section B(8) without changing

parallel provisions in a true NBCWA Agreement.  This would create an irreconcilable conflict between the rate established in Article XX of a true NBCWA and the 1974 Plan.[20]

The Trustees present no actual evidence to support their claim that the drafters of the 1978 evergreen clause intended to permit a conflict between the contribution rates as set forth in Section B(8) and the contribution rates in a true NBCWA.  The only reasonable interpretation is that, for purposes of the evergreen clause, the rates referred to in Section B(8) may be amended only to conform to a true multiemployer NBCWA.  That being the case, it would be unreasonable to read the evergreen clause, a separate clause not aimed at setting rates, as providing authority for a single employer and the UMWA to amend Section B(8) in 2007 to create a stand-alone right in the 1974 Plan Instrument to bind non-signatories to the Consol Agreement to pay at rates that were not arrived at in a true NBCWA multiemployer agreement.

---

[20] The 1974 Plan reserves to the Employers and Union the right to amend the 1974 Plan "by a written agreement between the Employers and the Union  . . . ."  Article VIII, section (B)(3) of the 2002 Plan Instrument at 29.  "Employers" under the 1974 Plan includes every employer that has been signatory to a NBCWA from 1974 forward. Article I, section A(2) of the 2002 Plan Instrument at 2.  BCOA "amends" the 1974 Plan only because the 1974 Plan further provides that any action that may or must be taken by the Employers "may be taken by BCOA." Article VIII, section (B)(15) of the 2002 Plan Instrument at 31.  Without doubt, therefore, in executing a written plan amendment, BCOA exercises a right that belongs to the entire "Employers" group – a group that extended beyond the membership of BCOA even when BCOA actually constituted a multiemployer group.   Given the extrinsic evidence presented by Freeman United that Consol used the BCOA shell for its own purposes without consultation with, or consideration of, other Employers, it appears undeniable that "BCOA" acted disloyally and/or beyond the scope of any arguable authority in agreeing to amend the Plan as part of an overall negotiation strategy aimed at achieving only Consol objectives.

**III.**

**DISCONTINUANCE OF CONTRIBUTIONS TO THE 1974 PENSION PLAN UNDER THE 2002 NBCWA PRECLUDES APPLICATION OF A CONTINUING CONTRIBUTION OBLIGATION ON EMPLOYERS WHO DO NOT SIGN A SUBSEQUENT AGREEMENT.**

Monterey's initial opposition to the Trustees' Motion pointed out that the Trustees had failed to account for the "discontinuance of contributions" provision in the 1974 Plan – a provision that was not before the court in *Pittston* and that negates the Trustees' reliance on the evergreen clause in the instant case. In responding to Monterey's position the Trustees could not, and did not, assert that *Pittston* was *stare decisis* on the discontinuance of contributions argument.

Monterey briefly summarizes the relevance of the discontinuance clause to this case, and responds to the Trustees' argument as presented in their Reply Memorandum to Monterey's Opposition to their Motion for Summary Judgment.

**A.    The Discontinuance Of Contributions Clause Became Applicable During The 2002 NBCWA.**

Article VIII-Miscellaneous. § B(4) of the 1974 Plan states:

> Upon the termination of this Plan **or the complete discontinuance of contributions to the 1974 Pension Trust**, this Plan shall remain in force and effect for the period necessary to complete the payment of benefits in accordance with the terms of this Plan to the extent assets in the 1974 Pension Trust are available to pay such benefits. (Emphasis supplied)

This language plainly does not require formal 1974 Plan termination in order to have legal effect. Nor does it require that the discontinuance of contributions be permanent. Rather, it is only necessary that the discontinuance be complete.

The evergreen clause and discontinuance of contributions clause were both inserted in the same Article of the 1974 Plan before withdrawal liability was established under MPPAA. The same parties that created and inserted the evergreen clause in the 1978 version of the 1974 Plan did so with knowledge of, and against the backdrop of, the discontinuance of contributions clause which first appeared in the 1974 version of the Plan.

As set forth above in this Memorandum, affidavits of 1978 NBCWA negotiators demonstrate that the evergreen clause is conditional and not perpetual. Indeed, the Trustees do not dispute that premise. A jury would be entitled to find that, in the absence of statutory withdrawal liability, these two pre-MPPAA clauses demonstrate that in 1978 the Union and employers (acting through BCOA as the industry-wide bargaining group) constructed an arrangement whereby companies participating in the 1974 Plan would be required to contribute to the Plan at rates set forth in successor agreements reached in multiemployer bargaining until such time as a subsequent NBCWA no longer required that contributions be made. Once the Union and the multiemployer group determined that the Plan was sufficiently funded to warrant the discontinuance of contributions, the underlying purpose of the evergreen clause, which was to prevent employers participating in the 1974 Plan from withdrawing and dumping liability on BCOA members, would be accomplished.

The discontinuance of contributions described in Article VIII-Miscellaneous, §B(4) finally occurred some twenty-four years later when the 2002 NBCWA provided that contributions to the 1974 Plan would be discontinued. Indeed, prior to the 2007 Consol

Agreement, contributions to the 1974 Plan had not been required for eight years - from 1998 through 2006.[21]

This notwithstanding, the Trustees have said that the discontinuance of contribution is not relevant to this case because it only applies to "permanent" cessations and not to "temporary" cessations.[22] Their argument is misplaced for a number of reasons. First, the Trustees assert but do not show that the plain language of the 1974 Plan supports their interpretation. To the contrary, the discontinuance clause does not use the word "permanent," and the absence of such modifying or limiting word militates in favor of an interpretation without such adjectival limitation. In short, the "plain language" of the clause clearly favors Monterey's view.

Second, although the Trustees aver that the eight year discontinuance of contributions was only temporary, and not intended to herald the end of the 1974 Plan, they cannot find support in the 2002 NBCWA for that proposition. The 2002 NBCWA does not include a commitment that the employers would agree to new benefits or resume contributing to the 1974

---

[21] Monterey noted in its initial memorandum that Article XX(d)(1) of the 2002 NBCWA required an employer that began participation in the 1974 Plan for the first time after the effective date to contribute 75 cents per hour worked during the term of the Agreement, in recognition that employees of a company that had not previously participated in the 1974 Plan would accrue benefits during the term of the 2002 NBCWA. Monterey pointed out that if the Trustees claimed that this residual and limited contribution requirement barred application of the discontinuance clause, the Trustees' claim would create a disputed issue as to whether the unequal contribution rates of the 2002 NBCWA nullifies the evergreen clause. The Trustees presented no response to that point in their reply to Monterey's initial memorandum.

[22] The Trustees assert that it is undisputed that the zero contribution rate in the 1974 Plan under the 2002 NBCWA was temporary rather than permanent. They submit no support whatsoever for that proposition other than to claim that benefits would continue to accrue. Accrual of benefits, standing alone, does not prove that the funding of the 1974 Plan would be inadequate to support such benefits or that benefits might be modified in subsequent bargaining to avoid imposition of renewed contributions. In any event, speculation over the permanency of the zero contribution rate is not material, as Monterey disputes the underlying premise that only a permanent cessation of contributions triggers application of the discontinuance of contributions clause.

Plan in the future. Without regard to whether that possibility was assumed or anticipated, nothing in the 2002 NBCWA obligated the employers to do so. After the 2002 NBCWA expired, the employers and the Union could have agreed to terminate the 1974 Plan and create an entirely new pension arrangement. Indeed, the employers did not even need to secure the Union's consent, because they could have bargained to impasse over a proposal to terminate the 1974 Plan in favor of a different pension structure and could have implemented that proposal unilaterally in accordance with applicable labor law.

Third, when ratifying the 1978 NBCWA, it would have been reasonable and logical for BCOA member companies to have understood their commitment to the evergreen clause to extend only until such time that a future NBCWA provided contributions were no longer required, as specifically stated in the discontinuance clause. Indeed, the statements of key BCOA representatives introduced in the *Pittston* case can certainly be read as recognizing that the complete discontinuance of contributions to the 1974 Plan would constitute an event that vitiated the binding effect of the continuing contribution requirement. For example, Roger Haynes acknowledged that the evergreen clause was designed to require all signatory employers to continue contributions "so long as the NBCWA of 1978 and 'successor agreements thereto' required such contributions." Haynes 1991 Decl. at 15.

NBCWA negotiator David Kempken testified likewise. *See, supra* note 9 at 10. It is certainly the case that this characterization of the effect of the evergreen clause could be read to mean that with the eventuality of an NBCWA that did not require contributions (as occurred in the 2002 NBCWA), the condition that animated the purpose of the clause would be satisfied. The Trustees have introduced no evidence that companies that ratified the 1978 NBCWA were informed that the effect of the continuing contributions clause would endure even after a

34

successor NBCWA ceased to require contributions. Contrary to the Trustees' assumption and position in this case, this understanding of the temporal limitation of the binding effect of the evergreen clause in 1978 would not be negated by the hypothetical possibility that in some future NBCWA (much less a single employer agreement) the negotiators might agree to provide new benefits, which could require that contributions be resumed.

Against this backdrop, the only actual commitment to the 'future'' of the 1974 Plan that can be identified in the 2002 NBCWA is found in the discontinuance of contributions clause itself, which ensures that the 1974 Plan would "remain in force and effect for the period necessary to complete the payment of benefits in accordance with the terms of this Plan."

This situation existed when Monterey's 2002 contract expired December 31, 2006. The Trustees can point to no action taken by Monterey since its contract terminated that changed or overrode the operation of the discontinuance clause in Article VIII-Miscellaneous, § B(4) as it pertains to Monterey's right to not resume participation in or contributions to the 1974 Plan at the rates established in the private Consol Agreement, in the absence of an agreement with the Union to do so.

The fact that the discontinuance of contributions clause means the companion evergreen clause is not applicable to Monterey with respect to periods after December 31, 2006 does not, of course, preclude the Union from entering into a new agreement (whether with an industry bargaining group or with a single employer such as Consol) that provides for new benefits and renewed contributions to the 1974 Plan. However, the discontinuance clause does mean that a former participating employer such as Monterey is under no binding obligation to renew contributions at the rates set forth therein unless and until it signs a new contract which includes an obligation to contribute to the 1974 Plan at the new rates.

**B.    Whether The Discontinuance Clause Was First Inserted Into The 1974 Plan To Comport With a Treasury Regulation Is Immaterial.**

The only substantive argument offered by the Trustees to support their contention that the discontinuance provision is relevant only to intentionally permanent cessations of contributions is their surmise that the provision was included in the 1974 Plan to conform the Plan to governmental regulations. The Trustees' surmise, however, is drawn from a comparison of the similarity of language in the cited Treasury Regulation and is not supported by extrinsic evidence of the intention of the drafters.

Assuming *arguendo* that the discontinuance clause was initially included in the 1974 Plan to comport with a Treasury Regulation, this still would not satisfy the requirement for summary disposition of the interpretation of language in the Trustees' favor.  The Trustees certainly have not established that the BCOA member companies who ratified the 1978 NBCWA, and who were aware of the discontinuance clause, did not or could not have considered the clause as establishing one of the watershed conditions terminating the binding effect of the evergreen clause on their future obligation to contribute to the 1974 Plan, especially where the Trustees were attempting to enforce payment of contributions established in an agreement between the Union and a single employer.

Going further, even if the Court were to make a leap of faith and assume that the drafters of the discontinuance clause intended to mimic a Treasury Regulation, that Regulation provides that the determination of whether a complete discontinuance has occurred must be made based upon all the facts and circumstances in the case.   Treasury Regulation § 1.401-6(c)(1) states:

> For purposes of this section, a complete discontinuance of contributions under the plan is contrasted with a suspension of contributions under the plan, which is merely a temporary cessation of contributions by the employer. A complete discontinuance of contributions may occur although some amounts are contributed by the employer under the plan if such amounts are not substantial

enough to reflect the intent on the part of the employer to continue to maintain the plan. **The determination of whether a complete discontinuance of contributions under the plan has occurred will be made with regard to all the facts and circumstances in the particular case, and without regard to the amount of any contributions made under the plan by employees**. (emphasis added.)

The term "facts and circumstances" in the Regulation designates exactly what Monterey seeks – a trial at which it can present the reasonable and plausible argument that the cessation of contributions under the 2002 NBCWA terminated the right and authority of the Trustees to rely upon the evergreen clause to compel Monterey to resume contributions to the 1974 Plan at new rates agreed to between the Union and Consol to finance new benefits those parties agreed to in the Consol Agreement. While companies that subsequently signed a contract that provided for the new benefits and rates set forth in the Consol Agreement may be obligated to resume contributions to the 1974 Plan, Monterey did not agree to either the new benefits or to the resumption of contributions to the 1974 Plan.

## IV.
## THE 1974 PLAN IS NOT IMPERILED.

**A.    Acceptance Of Monterey's Position Will Not Imperil The 1974 Plan.**

The Trustees asserted in their Memorandum at page 25 that if Monterey's argument were accepted it would imperil the 1974 Plan's very existence. In their reply to points made in Freeman United's opposition brief, the Trustees essentially abandoned their hyperbole, suggesting instead that their "sky is falling" line of argument was in the nature of an aside.

The Trustees nevertheless persist in their attempt to inject the prospect of future harm to the 1974 Plan into the legal analysis, presumably to color the Court's perception of the issue. They assert that MPPAA's introduction of withdrawal liability after the evergreen clause was created in 1978 does not adequately protect the 1974 Plan from future risks. That is a tenuous

position indeed, since, as the Supreme Court has noted, annual payments of withdrawal liability are established by MPPAA "at a level that approximates the periodic contributions the employer had made before withdrawing from the plan." *Bay Area Laundry*, 522 U.S. at 196-7.

While it is certainly true that future adverse economic developments could result in the 1974 Plan's unfunded status worsening, the Trustees conveniently fail to mention that future positive developments could provide the 1974 Plan a windfall. This is because a withdrawn employer's liability is fixed as of the time of withdrawal, and the employer must continue to make its payments even though improvements may result in the 1974 Plan becoming fully funded. *See Connors v. Hi-Heat Coal Co.*, 772 F. Supp. 1, 6 (D.D.C. 1991). Indeed, a withdrawn employer such as Monterey must make annual payments of withdrawal liability even though remaining participating employers cease to be subject to a contractual obligation to contribute (as was the case with the 1974 Plan for nearly a decade). The "future risks" door swings both ways, although that is not discernible from the Trustees' brief.

**B.    The 1974 Plan's Position Permits A Single Employer To Usurp Monterey's Right Under Federal Labor Law To Bargain With The Union About Pensions.**

Since the Trustees "future risks" argument is clearly meritless, Monterey supposes that the Trustees' real concern is that, if they cannot rely on the evergreen clause to force Monterey to contribute at rates agreed to in a contract between the Union and a single employer, then the Union will have to secure financing for any future benefit increases for already retired 1974 Plan participants through contract bargaining with all employers. Thus, the Union would have to engage in negotiations with each employer about its continued participation in the 1974 Plan, and offer terms and conditions sufficiently attractive to induce those employers to agree to pay contributions to fund any new benefits granted in a future labor agreement. The Union would not be able to exploit the device of negotiating with a single employer to secure increased

benefits for already retired 1974 Plan participants by providing only to one, single employer the concessions or advantages necessary to secure the Union's objectives, and then rely upon the evergreen clause to compel all other employees to finance the 1974 Plan portion of the private-party deal.

Although the Trustees certainly would prefer the simplicity and security provided by this approach, it suffers from a fatal flaw. As we have seen, the 1978 signatories did not contemplate such a single employer deciding upon rates that would bind the entire unionized industry and federal labor law protects the right of employers to bargain, or refuse to bargain, over matters not related to their current employees. It is well established that a union cannot force an employer to bargain about benefits for retired employees. *Pittsburgh Plate Glass Co.*, 313 U.S. 146 (1941). Indeed, a union would violate the National Labor Relations Act if it struck an employer for the purpose of securing benefits for non-employees, including retirees. The Trustees' Complaint in this case advances the interests of the Union and a single employer, as Freeman United's Memorandum compellingly demonstrates. This effectively puts the Trustees in the position of being the enforcer of a private party agreement that denies other employers, including Monterey, their right under labor law to bargain with the Union about their continued participation in the 1974 Plan.

At trial, Monterey will be entitled to show that a substantial portion of the contributions required in the Consol Agreement are for the purpose of funding benefit increases for retired participants. By attempting to invoke the evergreen clause to force Monterey to contribute to the 1974 Plan at rates specified in the Consol Agreement, the Trustees (who are appointed by the Union and Consol/BCOA) seek to compel Monterey to pay for new benefits for retirees even

thought the Supreme Court has made it clear that federal labor law protects Monterey's right to refuse to do so.

At a minimum, the Trustees cannot demonstrate an entitlement to summary judgment on their claim that the evergreen clause agreed to in 1978 by an association that comprised the vast majority of companies then active in the coal industry can **only** be interpreted to mean that, thirty years later, when group bargaining no longer exists, a single employer may nevertheless continue to bind all other employers to its private contract as a matter of law.

## CONCLUSION

For the reasons set forth herein, Monterey respectfully requests that this Court deny the Plaintiffs' motion for summary judgment.

Respectfully submitted,


_____/s/_____

John R. Woodrum, D.C. Bar No. 933457
William I. Althen, D.C. Bar No. 122523
Ogletree, Deakins, Nash, Smoak
  & Stewart, P.C.
Fifth Floor
2400 N Street, N.W.
Washington, DC   20037
john.woodrum@odnss.com
william.althen@odnss.com
Phone:  (202) 887-0855

*Counsel for Monterey Coal Company*


Dated: March 14, 2008

# EXHIBIT A

# NATIONAL BITUMINOUS COAL
# WAGE AGREEMENT OF 1978

### Effective March 27, 1978



## TABLE OF CONTENTS

Page

**Article I—ENABLING CLAUSE** .................. 1

**Article IA—SCOPE AND COVERAGE** ........ 3

Section (a)    Work Jurisdiction ............... 3
Section (b)    Exemptions Clause ............. 3
Section (c)    Supervisors Shall Not Perform Classified Work .................. 4
Section (d)    Management of the Mines .. 5
Section (e)    Union's Rights ..................... 5
Section (f)    Application of This Contract to the Employer's Coal Lands.... 5
Section (g)    Contracting and Subcontracting ................ 6
Section (h)    Leasing, Subleasing and Licensing Out of Coal Lands ................................. 6
Section (i)    Construction Work ............. 7

**Article II—INDUSTRY DEVELOPMENT** .. 7

**Article III—HEALTH AND SAFETY** ........ 10

Section (a)    Right to a Safe Working Place ............................... 10
Section (b)    Federal Coal Mine Health and Safety Act of 1969.. 10
Section (c)    Joint Industry Health and Safety Committee .......... 11
Section (d)    Mine Health and Safety Committee ...................... 12
Section (e)    Access to the Mine ............. 14
Section (f)    Reports ............................... 16
Section (g)    Safety Rules and Regulations ..................... 16
Section (h)    Cooperation in Development of Mining Plans .... 17
Section (i)    Preservation of Individual Safety Rights ..................... 18
Section (j)    Physical Examination ........ 20
Section (k)    Minimum Age ..................... 21
Section (l)    Workmen's Compensation and Occupational Disease ............................. 21
Section (m)    Safety Equipment and Protective Clothing Allowance ......................... 22
Section (n)    Maintenance ....................... 23
Section (o)    Special Safety Problem Areas ................................ 23
Section (p)    Settlement of Health or Safety Disputes ............... 25

**Article IV—WAGES AND HOURS** ............. 27

Section (a)    Basic Work Week ............... 27
Section (b)    Basic Work Day ................. 27

iii

Page

Section (c)    Lampman ................................ 28
Section (d)    Saturday, Sunday and
                Premium Work ........... 29
Section (e)    Standard Daily Wage Rate   30

**Article V—HELPERS ON FACE
EQUIPMENT IN UNDERGROUND
MINES** ........................................... 32
Section (a)    Assignment of Helpers ...... 32
Section (b)    Duties and Responsibilities
                of Helpers ................. 33
Section (c)    Exemption ........................... 34

**Article VI—SHIFTS AND SHIFT
DIFFERENTIALS** ........................ 34
Section (a)    Multiple Shifts .................. 34
Section (b)    Hoisting of Coal .............. 35
Section (c)    Shift Differentials .......... 35
Section (d)    Working into the Next
                Shift ......................... 35
Section (e)    Call-back ........................... 35
Section (f)    Shift Rotation ................... 36

**Article VII—MINE COMMUNICATION
COMMITTEES** ............................ 36

**Article VIII—STARTING TIME** ... 37
Section (a)    Shift Starting Time ......... 37
Section (b)    Lowering Employees ........ 37
Section (c)    Safety and Maintenance .. 38
Section (d)    Surface Facilities ............ 38
Section (e)    Crew Changes .................... 38

**Article IX—ALLOWANCES** ........... 38
Section (a)    Bereavement Pay ............. 38
Section (b)    Jury Duty ........................... 39
Section (c)    Reporting Pay ................... 39
Section (d)    Military Duty ..................... 40
Section (e)    Personal or Sick Leave ... 40
Section (f)    Additional Allowance ...... 41

**Article X—COST-OF-LIVING WAGE
INCREASE** .................................... 42

**Article XI—SICKNESS AND ACCIDENT
BENEFITS** .................................... 42
Section (a)    General Purpose ............... 42
Section (b)    Eligibility ........................... 42
Section (c)    Commencement and
                Duration of Benefits ...... 44
Section (d)    Amount and Payment of
                Benefits .................... 46
Section (e)    Filing of Claims for
                Benefits .................... 47
Section (f)    Structure and
                Administration .............. 47

iv

Page

**Article XII—HOLIDAYS** ................ 50
Section (a)    Holidays Observed ............ 50
Section (b)    Sunday Holidays .............. 51
Section (c)    Monday Holidays ............. 51
Section (d)    Pay for Holidays Worked.. 51
Section (e)    Pay for Holidays Not
                Worked ..................... 52
Section (f)    Holidays During Vacation
                Period ....................... 52
Section (g)    Birthday Holidays ........... 52
Section (h)    Holidays for Sick and
                Injured ...................... 53
Section (i)    Time of Payment ............. 53

**Article XIII—REGULAR VACATION** ... 53
Section (a)    Annual Vacation ............... 53
Section (b)    Dates of Regular
                Vacation Period ........... 53
Section (c)    Staggered Regular
                Vacation ..................... 54
Section (d)    Qualifying Period and
                Amount of Payment ...... 55
Section (e)    Floating Vacation Days .... 57
Section (f)    Time of Payment ............. 57
Section (g)    Obligation for Payment ... 57
Section (h)    Work During Vacation
                Shutdown .................... 58

**Article XIV—GRADUATED VACATION** ... 58
Section (a)    General .............................. 58
Section (b)    Definition of Additional
                Days .......................... 59
Section (c)    Definition of Continuous
                Employment ................ 59
Section (d)    Amount of Continuous
                Employment ................ 60
Section (e)    Time of Payment ............. 60
Section (f)    Rate of Payment .............. 61
Section (g)    Scheduling and Pay in
                Lieu .......................... 61
Section (h)    Sick and Injured
                Employees .................. 61

**Article XV—CHECKOFF** ............... 61

**Article XVI—TRAINING** ............... 62
Section (a)    Priority .............................. 62
Section (b)    Orientation for New
                Employees .................. 63
Section (c)    General Retraining
                Programs .................... 67
Section (d)    Safety Training for
                Specific Job .............. 70
Section (e)    Maintenance Training and
                Rate of Pay ................ 70

v

                                                        Page
Section (f)    New Inexperienced Em-
               ployees at Underground
               Mines ...........................    71
Section (g)    General Training
               Provisions .....................    72

**Article XVII—SENIORITY** ...........................    73
Section (a)    Definition of Seniority .....    73
Section (b)    Reduction in Work Force ..    74
Section (c)    Layoff Procedure ...............    74
Section (d)    Panels ...............................    75
Section (e)    Panel Custodians .............    75
Section (f)    Panel Members Accrue
               Seniority .........................    76
Section (g)    Right to be Recalled .........    76
Section (h)    Recall of Persons on
               Layoff Status ...................    76
Section (i)    Job Bidding .....................    78
Section (j)    Training for Vacancy Not
               Filled by Bidding .............    81
Section (k)    Transfer to Other Mines
               of Employer .....................    82
Section (l)    Leave of Absence .............    84
Section (m)    Permanent and Temporary
               Supervisors .....................    84
Section (n)    Shift Preference .............    85

**Article XVIII—TONNAGE RATES AND
HAND LOADING** ...........................    85
Section (a)    Tonnage Rates .................    85
Section (b)    Checkweighmen ...............    85
Section (c)    Preparation and Cleaning
               of Coal ...........................    87
Section (d)    Delivery of Cars .............    88
Section (e)    Explosives .......................    88
Section (f)    Bottom Coal .....................    88
Section (g)    Cutting Coal .....................    89
Section (h)    Blacksmithing .................    89
Section (i)    Rockdusting .....................    89
Section (j)    Day Men Transferred .........    89

**Article XIX—CLASSIFICATION** ...........................    89
Section (a)    Working in Classification..    89
Section (b)    Classification Requirement    89
Section (c)    Temporary Assignments....    90
Section (d)    Protection Against
               Discrimination .................    90
Section (e)    Compensation for Tem-
               porary Assignments .........    90

**Article XX—HEALTH AND RETIRE-
MENT BENEFITS** ...........................    91
Section (a)    General Purpose .................    91
Section (b)    1950 Plans and Trusts .........    93
Section (c)    1974 Plans and Trusts .........    93
Section (d)    Contributions by Em-
               ployers .............................    96

vi

                                                        Page
Section (e)    Responsibilities and Duties
               of Trustees .....................    106
Section (f)    Audits, Reports and
               Notices ...........................    109
Section (g)    Administration of Trusts....    111
Section (h)    Guarantee of 1950 Plans
               and Trusts and 1974
               Plans and Trusts ...........    113

**GENERAL DESCRIPTION OF THE
HEALTH AND RETIREMENT
BENEFITS** ...........................    114
(1)   Pensions for Miners Retired Under
      the 1950 Pension Plan ...........    115
(2)   Pensions for Miners Who Retired
      Under the 1974 Pension Plan
      Prior to the Effective Date of
      This Agreement .....................    116
(3)   Pensions for Miners Who Retire on
      or After the Effective Date of
      This Agreement .....................    117
(4)   Signatory Service .....................    118
(5)   Pensions for Disabled Miners .....    119
(6)   Pensions for Surviving Spouses .....    120
(7)   Deferred Vested Pension .............    121
(8)   Life and Accidental Death and Dis-
      memberment Benefits .............    121
(9)   Pensioner's Death Benefits .........    123
(10)  Health Care .............................    123
(11)  Vision Care .............................    127

**Article XXI—SURFACE MINES** ...........................    129
Section (a)    Parking Areas .................    129
Section (b)    Manning of Surface
               Mining Equipment .........    130
Section (c)    Eating Place .....................    132
Section (d)    Cabs ...............................    133
Section (e)    Special Health and Safety
               Problems in Surface
               Mines .............................    133
Section (f)    Toilets .............................    135
Section (g)    Swing Shift .....................    135
Section (h)    Leasing of Employees'
               Vehicles .........................    135
Section (i)    Production and Processing
               of Coal at Surface Mines    136

**Article XXII—MISCELLANEOUS** ...........................    136
Section (a)    Bathhouse .......................    136
Section (b)    Access Roads .................    137
Section (c)    Parking Facilities .............    137
Section (d)    Bulletin Boards ...............    137
Section (e)    Coke and Cleaning Plants    137
Section (f)    Compulsory Retirement ....    138
Section (g)    House Coal .....................    138
Section (h)    House Rent .....................    138
Section (i)    Irregular Work .................    138

vii

| | | Page |
|---|---|---|
| Section (j) | Memorial Periods | 138 |
| Section (k) | Closing Following Fatal Accident | 139 |
| Section (l) | New Machinery | 139 |
| Section (m) | Pay Day | 140 |
| Section (n) | Lunches | 140 |
| Section (o) | Portals | 141 |
| Section (p) | Tools | 141 |
| Section (q) | Tramming | 141 |
| Section (r) | Local Union Meeting Place | 141 |
| Section (s) | Federal Mine Safety and Health Act | 141 |
| Section (t) | Bonus Plans | 142 |

**Article XXIII—SETTLEMENT OF DISPUTES** ... 144

| | | |
|---|---|---|
| Section (a) | Mine Committee | 144 |
| Section (b) | District Arbitrators | 145 |
| Section (c) | Grievance Procedure | 147 |
| Section (d) | Ten Day Limitation | 150 |
| Section (e) | Earnest Effort to Resolve Disputes | 151 |
| Section (f) | Employee's Right to Presence of Member of Mine Committee | 151 |
| Section (g) | Right of Grievant to be Present | 151 |
| Section (h) | Finality of Decision or Settlement | 152 |
| Section (i) | Exclusion of Legal Counsel | 152 |
| Section (j) | Waiver of Time Limits | 152 |
| Section (k) | Prior Agreement | 152 |

**Article XXIV—DISCHARGE PROCEDURE** ... 153

| | | |
|---|---|---|
| Section (a) | Just Cause Required | 153 |
| Section (b) | Procedure | 153 |
| Section (c) | Suspension | 154 |
| Section (d) | Immediate Arbitration | 154 |
| Section (e) | Regular Arbitration | 155 |
| Section (f) | Compensation for Lost Earnings | 155 |

**Article XXV—DISCRIMINATION PROHIBITED** ... 155

**Article XXVI—DISTRICT AGREEMENTS** ... 156

| | | |
|---|---|---|
| Section (a) | New Districts | 156 |
| Section (b) | Prior Practice and Custom | 156 |
| Section (c) | Protective Wage Clause | 157 |
| Section (d) | Approval of District Agreements | 157 |

viii

| | | Page |
|---|---|---|
| **Article XXVII—MAINTAIN INTEGRITY OF CONTRACT AND RESORT TO COURTS** | | 157 |

**Article XXVIII—SEVERABILITY CLAUSE** ... 158

| | | |
|---|---|---|
| Section (a) | General Rule | 158 |
| Section (b) | Exception | 158 |

**Article XXIX—RATIFICATION AND TERMINATION OF THIS AGREEMENT** ... 159

* * * *

**Memorandum of Understanding—Continuance of Arbitration Review Board** ... 161

**Letter Regarding Article XX, Section (e) (5)** ... 164

**UMWA BARGAINING COUNCIL** ... 165

**BCOA MEMBERSHIP** ... 167

**Pension Table** ... 172

**Appendix A—Part I**
Rates—Underground at Deep Mines ... 173

**Appendix A—Part II**
Rates—Strip and Auger Mines ... 174

**Appendix A—Part III**
Rates—Preparation Plants and Other Surface Facilities for Deep or Surface Mines ... 175

**Appendix B—Part I**
Classification—Underground at Deep Mines ... 176

**Appendix B—Part II**
Classification—Strip and Auger Mines ... 185

**Appendix B—Part III**
Classification—Preparation Plants and Other Surface Facilities for Deep or Surface Mines ... 192

**Index** ... 201

ix

## BITUMINOUS COAL OPERATORS' ASSOCIATION, INC. MEMBERSHIP

Alabama By-Products Corporation
AMAX Coal Company
    Gibraltar Coal Corporation
    Yankeetown Dock Corporation
American Coal Company
Armco, Inc. (West Virginia Coal Operations)
Barnes & Tucker Company
**Beckley Coal Mining Company**
**Beth-Elkhorn Corporation**
**Bethlehem Mines Corporation**
**Bishop Coal Company**
**CF&I Steel Corporation**
**Canneton Industries, Inc.**
    Maple Meadow Mining Co., Inc.
Cedar Coal Company
Central Appalachian Coal Company
Central Coal Company
Central Ohio Coal Company
CoalARBED, Inc.
    Red Ash Sales Company, Inc.
    Delaware Fuel Company
    Ottaway Mining Corporation
    Huff Energy
    Hull Coal Company
Consolidation Coal Company
    Eastern Region
    Northern West Virginia Region
    Southern Appalachia Region
    Midwestern Region
**Drummond Coal Company**
**Duquesne Light Company**
**Eastern Associated Coal Corp.**
    Affinity Mining Company
    Sterling Smokeless Coal Company
Emerald Mines Corporation
**Freeman United Coal Mining Company**
**G.M.&W. Coal Company**
**Gateway Coal Company**
**Harmar Coal Company**
**Hawley Coal Mining Corporation**
**Hawley Fuel Corporation**
    Kitchekan Fuel Corporation
    Peter White Coal Mining Corporation
**Helvetia Coal Company**
**Inland Steel Coal Company**
**Iselin Preparation Company**
**Island Creek Coal Company**
    Beatrice Pocahontas Company
    National Coal Mining Company
    Virginia Pocahontas Company
    V. P.-5 Mining Company
**Itmann Coal Company**
**Jim Walter Resources, Inc.**

167

Jones & Laughlin Steel Corporation
Kaiser Steel Corporation
Kanawha Coal Company
Keystone Coal Mining Corporation
Mathies Coal Company
Middle States Coal Company
Midland Coal Company
Monterey Coal Company
National Mines Corporation
Nemacolin Mines Corporation
The North American Coal Corporation
    Central Division
    Eastern Division
    The Florence Mining Company
    The Helen Mining Company
    The Nacco Mining Company
    Quarto Mining Company
North River Energy Corporation
Old Ben Coal Company
Olga Coal Company
Omar Mining Company
    M. & B. Coal Company
    Piney Creek Coal Company
    Raleigh Six Coal Company
    Robinson-Phillips Coal Company
      Simron Fuel Company
      Winston Coal Company
    Royalty Smokeless Coal Company
      Leslie Coal Company
      Trace Fork Coal Company
      Tug River Coal Company
    Russell Fork Coal Company
      Rebecca Coal Company
      Rita Coal Company
    T.C.H. Coal Company
    Virginia Crews Coal Company
Peabody Coal Company
Penn Pocahontas Coal Company
Pennsylvania Mines Corporation
Pikeville Coal Company
The Pittston Coal Group
    Amigo Smokeless Coal Company
    Badger Coal Company, Inc.
    Buffalo Mining Company
    Clinchfield Coal Company
    Eastern Coal Corporation
    Elkay Mining Company
    High Spur Coal Company
    Jewell Ridge Coal Corporation
    Kentland-Elkhorn Coal Corporation
    Ranger Fuel Corporation
    Sewell Coal Company
    The Snap Creek Coal Company
Reliable Coal Corporation
Republic Steel Corporation
Robert Coal Company
Saginaw Mining Company
Scotts Branch Company

Semet-Solvay Division, Allied Chemical
    Corporation
Slab Fork Coal Company
Southern Appalachian Coal Company
Southern Ohio Coal Company
Southwestern Illinois Coal Corporation
Sugarloaf Mining Company
United States Steel Corporation
Upshur Coals Corporation
The Valley Camp Coal Company
Valley Camp of Utah
W-P Coal Company
Westmoreland Coal Company
    Hampton Division
    Imperial Smokeless Division
    Stonega Division
    Winding Gulf Division
Windsor Power House Coal Company
The Youghiogheny & Ohio Coal Company
The Youngstown Mines Corporation
Central Pennsylvania Coal Operators' Associa-
    tion
    Apollo Corporation
    Armstrong Energy Services, Inc.
    Hiysota Fuel, Inc.
    J & D Mining Company
    Jandy Coal Company
    Mark Mining Company, Inc.
    Mark Mining Company No. 2, Inc.
    North Somerset Mining Company, Inc.
    Reitz Coal Company
Highlands Coal Association, Inc.
    B & D Coal Company
    Caroline Coal Co., Inc.
    Cole & White, Inc.
    Dotson Coal Company, Inc.
    Elm Coal Corporation
    Kentucky Central Coal Corporation
    L & M Coal Company, Inc.
    Lance Hall Coals, Inc.
    Michael Coal Company
    Rebel Coal Company, Inc.
    Rebel Coal Company II, Inc.
    Sando Services, Inc.
    Sherwood Coal Company, Inc.
    Thelma Coal Company, Inc.
    Wedgewood Coal Company, Inc.
    Western Coal Corporation
Northern West Virginia Coal Association
    King Knob Coal Company
    South Union Coal Company
Southern Coal Producers' Association
    Big Sandy-Elkhorn Coal Operators' Asso-
        ciation
        Kentucky Carbon Corporation
        Sovereign Coal Corporation

Kanawha Coal Operators' Association
   Alma Coal Corporation
   Capital Fuels, Inc.
   Carbon Fuel Company
   Coal Management, Inc.
   Eagle Coal & Dock Company
   Ellis Creek Coal Company
   F & F Mining Corporation
   Fletcher Mining Co., Inc.
   Hawks Nest Mining Company
   Hope Mining Company
   Imperial Colliery Company
   Kessler Coals, Inc.
   King Powellton Mining, Inc.
   Milburn Colliery Company
   Oglebay Norton Company (Ceredo
      Dock)
   Pratt Mining Company
   Princess Susan Coal Company
   Riverton Coal Company
   Transport, Inc.
   Zapata Coal Corporation
Logan Coal Operators' Association
   Allburn Coal Company
   Belva Coal Company
   Bonnie Coal Company
   Caroline Coal Company
   Crystal Alma Coal Corporation
   Crystalee Coal Company
   Energy Development Corporation
   Guyan Eagle Mining Company
   Max Ann Coal Company
   P. M. Charles Coal Company
   Pond Creek Mining Company
   Powellton Company
   Rocky Hollow Coal Company
   Royal Coal Company
   Smith Brothers Construction
   Sprouse Creek Coal Company
   Stevan Coal Company
   Sycamore Mining Company
   United Pocahontas Coal Co.
   Wedgewood Coal Company
Southern Virginias Coal Association
   Ashland Mining Corporation
   Clintwood Mining Corporation
   Harman Mining Corporation
Individual Members
   Eagle Mining Industries, Inc.
   Majestic Mining, Inc.
   The New River Company
   Union Carbide Corporation
      (Ferroalloys Division)
Western Pennsylvania Coal Operators'
   Association
   Aloe Coal Company
   Bologna Coal Company
   Bren-Mar Minerals

170

Canterbury Coal Company
Carpentertown Coal & Coke Company
Crescent Hills Coal Company, Inc.
Dunkard Creek Coal Company
Eola Coal Corporation
Hawk Contracting, Inc.
King Knob Coal Company
Leechburg Mining Company
Luzerne Coal Corporation
Maysville Coal Company
Midway Coal Company
Penn Allegh Coal Company, Inc.
South Union Coal Company, Inc.
Tremont Mining Company

# EXHIBIT B



**NATIONAL BITUMINOUS COAL
WAGE AGREEMENT OF 2002**

**TABLE OF CONTENTS**

Page

**Article I - ENABLING CLAUSE** . . . . . . . . . . . . .   1


**Article IA - SCOPE AND COVERAGE** . . . . . . .   3
Section (a)      Work Jurisdiction . . . . . . . . . . . . .   3
Section (b)      Exemptions Clause . . . . . . . . . . .   4
Section (c)      Supervisors Shall Not Perform
                 Classified Work . . . . . . . . . . . . .   5
Section (d)      Management of the Mines . . . . . .   5
Section (e)      Union's Rights . . . . . . . . . . . . . .   5
Section (f)      Application of This Contract to
                 the Employer's Coal Lands . . . . .   6
Section (g)      Contracting and Subcontracting . .   6
Section (h)      Leasing, Subleasing and
                 Licensing Out of Coal Lands . . .   8
Section (i)      Construction Work . . . . . . . . . . .   8


**Article II - JOB OPPORTUNITY AND BENEFIT
       SECURITY (JOBS)** . . . . . . . . . . . . . . . . . . . . . .   9
A       Non-Signatory Operations of the
        Signatory Employer . . . . . . . . . . . . . . . . . .  10
B       Lessee-Licensee . . . . . . . . . . . . . . . . . . . . .  13
C       Coordination of Employment Obligations
        Under the JOBS Program . . . . . . . . . . . . . .  17
D-1     Employer-Wide Panel Rights to
        Signatory Operations . . . . . . . . . . . . . . . . .  18
D-2     Exhaustion of Employer Panel . . . . . . . . . . .  18
D-3     Monitoring of Job Selections . . . . . . . . . . . .  18
E       UMWA-BCOA Training and Education
        Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
F       Skills Training . . . . . . . . . . . . . . . . . . . . . . .  24
G       UMWA-BCOA Labor Management
        Positive Change Process ("LMPCP") . . . . .  26
H       UMWA-BCOA Labor Management
        Policy Committee . . . . . . . . . . . . . . . . . . . .  36
I       UMWA-BCOA Resolution of Disputes Trust .  38

i

*Contents*

Page

### Article III - HEALTH AND SAFETY ........ 38
Section (a)  Right to a Safe Working Place ... 38
Section (b)  Federal Mine Safety and Health
             Act of 1977, as Amended ..... 39
Section (c)  Joint Industry Health and
             Safety Committee ........... 39
Section (d)  Mine Health and Safety
             Committee .................. 40
Section (e)  Access to the Mine ........... 43
Section (f)  Reports ..................... 44
Section (g)  Safety Rules and Regulations ... 45
Section (h)  Cooperation in Development of
             Mining Plans ............... 46
Section (i)  Preservation of Individual
             Safety Rights .............. 46
Section (j)  Physical Examination ........ 50
Section (k)  Minimum Age ................. 51
Section (l)  Workers' Compensation and
             Occupational Disease ....... 51
Section (m)  Safety Equipment and Protective
             Clothing Allowance ......... 51
Section (n)  Maintenance ................. 52
Section (o)  Special Safety Problem Areas .... 53
Section (p)  Settlement of Health or Safety
             Disputes ................... 55

### Article IV - WAGES AND HOURS Traditional
Schedules ............................. 56
Section (a)  Basic Work Week ............. 56
Section (b)  Basic Work Day .............. 57
Section (c)  Alternate Work Schedules .... 58
Section (d)  Lampman ..................... 59
Section (e)  Saturday, Sunday and Premium
             Work ....................... 59
Section (f)  Standard Daily Wage Rate .... 62

ii

*Contents*
Page

### Article V - HELPERS ON FACE EQUIPMENT IN
UNDERGROUND MINES ................. 64
Section (a)  Assignment of Helpers ....... 64
Section (b)  Duties and Responsibilities
             of Helpers ................. 65
Section (c)  Exemption ................... 66

### Article VI - SHIFTS AND SHIFT
DIFFERENTIALS ....................... 66
Section (a)  Multiple Shifts ............. 66
Section (b)  Hoisting of Coal ............ 67
Section (c)  Shift Differentials ......... 67
Section (d)  Working into the Next Shift .. 67
Section (e)  Call-back ................... 68
Section (f)  Shift Rotation .............. 68

### Article VII - MINE COMMUNICATION
COMMITTEES .......................... 68

### Article VIII - STARTING TIME .......... 69
Section (a)  Shift Starting Time ......... 69
Section (b)  Lowering Employees .......... 70
Section (c)  Safety and Maintenance ...... 70
Section (d)  Surface Facilities .......... 70
Section (e)  Changing Crews at the Face ... 70

### Article IX - ALLOWANCES ............... 71
Section (a)  Bereavement Pay ............. 71
Section (b)  Jury Duty ................... 71
Section (c)  Reporting Pay ............... 71
Section (d)  Military Duty ............... 72
Section (e)  Personal or Sick Leave ...... 72
Section (f)  Family and Medical Leave .... 75

iii

*Contents*

| | | Page |
|---|---|---|
| **Article X - WAGE INCREASE** . . . . . . . . . . . . . . . | | 78 |
| | | |
| **Article XI - SICKNESS AND ACCIDENT** | | |
| **BENEFITS** . . . . . . . . . . . . . . . . . . . . . . | | 79 |
| Section (a) | General Purpose . . . . . . . . . . . . | 79 |
| Section (b) | Eligibility . . . . . . . . . . . . . . . . | 79 |
| Section (c) | Commencement and Duration of | |
| | Benefits . . . . . . . . . . . . . . . . | 81 |
| Section (d) | Amount and Payment of Benefits . | 83 |
| Section (e) | Filing of Claims for Benefits . . . . . | 84 |
| Section (f) | Structure and Administration . . . . | 84 |
| | | |
| **Article XII - HOLIDAYS** . . . . . . . . . . . . . . . . | | 87 |
| Section (a) | Holidays Observed . . . . . . . . . . | 87 |
| Section (b) | Sunday Holidays . . . . . . . . . . . . | 89 |
| Section (c) | Monday Holidays . . . . . . . . . . . . | 89 |
| Section (d) | Pay for Holidays Worked . . . . . . . . | 90 |
| Section (e) | Pay for Holidays Not Worked . . . . | 90 |
| Section (f) | Holidays During Vacation Period . | 90 |
| Section (g) | Birthday Holidays . . . . . . . . . . . . | 90 |
| Section (h) | Holidays for Sick and Injured . . . . | 91 |
| Section (i) | Time of Payment . . . . . . . . . . . . | 91 |
| | | |
| **Article XIII - REGULAR VACATION** . . . . . . . . . . | | 92 |
| Section (a) | Annual Vacation . . . . . . . . . . . . | 92 |
| Section (b) | Dates of Regular Vacation Period . | 92 |
| Section (c) | Staggered Regular Vacation . . . . . | 93 |
| Section (d) | Qualifying Period and Amount of | |
| | Payment . . . . . . . . . . . . . . . . | 94 |
| Section (e) | Floating Vacation Days . . . . . . . . | 96 |
| Section (f) | Time of Payment . . . . . . . . . . . . | 99 |
| Section (g) | Obligation for Payment . . . . . . . . | 99 |
| Section (h) | Work During Shutdown . . . . . . . . | 100 |

iv

*Contents*

| | | Page |
|---|---|---|
| **Article XIV - GRADUATED VACATION** . . . . . . . | | 100 |
| Section (a) | General . . . . . . . . . . . . . . . . . . | 100 |
| Section (b) | Definition of Additional Days . . . . | 101 |
| Section (c) | Definition of Continuous | |
| | Employment . . . . . . . . . . . . . . | 101 |
| Section (d) | Amount of Continuous | |
| | Employment . . . . . . . . . . . . . . | 102 |
| Section (e) | Time of Payment . . . . . . . . . . . . | 103 |
| Section (f) | Rate of Payment . . . . . . . . . . . . | 103 |
| Section (g) | Scheduling and Pay in Lieu . . . . | 103 |
| Section (h) | Sick and Injured Employees . . . . | 104 |
| | | |
| **Article XV - CHECKOFF** . . . . . . . . . . . . . . . | | 104 |
| | | |
| **Article XVI - TRAINING** . . . . . . . . . . . . . . . | | 105 |
| Section (a) | Priority . . . . . . . . . . . . . . . . . . | 105 |
| Section (b) | Orientation for New Employees . . | 106 |
| Section (c) | General Retraining Programs . . . . | 110 |
| Section (d) | Safety Training for Specific Job . . . | 113 |
| Section (e) | Maintenance Training and | |
| | Rate of Pay . . . . . . . . . . . . . . . | 113 |
| Section (f) | New Inexperienced Employees at | |
| | Underground Mines . . . . . . . . . | 115 |
| Section (g) | General Training Provisions . . . . . | 115 |
| Section (h) | Skills Enhancement . . . . . . . . . . . | 116 |
| | | |
| **Article XVII - SENIORITY** . . . . . . . . . . . . . . . | | 117 |
| Section (a) | Definition of Seniority . . . . . . . . . | 117 |
| Section (b) | Reduction; Realignment . . . . . . . . | 117 |
| Section (c) | Layoff Procedure . . . . . . . . . . . . | 121 |
| Section (d) | Panels . . . . . . . . . . . . . . . . . . | 122 |
| Section (e) | Panel Custodians . . . . . . . . . . . . | 122 |
| Section (f) | Panel Members Accrue Seniority . | 123 |
| Section (g) | Right to be Recalled . . . . . . . . . | 124 |
| Section (h) | Recall of Persons on Layoff Status | 124 |

v

*Contents*

*Contents*

|  |  | Page |
|---|---|---|
| Section (i) | Job Bidding | 126 |
| Section (j) | Training for Vacancy Not Filled by Bidding | 130 |
| Section (k) | Transfer to Other Mines of Employer | 131 |
| Section (l) | Leave of Absence | 133 |
| Section (m) | Permanent and Temporary Supervisors | 133 |
| Section (n) | Shift Preference | 134 |

**Article XVIII - TONNAGE RATES AND HAND LOADING** 134

| Section (a) | Tonnage Rates | 134 |
|---|---|---|
| Section (b) | Checkweighman | 134 |
| Section (c) | Preparation and Cleaning of Coal | 136 |
| Section (d) | Delivery of Cars | 137 |
| Section (e) | Explosives | 137 |
| Section (f) | Bottom Coal | 137 |
| Section (g) | Cutting Coal | 138 |
| Section (h) | Blacksmithing | 138 |
| Section (i) | Rockdusting | 138 |
| Section (j) | Day Men Transferred | 138 |

**Article XIX - CLASSIFICATION** 138

| Section (a) | Working in Classification | 138 |
|---|---|---|
| Section (b) | Classification Requirement | 138 |
| Section (c) | Temporary Assignments | 139 |
| Section (d) | Protection Against Discrimination | 139 |
| Section (e) | Compensation for Temporary Assignments | 139 |

**Article XX - HEALTH AND RETIREMENT BENEFITS** 140

| Section (a) | General Purpose | 140 |
|---|---|---|
| Section (b) | 1950 Pension Plan and Trust | 142 |

vi

|  |  | Page |
|---|---|---|
| Section (c) | 1974 Pension Plan and Trust, 1993 Benefit Plan and Trust, and Employer Benefit Plans | 143 |
| Section (d) | Contributions by Employers | 148 |
| Section (e) | Responsibilities and Duties of Trustees | 157 |
| Section (f) | Audits, Reports and Notices | 159 |
| Section (g) | Administration of Trusts | 161 |
| Section (h) | Guarantee of 1950 and 1974 Plans and Trusts | 163 |

**GENERAL DESCRIPTION OF THE HEALTH AND RETIREMENT BENEFITS** 164

| (1) | Pensions for Miners Retired Under the 1950 Pension Plan | 168 |
|---|---|---|
| (1A) | 1950 Widows' Pension | 171 |
| (2) | Pensions for Miners Who Retired Under the 1974 Pension Plan Prior to the Effective Date | 172 |
| (3) | Pensions for Miners Who Retire on or after the Effective Date | 175 |
| (4) | Signatory Service | 178 |
| (5) | Pensions for Disabled Miners | 180 |
| (6) | Pensions for Surviving Spouses | 181 |
| (6A) | Pre-retirement Survivor's Pension | 184 |
| (7) | Deferred Vested or Special Pensions | 185 |
| (7A) | Pension Bonuses | 191 |
| (8) | Life and Accidental Death and Dismemberment Benefits | 192 |
| (9) | Pensioner's Death Benefits | 193 |
| (10) | Health Care | 195 |
| (11) | Vision Care | 208 |
| (12) | Health Care Cost Containment | 208 |
| (13) | National Health Care | 210 |

vii

Contents

|  |  | Page |
|---|---|---|
| **Article XXA - DENTAL PLAN** |  | 210 |
| Section I | Definitions | 211 |
| Section II | Eligibility | 212 |
| Section III | Benefits | 214 |
| Section IV | Termination of Coverage | 229 |
| Section V | Schedule of Benefits | 230 |

| **Article XXB - UMWA CASH DEFERRED SAVINGS PLAN OF 1988** |  | 246 |
|---|---|---|
| Section (a) | General Purpose | 246 |
| Section (b) | Trust | 246 |
| Section (c) | Plan | 247 |
| Section (d) | Funding | 247 |
| Section (e) | Administration | 248 |
| Section (f) | Investments | 250 |
| Section (g) | Plan and Trust Provisions | 251 |

| **Article XXI - SURFACE MINES** |  | 252 |
|---|---|---|
| Section (a) | Parking Areas | 252 |
| Section (b) | Manning of Surface Mining Equipment | 253 |
| Section (c) | Eating Place | 255 |
| Section (d) | Cabs | 255 |
| Section (e) | Special Health and Safety Problems in Surface Mines | 255 |
| Section (f) | Toilets | 257 |
| Section (g) | Swing Shift | 257 |
| Section (h) | Leasing of Employees' Vehicles | 258 |
| Section (i) | Production and Processing of Coal at Surface Mines | 258 |

| **Article XXII - MISCELLANEOUS** |  | 259 |
|---|---|---|
| Section (a) | Bathhouse | 259 |
| Section (b) | Access Roads | 259 |
| Section (c) | Parking Facilities | 260 |

viii

Contents

|  |  | Page |
|---|---|---|
| Section (d) | Bulletin Boards | 260 |
| Section (e) | Coke and Cleaning Plants | 260 |
| Section (f) | Compulsory Retirement | 260 |
| Section (g) | House Coal | 260 |
| Section (h) | House Rent | 261 |
| Section (i) | Attendance Control | 261 |
| Section (j) | Memorial Periods | 264 |
| Section (k) | Closing Following Fatal Accident | 264 |
| Section (l) | New Machinery | 265 |
| Section (m) | Pay Day | 266 |
| Section (n) | Lunches | 266 |
| Section (o) | Portals | 266 |
| Section (p) | Tools | 267 |
| Section (q) | Tramming | 267 |
| Section (r) | Local Union Meeting Place | 267 |
| Section (s) | Bonus Plans | 267 |

| **Article XXIII - SETTLEMENT OF DISPUTES** |  | 269 |
|---|---|---|
| Section (a) | Mine Committee | 269 |
| Section (b) | District Arbitrators | 271 |
| Section (c) | Grievance Procedure | 273 |
| Section (d) | Ten Day Limitation | 276 |
| Section (e) | Earnest Effort to Resolve Disputes | 276 |
| Section (f) | Employee's Right to Presence of Member of Mine Committee | 277 |
| Section (g) | Right of Grievant to be Present | 277 |
| Section (h) | Finality of Decision or Settlement | 277 |
| Section (i) | Exclusion of Legal Counsel | 278 |
| Section (j) | Waiver of Time Limits | 278 |
| Section (k) | Prior Agreement | 278 |

| **Article XXIV - DISCHARGE PROCEDURE** |  | 279 |
|---|---|---|
| Section (a) | Just Cause Required | 279 |
| Section (b) | Procedure | 279 |
| Section (c) | Suspension | 280 |

ix

*Contents*

|  |  | Page |
|---|---|---|
| Section (d) | Immediate Arbitration | 280 |
| Section (e) | Regular Arbitration | 281 |
| Section (f) | Compensation for Lost Earnings | 281 |

**Article XXV - DISCRIMINATION PROHIBITED** 281

**Article XXVI - DISTRICT AGREEMENTS** 282
| Section (a) | New Districts | 282 |
| Section (b) | Prior Practice and Custom | 282 |
| Section (c) | Protective Wage Clause | 283 |
| Section (d) | Approval of District Agreements | 283 |

**Article XXVII - MAINTAIN INTEGRITY OF CONTRACT AND RESORT TO COURTS** 283

**Article XXVIII - SEVERABILITY CLAUSE** 284
| Section (a) | General Rule | 284 |
| Section (b) | Exception | 284 |

**Article XXIX - RATIFICATION AND TERMINATION OF THIS AGREEMENT** 285

**Letter Regarding Mediation** 287

**Letter Regarding Special Permanent Layoff Pension** 288

**Memorandum of Understanding Regarding Job Opportunities** 289
Appendix B - Request for Employment 300
Bituminous Coal Operators' Association, Inc.
Companies for Which BCOA was Authorized to Represent for the Negotiation of this Agreement 302

x

*Contents*

|  | Page |
|---|---|
| **Pension Tables** | 303 |

**Appendix A - Part I**
Wage Rates Underground at Deep Mines 310

**Appendix A - Part II**
Wage Rates at Strip and Auger Mines 312

**Appendix A - Part III**
Wage Rates at Preparation Plants and Other Surface Facilities for Deep or Surface Mines 314

**Appendix B - Part I**
Job Classifications Underground at Deep Mines 316

**Appendix B - Part II**
Job Classifications at Strip and Auger Mines 323

**Appendix B - Part III**
Job Classifications at Preparation Plants and Other Surface Facilities for Deep or Surface Mines 328

**Appendix C**
Alternative Schedules 336

**Index** 353

xi

**BITUMINOUS COAL OPERATORS'
ASSOCIATION, INC.
COMPANIES FOR WHICH BCOA WAS
AUTHORIZED TO REPRESENT FOR THE
NEGOTIATION OF THIS AGREEMENT**

Affinity Mining Company
Apogee Coal Company
Central Ohio Coal Company
Colony Bay Coal Company
Consolidation Coal Company
Eastern Associated Coal Corp.
Eighty-Four Mining Company
Helvetia Coal Company
Hobet Mining, Inc.
Island Creek Coal Company
Kent Coal Company
Keystone Coal Mining Corporation
Laurel Run Mining Company
Martinka Coal Company
McElroy Coal Company
Mountain View Coal Company
Peabody Coal Company
Pine Ridge Coal Company
Quarto Mining Company
Southern Ohio Coal Company
Squaw Creek Coal Company
Sterling Smokeless Coal Company
Windsor Coal Company

# EXHIBIT C

**FILE COPY**

**UMWA HEALTH AND RETIREMENT FUNDS**
2121 K Street, NW, Washington, DC 20037  -   (202) 521-2200

January 25, 2001

Mr. John Woodrum
Heenan, Althen & Roles
Suite 400
1110 Vermont Avenue, N.W.
Washington, D.C. 20005-3593

Dear Mr. Woodrum:

I am writing to inform you that the Actuarial Valuation reports for the UMWA 1950 and
1974 Pension Plans ("the Plans") as of July 1, 2000, show that the Plans do not currently
have any Unfunded Vested Benefits.  Therefore, any employer that withdraws from the
Plans during July 1, 2000 through June 30, 2001 will not incur withdrawal liability.

If you have any questions regarding this matter, please contact me at the above address
or on 202-521-2288.

Sincerely,

Carl F. Tennille
Comptroller

CFT/zgb

# EXHIBIT D



**NATIONAL BITUMINOUS COAL
WAGE AGREEMENT OF 2007**

## TABLE OF CONTENTS

Page

**Article I - ENABLING CLAUSE** . . . . . . . . . . . . .   1


**Article IA - SCOPE AND COVERAGE** . . . . . . .   3
Section (a)     Work Jurisdiction . . . . . . . . . . . . .   3
Section (b)     Exemptions Clause . . . . . . . . . . . .   4
Section (c)     Supervisors Shall Not Perform
                Classified Work . . . . . . . . . . . .   5
Section (d)     Management of the Mines . . . . . . .   5
Section (e)     Union's Rights . . . . . . . . . . . . . . .   5
Section (f)     Application of This Contract to
                the Employer's Coal Lands . . . . .   6
Section (g)     Contracting and Subcontracting . . .   6
Section (h)     Leasing, Subleasing and
                Licensing Out of Coal Lands . . . .   8
Section (i)     Construction Work . . . . . . . . . . . .   8


**Article II - JOB OPPORTUNITY AND BENEFIT**
**SECURITY (JOBS)** . . . . . . . . . . . . . . . . . . . . . . .   9
A       Non-Signatory Operations of the
        Signatory Employer . . . . . . . . . . . . . . . . . . .  10
B       Lessee-Licensee . . . . . . . . . . . . . . . . . . . . . .  13
C       Coordination of Employment Obligations
        Under the JOBS Program . . . . . . . . . . . . . .  17
D-1     Employer-Wide Panel Rights to
        Signatory Operations . . . . . . . . . . . . . . . .  18
D-2     Exhaustion of Employer Panel . . . . . . . . . . .  18
D-3     Monitoring of Job Selections . . . . . . . . . . . .  18
E       UMWA-BCOA Training and Education
        Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21
F       Skills Training . . . . . . . . . . . . . . . . . . . . . . .  24
G       UMWA-BCOA Labor Management
        Positive Change Process ("LMPCP") . . . . .  26
H       UMWA-BCOA Labor Management
        Policy Committee . . . . . . . . . . . . . . . . . . . .  36
I       UMWA-BCOA Resolution of Disputes Trust .  38

i

*Contents*                                    Page

**Article III - HEALTH AND SAFETY** . . . . . . . . . . 38
  Section (a)      Right to a Safe Working Place . . . .   38
  Section (b)      Federal Mine Safety and Health
                   Act of 1977, as Amended . . . . . . .   39
  Section (c)      Joint Industry Health and
                   Safety Committee . . . . . . . . . . . .   39
  Section (d)      Mine Health and Safety
                   Committee  . . . . . . . . . . . . . . . .   40
  Section (e)      Access to the Mine  . . . . . . . . . .   43
  Section (f)      Reports . . . . . . . . . . . . . . . . . .   44
  Section (g)      Safety Rules and Regulations . . . . .   45
  Section (h)      Cooperation in Development of
                   Mining Plans . . . . . . . . . . . .   46
  Section (i)      Preservation of Individual
                   Safety Rights . . . . . . . . . . . .   46
  Section (j)      Physical Examination . . . . . . . . .   50
  Section (k)      Minimum Age  . . . . . . . . . . . . .   51
  Section (l)      Workers' Compensation and
                   Occupational Disease . . . . . . . . .   51
  Section (m)      Safety Equipment and Protective
                   Clothing Allowance . . . . . . . . . .   51
  Section (n)      Maintenance . . . . . . . . . . . . . .   52
  Section (o)      Special Safety Problem Areas  . . . .   53
  Section (p)      Settlement of Health or Safety
                   Disputes . . . . . . . . . . . . . . . . .   55

**Article IV - WAGES AND HOURS Traditional
  Schedules** . . . . . . . . . . . . . . . . . . . . . . .   56
  Section (a)      Basic Work Week . . . . . . . . . . . .   56
  Section (b)      Basic Work Day  . . . . . . . . . . . .   57
  Section (c)      Alternate Work Schedules . . . . . . .   58
  Section (d)      Lampman  . . . . . . . . . . . . . . . .   59
  Section (e)      Saturday, Sunday and Premium
                   Work . . . . . . . . . . . . . . . . . . .   59
  Section (f)      Standard Daily Wage Rate . . . . . . .   62

ii

*Contents*
Page

**Article V - HELPERS ON FACE EQUIPMENT IN
  UNDERGROUND MINES** . . . . . . . . . . . . . . . .   64
  Section (a)      Assignment of Helpers . . . . . . . . .   64
  Section (b)      Duties and Responsibilities
                   of Helpers . . . . . . . . . . . . . . .   65
  Section (c)      Exemption  . . . . . . . . . . . . . . .   66

**Article VI - SHIFTS AND SHIFT
  DIFFERENTIALS** . . . . . . . . . . . . . . . . . . . . .   66
  Section (a)      Multiple Shifts . . . . . . . . . . . . .   66
  Section (b)      Hoisting of Coal  . . . . . . . . . . . .   67
  Section (c)      Shift Differentials . . . . . . . . . . .   67
  Section (d)      Working into the Next Shift  . . . . .   67
  Section (e)      Call-back  . . . . . . . . . . . . . . . .   68
  Section (f)      Shift Rotation  . . . . . . . . . . . . .   68

**Article VII - MINE COMMUNICATION
  COMMITTEES** . . . . . . . . . . . . . . . . . . . . . .   68

**Article VIII - STARTING TIME** . . . . . . . . . . .   69
  Section (a)      Shift Starting Time  . . . . . . . . . .   69
  Section (b)      Lowering Employees  . . . . . . . . . .   70
  Section (c)      Safety and Maintenance . . . . . . . .   70
  Section (d)      Surface Facilities  . . . . . . . . . . .   70
  Section (e)      Changing Crews at the Face . . . . . .   70

**Article IX - ALLOWANCES** . . . . . . . . . . . . . .   71
  Section (a)      Bereavement Pay  . . . . . . . . . . . .   71
  Section (b)      Jury Duty . . . . . . . . . . . . . . . .   71
  Section (c)      Reporting Pay  . . . . . . . . . . . . .   71
  Section (d)      Military Duty  . . . . . . . . . . . . .   72
  Section (e)      Personal or Sick Leave  . . . . . . . .   72
  Section (f)      Family and Medical Leave . . . . . . .   75

iii

*Contents*

|  |  | Page |
|---|---|---|
| **Article X - WAGE INCREASE** | | 78 |
| **Article XI - SICKNESS AND ACCIDENT BENEFITS** | | 79 |
| Section (a) | General Purpose | 79 |
| Section (b) | Eligibility | 79 |
| Section (c) | Commencement and Duration of Benefits | 81 |
| Section (d) | Amount and Payment of Benefits | 83 |
| Section (e) | Filing of Claims for Benefits | 84 |
| Section (f) | Structure and Administration | 84 |
| **Article XII - HOLIDAYS** | | 87 |
| Section (a) | Holidays Observed | 87 |
| Section (b) | Sunday Holidays | 89 |
| Section (c) | Monday Holidays | 89 |
| Section (d) | Pay for Holidays Worked | 90 |
| Section (e) | Pay for Holidays Not Worked | 90 |
| Section (f) | Holidays During Vacation Period | 90 |
| Section (g) | Birthday Holidays | 90 |
| Section (h) | Holidays for Sick and Injured | 91 |
| Section (i) | Time of Payment | 91 |
| **Article XIII - REGULAR VACATION** | | 92 |
| Section (a) | Annual Vacation | 92 |
| Section (b) | Dates of Regular Vacation Period | 92 |
| Section (c) | Staggered Regular Vacation | 93 |
| Section (d) | Qualifying Period and Amount of Payment | 94 |
| Section (e) | Floating Vacation Days | 96 |
| Section (f) | Time of Payment | 99 |
| Section (g) | Obligation for Payment | 99 |
| Section (h) | Work During Shutdown | 100 |

iv

*Contents*

|  |  | Page |
|---|---|---|
| **Article XIV - GRADUATED VACATION** | | 100 |
| Section (a) | General | 100 |
| Section (b) | Definition of Additional Days | 101 |
| Section (c) | Definition of Continuous Employment | 101 |
| Section (d) | Amount of Continuous Employment | 102 |
| Section (e) | Time of Payment | 103 |
| Section (f) | Rate of Payment | 103 |
| Section (g) | Scheduling and Pay in Lieu | 103 |
| Section (h) | Sick and Injured Employees | 103 |
| Section (i) | Conversion of Graduated Vacation Day | 104 |
| **Article XV - CHECKOFF** | | 104 |
| **Article XVI - TRAINING** | | 105 |
| Section (a) | Priority | 105 |
| Section (b) | Orientation for New Employees | 106 |
| Section (c) | General Retraining Programs | 110 |
| Section (d) | Safety Training for Specific Job | 113 |
| Section (e) | Maintenance Training and Rate of Pay | 113 |
| Section (f) | New Inexperienced Employees at Underground Mines | 115 |
| Section (g) | General Training Provisions | 115 |
| Section (h) | Skills Enhancement | 116 |
| **Article XVII - SENIORITY** | | 117 |
| Section (a) | Definition of Seniority | 117 |
| Section (b) | Reduction; Realignment | 117 |
| Section (c) | Layoff Procedure | 121 |
| Section (d) | Panels | 122 |
| Section (e) | Panel Custodians | 122 |
| Section (f) | Panel Members Accrue Seniority | 123 |
| Section (g) | Right to be Recalled | 124 |

v

Contents

| | | Page |
|---|---|---|
| Section (h) | Recall of Persons on Layoff Status | 124 |
| Section (i) | Job Bidding | 126 |
| Section (j) | Training for Vacancy Not Filled by Bidding | 130 |
| Section (k) | Transfer to Other Mines of Employer | 131 |
| Section (l) | Leave of Absence | 133 |
| Section (m) | Permanent and Temporary Supervisors | 133 |
| Section (n) | Shift Preference | 134 |

**Article XVIII - TONNAGE RATES AND HAND LOADING** ............... 134

| | | |
|---|---|---|
| Section (a) | Tonnage Rates | 134 |
| Section (b) | Checkweighman | 134 |
| Section (c) | Preparation and Cleaning of Coal | 136 |
| Section (d) | Delivery of Cars | 137 |
| Section (e) | Explosives | 137 |
| Section (f) | Bottom Coal | 137 |
| Section (g) | Cutting Coal | 138 |
| Section (h) | Blacksmithing | 138 |
| Section (i) | Rockdusting | 138 |
| Section (j) | Day Men Transferred | 138 |

**Article XIX - CLASSIFICATION** ............... 138

| | | |
|---|---|---|
| Section (a) | Working in Classification | 138 |
| Section (b) | Classification Requirement | 138 |
| Section (c) | Temporary Assignments | 139 |
| Section (d) | Protection Against Discrimination | 139 |
| Section (e) | Compensation for Temporary Assignments | 139 |

**Article XX - HEALTH AND RETIREMENT BENEFITS** ............... 140

| | | |
|---|---|---|
| Section (a) | General Purpose | 140 |

vi

Contents

| | | Page |
|---|---|---|
| Section (b) | 1950 Pension Plan and Trust | 142 |
| Section (c) | 1974 Pension Plan and Trust, 1993 Benefit Plan and Trust, and Employer Benefit Plans | 143 |
| Section (d) | Contributions by Employers | 148 |
| Section (e) | Responsibilities and Duties of Trustees | 156 |
| Section (f) | Audits, Reports and Notices | 158 |
| Section (g) | Administration of Trusts | 160 |
| Section (h) | Guarantee of 1950 and 1974 Plans and Trusts | 162 |

**GENERAL DESCRIPTION OF THE HEALTH AND RETIREMENT BENEFITS** ............... 163

| | | |
|---|---|---|
| (1) | Pensions for Miners Retired Under the 1950 Pension Plan | 165 |
| (1A) | 1950 Widows' Pension | 168 |
| (2) | Pensions for Miners Who Retired Under the 1974 Pension Plan Prior to the Effective Date | 169 |
| (3) | Pensions for Miners Who Retire on or after the Effective Date | 173 |
| (4) | Signatory Service | 176 |
| (5) | Pensions for Disabled Miners | 178 |
| (6) | Pensions for Surviving Spouses | 179 |
| (6A) | Pre-retirement Survivor's Pension | 182 |
| (7) | Deferred Vested or Special Pensions | 183 |
| (7A) | Pension Bonuses | 189 |
| (8) | Life and Accidental Death and Dismemberment Benefits | 189 |
| (9) | Pensioner's Death Benefits | 191 |
| (10) | Health Care | 193 |
| (11) | Vision Care | 207 |
| (12) | Health Care Cost Containment | 207 |
| (13) | National Health Care | 208 |

vii

*Contents*

**Article XXA - DENTAL PLAN** . . . . . . . . . . . . . 209
  Section I    Definitions . . . . . . . . . . . . . . . . . . . 210
  Section II   Eligibility . . . . . . . . . . . . . . . . . . . 211
  Section III  Benefits . . . . . . . . . . . . . . . . . . . 212
  Section IV  Termination of Coverage . . . . 228
  Section V   Schedule of Benefits . . . . . . . . . . 229

**Article XXB - UMWA CASH DEFERRED SAVINGS
PLAN OF 1988** . . . . . . . . . . . . . . . . . . . . . . 244
  Section (a)  General Purpose . . . . . . . . . . . . . 244
  Section (b)  Trust . . . . . . . . . . . . . . . . . . . . . 245
  Section (c)  Plan . . . . . . . . . . . . . . . . . . . . . . 245
  Section (d)  Funding . . . . . . . . . . . . . . . . . . . 246
  Section (e)  Administration . . . . . . . . . . . . . . 249
  Section (f)  Investments . . . . . . . . . . . . . . . . 250
  Section (g)  Plan and Trust Provisions . . . . . . 250

**Article XXI - SURFACE MINES** . . . . . . . . . . . . 250
  Section (a)  Parking Areas . . . . . . . . . . . . . . . 250
  Section (b)  Manning of Surface Mining
             Equipment . . . . . . . . . . . . . . . . . 251
  Section (c)  Eating Place . . . . . . . . . . . . . . . . 253
  Section (d)  Cabs . . . . . . . . . . . . . . . . . . . . . 254
  Section (e)  Special Health and Safety Problems
             in Surface Mines . . . . . . . . . . . . 254
  Section (f)  Toilets . . . . . . . . . . . . . . . . . . . . 256
  Section (g)  Swing Shift . . . . . . . . . . . . . . . . . 256
  Section (h)  Leasing of Employees' Vehicles . 257
  Section (i)  Production and Processing of Coal
             at Surface Mines . . . . . . . . . . . 257

**Article XXII - MISCELLANEOUS** . . . . . . . . . . . . 258
  Section (a)  Bathhouse . . . . . . . . . . . . . . . . . 258
  Section (b)  Access Roads . . . . . . . . . . . . . . . 258
  Section (c)  Parking Facilities . . . . . . . . . . . . 259

viii

*Contents*

  Section (d)  Bulletin Boards . . . . . . . . . . . . . . 259
  Section (e)  Coke and Cleaning Plants . . . . . . 259
  Section (f)  Compulsory Retirement . . . . . . . . 259
  Section (g)  House Coal . . . . . . . . . . . . . . . . . 259
  Section (h)  House Rent . . . . . . . . . . . . . . . . . 260
  Section (i)  Attendance Control . . . . . . . . . . . 260
  Section (j)  Memorial Periods . . . . . . . . . . . . 263
  Section (k)  Closing Following Fatal Accident 263
  Section (l)  New Machinery . . . . . . . . . . . . . . 264
  Section (m)  Pay Day . . . . . . . . . . . . . . . . . . . 265
  Section (n)  Lunches . . . . . . . . . . . . . . . . . . . 265
  Section (o)  Portals . . . . . . . . . . . . . . . . . . . . 266
  Section (p)  Tools . . . . . . . . . . . . . . . . . . . . . 266
  Section (q)  Tramming . . . . . . . . . . . . . . . . . 266
  Section (r)  Local Union Meeting Place . . . . . 266
  Section (s)  Bonus Plans . . . . . . . . . . . . . . . . 267

**Article XXIII - SETTLEMENT OF DISPUTES** . . 269
  Section (a)  Mine Committee . . . . . . . . . . . . . 269
  Section (b)  District Arbitrators . . . . . . . . . . . 270
  Section (c)  Grievance Procedure . . . . . . . . . . 272
  Section (d)  Ten Day Limitation . . . . . . . . . . . 276
  Section (e)  Earnest Effort to Resolve Disputes 276
  Section (f)  Employee's Right to Presence of
             Member of Mine Committee . . . 276
  Section (g)  Right of Grievant to be Present . . . 277
  Section (h)  Finality of Decision or Settlement 277
  Section (i)  Exclusion of Legal Counsel . . . . . 277
  Section (j)  Waiver of Time Limits . . . . . . . . . 277
  Section (k)  Prior Agreement . . . . . . . . . . . . . 278

**Article XXIV - DISCHARGE PROCEDURE** . . . . 278
  Section (a)  Just Cause Required . . . . . . . . . . . 278
  Section (b)  Procedure . . . . . . . . . . . . . . . . . . 279
  Section (c)  Suspension . . . . . . . . . . . . . . . . . 279

ix

Contents

| | | Page |
|---|---|---|
| Section (d) | Immediate Arbitration | 280 |
| Section (e) | Regular Arbitration | 280 |
| Section (f) | Compensation for Lost Earnings | 281 |

**Article XXV - DISCRIMINATION PROHIBITED** 281

**Article XXVI - DISTRICT AGREEMENTS** 281
| Section (a) | New Districts | 281 |
|---|---|---|
| Section (b) | Prior Practice and Custom | 282 |
| Section (c) | Protective Wage Clause | 283 |
| Section (d) | Approval of District Agreements | 283 |

**Article XXVII - MAINTAIN INTEGRITY OF CONTRACT AND RESORT TO COURTS** 283

**Article XXVIII - SEVERABILITY CLAUSE** 284
| Section (a) | General Rule | 284 |
|---|---|---|
| Section (b) | Exception | 284 |

**Article XXIX - RATIFICATION AND TERMINATION OF THIS AGREEMENT** 285

**Letter Regarding Mediation** 287

**Letter Regarding Special Permanent Layoff Pension** 288

**Memorandum of Understanding Regarding Job Opportunities** 289
Appendix B - Request for Employment 300
Bituminous Coal Operators' Association, Inc. Companies for Which BCOA was Authorized to Represent for the Negotiation of this Agreement 302

x

Contents

| | Page |
|---|---|
| **Pension Tables** | 303 |

**Appendix A - Part I**
Wage Rates Underground at Deep Mines 310

**Appendix A - Part II**
Wage Rates at Strip and Auger Mines 312

**Appendix A - Part III**
Wage Rates at Preparation Plants and Other Surface Facilities for Deep or Surface Mines 314

**Appendix B - Part I**
Job Classifications Underground at Deep Mines 316

**Appendix B - Part II**
Job Classifications at Strip and Auger Mines 323

**Appendix B - Part III**
Job Classifications at Preparation Plants and Other Surface Facilities for Deep or Surface Mines 328

**Appendix C**
Alternative Schedules 336

**Appendix D**
2007 New Inexperienced Miners' Optional Work Schedule 353

**Index** 357

xi

**BITUMINOUS COAL OPERATORS'
ASSOCIATION, INC.
COMPANIES FOR WHICH BCOA WAS
AUTHORIZED TO REPRESENT FOR THE
NEGOTIATION OF THIS AGREEMENT**

Central Ohio Coal Company
Consolidation Coal Company
Eighty-Four Mining Company
Helvetia Coal Company
Island Creek Coal Company
Keystone Coal Mining Corporation
Laurel Run Mining Company
McElroy Coal Company
Quarto Mining Company
Southern Ohio Coal Company
Windsor Coal Company

302

# EXHIBIT E

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Michael H. Holland, Michael W. Buckner, B.V. Hyler and Steven F. Schaab as Trustees of the United Mine Workers of America 1974 Pension Trust, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 07-cv-00490 (PLF/AK) |
| Freeman United Coal Mining Company, et al., | ) ) | |
| Defendants. | ) ) | |
| Freeman United Coal Mining Company, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 07-cv-01050 (PLF/AK) |
| v. | ) ) | |
| United Mine Workers of America, et al., | ) ) ) | |
| Defendants. | ) ) | |

### DECLARATION OF HOWARD C. SCHULZ

I, Howard C. Schulz, declare as follows:

1.    I am currently employed as General Manager – Monterey Coal Company, which is located near Carlinville, Illinois. I have held that position since 1996.

2.    As a result of my employment, I am knowledgeable of the history of Monterey's relationship with the United Mine Workers of America ("Union") prior to 1996, and I have personal knowledge of the relationship between Monterey and the Union since that date.

1

3.      Monterey mined coal in the Southern Illinois coal basin from 1970 until December 2007 at which time Monterey's mine was closed pursuant to Monterey's decision to exit the coal mining business.

4.      Monterey was a member of the Bituminous Coal Operators' Association ("BCOA") in 1978 when BCOA negotiated the National Bituminous Coal Wage Agreement of 1978. Monterey remained a member of BCOA during the terms of the National Bituminous Coal Wage Agreements of 1978, 1981, 1984, and 1988. Monterey withdrew from BCOA prior to negotiation of the National Bituminous Coal Wage Agreement of 1993.

5.      Subsequently, Monterey signed agreements with the Union in which it agreed to accept the terms of the National Bituminous Coal Wage Agreements of 1993, 1998, and 2002. Under the terms of the 2002 NBCWA, Monterey was not required to make contributions to the Union 1974 Pension Trust and Plan.

6.      Monterey's 2002 labor agreement with the Union terminated on December 31, 2006.

7.      Prior to termination of Monterey's 2002 labor agreement, Monterey decided to sell its mining operation and exit the coal industry. The Union was aware of Monterey's decision. Monterey's union-represented employees continued to work under the terms and conditions of the expired labor agreement during 2007, but Monterey and the Union did not engage in bargaining for a successor to their expired 2002 labor agreement.

8.      Having unsuccessfully sought a buyer for its mining operation through most of 2007, Monterey decided to close the mine and exit the coal business. As a result, Monterey closed its mine in December 2007.

.9.    Monterey has notified the Trustees of the United Mine Workers of America Health and Retirement Funds of the permanent closure of its mine.  Monterey intends to pay withdrawal liability in an amount and manner in conformance with the Multiemployer Pension Plan Amendments Act.

I declare under penalty of perjury that the foregoing is true and correct.

Howard C. Schulz

Dated: March *11*, 2008

3

# EXHIBIT F

### DECLARATION OF MICHAEL D. HALL

I, Michael D. Hall, do hereby state under oath as follows.

1.     I am the Director of Human Resources for Jim Walter Resources, Inc. (JWR). My office address is P.O. Box 133, Brookwood, Alabama 35444.

2.     I have held this position since May 2005. For the previous seven years my job title at JWR was General Manager, Labor Relations. My responsibilities include handling labor relations for JWR's UMWA-represented mining operations located in Brookwood, Alabama.

3.     On May 4, 2005, I called David Young, President of the Bituminous Coal Operators' Association, to inquire as to the process for JWR to rejoin the BCOA. JWR had previously been a member company, but had bargained independently with the UMWA since expiration of the 1981 National Bituminous Wage Agreement.

4.     Mr. Young told me that requests by companies interested in joining the BOCA are taken before the membership for discussion, and said that the next meeting was scheduled for May 20, 2005. He said that, in the meantime, he would attempt to have informal conversations with members and get feedback, and would call me back the following week.

5.     On May 16, 2005, I received a call from Morris Feibusch. Mr. Feibusch told me that JWR would need to provide some detailed information, and he explained what was needed. He also said that there could potentially be problems with the UMWA's willingness to go along with JWR joining the BCOA, and there was a need to understand the differences between the JWR/UMWA Contract and the BCOA/UMWA Contract.

6.     Mr. Feibusch requested that JWR provide the following information; (i) a copy of the current JWR-UMWA labor agreement, (ii) a summary of JWR's 2004 grievance activity,

(iii) JWR's 2004 production information, and (iv) comments regarding outstanding issues. I compiled the requested information and mailed it to Mr. Feibusch on May 27, 2005.

7.    At that time JWR employed more than one thousand (1,000) UMWA-represented miners and produced approximately 6.8 million tons of coal per year. It was the largest coal producer in Alabama, and, to the best of my knowledge was one of the ten largest unionized bituminous coal mining companies in the United States.

8.    On August 9, 2005, I contacted Mr. Feibusch for an update as to the status of our request. Mr. Feibusch told me that the BCOA had been spending a lot of time dealing with the Energy Bill legislation and expected that JWR's application for membership would be discussed the following week. He said that he should be able to get back with me during the next week or so.

9.    On August 16, 2005, Mr. Feibusch contacted me by phone. He informed me that JWR's request to rejoin had been declined by the BCOA. He stated that at this point in time the BCOA did not want to expand its membership. He did not elaborate on the reasons for refusing JWR's request to join. Mr. Feibusch said that he was sorry it had taken so long to get us an answer, but they had just spent so much time regarding the Energy Bill.

10.    The forgoing information is taken from my file notes which were made at the time in question.

I declare under penalty of perjury that the foregoing is true and correct.

*Michael D. Hall*

Michael D. Hall

Dated: March 7th, 2008

# EXHIBIT G

## Cecil E. Roberts

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

```
-------------------------------X
MICHAEL H. HOLLAND, MICHAEL W. )
BUCKNER, B.V. HYLER and STEVEN )
F. SCHAAB, AS TRUSTEES OF THE  )
UNITED MINE WORKERS OF AMERICA )
1974 PENSION FUND,             )
                               )
            Plaintiffs,        )
                               )
V.                             ) CASE No. 07-cv-00490
                               )
FREEMAN UNITED COAL MINING     )        (PLF/AK)
COMPANY, et al.,               )
                               )
            Defendants.        )
-------------------------------X
FREEMAN UNITED COAL MINING     )
COMPANY,                       )
                               )
            Plaintiffs,        )
                               )
V.                             ) CASE No. 07-cv-01050
                               )
UNITED MINE WORKERS OF AMERICA,)        (PLF/AK)
et al.,                        )
                               )
            Defendants.        ) PAGES 1 - 233
-------------------------------X
```

Videotaped Deposition of CECIL E. ROBERTS

Vienna, Virginia

Thursday, February 14, 2008

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO.  185588

cb3e669d-9301-4393-85d6-741056faf345

Cecil E. Roberts

Page 105

1    to take a break.

2                    THE VIDEOGRAPHER:   The time is 12:42

3    p.m.   Going off the record.

4                    (Thereupon, a recess was taken.)

5                    AFTERNOON SESSION

6                    THE VIDEOGRAPHER:   Time is 1:35 p.m.

7    On the record.

8    BY MR. OSSI:

9         Q.   Mr. Roberts, we've been discussing the

10   negotiations for the 2007 NBCWA and I wanted to ask

11   you:   At the same time you were having meetings and

12   negotiations regarding the 2007 NBCWA, did you have

13   meetings regarding negotiations with any other coal

14   company?

15        A.   Yes.

16        Q.   Who did you meet with?

17        A.   Peabody.

18        Q.   About how many times did you meet with

19   Peabody?

20        A.   Probably two times, or if that.

21        Q.   Do you recall the substance of your

22   discussions?

Cecil E. Roberts

Page 106

1       A.   General discussions about the new collective

2   bargaining agreement with Peabody.

3       Q.   When you say general discussions, do you

4   recall anything more specific that you discussed with

5   Peabody?

6       A.   We -- the representative from Peabody was

7   Jerry Nemec and both Mr. Nemec and myself agreed that

8   Article XX was pretty much off the table for

9   discussions because that would obviously be driven by

10  the BCOA negotiations.   Some very general discussions,

11  a lot of it being raised by Mr. Nemec about Peabody,

12  specific concerns that they had, but those negotiations

13  really did not go for any length of time.   Didn't

14  create anything of substance.

15      Q.   Did it create anything at all?

16              MR. MOONEY:   Objection to the form of

17  the question.

18              THE WITNESS:   Did it create anything.

19  I guess some goodwill.

20  BY MR. OSSI:

21      Q.   You mentioned that you met with Jerry Nemec at

22  Peabody.   Was there anybody else from Peabody that you

Cecil E. Roberts

Page 107

1    met with?

2        A.  I don't think so.

3        Q.  Was there anybody with you at the time you met

4    with Peabody?

5        A.  No.

6        Q.  Did you have any subsequent communications

7    with Mr. Nemec or anybody else at Peabody regarding

8    negotiations for a new collective -- new collective

9    bargaining agreement for Peabody?

10       A.  We eventually did after the signing of the

11   2007 contract.

12       Q.  After you signed the 2007 NBCWA contract, did

13   you try to get other companies to sign on to that

14   agreement?

15       A.  Yes.

16       Q.  Do you recall the first company that signed on

17   to the 2007 NBCWA?

18       A.  First company that signed on had signed the

19   me-too agreement.   So they automatically were bound.

20   It would have been Bob Murray's company.   I believe

21   it's Ohio Valley.

22       Q.  Could you just describe for me what you mean

Cecil E. Roberts

Page 134

1    an additional thousand dollars payable to each of the

2    employees that's clearly over and above the National

3    Agreement.    Then there are additional safety

4    inspections called for in this over and above the

5    national contract, which is also an economic item.

6         Q.   Thank you.   You can put that document aside.

7              Is that -- is that -- just going back to that

8    exhibit very quickly, is that what you would consider a

9    me-too agreement?

10        A.   No.

11        Q.   Do you have a term for that type of agreement?

12        A.   We've gone over this a couple of times.

13   What, this agreement?

14        Q.   Yes.

15        A.   Oh, I'm sorry.   This is the 2007 NBCWA plus.

16        Q.   You call it a plus agreement?

17        A.   Better than.

18        Q.   Okay.   Just so I have a way to understand --

19        A.   Sure.

20        Q.   -- the reference to these.

21                  (Thereupon, a document was marked for

22   identification Exhibit No. 10.)

EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSEPH S. CONNORS, Sr., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | C.A. No. 87-1210 SSH |
| ) | |
| ISLAND CREEK CORPORATION, et al., ) | |
| ) | |
| Defendants. ) | |
| JOSEPH S. CONNORS, Sr., et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | C.A. No. 87-1973 SSH |
| ) | |
| DRUMMOND COAL COMPANY, et al., ) | |
| ) | |
| Defendants. ) | |

## DECLARATION OF ROGER HAYNES

Roger Haynes makes the following Declaration in support of Plaintiffs' Opposition to Defendants' Motions for Summary Judgment in the above cases.

1.   My name is Roger Haynes.  My address is 9570 Longmont Drive, Houston, Texas 77063.

2.   From January 1, 1967, to May 1987, I was employed by Consolidation Coal Company.  I began there as the Manager of Personnel.  Over the years, my responsibilities expanded and my title was changed several times.  When I retired, I was the Vice President and General Manager of Human Resources.

PT-10381


DEPOSITION
EXHIBIT
#141
o vH
12/2847

described), the parties agreed to take away from the trustees the power to set benefits. In 1974 the parties bargained not only the employer contribution rate to the Funds but also the precise pension benefits that the 1950 and 1974 Funds would provide. In 1978 the parties also bargained the precise health benefits that the 1950 and 1974 Funds would provide. At all times since, both the contribution rates and the benefits have been set in the national collective bargaining between UMWA and BCOA. As was always true before, both the bargained rates and the bargained benefits have been uniform for all employers and for all participants.

12.    The method that UMWA and BCOA use to set the contribution rates is as follows. We reach agreement on the benefits that will be provided from each Fund. Actuaries calculate the expected cost of providing those benefits month by month during the anticipated term of the contract. Economists project the levels of coal production during those same periods and the percentage of total production that will be represented by employers that are parties either to the Wage Agreement or to wrap-around contracts. We then divide the expected cost of providing benefits from each Fund by the total projected production of contributory coal, to arrive at a single uniform rate of contributions for each Fund for each period during the term of the contract.

13.    We not only assume that all contributing employers -- whether BCOA members or parties to wrap-around agreements --

- 6 -

PT-10386

to the 1950 Pension Fund would continue only "until fully
funded." The UMWA refused to agree to that proposal. The UMWA
did not request any kind of special exception to the previously
bargained provisions for uniform contributions for the purpose
of being able to negotiate individual cut-offs of contributions
upon full funding, or for the purpose of being able to
negotiate special cut-rate contributions for certain employers
after full funding. If it had requested any such special
exception, BCOA would not have agreed to it, because such an
exception would have violated the fundamental premises of
uniformity on which the Funds had always operated.

        I declare under penalty of perjury that the foregoing
is true and correct.

                                    _____
                                    Roger Haynes

Dated: November _____, 1988

                            - 14 -                    PT-10394